Dear clerk

Please let the Judges KNow that I wrote Most of the traverse is Egregation with a small FlimSy seg. PeN. I did Not have Law Library Access, My Legal Property, Nor the AAGs ANswer.

I was Placed iN seg. on 3-6-16 out of pure retaliation by PrisoN officials. J. ThompSoN ANd S. SulliVaN would Not send out My TRO or motions For extension. I received Some of My legal material on 3-16-16 And a little More oN 3-21-16, Still Not what I Needed. I had the traverse 90% done and Nicely typed. The clo's Threw me iN seg And would Not get it for me. They even confiscated my TypeWritter ANd INfracted me for it even though it is MINe.

I put all of these Active INterference facts IN My AMended complaiNt; Ruth V. Glebe et al... 2:14-cv-01389-BHS-OWC. I did the Best Job I could do under This extreme Brutal retaliation. I am beiNg transferred To Callam-Bay on Monday. Please give this Traverse liberal INterpretation due to the extraordinary circumstances.
THANK you So much,

X _Matthew R. Ruth_ PRo se
mАtthew R. Ruth 879442   PRo Se

3-23-16

CASE 2:15-CV-00533-TSZ-JPD

District cort Judge  THOMAS S. ZILLY

Magistrate Judge   James P. DonoAue

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

# MATTHEW R. RUTH,

PETITIONER,

V.

PATRICK GLEBE,

RESPONDENT,

## TRAVERSE

Matthew R. Ruth
Pro se litigant
Doc # 879442

# TABLE OF CONTENTS

1. Opening Statement..................................1

2. THE EXHAUSTION DOCTRINE EMPHASIZES
   SUBSTANCE OVER FORM......................2

A. I PURSUED All STATE REMEDIES
   AND SATISFIED THE PRESENTATION Requirement.......3

       i. GROUND 2 - PUBLIC TRIAL...........4

   ii. GROUND 3 - DENIAL OF counsel AND FACTS
      FOR Right to Be Present Violation............7

 iii. Ground 6 - Right to be Present.............9

3. I AM ENTITLED TO AN EVIDENTIARY HEARING I REQUESTED
   ONE AT EVERY LEVEL AND PRESENTED OFF-THE-RECORD
   FACTS THAT THE JURY, TRIAL Judge, AND SOME THAT DEFENSE
   COUNSEL DID NOT HEAR AND THESE FACTS ENTITLE ME
   TO A NEW TRIAL OR A DISMISSAL OF All CHARGES....11

4. AAG KOSTIN DID NOT ADDRESS ANY OF THE MERITS
   OF MY ARGUMENTS INSTEAD HUGE CHUNKS OF THE
   LOWER COURTS OPINIONS ARE CITED AND KOSTIN
   GIVES A IS PERSONAL OPINION THAT THEY ARE
   NOT "CONTRARY TO" OR AN "UNREASONABLE
   DETERMINATION OF THE FACTS!..................22

### 1. OPENING STATEMENT

The purpose of the Traverse is merely to obtain an evidentiary hearing, not win the case outright. In making that determination this Court must accept as "true" the facts that I have alleged. This means that factual disputes must be resolved with my version of the facts, this Court cannot reject them, no matter how loudly AAG Kostin argues that they are "not Credible." Kostin's Answer fits into three sections: (1) Nonexhaustion Defense; (2) Evidentiary Hearing; and (3) The Merits.

(1) Nonexhaustion Defense: Kostin's defense is based on pure fantasy. The factual and legal bases is wrong. The entire Answer is like this.

(2) Evidentiary Hearing: Like the State Courts, Kostin, ignores the competent off-the-record evidence of facts. ECF 4, MEMORANDUM at 6, 9-10, 15-18, 45, 48-50, Exh. 1-5, 8, 11-13, 17-20. Then, Kostin incorrectly ask this Court to use the evidentiary hearing standard that applies to State inmates that did not request an evidentiary hearing at the State Appellate level. This is the wrong standard because I did request an evidentiary hearing. In fact I argued to the State Supreme Court that both the Division One Acting Chief Judge (ACJ) and the Supreme Court Deputy Commissioner (DC) unreasonably resolved factual disputes and made credibility determinations in favor of the State, which cannot be done without an evidentiray hearing. ECF 4 at Appendix E, RAP 13.5A at 2-4, 6 (issue 8), Appendix F, RAP 17.7.

(3) The Merits: Kostin does not make any arguments against my "Contrary to" and "Unreasonable determination" of the facts arguments. Instead, Kostin cites huge chunks of the State Court Opinions and merely gives his personal opinion that they are not "Contrary to" or an "objectively unreasonable" determination of the fact. He does not address my arguments, off-the-record facts that prove my claims, or Ground 7.

-1-

## 2. THE EXHAUSTION DOCTRINE EMPHASIZES SUBSTANCE OVER FORM

The applicant for a Federal Habeas "shall not be granted unless it APPEARS that.... the applicant has exhausted the remedies available in the Courts of the State." 28 U.S.C. § 2254 (b) (2012). The Exhaustion Doctrine of State Judicial remedies is discretionary not jurisdictional. Granberry v. Greer, 481 U.S. 129, 131 (1987). According to Justice O'Connor, the purpose of the Exhaustion Rule, is to alert the State Courts of the claims Federal Nature. Subsequently, giving the State Courts a full & fair opportunity to act on the claims before being presented in a Federal Habeas Petition. O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728 (1999).

Because the Federal Habeas forum must emphasize substance over form, the basic rule is that I must "present the substance of [my] claim to the State courts." Vasquez v. Hillery, 474 U.S. 254, 258 (1986). "[A] habeas petitioner need not spell out each syllable of his claim before the state courts in order to satisfy the exhaustion requirement of § 2254 (b). It suffices that the substantial equivalent of a petitioners federal habeas claim has been argued in the state proceedings." Spiegel v. Sandstrom, 637 F.2d 405, 407 (5th Cir. 1981); Kelly v. Small; 315 F.3d 1063, 1067 (9th Cir.), cert. denied, 538 U.S. 1042 (2003). No citation to the Federal Constitution is required if the Petitioner relied on pertinent Federal cases employing constitutional analysis. Casey v. Moor, 386 F.3d 896, 912 n.13 (9th Cir. 2004). I did cite to the pertinent Federal cases at every level. There are two questions that determine whether a claim is properly exhausted:

(1) Did I pursue the appropriate State Remedies?

(2) Did I satisfy the presentation requirement?

"YES" is the answer to both questions.

-2-

## A. I PURSUED ALL STATE REMEDIES AND SATISFIED THE PRESENTATION REQUIREMENT

AAG Kostin incorrectly asserted a nonexhaustion defense on Habeas ground 2, 3, and 6. Kostin states that I did not raise these grounds on direct review. However, Kostin conveniently fails to mention that I could not raise these Initial Collateral Review Issues (ICRI) on direct. Martinez v. Ryan, 132 S.Ct. 1309 (2012). When dealing with ICRI there are two available State remedies: (1) File a RAP 16.3(a), Personal restraint Petition (PrP), in the Court of Appeals; and (2) File a RAP 13.5A, Motion for Discretionary Review (MDR), in the State Supreme Court. In Washington unique procedural obstacles prevent off-the-record evidence of facts from being considered on Direct review. State v. McFarland, 127 Wn.2d 322 (1995). The grounds in question share an interconnected factual bases and could not be raised on direct review, which classifies them as ICRI. Id. I filed all grounds in both Courts.

In order to help this Court see that I did pursue the appropriate state remedies I must explain that the three grounds are interconnected by a four part factual bases: (1) Hallway Juan confrontation; (2) In-Chambers Juan closure; (3) Sole defense witnesses Direct Examination; (4) Jury Deliberations. The first part caused the second. The first and second combined to cause the third. The first three combined to cause the fourth.

From the above four part factual bases I raised: two public trial right violations (Habeas grounds 1, 2, & 6); Two right to be present violations (Habeas ground 6); and one denial of counsel violation (Habeas ground 3). Exh. 1, PrP at 4, 6, 9, 12-13; Exh. 2, Amended PrP at 1-3, 5, 7, 9, 11-15; Exh. 3, Pro Se Reply at 11-14, 17-20; Exh. 4, MDR at 2, 4-6, 12-13, 15-16, 18-19, 20 ("Federal Constitutional Right to Appear & Defend"); Exh. 5, Supplemental Brief RAP 1.2(a) at 2, 5, 14-17, 19-20; Exh. 6, Motion to Modify RAP 17.7 at 3, 5, 9-12, 15, 19-20. I pursued the appropriate State remedies.

The above exhibits and citation to page numbers proves that I presented all three grounds to both the Court of Appeals and State Supreme Court. Since I pursued the appropriate state court remedies the only question that remains for purposes of exhaustion is whether I presented the federal claims in a manner that adequately apprised the state courts of the federal nature of the claims and gave them "'an opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim.' Picard v. Connor, 404 U.S. 270, 277 (1971)." Baldwin v. Reese, 541 U.S. 27, 29 (2004).

Three prongs control the sufficiency of presentation: (1) Legal bases; (2) Factual Bases; and (3) Similarity between the claim stated in the State and Federal pleading. This court must focus on the substance of my issues argued in the State Courts to determine whether I satisfied the presentation requirement. Simply put the substance of my issues must alert the State Court to the federal nature of the claim. Id.; Vasquez v. Hillery, 474 U.S. 254, 258, 260 (1986). I fairly and fully alerted the State Courts to the Federal Nature of my claims.

### 1. GROUND 2 - PUBLIC TRIAL RIGHT VIOLATION

Although ~~the failure to cite to~~ *citation to* the Federal Constitution is not required to satisfy the Exhaustion Doctrine, Reutter v. Crandel, 109 F.3d 575, 577 (9th Cir. 1997); Dye v. Hofbauer, 546 U.S. 1, 3-4 (2005); Casey v. Moor, 386 F.3d 896, 912 n.13 (9th 2004), the Ninth Circuit has found that a prisoner's explicit reference to a Federal Constitutional Guarantee in State Court briefs "was sufficient to keep the issue alive" for exhaustion purposes. Jones v. Smith, 231 F.3d 1227, 1231 (9th Cir. 2001). In my PRP and MDR I cited to specific Constitutional Guarantees and relied on pertinent Federal cases employing Constitutional analysis.

-4-

"The issue for this Court to decide is whether the Chambers conference violated the Open Courtroom guarantee of the State and Federal Constitution." Exh. 2, AMENDED PRP at 5. *See Jones v. Smith, 231 F.3d 1227, 1231 (9th. Cir. 2001).*

Habeas Ground 2 is a public trial right claim. AAG Kostin incorrectly characterizes ground 2 as a Juan violation based on the Jury Deliberation facts (part 4). See Answer at 20. I never raised a Juan violation from the part 4 factual bases. I clearly raised the Juan violation under parts 1 & 2, the hallway confrontation and In-Chambers Juan hearing. AAG Kostin makes the ridiculous argument that ground 2 is not exhausted because I did not raise it in the PRP or the MDR. This is crazy, I never raised a Juan issue from the part 4 facts, so of course I did not raise it in any court.

However, Ground 2 is really a Public trial right claim, and I did raise the public trial right claim in every State Court. Exh. 1 - 7. Mr. Kostin is arguing that I did not exhaust an issue that I did not raise. This means that Kostin did not assert a nonexhaustion defense against the real ground 2. This Court cannot now Sua Sponte assert the defense for Mr. Kostin. Trest v. Cain, 522 U.S. 87, 139 L.Ed. 2d 444, 118 S.Ct. 478 (1997).

More shocking is that Habeas Ground 1 is part of Ground 2, and AAG Kostin concedes that Ground 1 is exhausted. ECF 4, MEMORANDUM at 12, 14, 18-19. How can AAG Kostin concede that Ground One is exhausted, and then allege that Ground Two is not, when Ground Two is merely an extension of Ground One? ECF 4, Memorandum at 12, 14, 18-19, and 21.

Next, Kostin completely contradicts himself on pages 20 and 24 of the Answer:

"The Supreme Court DID NOT address the claim as a JUAN violation in its ruling. Exhibit 22, at 4." Answer at 20.

"Since the State Supreme Court addressed the Juan violation claim, this claim would likely be considered properly exhausted. Exhibit 22, at 3-4." Answer at 24.

-5-

which only proves the federal constitutional violation at every level. Did I argue state constitutional violations And that the state constitution is more protective? Yes I did). However there is No authority that supports that I am barred from Raising both Federal And state constitutional claims. AAG Kostin's entire answer is like the exhaustion section, off base, Not true, and he asked for three extensions for this. It is disrespectful To both this court and me.

Through out my PRP And MDR I argued that both Public Trial Right violations are structural error. I Relied on U.S. Supreme court precedent to make this Argument. WASHINGTON State has Ruled IN <u>IN RE PERS. RESTRAINT OF</u> <u>Coggin</u>, 182 WN.2d 115, 120-121, 340 P.3d 810 (2014), that under The Washington State constitution a petitioner on collateral attack must prove prejudice. IN MY Amended PRP I cited To <u>waller</u>, 467 u.s. at 49, <u>u.s. v. marcus</u>, 130 S.ct. 2159, 2165 (2010), and <u>u.s. v. withers</u>, 638 F.3d 1055, 1063 (9th cir. 2011) To Support that both Public Trial Right violations are structural under the federal constitution. <u>Exhibit 2</u> at 12-15. IN the Supreme court I cited To "the u.s. Supreme court decided they do, <u>u.s. v. Gonzalez-Lopez</u>, 548 u.s. 140, 149 (2006)." <u>Exhibit 4</u> at 18-19. The State courts were Alerted To the federal nature of my claims. Requiring me To Prove Prejudice i's "Contrary To" clearly established Federal Law. Both courts Required prejudice. In my Pro se PRP Reply I cited To <u>Richmond</u>, <u>Presley</u>, and <u>Press-II</u>, <u>Exhibit 3</u> at 13-14. Pursuant to the Ninth circuit precedent <u>Kelly v. small</u>, 315 F.3d 1063, 1066 (9th cir. 2003), this is enough to satisfy the exhaustion requirement. IN The Supplemental MDR I challenged that the AG's Ruling Denying Review of my PRP And the state Supreme courts application of the u.s. Supreme court's Experience And Logic test is contrary To Federal Law. I gave a thorough analysis of <u>Globe</u>, <u>Richmond</u>, and <u>Press</u>. <u>Exhibit 5</u> at 7. I even argued that my case is similar To <u>Rovinsky v. McKaskle</u>, 722 F.2d 197, 198 (5th cir. 1984) <u>Exhibit 5</u> at 5, 16-17. No citation To Federal constitution is required since I relied on pertinent

pertinent facts to this grounds. Casey V. Moore,

386 F.3d 896, 912 N.13 (9th. 2004); DYE V. Hofbauer, 546 U.S. 1, 3-4 (2005).

The State addressed my claims as Federal constitutional Violations In the Response to PRP. "The Sixth Amendment to the United states constitution... guarantee criminal defendants the Right to a public trial." EXHIBIT 8 at 22-24. The appellate court did the Same. EXHIBIT 7 at 2. "A state Courts actual consideration of a claim satisfies exhaustion." Sandstrom V. Butterworth, 738 F.3d 1200, 1206 (11th cir. 1984). I believe that this Court Can see that I did Exhaust Both Public Trial Right Violations.

## III. GROUND 3 - DENIAL OF COUNSEL AND FACTS FOR Right to be Present Violation

This ground arises from Part 4 Factual bases. (4) Jury deliberations.

This Factual bases supports a complete denial of counsel CIAIM AND a Right to be Present Violation. The state addressed it as Such. Exhibit 8 at 21. The court of Appeals addressed it as Such. Exhibit 7 at 2 FN1. The Court of Appeals Required me to Prove Prejudice to the denial of counsel claim Contrary to Federal Law. I Presented That very Footnote in The MDR to the state supreme court. Exhibit 4 at 4. I argued that I was denied counsel at a critical stage and the error is structural. Exhibit 4 at 2,16,19-20. The Supreme court ignored the denial of counsel issue, However, "Whether the exhaustion requirement has been satisfied cannot turn on whether the state appellate court choose to ignore in its opinion a Federal constitutional claim..." Smith V. Digmon, 434 U.S. 332, 333 (1978). Since the court of appeals did not Address the merits but instead Rejected it on Procedural grounds Both claims are exhausted. Coleman V. Thompson, 501 U.S. 722, 731 (1991). AAG Kostin makes zero Sense when arguing:

"He did not raise the claim in his personal restraint petition and presented the claim as a federal constitutional violation in his supplemental brief filed in the Supreme Court. Exhibit 19, at 20. The claim is not properly exhausted since he failed to present it at every level of state courts' review." <u>Answer</u> at 20.

Contrary to AAG Kostin's warped perception of the record, I did raise

this issue in the initial PrP, amended PrP, Pro Se reply, and RAP 13.5A (MDR)

filed in Division one and the State Supreme Court:

"This occurrence not only implicates Mr. Ruth's constitutional right to due
process of law, but also his constitutional right to counsel. (United States
Constitution, Amendments 6 and 14 and the Washington Constitution, Article
I, 22) .... Petitioner maintains that both he and the public have the right
to be present when the Court is communicating substantive matters with the
jury. CrR 6.15(f) requires the Court to notify the parties of the contents
of the questions and provide them an opportunity to comment upon an
appropriate response .... Mr. Ruth maintains that the error is structural
and requires reversal .... In French v. Jones, 332 F.3d 430, 436 (C.A.6,
2003), the Court held that ... violated the defendant's Sixth Amendment rights
...." Exhibit 1, Initial PRP at 12 - 13.

"Additionally, there is a due process right for counsel and the defendant
to be present when consideration is given to inquires made by a deliberating
jury. See Frantz v. Hazey, 533 F.3d 724, 743 (9th Cir.2008) .... Mr. Ruth
contends that Judge Hulbert violated his RIGHT TO BE PRESENT and his RIGHT
to COUNSEL when he failed to notify him of the note or allow him to suggest
input through his counsel of the proper response .... Accordingly, he requests
a reference hearing pursuant to RAP 16.12." Exhibit 2, AMENDED PRP at 12.

"'Any statements from the trial judge - no matter how innocuous - are likely
to have some impact ... even if the response is not improper, we recognize
that some influence on the jury's deliberation is difficult to avoid when
the jury is troubled enough to seek advice.... Counsel is most acutely needed
before a decision about how to respond to the jury is made because it is
the substance of the response, or decision whether to respond substantively
or not, that is crucial ... The missed opportunity to influence the trial
courts response to a jury question. That is the significant moment.' Musladin
v. Lamarque, 555 F.3d 830, 841-43 (9th.Cir.2009) .... J. Stephens pointed
out in Sublett that this rule mirrors the constitutional right it protects.
This means unlike the Bone-club rule, when CrR 6.15(f)(1) is violated, so
is the Constitutional Rights it mirrors." Exhibit 3, Pro Se Reply at 19-20.

"Mr. Ruth was completely denied counsel at a critical stage of trial and
Musladin v. Lamarque, 555 F.3d 830, 841-43 (9th.Cir.2009), holds that this
same error is structural on Collateral Review .... The A.C.J. then distorts
Mr. Ruth's argument: 'Ruth asserts that the trial court violated his right
to be present and his right to counsel by failing to hold a hearing before
responding to the jury question. Because Ruth fails to identify any resulting
prejudice, he cannot establish a ground for relief.' n.1. This is contrary
to Mr. Ruth's argument see Pro se Reply brief pg. 19-20." Exhibit 4, MDR
RAP 13.5A at 2-4, 6 (Issue 10), 19-20.

This Court can clearly see that AAG Kostin is wrong I did raise ground 3 in the PRP and MDR. Most contrary to clearly established Federal Law, the Court of Appeals rejected my denial of counsel claim because I failed to prove prejudice. Exhibit 7, Division One Opinion at 2, f.n. 1. I notified the State Supreme Court that the Court of Appeals applied the harmless error analysis contrary to federal law. The State Supreme Court completely ignored me. The State Supreme court addressed the Right to be present and public trial right claim from the Jury Deliberation factual bases (Part 4). Exh. 9, Supreme Court Order at 4, f.n. 2.

### iii. GROUND 6 - RIGHT TO BE PRESENT - WAS RAISED AT EVERY LEVEL

"In the personal restraint petition, he did not present the claim as a federal constitutional violation. Exhibit 12, at 9-10, 12. He did not present the claim in his state supreme court pleadings. The claim is not properly exhausted because he did not present it to the state highest court." Answer at 20.

During the time frame the initial PRP was filed (Exh. 1) it was impossible to raise a public trial right claim without also raising a right to be present violation. "In Sadler the Court of Appeals linked the right of the defendant to be present at critical phases of the trial with the public's right to an open courtroom. Sadler, 147 Wash.App. at 114." Exh. 1, Initial PRP at 9, F.N. 2. In the initial PRP I raised the Right to be present and Public Trial Right claim under the Due Process clause and cited to the "United States Constitution, Amendment 6 and 14 ..." Exh. 1, Initial PRP at 12. "If, as stated in Sadler, Supra., the defendant's RIGHT TO BE PRESENT at a critical stage of the proceeding is linked to the public's right to an open court, the answer to the jury's question should have been given in open court." Exh. 1 at 14.

-9-

My PrP was placed on stay pending the final resolution of Sublett. In Sublett the State Supreme Court rejected the Sadler analysis and adopted the U.S. Supreme Court's Experience and logic test. I was granted permission to file an amended PRP, that was labeled "Petitioner's Reply Memorandum," simply because I never filed a reply to the initial PRP response. Exh. 2, Amended PRP. In the Amended PRP counsel Mark D. Mestel argued that I had a Federal Constitutional right to be present at both the Juan closure and during the Judge's response to the jury inquiry. Exh. 2, AMENDED PRP at 5-9, 12.

"The State and federal constitution guarantee a defendant the 'fundamental right to be present at all critical stages of a trial.' State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011); See also United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); United States Constitution Amendment VI ..." Exh. 2, Amended PRP at 7.

"Additionally, there is a due process right for counsel and the defendant to be present when consideration is given to inquiries made by a deliberating jury. see Frantz v. Hazey, 533 F.3d 724, 743 (9th Cir.2008) .... Mr. Ruth contends that Judge Hulbert violated his right to be present and his right to counsel when he failed to notify him of the note or to allow him to suggest input through his counsel of the proper response." Exh. 2, Amended at 12.

I clearly presented the claim as a federal constitutional violation in the PRP. I did make State Constitutional arguments. I argued that the Right to be present is more protective in Washington State and not only attaches when there is any chance that my rights may be implicated, but also that the violation is structural. In the RAP 13.5A, I labeled the right to be present as the right to "Appear and Defend." I clearly alerted the State Supreme Court that the right to Appear and defend was the right to be present under the federal constitution. "Mr. Ruth had a right under the State & Federal Constitution to 'Appear & Defend' during the In-Chamber hearing..." Exh. 4, RAP 13.5A MDR at 20. I used this term on pages 19-20 against the jury deliberation facts:

1. creates a significant meaning, that triggers the Right to counsel, Public Trial, and Appear & Defend safeguards.... when CrR 6.15 (F)(1) is violate), so are the constitutional Rights It mirrors & protects.... and the only safeguard for the Right to counsel, "Appear & Defend," and Fair Trial Rights, even if only In the written Record." Exhibit 4 at 19-20.

In conclusion I believe this court can clearly see that I Fully and fairly exhausted grounds 2, 3, and 6. I ask that this court reject the AAG's exhaustion defense and rule that My grounds are properly exhausted.

5. I AM ENTITLED TO AN EVIDENTIARY HEARING I REQUESTED ONE AT EVERY LEVEL AND PRESENTED OFF-THE-RECORD FACTS THAT THE JURY NEVER HEARD; THE TRIAL JUDGE NEVER HEARD; AND SOME THAT DEFENSE COUNSEL DID NOT HEAR AND THESE FACTS ENTITLE ME TO A DISMISSAL OR A NEW TRIAL

Kostin omitted entirely the most important standard of Review to be considered At this juncture in the litigation the standard this court MUST apply in deciding whether or not to grant me an evidentiary Hearing on one or more of the Habeas corpus claims. I am entitled to an evidentiary Hearing (EH) where the Petitioner establishes a colorable claim for relief, and where the Petitioner has never been accorded a state or federal hearing on his claim. EARP v. ORONSKI, 431 F.3d 1158, 1167 (9th cir. 2005).

In stating a colorable claim, a Petitioner is merely required to allege Specific Facts which, if true, would entitle him to relief, I did. No AEDPA deference is due in a case like Mine where the state has Made an unreasonable determination of the Facts, and: where a state court Makes evidentiary findings without holding a hearing and giving Petitioner an opportunity to present evidence, such findings clearly result in an unreasonable determination of the facts. Taylor v. Maddox, 366 F.3d 992, 1001 (9th cir. 2004)

In sum, an EH is required under the AEDPA AND THE NINTH Circuit will Remand for a Hearing if the district court rules without granting one where the Petitioner establishes a colorable claim for relief and has never been accorded a state or federal hearing on his claim. EARP supra, at 1167 In the Pro Se Reply I argued " the professional Misconduct involved) In the In-chambers Proceeding Prevented MR. Ruth From Developing

CRITICAL issues... process the jury, and cloaked MR. Adcock's misconduct.... An evidentiary hearing may be ordered for the witnesses in the exhibits." EXHIBIT 3 at 19. I ask this court to please incorporate and read the fact section from EXHIBIT 3, into this section. EXHIBIT 3 at 2-11. It breaks down the off-the-record facts of evidence and proves I am entitled to an EVIDENTIARY HEARING. The court of appeals ignored my evidence and EH request. All the original exhibits and appendix are in EXHIBIT 3.

I challenged the court of appeals opinion to the state supreme court.
" MR. Ruth did make a threshold showing on collateral review and is entitled to a full hearing on the merits, or a reference hearing. The A.C.J. erroneously resolved material factual disputes and made credibility determinations, contrary to the record and the EVIDENCE OF OFF THE RECORD FACTS." EXHIBIT 4 at 2.
" THE decision erroneously resolved credibility issues and material disputed facts by completely ignoring trial counsel MARK STEPHENS sworn declaration; on the record objections to DPA Adcock's version of what was discussed in chambers and the context of the perjury threats....
"The A.C.J. completely ignored all of the "off the record" evidence of facts gathered from private investigator Micheal Powers. The evidence consist of interviews with members of the public who witnessed DPA Adcock ASSAULT & threaten MS. Woerner for refusing to lie for the state; she wanted to testify truthfully; and an interview with MS. Woerner proves her intended testimony was not materially contrary to her original statement.
" The A.C.J. also ignored sworn AFFIDAVITS from public witnesses who observed the same confrontation. The decision restrains MR. Ruth from receiving a reference hearing, or the appropriate remedy for the violation, which is a complete dismissal with prejudice." EXHIBIT 4 at 3. Also see issue 8 on page 6.

I ask this court to please incorporate and read the statement of the case in EXHIBIT 4, pages 7-11. MS. Woerner's police statement and interview from western state hospital is added and very material. Pages 10-11 even prove DPA Adcock committed perjury. Please read the statement of case It will prove I am entitled to an EH. The jury never heard MS. Woerner's version of events. The jury verdict cannot be trusted, the jury did not hear MR. Stephens declaration either that is critical, EXHIBIT 4 at
15. The in-chamber hearing prevented these facts from being developed.

I also ask that this court please read page 17 of Exhibit 4, It
shows why Ms. Woerner, Mr. Stroud I, Mr. Slothaw, and Stephens testimony is
so important for a fair and accurate verdict. This evidence entitles me
to an EH for the public trial Right violations, the Juan violation of the
Right to be present violations. In the conclusion of the MDR I asked
the supreme court to "Remand for a Reference Hearing". Exhibit 4 at 20

in the supplemental brief filed in the state supreme court I argued
that "In slert the majority stated that 'the experience and logic test is also
a useful analytical tool for determining whether a discussion may be held
in chambers." No. 87844-7/11 FN4. How can that be true when the ACJ completly
ignored evidence provided by Mr. Ruth; sworn statement of counsel Stephens; the
affidavits & private investigation Interviews of Ms. Woerner, matthew R. Ruth, and
Henry Slothaw, Donnie G. Poole, matthew R. Ruth, and Jury Member
Leslie Winnie?? Exhibit 5 at 3 Issue 2

Please read the supplemental brief and exhibits it really breaks down the
facts that have been ignored. Exhibits 5 at 4-5, 8, 9-12, 14-15, 19 and Exhibit
9 Interview of lesley winney Jury member. what is critical about the Exhibits in
Exhibit 5 is that # 9 is the winney interview, Mr. winney states that
the Jury was going to find me innocent but for two Reasons. The First
means this court should grant an evidentiary Hearing on my deficient
Presumption of Innocence Instruction issue, Habeas ground Four.
The Jury thought that I was guilty by Law P+ I admitted to Shooting
the Alleged victims, This is because the deficient Presumption of
Innocence Instruction creates a Presumption of Guilt totally erasing
the mens rea of assault one. The Actus Reus, I mean the physical
element, simple the shooting becomes all the evidence necessary to
find me guilty, the Jury does not even consider the mental element.
Mr. winney admits this in his interview. Once I admit to shooting I am guilty.

Second, winney stated that the Jury was provided information that
I shot Drew Eden from a far distance in the back while he was
trying to climb the fence. This is crazy because that was not
in the trial testimony and that brings P.I. Gary may into

—13—

The following. In Exhibit 5 you will find Exhibit 10, P.I. Gary Way's interview of alleged victim Drew Eden. Gary Way did not testify so the jury, nor trial judge heard this critical evidence. Drew Eden told Gary Way that "He ran out behind Renee [Woerner]. He thought he was still in the small hallway area when he was shot." The hallway leads out of my bedroom. In trial Eden testified that he grabbed Renee Woerner in the hallway as she was trying to leave and he threw her into me. Custer and Eden both testified I was screaming for Woerner to leave the whole time. If the jury would have heard Mr. Way's testimony they would have been clear that I shot Eden in the trailer chasing after Woerner, not while climbing over a fence at a far distance as Mr. Winney stated. The jury would have found me "not guilty" under the "Act on Appearance" self-defense instruction.

Another shocker is DPA Adcock kept saying the bullets were permanently stuck in Custer and Eden. "Both victims still have bullets in their bodies, they are going to have them there forever as a reminder of what the defendant did to them that day." 2-4-05 VRP 15.

In the Way interview Eden stated that the bullets were left in because he had no medical insurance. This means the bullets are not life threatening, and that is why DPA Adcock did not have any medical experts or the attending doctors testify. The only fact that elevated the assault from second to first is DPA Adcock's lies that the bullets were permanent. That is the difference between great bodily harm and substantial bodily harm, first versus second degree. Please read Habeas ground 5. Also note that there is much more evidence like this, but WDOC will not let me have it. I have filed a civil suit against them for this active interference with my right to access the courts. Ruth v. Glebe, et al... 2:14-cv-01388-BHS-DWC.

Also see "Exhibit 5 is Exhibit Eleven another Gary Way interview not given to my attorney until 12/10/04. I never spoke to Gary Way and only recently obtained this material. This second interview flies in the face of

the trial Judge Heights Findings of Fact and conclusion of law filed on the CrR 3.5 hearing to suppress Jeremiah Sheridians testimony. If the Judge would have had these witnesses he would have suppressed sheridians testimony because It Proves He targeted me. Again due to active interference from WDOC I did not get this evidence in time to raise this issue in the PRP, only to submit it to the supreme court. It Proves that I am Innocent. This court should grant me an evidentiary Hearing.

The most critical document/Motion for this court to read is Exhibit 6 the Motion to Modify the state supreme court deputy commissioner, RaP 17.7. "MR. Ruth objects to the Deputy commissioner's version of the facts because they are contrary to the Record and Evidence of off the Record facts submitted as Exhibits In the PRP & RaP 13.5A..." Exhibit 6 at 1. I Prove how each Portion of the deputy commissioner's Ruling denying Review is contrary to the Evidence and an unreasonable determination of the facts. I Prove he lies and makes credibility determinations and resolves factual disputes In Favor of the state without an evidentiary hearing. Please Read this Motion and Incorporate this Motion Into this Argument. on Page 3 the deputy commissioner is quoted lying claiming that Defense counsel merely stated that MS. Woerner "told him the Prosecutor had warned her of the consequences of committing Perjury." Exhibit 6 at 3. that is not true defense counsel stated that "MS. Woerner appeared agitated, emotionally erratic, and extremely upset. She Indicated to me MR. Adcock had threatened to charge her with Perjury if she testified! Exhibit 6 at 4. "why is everyone ignoring what happened? This is more than enough for a reference hearing! Exhibit 6 at 4.

IN PAGE 2 ~ EXHIBIT 6 ~ I cite to the Trial Record where the State was allowed to elicit adverse portions of Ms. woerner's Police Statement And Mr. Ruth was not allowed to cross-examine Ms. woerner or rebut the adverse statements on Direct-examination of Mr. Ruth the only Defense witness. Exhibit 6 at 3. On Page 5 I show that when I tried to make record of the threats from DPA Adcock to woerner the Judge threatened to Put Me IN Restraints, IN front of the Jury. VRP 266-67. Exhibit 6 at 5. On pages 6-9 I Prove that Ms. Woerner's Police Statement And intended testimony was the only evidence corroborating My defense. Please Read this Please, Exhibit 6 at 6-9. This Flies right in the Face of the Deputy Commissioner's Fact Finding that "Ms. woerner had Previously given a sworn statement to Police And Prosecutor corroborating the victim's account of events." Exhibit 6 at 6.

This Resolves the Facts in the States favor because she corroborated My version of events, too, and disputed the alleged victims in Material Portions outlined in Pages 6-9, that if the Jury would have heard would have resulted in Me being found Not guilty. The state had the burden to call its witness. DPA Adcock's Juan violation And Judge Hulbert's Public Trial Right violations and Right to be Present violations Do Not Relieve the State of it's Burden to Present its witness. Please give Me an Evidentiary Hearing. think of this, the alleged victims corroborated each other, woerner's corroboration of Same of their version was No big deal. However, No witness but her corroborated My version And disputed theirs (sister of Eden) so

It is essential and prejudicial for the jury not to hear from Ms. Woerner and the witnesses to DPA Adcock's threats. EXHIBIT 6 at 13-14. As I argued in the Habeas DPA Adcock's vile tactic will prevent Ms. Woerner's testimony from ever coming to light "because a good defense attorney will not take the risk of calling her. Lopez v. U.S., at 441. Defense counsel Stephens did not call Ms. Woerner for this reason, he feared she would be impeached." ECF 4, memorandum at 27. Judge Hulbert had a duty to interview Ms. Woerner and all other witnesses to the threats in open court with all parties present. "The Judge in Juan denied the government's motion to introduce as evidence C.J.'s (Juan's wife) earlier statements to the police. Juan at 1140." ECF 4, memorandum, at 9. Judge Hulbert should have protected Woerner from the threats the same way. This process is not fair nor accurate to develop truthful and credible facts and this court should fix that by granting me an EH.

The Deputy Commissioner conceded that "a hearing to explore the matter" would have been open. ECF 4 memorandum, at 10. However, the D.C. made a finding of fact that because defense counsel did not request such a hearing I am not entitled to relief on the Juan claim and public trial right claims. ECF 4 memorandum at 10. The evidence is more in favor that counsel did request a hearing to explore the matter, he went to the Judge after Woerner told him Adcock threatened her, and the Judge called Adcock and Stephens into the secret hearing. This fact cannot be made without an EH to interview Stephens, Adcock, and Judge Hulbert. I gave three reasons in Exhibit 15-16 that support that defense counsel did feel Adcock's threats interfered with Woerner's testimony, like he advised that she be appointed counsel. Exhibit 6 at 15-16; ECF 4, memorandum at 10-11. The Juan analysis does not require counsel to feel anyway before relief can be granted. I satisfied the Juan test but the D.C. made credibility determinations and resolved disputed facts against me without a proper Evidentiary Hearing. These finding of fact are not entitled to a presumption of correctness. Taylor, 366 F.3d at 1001.

that prove I am entitled to an evidentiary hearing. IN Ground one I lay the facts out in a way that describes from all the witnesses perspectives, the Hallway confrontation and In-chambers closure incident. ECF 4, memorandum

11 DPA Adcock committed a *Juan* violation on Mr. Poole Jr. and never disclosed the interview to the defense. (Exh. "5" Y. S. Powers). MR. Ruth was not granted an evidentiary hearing. Where facts outside of the trial record and especially where the facts are disputed and/or involve credibility determinations the need for a hearing is at it's zenith. *Frazer v. U.S.*, 18 F.3d 778, 784 (4th cir. 1994) ("because all of these factual allegations where outside the record, this claim should have signaled the need for an evidentiary hearing.") at 8. "Judge Hulbert assisted DPA Adcock execute his deliberate intention of distorting the fact finding process." *U.S. v. Quin*, 728 F.3d 243, 258 (C.A.3 (Pa) 2013)" ECF 4, memorandum ECF 4, At 9.

Please look at page 9 I challenge the DC's erroneous fact finding so on the following pages: 9-11, 16, 20-24, 31-32, 36-37, 40, 44-47 48-50, ECF 4. In Ground one pages 9-11 are very important because the DC made two findings of fact 1.) woerner told defense counsel Adcock "warned her" and 2.) defense counsel confirmed to the court the events as related by the prosecutor. "Nothing could be further from the truth," ECF 4 at 9. woerner told defense counsel Adcock threatened her, not warned. Defense counsel disputed Adcock's version. RP 180, ECF 4 at 10. Henry Slothaug remebers DPA Adcock dragging woerner down the hallway against her will. "Ms. woerner told P.I. Powers that DPA Adcock called her a stupid bitch several times, and left bruises on her arm... Mr. Stroud I & Mr. Slothaug stated that Ms. woerner did not want to lie, only tell the truth." ECF 4 at 10,

pages 14-18 are critical. It breaks down why even the admissible portions of Ms. woerners police statement support Ruth's self defense claim and dispute the alleged victims substantively. Please read pages 14-18 in *ECF 4*, memorandum.

The DC made a fact finding that the JUAN incident was similar in nature to a decision to call a witness. This is crazy. ECF 4 at 20. How did the DC make that factual determination? I am entitled to a fact-finding hearing to determine the real similar in nature of the incident using all the off-the-record evidence of facts. ECF 4 at 22-24. Please read my 5-part conclusion on page 24. See also ECF 4 at 32.

Please read page 40, Ground Four, the faulty presumption of innocence and Prosecutorial Misconduct issue. The Affidavit of Matthew R. Stroud I and interview of Lesly Winney proves that I should be granted an evidentiary hearing on this issue. The jury believes it I admitted to shooting I was guilty just for that. ECF 4 at 40. A juror told Mr. Stroud I that "we all believed Matt but was told if there was any doubt we had to find him guilty." ECF 4 at 40.

I should be granted an evidentiary hearing for Ground Four section B, pages 42 - 44. The juror, nor Appeals court had the benefit of hearing Ms. Woerner's police statement "12-11-03, police statement, Woerner told Adcock that she left to California with Ruth because she 'didn't want to get shot by drug dealers. And cuz [Custer] said 'no cops' when he left. It scared me.' see ground one at 15." ECF 4 at 43.

I should be granted an evidentiary hearing on Ground 4, C, pages 44-45, because Jeremy Custer committed perjury in trial and the jury, judge, nor defense counsel knew this. P.I. Powers discovered this when he interviewed Custer. Custer is now admitted the incident was over stolen drugs and that Mr. Ruth was telling the truth in trial. ECF 4 at 45. The jury also did not know that Custer had 2-liters of Alcohol in him, stated originally that he didn't know what the shooting was about, and that I only shot at him three times not four.

I should be granted an evidentiary hearing on Ground 4, section D, pages 46-47, because the jury, judge, nor defense counsel heard of Donnie G. Poole JR. interview with DPA Adcock. Mr. Poole told Adcock that custer is a drug dealer who carried guns and threatened him not to talk to the police. ECF 4 at 47.

Poole failed to disclose it. After Custer threatened me with a gun and Adcock got mad and yelled at him. ECF4 at 47. DPA Adcock never disclosed this interview to the defense, nor did he call Mr. Poole Jr. as a witness. However, during my **CROSS**-Examination Adcock asked wether I told Mr. Poole Jr. that I just "Freaked out, got wierded out, and Shot? RP 279. I denied making the statement, because he took it out of context and omitted, "After Custer threatened me with a gun." Adcock did not present Poole Jr. to perfect the impeachment and insinuated that I confessed guilt to Poole Jr. Adcock repeated this theme in closing arguments. ECF4 at 46. Remember the to the unconstitutional presumption of innocence instruction and Adcocks improper closing arguments fashioned from the "Castle" instruction language. The juror already that I could legally be found guilty, it was their duty, if I admit to shooting. Imagine what they thought when they heard that I allegedly told a friend I just freaked out for no reason and started shooting? The jury, judge, Nor defense counsel heard Donnie G. Poole Jr. statement, Nor did the court of appeals. I would have been found Not guilty if Adcock would have produced Poole. Does this court see the pattern? All favorable evidence to my defense was threatened or hidden by DPA Adcock and never made it to trial. Woerner, Poole, Doctors to read the medical reports, the blanket, the bullet, the picture of the paneling that proves I could Not have shot at Custer's head.

I am entitled to an evendentiary hearing on Ground five the 4-part ineffective assistance of counsel claim. No medical experts testified, Nor read the reports. The jury did Not know the bullets were Not permanent, Nor Custer tried to remove the bullets himself with tweezers, and custer was on 2 liters of alcohol and drug abuse was marked. ECF4 at 48. This evidence is crucial for a defense attorney to request a lesser included. Mr. Stephans should have had Kenneth Muscatel testify at the 3.5 hearing that proves Mr. Ruth was Not competent when sheridan victimized Ruth. This court should grant an evidentiary hearing and consider the Gary Way

-20-

EVIDENCE (I of multiple...) ..... S, consider the medication Ruth was on from western state, ECF4 at 49, and Muscatell's Psychological Report, Exhibit 10.

An Evidentiary Hearing should be granted because Exhibit 29 in Trial was a Picture of a hole taken after the crime scene was contaminated. It was Not By My HeadBoard And was used to tell the Jury I shot at custer's Head. ECF4 at 49-50. Stephens did Not object. A Picture exist that shows a bullet hole By the Paneling in the Door. It Proves I could Not have shot at custer's Head and Bolsters My testimony of self-defense. ECF4 at 49-50. A Picture of a small Red Stain was admitted from a Blanket that was Not collected. The state used it to impeach me And I was Not allowed to test the Red Stain. Stephens did Not object or defend me. Please Read pages 49-50, of ECF4.

Police Statements exist of a Sheriff who had to tackle custer at the crime scene And Handcuff him and force him to the Hospital. At the Hospital custer was freaking out so Much the officer had to keep talking him and Putting him In Restraints. this supports My self-defense testimony that custer was high on Meth, this was Not disclosed to the defense, the Sheriff did Not testify, and WDOC will Not Let me have these Reports. they Retest them as inmate-to inmate correspondence And Security threat. the Same applies To the Bullet picture by the Door. To have filed a Law suit over this Active Interference. I ask this Court to consider this. Kristine A. Kain has My entire Discovery. The Jury did Not Know that Eden who was shot once was given Narcotics, But custer shot 3-times, was given IB Profen only. I Know it is Because He admitted Drug use to the Attending Doctors And Sheriff and that is why None of them testified, Just Like Jaurt Lamb, Jeremy Chasky, Daniel gist, and Donnie Pool Jr. And Renee M. Caberner.

Here, petitioner requested an evidentiary hearing at every level of the state habeas proceedings, and each of the courts to which I applied ruled without granting him an evidentiary hearing. As a result, (1) I am entitled to an evidentiary hearing in this court before the court can make any credibility determinations on the facts alleged in the petition and supporting exhibits; and (2) Any controverted facts found by the state court while denying a request for an evidentiary hearing necessarily result from an unreasonable determination of the facts, and hence are not entitled to any presumption of correctness. EARP, supra, at 1167; Taylor, supra, at 1101.

4. AAG KOSTIN DID NOT ADDRESS ANY OF THE MERITS OF MY ARGUMENTS INSTEAD HUGE CHUNKS OF THE LOWER COURTS OPINIONS ARE CITED AND KOSTIN GIVES HIS PERSONAL OPINION THAT THEY ARE NOT "CONTRARY TO" OR AN "UNREASONBLE DETERMINATION OF THE FACTS"

I incorporate all my grounds into this section because AAG KOSTIN did not address my arguments. Please read my grounds and then compare to Kostin's answer. This court will see that my arguments are not addressed, or I already argued against AAG Kostin's argument. FOR EXAMPLE, he just parrots the state supreme court Deputy Commissioner's resolution of my Juan claim. Kostin merely says my attorney did not feel that the prosecutors threats interferred with woemen's statements, or intended testimony. Kostin does not address my argument against this, which is the Ninth circuit does not require counsels feeling to satisfy the Juan analysis. counsels feeling are not determinative of a Juan claim.

-22-

Even if it was I show that counsel did feel that way, and since this all occurred off the record I should be granted an evidentiary hearing because I Produced Evidence that Proves the JUAN claim. KOSTIN ignores my Evidence Just like the lower courts.

Please compare my Grounds to KOSTINS ANSWER, this court will see that my Arguments show why the Lower Courts Opinions are "contrary to" And "Unreasonable determinations" of the Facts. KOSTIN does Not address my Arguments Head up, he RUNS from them which is an act of Conceeding.

I would also like to make this court aware of the Fact that I have been placed in segregation since 3-6-16. Out of Pure Retaliation, I have been denied my Legal Property, Law Library, and wrote this with a flimsy Segregation Pon. My D-seg time has been up since 3-15-16 today is 3-23-16, I am still in seg. I am getting transferred to camm bay on 3-28-16. I did not have the AAG's Answer for all the Handwritten Parts. My traverse was 90% done and The clo's would/will Not give it to me. I wrote a tro and Motion for extension And J. Thompson And S. Sullivan Refused To E-file it. I was given some of my legal Property ON 3-16-16 But Not everything I needed. I apologize that I was Not able to give you better work.

— 23 —

I did the best I could with what I had and under the Brutal Retaliation and Active Interference with my Right to access the courts. I have an Active law suit because of this and have filed the amended complaint, the motions I had ready for this court are in Exhibit 50 of the amended complaint. Ruth v. Glebe, et al.... 2:14-cv-01388-BHS-DWC.

Because of these extraordinary circumstances please give this traverse a liberal interpretation. Please incorporate my memorandum ecky grounds into this section against Mr. Hostins answer. I advise when you Read what he argued, and then Read my argument you will see I already addressed his counter arguments in my writ. Please read my writ I put so much work into it. I put so much work but was not able to file it due to the CIO's Interference. I am so glad I am being sent to another facility.

Please grant me an evidentiary hearing, Please Rule my grounds are all exhausted, Please Dismiss my charges with Prejudice, or give me a new fair trial. Respectfully submitted,

3-23-16

X Matthew R. Ruth

Matthew R. Ruth Pro Se
879492

—24—

EXHIBIT
ONE

Initial PRP
Division One    68380-2

(THIS is EXHIBIT 12 IN AAG's ANSwer)

RECEIVED

RECEIVED
COURT OF APPEALS
DIVISION ONE
DEC 0 2 2011

DEC 0 2 2011

No. _____   PROSECUTING ATTORNEY
FOR SNOHOMISH COUNTY

BY _____
FOR _____

RECEIVED
DEC 0 2 2011
ATTORNEY GENERAL OFFICE
SEATTLE

## WASHINGTON COURT OF APPEALS

### DIVISION I

MATTHEW R. RUTH,   )   68380-2
                   )
                   )   **PERSONAL RESTRAINT**
       Petitioner. )   **PETITION**

## A. STATUS OF PETITIONER

I, MATTHEW R. RUTH, Clallam Bay Corrections Center, 1830 Eagle Crest Way, Clallam Bay, WA 98326, apply for relief from confinement. I am  X  am not ____ now in custody serving a sentence upon conviction of a crime. (If not serving a sentence upon conviction of a crime) I am now in custody because of the following type of court order _____.

1. The court in which I was sentenced is the Snohomish County Superior Court.

2. I was convicted of the crime(s) of Assault 1 (2 counts), each with an allegation that I was armed with a deadly weapon.

3. I was originally sentenced after trial  X  on February 4, 2005. The judge who imposed sentence was Judge David Hulbert.

4. My lawyer at trial court was
Mark Stephens, 2825 Colby Ave, Ste 304, Everett, WA 98201.

EXHIBIT 12

5. I did _X_ did not ___ appeal from the decision of the trial court. (If the answer is that I did), I appealed to Division I, and the Supreme Court.

My lawyer on appeal was:
Eric Broman, 1908 E Madison Street, Seattle, WA 98122.

The decision of the appellate court was ___ was not _X_ published.
(If the answer is that it was published, and I have this information), the **Decision from the Supreme Court was published in 167 Wash.2d 889 (2010).**

6. Since my conviction I have _X_ have not ___ asked a court for some relief from my sentence other than I have already written above. (If the answer is that I have asked), the court I asked was Snohomish County Superior Court following remand from Supreme Court.

Relief was granted in part on December 7, 2010.

7. (If I have answered in question 6 that I did ask for relief), the name of my lawyer in the proceeding mentioned in my answer to question 6 was Mark D. Mestel, 3221 Oakes Avenue, Everett, WA 98201.

8. If the answers to the above questions do not really tell about the proceedings and the courts, judges and attorneys involved in your case, tell about it here:

See attached Memorandum of Authorities.

## B. GROUNDS FOR RELIEF

(If I claim more than one reason for relief from confinement, I attach sheets for each reason separately, in the same way as the first one. The attached sheets should be numbered "First Ground", "Second Ground", "Third Ground", etc.). I claim that I have <u>3</u> (number) reason(s) for this court to grant me relief from the conviction and sentence described in Part A.

**FIRST GROUND:** The Court gave an erroneous instruction to the jury concerning the special verdict forms.

**SECOND GROUND:** The Court violated my rights and the right of the public to an open courtroom. This also violated my right to counsel.

**THIRD GROUND:** I am entitled to a new trial because of prosecutorial misconduct during the closing argument based in part on the court's giving of a faulty reasonable doubt instruction. The record reflects the "castle" reasonable doubt instruction given by the Court. This allowed the prosecutor to diminish the presumption of innocence during his closing argument.

1. I should be given a new trial or released from confinement because (Here state legal reasons why you think there was some error made in your case which gives you the right to a new trial or release from confinement.):
See attached Memorandum of Authorities.

2. The following facts are important when considering my case (After each fact statement, put the name of the person or persons who know the fact and will support your

statement of the fact. If the fact is already in the record of your case, indicate that, also.):

See attached Memorandum of Authorities.

3. The following reported court decisions (include citations if possible) in cases similar to mine show the error I believe happened in my case:

See attached Memorandum of Authorities.

4. The following statutes and constitutional provisions should be considered by the court:

See attached Memorandum of Authorities.

5. This petition is the best way I know to get the relief I want, and no other way will work as well because:
I have exhausted my direct appeals and my Petition for Review to the Supreme Court. The Personal Restraint Petition is the only procedure available to allow me to get this issue before the Court.

## C. STATEMENT OF FINANCES

If you cannot afford to pay the filing fee or cannot afford to pay an attorney to help you, fill this out. If you have enough money for these things, do not fill out this part of the form.

1. I do ___ do not _X_ ask the court to file this without making me pay the filing fee because  I am so poor I cannot pay the fee.

## D. REQUEST FOR RELIEF

I want this court to:

_X_ vacate my conviction and give me a new trial

____ vacate my conviction and dismiss the criminal charges
against me without a new trial

_X_ other (specify):

Strike the deadly weapon enhancement and order the trial
court to decrease my sentence by 48 months.

DATED this _____ day of December, 2011.

Respectfully Submitted,

MARK D. MESTEL, INC., P.S.

Mark D. Mestel, WSBA# 8350
Attorney for Petitioner

RECEIVED
COURT OF APPEALS
DIVISION ONE

DEC 02 2011

IN THE COURT OF APPEALS
OF THE STATE OF WASHINGTON,
DIVISION ONE

| | |
|---|---|
| IN RE THE MATTER OF | CASE NO. |
| MATTHEW R. RUTH, | |
| Petitioner. | PETITIONER'S MEMORANDUM OF AUTHORITIES |

1.    An Erroneous Special Verdict Form Instruction Violated

the Petitioner's Right to Due Process of Law.[1]

In the Supreme Court decision, <u>State v. Ruth</u>, 167

Wash.2d 889 (2010), the Court held that it was error to impose

a firearm sentencing enhancement when the jury returned a

verdict that Mr. Ruth was armed with a deadly weapon.

Following the remand Mr. Ruth returned to Snohomish County

and appeared before Judge Lucas for a new sentencing hearing.

On December 7, 2010, the Court imposed a sentence of 234

---

[1] Facts relevant to each Ground for Relief will be included separately
in each subsection.

months, 93 months on each count of Assault 1, to run consecutively, and 24 months on each count for the deadly weapon enhancements, also to run consecutively. Now Mr. Ruth challenges the imposition of the enhancement sentences based on an improper jury instruction which he contends violates his right to due process of law as guaranteed to him by the Washington Constitution, Article I, Sections 3 and 22, Amendment 10 and the United States Constitution, Amendment 14.

At the conclusion of his trial Judge Hulbert instructed the jury that in a criminal case unanimity is required for it to return a verdict. Instruction 19, given to the jury as the concluding instruction and attached in Appendix A, reads in relevant part:

> Since this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in the verdict forms to express your decision. The presiding juror will sign it and notify the bailiff, who will conduct you into court to declare your verdict.
>
> You will also be furnished with special verdict forms. If you find the defendant not guilty do not use the

special verdict forms. If you find the defendant guilty, you will then use the special verdict forms and fill in the blank with the answer "yes" or "no" according to the decision you reach. In order to answer the special verdict forms "yes", you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you have a reasonable doubt as to the question, you must answer "no".

The clear implication from the instruction is that each juror must vote the same to return a verdict on either the substantive charge and/or the special verdict (enhancement) forms. By not advising the jurors that unanimity was not required to answer the special verdict forms "no" the instruction was defective.

Although there was no objection by the defense to the form of the instruction, Mr. Ruth contends that the erroneous instruction constitutes manifest constitutional error, which he may raise in this Personal Restraint Petition. In State v. Ryan, 160 Wash.App. 944, 948, 252 P.3d 895 (2011) Division I held:

*direct appeal*

The Bashaw court strongly suggests its decision is grounded in due process. The court identified the error as "the procedure by which unanimity would be inappropriately achieved," and referred to "the flawed deliberative process" resulting from the erroneous instruction. The court then concluded the error could not

be deemed harmless beyond a reasonable doubt, which is
the constitutional harmless error standard. The court
refused to find the error harmless even where the jury
expressed no confusion and returned a unanimous verdict
in the affirmative. We are constrained to conclude that
under Bashaw, the error must be treated as one of
constitutional magnitude and is not harmless.

In this case the jury instruction was erroneous. Since the jury in

this case was not properly instructed that it could answer the

special verdict form "no" based on one juror's reasonable

doubt, rather than unanimity, this Court should remand the case

to the trial court for further proceedings consistent with

applicable case law.


2.    The Court violated the petitioner's and public's right

       to an open court.

       Petitioner contends that the Trial Court twice violated his

right and the public's right to a public trial during his trial:

First, when it answered a question from the jury from

chambers; second, when it held a chambers conference to

discuss a problem that had arisen concerning a State's witness.

The seminal Washington case on this issue is <u>State v. Bone-Club,</u> 128 Wash.2d 254, 906 P.2d 325 (1995).  There the State requested closure of the courtroom during an undercover police officer's testimony at the pretrial suppression hearing. The trial court agreed and cleared the entire courtroom for the officer's testimony.    The defendant was not given an opportunity to object to the closure. The Washington Supreme Court found that "the temporary, full closure of [the] pretrial suppression hearing" was a violation of the defendant's right under article I, section 22 of the Washington Constitution. The court further found that the defendant's "failure to object contemporaneously did not effect a waiver" and that the closure requirements are triggered by the motion to close, not by a defendant's objection.

The court explained the importance of an open courtroom stating:

> The section 10 guaranty of public access to proceedings and the section 22 public trial right serve complementary and interdependent functions in

assuring the fairness of our judicial system. In particular, the public trial right operates as an essential cog in the constitutional design of fair trial safeguards. We echo the sentiments of the United States Supreme Court:

> "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...."

In re Oliver, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 506 n. 25, 92 L.Ed. 682 (1948) (quoting Thomas M. Cooley, Constitutional Limitations 647 (8th ed. 1927)). Although the public trial right may not be absolute, protection of this basic constitutional right clearly calls for a trial court to resist a closure motion except under the most unusual circumstances. We hold the five criteria a trial court must obey to protect the public's right of access before granting a motion to close are likewise mandated to protect a defendant's right to public trial.

State v. Bone-Club, 128 Wash.2d 254, 259.

The holding in Bone-Club soon spread into other facets of the trial, eventually including jury questionnaires and in chamber questioning of potential jurors.

While closure of the courtroom is still possible, the Court must first conduct a <u>Bone-Club</u> analysis, prior to excluding the public from court proceedings. This is a five part analysis necessary to protect both the public's right under article I, section 10 and the defendant's rights under article I, section 22: The five parts are:

1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

4. The court must weigh the competing interests of the proponent of closure and the public.

5. The order must be no broader in its application or duration than necessary to serve its purpose."

Judge Hulbert did not conduct a <u>Bone Club</u> analysis on either occasion.

In <u>State v. Sublett,</u> 156 Wash.App. 160, 181, 231 P.3d 231, 242 - 243 (2010) the Court noted whether a defendant's public trial right applies in the context of an in-chambers conference to answer a question the jury submitted during deliberations appears to be an issue of first impression in Washington. The Court went on to note: "In <u>State v. Sadler,</u> 147 Wash.App. 97, 114, 193 P.3d 1108 (2008), this court recognized that the public trial right applies to evidentiary phases of the trial as well as other "adversary proceedings," including suppression hearings, during voir dire, and during the jury selection process. But this court also determined that "[a] defendant does not ... have a right to a public hearing on purely ministerial or legal issues that do not require the resolution of

disputed facts." Sadler, 147 Wash.App. at 114, 193 P.3d 1108."[2]

While Sublett's holding is contrary to Petitioner's position our Supreme Court has granted a Petition for Review in Sublett. See, 156 Wash.App. 160, 231 P.3d 231 (2010). Petitioner asserts that while there may be ministerial matters that may be discussed between the parties outside the presence of the public and the defendant they should be limited in scope. To satisfy the principles announced in Bone Club, the public and the defendant should be present whenever anything of substance concerning the case is discussed. A courtroom open to the public and proceedings that occur in the presence of the accused better serve the ends of justice and satisfy the constitutional considerations discussed in Bone Club.

In Mr. Ruth's trial, proceedings were twice carried out without his presence and outside an open courtroom. The first

---

[2] In Sadler the Court of Appeals linked the right of the defendant to be present at critical phases of the trial with the public's right to an open courtroom. Sadler, 147 Wash.App. at 114. Petitioner does not believe that analysis to necessarily be correct.

occasion occurred during trial when an issue arose concerning Rene Woerner, a listed state's witness, and an eyewitness to the shootings. Apparently concerned that Ms. Woerner's anticipated testimony had changed from her statement given to police, counsel met with Judge Hulbert in chambers. RP 179-181. Mr. Ruth was not present. Following the in chambers conference the Judge had the attorneys put on the record, in the defendant's presence, what had occurred in chambers. From the in court recitation it is clear that there was discussion during the chamber's conference of issues that had arisen between Ms. Woerner and the prosecutor. The in court summary set out below clearly shows that this was more than a ministerial or scheduling matter.

> THE COURT: I think in an overabundance of caution, real quickly, because Mr. Ruth was not present during a very brief conversation that we had in Chambers, we were simply talking about a scheduling"""issue. Calling or not calling a particular witness. If you want to just flesh that out.
>
> MR. ADCOCK: We had a conversation, Your Honor. I informed Mr. Stephens and Your Honor that my

next witness, Renee Woerner, indicated to me, without any doubt, that she was going to commit perjury if she were called by the State to testify in this case. Because of my ethical obligation not to suborn perjury, I made a decision not to call her as a State's witness. After my conversation with her, I spoke to Mr. Stephens, I explained that to him. I suggested maybe he wanted to talk to her. Maybe he was going to call her as a witness. I believe he had a conversation with her where she brought up the fact that I had said that if you commit perjury, there is going to be consequences. And at that point he concluded that she needed to be advised. We're going to make arrangements for the Office of the Public Defender to get her an attorney, to consult with her tomorrow about her options, so to speak. Mr. Stephens indicated to me that he did not know whether he is going to call her yet but that that was the first step, in any event, and I agree. And that's where we're at.

MR. STEPHENS: I just might add that's, more or less, what's happen. When I had my conversation with this potential witness, she indicated to me concerns about comments Mr. Adcock made. She did indicate the word "perjury" was used. I don't know what context that was in. I advised her I cannot give you any advice and if you need advice you need your own lawyer. Which I think was about all I could do with that.

There was no further discussion concerning Ms. Woerner, nor

was she called as a witness.    The conversations concerning

Ms. Woerner should have occurred in the defendant's presence

and in open court.

The second instance occurred on December 8, 2004. This occurrence not only implicates Mr. Ruth's constitutional right to due process of law, but also his constitutional right to counsel.  (United States Constitution, Amendments 6 and 14 and the Washington Constitution, Article I, section 22).

Mr. Ruth's case went to the jury at 3:06 PM. RP 318.  At 4:12 the jury sent a written question to the Court.  The Court sent back a written response at 4:15 PM.  Mr. Ruth, who was in custody, was not present either when the Judge received the question or when he responded.  The minutes from the trial, a true and accurate copy of which is attached in Appendix B, show the relevant times and does not note that either counsel or the defendant was present.

Petitioner maintains that both he and the public have the right to be present when the Court is communicating substantive matters with the jury.  CrR 6.15 (f) requires the Court to notify the parties of the contents of the questions and

provide them an opportunity to comment upon an appropriate response. While State v. Jasper, 170 Wash.2d 1025 (2011) states that error under CrR 6.15(f) is subject to a harmless error analysis, the Supreme Court has granted review. See, 170 Wash.2d 1025 (Wash. Feb 01, 2011). Mr. Ruth maintains that the error is structural and requires reversal.

In French v. Jones, 332 F.3d 430, 436 (C.A.6, 2003), the Court held that the absence of defense counsel when the Court re-instructed the jury violated the defendant's Sixth Amendment rights stating:

> Once the evidentiary hearing established Jones was not an attorney, French argued that the Supreme Court has "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n. 25, 104 S.Ct. 2039. Since the supplemental jury instruction was a critical stage of the trial, French contended that reversal should be automatic. The district court agreed with French. Citing Cronic, the district court found a structural defect like the deprivation of counsel during a critical stage of the trial required automatic reversal. See French, 114 F.Supp.2d at 642.

13

If, as stated in <u>Sadler</u>, supra., the defendant's right to be present at a critical stage of the proceeding is linked to the public's right to an open court, the answer to the jury's questions should have been given in open court.  The failure to do so or to conduct a <u>Bone Club</u> analysis violated Mr. Ruth's constitutional rights to an open court and to counsel.

3. The Court's "Castle" reasonable doubt instruction together with the prosecutor's Closing Argument violated the Petitioner's rights under the United States Constitution, Amendments 5 and 14 and the Washington Constitution, Article I, sections 3 and 22, amendment 10.

Part of the Court's instructions to the jury included Instruction 3, found in Appendix A, which defined reasonable doubt and the presumption of innocence.  The instruction[3] reads:

The defendant has entered a plea of not guilty, which puts in issue every element of the crime charged. The

---

[3] This is known as the "Castle"

State, as plaintiff, has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.

A defendant is presumed innocent. This presumption continues throughout the entire trial unless you find during your deliberations that it has been overcome by the evidence beyond a reasonable doubt.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

Under Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), overruled in part, Estelle v. McGuire, 502 U.S. 62, 72, and n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) a jury instruction is unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a

reasonable doubt.  In Cage the trial court gave the following

reasonable doubt:

> "If you entertain a reasonable doubt as to any fact or
> element necessary to constitute the defendant's guilt, it
> is your duty to give him the benefit of that doubt and
> return a verdict of not guilty. Even where the evidence
> demonstrates a probability of guilt, if it does not
> establish such guilt beyond a reasonable doubt, you
> must acquit the accused. This doubt, however, must
> be a reasonable one; that is one that is founded upon a
> real tangible substantial basis and not upon mere
> caprice and conjecture. It must be such doubt as
> would give rise to a grave uncertainty, raised in your
> mind by reasons of the unsatisfactory character of the
> evidence or lack thereof. A reasonable doubt is not a
> mere possible doubt. It is an actual substantial doubt.
> It is a doubt that a reasonable man can seriously
> entertain. What is required is not an absolute or
> mathematical certainty, but a moral certainty."

The Supreme Court held that this instruction violated the

defendant's right to due process stating:

> It is plain to us that the words "substantial" and
> "grave," as they are commonly understood, suggest a
> higher degree of doubt than is required for acquittal
> under the reasonable-doubt standard. When those
> statements are then considered with the reference to
> "moral certainty," rather than evidentiary certainty, it
> becomes clear that a reasonable juror could have
> interpreted the instruction to allow a finding of guilt

16

based on a degree of proof below that required by the
Due Process Clause.

Cage at 229-30.

In <u>State v. Bennett</u>,  161 Wash.2d 303, 315-316, 165 P.3d

1241, 1248 (2007) our Supreme Court, while finding the Castle

instruction  constitutional,  criticized  its  wording  and  directed

that it not be used in subsequent trials stating:

> Even if many variations of the definition of
> reasonable doubt meet minimal due process
> requirements, the presumption of innocence is
> simply too fundamental, too central to the core of
> the foundation of our justice system not to require
> adherence to a clear, simple, accepted, and uniform
> instruction. We therefore exercise our inherent
> supervisory power to instruct Washington trial
> courts not to use the Castle instruction. We have
> approved WPIC 4.01 and conclude that sound
> judicial practice requires that this instruction be
> given until a better instruction is approved. Trial
> courts are instructed to use the WPIC 4.01
> instruction to inform the jury of the government's
> burden to prove every element of the charged
> crime beyond a reasonable doubt.

<u>State v. Bennett</u> , 161 Wash.2d 303, 317-318, 165 P.3d

1241, 1249 (2007)

The Court's concern was that the Castle instruction defined reasonable doubt in too confusing a manner thereby diluting the presumption of innocence and diminishing the burden on the State.   By giving the Castle instruction the prosecutor found authority to fashion an argument, which undermined the presumption of innocence.   In his closing the Prosecutor argued:

> Now, I talked to you Monday about beyond a reasonable doubt and what it meant and what the law says it means. As I told you, few things in life we know with absolute certainty. And the law does not require you to be absolutely certain. If you're firmly convinced -- and that is the phrase in the instruction firmly convinced that the defendant did this, then he is guilty beyond a reasonable doubt and it's your duty to convict him.

> We talked about the presumption of innocence. We are very fortunate to live in the United States of America. We have the presumption of innocence. It's a constitutional shield that protects each and everyone of us. Well Ladies and Gentlemen, this particular case the State has pierced the defendant's constitutional shield and proven beyond a reasonable doubt that he committed first degree assault on November 5th when he shot these two boys. We have pierced that constitutional protection.

> Again, the defendant's story is ridiculous. Makes no
> sense in light of the other testimony and evidence in
> this case. The state has proven beyond a reasonable
> doubt that he is guilty.

RP 300-301.

Petitioner contends that this argument did undermine his

constitutional right to be presumed innocent and allowed the

jury to convict based on a lower standard of proof than required

by the State and Federal Constitutions.

## CONCLUSION

For the reasons set out above this Court should Grant the

Petition for Review, vacate the Petitioner's conviction and

remand the matter for a new trial.  In the alternative the Court

should vacate the sentencing enhancements and remand the

case     to     the     trial     court     for     further     proceedings.

DATED ___/___ day of December, 2011.

           Respectfully submitted,

           MARK D. MESTEL, INC., P.S.

           MARK D. MESTEL, WSBA #8350
           Attorney for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Personal Restraint Petition and Petitioner's Memorandum of Authorities was served on the following by Legal Messenger, addressed to:

1) Court of Appeals         2) Attorney General's Office
   Division One                800 – 5th Ave, Ste 2000
   600 University Street       Seattle, WA 98104
   One Union Square
   Seattle, WA 98101

3) Snohomish County Prosecutor's Office
   3000 Rockefeller Avenue, M/S 504
   Everett, WA 98201

I hereby certify that a copy of the foregoing Personal Restraint petition and Petitioner's Memorandum of Authorities was served upon the following by United States Postal Service, addressed to:

1) Matthew Ruth, DOC# 879492
   c/o Clallam Bay Corrections Center
   1830 Eagle Crest Way
   Clallam Bay, WA 98326

DATED this 2nd day of December, 2011.

Brandy L. Ellis, Secretary

22



03-1-02451-6          86

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR THE COUNTY OF SNOHOMISH

STATE OF WASHINGTON                 )     CASE NO. 03-1-02451-6
                                    )
                    Plaintiff,      )
                                    )     **Filed In Open Court**
            v.                      )
                                    )     *12-8-004*
MATTHEW ROBERT RUTH                 )     PAM. L. DANIELS
                    Defendant.      )     COUNTY CLERK
                                    )     By *Grace Hampton*
                                    )           Deputy Clerk

### COURT'S INSTRUCTIONS
### TO THE JURY

JUDGE _____

*December 8, 2004*
Date given to Jury

A4
86

APPENDIX A

INSTRUCTION NO. _____1_____

It is your duty to determine which facts have been proved in this case from the evidence produced in court. It is also your duty to accept the law from the court, regardless of what you personally believe the law is or ought to be. You are to apply the law to the facts and in this way decide the case.

The order in which these instructions are given has no significance as to their relative importance. The attorneys may properly discuss any specific instructions they think are particularly significant. You should consider the instructions as a whole and should not place undue emphasis on any particular instruction or part thereof.

A charge has been made by the prosecuting attorney by filing a document, called an information, informing the defendant of the charge. You are not to consider the filing of the information or its contents as proof of the matters charged.

The only evidence you are to consider consists of the testimony of witnesses and the exhibits admitted into evidence. It has been my duty to rule on the admissibility of evidence. You must not concern yourselves with the reasons for these rulings. You will disregard any evidence that either was not admitted or that was stricken by the court. You will not be provided with a written copy of testimony during your deliberations. Any exhibits admitted into evidence will go to the jury room with you during your deliberations.

In determining whether any proposition has been proved, you should consider all of the evidence introduced by all parties bearing on the question. Every party is entitled to the benefit of the evidence whether produced by that party or by another party.

You are the sole judges of the credibility of the witnesses and of what weight is to be given the testimony of each. In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to observe, the witness's memory and manner while testifying, any interest, bias or prejudice the witness may have, the reasonableness of the testimony of the witness considered in light of all the evidence, and any other factors that bear on believability and weight.

The attorney's remarks, statements and arguments are intended to help you understand the evidence and apply the law. They are not evidence. Disregard any remark, statement or argument that is not supported by the evidence or the law as stated by the court.

The attorneys have the right and the duty to make any objections that they deem appropriate. These objections should not influence you, and you should make no assumptions because of objections by the attorneys.

The law does not permit a judge to comment on the evidence in any way. A judge comments on the evidence if the judge indicates, by words or conduct, a personal opinion as to the weight or believability of the testimony of a witness or of other evidence. Although I have not intentionally done so, if it appears to you that I have made a comment during the trial or in giving these instructions, you must disregard the apparent comment entirely.

You have nothing whatever to do with any punishment that may be imposed in case of a violation of the law. The fact that punishment may follow conviction cannot be considered by you except insofar as it may tend to make you careful.

You are officers of the court and must act impartially and with an earnest desire to determine and declare the proper verdict.  Throughout your deliberations you will permit neither sympathy nor prejudice to influence your verdict.

INSTRUCTION NO. _2_

As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become convinced that it is wrong. However, you should not change your honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

INSTRUCTION NO. _3_

The defendant has entered a plea of not guilty, which puts in issue every element of the crime charged. The State, as plaintiff, has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.

A defendant is presumed innocent. This presumption continues throughout the entire trial unless you find during your deliberations that it has been overcome by the evidence beyond a reasonable doubt.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.



INSTRUCTION NO. _4_

Evidence may be either direct or circumstantial. Direct evidence is that given by a witness who testifies concerning facts which he or she has directly observed or perceived through the senses. Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. One is not necessarily more or less valuable than the other.

INSTRUCTION NO. _5_

A witness who has special training, education or experience in a particular science, profession or calling, may be allowed to express an opinion in addition to giving testimony as to facts. You are not bound, however, by such an opinion. In determining the credibility and weight to be given such opinion evidence, you may consider, among other things, the education, training, experience, knowledge and ability of that witness, the reasons given for the opinion, the sources of the witness' information, together with the factors already given you for evaluating the testimony of any other witness.

INSTRUCTION NO. _6_

A separate crime is charged in each count.   You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

INSTRUCTION NO. ___7___

A person commits the crime of assault in the first degree when, with intent to inflict great bodily harm, he or she assaults another with a firearm.

INSTRUCTION NO. _8_

A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result which constitutes a crime.

INSTRUCTION NO. _9_

Great bodily harm means bodily injury that creates a probability of death, or which causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.

INSTRUCTION NO. _____10_____

The term "deadly weapon" includes any firearm, whether loaded or not.

INSTRUCTION NO. __11__

To convict the defendant of the crime of assault in the first degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1)   That on or about the 5th day of November, 2003, the defendant assaulted Drew Eden.;

(2)   That the assault was committed with a firearm;

(3)   That the defendant acted with intent to inflict great bodily harm; and

(4) That the acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

PLTF. _____

INSTRUCTION NO. _12_

For purposes of a special verdict, the State must prove beyond a reasonable doubt that the defendant was armed with a firearm at the time of the commission of the crime in Count I.

A "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder.

INSTRUCTION NO. _13_

To convict the defendant of the crime of assault in the first degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1)   That on or about the 5th day of November, 2003, the defendant assaulted Jeremy Custer;

(2)   That the assault was committed with a firearm;

(3)   That the defendant acted with intent to inflict great bodily harm; and

(4) That the acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

PLTF. _____

INSTRUCTION NO. _14_

For purposes of a special verdict, the State must prove beyond a reasonable doubt that the defendant was armed with a firearm at the time of the commission of the crime in Count II.

A "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder.

DFDT. NO. _____

## INSTRUCTION NO. _15_

It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

DFDT. NO. _____

INSTRUCTION NO. _16_

A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is in actual danger of great bodily harm, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

DFDT. NO._____

INSTRUCTION NO. _17_

It is a defense to a charge of Assault in the First Degree that the force used was lawful as defined in this instruction.

The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured or by someone lawfully aiding a person who he reasonably believes is about to be injured in preventing or attempting to prevent an offense against the person or a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary.

The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

INSTRUCTION NO. _18_

During the course of this trial, you have been permitted to take notes.   By permitting you to take notes, I have not urged or instructed you to do so.  I caution you note taking may have interfered with your opportunity to observe the demeanor of witnesses and other events of the trial.

After you have reached a verdict, the bailiff will collect your pads.  The notes you took will then be destroyed.  No one will be allowed to read your notes.

Finally, I caution you not to assume that any particular note you may have taken is necessarily more accurate than your memory or the notes or memories of your fellow jurors.  At all times keep your minds open to the notes or memories of your fellow jurors.

INSTRUCTION NO. _19_

Upon retiring to the jury room for your deliberation of this case, your first duty is to select a presiding juror. It is his or her duty to see that discussion is carried on in a sensible and orderly fashion, that the issues submitted for your decision are fully and fairly discussed, and that every juror has an opportunity to be heard and to participate in the deliberations upon each question before the jury.

You will be furnished with all of the exhibits admitted into evidence, these instructions, and a verdict form for each count.

You must fill in the blank provided in each verdict form the words "not guilty" or the word "guilty", according to the decision you reach.

Since this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in the verdict forms to express your decision. The presiding juror will sign it and notify the bailiff, who will conduct you into court to declare your verdict.

You will also be furnished with special verdict forms. If you find the defendant not guilty do not use the special verdict forms. If you find the defendant guilty, you will then use the special verdict forms and fill in the blank with the answer "yes" or "no" according to the decision you reach. In order to answer the special verdict forms "yes", you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you have a reasonable doubt as to the question, you must answer "no".

If you should have any question for the court about these instructions or the evidence, you should submit the question in writing to the bailiff. The written question should be dated and signed by the presiding juror.

IN THE SUPERIOR COURT OF THE STATE OF

WASHINGTON FOR SNOHOMISH COUNTY

STATE OF WASHINGTON      )     CASE NO. 03-1-02451-6

         Plaintiff,       )

                    )     VERDICT FORM A

       v.              )

MATTHEW ROBERT RUTH    )

            Defendant.    )

We, the jury, find the defendant, Matthew Robert Ruth,

_____ of the crime of First Degree Assault
    (write in not guilty or guilty)

as charged in Count I.

                            _____

                                Presiding Juror

IN THE SUPERIOR COURT OF THE STATE OF

WASHINGTON FOR SNOHOMISH COUNTY

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | CASE NO: 03-1-02451-6 |
| Plaintiff, | ) | |
| | ) | VERDICT FORM B |
| v. | ) | |
| | ) | |
| MATTHEW ROBERT RUTH | ) | |
| Defendant. | ) | |

We, the jury, find the defendant, Matthew Robert Ruth,

_____ of the crime of First Degree Assault
(write in not guilty or guilty)

as charged in Count II.

_____
Presiding Juror

IN THE SUPERIOR COURT OF THE STATE OF

WASHINGTON FOR SNOHOMISH COUNTY

|  |  |  |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03-1-02451-6 |
| | ) | |
| vs. | ) | SPECIAL VERDICT FORM A |
| | ) | |
| MATTHEW ROBERT RUTH | ) | |
| | ) | |
| Defendant. | ) | |

We, the jury, return a special verdict by answering as follows:

Was the defendant Matthew Robert Ruth armed with a deadly weapon at the time

of the commission of the crime in Count I?

ANSWER: _____
(Yes or No)

_____
Presiding Juror

IN THE SUPERIOR COURT OF THE STATE OF

WASHINGTON FOR SNOHOMISH COUNTY

THE STATE OF WASHINGTON,          )
                                  )
          Plaintiff,              )          No. 03-1-02451-6
                                  )
     vs.                          )          SPECIAL VERDICT FORM B
                                  )
MATTHEW ROBERT RUTH               )
                                  )
          Defendant.              )

We, the jury, return a special verdict by answering as follows:

Was the defendant Matthew Robert Ruth armed with a deadly weapon at the time

of the commission of the crime in Count II?

ANSWER: _____
                  (Yes or No)


                    _____
                         Presiding Juror

APPENDIX B

FILED IN OPEN COURT

December 6, 2004
Pam L. Daniels
County Clerk

By: _____
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
### FOR SNOHOMISH COUNTY

State of Washington
(PLAINTIFF)
VS.
Matthew Robert Ruth
(DEFENDANT)

CAUSE NO.: 03-1-02451-6
JUDGE: David F. Hulbert
DATE OF TRIAL: December 6, 2004
REPORTER: Stephanie Magee
CLERK: Grace Hampton

**ATTORNEY FOR PLAINTIFF:**

John Adcock

**ATTORNEY FOR DEFENDANT:**

Mark Stephens

Days: 3.5 Days      **FINAL DISPOSITION - VERDICT**
Date trial ended: December 9, 2004
  The Jury found the Defendant guilty of the crime of First Degree
Assault as charged in Count I; and guilty of the crime of First
Degree Assault as charged in Count II.  On Special Verdict Form A,
the Jury found that the defendant was armed with a deadly weapon at
the time of the commission of the crime in Count I and on Special
Verdict Form B, the Jury found that the defendant was armed with a
deadly weapon at the time of the commission of the crime in Count
II.

Sentencing set for December 28, 2004 @ 1:00 p.m. Dept. 5,
Judge Hulbert.

9:35  This matter came on regularly for 12-person jury trial.
      State of Washington represented through Deputy Prosecuting
      Attorney, John Adcock.  Detective Kelly Willoth seated at
      counsel table.
      Defendant present, in custody, represented by counsel,
      Mark Stephens.
      Proposed jurors not present.

      Plaintiff's proposed Jury Instructions filed in open court.
      Defendant's Proposed Jury Instructions filed in open court.

      Colloquy of Court and counsel.

      Exhibit no. 1 offered by the State:      ADMITTED 12-7-04



1                          **TRIAL MINUTES**

AA
85

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

```
Exhibit no.  2 offered by the State:    ADMITTED 12-7-04
Exhibit no.  3 offered by the State:    ADMITTED 12-7-04
Exhibit no.  4 offered by the State:    ADMITTED 12-7-04
Exhibit no.  5 offered by the State:    ADMITTED 12-8-04
Exhibit no.  6 offered by the State:    ADMITTED 12-7-04
Exhibit no.  7 offered by the State:    ADMITTED 12-7-04
Exhibit no.  8 offered by the State:    ADMITTED 12-7-04
Exhibit no.  9 offered by the State:    ADMITTED 12-7-04
Exhibit no. 10 offered by the State:    ADMITTED 12-7-04
Exhibit no. 11 offered by the State:    ADMITTED 12-7-04
Exhibit no. 12 offered by the State:    ADMITTED 12-7-04
Exhibit no. 13 offered by the State:    ADMITTED 12-7-04
Exhibit no. 14 offered by the State:    ADMITTED 12-7-04
Exhibit no. 15 offered by the State:    ADMITTED 12-7-04
Exhibit no. 16 offered by the State:    ADMITTED 12-7-04
Exhibit no. 17 offered by the State:    ADMITTED 12-7-04
Exhibit no. 18 offered by the State:    ADMITTED 12-7-04
Exhibit no. 19 offered by the State:    ADMITTED 12-7-04
Exhibit no. 20 offered by the State:    ADMITTED 12-7-04
Exhibit no. 21 offered by the State:    ADMITTED 12-7-04
Exhibit no. 22 offered by the State:    ADMITTED 12-7-04
Exhibit no. 23 offered by the State:    ADMITTED 12-7-04
Exhibit no. 24 offered by the State:    ADMITTED 12-7-04
Exhibit no. 25 offered by the State:    ADMITTED 12-7-04
Exhibit no. 26 offered by the State:    ADMITTED 12-7-04
Exhibit no. 27 offered by the State:    ADMITTED 12-7-04
Exhibit no. 28 offered by the State:    ADMITTED 12-7-04
Exhibit no. 29 offered by the State:    ADMITTED 12-7-04
Exhibit no. 30 offered by the State:    ADMITTED 12-7-04
Exhibit no. 31 offered by the State:    ADMITTED 12-7-04
Exhibit no. 32 offered by the State:    ADMITTED 12-7-04
Exhibit no. 33 offered by the State:    ADMITTED 12-7-04
Exhibit no. 34 offered by the State:    ADMITTED 12-7-04
Exhibit no. 35 offered by the State:    ADMITTED 12-7-04
Exhibit no. 36 offered by the State:    ADMITTED 12-7-04
Exhibit no. 37 offered by the State:    ADMITTED 12-7-04
Exhibit no. 38 offered by the State:    ADMITTED 12-7-04
Exhibit no. 39 offered by the State:    ADMITTED 12-8-04
Exhibit no. 40 offered by the State:    ADMITTED 12-8-04
```

9:35   Arraignment on Second Amended Information.   SEE COURT FILE FOR
       RECORD OF MINUTES.

9:36   State's motion in limine to exclude witnesses except Detective
       Willoth: Granted.

2                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:37   State's motion in limine to prevent Defense counsel from using
       the term of "Snitch" or another derogatory comments regarding
       State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49   Defense motion in limine to exclude testimony of prior burglary
       charge around the time of the incident in question:
       Granted/Stipulated.

9:40   Defense motion in limine to exclude testimony of a prior assault
       of Renee Woerner: Granted/Stipulated.

9:41   Defense motion in limine to exclude testimony of defendant's
       criminal activity in Blythe, California: Granted/Stipulated.

9:42   Defense motion in limine to exclude any testimony or evidence of
       defendant's prior criminal history: Reserved.

9:43   Defense motion in limine exclude any evidence about defendant's
       last name or alias last names: Granted/Stipulated.

9:45   Defendant motion to strike testimony of State's witnesses, Renee
       Woerner, because he was unable to interview her, as his subpoena
       was returned: Denied.  The Court finds that the remedy is not
       exclusion but to allow Defendant to interview the witness prior
       to testifying.

       Exhibit no. 41 offered by the State:    ADMITTED 12-7-04
       Exhibit no. 42 offered by Defendant:    Not Offered

9:48   Defendant's motion strike testimony of Jeremiah Sheridan because
       of defendant's inability to locate and interview this witness:
       Denied.  The Court finds that the remedy is not exclusion but to
       allow Defendant to interview the witness prior to his testimony.

9:50   Colloquy of Court and counsel.
9:52   Court in recess.

10:15  The following persons were selected to qualify as jurors on this
       cause and seated in the jury box:
       1.  Gary R. Hall               7.   Andrea L. Greenlee
       2.  Edward A. Dawson           8.   Robert G. Sears
       3.  Kandace Aksnes             9.   Richard E. Olsen
       4.  Jody Marie Mountifield     10.  Marilyn Churchill
       5.  Karen R. Egtvedt           11.  Sharon Walker
       6.  Jennifer R. Clyde          12.  Donna Lee Orr


3                          TRIAL MINUTES

### STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:
13.  Mehari E. Gebrewold
14.  Frank P. Brady
15.  James C. Sinnema
16.  Barbara R. Garrett
17.  Frances Winters
18.  Lesley W. Winney
19.  Michael Rucker
20.  William Glover
21.  Raymond Johnson
22.  Richard Hill
23.  Ella Larrick
24.  Patricia Nakahara
25.  Charlene Lindsay
26.  Mary E. Barringer
27.  I. Jay Fritch
28.  Lawrence Thompson
29.  Donna R. West
30.  Jerry D. Rochford
31.  Daniel D. Orme-Doutre
32.  Jessica Marie Kinney
33.  Dale W. Troupe
34.  Brandon Duc Ha
35.  Patricia J. Jason

10:20  All prospective jurors sworn: Oath of Voir Dire.
       The Court directs general questions to all prospective jurors.
10:35  State's initial voir dire of entire prospective jury panel.
10:51  Defendant's initial voir dire of entire prospective jury panel.
11:13  State waives concluding voir dire of entire prospective jury
       panel.
11:14  Defendant's concluding voir dire of entire prospective jury
       panel.
11:20  Challenges for cause: prospective jurors passed for cause.

11:22  Plaintiff's first peremptory challenge: Kandace Aksnes.
       Frank Brady picked to qualify as juror #3.
       Defendant's first peremptory challenge: Edward Dawson.
       James Sinnema picked to qualify as juror #2.

       Plaintiff's second peremptory challenge: Jody Mountfield.
       Barbara Garrett picked to qualify as juror #4.
       Defendant's second peremptory challenge: Accepts Panel.

       Plaintiff's third peremptory challenge: Richard Olsen.
       Frances Winters picked to qualify as juror #9.
       Defendant's limited peremptory challenge: Frank Winters.

4                          **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27 The following 13 jurors were sworn to try this cause: Juror #1,
Gary R. Hall is designated as alternate juror.

| | | | |
|---|---|---|---|
| 1. | Gary R. Hall | 7. | Andrea L. Greenlee |
| 2. | James Sinnema | 8. | Robert G. Sears |
| 3. | Frank Brady | 9. | Lesley Winney |
| 4. | Barbara Garrett | 10. | Marilyn Churchill |
| 5. | Karen R. Egtvedt | 11. | Sharon Walker |
| 6. | Jennifer R. Clyde | 12. | Donna Lee Orr |
| | | 13. | Mehari Gebrewold |

11:28 Attorney conference at sidebar.
11:30 The Court directs general instructions to the Jury.
11:35 Colloquy of Court and counsel.
11:40 Court in recess until 1:00 p.m.

1:08 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
1:10 Jury present.
State makes opening statement.
1:20 Defendant makes opening statement.
1:29 The Court instructs the Jury regarding note taking.
1:31 SUZANNA JOHNSON, called by the State, sworn and testified.
1:40 Cross examination of Suzanna Johnson by the Defendant.
1:42 Attorney conference at sidebar.
1:43 Jury admonished not to discuss this case and return on Tuesday,
December 7, 2004 @ 9:55 a.m.
1:45 Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

TUESDAY, DECEMBER 7, 2004                     Clerk: Grace Hampton
                                             Reporter: S. Magee
Court opened at 9:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock.  Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Jury not present.

5                          **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.
9:10  Juror #9, Lesley Winney present.
State's voir dire of Juror #9, Mr. Winney.
Juror #9, Lesley Winney released to go back to the Jury Room.
The Court finds that Juror #9, Lesley Winney was engrossed in
the book he was reading and did not see the defendant being
brought to the Courtroom.

Exhibit no. 43 offered by the State:   ADMITTED 12-7-04
Exhibit no. 44 offered by the State:   Not Offered
Exhibit no. 45 offered by Defendant:   Not Offered

9:13  Court in recess.

9:40  Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
9:45  Court in recess.

10:05  Court resumes as heretofore, defendant present, in custody, and
all parties present.
KELLY WILLOTH, called by the State, sworn and testified.

Exhibit no. 46 offered by the State:   ADMITTED 12-8-04

10:55  Court in recess.

11:14  Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Cross examination of Kelly Willoth by the Defendant.

Exhibit no. 47 offered by Defendant:   Not Offered

11:28  GEORGE WILKINS, called by the State, sworn and testified.

Exhibit no. 48 offered by the State:   ADMITTED 12-7-04

11:39  Cross examination of George Wilkins by the Defendant.
11:40  Redirect examination of George Wilkins by the State.
11:42  Recross examination of George Wilkins by the Defendant.
11:44  SARAH BRYANT, called by the State, sworn and testified.
11:46  Cross examination of Sarah Bryant by the Defendant.
11:47  Court in recess until 1:30 p.m.

6                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

1:50   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       JEREMY CUSTER, called by the State, sworn and testified.

       Exhibit no. 49 offered by the State:     ADMITTED 12-7-04
       Exhibit no. 50 offered by the State:     ADMITTED 12-7-04
       Exhibit no. 51 offered by the State:     Not Offered
       Exhibit no. 52 offered by Defendant:     Not Offered

2:15   Cross examination of Jeremy Custer by the Defendant.
2:19   Redirect examination of Jeremy Custer by the State.
2:22   Recross examination of Jeremy Custer by the Defendant.
2:30   DREW EDEN, called by the State, sworn and testified.
2:45   Cross examination of Drew Eden by the Defendant.
2:53   Redirect examination of Drew Eden by the State.
2:55   Recross examination of Drew Eden by the Defendant.
2:56   Court in recess.

3:22   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       Attorney conference at sidebar.
3:24   The Court admonishes the jury and directs them to return on
       December 8, 2004 @ 9:00 a.m.
3:25   Colloquy of Court and counsel.
3:28   Court in recess.

       WEDNESDAY, DECEMBER 8, 2004            Clerk: Grace Hampton
                                              Reporter: S. Magee
       Court opened at 9:12 a.m., David F. Hulbert, Judge.
       The following proceedings were had to wit:
       This matter continued from previous day.
       State of Washington represented through Deputy Prosecuting
       Attorney, John Adcock.  Detective Kelly Willoth seated at
       counsel table.
       Defendant present, in custody, represented by counsel,
       Mark Stephens.
       Jury not present.
       Colloquy of Court and counsel.
9:15   Jury present.
       JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20   Cross examination of Jeremiah Sheridan by the defendant.
9:23   Detective Kelly Willoth, recalled by the State, previously
       sworn, testified.
9:25   Cross examination of Detective Kelly Willoth by the Defendant.

7                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:28  Redirect examination of Detective Kelly Willoth by the State.
9:30  CANDY CORDER, called by the State, sworn and testified.
9:37  Cross examination of Candy Corder by the Defendant.
9:45  Court in recess.

10:00 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
10:02 EVAN THOMPSON, called by the State, sworn and testified.


      Exhibit no. 53 offered by the State:     ADMITTED 12-8-04
      Exhibit no. 54 offered by the State:     ADMITTED 12-8-04

10:15 Cross examination of Evan Thompson by the Defendant.
10:18 State rests.
10:19 MATTHEW RUTH, called by the Defendant, sworn and testified.
10:26 Attorney conference at sidebar.
10:28 Continuation of testimony of Matthew Ruth on direct examination
      by the Defendant.
11:03 Jury not present.
11:04 Colloquy of Court and counsel.
11:05 Court in recess.

11:25 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
11:26 Cross examination of Matthew Ruth by the State.
11:45 Defense rests.
      State rests.
11:46 Jury not present.
11:48 Colloquy of Court and counsel.
11:50 Court in recess until 2:00 p.m.

 2:00 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury not present.
      The Court takes exceptions and objections to instruction: None
      given.
 2:05 Jury present.
      Not reported.
      The Court instructs the Jury.
 2:20 Reported.
      State opens closing argument.
 2:40 Defendant makes closing argument.
 2:52 State makes final argument.

8                            TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate juror.
The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

At 4:12 p.m. on December 8, 2004, the Jury submits a written inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10 & 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov. 24, 2003; and 3) Transcript of interview with Drew Eden (Nov. 10, 2003)"

At 4:15 p.m. on December 8, 2004 the Court responds in writing "The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank you."

Inquiry from the Jury and Court's Response filed in open court.

**THURSDAY, DECEMBER 9, 2004**                    Clerk: Grace Hampton
                                                  Reporter: S. Magee
Court opened at 11:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
The jury returns to open court with their verdict.
State of Washington represented through Deputy Prosecuting Attorney Julie Mohr. Detective Kelly Willoth seated at counsel table.
Defendant present, in custody, represented by counsel Mark Stephens.
Verdict read in open court finding the Defendant guilty of the crime of First Degree Assault as charged in Count I; and guilty of the crime of First Degree Assault as charged in Count II. On Special Verdict Form A, the Jury found that the defendant was armed with a deadly weapon at the time of the commission of the crime in Count I and on Special Verdict Form B, the Jury found that the defendant was armed with a deadly weapon at the time of the commission of the crime in Count II.
Jurors polled: verdict unanimous.
Verdict Form A; Special Verdict Form A; Verdict Form B and Special Verdict Form B are received and filed.
Court's Instructions filed in open court.
Jury is discharged.

9                              **TRIAL MINUTES**

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5, Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

10                          **TRIAL MINUTES**

EXHIBIT 13

EXHIBIT
TWO

Petitioner's Reply Memorandum

( AAG Answer - EXHIBIT 14 )

SCANNED
mm- 5/19/14

RECEIVED
JUN 17 2013
PROSECUTING ATTORNEY
FOR SNOHOMISH COUNTY

CFB

No. 68380-2-I

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

(Aug 16)

STATE OF WASHINGTON,

Respondent,

vs.

MATTHEW RUTH,

Petitioner.

## PETITIONER'S REPLY MEMORANDUM

Mark D. Mestel
Attorney for Petitioner
3221 Oakes Ave.
Everett, WA 98201
425-339-2383
WSBA# 8350

EXHIBIT **14**

EXHIBIT 14

# TABLE OF CONTENTS

I.     INTRODUCTION.......................................1

II.    ARGUMENT.............................................1

    A. The Open Courtroom.............................1

        1.  The Chambers Conference...............1

        2.  The Question From the Jury.............10

        3.  Structural Error............................12

III.   CONCLUSION......................................15

IV.   CERTIFICATE OF SERVICE..................17

# TABLE OF AUTHORITIES

## Table of Cases

### WASHINGTON CASES

State v. Bennett, 168 Wash.App. 197, 203-04, 275 P.3d 1224, 1226-1229 (2012)..................................................9

State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011).......7, 8

State v. Jasper, 174 Wash.2d 96, 124, 271 P.3d 876, 891 (2012)...........................................................11

State v. Paumier, 176 Wash.2d 29, 36-37, 288, P.3d 1126, 1130 (2012)...........................................................14

State v. Sublett, 176 Wash.2d 58, 292 P.3d 715 (2012)....1-3, 11

State v. Wise, 176 Wash.2d 1, 13-14, 288, P.3d 1114 (2012)..13

### FEDERAL CASES

Frantz v. Hazey, 533 F.3d 724, 743 (9th Cir.2008)..............12

United States v. Barragan-Devis, 133 F.3d 1287, 1289 (9th Cir.1998)......................................................12

United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985)................................................7

United States v. Withers, 638 F.3d 1055, 1063 (9th Cir.2011).15

### CONSTITUTIONAL PROVISIONS

United States Constitution, Amendment VI.....................7

Washington Constitution, Article I, Section 22...................7

### OTHER AUTHORITIES

CrR 6.15................................................................12

RAP 16.12..............................................................12

## I.    INTRODUCTION[1]

In his personal restraint petition, Mr. Ruth makes two separate claims regarding his contention that the trial court improperly closed the courtroom to the public and to him. The first occasion occurred during the trial when the attorneys met with Judge Hulbert in chambers and discussed the anticipated calling of Rene Woerner as a state's witness. The second occurred during jury deliberations when Judge Hulbert responded to a question from the jury.

## II.    ARGUMENT

### A.    The Open Courtroom

#### 1. The Chambers Conference

Mr. Ruth contends that under *State v. Sublett*, 176 Wash.2d 58, 292 P.3d 715 (2012), the chamber conference in

---

[1] Mr. Ruth recognizes that since the filing of his Personal Restraint Petition, our Supreme Court announced its decision in *State v. Nuñez*, 174 Wash.2d 707, 285 P.3d 21 (2012) which overruled *State v. Bashaw*, 169 Wash.2d 133, 234 P.3d 195 (2010). He does not however withdraw his assignment of error so that it is clear that he has exhausted his state remedies.

which the parties discussed whether Ms. Woerner would be

called as a witness should have been done in open court. In

*Sublett,* our Supreme Court adopted the "experience and logic"

test announced by the United States Supreme Court stating:

> Recognizing that resolution of whether the public trial
> right attaches to a particular proceeding cannot be
> resolved based on the label given to the proceeding, in
> *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1,
> 8–10, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press II*),
> the United States Supreme Court formulated and
> explained the experience and logic test to determine
> whether the core values of the public trial right are
> implicated. The first part of the test, the experience
> prong, asks "whether the place and process have
> historically been open to the press and general
> public." *Press II,* 478 U.S. at 8, 106 S.Ct. 2735. The
> logic prong asks "whether public access plays a
> significant positive role in the functioning of the
> particular process in question." Id. If the answer to
> both is yes, the public trial right attaches and the
> *Waller* or *Bone–Club* factors must be considered
> before the proceeding may be closed to the public.
> *Press II,* 478 U.S. at 7–8, 106 S.Ct. 2735. We agree
> with this approach and adopt it in these circumstances.

*Sublett,* 176 Wash.2d at 72-3   (footnotes omitted).

With regard to the "experience and logic test" the

Court in *Sublett* went on to state:

2

> But not every case will fit cleanly within a
> comparison between the proceeding at issue and trial
> in general, so the trial or reviewing court must
> consider whether openness will "enhance both the
> basic fairness of the criminal trial and the appearance
> of fairness so essential to public confidence in the
> system." *Press–Enter. Co. v. Superior Court*, 464
> U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (
> Press I )

*Sublett*, 176 Wash.2d at 74-5.

In this case four people were present in the trailer at the

time shots were fired: Ruth, the two alleged victims Custer and

Eden, and Rene Woerner, Ruth's girlfriend. The State had

endorsed Woerner as a witness to be called in its case in chief.

As discussed in Mr. Ruth's previously submitted Memorandum

of Authorities, the attorneys met with the Judge Hulbert in his

chambers. Excluded from the in chambers conference was Ruth

and the public. The discussion was not reported by a court

reporter.

While Judge Hulbert may have believed, based on

representations made by the attorneys, that the meeting was

intended to discuss witness scheduling, the conference went far

3

beyond such a ministerial conversation. Discussed was a confrontation that occurred between the deputy prosecutor and Ms. Woerner in the hallway outside the courtroom. The Court recognized that issues of substance had been discussed in chambers outside the presence of Mr. Ruth and the public.[2] Following the conference Judge Hulbert had the attorneys put on the record a summary of what occurred. Adcock, the deputy prosecutor, relayed that he had talked with Woerner in the hallway and based on her intended testimony, which apparently differed from her earlier statements, decided that he would not call her as a witness. He indicated that he would not be calling her due to his ethical obligation not to suborn perjury. Defense counsel stated that Ms. Woerner told him that during her conversation with the prosecutor perjury had been discussed. RP 179-80. Apparently there was a consensus that Ms. Woerner needed the advice of independent counsel. The record is silent

_How do we know this?_ (handwritten annotation)

---

[2] A procedure later suggested in *State v. Bennett*, 168 Wash.App. 197, 206, 275 P.3d 1224, 1229 (2012), which allows this Court to better understand what occurred in chambers.

4

on what, if anything, occurred with respect to Ms. Woerner consulting with counsel following the chambers conference though the transcripts show that neither party called her as a witness.

From the record it is clear that the conference occurred in the Judge's chambers. This establishes that it was a closed hearing, which the public could not attend. The Judge's request, after the conference, to summarize for Mr. Ruth what occurred establishes that Ruth was not present in chambers during the discussions. Nowhere is there any indication that before adjourning to chambers Judge Hulbert conducted a *Bone-Club* analysis. The issue for this Court to decide is whether the chambers conference violated the open courtroom guarantee of the State and Federal Constitutions.

This chamber's conference does not "fit clearly within a comparison between the proceeding at issue and trial in general." Discussions of this nature are not what come to mind when the parties announce that they are going to advise the

5

Court of scheduling issues. This was a conversation of substance that concerned one of four people who witnessed what occurred in the trailer. Statements concerning the credibility of witnesses, whether they will need counsel, and whether there is a suggestion of potential perjury should be held in open court in the presence of the press and general public, as well as the accused. Once the prosecutor decided not to call Ms. Woerner, a decision that did not require a private audience with the Judge, all he needed to do was announce in open court that he would not be calling her. His explanation of why he decided not to call her was not the type of communication that should be done in private. Judge Hulbert recognized that it was advisable for Mr. Ruth to know what occurred in chambers. Had Ruth actually been present with his attorney he would have been in a position to assist his attorney. He could have heard first hand Adcock's description of what occurred with Ms. Woerner and with the benefit of that knowledge given input to his counsel on whether to call Ms. Woerner as a defense

witness. He could have asked his attorney to request from DPA Adcock further information concerning the interaction with Ms. Woerner. Had this been done in open court there would have been a court reporter taking down what was said by the parties. The public would have been there to witness the potential coercive effect that the prosecutor's threats may have had on Ms. Woerner.   *Juqu*

The state and federal constitutions guarantee a defendant the "fundamental right to be present at all critical stages of a trial." *State v. Irby,* 170 Wn.2d 874, 880, 246 P.3d 796 (2011); *see also United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); United States Constitution, Amendment VI; Washington Constitution, Article I, Section 22. A defendant has the right to be present " 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " *Irby,* supra., 170 Wash.2d at 881, 246 P.3d 796 (quoting *Snyder,* 291 U.S. at 105–06, 54 S.Ct. 330). The *Irby* Court more fully explained the

defendant's greater protection under the State Constitution in footnote 6 wherein it stated in relevant part: "The right under the state constitution to "appear and defend" is, arguably, broader than the federal due process right to be present. Unlike *Snyder*, our decision in *Shutzler* does not condition the right to "appear and defend" at a particular "stage of trial" on what a defendant might do or gain by attending, see *Snyder*, 291 U.S. at 108, 54 S.Ct. 330."

*Irby, supra.*, 170 Wash.2d at 158.

In light of the nature of the representations made by the prosecutor, Mr. Ruth should have been present for the full discussion of issues pertaining to Ms. Woerner rather than have to rely on a summary characterized by his counsel as "more as less what's happen," (sic). RP 180. He asserts that he satisfied the first part of the experience and that openness to the public and his presence would have enhanced both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

The second prong: "whether public access plays a significant positive role in the functioning of the particular process in question" also should be answered in the affirmative when applied to the facts of this case. As stated in *State v. Bennett,* 168 Wash.App. 197, 203-04, 275, P.3d 1224, 1226 - 1229 (2012):

> The defendant's right to be present encompasses situations in which he may actively contribute to his own defense, such as offering his input to his counsel during jury selection and the exercise of preemptory challenges, as well as critical stages of trial where his presence " 'has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge,' " such as potentially convincing jurors to change their votes upon polling at the return of their verdict. *Irby,* 170 Wash.2d at 881, 246 P.3d 796 (quoting *Snyder,* 291 U.S. at 105–06, 54 S.Ct. 330); see, e.g., *Irby,* 170 Wash.2d at 883, 246 P.3d 796; *State v. Rice,* 110 Wash.2d 577, 616, 757 P.2d 889 (1988); see also *Rice v. Wood,* 77 F.3d 1138, 1143 n. 5 (9th Cir.1996) (citing cases discussing the potential effect of the defendant's presence on the return of the verdict and jury polling). In contrast, the defendant's and the public's right to open and public trials also encompasses circumstances in which the public's mere presence passively contributes to the fairness of the proceedings, such as deterring deviations from established procedures, reminding the officers of the court of the importance of their functions, and

9

subjecting judges to the check of public scrutiny. See, e.g., *Brightman*, 155 Wash.2d at 514, 122 P.3d 150; *Leyerle*, 158 Wash.App. at 479, 242 P.3d 921.

While Judge Hulbert may have invited counsel into chambers believing that there was to be a ministerial discussion concerning the scheduling of witnesses, once it expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor, the Judge should have stopped the conversation and brought the attorneys back into open court. This is a situation in which the public's presence would arguably contribute to the fairness of the proceedings and serves as a potential check on the power of the prosecutor( A prosecutor who knows that his conversations with witnesses will be repeated in open court, before the public and press, may not be so willing to threaten potential witnesses with perjury prosecutions.) *Juan*

Mr. Ruth asserts that he has satisfied the logic factor.

*2. The Question from the Jury*

10

In *Sublett*, supra., the Court held that under the facts of that case it was not a violation of the open court doctrine for the Court to answer a question from the jury from chambers. The Court, as discussed supra., announced the experience and logic test and concluded that questions from the jury did not implicate the right to an open courtroom stating:

> Under the facts of this case, then, we find no closure occurred because this proceeding did not implicate the public trial right, and therefore there was no violation of either petitioner's public trial right. None of the values served by the public trial right is violated under the facts of this case. No witnesses are involved at this stage, no testimony is involved, and no risk of perjury exists. The appearance of fairness is satisfied by having the question, answer, and any objections placed on the record pursuant to CrR 6.15. Similarly, the requirement that the answer be in writing serves to remind the prosecutor and judge of their responsibility because the writing will become part of the public record and subject to public scrutiny and appellate review.

In Mr. Ruth's case the State concedes that Mr. Ruth was not present nor consulted before Judge Hulbert answered the question. Unlike the situation in *State v. Jasper*, 174 Wash.2d 96, 124, 271 P.3d 876, 891 (2012) there is nothing to suggest

that counsel was advised of the jury's question or the Judge's intended answer. There is no showing that the Court complied with CrR 6.15. Additionally, there is a due process right for counsel and the defendant to be present when consideration is given to inquiries made by a deliberating jury. See *Frantz v. Hazey*, 533 F.3d 724, 743 (9th Cir.2008) quoting *United States v. Barragan-Devis*, 133 F.3d 1287, 1289 (9th Cir.1998).

Mr. Ruth contends that Judge Hulbert violated his right to be present and his right to counsel when he failed to notify him of the note or to allow him to suggest input through his counsel of the proper response. Mr. Ruth only can establish the failure of the Court to contact counsel through evidence outside of the record. Accordingly, he requests a reference hearing pursuant to RAP 16.12.

### 3. *Structural Error*

If this Court accepts Mr. Ruth's position, it should vacate his convictions and remand for a new trial. The State's argues that in a Personal Restraint Petition reversal is required only

12

upon a showing of actual prejudice. However, that argument is inapplicable to structural error. The difference between "structural error and other constitutional error was discussed by our Supreme Court in *State v. Wise*, 176 Wash.2d 1, 13-14, 288 P.3d 1114 (2012). There the Court explained why a showing of actual prejudice is not required if the error is structural stating:

> Structural error is a special category of constitutional error that "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310, 111 S.Ct. 1246. Where there is structural error " 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " Id. (quoting *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (citation omitted)). Structural error, including deprivation of the public trial right, is not subject to harmlessness analysis. Id. at 309–10; *Easterling*, 157 Wash.2d at 181, 137 P.3d 825. A defendant "should not be required to prove specific prejudice in order to obtain relief." *Waller*, 467 U.S. at 49, 104 S.Ct. 2210. Accordingly, unless the trial court considers the *Bone–Club* factors on the record before closing a trial to the public, the wrongful deprivation of the public trial right is a structural error presumed to be prejudicial. *Easterling*, 157 Wash.2d at 181, 137 P.3d 825; *Orange*, 152 Wash.2d at 814, 100 P.3d 291; *Bone–Club*, 128 Wash.2d at 261–62, 906, P.2d 325.

In *State v. Paumier*, 176 Wash.2d 29, 36-37, 288, P.3d

1126, 1130 (2012) the Supreme Court had to decide whether

the defendant had waived his right to raise the "closed court"

issue on appeal as he had not objected to the closure at trial. It

also addressed whether he needed to show prejudice. It ruled

that neither was necessary as the improper closure of the

courtroom constituted structural error. It explained its position

writing:

> In fact, there is good reason to treat structural errors,
> like violation of a defendant's public trial right,
> differently. A STRUCTURAL ERROR "affect[s] the
> framework within which the trial proceeds" and
> renders a criminal trial an improper " 'vehicle for
> determin[ing] guilt or innocence.' " *Arizona v.*
> *Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113
> L.Ed.2d 302 (1991) (quoting *Rose v. Clark*, 478 U.S.
> 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)).
> The right to a public trial is a unique right that is
> important to both the defendant and the public. *Wise*,
> 176 Wash.2d at ——, 288 P.3d 1113; *Momah*, 167
> Wash.2d at 148, 217 P.3d 321. Moreover, assessing
> the effects of a violation of the public trial right is
> often difficult. *Wise*, 176 Wash.2d at ——, 288 P.3d
> 1113 (quoting *United States v. Marcus*, —— U.S. ——
> , 130 S.Ct. 2159, 2165, 176 L.Ed.2d 1012 (2010)).
> Requiring a showing of prejudice would effectively
> create a wrong without a remedy. Therefore, we do

not require a defendant to prove prejudice when his right to a public trial has been violated. *Wise*, 176 Wash.2d at ——, 288 P.3d 1113.

(footnotes omitted).   See also, *United States v. Withers*, 638 F.3d 1055, 1063 (9th Cir. 2011) (Because such violations are structural errors, they warrant habeas relief without a showing of specific prejudice.)

Our Courts have determined that prophylactic protection is necessary to assure compliance with bedrock principles of our criminal justice system. While it is possible to show violations of these fundamental principles, it is not possible to show prejudice. For that reason, and to motivate compliance the Courts have decided that structural errors require a reversal of the conviction regardless of the lack of any demonstrable prejudice. Accordingly, Mr. Ruth is entitled to have his convictions reversed and the matter remanded for a new trial.

## III.   CONCLUSION

For the reasons set out in the Petitioner's pleadings he contends that he is entitled to a new trial.

15

DATED ___10___ day of June, 2013.

Respectfully submitted,

MARK D. MESTEL, INC., P.S.

MARK D. MESTEL, WSBA #8350
Attorney for Petitioner

16

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply Brief was

served on the following by US Postal Service, addressed to:

1) Court of Appeals  *(2 Copies)*
   Division One
   600 University Street
   One Union Square
   Seattle, WA 98101

2) Snohomish County Prosecutor's Office
   3000 Rockefeller Avenue, M/S 504
   Everett, WA 98201

3) Matthew Ruth, DOC# 879492
   c/o Stafford Creek Corrections Center
   191 Constantine Way
   Aberdeen, WA 98520

DATED this _11_ day of June, 2013.

Brandy L. Ellis, Secretary

EXHIBIT 15

EXHIBIT
THREE

Petitioner's REPLY MEMORANDUM
To State's SUPPLEMENTAL RESPONSE
to PERSONAL RESTRAINT PETITION

(AAG Answer EXHIBIT 16)



No. 68380-2-I

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

MATTHEW R. RUTH,

Petitioner,

Vs.

State of Washington,

Respondent.

PETITIONER'S REPLY MEMORANDUM
To State Supplemental Response to Personal Restraint Petition

Matthew R. Ruth
Pro Se Litigant
Doc 879492 H4-A-88U
Stafford Creek Correctional Center
191 Constantine Way
Aberdeen, Wa 98520





# TABLE OF CONTENTS

I. Opening Statement...........................................1

II. Relevant Fact's..........................................2

The State's Response brief omits key words to Change Context of threats
Pg 3

The Public Witnessed The Prosecutor Assault Ms. Woerner
And threaten to arrest Her If She Tells The Complete Truth
Pg 3

Mr. Ruth Objected to Mr. Adcock Threatening Ms. Woerner and Established She wasn't
Testifying because of the threats; The trial Judge Threatened to place Mr. Ruth in
Restraints in Front of the JURY for Objecting
Pg 4

Mr. Ruth demanded Ms. Woerner Testify; No Factual Basis for Perjury exist;
No legitimate Strategic or Tactical Reason to not call Woerner; Mr. Adcock
Admits a Motion for Mistrial was ruled on During the In-Chambers Hearing
Pg 5

Ms. Woerners Original Statement and Intended Testimony are identical in the
Portions that support Mr. Ruth's defense; Mr. Adcock violated Confrontation
rights; Mr. Adcock induced Mr. Poole not to testify failed to disclose and
Misrepresented Interview to impeach Mr. Ruth with two non-testifying witnesses
Pg 8

III. Argument.............................................12

I. THE STATE'S VERSION OF THE EXPERIENCE PRONG IS CONTRARY TO SUBLETT WISE MORRIS
Pg 12

A. FAIRNESS TRIGGERS THE PUBLIC AND ACCUSED SAFEGUARD
Pg 13

B. THE FRAMERS OF THE WASHINGTON STATE CONSTITUTION SEPARATED APPEAR AND DEFEND
Pg 15

C. CORRUPT PROCEEDINGS CREATED BY PROFESSIONAL MISCONDUCT ARE THE INCARNATE OF
WHAT PUBLIC AND JURY TRIAL RIGHTS WERE DESIGNED TO PREVENT
Pg 17

II. THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL
Pg 19

III. THE STRUCTURAL ERROR BAR FOR COLLATERAL REVIEW HAS NOT BEEN DEFINED
Pg 20

### TABLE OF AUTHORITIES

**STATE SUPREME COURT**                                              **Pg**

Cohen v. Everret City Council, 85 Wash.2d 385,
535 P.2d 801, 804 (1975).....................................18

In Re Bonet, 144 Wn.2d 502 (2001)...........................17

In Re LongAcre, 155 Wash.2d at 728, 741-42,
193 P.3d 1074...............................................17

In Re Personal Restraint of Morris, 84929-3,
Wash: Supreme Court (2012)..................................12

Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 37-39,
640 P.2d 716, 719-20 (1982)..............................13, 18

State v. Bone-Club, 128 Wash.2d 254, 259,
900 P.2d 325, 328 (1995).................................14,18

State v. Burri, 87 Wn.2d 175, 550 P.2d 507, 513 (1976)....18

State v. Esterling, 157 Wash.2d 167, 179,
137 P.3d 825, 830 (2006)....................................13

State v. Hess, 86 Wn.2d 51 (1975)...........................19

State v. Irby, 170 Wn.2d 874, 880, 885 n.6 (2011)......15,16

State v. Ledford, 195 Wash. 581, 81 P.2d 830, 832 (1938)..18

State v. Martin, 171 Wn.2d 521 (2011).......................15

State v. McCuistion, 174 Wash.2d 369, 387
(2012)......................................................15

State v. Shutzler, 82 Wash. 365, 114 p. 284, 285 (1914)...15

State v. Sublett, 176 Wash.2d 58,
292 P.3d 715 (2012)......................12, 15, 16, 18, 20

Lead opinion, 292 P.3d 715, 723...................16, 18, 20
C.J. Madsen Concurrence, 292 P.3d at 736..................12
J. Wiggins Concurrence, 292 P.3d at 761..................12
J.Stephens Concurrence, 292 P.3d at 754-56, Fn.1..15, 16, 20

State v. Wise, 176 Wash.2d at 18,
288 P.3d at 1121, n.2 (2012)..................12, 14, 16

State v. Wroth, 15 Wash.621,
47 p. 106, 106-08 (Wash.1896)....................16, 20

## TABLE OF AUTHORITIES

### COURT OF APPEALS DIVISION I

Hundtofte v. Encarnacion, 169 Wn.App. 498,
280 P.3d 513, 520 (Wash.App.Div.I 2012).....................19

State v. Carlisle, 73 Wn.app. 678, 871 P.2d 174,
177 (Wash.App.Div.I 1994)..............................17, 18

### DIVISION II

State v. Bennet, 168 Wash.App. 197,
275 P.3d 1224, 1229-30, 1232 n.6 (2012)..............16, 19

State v. Barrysmith, 87 Wash.app. at 273,
944 P.2d 400.............................................18

State v. Jones, 2013 WL 2407119 at 9-12...........13, 15, 16

State v. Varnell, No. 42575-1-II (9-4-13)(Unpublished)....13

### UNITED STATES SUPREME COURT

Danforth v. Minnesota, 128 S.Ct. 1029 (2008).............20

Duncan v. Louisana, 391 U.S. 145, 156,
88 S.Ct. 1444, 1449, 1451-52 (1968).....................17

In Re Oliver, 333 U.S. 257, 270 n.25 (1948)..............15

Maleng v. Cook, 490 U.S. 488, 493,
109 S.Ct. 1923, 1926-27 (1989)...........................1

Presley v. Georgia, 130 S.Ct. 731 (2010)................14

Press-Enterprise Co. V. Superior Court, 478 U.S. 1, 8-10,
106 S.Ct. 2735, 92 L.ed.2d 1 (1986).....................13

Richmond Newspapers v. Virginia, 448 U.S. 555,
564 (1980)..............................................14

Schriro V. Summerlin, 542 U.S. 348 (2004)...............20

Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646,
653-54 (U.S.Ill.1988)...................................18

Teague V. Lane, 489 U.S. 288, (1989).....................20

Webb v. Texas, 409 U.S. 95 (1972).......................18

## TABLE OF AUTHORITIES

### THE NINTH CIRCUIT

MUSLADIN V. LAMARQUE, 555 F.3d 830, 841-43,
(9th.Cir.2009)..........................................19, 20

U.S. V. Lord, 711 F.2d 887, 893
(C.A.9(Wash)1983)..........................................19

### OTHER AUTHORITIES

Anne L. Ellington and Jeanine B. Lutzenhiser,
Washington Law Review (2013) Vol. 88:491, 514, 518........12

Jeanine B. Lutzenhiser, Washington Law Review,
(2012) Vol. 87:1203, 1209, 1228 n.259, 1244..........14, 18

Jeremy Bentham, Washington Law Review,
(2012) Vol. 87:1203, 1207......................................19

### RULES AND CONSTUTIONAL PROVISIONS

RPC 1.1 Competence...........................................9

RPC 1.2(a)(1)................................................5

RPC 1.4(2)(3)(5)(B).........................................5

RPC 3.4(b)..................................................17

RPC 8.3....................................................17

RPC 8.4                    PROFESSIONAL MISCONDUCT

(A)...........................................................1
(B).......................................................11, 17
(c)....................................................1, 11, 17
(D)......................................................11, 17
(i).........................................................11
(k).....................................................1, 11

CrR 6.15(f)(1)..............................................20

CrR 7.5....................................................17

CrR 8.3(b).................................................17

iv

## WASH.CONST. ART I Section 10 ADMINISTRATION OF JUSTICE

Justice in all cases SHALL be administered openly,
and without unnecessary delay.

### WASH.CONST. ART I Section 22 RIGHTS OF THE ACCUSED.

In criminal prosecutions the accused SHALL have the right to APPEAR
and Defend in PERSON... to Testify in his own behalf, to meet the
witnesses against him FACE to FACE, to have COMPULSORY process to
compel the attendance of witnesses in his OWN BEHALF,
to have a Speedy PUBLIC TRIAL by an impartial jury...

### WASH.CONST. ART I Section 24 RIGHT TO BEAR ARMS.

The right of the individual citizen to bear arms in
DEFENSE of HIMSELF... SHALL not be impaired....

## TRIAL AND SENTENCING TRANSCRIPT

RP 142 (Custer-Search Mr. Ruth's Home one way or another)..5

Rp 164 (Mr. Eden's Hearsay about Ms. Woerner)..............9
Rp 247 (Defense Cannot rebut Hearsay of
        Non-testifying Witness)..........................10

RP 179-81 (In-Chamber Summary Appendix "A").......2-3, 6, 17

Rp 171-74 (Mr. Stephens fails to perfect impeachment
        of Mr. Eden with P.I. Gary Way).................8

Rp 195-97...................................................8
(Custer demanded an attorney; refused Medical attention;
Screamed he didn't break in; wouldn't cooperate with Police)

Rp 228 (Mr. Adcock objects to sole Defense theory;
        drug selling and use; Judge called a side bar)....11

Rp 266-67...............................................4, 19
(Mr. Ruth made Record that Ms. Woerner was not testifying
because of Mr. Adcocks threats; the Judge threatened to place
Mr. Ruth in restraints, in front of the jury)

Rp 281 (Mr. Adcock claims Mr. Ruth's and Ms. Woerner's
        lifes are not justification enough to defend).....11

Rp 281-82 (Mr. Adcock keeps screaming and yelling
        at Mr. Ruth, Cross-examination of Fury)........11
2/5/05 Sentencing Rp 19 (References Cross of Fury)........11

v

Rp 310...............................................11
(Misrepresentation Impeachment; Non-testfying witness)

2/5/05 Sentencing Rp 1-7.........................5-7, 19
(Mr. Ruth demanded Ms. Woerner be called; Ask for continuance
to file motion for new trial; Mr. Ruth attempts to file pleadings;
Mr. Adcock admits a Motion to dismiss was discussed In Chambers)

2/5/05 Sentencing Rp 23-25......................11, 19
(Judge Admits to being biased against Mr. Ruth)

## APPENDIX AND EXHIBITS

Appendix "A"
On the record Summary of In-Chambers Hearing......2-3, 6, 17

Appendix "B"
2/5/05 Sentencing...........................5-7,11, 19

Appendix "C"..................................9
(Jury Instructions 15, 16, 17)

Exhibit One..................................4, 17
(Trial Counsel Mark D. Stephens - Motion to Withdraw)
Pg 1, Section 7.............................7, 19
Pg 3, Section 10.........................2-3, 13, 19
Pg 4, Section 16-17........................18, 19

Exhibit Two..................3-5, 8-9, 17, 19
(P.I. Michael Powers, Henry Slothang and Renne M. Woerner)

Exhibit Three...................4-5, 17, 19
(P.I. Michael Powers - Henry Slothang)

Exhibit Four...................4-5, 17, 19
(Matthew R. Stroud I)

Exhibit 5....................5, 8-9, 17, 19
(Matthew R. Ruth)

Exhibit 6...................5-8, 17, 19
(Pleadings attempted to file at 2/5/05 sentencing)

Exhibit Seven...................8, 19
(P.I. Michael Powers - Jeremy Custer)

Exhibit Eight.................9, 10, 19
(P.I. Michael Powers - Donnie Poole)

Exhibit Nine..................9, 19
(Psychological evaluation - Dr. Muscatel)

Exhibit Ten...................11, 19
(Jury mid-Deliberation inquiry)

# I. OPENING STATEMENT

The Petitioner, Matthew R. Ruth, Humbly asks this Most Honorable Court to Please not hold him to the same standards as a Lawyer, since he is acting Pro Se and has no legal training. Please give these pleadings Liberal Interpretations and hold them to less stringent standards then those drafted by Lawyers.

Maleng v. Cook, 490 U.S. 488, 493, 109 S.Ct. 1923, 1926-27 (1989).

Mr. Blackman has violated RPC 8.4(a)(c)(k) in the State's response, by misrepresenting material facts, to assist the trial Court in further cloaking evidence that Mr. Adcock, attempted to Suborn Perjury and when failing, physically assaulted the sole Material eye-witness Ms. Woerner; then abused the power of his office, to prevent this crucial testimony from being presented to the jury, by threatening to arrest and prosecute Ms. Woerner for perjury "IF SHE TESTIFIED."

Ten Exhibit's are attached that prove when Ms. Woerner refused to lie for Mr. Adcock, he inflicted bruises on her, while calling her a "Stupid Bitch", and threatening to arrest her for perjury "IF SHE TESTIFIED". This is the reason Judge Hulbert -- even though the Jury was gone - called a side bar, that led into Chambers. The Factual basis for Mr. Adcock's In-Chamber Perjury allegation, is that Ms. Woerner wanted to testify to the complete truth.

Any issue of Fairness Synchronizes the "Open Administration of Justice" and Mr. Ruth's Public Trial Right's into a safeguard that triggers at any proceeding when Fair Trial rights are at issue, on the likelihood of Jeopardy to Constitutional Rights; and restricts the Court from Closure absent a Bone-Club analysis. The right to Jury trial was designed as a safeguard against Misconduct of Prosecutors and Judges. Any Proceeding concerning Highly unethical Professional Misconduct that prejudices the Administration of Justice has Historically and must always be an Open Proceeding; Never cloaked by the label "In-Chambers Conference."

Mr. Ruth has included a detailed factual account of the relevant record to clear the confusion of Mr. Blackman's most Colorable Response.

1

## II. RELEVANT FACT'S

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.

She indicated to me Mr. Adcock had THREATENED to CHARGE her with PERJURY IF SHE TESTIFIED.

She expressed concern to me about the potential legal consequences IF SHE TESTIFIED.

I indicated I could not advise her and suggested she seek appointed counsel to answer her questions."

(Exhibit One, Trial Counsel Mark Stephens, Declaration in motion to withdraw, 12-28-04, About Conversation with Renee M. Woerner during trial 12-7-04)(State's Exhibit 21).

On the record in the Summary of what was discussed during the Secret In-Chambers hearing, Mr. Adcock misrepresented the facts of the Stephens/Woerner Conversation:

"I believe he had a conversation with her where she brought up the fact that I had said that IF YOU COMMIT PERJURY, there is going to be consequences. And at that point he concluded that she needed to be advised." RP 180.

That is not what Mr. Stephens said In-Chambers. There is a huge difference between "if you commit perjury there will be consequences" (Adcock Version) and "threatened to charge her with Perjury IF SHE TESTIFIED." (Woerner, Stephens, Stroud I Version).

Although, Mr. Stephens did not correct the Misrepresentation made by Mr. Adcock during the summary on the record, he did dispute the "Context" and what was "discussed" In-Chambers:

"I just might add that's, more or less, what's happen. When I had my conversation with this potential witness, she indicated to me concerns about comments Mr. Adcock made. She indicated the word "PERJURY" was used. I DON'T KNOW WHAT "CONTEXT" THAT WAS IN. I advised her I cannot give you any advice and if you need advice you need your own lawyer. Which I think was about all I could do with that." RP 180.

It is not clear why Mr. Stephens did not repeat what was really said In-Chambers which is presented in Exhibit one, pg. 3 section 10, but he did dispute Mr. Adcocks misrepresentation. Rp 180.

2

## THE STATE'S RESPONSE BRIEF OMITS KEY WORDS TO CHANGE CONTEXT OF THREATS

The State's Suppl.Resp. to P.R.P. pg 3-4 omits the Words "IF SHE TESTIFIED" and "She expressed concern to me about the legal consequences if she testified", in an attempt to mislead this Court about the Confrontation, Mr. Adcock's professional misconduct, and what was discussed In-Chambers.

On Pg. 4 of the Suppl.Resp. to P.R.P., Mr. Blackman wrote:

"she recalled the prosecutor 'had threatened to charge her with perjury' (ex.21 at 3), there is no evidence in the record that there actually was a 'confrontation,' much less that it was discussed in chambers."

Please Look at Exhibit one at 3 section 10, Mr. Blackman removed the words "If she testified", to make the context fit Mr. Adcocks version of events. In reality Ms. Woerner said:

"Mr. Adcock had threatened to charge her with perjury IF SHE TESTIFIED."

Mr. Blackman also removed the last two sentences which established Mr. Adcocks threats made Ms. Woerner concerned about being arrested and prosecuted for perjury, IF SHE TESTIFIED; and Mr. Stephens advising her to seek counsel. Mr. Blackman Misrepresented the record because it proves that the In-chambers hearing was caused by the Professional misconduct of Mr. Adcock, and resolved Ms. Woerners concerns about the threats by making plans to appoint her counsel. Rp 180. Which proves this confrontation did happen, was discussed, and partially resolved In-Chambers. Why else appoint Counsel? RP 180; (Exhibit One).

## THE PUBLIC WITNESSED THE PROSECUTOR ASSAULT MS. WOERNER AND THREATEN TO ARREST HER IF SHE TELLS THE COMPLETE TRUTH

"Henry was at the courthouse on the day in question. He did witness Adcock 'drag' his daughter into a side room where he then heard yelling going on between Adcock and his daughter.... Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. That he left bruises.... She said that he called her a stupid bitch several times." (Exhibit Two, Private Investigator Michael Powers interview of Henry Slothang and Renne M. Woerner).

3

"Mr. Slothang told me that.... he too was present at the courthouse at the time of Matt's trial. He said that the Prosecutor got very angry at Renee because Renee wanted to testify to the 'complete truth and not just what was in her statement.'" (Exhibit Three, Michael Powers interview with Henry Slothang).

Mr. Stroud who was also present watched Mr. Adcock drag Ms. Woerner into a side room, heard the yelling. When they reappeared Mr. Adcock threatened to have her arrested if she took the stand. Ms. Woerner told Mr. Adcock that she would not lie for him. Mr. Stroud followed Mr. Adcock back into the Court room, where Mr. Adcock lied to Defense Counsel, Mr. Stephens, telling him Ms. Woerner intended to perjure herself. Mr. Stroud told Defense Counsel Stephens that is not true, Ms. Woerner is trying to tell the truth, and Mr. Adcock threatened her. Mr. Stephens told Mr. Stroud to calm down, he would put Ms. Woerner on the stand. Mr. Stephens then went to talk to Ms. Woerner in the hallway, and pulled her into a side room where the discussion in Exhibit one took place. After that discussion Mr. Stephens approached the bench, and shortly after, the secret In-Chambers hearing took place. (Exhibit Four, Affidavit of Matthew R. Stroud I).

There was no Bone-club analysis before the Closure, and that prevented the public from objecting and making record of this confrontation and misconduct.

**MR. RUTH OBJECTED TO MR. ADCOCK THREATENING MS. WOERNER AND ESTABLISHED SHE WASN'T TESTIFYING BECAUSE OF THE THREATS; THE TRIAL JUDGE THREATENED TO PLACE MR. RUTH IN RESTRAINTS IN FRONT OF THE JURY FOR OBJECTING**

A. You're the one who threatened witnesses.

A. — And Coached Witnesses.

A. That's why my girlfriend is not here to testify.

The Court: You will be quiet or restrained. Am I very Clear about that?

RP 266-67. (Mr. Ruth Cross-examination by Mr. Adcock)

4

This is the first time Mr. Ruth was allowed to make record after learning why and that Ms. Woerner was not testifying. Ms. Woerners Parents were both in the Court room, on the day Mr. Ruth Testified. Mr. Stephens told Mr. Ruth that Ms. Woerner Would not testify because She was scared of the Threats made by Mr. Adcock. (Exhibit 5, Affidavit of Mathew R. Ruth). Mr. Ruth demanded that Ms. Woerner be called to testify at all times. See 2/5/05 Sent'g RP 3-7. Defense Counsel did not communicate with Mr. Ruth about what Ms. Woerner said before approaching the bench and going In-Chambers. RPC 1.2(a)(1);RPC 1.4(2)(3)(5)(b); (Exhibit 5 Affidavit of Matthew R. Ruth).

Defense counsel told Mr. Ruth that Ms. Woerner was scared of Mr. Adcocks threats, and attempts to get her to lie. The original statement Ms. Woerner gave corroborated Mr. Ruth's defense on crucial parts; she said the alleged victims were high on drugs; accusing Mr. Ruth of stealing drugs; forced their way into the trailer after making threats. Finally she said the alleged victims said they would do whatever it takes to search the trailer "one way or another", this part is Corroborated by Custer at trial Rp 142. Mr. Stephens told Mr. Ruth, that Mr. Adcock was trying to get Ms. Woerner to change those parts of her statement, and bring in the Domestic violence allegations, when she refused Mr. Adcock threatened her with arrest and prosecution if she testified to the truth. (Exhibits 1,2,3,4,5,6).

**MR. RUTH DEMANDED MS. WOERNER TESTIFY; NO FACTUAL BASIS FOR PERJURY EXIST; NO LEGITIMATE STRATEGIC OR TACTICAL REASON TO NOT CALL WOERNER; MR. ADCOCK ADMITS A MOTION FOR MISTRIAL WAS RULED ON DURING THE IN-CHAMBERS HEARING**

The State's Suppl.Resp. To P.R.P. pg 3-4, in a deceitful manner attempts to make this Court believe the decision not to call Ms. Woerner by the defense was, first, made at the same time as the state; second, with Mr. Ruth's consent;

5

Third, a legitimate strategic decision because allegedly her intended testimony would corroborate the alleged victims, or easily be impeached by her prior statement. None of this is true, nor is there a factual basis; support from the record; or any substance to the state's claims. Also, Mr. Blackman claims that no evidence exist to support that a "Confrontation" occured, or was "Discussed" in the three part closure: Side bar, into chambers, out to sidebar.

(12-7-4 2:56 Recess; 3:22 - (The professional misconduct proceeding was 26 Min.) - The Court resumes with the sidebar still in progress that occured immediately upon exiting the In-Chambers hearing; 3:24 The Court admonishes the Jury: "Sometimes people are available or they are not available." Rp 177; 3:25 "real quickly" In-Chambers Summary; 3:28 Court in recess. (Appendix "D").

"We're going to make arrangements for the office of the Public defender To get HER an ATTORNEY, to consult with her tomorrow about her options, so to speak."

"Mr. Stephens indicated to me that HE DID NOT KNOW whether he WAS going to CALL HER YET but that was the first step, in any event, and I agree." Rp 180.

12-28-04 Mr. Stephens withdrew from the case when caught making unethical comments about Ms. Woerner. See (Exhibit 1 Declaration/transcripts Rp 319-321). Charles H. Dold was appointed, and investigated the Woerner Proceeding:

"I met with Mr. Ruth, and determined that one of the main issues that he had indicated needed to be investigated was the testimony of Renee Woerner.... Mr. Ruth advised me that Ms. Woerner's testimony was critical, that he was very critical of his attorney for not calling her....

I have not had a chance to interview her at length about this incident and about what her testimony would be and about WHAT MAY IN FACT BE AN APPARENT CONFLICT BETWEEN STATEMENTS that she had made PREVIOUSLY VERSUS WHATEVER HER TESTIMONY WOULD BE.

As a result, I AM NOT PREPARED to PRESENT a MOTION for a NEW TRIAL based on either PROSECUTORIAL MISCONDUCT, ineffective assistance of counsel, or DENIAL OF JUSTICE, any of the three.... Mr. Ruth wanted me to ask the court, because of that, to continue this proceeding....

Mr. Ruth has prepared some pleadings that would effectively make that request." 2/4/05 Sentencing Rp 3-5; (Exhibit 6 Affidavit and pleadings).

In response to this Mr. Adcock (Like Mr. Blackman Supp.Resp.to.P.R.P. pg 3) referred to Mr. Stephens declaration to claim Defense Counsel also chose not to call Ms. Woerner based on legitimate tactics and strategy, and allegedly Mr. Ruth agreed. Most important, though, is Mr. Adcock admits that a motion for dismissal occured during the In-Chambers hearing at issue:

6

"Mr. Stephens also declines to call her as a witness. He filed a declaration at the first sentencing date -- when he was asking leave to withdraw -- in which he states that after conferring with his client, he decided not to call her as a witness because he believed her testimony would be either corroborative of what she told the police in the original statement or that, if she lied, she would be easily impeached; and, therefore, there was no tactical or practical advantage of calling her as a witness.

WE HAVE BEEN THROUGH THIS BEFORE... Given the fact it won't change anything. I'd ask you to deny the motion for continuance.

Mr. Dold: The only comment in response is that he may have conferred with Mr. Ruth. Mr. Ruth never agreed to Mr. Stephens' strategy in that regard and was quite upset... he has indicated that that's not a decision he ever would have agreed with, and he disagrees with any assessment of tactical or strategic advantage.

The Court: Thats fine. Those are all post-trial issues. We'll proceed to sentencing." 2/5/05 Sentencing RP 6-7.

Where did Mr. Adcock, the Trial Judge, and Defense Counsel go through a motion for new trial based on Ms. Woerners intended testimony, the Professional misconduct of the Prosecutor, and denial of justice? The only place this was at issue was during the In-Chambers hearing.

The Pleadings Mr. Ruth had prepared and attempted to file on 2/5/05 at sentencing, is attached as exhibit 6. Mr. Ruth states on page 2 of the affidavit:

"5.) It is believed that the attorney should have made an offer of proof... to show that the state had threatened the defense's key witness with adversities such as charges of perjury and threatening that she would not see her children for 10-15 years. The prosecution was using these tactics continuously to try to get the witness to change her story to this story or that story by telling her, 'this is how it happened remember, hint, hint!' the witness called the defense attorney and told him, he said, 'it doesn't matter' that the state is tampering with witnesses, 'because he is fucked anyways.' see (Exhibit 6, see motion for new trial pg 2 "Pros. extorted witnesses"; pg 9 "Defense Counsel failed to interview Ms. Woerner"; pg 11 "Pros. threatened and harassed witnesses").

This is Corroborated by Mr. Stephens declaration pg 1 section 7. On 12-4-04, before trial Ms. Woerner called defense counsel, and told him about Mr. Adcock trying to get her to change key points in her original statement that corroborated the defense. After trial, Ms. Woerner told Mr. Ruth that his defense counsel said it didn't matter because Mr. Ruth "is fucked", and would not listened to her.

7

Mr. Ruth called Mark Stephens with Ms. Woerner on the phone to confront him about this, Mr. Stephens confirmed the statement, and made disparaging remarks about Ms. Woerner, and that is why he motioned to withdraw. (Exhibit One, pg 4 section 16, 17).

**MS. WOERNERS ORIGINAL STATEMENT AND INTENDED TESTIMONY ARE IDENTICAL IN THE PORTIONS THAT SUPPORT MR. RUTH'S DEFENSE; MR. ADCOCK VIOLATED CONFRONTATION RIGHTS; MR. ADCOCK INDUCED DONNIE POOLE NOT TO TESTIFY FAILED TO DISCLOSE AND MISREPRESENTED INTERVIEW TO IMPEACH MR. RUTH WITH TWO NONTESTIFYING WITNESSES**

Ms. Woerners original statement corroborated Mr. Ruth's defense on crucial points. She is one of four people who witnessed the shooting. Mr. Stephens did not admit one piece of evidence, and presented one witness, Mr. Ruth. Ms. Woerner's original statement did contained a lot of bad stuff about Mr. Ruth, all of which was not true, nor admissible because it was alleged domestic disputes between Ms. Woerner and Mr. Ruth. The Domestic stuff was already ruled not admissible in the Motion in limine. Ms. Woerner was not thrilled about the case because of the rough relationship she had with Mr. Ruth. Why would she lie? (Exhibit 7, interview of Jeremy Custer 1-20-11).

Ms. Woerner always maintained there was a lot of people out side the trailer; Custer and Eden came in without permission; Mr. Ruth told them to get out; Custer and Eden accused Mr. Ruth of stealing drugs; "Searching everyone's Shit, no exceptions"; Threats were made by Custer and Eden; Custer and Eden Were High as a Kite. This corroborated Mr. Ruth's Testimony, self-defense theory, and is the only eye-witness evidence that is not biased because she was not shot, nor the shooter. (Exhibit 2, 5, 6). On 10-11-04, Alleged Victim Eden, gave a statement to Defense Investigator Gary Way, that Corroborated Ms. Woerner and Mr. Ruth on the above key points. Defense Counsel did not call Gary Way as a witness, although, he tried to impeach Eden with the statement. RP 171-74, 195-97.

8

The original statement and intended testimony corroborated the alleged victims in places as well. Ms. Woerner said Custer sat on the bed with her; Eden sat on the couch behind Mr. Ruth. This is the extent of the Corroboration, and under the "Act on Appearance" Self-defense Instruction 16; bolsters Mr. Ruth's Reasonableness to defend Ms. Woerner; instruction 17. (Exhibit 2, 5)(Appendix "c" Instructions).

12-6-04 at 9:45, Mr. Stephens motions to strike testimony of Woerner because he was unable to interview her. (Appendix "D" pg 3). Compare that to Saturday 12-4-04, Mr. Stephens: "I returned a phone call from Ms. Woerner, in which she suggested..." (Exhibit 1 Pg 1 Section 7).

There is no legitimate tactical or Strategic reason not to call Ms. Woerner. Her intended testimony (Exh. 2) is consistent with her original statement to the material facts that support Mr. Ruth's defense. Mr. Stephens did not provide competent Representation, he was not prepared for Trial, he never interviewed Ms. Woerner, even he said at the Motion In-Limine that he had not interviewed her, and he didn't interview after the threats. RPC 1,1 Competence.

Ms. Woerner and Mr. Poole both corroborated that Mr. Custer carried around guns, sold Drugs, and invaded MR. Ruth's house over stolen Drug's. (Exh 2, 7, 8). Without reading the Evaluation, Mr. Woerner corroborated Kenneth Muscatel, Ph.d in that Mr. Ruth shot the alleged victims because:

"Under the pressure of the situation he may have acted with fear and suspiciousness.... This EVENT did OCCUR in HIS 'HOME' a SMALL fifth Wheel Trailer, and he may have FELT INVADED and THREATENED by the TRAPPING nature of this Location.... he may have interpreted those actions as being legal and appropriate, if as he asserted, he perceived his own life as being at risk." (Exhibit 9, Muscatel, Ph.D)("She felt that she grabbed the Gun because he 'felt trapped in the bedroom.'" Exh.2).

Mr. Adcock brought in hearsay testimony of Ms. Woerner through numerous witnesses, the most prejudicial is during alleged victim Mr. Eden's testimony:

Q- What was Renee doing during all This?

A- I remember her being freaked out. Although it could -- I can't really observe everything as it's going on. I don't know if she was vocally freaked out, but I know she was at least distraught by this. And SHE WAS SAYING, like, "MATT STOP, STOP," Rp 164

9

Any proceeding concerning Ms. Woerners testimony is now attached to Mr. Ruth's

rights to Confrontation because Ms. Woerner has to perfect Mr. Eden's testimony.

After Mr. Adcock knew Ms. Woerner would not be testifying-after the In-Chambers

hearing- during Mr. Ruth's Direct examination the following occured:

Q-Let me ask this. Before that, do you remember what Renee's reaction was to all
this Choas?

Mr. Adcock: Objection.

A-She was screaming for them to get out.
The Court: Excuse me. There's an objection.

Mr. Adcock: Objection. Relevance.

Mr. Stephens: I believe it came up in the state's case in chief.

The Court: That's not my recollection. The Jury can draw it's own conclusion about
it's recollection. I've sustained the objection. Rp 247.

In support of Mr. Adcock's professional misconduct, Donnie Poole (Mr. Ruth's

friend who's house he went to immediately after the shooting), stated that he also

was harassed by Mr. Adock.

"Donnie told me that... what he remembers most was that Adcock was 'trying to
intimidate me'.... Matt said that he freaked out after Custer threatened him with
a gun. Donnie said that was about when Adcock started to get mad and started to
yell...
    Donnie believes the interview with Adcock started to go bad when he tried
to tell Adcock that he had bought drugs from Custer....
    Custer showed up at his house... after the shooting... and Custer threatened
Donnie and told him that he had better not tell anyone about Cuter's business and
what kind of guy Custer was... Mr. Adcock did not believe him and started getting
red in the face and yelling at Donnie... Adcock started yelling... 'you're lying
to protect your friend, none of this is true, this will never see the light of
day'....
    Donnie told Adcock the incident was over 'drugs.' Donnie said that at this
point Adcock was in his face yelling at him... Donnie recalled that Mr. Adcock
'really got mad when I told him this was all over some drugs that Matt had
supposedly stolen from Custer'...
    as soon as he heard things that he didn't like to hear that's when Mr.
Adcock... started to get mad and was trying very hard to intimidate Donnie."
(Exhibit 8, interview with Donnie poole).

10

This interview was never disclosed to the defense, and Donnie Poole did not testify. During Mr. Ruth's Cross-examination Mr. Adcock Misrepresented what Mr. Poole said, and impeached Mr. Ruth with the Material Misrepresentation of a Non-Testifying Witness. Rp 310; RPC 8.4(b)(c)(d)(i)(k).

Mr. Adcock knew this incident was over drugs and the Alleged victims were high, so he prevented any evidence that proves this from being presented to the jury, even when the sole defense witness, Mr. Ruth testified:

"Object to this line of testimony — to this POINT about the shooting indicates THERE WERE NO DRUGS PRESENT. How is this relevant? This is just an attempt to try to BLAME the VICTIMS or portray them in a negative light without really any connection to the issues." Rp 228.

This caused Judge Hulbert to call a side bar, and afterwards no more questioning about the drugs ensued from the defense, which is what the entire defense is based on. Rp 228.

Mr. Adcock kept screaming at Mr. Ruth during cross, and Mr. Ruth asked him to Stop. Rp 281-82. Defense Counsel Dold pointed this out, "Mr. Adcock is saying he doesn't like Mr. Ruth. He uses terms like sociopath to describe Mr. Ruth. We know he doesn't like Mr. Ruth. I think that probably became evident in Cross-examination." 2/4/05 Sentencing Rp 19. This is the same professional Misconduct used to scare Ms. Woerner and Mr. Poole.

Mr. Adcock stated that Mr. Ruth's and Ms. Woerner's lives are not worth defending, even when threatened in their own home. Rp 281. Judge Hulbert expressed his personal dislike for Mr. Ruth, this existed he said throughout the entire trial (Even In-Chambers). 2/4/05 Sentencing Rp 24-25.

The Jury inquired about Ms. Woerner's statement during deliberations. (Exhibit 10). The defense was not allowed to participate in the formulation of the answer to the Jury, nor lodge any objections because the Trial Court did not notify the Defense.

11

## III. ARGUMENT

### I. THE STATE'S VERSION OF THE EXPERIENCE PRONG IS CONTRARY TO SUBLETT WISE MORRIS

The state incorrectly argues that case law is the only source to establish history under the experience prong, and that when case law is silent the experience prong cannot be satisfied. Chief Justice Madsen explains the proper experience prong analysis in her Sublett concurrence.

"Under the experience and logic test, history is one source of guidance as to whether a particular part of the proceeding is one to which the right to a public trial attaches. If precedent or other history, or both, are silent, then the second part of the analysis involves inquiry into whether the particular procedure, hearing, discussion, decision, or other aspect of the case is one to which the public trial right should apply. This demands an examination of the values served by the right to a public trial and whether they would be furthered if the right is applied with respect to the part of the proceeding in question...

These values are ensuring that the defendant has a Fair Trial, to remind the trial Judge and Prosecution of the importance of their function and the obligation to the accuse to carry out their responsibilities, and to encourage witnesses to come forward and testify truthfully... Because protecting and advancing these values are the core concern of the right to a public trial." State v. Sublett, 176 Wash.2d 58, 292 P.3d 715, 736 (2012).

What then is the role of the history inquiry? "Questioning potential jurors In-Chambers is a practice of long-standing and wide use, but history has played no part in the Court's analysis (and rejection) of the practice before or after Sublett." Washington Law Review (2013) Vol. 88:491, Pg 514, 518 (By Anne L. Ellington and Jeanine B. Lutzenhiser).

The Correct Experience Prong analysis is to determine if the core values of the Public trial right would be protected and advanced when attached to the particular stage in question. History is only a guide to help make this determination. The label given to the proceeding does not determine if Public trial rights attach because "Corruption and manipulation can slip into any phase of the trial." 292 P.3d at 761.

12

This has been recently demonstrated in State v. Varnell, where Counsel went In-Chambers - without Bone-Club inquiry - briefly to discuss excusing two potential jurors for cause of employment, and other issues that would not allow them to sit on the jury. This was not put on the record until the next day during a very brief summary. The Appeals Court relied on the summary and result of the In-Chambers hearing to determine Public Trial Rights attached, reverse and remanded. No. 42575-1-II (94-13 Div.II)(unpublished); Also State v. Jones, 2013 WL 2407119.

The summary, Exhibit 1 pg 3, and result of the In-Chambers conference, proves Ms. Woerner was appointed counsel because she was scared to testify due to Mr. Adcock's threats; She Ultimately did not testify; The Jury inquired about her Statement in Deliberations; Professional Misconduct was cloaked; Ms. Woerner and Public were prevented from making record of assault and threats.

Mr. Ruth contends that when Fair Trial rights are at issue the likelihood of Jeopardy to Substantial rights of the Accused simultaneously triggers the protection of both section 10 and 22. This Safeguard restricts the trial court from closure by triggering the Bone-Club Analysis.

### A. FAIRNESS TRIGGERS THE PUBLIC AND ACCUSED SAFEGUARD

In ISHIKAWA the Courts held that the Public's access to open courts can be restricted only when a likelihood of Jeopardy to constitutional rights exist, "where the right to Fair Trial is at Issue." 97 Wash.2d 30, 37-39, 640 P.2d 716, 719-20 (1982).

Logically the same protection must apply to restrict illegal closure by the trial Courts when the right to fair trial is at issue. Our State Supreme Court found the right to an open public trial is a shared right of the accused under section 22 and the Public under section 10 "The common concern being the issue of Fairness." State V. Esterling, 157 Wash.2d 167, 179, 137 P.3d 825, 830 (2006)(Quoting Press-II, 478 U.S. 1, 7 (1980)).

13

Both sections 10 and 22 "Serve complementary and interdependent functions in assuring the fairness of our judiciary system. In particular, the Public Trial right operates as an essential cog in the Constitutional design of Fair Trial safeguards." State v. Bone-Club, 128 Wasg.2d 254, 259, 900 P.2d 325, 328 (1995); See also, Washington Law Review (2012) Vol 87:1203 Pg 1209, 1228 Fn 259 (by Jeannie B. Lutzenhiser). The Protection of the "Superior Right" to Fair Trial is Fundamental. Richmond Newspapers v. Virginia, 448 u.s. 555, 564 (1980).

The Bone-Club test was designed to analyze the Constitutional sufficiency of the need for Closure under Both Section's 10 and 22. This Coextensive analysis protects Fair Trial rights during the Administration of Justice. "It is the Frame work of our system we must protect against erosion of the Public Trial Right." State v. Wise, 176 Wash.2d at 18, 288 P.3d at 1121 (2012).

In Presley v. Georgia, the U.S. Supreme court found that some stages of trial are so important to the Administration of Justice that even if only the Publics right is implicated; the accused has an equal right to the protection provided by the Core Values served by the Public Trial Rights at that stage. 130 S.Ct. 731 (2010).

The Presley Court reasoned that "there could be no explanation for barring the accused from raising a Constitutional right that is unmistakably for his or her benefit." Id. When the proceeding is a Matter of importance to the criminal Justice System, the Public has a right to be present whether or not any party has asserted the right.

The experience and logic test was developed under the First Amendment, However, the Sublett Court has applied it to Section 22. This means that like the Bone-Club analysis, the Experience and Logic analysis is coextensive to the Public and Accused right to "Appear" under the more protective Washington Constitution.

14

The Bone-club and Sublett test are both part of a more protective coextensive "Fair Trial" right "safeguard" that restricts Closure when there is a "chance that a defendants 'substantial rights may be affected' at that stage of trial." State v. Irby, 170 Wn.2d 874, 880, 885 n. 6 (2011); State v. Jones, 2013 WL 2407119, at 11.

B. THE FRAMERS OF THE WASHINGTON STATE CONSTITUTION SEPARATED APPEAR AND DEFEND

"Constitutional questions are reviewed De Novo." State v. McCuistion, 174 Wash.2d 369, 387 (2012). The right to "Appear" under the Washington State Constitution does not depend on the Due Process right to defend, as the Federal Right to be present does. Id. IRBY; JONES, Supra.

"We have never held that if the defendant can be excluded without offending his Due Process rights, then there is no Public Trial Right.... The benefits of a public trial sweep more broadly than the defendant's Due Process interests. see In Re Oliver, 333 U.S. 257, 270 n.25 (1948)." Sublett, 292 P.3d at 756.

"We believe that when the framers of our State Constitution drafted Art I section 22 and presented it to the people of the territory of Washington for adoption they were aware of the linguistic differences between that section and the 6th Amendment and assumed that the State provided rights that were not provided by the USC." State v. Martin, 171 Wn.2d 521 (2011).

"Unlike Snyder, our decision in Shutzler, does not condition the right to 'appear and defend' at a particular 'stage of trial' on what a defendant might do or gain by attending... or the extent to which the defendants presence may have aided his defense, but rather on the chance that a defendant's 'substantial rights may be affected' at that stage of trial." IRBY at 885 Fn 6.

"It is no answer to say that in the particular proceeding nothing was done which might not lawfully have been done had he been personally present. The excuse, if good for the particular proceeding, would be good for the entire proceedings; the result being a trial and conviction without his presence at all. The wrong lies in the act itself, the violation of Constitutional and statutory rights of the accused to be present and defend." Shutzler, 82 Wash. 365, 114 p. 284, 285 (1914).

The right to Appear historically attaches independent of the Due Process right to Defend, as part of the Public's and defendant's Public trial right safeguard.

15

There is no per se rule that the issues raised during In-Chambers conference are not subject to Public Scrutiny and the defendants right to appear. <u>State v. Bennett</u>, 168 Wash.App. 197, 275 P.3d 1224, 1229-30 (2012).

"Even proceedings involving purely legal matters, the public's presence may ensure the fairness of such proceedings.... The Defendant's and Public's... mere presence passively contributes to the fairness of the proceedings such as deterring deviations from established procedures, reminding the officers of the court of the importance of their functions, and subjecting Judges to the Check of public Scrutiny... The defendant's and the Public's mere presence passively contribute to the proceedings" even when serving "No function in aiding the defendant's defense." Id. 275 P.3d at 1229, 1232 n.6, (quoting Irby n.6).

Sublett rejected the "Sadler" test, that is built from the Federal Right to be present standard. Under this Federal right the Due Process standard to "Defend" must be overcome before the Right to be present is activated. Irby, n.6.

With the rejection of the "Sadler" test, the wide majority also rejected any notion that the Federal Due Process standard to "Defend" is Conflated with the Washington State Constitution's Mandatory Right of both the defendant and Public's to "Appear". <u>Sublett</u> at 292 P.3d at 723, 754-56; <u>Wise</u> at n.2(Gunwall?).

Justice Wiggins recently made this clear, in <u>Jones</u>, when holding that the Right to "Appear" triggered at an illegal closure, and Public trial rights attached even though the error was Harmless under the Due Process Right to "Defend". 2013 WL2407119 at 9-12. Historically, when the right to "appear" is triggered that proceeding is Open to the Public:

"It is the lawful right of a party to have his cause tried in open court, with opportunity to be present and heard in respect to everything transcribed.... Aside from the rights of the parties, Public policy will not sanction any departure from the rule which requires that all communication SHALL be PUBLIC, and in the presence of the Parties..." <u>State v. Wroth</u>, 15 Wash.621, 47 P.106, 106-108 (Wash.1896).

Mr. Ruth argues that when the "Superior right" to Fair Trial is at issue, the Public trial coextensive protection attaches, upon the likelihood of Jeopardy to Constitutional rights, and restricts closure by the Trial Court; absent passing the Bone-Club test (in open court).

16

## C. CORRUPT PROCEEDINGS CREATED BY PROFESSIONAL MISCONDUCT ARE THE INCARNATE OF WHAT PUBLIC AND JURY TRIAL RIGHTS WERE DESIGNED TO PREVENT

The Jury trial Right was designed as "an inestimable SafeGuard" against the chance of bias and corrupt proceedings created by the Professional misconduct of the Prosecutor, or Judge. Duncan v. Louisana, 391 u.s. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968). Which is equivalent to the "corrupt" and "biased" In-Chambers Proceeding at issue in the present case. The Court was in recess, Jury removed; the Public inherited the Jury safeguard function (Sublett, 723-24); What is the Purpose of a Side-bar when the jury is not present? The Side-bar did not restrict the Defendant's and Public's access enough because the Judge furthered the Closure by taking Mr. Stephens, and Mr. Adcock In-Chambers; and afterwards endorsed Mr. Adcock's Misrepresentation of the material facts discussed In-Chambers. Rp 179.

Trial Prosecutor Mr. Adcock's Professional Misconduct prejudice the Fair Administration of Justice. In Re Bonet, 144 Wn.2d 502 (2001). In Bonet the prosecutor violated RPC 3.4(b), 8.4(b)(c)(d), when misrepresenting Material Facts; and used charging power in an attempt to induce a witness not to testify. The Supreme Court found this to be a "Highly Unethical" issue of Significant Public interest, that rendered the ultimate fact of whether the witnesses testified, or not, irrelevant. The same applies to Ms. Woerner, and triggers Right's to "Appear".

Mr. Adcock misrepresented the Material facts of the perjury allegation and what was discussed In-Chambers; Attempted to Suborn Parjury; Assaulted Ms. Woerner; then Personally threatened to arrest and prosecute her for Perjury "If She Testified." State v. Carlisle, 73 Wn.App. 678, 871 P.2d 174, 177 (Wash.App.Div.1 1994)(Exh. 1-6). Both Mr. Stephens and Judge Hulbert, have a duty to motion for a mistrial at this point, (CrR 7.5/8.3(b)), and to report this Misconduct, (RPC 8.3). This Cloak defeats the purpose of the Attorney discipline Safeguard;

"The purpose of discipline is primarily to protect the public and maintain public confidence and trust in the legal system and secondarily to deter other lawyers from similar behavior." In Re LongAcre, 155 Wash.2d at 728, 741-42, 193 P.3d 1074.

This Court held that a direct threat from the prosecutor to charge a material witness "If she testified" violates the Defendants Rights to Compulsory Process, and requires DISMISSAL. Cariale, 871 P.2d at 177; Webb v. Texas, 409 u.s. 95 (1972)(Compulsory violation for telling sole witness about perjury even on record).

Mr. Ruth has a Compulsory process right to ascertain what the sole Material Eye-witness's testimony will be. The Fundamental Due Process Right to Present the Defendants version of the facts can only be protected if presented to the Jury, so they may decide where the truth lies. This element goes directly to the right to present a defense. State v. Burri, 87 Wn.2d 175, 550 P.2d 507, 513 (1976).

The ends of Justice would be defeated if Judgments were to be founded on a partial or speculative representation of Facts. The guarantee to develop all relevant facts in the Adversary system is both Fundamental and Comprehensive. Taylor v. Illinois, 484 u.s. 400, 108 S.Ct. 646, 653-54 (U.S.Ill.1988). The Courts must safeguard this Right with meticulous care because it can be violated by the ACTIONS of the Prosecutor as well as the Judge. Burri at 513. Any discussion of Mr. Adcock's actions In-Chambers is the equivalent of testimony, and that cannot be taken in Secret. Cohen v. Everett City Council, 85 Wash.2d 385, 535 P.2d 801, 804 (1975).

Mr. Ruth and the Public have a right to "Appear" during this corrupt proceeding to develop all the relevant facts; ascertain what the inteded testimony will be; if a sufficient factual basis supports a strong belief in perjury and that perjury cannot be disuaded (Berrysmith, 87 Wash.app. at 273); Perjury cannot be predicated on false statement corrected before the submission to the jury (Ledford, 195 Wash. 581, 81 P.2d 830, 832). This Closure does not ensure a Fair Trial, it encourages Professional Misconduct, Perjury, and Discourages witnesses from coming forward. Sublett, at 723. Proponent Two of the Bone-Club Analysis is very critical in this case:

"Giving all parties and the Public enough information about a proposed closure and an opportunity to register their objections furthers the objectives of open court. In the event of an objection, the Court can hear and assess the arguments." WLR Vol. 87:1203 pg 1244 (Ishikawa and Bone-club).

18

The Exhibits, Sentencing Rp 1-6, 24-25, and Rp 266-67, clearly establish that the relevant facts would have been determined in the Bone-Club analysis. The Judge has a Mandatory obligation to protect the Open Administration of Justice. Handtofte v. Encarnacion, 280 P.3d 513, 520 (Wash.Div.I 2012). The Foundation to the Fair and Open administration of justice is broken by this secret hearing:

"Without publicity, all other checks are of small account, recordation, appeal, whatever other institutions might be present themselves in the character of checks, would be forced to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." WLR Vol. 87:1203, 1207.

How can the Appeals Court review the entire context of the record to determine if the Constitution has been violated, when the corrupt misconduct is cloaked in a Bias In-Chamber conference, and misrepresented as a scheduling matter, or decision to call a witness? When even that decision can only be reviewed by a Fair and accurate complete record. State v. Hess, 86 Wn.2d 51 (1975); Bennett, 275 P.3d at 1250. U.S. v. Lord, 711 F.2d 887, 893 (C.A.9(wash)1983)(Denied a fair trial when Judge failed to determine if prosecutors threats affected Material Witness).

The professional misconduct involved in the In-Chambers proceeding prevented Mr. Ruth from developing critical facts; removed any favorable evidence from the jury, and cloaked Mr. Adcock's misconduct. Mr. Ruth prays for mercy and Justice from this Most Honorable Court. An evidentiary hearing may be ordered for the witnesses in the Exhibits.

## II. THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL

"Any statements from the trial judge - no matter how innocuous - are likely to have some impact... even if the response is not improper, we recognize that some influence on the jury's deliberation is difficult to avoid when the jury is troubled enough to seek advice.... Counsel is most acutely needed before a decision about how to respond to the jury is made because it is substance of the response, or decision whether to respond substantively or not, that is crucial... The missed opportunity to influence the trial courts response to a jury question. That is the significant moment." Musladin v. Lamarque, 555 F.3d 830, 841-43 (9th.Cir.2009).

The Musladin Court reasoned that because all parties participated in the formulation of the jury inquiry, any answer to an inquiry regarding instructions contains some information from all the parties, even absent notifying the Defense. Allen/Russell, like Sublett and Musladin, involved inquiries about Jury instructions. An inquiry not about Jury instructions, like in the instant case,

contains no information from the parties, and creates a significant moment that triggers right to counsel, and right to Appear and defend.

Sublett reduced Public Trial rights during deliberations to the written record in accordance with the CrR 6.15(f)(1) procedure. J. Stephens pointed out in Sublett that this rule mirrors the constitutional rights it protects. This means unlike the Bone-Club rule, when CrR 6.15(f)(1) is violated, so is the Constitutional Rights it mirrors. CrR 6.15(f)(1) is the functional equivalent of the Bone-Club analysis during deliberations which triggers upon any jury inquiry. The only Safeguard for the right to counsel, Fair Trial, and Appear/Defend at this stage is the Public Trial Right, even if only in written record form. There is no other way at this stage to safeguard the defendants and Publics rights. Which Historically as J.Stephens (n.1) and Wroth point out has been an open proceeding.

III. THE STRUCTURAL ERROR BAR FOR COLLATERAL REVIEW HAS NOT BEEN DEFINED

Wise held that prejudice is unquantifiable; requiring a showing of prejudice creates a wrong without a remedy. How can this magically change on Collateral review, when the error is in the fundamental framework of the Fair and Open Administration of Justice? The effect shatters all trust and confidence that no innocent will be found guilty. A Cloak prevents direct review of the Public Trial violation, and only collateral evidence can establish the error even occured. If the structural error bar applies to Ruth's case, it creates a vehicle for the Courts to cloak misconduct and bar it from review. Creating a wrong without a remedy.

The St. Pierre "Higher Standard" is the Linkletter of Structural error. Since J. Dolliver was concerned about keeping in step with Teague, when announcing the unknown "Higher Standard", It would make sense to adopt the Schriro, 542 U.S. 348 and Danforth, 128 S.Ct. 1029 (Both fixed Teague), retroactivity standards as the "Higher Standard" for determining when Structural error applies. The State Supreme court hinted at this in In Re Eastmond, when announcing the Ruth Rule is new.

This 14th Day of September, 2013

X _Matthew R. Ruth_

Matthew R. Ruth

# APPENDIXS AND EXHIBITS

Appendix "A"
On the record Summary of In-Chambers Hearing......2-3, 6, 17

Appendix "B"
2/5/05 Sentencing.................................5-7,11, 19

Appendix "C"..........................................9
(Jury Instructions 15, 16, 17)

Exhibit One...........................................4, 17
(Trial Counsel Mark D. Stephens - Motion to Withdraw)
Pg 1, Section 7.....................................7, 19
Pg 3, Section 10................................2-3, 13, 19
Pg 4, Section 16-17..............................18, 19

Exhibit Two...........................3-5, 8-9, 17, 19
(P.I. Michael Powers, Hanry Slothang and Renne M. Woerner)

Exhibit Three.........................4-5, 17, 19
(P.I. Michael Powers - Henry Slothang)

Exhibit Four.........................4-5, 17, 19
(Matthew R. Stroud I)

Exhibit 5.............................5, 8-9, 17, 19
(Matthew R. Ruth)

Exhibit 6.............................5-8, 17, 19
(Pleadings attempted to file at 2/5/05 sentencing)

Exhibit Seven........................8, 19
(P.I. Michael Powers - Jeremy Custer)

Exhibit Eight........................9, 10, 19
(P.I. Michael Powers - Donnie Poole)

Exhibit Nine.........................9, 19
(Psychological evaluation - Dr. Muscatel)

Exhibit Ten..........................11, 19
(Jury mid-Deliberation inquiry)

APPENDIX
"A"

December 7, 2004
*EDEN - Cross (Stephens)*

1  Q  Is that a yes?

2  A  Yes.

3  Q  Do you remember Mr. Way asking you in that interview

4     what Jeremy was looking for on the day in question?

05:39  5  A  No.  I'm sure he asked, but I don't remember that.

6  Q  Well, is it possible that you responded that you had

7     heard that he was looking for a pound of weed?

8  A  No.

9  Q  Between the time of the day of the shooting and the day

05:39  10    that you sat for the interview with Detective Willoth,

11    did you discuss the incident with Jeremy Custer?  Did

12    you talk about it with him?

13  A  Yeah.

14  Q  You remember how many times?

05:40  15  A  We didn't want to talk about it too much, so not too

16    many times.

17  Q  You guys were good friends?

18  A  Yeah.

19  Q  Had to come up.

05:40  20  A  Yes.

21  Q  Is it possible that you -- Strike that.

22        Was it your testimony on direct examination that

23    one of the reasons you stopped by Jeremy Custer's

24    apartment on November 5, 2003, was with the expectation

5:40  25    there might have been a pound of weed there?

December 7, 2004

*EDEN ~ Cross (Stephens)*

1   A   It's a home.

2        And that was the rumor.

3   Q   Your response is that it's a home, and that was a

4        rumor?

09:40   5   A   You said apartment.  It's Jeremy Custer's home.  And

6        that was something I had heard about.

7   Q   So you went to Jeremy Custer's home thinking there

8        might be a pound of weed there?

9   A   Yes.

05:41   10   Q   Getting back to the interview you did with Gary Way in

11        October of 2004, you remember telling Gary Way, first

12        of all, that you heard shouting in the trailer?

13   A   Um-hum.

14   Q   I assume that is accurate.  And it sounded

05:41   15        confrontational?

16   A   Yeah.

17   Q   Thought there might be a fight?

18   A   Yes.

19   Q   And I guess that's what motivated you to go into the

05:41   20        trailer, to try to prevent a fight between Jeremy and

21        Matt?

22   A   Um-hum.

23   Q   That's yes?

24   A   Yes.

5:41   25   Q   I'm sorry.  It's easier for the court reporter.

173

December 7, 2004
*EDEN - Cross (Stephens)*

1      Do you recall making the comment to Gary Way that

2   you here something along the lines or something like,

3   "Get the hell out of my trailer," from Matt Ruth on the

4   day in question?

05:41  5  A  I do not recall those exact words on that day.

6  Q  Is it possible that's what you said to Mr. Way?

7  A  It's a possibility I could have said something like

8     that to Gary Way.  All of the --  *Page 171  line 17*
                                          *Person*

9  Q  Thank you.  You answered the question.

05:42  10     Now, there was some discussion with the police

11     about a bandana.  You remember that?

12  A  Um-hum.

13  Q  You remember telling Detective Willoth that you

14     believed that you saw the bandana a few days after the

05:42  15     shooting?

16  A  Yeah.

17  Q  And you saw that on the floor of the trailer; is that

18     right?  *Contaminated crime scene*

19  A  Yeah.

15:42  20  Q  So you actually went back to the trailer after the

21     shooting?

22  A  Um-hum.

23  Q  That's yes?

24  A  Yes, yes.

5:42  25        MR. STEPHENS:  If I could just have a moment.

*EDEN - Redirect (Adcock)*

1       That's all I have of.

2                   REDIRECT EXAMINATION

3    BY MR. ADCOCK:

4    Q   You were asked a question by Mr. Stephens about a

05:43   5       question his investigator asked you.  And I got the

6        impression you wanted to finish the answer.  Do you

7        remember the question?

8    A   Yes, it was:  Is it possible I told Investigator Way

9        that I heard the words "Get the hell out of the

05:43  10       trailer"?  And I wanted to say that most of the

11       conversations are not at my best memory.  The most --

12       the biggest thing in my mind is the shooting.  And I

13       don't really recall quite the exact words of

14       conversations.

05:44  15    Q   And now, he asked you also if you went back a few days

16       later and saw a bandana.

17    A   Um-hum.

18    Q   You don't know -- did you see a bandana on the day this

19       happened?  Do you remember a bandana?

05:44  20    A   I remember a bandana.

21    Q   Where did you see that?

22    A   I remember it being associated with the gun.  Around

23       the gun.  Maybe on his waistband near the gun, if he

24       had it there.  I just remember the bandana.

05:44  25    Q   But you don't know if the bandana you saw a couple of

December 7, 2004

*EDEN - Recross (Stephens)*

*[handwritten: Why wouldn't The Police collect the bandana]*

1    days later is the same bandana?

2  A   I don't know for sure, no.

3            MR. ADCOCK:  Thank you.  I have no further

4    questions.

05:44  5            THE COURT:  Counsel?

6                  RECROSS-EXAMINATION

7  BY MR. STEPHENS:

8  Q   I guess my question is:  It's been over a year since

9    this happened, right?

05:45  10  A   Yeah.

11  Q   And is it fair to say then you may well have said to

12    Gary Way you remember hearing something like "Get the

13    hell out of my trailer," from Matt, you're just not

14    sure if that's accurate?  Is that your testimony?

05:45  15  A   I'm not sure if that's accurate.  Also, I don't

16    remember any point Matt really wanting Jeremy out of

17    the trailer.  It seemed the whole time he definitely

18    wanted Jeremy in the trailer.

19            MR. STEPHENS:  That's all I have.

05:45  20            MR. ADCOCK:  I have nothing further.

21            THE COURT:  Sir, thank you.  You may step

22    down.

23        With that, we'll take our afternoon recess then.

24    Ladies and Gentlemen, we'll take a fifteen-minute

5:46  25    afternoon recess.

December 7, 2004
*Colloquy*

1    Thank you.

2              AFTERNOON RECESS TAKEN

3              JURY PRESENT

4         THE COURT:  Ladies and Gentlemen of the Jury,

06:13   5    at this point in time we have had a slight scheduling

6    change that's being contemplated by parties in this

7    case.  And also, I think a couple of the witnesses

8    actually didn't take quite as long as counsel had

9    anticipated they might.  Sometimes --

06:14  10    The beauty of watching television dramas is that

11    these things are specifically scripted to fill 30

12    minutes or 50 minutes of an hour-long program.  And we

13    don't script our cases like that.  Sometimes people are

14    available or not available.  Changes are made as the

06:14  15    flow of the case goes.

16         All that is to say that we're done for today.  We

17    have no further witnesses available to us this

18    afternoon.  The attorneys tell me they are still right

19    on time as far as what they thought the length of the

06:14  20    case would be, so we're not losing ground in any way.

21    It won't cause an extension of the time of the overall

22    trial.

23         So with that, I'm going to just give you one last

24    brief admonishment, as we do every day.  Please do not

06:14  25    discuss the case.  Do not go to or near the scene.  Do

177

December 7, 2004

*Colloquy*

1    not remain anywhere near anyone who may be discussing

2    ·the case.  I know you are fully aware of those

3    restrictions and I appreciate your willingness to

4    adhere to those.

06:15  5         You understand why we do these things, and it's

6    obviously very important to a fair trial that I at

7    least remind you briefly every evening of those

8    restrictions.

9         Counsel, I'm assuming we can start tomorrow at

06:15  10   nine.

11              MR. ADCOCK:  That's fine.

12              MR. STEPHENS:  That's fine.

13              THE COURT:  Be in the jury room, if you can,

14   by 8:55.  Do our very best to do that.

16:15  15        And just for what it's worth, it is obviously ---

.16   your transportation issues as far as getting here and

17   so forth are different.  We all vary.  Some car pool,

18   ride a bus, drive your own car.  Whatever.  If you can

19   please do the following.  If you're going to get here

16:15  20   early -- by early meaning 15, 20 minutes, up to half an

21   hour before nine o'clock -- if you could simply find

22   yourself a location in the courthouse that is not

23   immediately adjacent to the courtroom up here.  In ....

24   other words, don't sit up on the second floor anyway,

6:16  25   anywhere.  Stay in the jurors lounge or something of

178

06:16

06:16

16:17

5:17

1    that nature.  It makes it easier for us to coordinate

2    everything else involved in our case.  And again, we'll

3    open the door about ten minutes before nine, is all.

4    So if you can time it that way, it really doesn't do

5    you any good to get here a whole lot earlier.  Some of

6    you might have to.  I'm not saying you can't.  But

7    please locate yourselves somewhere away from the

8    courtroom, and come to the jury room at five to nine.

9         Thanks a lot for attending today, and we'll see

10   you tomorrow.

11                    JURY NOT PRESENT

12        THE COURT:  I think in an overabundance of

13   caution, real quickly, because Mr. Ruth was not present

14   during a very brief conversation that we had in

15   Chambers, we were simply talking about a scheduling

16   issue.  Calling or not calling a particular witness.

17   If you want to just flesh that out.

18        MR. ADCOCK:  We had a conversation, Your

19   Honor.  I informed Mr. Stephens and Your Honor that my

20   next witness, Renee Woerner, indicated to me, without

21   any doubt, that she was going to commit perjury if she

22   were called by the State to testify in this case.

23   Because of my ethical obligation not to suborn perjury,

24   I made a decision not to call her as a State's witness.

25        After my conversation with her, I spoke to Mr.

December 1, 2004

*Colloquy*

1    Stephens, I explained that to him.  I suggested maybe

2    he wanted to talk to her.  Maybe he was going to call

3    her as a witness.  I believe he had a conversation with

4    her where she brought up the fact that I had said that

5    if you commit perjury, there is going to be

6    consequences.  And at that point he concluded that she

7    needed to be advised.

8        We're going to make arrangements for the Office of

9    the Public Defender to get her an attorney, to consult

10   with her tomorrow about her options, so to speak.

11       Mr. Stephens indicated to me that he did not know

12   whether he is going to call her yet but that that was

13   the first step, in any event, and I agree.  And that's

14   where we're at.

15           MR. STEPHENS:  I just might add that's, more

16   or less, what's happen.  When I had my conversation

17   with this potential witness, she indicated to me

18   concerns about comments Mr. Adcock made.  She did

19   indicate the word "perjury" was used.  I don't know

20   what context that was in.  I advised her I cannot give

21   you any advice and if you need advice you need your own

22   lawyer.  Which I think was about all I could do with

23   that.

24           THE COURT:  Fair enough.  Again, primarily for

25   the benefit of Mr. Ruth, who was not present during

                                                      180

*Colloquy*

1  that conversation, I want to make sure that we had laid

2  it all out, what the conversation was in Chambers.

3  Obviously that facilities communication between you and

4  your attorney.  I don't know where it's going to go.

5  You're ready to proceed tomorrow with other witnesses,

6  obviously.

7          MR. ADCOCK:  Nine o'clock.

8          THE COURT:  Start at nine and do what we can

9  do.

10              COURT RECESSED AT 3:29 P.M.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF 29906*

APPENDIX
"B"
Sentencing transcripts

1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,    )
                            )          RECEIVED
                            )
         Plaintiff,         )          SEP 1 4 2005
                            )
                            )     Snohon. Division & adm. PL..
vs.                         )     NO. 03-1-02451-6
                            )
                            )     COURT OF APPEALS
MATTHEW RUTH,               )     NO. 56318-1-I
                            )
                            )
         Defendant.         )

VERBATIM REPORT OF PROCEEDINGS

SENTENCING HEARING

FEBRUARY 4, 2005

HONORABLE DAVID F. HULBERT
Judge

Department No. 6
Snohomish County Courthouse
Everett, Washington

Reported by:
Laurel Olson
Official Court Reporter
CR #29906-2645
425) 388-3088

DISK
ENCLOSED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| THE STATE OF WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | NO. 03-1-02451-6 |
| vs. ) | |
| ) | |
| MATTHEW RUTH, ) | |
| ) | |
| Defendant. ) | |

VERBATIM REPORT OF PROCEEDINGS

BE IT REMEMBERED that on the 4th day of February,
2005, the above-entitled and numbered cause came on for
sentencing before the Honorable DAVID F. HULBERT, one of
the judges of the above-entitled court, sitting in
Department No. 6 thereof, at the Snohomish County
Courthouse, in the City of Everett, County of Snohomish,
State of Washington.

The Plaintiff was represented by JOHN ADCOCK,
Deputy Prosecuting Attorney for Snohomish County;

The Defendant was present and represented by his
attorney, CHARLES DOLD.

WHEREUPON, both sides having announced they were
ready to begin, the following proceedings were had, to wit:

1          11:00 A.M., FRIDAY
              FEBRUARY 4, 2005
2       SNOHOMISH COUNTY SUPERIOR COURT

3           *   *   *   *   *   *   *   *   *   *

4

5           MR. ADCOCK:  Good morning, Judge.

6       State of Washington v. Matthew Robert Ruth, Cause

7       Number 03-1-02451-6.  The defendant is present, in custody,

8       represented by Chad Dold.  John Adcock for the State.

9           We are here for sentencing.  I know, as a preliminary

10      matter, counsel had some motions that he would like to put

11      on the record.

12              THE COURT:  Counsel.

13              MR. DOLD:  Yes, your Honor.

14          A couple things.  One, I was appointed to represent Mr.

15      Ruth after the trial, so I did not attend the trial.  I was

16      contacted by Mr. Stephens, who represented Mr. Ruth; and he

17      provided me with a portion of the discovery, feeling that

18      that was the portion I needed.

19          I met with Mr. Ruth, and I determined that one of the

20      main issues that he had indicated needed to be investigated

21      was the testimony of Renee Woerner.  I think the Court will

22      recall that Ms. Woerner was a listed witness; that she was

23      brought back from California; she was represented by Mr.

24      Joice.  When she was brought back, I think she was released

25      with a promise to appear.  She appeared at trial and was not

1  called.  I won't go into the circumstances of not calling

2  her.  I wasn't there, I don't know, and I haven't reviewed

3  the transcript.

4     Mr. Ruth advised me that Ms. Woerner's testimony was

5  critical, that he was very critical of his attorney for not

6  calling her.  I've spoken briefly to Mr. Adcock about that,

7  and I've spoken briefly to Mr. Stephens about that.  I've

8  made a very serious effort to reach Ms. Woerner.  I had left

9  two phone numbers for her; I have left numbers for her on a

10  number of occasions.  She called me once; we had a brief

11  conversation.  She left a message for me yesterday on the

12  number that goes to my answering machine rather than my cell

13  phone; I had given her my cell phone number so that we could

14  talk.  I have not yet had a chance to interview her at

15  length about this incident and about what her testimony

16  would be and about what may in fact be an apparent conflict

17  between statements that she had made previously versus

18  whatever her testimony would be.

19     As a result, I am not prepared to present a motion for

20  a new trial based either on prosecutorial misconduct,

21  ineffective assistance of counsel or denial of justice, any

22  one of the three, depending on what Ms. Woerner tells me.

23     I apologize to the Court.  I've made my best efforts to

24  reach her.  Mr. Ruth has assisted me as far as he's been

25  able to.  She is not readily available.  I've gotten to know

Case 2:15-cv-00533-TSZ-JPD   Document 36   Filed 03/25/16   Page 164 of 307

 1    her parents very well, and they have been very kind in

 2    passing on my number to Ms. Woerner.  I am not prepared.  I

 3    will continue to try and reach her, and I will continue to

 4    try and develop a motion for a new trial.

 5         Mr. Ruth wanted to ask the Court, because of that, to

 6    continue this proceeding.  I advised him that that would

 7    have to be brought up now.  Those are the grounds on which

 8    I'm asking to do that.

 9         Does that correctly state what you wanted to do, Matt?

10              THE DEFENDANT:  Yes.

11              MR. DOLD:  Mr. Ruth has prepared some pleadings

12    that would effectively make that request.  I have not

13    reviewed them.

14              MR. ADCOCK:  I think that motion should be denied,
                                  HOPE
15    your Honor.  With respect to Ms. Woerner, she was a State's

16    witness.  When she was brought back from the state of

17    California, she gave a lengthy statement to detectives under

18    oath; it was taped, and a transcript was prepared and

19    provided to the defendant through the course of discovery,

20    in which she clearly indicated she watched the defendant,

21    without provocation, shoot the two victims in this case.

22         My intention was to call her to testify to that.  On

23    the day that she was supposed to testify, I met with her.

24    She was highly agitated, she seemed very upset, and she

25    immediately repudiated her statement.  I decided at that



STATE V. MATTHEW RUTH                                          6

1   point that I could not call her as a witness, as I have an

2   obligation not to suborn perjury; and if the Court recalls,

3   I brought it to the Court's attention and so stated on the

4   record at the time.

5        Mr. Stephens also declined to call her as a witness.

6   He filed a declaration at the first sentencing date -- when

7   he was asking leave to withdraw -- in which he states that

8   after conferring with his client, he decided not to call her

9   as a witness because he believed her testimony would be

10  either corroborative of what she told the police in the

11  original sworn statement or that, if she lied, she would be

12  easily impeached; and, therefore, there was no tactical or

13  practical advantage of calling her as a witness.

14       We have been through this before.  I see no reason at

15  all to delay this hearing today.  The victims are present.

16  Given the fact that it won't change anything, I'd ask you to

17  deny that motion to continue.

18       MR. DOLD:  The only comment in response is that he

19  may have conferred with Mr. Ruth.  Mr. Ruth never agreed to

20  Mr. Stephens' strategy in that regard and was quite upset --

21  again, I wasn't here, I don't know what happened in the

22  courtroom; but in my dealings with him, he has indicated

23  that that's not a decision he ever would have agreed with,

24  and he disagrees with any assessment of tactical or

25  strategic advantage.

1          THE COURT:  That's fine.  Those are all post-trial

2     issues.  We'll proceed to sentencing.

3          MR. DOLD:  Before we proceed to sentencing, your

4     Honor, I'd ask the Court to just take a moment and review

5     the jury instructions with me.  I reviewed them last

6     evening.  My recollection is that Instructions Numbers 10

7     and 12 --

8          THE COURT:  Let me locate them here, first.

9          MR. ADCOCK:  12 and 14, actually.

10         MR. DOLD:  Well, okay.

11         MR. ADCOCK:  I have my copy right here, Judge.

12         MR. DOLD:  Let me just advise the Court what I

13    found.  The defendant was charged with two counts of assault

14    in the first degree while armed with a deadly weapon.  The

15    firearm language was mentioned with respect to assault in

16    the first degree as an element of the offense, and a firearm

17    was mentioned as the aggravating factor in the Information.

18    That same information was contained in the to-convict

19    instructions.  When you take a look at the Special Verdict

20    Forms, however, the jury was asked to find whether or not

21    the crime was committed with a deadly weapon rather than a

22    firearm.

23         The jury never was given the question of whether or not

24    the defendant was armed with a firearm at the time the crime

25    was committed.

1        THE COURT:  All right.

2        MR. DOLD:  I trust that's -- that's my reading of

3   the instructions that the jury was given.

4        THE COURT:  Looking at Special Verdict Forms A and

5   B, and, "Was the defendant Matthew Robert Ruth armed with a

6   deadly weapon at the time of the commission of the Crime in

7   Count I," that's A; and B is reiterating the same language.

8        MR. DOLD:  Okay.  Going to RCW 9.94A.533(3), "The

9   following additional times shall be added to the standard

10  sentence range for felony crimes committed after July 23,

11  1995, if the offender or an accomplice was armed with a

12  firearm as defined by 9.41.010...."

13       If we take a look at subsection (4), the language is

14  exactly the same:  "...if the offender or an accomplice was

15  armed with a deadly weapon...."

16       The punishments are very different.  The definitions

17  are very different.  It's our position that there is no

18  necessary overlap between firearm and deadly weapon; and, as

19  a result, the jury was never asked if Mr. Ruth was armed

20  with a firearm.  As a result, we take the position that

21  there is no enhancement that can be imposed at this time.

22       I am aware of State v. Serrano, and I provided Mr.

23  Adcock a copy of materials that I found.  As I say, I read

24  the instructions last evening; I did this research last

25  evening.  In Serrano, it appears a very similar fact pattern

1          MR. DOLD:  Did anybody else want to address the

2     court?

3          THE COURT:  Apparently not.

4          MR. DOLD:  I didn't want to foreclose on them if

5     they did.

6          THE COURT:  I have the advantage of being able to

7     see behind you.  They are gesturing no.

8          MR. DOLD:  Okay.

9     I'd ask the Court to consider what Dr. Muscatel wrote.

10    I think that explains Mr. Adcock's being as upset as he is,

11    very well.  Dr. Muscatel did not have the benefit of Mr.

12    Adcock's thoughts when he wrote his report.  He didn't have

13    the benefit of the report from Western State Hospital, which

14    I have not reviewed; I understand it is in the file.  His

15    analysis in fact is consistent with Western State Hospital's

16    analysis of Mr. Ruth.  In sending him to Western, I assume

17    that there were some rather serious concerns about his

18    competency, his capacity to assist counsel.

19         MR. ADCOCK:  I misspoke.  He didn't go to Western.

20    He just went to Lee.

21         MR. DOLD:  Gustafson?

22         MR. ADCOCK:  Yes.

23         MR. DOLD:  I thought I remembered some reference

24    to a report from Western that was written by --

25         THE COURT:  I did, too.  At some point early on,

1    there was an initial evaluation in terms of legal

2    competence.

3              MR. ADCOCK:  That must have been the first

4    attorney.

5              THE COURT:  Yes.  I think that's probably what

6    we're talking about.

7              MR. DOLD:  The personality dynamics referenced by

8    Dr. Muscatel are consistent with all of those observations

9    and with Mr. Adcock being as upset as he is.  They aren't

10   aggravators, however; they are mitigators.  9.94A.535 speaks

11   about mitigators, what they are, how they operate, and when

12   this court should consider them.

13         Our position is that the psychological defects, while

14   not amounting to a defense to the charges, are seriously

15   mitigating factors.  The fact that there was polysubstance

16   abuse prior to this event which had a serious impact on Mr.

17   Ruth's ability to appreciate his behavior, the consequences

18   of his behavior both in terms of the incident itself, his

19   relationship with his attorneys, his relationship to the

20   world around him, are substantially mitigating and I believe

21   should be considered by the Court to be such.

22         Dr. Muscatel I think explains very clearly what the

23   impact of this circumstance on Mr. Ruth is and that, in

24   fact, it was substantial.

25         Second, Mr. Ruth has no prior criminal history.  This



STATE v. MATTHEW RUTH

19

1   is not a person who has called himself to law enforcement's

2   attention time and time again.  This is a person who, with

3   the confluence of the personality disorder, the drug-induced

4   psychosis, the post-drug-induced psychosis and the other

5   circumstances going on at the time, acted in a way that was

6   uncharacteristic of him.

7       I understand putting people away for long periods of

8   time when they develop a consistent pattern of behavior

9   which indicates that they are a sociopath.  I would ask the

10  Court to disregard the seat-of-the-pants diagnosis, however.

11      Mr. Adcock is saying he doesn't like Mr. Ruth.  He uses

12  the term "sociopath" to describe that feeling of not liking

13  Mr. Ruth.  We know he doesn't like Mr. Ruth.  I think that

14  probably became evident in cross-examination.  That doesn't

15  make Mr. Ruth a sociopath, however.  A sociopath has a very

16  specific legal definition and, in fact, could be the basis

17  for recommending a term beyond the standard range under the

18  old Sentencing Reform Act; future dangerousness.  There is

19  no evidence of future dangerousness in this case.  Nothing

20  in his past, nothing in his present would indicate any form

21  of future dangerousness.

22      Psychopathy is not what we are about here.  There's

23  nothing to support that.  Dr. Muscatel doesn't find it.

24  What he finds is a personality disorder which, in layman's

25  terms, means this is a person who is very difficult to get



1    along with.  Mr. Ruth has continued to clear while he's been

2    in the jail.  He's been very cooperative with me.

3            THE COURT:  He has continued to what?

4            MR. DOLD:  To clear.  I got a picture of the

5    person that I was going to meet from Mr. Stephens.  Mr. Ruth

6    has not lived up to the billing that Mr. Stephens gave me.

7    He's been very cooperative with me.

8            THE COURT:  I see what you're saying; his

9    condition has continued to clear, or his thinking, as far

10   as --

11           MR. DOLD:  Whatever.  I'm using it --

12           THE COURT:  I didn't know what you meant by

13   "continued to clear."

14           MR. DOLD:  I'm using it in a generic sense.  What

15   I was led to believe was that I would be running into a very

16   difficult person, somebody that I would have tremendous

17   difficulty working with.  Mr. Stephens is a very good

18   lawyer, and he's worked with very difficult clients in the

19   past.  In fact, he and I have shared some very difficult

20   clients in the past.  Mr. Ruth has worked very well with me.

21   He's been cooperative.  I don't know if he appears any

22   different today than when he appeared in front of the court.

23           THE COURT:  Not substantially.

24           MR. DOLD:  He's brought his motion.  He didn't get

25   up and shout about it.  He's tried very hard to cooperate

1    with the process.  I think that whatever happened back then

2    and what has worked its way through will continue to do so.

3         There is no reason for a high-end sentence.  I'm going

4    to recommend to the Court a sentence of 70 months, and

5    that's 23 months, basically 2 years below the standard

6    range, 4 years below the standard range on both counts.  He

7    will have to serve the 120 months on the firearms

8    enhancement that the Court has imposed.  That's mandatory;

9    there is no good time.  He will serve 10 years to accomplish

10   that sentence.  With another 140 months tacked on, 70 and

11   70, that would be a total of 260 months.  That is a very

12   long time.  Mr. Ruth is 22 now; right?

13             THE DEFENDANT:  25.

14             MR. DOLD:  25 now.  He will be in custody during

15   the period of his life that statistics show us people commit

16   crimes.  He will only be released after he's passed that

17   part of his life.  The likelihood of his reoffending at that

18   point is minimal.

19        Under the circumstances, we believe, in light of the

20   firearm enhancements that the Court has found, that the

21   multiple offenses policy suggests that a sentence of

22   360 months is too long, that the 93 and 93 plus 120 is too

23   long a sentence; and so on those three grounds, we'd ask the

24   Court to impose a 70-month sentence, a sentence below the

25   standard range.

1          With respect to the restitution, we have no issue.  Mr.

2     Ruth will be in custody for a long period of time.  I take

3     no position on the money that should go back to the County

4     or the State other than to advise the Court that Mr. Ruth

5     will have a very limited ability to pay that; that it will

6     bear interest at the rate of 12 percent until he gets out of

7     prison and be much more formidable then than it is now.

8               THE COURT:  Mr. Ruth, you have an opportunity to

9     address the Court.  Would you like to do so?

10              THE DEFENDANT:  No, sir.

11              THE COURT:  All right.  Thank you.

12              MR. ADCOCK:  Can I respond to Mr. Dold's argument?

13              THE COURT:  Yes.

14              MR. ADCOCK:  He's asking the Court to impose an

15    exceptional sentence down on spurious grounds, because, you

16    know, he's a polydrug user so we should give this guy a

17    break because he uses a lot of drugs.

18         I don't think so.

19         It may have affected his thinking?  Tough.  He took

20    them.  He did the shooting in this case.  His psychiatric

21    difficulties do not rise to the level that can be

22    sufficiently mitigated or mitigate the Court to impose an

23    exceptional sentence down.

24         The law is clear; you do this, this is the range, it's

25    consecutive.  Sorry.  Maybe he should have thought about

1      that before he shot these two guys.

2          As far as not liking Mr. Ruth, frankly, I don't care

3      about Mr. Ruth.  What I care about is the safety of my

4.     community and what happened to these two kids who got shot

5      for no reason.  My personal belief is that the defendant

6      represents a substantial danger, and I base that on the fact

7      that he shot two people without provocation.  I don't think

8      you have to be a rocket scientist or a psychologist to say

9      that people that do that present a danger to society.

10         It's my position, given the facts in this case, given

11     what he did and the circumstances under which he did it, an

12     exceptional sentence below the standard range is not

13     justified and in fact is a repudiation of what happened to

14     these victims and would be slap in their face; and this

15     Court should impose the high end, consecutive to the

16     firearms enhancements.

17         There's no legal justification to impose an exceptional

18     sentence down, Judge.

19            THE COURT:  Just give me a quick calculation.  If

20     I follow your recommendation, what is the total amount of

21     time that Mr. Ruth would serve?

22            MR. ADCOCK:  366 months.

23            MR. DOLD:  30 years, 6 months.

24            THE COURT:  A couple of things come to mind

25     initially with this case.  Having heard the case myself,




1   having heard all the evidence and so forth, I came away with

2   a couple of impressions, I guess, which will obviously be

3   translated into some sort of a legal result here before this

4   morning is over.

5        One of the impressions that I had was -- and again,

6   it's not something I can directly use in terms of

7   sentencing, but I was amazed, frankly, that Mr. Ruth had not

8   had some sort of prior contact with the legal system,

9   because Mr. Ruth appeared to me, during the course of this

10  trial, to be an extremely frightening individual, what he

11  was capable of doing under the circumstances.

12       Also, Mr. Ruth cannot take advantage of the fact that

13  he didn't kill these people. You can't come in and say,

14  well -- and, obviously, you haven't raised that. The point

15  is that it could have easily been a double homicide, from my

16  understanding of how the case went down.

17       I found Mr. Ruth's testimony to be entirely incredible,

18  uncredible, unbelievable, not to be believed; any

19  permutation of that definition you want to use. It was just

20  simply not helpful to the jury at all. I think their

21  verdict and how they handled the case proved very clearly

22  that they utterly repudiated his testimony. And I did, too;

23  I did, as well. I mean, I couldn't find it to be credible

24  at all.

25       I think Mr. Ruth presents a grave danger to this

1   community. He's a time bomb, waiting to be provoked. His

2   drug use in the past obviously is not a mitigating factor in

3   this particular case, I don't believe. Mr. Ruth walks in

4   sort of that area between being fully engaged in the

5   community and understanding completely, I think, what's

6   going on, and some other place; but he is a participating

7   member of society, and if he's not in prison, he will be

8   free, then, to constitute an ongoing and continuing danger.

9        Now, the question is, having made those determinations,

10  does this particular case, in light of the fact that there

11  is no criminal history, does it justify a high-end sentence,

12  which ends up being 30 years in prison, which is a very long

13  time for a person. I have to then balance that with the

14  fact -- I guess we have to analyze it based on what did he

15  actually do regardless of what the outcome was. He was no

16  longer in charge of the outcome. Once he pulled the trigger

17  and started firing, the results were up to a Higher Power

18  and not Mr. Ruth, although he had certainly put himself in a

19  position where any number of results could have obtained,

20  including the death of these individuals.

21       However, given the overall circumstances of this case,

22  I am going to impose 105 months of imprisonment for each

23  count, added to which will be the 60 months of firearms

24  enhancement, for a total of 165 months --

25            MR. DOLD: A total of 330.

1      THE COURT:  -- for a total of 330 months.  I

2   believe that that accomplishes the following:  Number 1, it

3   removes Mr. Ruth from this community for a very long time,

4   long enough to -- and I agree with Mr. Dold, long enough for

5   there to be the natural maturation that occurs; not that·

6   elderly people or older people cannot commit crimes, they

7   do, we see that all the time, and sometimes they commit

8   violent crimes, but very rarely in comparison to the number

9   of violent crimes that are committed by youthful offenders.

10   I guess some of the juice just runs out of us, and we just

11   no longer are as interested in being as violent as we were

12   when we were young.

13      But it also reflects the fact that this is a first-time

14   offense and that I personally believe that, in the totality

15   of the circumstances, the total sentence recommended by the

16   Prosecutor's Office would have been a bit excessive; if not

17   excessive, I don't think it's merited.

18      Again, 24 to 48 months of community custody following

19   release.  At least that's what the law is now, so I'll

20   impose that.  I'll waive all non-mandatory fees, penalties

21   and assessments.  The only one I cannot waive is the $500

22   mandatory victim penalty assessment, which I will impose.

23      Restitution; are you going to agree to that?

24      MR. DOLD:  We agree to that, your Honor.  It's

25   $300 and change.  Looking at the two gentlemen here, I don't

APPEND iX

"C"

**ORIGINAL**

Snohomish County Superior Court for the State of Washington

| | | |
|---|---|---|
| State of Washington, | ) | No.03-1-02451-6 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NOTICE OF DEFENSE |
| | ) | |
| Matthew R. Ruth, | ) | |
| Defendant. | ) | |

The Defendant in the above entitled action, through his attorney Mark Stephens, hereby

notifies this Court, and the Prosecutor, pursuant to CrR 4.7 (b)(xiv), RCW 9A.16.110 and RCW

9A.16.020 (3), of his intent to assert Reasonable Defense of Self, Defense of Another Person,

and/or Defense of Property at trial.

Respectfully Submitted this 8th day of October, 2004.

Mark Stephens, WSBA #26110
Attorney for Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

DFDT. NO. _____

INSTRUCTION NO. _15_

It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

DFDT. NO._____

INSTRUCTION NO. _16_

A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is in actual danger of great bodily harm, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

DFDT. NO. _____

INSTRUCTION NO. _17_

It is a defense to a charge of Assault in the First Degree that the force used was lawful as defined in this instruction.

The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured or by someone lawfully aiding a person who he reasonably believes is about to be injured in preventing or attempting to prevent an offense against the person or a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary.

The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

APPENDIX

"D"

TRIAL MINUTES



FILED IN OPEN COURT

December 6, 2004
Pam L. Daniels
County Clerk

By: _Grace Hampton_
Deputy Clerk

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

| | | |
|---|---|---|
| State of Washington | CAUSE NO.: | 03-1-02451-6 |
| (PLAINTIFF) | JUDGE: | David F. Hulbert |
| VS. | DATE OF TRIAL: | December 6, 2004 |
| Matthew Robert Ruth | REPORTER: | Stephanie Magee |
| (DEFENDANT) | CLERK: | Grace Hampton |

**ATTORNEY FOR PLAINTIFF:**          **ATTORNEY FOR DEFENDANT:**

John Adcock                          Mark Stephens

---

Days: 3.5 Days      **FINAL DISPOSITION - VERDICT**
Date trial ended: December 9, 2004
The Jury found the Defendant guilty of the crime of First Degree
Assault as charged in Count I; and guilty of the crime of First
Degree Assault as charged in Count II.  On Special Verdict Form A,
the Jury found that the defendant was armed with a deadly weapon at
the time of the commission of the crime in Count I and on Special
Verdict Form B, the Jury found that the defendant was armed with a
deadly weapon at the time of the commission of the crime in Count
II.

Sentencing set for December 28, 2004 @ 1:00 p.m. Dept. 5,
Judge Hulbert.

---

9:35    This matter came on regularly for 12-person jury trial.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock.  Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Proposed jurors not present.

Plaintiff's proposed Jury Instructions filed in open court.
Defendant's Proposed Jury Instructions filed in open court.

Colloquy of Court and counsel.

Exhibit no. 1 offered by the State:        ADMITTED 12-7-04

1                               **TRIAL MINUTES**

AA
85

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

```
Exhibit no.  2 offered by the State:      ADMITTED 12-7-04
Exhibit no.  3 offered by the State:      ADMITTED 12-7-04
Exhibit no.  4 offered by the State:      ADMITTED 12-7-04
Exhibit no.  5 offered by the State:      ADMITTED 12-8-04
Exhibit no.  6 offered by the State:      ADMITTED 12-7-04
Exhibit no.  7 offered by the State:      ADMITTED 12-7-04
Exhibit no.  8 offered by the State:      ADMITTED 12-7-04
Exhibit no.  9 offered by the State:      ADMITTED 12-7-04
Exhibit no. 10 offered by the State:      ADMITTED 12-7-04
Exhibit no. 11 offered by the State:      ADMITTED 12-7-04
Exhibit no. 12 offered by the State:      ADMITTED 12-7-04
Exhibit no. 13 offered by the State:      ADMITTED 12-7-04
Exhibit no. 14 offered by the State:      ADMITTED 12-7-04
Exhibit no. 15 offered by the State:      ADMITTED 12-7-04
Exhibit no. 16 offered by the State:      ADMITTED 12-7-04
Exhibit no. 17 offered by the State:      ADMITTED 12-7-04
Exhibit no. 18 offered by the State:      ADMITTED 12-7-04
Exhibit no. 19 offered by the State:      ADMITTED 12-7-04
Exhibit no. 20 offered by the State:      ADMITTED 12-7-04
Exhibit no. 21 offered by the State:      ADMITTED 12-7-04
Exhibit no. 22 offered by the State:      ADMITTED 12-7-04
Exhibit no. 23 offered by the State:      ADMITTED 12-7-04
Exhibit no. 24 offered by the State:      ADMITTED 12-7-04
Exhibit no. 25 offered by the State:      ADMITTED 12-7-04
Exhibit no. 26 offered by the State:      ADMITTED 12-7-04
Exhibit no. 27 offered by the State:      ADMITTED 12-7-04
Exhibit no. 28 offered by the State:      ADMITTED 12-7-04
Exhibit no. 29 offered by the State:      ADMITTED 12-7-04
Exhibit no. 30 offered by the State:      ADMITTED 12-7-04
Exhibit no. 31 offered by the State:      ADMITTED 12-7-04
Exhibit no. 32 offered by the State:      ADMITTED 12-7-04
Exhibit no. 33 offered by the State:      ADMITTED 12-7-04
Exhibit no. 34 offered by the State:      ADMITTED 12-7-04
Exhibit no. 35 offered by the State:      ADMITTED 12-7-04
Exhibit no. 36 offered by the State:      ADMITTED 12-7-04
Exhibit no. 37 offered by the State:      ADMITTED 12-7-04
Exhibit no. 38 offered by the State:      ADMITTED 12-7-04
Exhibit no. 39 offered by the State:      ADMITTED 12-8-04.
Exhibit no. 40 offered by the State:      ADMITTED 12-8-04
```

9:35  Arraignment on Second Amended Information.   SEE COURT FILE FOR
      RECORD OF MINUTES.

9:36  State's motion in limine to exclude witnesses except Detective
      Willoth: Granted.

2                          TRIAL MINUTES

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:37  State's motion in limine to prevent Defense counsel from using
      the term of "Snitch" or another derogatory comments regarding
      State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49  Defense motion in limine to exclude testimony of prior burglary
      charge around the time of the incident in question:
      Granted/Stipulated.

9:40  Defense motion in limine to exclude testimony of a prior assault
      of Renee Woerner: Granted/Stipulated.

9:41  Defense motion in limine to exclude testimony of defendant's
      criminal activity in Blythe, California: Granted/Stipulated.

9:42  Defense motion in limine to exclude any testimony or evidence of
      defendant's prior criminal history: Reserved.

9:43  Defense motion in limine exclude any evidence about defendant's
      last name or alias last names: Granted/Stipulated.

9:45  Defendant motion to strike testimony of State's witnesses, Renee
      Woerner, because he was unable to interview her, as his subpoena
      was returned: Denied.  The Court finds that the remedy is not
      exclusion but to allow Defendant to interview the witness prior
      to testifying.

      Exhibit no. 41 offered by the State:     **ADMITTED 12-7-04**
      Exhibit no. 42 offered by Defendant:     Not Offered

9:48  Defendant's motion strike testimony of Jeremiah Sheridan because
      of defendant's inability to locate and interview this witness:
      Denied.  The Court finds that the remedy is not exclusion but to
      allow Defendant to interview the witness prior to his testimony.

9:50  Colloquy of Court and counsel.
9:52  Court in recess.

10:15 The following persons were selected to qualify as jurors on this
      cause and seated in the jury box:
      1.  Gary R. Hall                    7.   Andrea L. Greenlee
      2.  Edward A. Dawson                8.   Robert G. Sears
      3.  Kandace Aksnes                  9.   Richard E. Olsen
      4.  Jody Marie Mountifield          10.  Marilyn Churchill
      5.  Karen R. Egtvedt                11.  Sharon Walker
      6.  Jennifer R. Clyde               12.  Donna Lee Orr

3                          **TRIAL MINUTES**

### STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:
13.  Mehari E. Gebrewold
14.  Frank P. Brady
15.  James C. Sinnema
16.  Barbara R. Garrett
17.  Frances Winters
18.  Lesley W. Winney
19.  Michael Rucker
20.  William Glover
21.  Raymond Johnson
22.  Richard Hill
23.  Ella Larrick
24.  Patricia Nakahara
25.  Charlene Lindsay
26.  Mary E. Barringer
27.  I. Jay Fritch
28.  Lawrence Thompson
29.  Donna R. West
30.  Jerry D. Rochford
31.  Daniel D. Orme-Doutre
32.  Jessica Marie Kinney
33.  Dale W. Troupe
34.  Brandon Duc Ha
35.  Patricia J. Jason

10:20 All prospective jurors sworn: Oath of Voir Dire.
The Court directs general questions to all prospective jurors.
10:35 State's initial voir dire of entire prospective jury panel.
10:51 Defendant's initial voir dire of entire prospective jury panel.
11:13 State waives concluding voir dire of entire prospective jury panel.
11:14 Defendant's concluding voir dire of entire prospective jury panel.
11:20 Challenges for cause: prospective jurors passed for cause.

11:22 Plaintiff's first peremptory challenge: Kandace Aksnes.
Frank Brady picked to qualify as juror #3.
Defendant's first peremptory challenge: Edward Dawson.
James Sinnema picked to qualify as juror #2.

Plaintiff's second peremptory challenge: Jody Mountfield.
Barbara Garrett picked to qualify as juror #4.
Defendant's second peremptory challenge: Accepts Panel.

Plaintiff's third peremptory challenge: Richard Olsen.
Frances Winters picked to qualify as juror #9.
Defendant's limited peremptory challenge: Frank Winters.

4                           **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27  The following 13 jurors were sworn to try this cause: Juror #1,
       Gary R. Hall is designated as alternate juror.

|     |                   |     |                   |
|-----|-------------------|-----|-------------------|
| 1.  | Gary R. Hall      | 7.  | Andrea L. Greenlee|
| 2.  | James Sinnema     | 8.  | Robert G. Sears   |
| 3.  | Frank Brady       | 9.  | Lesley Winney     |
| 4.  | Barbara Garrett   | 10. | Marilyn Churchill |
| 5.  | Karen R. Egtvedt  | 11. | Sharon Walker     |
| 6.  | Jennifer R. Clyde | 12. | Donna Lee Orr     |
|     |                   | 13. | Mehari Gebrewold  |

11:28  Attorney conference at sidebar.
11:30  The Court directs general instructions to the Jury.
11:35  Colloquy of Court and counsel.
11:40  Court in recess until 1:00 p.m.

1:08   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury not present.
       Colloquy of Court and counsel.
1:10   Jury present.
       State makes opening statement.
1:20   Defendant makes opening statement.
1:29   The Court instructs the Jury regarding note taking.
1:31   SUZANNA JOHNSON, called by the State, sworn and testified.
1:40   Cross examination of Suzanna Johnson by the Defendant.
1:42   Attorney conference at sidebar.
1:43   Jury admonished not to discuss this case and return on Tuesday,
       December 7, 2004 @ 9:55 a.m.
1:45   Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

TUESDAY, DECEMBER 7, 2004                 Clerk: Grace Hampton
                                          Reporter: S. Magee
Court opened at 9:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock.  Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Jury not present.

5                            TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.

9:10   Juror #9, Lesley Winney present.
       State's voir dire of Juror #9, Mr. Winney.
       Juror #9, Lesley Winney released to go back to the Jury Room.
       The Court finds that Juror #9, Lesley Winney was engrossed in
       the book he was reading and did not see the defendant being
       brought to the Courtroom.

       Exhibit no. 43 offered by the State:      ADMITTED 12-7-04
       Exhibit no. 44 offered by the State:      Not Offered
       Exhibit no. 45 offered by Defendant:      Not Offered

9:13   Court in recess.

9:40   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury not present.
       Colloquy of Court and counsel.
9:45   Court in recess.

10:05  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       KELLY WILLOTH, called by the State, sworn and testified.

       Exhibit no. 46 offered by the State:      ADMITTED 12-8-04

10:55  Court in recess.

11:14  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       Cross examination of Kelly Willoth by the Defendant.

       Exhibit no. 47 offered by Defendant:      Not Offered

11:28  GEORGE WILKINS, called by the State, sworn and testified.

       Exhibit no. 48 offered by the State:      ADMITTED 12-7-04

11:39  Cross examination of George Wilkins by the Defendant.
11:40  Redirect examination of George Wilkins by the State.
11:42  Recross examination of George Wilkins by the Defendant.
11:44  SARAH BRYANT, called by the State, sworn and testified.
11:46  Cross examination of Sarah Bryant by the Defendant.
11:47  Court in recess until 1:30 p.m.

6                         TRIAL MINUTES

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

1:50  Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
JEREMY CUSTER, called by the State, sworn and testified.

Exhibit no. 49 offered by the State:     ADMITTED 12-7-04
Exhibit no. 50 offered by the State:     ADMITTED 12-7-04
Exhibit no. 51 offered by the State:     Not Offered
Exhibit no. 52 offered by Defendant:     Not Offered

2:15  Cross examination of Jeremy Custer by the Defendant.
2:19  Redirect examination of Jeremy Custer by the State.
2:22  Recross examination of Jeremy Custer by the Defendant.
2:30  DREW EDEN, called by the State, sworn and testified.
2:45  Cross examination of Drew Eden by the Defendant.
2:53  Redirect examination of Drew Eden by the State.
2:55  Recross examination of Drew Eden by the Defendant.
2:56  Court in recess.

3:22  Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Attorney conference at sidebar.
3:24  The Court admonishes the jury and directs them to return on
December 8, 2004 @ 9:00 a.m.
3:25  Colloquy of Court and counsel.
3:28  Court in recess.

WEDNESDAY, DECEMBER 8, 2004          Clerk: Grace Hampton
                                     Reporter: S. Magee
Court opened at 9:12 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock.  Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Jury not present.
Colloquy of Court and counsel.
9:15  Jury present.
JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20  Cross examination of Jeremiah Sheridan by the defendant.
9:23  Detective Kelly Willoth, recalled by the State, previously
sworn, testified.
9:25  Cross examination of Detective Kelly Willoth by the Defendant.

7                        **TRIAL MINUTES**

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:28  Redirect examination of Detective Kelly Willoth by the State.
9:30  CANDY CORDER, called by the State, sworn and testified.
9:37  Cross examination of Candy Corder by the Defendant.
9:45  Court in recess.

10:00  Court resumes as heretofore, defendant present; in custody, and
       all parties present.
       Jury present.
10:02  EVAN THOMPSON, called by the State, sworn and testified.


       Exhibit no. 53 offered by the State:    ADMITTED 12-8-04
       Exhibit no. 54 offered by the State:    ADMITTED 12-8-04

10:15  Cross examination of Evan Thompson by the Defendant.
10:18  State rests.
10:19  MATTHEW RUTH, called by the Defendant, sworn and testified.
10:26  Attorney conference at sidebar.
10:28  Continuation of testimony of Matthew Ruth on direct examination
       by the Defendant.
11:03  Jury not present.
11:04  Colloquy of Court and counsel.
11:05  Court in recess.

11:25  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
11:26  Cross examination of Matthew Ruth by the State.
11:45  Defense rests.
       State rests.
11:46  Jury not present.
11:48  Colloquy of Court and counsel.
11:50  Court in recess until 2:00 p.m.

 2:00  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury not present.
       The Court takes exceptions and objections to instruction: None
       given.
 2:05  Jury present.
       Not reported.
       The Court instructs the Jury.
 2:20  Reported.
       State opens closing argument.
 2:40  Defendant makes closing argument.
 2:52  State makes final argument.

8                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate
juror.
The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

At 4:12 p.m. on December 8, 2004, the Jury submits a written
inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10
& 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov.
24, 2003; and 3) Transcript of interview with Drew Eden (Nov.
10, 2003)"

At 4:15 p.m. on December 8, 2004 the Court responds in writing
"The evidence requested by the jury was not admitted into
evidence and is not available to the jury during deliberations.
Thank you."

Inquiry from the Jury and Court's Response filed in open court.

THURSDAY, DECEMBER 9, 2004                    Clerk: Grace Hampton
                                             Reporter: S. Magee
Court opened at 11:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
The jury returns to open court with their verdict.
State of Washington represented through Deputy Prosecuting
Attorney Julie Mohr.  Detective Kelly Willoth seated at counsel
table.
Defendant present, in custody, represented by counsel Mark
Stephens.
Verdict read in open court finding the Defendant guilty of the
crime of First Degree Assault as charged in Count I; and guilty
of the crime of First Degree Assault as charged in Count II.  On
Special Verdict Form A, the Jury found that the defendant was
armed with a deadly weapon at the time of the commission of the
crime in Count I and on Special Verdict Form B, the Jury found
that the defendant was armed with a deadly weapon at the time of
the commission of the crime in Count II.
Jurors polled: verdict unanimous.
Verdict Form A; Special Verdict Form A; Verdict Form B and
Special Verdict Form B are received and filed.
Court's Instructions filed in open court.
Jury is discharged.

9                          TRIAL MINUTES

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5,
Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

10                    **TRIAL MINUTES**

FILED



2005 FEB -4  PH 12: 02

03-1-02451-6          104

SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY
SNOHOMISH CO WASH.

STATE OF WASHINGTON

VS.

MATTHEW RUTH
(DEFENDANT)

CAUSE NO.:     03-1-02451-6
JUDGE:         DAVID F. HULBERT
REPORTER:      LAUREL OLSON
CLERK:         HEIDI PERCY
DATE:          2-4-05 @ 11:00 PM

THIS MATTER CAME ON FOR: SENTENCING

CONTINUED/CODE:                                DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: JOHN ADCOCK          C.C.O.:

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: CHARLES DOLD

FAILED TO APPEAR:    WARRANT AUTHORIZED:    ISSUED:    BAIL AMOUNT:

REQUESTED COUNSEL:    REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

IT IS THE JUDGMENT AND SENTENCE OF THE COURT THE DEFENDANT IS GUILTY AS
CHARGED AND IS TO BE SENTENCED TO:

STATE DEPARTMENT OF CORRECTIONS: 105 MONTHS ON EACH COUNT, PLUS 60 MONTHS ON EACH
COUNT FOR FIREARMS ENHANCEMENT - FOR A TOTAL OF 330 MONTHS

DAYS OF SENTENCE SUSPENDED:              CREDIT FOR TIME SERVED:

WORK RELEASE:                        COMMENCING: IMMEDIATELY

DAYS CONFINEMENT CONVERTED:          COMMUNITY RESTITUTION HOURS:

COURT ORDERED MONETARY PAYMENTS: COURT COSTS: WAIVED    VICTIM ASSESSMENT: $500.00

ATTORNEY FEES: WAIVED    CRIME LAB FEE: N/A    MANDATORY DRUG FINE: N/A

RESTITUTION/HEARING DATE: $300.00                BIOLOGICAL TESTING FEE: WAIVED

PAYMENTS TO BE MADE: WITHIN 36 MONTHS FROM RELEASE

COMMUNITY SUPERVISION:                    COMMUNITY PLACEMENT:

COMMUNITY CUSTODY: 24-48 MONTHS DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS: YES

DEFENDANT NOTIFIED OF DRIVER'S LICENSE REVOCATION/SUSPENSION:

PRESENCE WAIVED AT SIGNING BY DEFENDANT: YES          DEFENDANT FINGERPRINTED: YES

JUDGMENT AND SENTENCE ENTERED: YES

OTHER:   — DEFENDANT'S MOTION TO CONTINUE: DENIED.
         CONNIE EDEN, VICTIM'S MOTHER, PRESENT AND ADDRESSED THE COURT.
         , VICTIM PRESENT AND ADDRESSED THE COURT.   BOBBY EDEN, FATHER OF
THE VICTIM PRESENT AND ADDRESSED THE COURT.
         DEFENDANT'S MOTION FOR AN EXCEPTIONAL SENTENCE DOWNWARD: DENIED.

1              CRIMINAL SENTENCING/CSV MINUTE ENTRY

AA
104

APPENDIX D

STATE OF WASHINGTON VS. MATTHEW RUTH
03-1-02451-6

THE DEFENDANT IS TO HAVE NO CONTACT WITH THE VICTIMS FOR LIFE.
THE COURT ADVISES THE DEFENDANT OF HIS RIGHT TO APPEAL WITHIN 30
DAYS.
FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO CRIMINAL RULES
3.5/3.6 ENTERED, TO BE FILED BY COUNSEL.  TEMPORARY ORDER OF COMMITMENT
ENTERED.  PSYCHOLOGICAL EVALUATION REPORT FILED.

2          CRIMINAL SENTENCING/CSV MINUTE ENTRY

APPENDIX

"   "

E

AFFIDAVIT OF:
Kenneth TIBBS

I lived in lake steven's and my friend's introduced me to this dude
named Jermy Custer because he would deliver weed, acid, exstasy, or glass
, or coke. This guy drove a Tan Doge durango He is tall, with redish hair
he also carry's a gun, and is part of the Northwest Mafia. He would come
over to my friend's house to sell us drug's him , and his frind's. Then I
went to his house on cavilero Rd. a few times. It was a small blue house,
and there was a fence around the outside of it with a horse field, and a
5th wheele trialer lined up in the horse feild directly with Jermy Custer
front door in fact his only door. If you were coming out of the house to
the left is the drive way, and cavilero Rd., and straight ahead is the
trailer where this dude named Matthew R. Ruth, and his girl friend lived.
Matthew was alway's at Custer house making music with turntable's,
keyboard's, guiatar's, and a computer. Matthew made some cool rave, metal
music. Jermy had a crazy party house, and everyone did drug's, and drank
beer. Jermy would alway's brag about robing people, and how he shoot's
people. Also his friend john Anderson would get lot's of praise for being
crazy, and Jermy would talk about all the fight's, and stuff they got
into.

On Nov,5, 2003 Me and my friend went to buy some weed from jermy in the
early afternoon. We got to the house, and their were lot's of people
their like usual. We bought are weed then started smoking with everyone.
Jermy was mad yelling about Matthew, and his girl friend stealing drug's
from him. Jermy had his gun's out, and said he was going to kill Matt,
and Renne if they did not give back their drug's. Then he said that
Renne had snitched on them to the land lord for selling drug's but the
land lord buy's from them, and told them. Then Custer went outside, and
everyone followed he had just got done smoking some Glass, and was acting
all crazy. Me, and my friend decided to leave, as we were going to the
car we saw Matthew come out of the trailer with his long hair. Then it
appeared Jermy was yelling at Matthew, and then after a few minutes
Matthew ran back into his trialer, And Jermy Custer, And one of his
friend's followed. It looked like they were trying to get the door out of
Matthew's hand's  the door is one of the wierd one's that open's out
instead of inward. By that time we were already pulling out of the drive
way. I did not hear about what happened until a long time after. The only
reason i am writting this is because it is not fair that Matthew is in
trouble for getting attacked by Jermy that guy is scary. I hope that he
will not find out I wrote this, and I will testify to this in court.

I declare under penalty of perjury that the fore going is true and
correct to the best of my knowledge.
            Dated this  1  day of _Nov___ ,2005

X _____
AFFIANT
Subscribed and sworn to before me this
 1 day of_ Nov _____,2005.

_Jodi J Robin_____
Notary Public in and for the State of
Washington, residing at Monroe, Wa 98272
My commission expires: 3/10/07

AFFIDAVIT-1

CERTIFIED
COPY

ORIGINAL

Filed In Open Court
_12-28-04_/20
PAM L. DANIELS
COUNTY CLERK
By _Grace Hampton_
Deputy Clerk

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) No.03-1-02451-6 |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) **MOTION TO WITHDRAW** |
| | ) |
| MATTHEW R. RUTH, | ) |
| **Defendant.** | ) |

Counsel for the defendant in the above entitled cause, Mark Stephens, respectfully

requests this Court allow counsel to withdraw from further representation of the defendant.

Counsel makes this motion based upon the attached declaration.

Respectfully Submitted this 28th day of December, 2004.

MARK STEPHENS, WSBA #26110
Attorney for Defendant

03-1-02451-6          97

In Response
C.A Blackman's
↓

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

Motion to Withdraw
Page 1

AA
97

# EXHIBIT 21

# EXHIBIT 4

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER |
|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | | REPORT DATE SO 03-25124 |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner DOB | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y    N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**Det. Willoth:** Okay. Was it the, the same gun that you had seen that he obtained when you were living in the apartment in Lake City?

**R. Woerner:** Yeah, the same gun he stuck down my throat, the same gun he hit me in the head with.

**Det. Willoth:** Okay. And I'll let you go on from there. Then he grabs the gun, he puts it in his uh, front waistband?

**R. Woerner:** Yeah and then he kept arguing. And Jeremy's going dude, I feel threatened. I don't think that any of us thought that Matt would actually pull the trigger. Ya know what I mean? I, I don't know. Jeremy was like dude, why you threatening me like this. I'm coming in here nicely. I just wanna go through your stuff and find out where, where this stuff, who took my stuff is missing. And Matt I don't even remember what happened or like if Drew said anything or what I just heard a wierd pop sound. And I was like what the…and then I don't even remember I was like oh my God Matt stop and he just kept pop, pop, pop.

**Det. Willoth:** 'kay. When you first heard the pop sound

**R. Woerner:** Um huh [that's a yes].

**Det. Willoth:** did you know what it was?

**R. Woerner:** No, not at all. It didn't sound like a gun. It didn't hurt my ears or anything.

**Det. Willoth:** Were you looking at Matt at the time or where were you?

**R. Woerner:** Like Jeremy was I was kinda focusing on Jeremy. I mean not, I wasn't really looking at Matt. I was, Jeremy was right in front of me and Matt was in front of him. I was just kinda I don't know I was just sitting there like they're arguing and I kinda looked at him and I was kinda looking at the computer and I'm like oh my God this argument's never gonna end.

| OFFICER NAME/NUMBER | | | | APPROVED BY | |
|---|---|---|---|---|---|
| *Detective Willoth #1335* | | 21 | | *12/11/03* | |

ISR CLEARANCE (ONE)  ( ) INSUFF / CLO  COPIES MADE FOR:  ( ) COURT: CAS / EVQ / SOUTH / EVT  DATA ENTRY
( ) ARR/A  ( ) EXC/A  ( ) OTHER / CLO  ( ) PA  ( ) CPS  ( ) JUV  ( ) DET: PREC /  CTH / SPEC
( ) ARR/J  ( ) EXC/J  ( ) UNF  ( ) PAT  ( ) DSHS  ( ) MM  ( ) OTHER:
SH-245 9/94                                                                    ORDER = 8

25     45

# FOLLOW-UP

PAGE _____ OF _____

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|

| NAME OF ORIGINAL VICTIM(S) | REPORT DATE |
|---|---|
| Renee Woerner  DOB | Det. Willoth |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|

| PROPERTY CHANGES | ACTION | ADDITIONAL $ | TO | Y | N | DRUG RELATED |
|---|---|---|---|---|---|---|
| | | | | | | ALCOHOL RELATED |

pasture and got up and ran towards the fence. Then Matt and Jeremy came tumbling out of the trailer together. And—um, I don't remember what they said or anything.

**Det. Willoth:**    Did you, when Matt came out of the trailer did he still have the gun?

**R. Woerner:**    Yes. I, I couldn't see where, which hand he had it in but I know he had the gun. Because I heard another pop and the horses went runnin'. And then Jeremy and Matt went runnin' up towards the lady's house and Jere...this is all, I mean I'm not, not super clear on this. I'm guessin'.

**Det. Willoth:**    That's okay.

**R. Woerner:**    Ya know what I mean. I'm only super clear on what's going on, what's goin on inside when I was sitting on the bed. That was that will always be super clear to me in my head, always. But then Jeremy ran that way, he kinda did a tumble also. And him and Drew ran into the street and they're like oh my God we've been shot what do we do? Jeremy said no cops. They came back, I don't remember which way he came back. If he came up the driveway or if he came up over the fence, went in the house, grabbed a black garbage bag which I'm I've seen that he had pound of weed in it before so that's what, he grabbed the garbage bag and he said no cops like that. I didn't see any blood at all on him. None at all. Got in the Durango and drove off. Somebody in a white car I think picked up Drew. There was a big moving truck that was taking garbage that day. Wasn't a regular garbage truck, that had, was right on the side street right there. I know that and then Drew got in the car. And he's like I've been shot and I don't know if it was later the man was like what are you talking about. He lifted up his shirt and was like look, I've been shot in the back twice and then got in the car and drove off.

| _Detective Willoth #1335_ | 25 | 12/11/03 |
|---|---|---|
| OFFICER NAME/NUMBER | | APPROVED BY |

| IBR CLEARANCE :(ONE) | ( ) INSUF / CLO | COPIES MADE FOR: | | ( ) COURT: CAS / EVG / SOUTH / EVT | DATA ENTRY |
|---|---|---|---|---|---|
| ( ) ARR/A    ( ) EXC/A | ( ) OTHER / CLO | ( ) PA    ( ) CPS | ( ) JUV | ( ) DET: PREC / CTH / SPEC | |
| ( ) ARR/J    ( ) EXC/J | ( ) UNF | ( ) PAT    ( ) DSHS | ( ) MH | ( ) OTHER: | |

GH-245  9/94

ORDER = 8

# FOLLOW-UP

PAGE __27 OF__ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER |
|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | | REPORT DATE   SO 03-25124 |
| TYPE OF ORIGINAL REPORT   Renee Woerner DOB | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS   Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y   N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**R. Woerner.** No. He called Donny at work and he called his friend Bill, D.J. Wills whatever and told them both, I shot him. And his friend was like dude you're not suppose to when you fight with somebody shoot em you're suppose to ya know like punch him and go for balls if you have a problem with him. You're not suppose to shoot em. And he was like yeah man, I don't know I just freaked out and I got weirded out and I shot him. I shot him and that was that. So

**Det. Willoth:** Okay. So what happened after you left was it Bill's house?

**R. Woerner.** Donny's house. We, we got on a train and went down to California.

**Det. Willoth:** Okay.

**J. Adcock:** How'd you pay for that?

**R. Woerner.** He had money and a new gun.

**Det. Willoth:** 'kay. Where'd he get the money and the new gun?

**R. Woerner.** He just said he got it from whatever. I don't know he had a secret stash. He got it out of the yard. I don't know. This is what happened. We went our separate ways okay?

**J. Adcock:** When?

**R. Woerner.** At Donny's. I went with my friend Michelle. Okay, he went, he didn't go anywhere. He was there I left him there. I went to my friend Michelle's. He called me and said that they were gonna chase me down. That cuz I know that the guy that drops off the, the drugs with uh, Jeremy, and he's an Asian guy, and I don't know what's gonna, I just got scared and Matt is a master of manipulation or I'm just a real big idiot. And he was like okay, these people are coming to get you. They're gonna shoot you over this pound of weed and Jeremy getting shot. And that so we went

| OFFICER NAME/NUMBER   *Detective Willoth #1335* | 27 | APPROVED BY   *12/11/03* | |
|---|---|---|---|
| IBR CLEARANCE (NONE) ( ) ARR/A ( ) ARR/J | ( ) EXC/A ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA  ( ) CPS ( ) PAT ( ) DSHS | ( ) JUV ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-245 9/94

ORDER = B

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER | |
|---|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | **ASSAULT 1 W/FIREARM** | | REPORT DATE | **SO 03-25124** |
| Renee Woerner DOB | | | CONNECTING REPORT NUMBERS | |
| OF ORIGINAL REPORT | DATE | RECLASSIFY TO | **Det. Willoth** | |
| PROPERTY CHANGES: ACTION  ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED  Y    N | COMPUTER USED  DRUG RELATED  ALCOHOL RELATED |

Matt came back and grabbed me and was like come on let's go. I don't know, I didn't know if he had the gun on him or what and he so I went with him. Waited and Candy's mom or whatever her name is that farm lady came home and Matt got a ride from her. Dan went and got the computer and the shoes for me. He got my shoes and brought back the computer. Um, I didn't know if Matt still had the gun on him or not. I didn't see, he didn't start waving a gun around at this point.

**Det. Willoth:** Did Matt have any conversation with you at that point? Did he say

**R. Woerner:** He's like just stand here. Don't move. And at that point that's what I did. Because I didn't know if he had the gun on him or not. I know whatever but um, then she gave us a ride to Monroe and dropped us off at Donny's house. The computer's still there.

**Det. Willoth:** Okay. What happened when you got to Donny's?

**R. Woerner:** Donny wasn't home. Donny's dad let us in and we had like four cigarettes. Sat downstairs in the basement, watched TV.

**Det. Willoth:** Any conversation between you and Matt about what happened?

**R. Woerner:** All it was, was I just cried because that was the most terrifying thing I've ever experienced in my life. I was like oh my God ya know, those are your friends. And I cried. He was like hee-hee-hee, hee does this weird thing when he gets excited. Like when he hit me in the head with the gun and shoved it down my throat and did all that weird stuff he does this thing. He gets all excited. It was really psychotic, it's creepy and he did that he's like maybe I'll be on TV I'll be famous. And I was just like oh my God. And yeah.

**Det. Willoth:** Did he ever talk to you about what his intent was that day or why he did what he did?

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| **Detective Willoth #1335** | 26 | **12/11/03** | |
| IBR CLEARANCE (ONE)  ( ) ARR/A   ( ) EXC/A  ( ) ARR/J   ( ) EXC/J | ( ) INSUFF / CLO  ( ) OTHER / CLO  ( ) UNF | COPIES MADE FOR:  ( ) PA  ( ) PAT | ( ) CPS  ( ) DSHS | ( ) JUV  ( ) MM | ( ) COURT: CAS / EVG / SOUTH / EVT  ( ) DET: PREC / CTH / SPEC  ( ) OTHER: | DATA ENTRY |
| SH-245  9/94 | | | | | | ORDER = 8 |

# INTERVIEW

PAGE ___ 29 __ OF ___ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| .E / DOB OF PERSON(S) INTERVIEWED Renee Woerner DOB | | INTERVIEW REQUESTED BY Det. Willoth |

| | |
|---|---|
| R. Woerner. | A thousand dollars or ss....yeah, a thousand dollars I believe. |
| Det. Willoth: | A thousand dollars?  Where does Michelle live? |
| R. Woerner. | Michelle lives in Silver Lake. |
| Det. Willoth: | Okay.  Okay so after um, the burglary happened how did you end up hooking back up with him? |
| R. Woerner. | He called, he said we've got to go.  They're gonna come and they're gonna shoot you blah di blah.  And because she had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shoot me over a pound of weed?  But all this weird stuff had happened and it was stressful and I didn't know, I didn't know what to do. Ya know and so I did, I, I left.  I didn't think about oh my God, the police are looking for me or anything like that cuz I didn't do anything wrong.  I didn't, I didn't shoot anybody. Ya know and |
| Det. Willoth: | Why did you go with him? |
| R. Woerner. | Because I didn't wanna get shot by drug dealers. |
| Det. Willoth: | Okay. |
| R. Woerner. | That's all I mean I can't, there's no other reason.  There's not.  I can't think of a fancy lie or anything, that's all.  I just didn't wanna get shot by by drug dealers.  And cuz Jeremy said no cops when he left.  Uh, it scared me. |
| Det. Willoth: | Okay. |
| J. Adcock: | How did he get a hold of you?  At Michelle's? |
| R. Woerner. | On, on her cell phone. |
| J. Adcock: | Did she call him or how did that (unintelligible) |
| R. Woerner. | He had her number.  He |
| J. Adcock: | Okay he knew...allright |

| INTERVIEWER NAME/NUMBER Detective Willoth #1335 | 29 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

5/12

1060-253

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT **ASSAULT 1 W/FIREARM** | REPORT NUMBER **SO 03-25124** |
|---|---|---|
| E / DOB OF PERSON(S) INTERVIEWED **Renee Woerner  DOB** | | INTERVIEW REQUESTED BY **Det. Willoth** |

| | |
|---|---|
| Det. Willoth: | Yeah. |
| R. Woerner: | Okay.  She said yeah, I'm hidin' from the police too.  I'm lookin' at six years.  You guys can stay here.  So then she apparently, they were shooting up in the bathroom.  I was sitting in the living room the whole time and um, they were shootin' up in the bathroom.  Matt started pounding on me.  That's when all her friends came in and said let go of her man.  And that's when he tried to pop my eyes out.  And uh, they're like dude let go of her.  And he had me all wrapped up like this and I that was the last, that was the last day I spent with Matt.  She took me and hid me down at a cousins.  Matt they ran him off whatever he kept he didn't call me because I was at her cousins.  He didn't know where I was at.  That's when I called my mom and I was like I need to get outta here, I need to come home.  That's when his sister came by and said you have a warrant for your arrest.  I freaked out.  I went oh my God I didn't do anything.  She's like yeah, they're dead, they're murdered.  You have a warrant for your arrest for murder.  And I was like oh my God.  My mom's gonna buy me a bus ticket and I was gonna come up here and handle it.  Matt I don't know where he was.  Running around in the shadows.  I was afraid he was gonna catch me and at that point he was gonna take me to his, his plan was gonna take me to Mexico and or kill me and throw me out in the desert.  I wanted to come home. |
| Det. Willoth: | Did he tell you that? |
| R. Woerner: | That is what he told me yeah.  He was gonna kill me and then take me and bury me out in the desert, go find my kids, slit my daughter from her vagina to her throat, that's what he told me.  So um, trying to think. |

| REVIEWER NAME/NUMBER **Detective Willoth #1335** | 32 | DATE OF INTERVIEW **12/11/03** |
|---|---|---|

6/02

1060-255

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT **ASSAULT 1 W/FIREARM** | REPORT NUMBER SO 03-25124 |
|---|---|---|
| ME / DOB OF PERSON(S) INTERVIEWED Renee Woerner  DOB | | INTERVIEW REQUESTED BY Det. Willoth |

| | |
|---|---|
| Det. Willoth: | Do you know if Matt ever stole stuff from Jeremy?  Did he ever take things from him? |
| R. Woerner: | He took he would take little, he would take weed and stuff from him.  I don't know anything about anything else.  But I know he'd take weed from him, yeah.  I don't know if he took the pound of weed. |
| Det. Willoth: | Okay. |
| R. Woerner: | I don't know about that. |
| Det. Willoth: | Did you ever see any of Jeremy's property inside of Matt's trailer? |
| R. Woerner: | No.  Dishes that we used. |
| Det. Willoth: | Okay.  Nothing else other than that? |
| R. Woerner: | No huh uh.  Nope. |
| Det. Willoth: | 'kay. |
| R. Woerner: | They would have it was a constant argument in the house.  With Jeremy and everybody.  Who stole my this?  Who took my that?  Ya know, It was mostly weed.  Ya know like if he left his bag of weed out or whatnot and people would dig in it or whatever.  But |
| Det. Willoth: | Okay. |
| R. Woerner: | that's all I know that was ever missing was like drugs. |
| Det. Willoth: | Okay.  Anybody else in the house or anybody else at the house at the trailer rather before this happened that I need to know about?  Is there any other people that came by or any other people that were in the trailer? |
| R. Woerner: | Huh uh [that's a no]. |
| Det. Willoth: | Nobody at all? |
| R. Woerner: | No, not that, no.  It was Drew was in the living room and Jeremy was on the bed and I was behind him and Matt was standing there. |

| ..ERVIEWER NAME/NUMBER *Detective Willoth #1335* | 37 | DATE OF INTERVIEW *12/11/03* |
|---|---|---|

503

1050-253  323

# INTERVIEW

PAGE _____ 38 OF ___ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT | REPORT NUMBER |
|---|---|---|
| | ASSAULT 1 W/FIREARM | SO 03-25124 |
| NAME / DOB OF PERSON(S) INTERVIEWED | | INTERVIEW REQUESTED BY |
| Renee Woerner  DOB | | Det. Willoth |

| | |
|---|---|
| Det. Willoth: | Okay.  And Nigel? |
| R. Woerner: | Nigel rode a bicycle into Lynnwood because Jeremy had not come home the night before and, and usually Jeremy would come home late, Nigel would take the car in the morning and go down into Lynnwood or whatever to his dad's and handle his unemployment check and do the thing. |
| Det. Willoth: | So he wasn't there during this? |
| R. Woerner: | Huh uh [that's a no]. |
| Det. Willoth: | Okay. |
| Det. Pince: | One question.  Um, you talk about there being lots of drugs used and around the place all the time. |
| R. Woerner: | Uh huh and underage girls all kinds of strange things. |
| Det. Pince: | Were these drugs for personal use or were they selling em? |
| R. Woerner: | Ya know, I, I know they were selling them.  I can't say that they were selling them.  They weren't doing it like that.  They would put it ya know, whatever uh, ya know, the, the zip sealed bags and everybody would get a backpack and they'd go about their thing.  That's all I can say.  Ya know, other than that all I saw was just them partaking of the drugs. |
| J. Adcock: | Well they didn't work regular jobs did they? |
| R. Woerner: | Well uh huh [that's a no] and they used the music thing and whatever and I know there's a stack of receipts that have my name on it that said paid for Matt's music lessons or D.J. lessons some such thing like that.  That that's not real.  It's just not real and he kept asking me when you gonna go back to work?  I never told Jeremy that I quit my job.  I just told him I was on leave because of my head injuries my head wounds and so he needed to know because he had continued to write these receipts for |

| INTERVIEWER NAME/NUMBER | DATE OF INTERVIEW |
|---|---|
| Detective Willoth #1335 | 12/11/03 |

# INTERVIEW

PAGE __ 39 OF __ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT | REPORT NUMBER |
|---|---|---|
| | ASSAULT 1 W/FIREARM | SO 03-25124 |
| AE / DOB OF PERSON(S) INTERVIEWED | | INTERVIEW REQUESTED BY |
| Renee Woerner DOB ( | | Det. Willoth |

| | |
|---|---|
| | these music lessons or whatever they were D.J. lesson's for Matt so that he could cover his tracks for the tax purposes and whatnot. And when he'd gone to tax class and all that and the library and all that so... |
| J. Adcock: | Do you think it's possible they used the proceeds for drug sales to finance the lifestyle you had out there? |
| R. Woerner: | Uh, yeah. That's definitely ya know, I know that for a fact but I ya know, that's not ya know, I didn't see this I mean hand for hand like I said ya know. |
| Det. Pince: | Was Matt selling drugs? |
| R. Woerner: | Matt, I know Matt acquired quite a bit of crystal meth at one point from one of their friends and they, everybody was all high. Everybody was all high and um, I just sat up in the trailer cuz it was crazy and that's yeah, that's when I got beat in the head and uh, |
| Det. Willoth: | Okay. One thing I just realized |
| R. Woerner: | But he was selling little packages of this, of the meth. But mostly Jeremy and them were buying it from Matt so it was just like this inner, this little circle. |
| Det. Willoth: | You're down in the jail down in California. |
| R. Woerner: | Um huh [that's a yes]. |
| Det. Willoth: | And uh, your mom had called me and spoke about some notes that you got. |
| R. Woerner: | Um huh [that's a yes]. |
| Det. Willoth: | Um, when did you get those and what, what was the deal with the notes? |
| R. Woerner: | God, they're just, I thought I don't know. Um, I don't 'member when I got the notes but the notes were disappointing first of all. So I thought okay, |

| RVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| Detective Willoth #1335 | 39 | 12/11/03 |

6/02

1000-253

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED Renee Woerner  DOB | | INTERVIEW REQUESTED BY Det. Willoth |

|  |  |
|---|---|
| | well maybe they might say he's sorry for bashing my head in and ya know, whatever. Ya know, just a last little string of hope. This is all been very traumatizing and that I know that I'm not, I should not have gone down to California with him. I should have ya know, I don't know, if I coulda done it different ya know, I, but the notes say something about Lou and Lou is the guy who they get the pounds of weed from. I know that. He's an Asian guy that comes in the black little sports car. Then brings the bag, garbage bag that Jeremy took out in the Durango. He's the one that takes it into Jeremy. That's all. I've seen that; that's all I know. But um, Matt wrote in there it's too bad that Lou came in and tried to rape you and hit you in the head with the gun and pistol whips you. It's a real ignorant, they're ignorant letters. And he's writing this and I'm goin oh my God, and when I, my cell mate is reading it and going oh my God, he's, he's telling you what to say. I got a Christmas card with the same crap up in it. I was like oh my God, ya know, at least write me a nice note or something. |
| Det. Willoth: | Okay. So there was no, there was nothing that was direct in there like you have to say this? |
| R. Woerner: | No, uh uh [that's a no]. |
| Det. Willoth: | It was telling you... |
| R. Woerner: | I talked to a sheriff and he said that because they tried to rape you and tried to ya know, and I wrestled the gun out of his hand and somebody got shot |
| Det. Willoth: | 'kay. And those were from Matt, the notes? |
| R. Woerner: | Um huh [that's a yes]. And I wrote him back and I was like yeah, everything's all good. I love you, I miss you, whatever and he sent the |

| INTERVIEWER NAME/NUMBER Detective Willoth #1335 | 40 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

5/02

# INTERVIEW

PAGE ___4 OF___ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED Renee Woerner DOB | | INTERVIEW REQUESTED BY Det. Willoth |

|  |  |
|---|---|
|  | Chaplain over to try and marry me over at Riverside. I was like yeah, probably not. I was like you don't even know what we've, what I've been through because he was like well yeah, that's what I was tellin' Matt and he kinda jumps with the gun. I was like yeah, no pun intended. Ya know, it was very creepy and strange and that's when I had my mom call. I said you don't understand that it's getting weird down here. |
| Det. Willoth: | Okay. |
| R. Woerner: | Ya know, cuz his mom's a corrections officer and because of the incident in 2002 and nobody did anything. I started to feel like okay, I'm never gonna get out of California. They're gonna set this up and it's gonna get strange. And so ya know |
| Det. Willoth: | Okay. |
| R. Woerner: | yeah, the notes. |
| Det. Willoth: | So there's two notes? |
| R. Woerner: | Yes. They should, they when I left Riverside when they came to transport me she gave me like 2.3 seconds to gather my stuff. Okay? They were in my Bible. That's the only thing I brought so, they should be in the Bible. |
| Det. Willoth: | And you don't have a problem with us getting those |
| R. Woerner: | No, go ahead. |
| Det. Willoth: | out of your property and taking a look at em? |
| R. Woerner: | Huh uh [that's a no]. |
| Det. Willoth: | Okay. Um, |
| J. Adcock: | I need to ask you about your drug use cuz that's gonna come up. |
| R. Woerner: | Um huh [that's a yes]. |
| J. Adcock: | Why don't you tell me? Do you use? |

| INTERVIEWER NAME/NUMBER Detective Willoth #1335 | 41 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

5/02

# INTERVIEW

PAGE ___42__ OF __45__

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT<br>**ASSAULT 1 W/FIREARM** | REPORT NUMBER<br>**SO 03-25124** |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED<br>Renee Woerner  DOB | | INTERVIEW REQUESTED BY<br>**Det. Willoth** |

| | |
|---|---|
| **R. Woerner:** | No I, I'm not using drugs at this time.  I have been, since before, before the pistol whipping I quit using drugs.  I, I can't tell you I haven't used drugs ya know.  I can't tell you I haven't done crystal meth.  I haven't done cocaine.  I live with Angie I mean come on and um, ya know, I smoke a little pot now and then.  Um, but if you check my blood now I mean I'm clean.  And |
| J. Adcock: | Well you've been in custody |
| **R. Woerner:** | I've been in custody for over a month so ya know that's that but ya know, when I go home |
| J. Adcock: | Were you using when the shooting occurred? |
| **R. Woerner:** | No. |
| J. Adcock: | And you indicated you stopped after you got hit in the head? |
| **R. Woerner:** | Yeah it was in, around October so I've been about, it'd only been about a month.  It wasn't very long. |
| J. Adcock: | Okay. |
| **R. Woerner:** | But ya know, with a concussion that's all I did was want to sleep. |
| J. Adcock: | Okay.  Alright. |
| Det. Pince: | Renee, you pointed to a mark on your eye and said that uh |
| **R. Woerner:** | Right here? |
| Det. Pince: | he tried to poke your eye out or something? |
| **R. Woerner:** | He tried to pop it out. |
| Det. Pince: | 'kay.  Do you have any other injuries |
| **R. Woerner:** | Like that. |
| Det. Pince: | related to your relationship with Matt? |
| **R. Woerner:** | I've got all kinds of scars yeah.  Um huh [that's a yes]. |
| Det. Pince: | 'kay. |

| INTERVIEWER NAME/NUMBER<br>**Detective Willoth #1335** | | DATE OF INTERVIEW |
|---|---|---|
| | 42 | **12/11/03** |

6/02

1060-2(5)

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
| --- | --- | --- |
| NAME / DOB OF PERSON(S) INTERVIEWED Renee Woerner  DOB | | INTERVIEW REQUESTED BY Det. Willoth |

| | |
| --- | --- |
| R. Woerner. | And I have scars, these scars here where the skin is all gone and right there. And on my head the scars from the pistol whipping. |
| Det. Pince: | How 'bout specifically from your trip to California?  Anything that happened down there that... |
| R. Woerner. | The only thing I have from there is my bracelet that has the picture of my black eye.  That's all. |
| Det. Pince: | 'kay. |
| J. Adcock: | When he pistol whipped you did he use the gun that he used to shoot? |
| R. Woerner. | Yes sir.  And his friend Arrow is the one who cleaned it.  His friend Arrow helped stop him but he said if Matt had a killed ya I'm sorry I woulda had to bury your body tonight? |
| Det. Pince: | So when you were booked in California, you had a black eye? |
| R. Woerner. | Yes sir. |
| Det. Pince: | 'kay. |
| R. Woerner. | Yep.  It's on my bracelet.  They took it after they took this ugly picture.  Good Lord. |
| Det. Willoth: | It's not very kind (laughs).  But yeah. |
| Det. Pince: | 'kay. |
| R. Woerner. | I feel better. |
| Det. Willoth: | 'kay. |
| R. Woerner. | And Jeremy and Drew are okay? |
| Det. Willoth: | Yes, they're fine.  Luckily. |
| R. Woerner. | Like walking, talking, no bullets left inside of them or anything? |
| J. Adcock: | One of em does have a bullet left in him. |
| Det. Willoth: | Yes, Jeremy does. |

| INTERVIEWER NAME&NUMBER Detective Willoth #1335 | 43 | DATE OF INTERVIEW 12/11/03 |
| --- | --- | --- |

# INTERVIEW

PAGE ___44__OF___45___

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED | | INTERVIEW REQUESTED BY |
| Renee Woerner  DOB | | Det. Willoth |

| | |
|---|---|
| J. Adcock: | They couldn't operate.  I mean they can't, it's too dangerous to take it out. |
| R. Woerner: | Yeah, that's why I know that's a .22 but I'm ya know, concerned because like I said Jeremy was a nice guy.  Ya know, and Drew I only met him a few times cuz he lived at that Love Israel Ranch or whatnot.  Creepy.  That's another weird thing I got scared about too.  That ya know, but Jeremy was always a nice guy. |
| Det. Willoth: | Okay.  Renee, do you have anything else you'd like to add to this statement that you thinks important or anything that you've left out? |
| R. Woerner: | I've told the story.  That's all, that's all I, that's it. |
| Det. Willoth: | 'kay. |
| J. Adcock: | I, would you be willing at some point to show us the uh, property and where people were and |
| R. Woerner: | Um huh [that's a yes]. |
| J. Adcock: | point out?  Okay. |
| R. Woerner: | Yes.  I have no problem at all. |
| Det. Willoth: | Okay.  Okay.  At any time during this statement have you asked that the questioning or taping be stopped? |
| R. Woerner: | No.  No. |
| Det. Willoth: | Okay.  At any time during this statement have you requested an attorney?  He's already here so no you haven't.  Is it true that the facts stated on this tape are true and correct to the best of your knowledge, and that your statement has been made freely, voluntarily, and without threats or promises of any kind? |
| R. Woerner: | Yes ma'am. |
| Det. Willoth: | Okay.  I'll have you sign the form. |

| INTERVIEWER NAME/NUMBER Detective Willoth #1335 | 44 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

8/02

1080-253 30

# INTERVIEW

PAGE _____ 45 F.    45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED | | INTERVIEW REQUESTED BY |
| Renee Woerner  DOB | | Det. Willoth |

R. Woerner:    Okay.  Down here too?

Det. Willoth:    Yeah.

R. Woerner:    Okay.

Det. Willoth:    Okay.  This concludes this statement.  It is 1108 hours.

*Transcribed 12/11/03 by L.E. Secretary M. Noland #4116..*

*Reviewed and corrected by Det. K. Willoth #1335*

| REVIEWER NAME/NUMBER Detective Willoth #1335 | 45 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

5/02

REPORT NUMBER

APPENDIX

"E"

MENTAL HEALTH

EVALUATION

Western State

**Forensic Psychological Report**                          March 19, 2004
**RE:  Matthew Robert Ruth**                                    Page 14

As the evaluation of Matthew Ruth is now complete with the submission of this report, he has been released into the custody of the Snohomish County Sheriff and has been transported to the Snohomish County Adult Detention Center to await further disposition by the Court. Please contact us if we may be of further service to the Court in this matter.

*Laurie Green, MA.*

Laurie Green, M.A.
Psychology Intern
Center for Forensic Services -
Western State Hospital

*R. M. Hart*

R. M. Hart, Ph.D.
Licensed Psychologist, #1180
253-756-2877

LG:kf

cc:     Presiding Judge, Snohomish County Superior Court
        John Adcock, DPA
        Jon T. Scott, Defense Counsel
        Preston Hess, Snohomish CDMHP
        Greg White, Snohomish County Jail Liaison

 

**STATE OF WASHINGTON**

DEPARTMENT OF SOCIAL AND HEALTH SERVICES

WESTERN STATE HOSPITAL

W27-19 • 9601 Steilacoom Blvd SW • Tacoma WA 98498-7213

FILED

04 MAR 24 PH 4:03

PAM L. DANIELS

SNOHOMISH CO. WASH.

**March 19, 2004**

**FORENSIC PSYCHOLOGICAL REPORT**

RE:   **STATE OF WASHINGTON**          **CAUSE NO:** 03-1-02451-6
               **VS.**                                 **WSH NO:**   387056
        **MATTHEW ROBERT RUTH**      **DOB:**
        **AKA:** Matthew Robert Stroud

The forensic mental health evaluation, as reflected in this report, was conducted pursuant to court order under the authority of RCW 10.77.060. This document has been released only to the Court, its officers, and other persons legally authorized to receive it and is intended for their use only. Any other use or distribution of this report is not intended by the undersigned.

**REASON FOR REFERRAL:**

Pursuant to a Snohomish County Superior Court order issued on 1/16/04, Matthew Robert Ruth was admitted to Western State Hospital on 3/04/04. He was court ordered to the hospital for a period of up to 15 days for an evaluation of his mental condition, his competency to proceed, his sanity at the time of the alleged offense, his imminent risk of danger to self or others under RCW 71.05, and his future risk of dangerousness under RCW 10.77.060.

Mr. Ruth is charged by Information in the Superior Court for Snohomish County with one count of Assault in the First Degree. According to the Certificate of Probable Cause and other supporting documents, the state alleges that on or about 11/05/03, Mr. Ruth shot two of his friends, Jeremy Custer and Drew Eden. At the time, Mr. Ruth lived with his girlfriend Renee Woerner in a fifth wheel trailer located at 3125 78th Ave., Everett, Washington. Victim Custer also resided at the same address in a small house. At the time of the incident Victim Eden and Witness Daniel Gist were visiting Victim Custer. Allegedly, Victim Custer arrived home the morning of the alleged incident to find some of his property missing. According to both victims and Witness Gist, the property was a set of music headphones. According to Witness Woerner and Mr. Ruth, the property was one pound of marijuana. Mr. Ruth allegedly complied with a request from Victim Custer to search his trailer for the missing property. Upon entering the trailer an argument ensued. Victim Eden then entered the trailer to inquire about the yelling he heard. Mr. Ruth was reportedly

**APPENDIX G**

**Forensic Psychological Report**
**RE: Matthew Robert Ruth**

March 19, 2004
Page 11

understanding of the roles of various legal personnel. When explanations were provided to him he was able to repeat the explanations in his own words showing that he could comprehend and then use the information. He stated that his lawyer's name was "Jon Scott" and that he first met his lawyer at the "Omnibus hearing." He further demonstrated an understanding of the meaning and consequences of guilty and not guilty pleas and findings.

Capacity to Assist in His Own Defense:
It is our opinion that Mr. Ruth currently possesses the capacity to assist in his own defense.

Mr. Ruth demonstrated an intact capacity to disclose pertinent facts to his attorney. He was able to explain his version of the alleged crime in a clear and coherent manner. Additionally, he has adequate verbal reception and expression skills to engage in a discussion of the facts with his attorney. He clearly appears motivated to defend himself against the charge and he appears quite capable of choosing in his own best interest.

Mr. Ruth demonstrated an ability to manifest appropriate courtroom behavior during our interviews He was well mannered and appropriate throughout. Although he informed us that he has had trouble understanding the hearings in the past he stated, "I think I would understand now, if not I would talk to my lawyer."

Mr. Ruth also demonstrated an ability to plan and strategize around his defense. His attempts to exaggerate his symptoms and downplay his knowledge of the legal system are examples of his ability to plan and strategize. Additionally, when given a hypothetical scenario involving a plea option, Mr. Ruth asked appropriate questions to aid in his decision making such as "How much time would I get if I took the plea?" Mr. Ruth then listed the circumstances of the alleged crime and concluded that he would not take the plea because he believed a jury would recognize that the victims were lying and he would likely be found not guilty. He clearly demonstrated rational, though possibly uninformed, decision making ability.

**SANITY AT THE TIME OF THE ALLEGED OFFENSE:**
The requirements for legal insanity in the state of Washington are found within RCW 9A.12.010.

**Forensic Psychological Report**                    **March 19, 2004**
**RE: Matthew Robert Ruth**                                    **Page 9**

in his life and has never received any help." When asked what behaviors he has demonstrated that specifically concern her, she vaguely responded that Mr. Ruth talks about demons.

Consultation with Cheryl Coupe, Mental Health Practitioner at the Snohomish County Adult Detention Center, indicated that Mr. Ruth was not a behavior problem while incarcerated. In a voice mail message Ms. Coupe stated that Mr. Ruth complained of hallucinations and was "somewhat sad," but that "he kept a low profile" and the mental health department had few interactions with him.

Criminal History:
Records indicate that Mr. Ruth has minimal criminal history. He was arrested in 1999 for driving under the influence and for driving with a suspended license. The status of this arrest is unknown. There were also three protection orders issued against Mr. Ruth. Two were issued recently for the victims of the current alleged crime and another was issued on 5/23/03 by a Theresa Velasquez. Records also indicate a 1994 arrest as a juvenile; however, the details and status of the arrest are unclear. Mr. Ruth additionally stated that he believes he has an "Assault Four" on his record for slapping an employer once while quitting his job.

Current Hospital Admission:
Mr. Ruth was admitted to this service on 3/4/04. He was prescribed Seroquil (an antipsychotic) and Trazodone (an antidepressant) and he took them voluntarily. He was described by ward staff as cooperative, mannerly and as "having a low profile." No behavioral problems or overt signs of psychosis were noted.

**CLINICAL FORMULATION:**
Mr. Ruth is a young man with a significant history of substance abuse and dependence. According to his parent's report, Mr. Ruth's psychotic symptoms developed at approximately the same time he began using large amounts of LSD and ecstasy. His pattern of drug use and the nature of his symptoms are consistent with a diagnosis of Polysubstance Induced Psychotic Disorder. His family history might suggest that he is more vulnerable to the effects of mood altering chemicals. While it appears that some of his symptoms are legitimate, Mr. Ruth's endorsement of virtually every first rank symptom, in combination with his fairly organized presentation is highly suspicious and a rule out of Malingering should be considered. Finally, Mr. Ruth's preoccupation with paranormal phenomena and difficulty in close relationships is consistent with a Personality Disorder NOS with Schizotypal features. However, it not clear whether these

**Forensic Psychological Report**
**RE: Matthew Robert Ruth**

March 19, 2004
Page 8

Psychiatric History:
Mr. Ruth's family is positive for a psychiatric history. His mother, Susan Stroud,
volunteered that she attempted suicide in 1995, was hospitalized for a few weeks, and
was diagnosed with Bipolar Disorder. Ms. Stroud also stated that both of Mr. Ruth's
sisters have mental health problems. His sister, Alicia, was hospitalized for three years
from the age of 16 to 18 and had a "Schizophrenia and Bipolar diagnoses." Mr. Stroud
reported that Alicia was again hospitalized for two years sometime later. Ms. Stroud
reported that Mr. Ruth's other sister, Melissa, was diagnosed at the age of 16 with
Bipolar Disorder, but she has always taken her medication and received treatment on
an outpatient basis. Reportedly, Mr. Ruth's maternal grandmother had severe mental
health problems as well, and his maternal aunt and uncle abused drugs.

Mr. Ruth reported that he has never received any previous mental health treatment.
During his intake interview he stated that he has been able to talk to aliens since he
was a child and that he once lived in a house as a child that had demons in it and that
the demons would possess him. In our follow up interview, when Mr. Ruth was
repeating this assertion, he finished his statement with, "That's what I was told." We
did not question him on this discrepancy; not wanting to draw attention to our
skepticism at that point. For reasons noted previously, these reports are of questionable
validity. His mother believed that Mr. Ruth fist began showing signs of psychosis at the
age of 18. She noticed him talking to people who weren't there and talking about aliens
and out of body experiences. She explained, "You just never know if he is going to be
himself or a really whacked out person." Mr. Stroud stated that the only concerning
behavior he noted in Mr. Ruth as an adolescent was his drug use. He began noticing
odd behaviors within the last four to five years. For example, he would periodically
catch Mr. Ruth talking to himself or speaking about astro-travel and aliens. Mr. Stroud
made weekly visits to Mr. Ruth while he was in detained at the Snohomish County Adult
Detention Center. When asked about Mr. Ruth's presentation during these visits, Mr.
Stroud stated that "he seemed very medicated" but that he was otherwise all right.
When asked specifically if he noted any concerning behaviors or indications that he
might be seeing or hearing things, he answered that he thinks his son may have made
a joke about seeing aliens, but that Mr. Ruth "tries to downplay any alien stuff" when
speaking with him.

Renee Woerner also commented about Mr. Ruth's mental health issues. She specifically
made the point that Mr. Ruth's problems were not a result of drug use but rather a
result of his poor mental health. She explained, "He has been through a lot of trauma

**Forensic Psychological Report**
**RE:  Matthew Robert Ruth**

March 19, 2004
Page 7

Mr. Ruth first stated that his aunt gave him cocaine as a baby. He first used cocaine as an adult when "he started kickin' it with strippers." He first stated that his last use was a couple weeks prior to his arrest; however, he later stated that his last use was September 6, 2004.

He acknowledged that he used methamphetamine "when he was younger" with his mother, but then informed us that he abused this drug primarily for the last year and a half "with the strippers." He stated, "I shot it, smoked it, and hot railed it." He reported that his last use was September 6, 2004.

Mr. Ruth reported frequent use of ecstasy (MDMA). He started abusing this drug around the age of 18 when he began attending raves. He explained that he would often mix it with "acid" (LSD).

Mr. Ruth also acknowledged the use of Psilocybin (psychedelic mushrooms), explaining that he used to grow them. He has also used Peyote "in Arizona with the Indians." Mr. Ruth denied the use of Phencyclidine (PCP), inhalants, or abuse of prescription mediations.

Mr. Ruth explained that on September 6, 2004 he had a seizure after using large quantities of drugs and that his girlfriend threatened to leave him if he did not quit. He explained that he has not used any drugs other than marijuana since that time.

Mr. Ruth reported that he used to sell a lot of drugs primarily when he was 18 and 19 years old.  He stated that his neighbor, Victim Custer, is currently a drug dealer and is connected with the Cambodian Mafia. He stated that Victim Custer always gave him drugs and wanted Mr. Ruth to go into a DJ business with him.

When Ms. Woerner was questioned about Mr. Ruth's drug use she was very vague and stated she did not know when he last used because she was not paying attention. She adamantly stated that Mr. Ruth only used drugs recreationally and that he was not a drug dealer or someone who was constantly high "like the guys next door." She emphasized, "The guys next door were the druggies, not Mathew."

It is our clinical opinion that Mr. Ruth has a significant illicit substance abuse problem. We think that there is a very high probability that he grossly under reported his involvement with and personal consumption of illicit substances.

**Forensic Psychological Report**　　　　　　　　　　March 19, 2004
**RE:  Matthew Robert Ruth**　　　　　　　　　　　　　　　　Page 6

*he eventually begins to show up late to work, or not show up at all and will then get
fired. Mr. Ruth does not receive any governmental assistance.*

Mr. Ruth has minimal prosocial support. Although his father has reportedly visited Mr.
Ruth once a week while he was in jail, the quality of his relationship with his parents is
unclear. Mr. Ruth stated that his mother does not like him and that she "is weird." His
friends and his sisters allegedly abuse drugs. Mr. Ruth frequently referred to his female
friends as "the strippers" who often provided him drugs, bought him clothes and let him
stay with them. He also has a girlfriend, Renee Woerner, of the last two years who also
used drugs and was employed as an exotic dancer in the past. This relationship was
reportedly tumultuous, and Ms. Woerner has alleged serious domestic violence (e.g.,
she stated to police that Mr. Ruth once "pistol whipped her" causing her to loose
consciousness and to seek medical treatment. Hospital records relating to this alleged
incident report that she presented with head contusions and lacerations and was
diagnosed as having a concussion.) When questioned about this. Mr. Ruth stated that
Renee becomes jealous of other women and accuses him of cheating on her. She then
hurts herself and makes up the allegations and blames him for the injuries. In her
phone interview with this evaluator, Ms. Woerner stated she was not comfortable
discussing the domestic violence charges, but then volunteered, "It never happened."

Medical History:
Mr. Ruth does not have a significant medical history. His father reported that as a child
he received a couple minor head injuries requiring stitches and that he was in a car
accident as an adolescent; however, he did not receive a head injury during this
accident.  Ms. Stroud stated that Mr. Ruth has always been physically healthy.

Substance Abuse:
Mr. Ruth has a significant substance abuse history. Overall, he was very vague about
the amount and frequency of his use. He stated that he first used alcohol as a child
with his mother. He then stated "I used to drink a little, but I stopped because I need
to stop putting bad stuff in my body."

He first used marijuana at the age of 13. He stated that he used it everyday from the
age of 13 to 20. He last used it just prior to his arrest.

Mr. Ruth stated he first used LSD with his uncle when he was 16 years old. He has used
it "a lot" since then, primarily when attending raves.

**Forensic Psychological Report**                          March 19, 2004
**RE:  Matthew Robert Ruth**                                    Page 2

upset about being accused of stealing the property and having his trailer searched. Witness
Woerner was also in the trailer observing the incident. While arguing Mr. Ruth reportedly
pulled out a gun and shot Victim Custer non-fatally three times. While Victim Eden was
trying to leave the trailer, Mr. Ruth allegedly non-fatally shot him in the back. Victim Eden
reported that he ran to the street, flagged down a motorist, and had the motorist take him
to the hospital. Victim Custer reportedly ran to his truck and drove off; however, Witness
Woerner reported to police that he ran to his house, retrieved a bag of Marijuana, told
Victim Eden "no cops" and then left in his truck. Mr. Ruth and Witness Woerner left the
scene before police arrived. An arrest warrant was issued for both Mr. Ruth and Ms.
Woerner.  The couple was next located by officials in Blythe, California on 11/15/03 at the
residence of Mr. Ruth's mother.  The couple fled from the officers and were not
apprehended at that time. Mr. Ruth reportedly turned himself into the Blythe Police
Department on 11/20/04 and was officially arrested at that time without incident. Ms.
Woerner also turned herself into the Blythe Police Department on the same day. Ms.
Woerner's statement to the police indicates that she was the victim of repeated domestic
violence assault inflicted by Mr. Ruth and that she fled with Mr. Ruth because he ordered
her to and she feared for her own safety. She further reported to police that he physically
beat her during their time in California.

**Database:**
Following his admission to the hospital, Mr. Ruth was placed on the evaluation ward in
the Center for Forensic Services to undergo psychiatric, psychological, physical, and
social examinations, to include 24-hour clinical observation. For purposes of this
evaluation, Dr. Lee Brock, Staff Psychiatrist and Dr. R.M. Hart, Staff Psychologist,
comprised the sanity commission. Laurie Green, M.A., Psychology Intern, also
participated in the evaluation. In formulating our opinion for the Court, we have
considered information from the following:

1.  Two independent interviews with the defendant, 3/4/04 & 3/12/04.
2.  State's Discovery materials.
3.  Criminal History Printouts of the Washington State Patrol: Washington Access to
    Criminal History (WSP:WATCH) and the National Crime Information Center (NCIC).
4.  Phone interview of Matthew Robert Stroud, defendant's father, 3/4/04.
5.  Phone interview of Susan Stroud, defendant's mother, 3/8/04.
6.  Voice mail message by Cheryl Coupe, Snohomish County Adult Detention Center
    Mental Health Professional, 3/9/04.
7.  Phone interview of Renee Woerner, defendant's girlfriend and witness in the instant
    offense, 3/17/04.

# EXHIBIT 1

I, Matthew R. Stroud I, swear or affirm:

That I was at Matthew Ruth's trial and they took a recess, Adcock, the prosecuting attorney, walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I fallowed as I walked into the court room I saw Adcock walking over to Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do. I walked over to Matthew Ruths attorney and told him what I had just saw and heard, he told me not to worry he was going to put Renee Woener on the stand.

In the hall was also Renee Woemer's Mother and Dad who also heard everything. After the trial was over the head juror asked to speak with Matt's attorney and me the juror asked Matt's attorney why he did not put the only other witness, Renee Woerner ,on the stand Matt's attorney replied that he wanted to but he could not find her, I spoke up that that was not true as he knew she was in the hall waiting to testify, the Juror said then we convicted an incent man, we all believed Matt but was told if there was any dough we had to find him guilty if Renee woerner had testified we would not of had any dough and would have found him innocent.

I SWEAR OR AFFIRM THAT THE ABOVE AND FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

9/16/2018          Matthew R, Stroud I

Date               Matthew R, Stroud I

STATE OF WASHINGTON

COUNTY OF SNOHOMISH

I, the undersigned Notary Public, do hereby affirm that Matthew R. Stroud I. personally appeared before me on the 16 day September, and signed the above Affidavit as his free and voluntary act and deed.

Notary Public

AMANDA M. MURRAY
Notary Public
State of Washington
My Commission Expires
November 19, 2016

# EXHIBIT 2

The following is a summary of the notes that I took on January 20, 2010 when I interviewed Rene Woerner. Her father Henry was present during the entire interview.

Henry was at the courthouse on the day in question. He did witness Adcock "drag" his daughter into a side room where he then heard yelling going on between Adcock and his daughter. Henry said that he was not able to make out what was being said but when Rene came out of the room she told her Dad that she was not testifying and that Adcock would not listen to what she was TRYING to tell him. Henry did not recall what the subject was about but he does recall that Rene said that she tried to tell him the truth and he didn't want to listen so she no longer had to testify.

Rene told me that she DID tell Adcock, just prior to trial, that this was over drugs and that Eden and Custer "were high at the time of the shooting." Renee said that she does recall what happened on that day, not all but most of what happened.

Renee said that there were a lot of people at the trailer and outside the trailer at the time of the shooting. The only ones IN the trailer were her, Eden, Custer and Matt. She said that Custer and Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs. Matt kept telling them to get out. Eden sat on couch in the living room area and Custer made his way over to the bed where Renee was sitting. She said that Matt kept telling them to get out and that he had not stolen their drugs. Eden and Custer did not believe him. Custer kept saying that they had to search the entire trailer because "we are searching everyone's shit, no exceptions." At some point Custer actually sat on the end of the bed with Renee. Matt was telling him to get out of the trailer and off of

their bed, Custer would not leave. Custer was reaching down into Renee's purse going through it while saying "we are searching everybody's shit." Renee said that Matt kept pleading with them to get out. Eden was sitting on the couch saying "what's the problem, if you didn't steal it then don't worry, we are going to do this one way or another." Custer was telling Matt and Renee that he was going to search the trailer "one way or another."

Renee said that she didn't recall the specific threats that Custer and Eden were making but she does recall that Matt kept telling them to leave, get out of his trailer. Renee said that Custer was "going through my purse, sitting on the bed when Matt reached up and grabbed his gun." The next thing she knows Matt is firing and the two are running out of the trailer. She did NOT see a gun on either Eden or Custer. She did tell me that Custer carried guns but she didn't recall seeing one on him that day. Renee said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not. I asked Renee if she thought her life or that of Matt's was in immediate danger at the time Matt started shooting? Renee response was "who knows, I didn't see any guns but then again I was not looking and they would not get out of the trailer."

She did confirm that Custer was "high as a kite at the time of the shooting." She feels that Matt grabbed the gun because he "felt trapped in the bedroom." She did recall that she was not able to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse, she can't say for sure.

Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. that he left bruises. She did tell Adcock that it was over drugs and that

Custer and Eden were higher than kites at the time of the shooting. She said that he called her a stupid bitch several times. Renee is still unsure as to why Stevens did not have her testify.

Mark, if needed I believe that I can get back in touch with Ms. Woerner. She gave me a private number that I can supposedly reach her at. Let me know what you think?

I will try to talk with Mark Stevens about the case and why he didn't put Woerner on the stand?

Thanks,
Michael Powers

# EXHIBIT 3

From: Wlegalworks@aol.com
Subject: **Ruth, Matthew**
Date: January 11, 2011 7:45:17 AM PST
To: markmestel@comcast.net

Mark:

I met with an inmate at the Snohomish County Jail by the name of Melvin Roy Decoteau. Melvin is good friends with Renee Woerner. Melvin is currently in jail on a DOC violation. He can and will lead us to Renee when he gets out. Mr. Decoteau has not heard from his DOC officer since he was arrested four days ago. He was wondering of YOU could call Alona Kinch at 425-290-3200 and see if you can find out when he is scheduled to be released. Melvin's DOC number is 996 707. If we can find this out it might help to establish when Melvin is getting out so he could possibly help us locate and interview Ms. Woerner. If you can that's great if not then we will locate her regardless.

I was able to locate Renee Woerner's Dad. Her Dad's name is Henry Slothang. I located Mr. Slothang and sat and talked with him at his home yesterday. We met for almost an hour. In the end Mr. Slothang told me that he talks with Renee at least one time per week, every week. He agreed to talk with Renee and have her sit with me for an interview. Mr. Slothang told me that his daughter does want to help Matthew Ruth. He said that he too was present at the courthouse at the time of Matt's trial. He said that the prosecutor got very angry at Renee because Renee wanted to testify to the "complete truth and not just what was in her statement."

Mark, I feel as if Mr. Slothang will help put Renee and myself together. He tried to reach her while I was sitting in his home. Her voicemail was full. The number I showed him that we had he said was an old number. I am going to concentrate on Renee Woerner for now and then I will sit with Donnie Poole. I know roughly where Mr. Poole lives but he too seems to be trying to avoid myself as well as other members of Matt's family. He could be using also?

I will keep you updated.

Thanks,
Michael Powers

No. 68380-2-I/4

direct trial courts to use only Washington Pattern Jury Instruction (WPIC) 4.01. Bennett, 161 Wn.2d at 315, 318. Without sufficient explanation, Ruth now claims that the use of the instruction in his 2004 trial undermined his constitutional right to the presumption of innocence and allowed the jury to convict based on a lower standard of proof. Because Ruth's trial took place years before the Supreme Court disapproved of the "constitutionally adequate" instruction in Bennett and he fails to identify or demonstrate a complete miscarriage of justice, this claim fails.

Finally, relying on State v. Bashaw, 169 Wn.2d 133, 234 P.3d 195 (2010), Ruth contends the jury instructions erroneously instructed the jury that it had to be unanimous in order to answer "no" on the special verdict forms. But our Supreme Court recently overruled the nonunanimity rule developed in Bashaw, concluding that it "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." State v. Nuñez, 174 Wn.2d 707, 709-710, 285 P.3d 21 (2012). Because the instructions were not erroneous, Ruth has no grounds for relief.

Now, therefore, it is hereby

ORDERED that the personal restraint petition is dismissed under RAP 16.11(b).

Done this 17th day of January, 2014.

_____
Acting Chief Judge

2014 JAN 17  PM 2:51

COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

4

No. 68380-2-I/3

As to the conference in chambers regarding the witness, Ruth claims that the particular circumstances here implicated the public trial right. Briefly, the attorneys and the trial judge met in chambers to discuss scheduling. Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record, "in an overabundance of caution, real quickly, because Mr. Ruth was not present." The prosecutor explained that he believed Ruth's girlfriend Rene Woerner would commit perjury if called to testify by the State, that defense counsel had also spoken with Woerner, and that the Office of Public Defense would be providing an attorney to advise Woerner.

Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it "expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor." Ruth claims "the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor." Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of Yeats, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Relying on State v. Bennett, 161 Wn.2d 303, 315-16, 165 P.d 1241 (2007), Ruth also contends the use of the Castle[2] reasonable doubt instruction violated his constitutional rights. In Bennett, the Supreme Court concluded that the Castle instruction is "constitutionally adequate," but used its inherent supervisory power to

---

[2] State v. Castle, 86 Wn. App. 48, 935 P.2d 656 (1997).

3

No. 68380-2-I/2

P.2d 1086 (1992). Because Ruth has not made any showing that he can satisfy this threshold burden, the petition is dismissed.

Ruth contends the trial court violated his right to a public trial by answering a jury question in chambers and by holding a conference in chambers about the State's decision not to call a witness. The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution, provide the accused with the right to a public trial. In re Pers. Restraint of Orange, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Certain proceedings must be held in open court unless the five factors listed in State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995) justify closing the courtroom. Orange, 152 Wn.2d at 808-11. The threshold question is whether, under the experience and logic test, the proceeding at issue implicates the public trial right. State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Under that test, courts consider (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Sublett, 176 Wn.2d at 73 (quotations omitted). In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question. Sublett, 176 Wn.2d at 75-78. Ruth fails to demonstrate a violation of his public trial rights involving the jury question.[1]

---

[1] Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. Because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief.

2

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) ) ) | No. 68380-2-I |
| MATTHEW ROBERT RUTH, | ) ) | ORDER OF DISMISSAL |
| Petitioner. | ) ) ) | |

 Matthew Ruth has filed this personal restraint petition challenging his conviction in Snohomish County Superior Court No. 03-1-02451-6. In Ruth's direct appeal, the Supreme Court remanded the matter for resentencing based on the use of the phrase "deadly weapon" rather than "firearm" in the special verdict forms on the enhancements in State v. Ruth, 167 Wn.2d 889, 225 P.3d 913 (2010), and issued the mandate in May 2010. The trial court resentenced Ruth on December 8, 2010. Ruth did not appeal. Ruth filed the present petition on December 2, 2011, raising issues relating only to his 2004 jury trial. In particular, Ruth now claims that the trial court violated his right to a public trial and his rights to the presumption of innocence and a unanimous verdict.

 In order to obtain collateral relief by means of a personal restraint petition, Ruth must demonstrate either an error of constitutional magnitude that gives rise to actual prejudice or a nonconstitutional error that inherently results in a "complete miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). Bare assertions and conclusory allegations do not warrant relief in a personal restraint proceeding. In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate
juror.
The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

At 4:12 p.m. on December 8, 2004, the Jury submits a written
inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10
& 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov.
24, 2003; and 3) Transcript of interview with Drew Eden (Nov.
10, 2003)"

At 4:15 p.m. on December 8, 2004 the Court responds in writing
"The evidence requested by the jury was not admitted into
evidence and is not available to the jury during deliberations.
Thank you."

Inquiry from the Jury and Court's Response filed in open court.

**THURSDAY, DECEMBER 9, 2004**                 Clerk: Grace Hampton
                                               Reporter: S. Magee
Court opened at 11:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
The jury returns to open court with their verdict.
State of Washington represented through Deputy Prosecuting
Attorney Julie Mohr.  Detective Kelly Willoth seated at counsel
table.
Defendant present, in custody, represented by counsel Mark
Stephens.
Verdict read in open court finding the Defendant guilty of the
crime of First Degree Assault as charged in Count I; and guilty
of the crime of First Degree Assault as charged in Count II.  On
Special Verdict Form A, the Jury found that the defendant was
armed with a deadly weapon at the time of the commission of the
crime in Count I and on Special Verdict Form B, the Jury found
that the defendant was armed with a deadly weapon at the time of
the commission of the crime in Count II.
Jurors polled: verdict unanimous.
Verdict Form A; Special Verdict Form A; Verdict Form B and
Special Verdict Form B are received and filed.
Court's Instructions filed in open court.
Jury is discharged.

9                         **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:28    Redirect examination of Detective Kelly Willoth by the State.
9:30    CANDY CORDER, called by the State, sworn and testified.
9:37    Cross examination of Candy Corder by the Defendant.
9:45    Court in recess.

10:00   Court resumes as heretofore, defendant present; in custody, and
        all parties present.
        Jury present.
10:02   EVAN THOMPSON, called by the State, sworn and testified.


        Exhibit no. 53 offered by the State:    ADMITTED 12-8-04
        Exhibit no. 54 offered by the State:    ADMITTED 12-8-04

10:15   Cross examination of Evan Thompson by the Defendant.
10:18   State rests.
10:19   MATTHEW RUTH, called by the Defendant, sworn and testified.
10:26   Attorney conference at sidebar.
10:28   Continuation of testimony of Matthew Ruth on direct examination
        by the Defendant.
11:03   Jury not present.
11:04   Colloquy of Court and counsel.
11:05   Court in recess.

11:25   Court resumes as heretofore, defendant present, in custody, and
        all parties present.
        Jury present.
11:26   Cross examination of Matthew Ruth by the State.
11:45   Defense rests.
        State rests.
11:46   Jury not present.
11:48   Colloquy of Court and counsel.
11:50   Court in recess until 2:00 p.m.

2:00    Court resumes as heretofore, defendant present, in custody, and
        all parties present.
        Jury not present.
        The Court takes exceptions and objections to instruction: None
        given.
2:05    Jury present.
        Not reported.
        The Court instructs the Jury.
2:20    Reported.
        State opens closing argument.
2:40    Defendant makes closing argument.
2:52    State makes final argument.

8                           **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

1:50   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       JEREMY CUSTER, called by the State, sworn and testified.

       Exhibit no. 49 offered by the State:      ADMITTED 12-7-04
       Exhibit no. 50 offered by the State:      ADMITTED 12-7-04
       Exhibit no. 51 offered by the State:      Not Offered
       Exhibit no. 52 offered by Defendant:      Not Offered

2:15   Cross examination of Jeremy Custer by the Defendant.
2:19   Redirect examination of Jeremy Custer by the State.
2:22   Recross examination of Jeremy Custer by the Defendant.
2:30   DREW EDEN, called by the State, sworn and testified.
2:45   Cross examination of Drew Eden by the Defendant.
2:53   Redirect examination of Drew Eden by the State.
2:55   Recross examination of Drew Eden by the Defendant.
2:56   Court in recess.

3:22   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       Attorney conference at sidebar.
3:24   The Court admonishes the jury and directs them to return on
       December 8, 2004 @ 9:00 a.m.
3:25   Colloquy of Court and counsel.
3:28   Court in recess.

       WEDNESDAY, DECEMBER 8, 2004               Clerk: Grace Hampton
                                                 Reporter: S. Magee
       Court opened at 9:12 a.m., David F. Hulbert, Judge.
       The following proceedings were had to wit:
       This matter continued from previous day.
       State of Washington represented through Deputy Prosecuting
       Attorney, John Adcock.  Detective Kelly Willoth seated at
       counsel table.
       Defendant present, in custody, represented by counsel,
       Mark Stephens.
       Jury not present.
       Colloquy of Court and counsel.
9:15   Jury present.
       JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20   Cross examination of Jeremiah Sheridan by the defendant.
9:23   Detective Kelly Willoth, recalled by the State, previously
       sworn, testified.
9:25   Cross examination of Detective Kelly Willoth by the Defendant.


7                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.
9:10 Juror #9, Lesley Winney present.
State's voir dire of Juror #9, Mr. Winney.
Juror #9, Lesley Winney released to go back to the Jury Room.
The Court finds that Juror #9, Lesley Winney was engrossed in
the book he was reading and did not see the defendant being
brought to the Courtroom.

Exhibit no. 43 offered by the State:      ADMITTED 12-7-04
Exhibit no. 44 offered by the State:      Not Offered
Exhibit no. 45 offered by Defendant:      Not Offered

9:13 Court in recess.

9:40 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
9:45 Court in recess.

10:05 Court resumes as heretofore, defendant present, in custody, and
all parties present.
KELLY WILLOTH, called by the State, sworn and testified.

Exhibit no. 46 offered by the State:      ADMITTED 12-8-04

10:55 Court in recess.

11:14 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Cross examination of Kelly Willoth by the Defendant.

Exhibit no. 47 offered by Defendant:      Not Offered

11:28 GEORGE WILKINS, called by the State, sworn and testified.

Exhibit no. 48 offered by the State:      ADMITTED 12-7-04

11:39 Cross examination of George Wilkins by the Defendant.
11:40 Redirect examination of George Wilkins by the State.
11:42 Recross examination of George Wilkins by the Defendant.
11:44 SARAH BRYANT, called by the State, sworn and testified.
11:46 Cross examination of Sarah Bryant by the Defendant.
11:47 Court in recess until 1:30 p.m.

6                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27 The following 13 jurors were sworn to try this cause: Juror #1,
Gary R. Hall is designated as alternate juror.

| | | | |
|---|---|---|---|
| 1. | Gary R. Hall | 7. | Andrea L. Greenlee |
| 2. | James Sinnema | 8. | Robert G. Sears |
| 3. | Frank Brady | 9. | Lesley Winney |
| 4. | Barbara Garrett | 10. | Marilyn Churchill |
| 5. | Karen R. Egtvedt | 11. | Sharon Walker |
| 6. | Jennifer R. Clyde | 12. | Donna Lee Orr |
| | | 13. | Mehari Gebrewold |

11:28 Attorney conference at sidebar.
11:30 The Court directs general instructions to the Jury.
11:35 Colloquy of Court and counsel.
11:40 Court in recess until 1:00 p.m.

1:08  Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
1:10  Jury present.
State makes opening statement.
1:20  Defendant makes opening statement.
1:29  The Court instructs the Jury regarding note taking.
1:31  SUZANNA JOHNSON, called by the State, sworn and testified.
1:40  Cross examination of Suzanna Johnson by the Defendant.
1:42  Attorney conference at sidebar.
1:43  Jury admonished not to discuss this case and return on Tuesday,
December 7, 2004 @ 9:55 a.m.
1:45  Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

**TUESDAY, DECEMBER 7, 2004**                    Clerk: Grace Hampton
                                                Reporter: S. Magee
Court opened at 9:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock.  Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Jury not present.

5                        **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:
13.  Mehari E. Gebrewold
14.  Frank P. Brady
15.  James C. Sinnema
16.  Barbara R. Garrett
17.  Frances Winters
18.  Lesley W. Winney
19.  Michael Rucker
20.  William Glover
21.  Raymond Johnson
22.  Richard Hill
23.  Ella Larrick
24.  Patricia Nakahara
25.  Charlene Lindsay
26.  Mary E. Barringer
27.  I. Jay Fritch
28.  Lawrence Thompson
29.  Donna R. West
30.  Jerry D. Rochford
31.  Daniel D. Orme-Doutre
32.  Jessica Marie Kinney
33.  Dale W. Troupe
34.  Brandon Duc Ha
35.  Patricia J. Jason

10:20 All prospective jurors sworn: Oath of Voir Dire.
      The Court directs general questions to all prospective jurors.
10:35 State's initial voir dire of entire prospective jury panel.
10:51 Defendant's initial voir dire of entire prospective jury panel.
11:13 State waives concluding voir dire of entire prospective jury
      panel.
11:14 Defendant's concluding voir dire of entire prospective jury
      panel.
11:20 Challenges for cause: prospective jurors passed for cause.

11:22 Plaintiff's first peremptory challenge: Kandace Aksnes.
      Frank Brady picked to qualify as juror #3.
      Defendant's first peremptory challenge: Edward Dawson.
      James Sinnema picked to qualify as juror #2.

      Plaintiff's second peremptory challenge: Jody Mountfield.
      Barbara Garrett picked to qualify as juror #4.
      Defendant's second peremptory challenge: Accepts Panel.

      Plaintiff's third peremptory challenge: Richard Olsen.
      Frances Winters picked to qualify as juror #9.
      Defendant's limited peremptory challenge: Frank Winters.

4                           TRIAL MINUTES

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:37 State's motion in limine to prevent Defense counsel from using the term of "Snitch" or another derogatory comments regarding State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49 Defense motion in limine to exclude testimony of prior burglary charge around the time of the incident in question: Granted/Stipulated.

9:40 Defense motion in limine to exclude testimony of a prior assault of Renee Woerner: Granted/Stipulated.

9:41 Defense motion in limine to exclude testimony of defendant's criminal activity in Blythe, California: Granted/Stipulated.

9:42 Defense motion in limine to exclude any testimony or evidence of defendant's prior criminal history: Reserved.

9:43 Defense motion in limine exclude any evidence about defendant's last name or alias last names: Granted/Stipulated.

9:45 Defendant motion to strike testimony of State's witnesses, Renee Woerner, because he was unable to interview her, as his subpoena was returned: Denied. The Court finds that the remedy is not exclusion but to allow Defendant to interview the witness prior to testifying.

Exhibit no. 41 offered by the State:     **ADMITTED 12-7-04**
Exhibit no. 42 offered by Defendant:     Not Offered

9:48 Defendant's motion strike testimony of Jeremiah Sheridan because of defendant's inability to locate and interview this witness: Denied. The Court finds that the remedy is not exclusion but to allow Defendant to interview the witness prior to his testimony.

9:50 Colloquy of Court and counsel.
9:52 Court in recess.

10:15 The following persons were selected to qualify as jurors on this cause and seated in the jury box:
1. Gary R. Hall
2. Edward A. Dawson
3. Kandace Aksnes
4. Jody Marie Mountifield
5. Karen R. Egtvedt
6. Jennifer R. Clyde
7. Andrea L. Greenlee
8. Robert G. Sears
9. Richard E. Olsen
10. Marilyn Churchill
11. Sharon Walker
12. Donna Lee Orr

3                        **TRIAL MINUTES**

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

```
Exhibit no.  2 offered by the State:    ADMITTED 12-7-04
Exhibit no.  3 offered by the State:    ADMITTED 12-7-04
Exhibit no.  4 offered by the State:    ADMITTED 12-7-04
Exhibit no.  5 offered by the State:    ADMITTED 12-8-04
Exhibit no.  6 offered by the State:    ADMITTED 12-7-04
Exhibit no.  7 offered by the State:    ADMITTED 12-7-04
Exhibit no.  8 offered by the State:    ADMITTED 12-7-04
Exhibit no.  9 offered by the State:    ADMITTED 12-7-04
Exhibit no. 10 offered by the State:    ADMITTED 12-7-04
Exhibit no. 11 offered by the State:    ADMITTED 12-7-04
Exhibit no. 12 offered by the State:    ADMITTED 12-7-04
Exhibit no. 13 offered by the State:    ADMITTED 12-7-04
Exhibit no. 14 offered by the State:    ADMITTED 12-7-04
Exhibit no. 15 offered by the State:    ADMITTED 12-7-04
Exhibit no. 16 offered by the State:    ADMITTED 12-7-04
Exhibit no. 17 offered by the State:    ADMITTED 12-7-04
Exhibit no. 18 offered by the State:    ADMITTED 12-7-04
Exhibit no. 19 offered by the State:    ADMITTED 12-7-04
Exhibit no. 20 offered by the State:    ADMITTED 12-7-04
Exhibit no. 21 offered by the State:    ADMITTED 12-7-04
Exhibit no. 22 offered by the State:    ADMITTED 12-7-04
Exhibit no. 23 offered by the State:    ADMITTED 12-7-04
Exhibit no. 24 offered by the State:    ADMITTED 12-7-04
Exhibit no. 25 offered by the State:    ADMITTED 12-7-04
Exhibit no. 26 offered by the State:    ADMITTED 12-7-04
Exhibit no. 27 offered by the State:    ADMITTED 12-7-04
Exhibit no. 28 offered by the State:    ADMITTED 12-7-04
Exhibit no. 29 offered by the State:    ADMITTED 12-7-04
Exhibit no. 30 offered by the State:    ADMITTED 12-7-04
Exhibit no. 31 offered by the State:    ADMITTED 12-7-04
Exhibit no. 32 offered by the State:    ADMITTED 12-7-04
Exhibit no. 33 offered by the State:    ADMITTED 12-7-04
Exhibit no. 34 offered by the State:    ADMITTED 12-7-04
Exhibit no. 35 offered by the State:    ADMITTED 12-7-04
Exhibit no. 36 offered by the State:    ADMITTED 12-7-04
Exhibit no. 37 offered by the State:    ADMITTED 12-7-04
Exhibit no. 38 offered by the State:    ADMITTED 12-7-04
Exhibit no. 39 offered by the State:    ADMITTED 12-8-04.
Exhibit no. 40 offered by the State:    ADMITTED 12-8-04
```

9:35  Arraignment on Second Amended Information.  SEE COURT FILE FOR
RECORD OF MINUTES.

9:36  State's motion in limine to exclude witnesses except Detective
Willoth: Granted.

FILED

2005 FEB -4 PM 12: 02


03-1-02451-6          104

SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY
SNOHOMISH CO. WASH.

STATE OF WASHINGTON

VS.

MATTHEW RUTH
(DEFENDANT)

CAUSE NO.:   03-1-02451-6
JUDGE:       DAVID F. HULBERT
REPORTER:    LAUREL OLSON
CLERK:       HEIDI PERCY
DATE:        2-4-05 @ 11:00 PM

THIS MATTER CAME ON FOR: SENTENCING

CONTINUED/CODE:                                DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: JOHN ADCOCK              C.C.O.:

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: CHARLES DOLD

FAILED TO APPEAR:   WARRANT AUTHORIZED:   ISSUED:   BAIL AMOUNT:

REQUESTED COUNSEL:    REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

IT IS THE JUDGMENT AND SENTENCE OF THE COURT THE DEFENDANT IS GUILTY AS
CHARGED AND IS TO BE SENTENCED TO:

STATE DEPARTMENT OF CORRECTIONS: 105 MONTHS ON EACH COUNT, PLUS 60 MONTHS ON EACH
COUNT FOR FIREARMS ENHANCEMENT - FOR A TOTAL OF 330 MONTHS

DAYS OF SENTENCE SUSPENDED:           CREDIT FOR TIME SERVED:

WORK RELEASE:                    COMMENCING: IMMEDIATELY

DAYS CONFINEMENT CONVERTED:           COMMUNITY RESTITUTION HOURS:

COURT ORDERED MONETARY PAYMENTS: COURT COSTS: WAIVED   VICTIM ASSESSMENT: $500.00

ATTORNEY FEES: WAIVED   CRIME LAB FEE: N/A   MANDATORY DRUG FINE: N/A

RESTITUTION/HEARING DATE: $300.00          BIOLOGICAL TESTING FEE: WAIVED

PAYMENTS TO BE MADE: WITHIN 36 MONTHS FROM RELEASE

COMMUNITY SUPERVISION:                COMMUNITY PLACEMENT:

COMMUNITY CUSTODY: 24-48 MONTHS DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS: YES

DEFENDANT NOTIFIED OF DRIVER'S LICENSE REVOCATION/SUSPENSION:

PRESENCE WAIVED AT SIGNING BY DEFENDANT: YES          DEFENDANT FINGERPRINTED: YES

JUDGMENT AND SENTENCE ENTERED: YES

OTHER:   DEFENDANT'S MOTION TO CONTINUE: DENIED.
         CONNIE EDEN, VICTIM'S MOTHER, PRESENT AND ADDRESSED THE COURT.
            VICTIM PRESENT AND ADDRESSED THE COURT.  BOBBY EDEN, FATHER OF
THE VICTIM PRESENT AND ADDRESSED THE COURT.
         DEFENDANT'S MOTION FOR AN EXCEPTIONAL SENTENCE DOWNWARD: DENIED.

1                CRIMINAL SENTENCING/CSV MINUTE ENTRY                AA
                                                                     104

# APPENDIX D

APPENDIX

"B"

TRIAL & SENTENCING
Minute entry

Pg 7

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5,
Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

10                              TRIAL MINUTES

FILED

2005 FEB -4  PM 12: 02



03-1-02451-6          104

SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY
SNOHOMISH CO. WASH

| | |
|---|---|
| STATE OF WASHINGTON | **CAUSE NO.:** 03-1-02451-6 |
| | **JUDGE:** DAVID F. HULBERT |
| VS. | **REPORTER:** LAUREL OLSON |
| | **CLERK:** HEIDI PERCY |
| MATTHEW RUTH | **DATE:** 2-4-05 @ 11:00 PM |
| (DEFENDANT) | |

THIS MATTER CAME ON FOR: SENTENCING

CONTINUED/CODE:                          DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: JOHN ADCOCK          C.C.O.:

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: CHARLES DOLD

FAILED TO APPEAR:    WARRANT AUTHORIZED:    ISSUED:    BAIL AMOUNT:

REQUESTED COUNSEL:    REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

IT IS THE JUDGMENT AND SENTENCE OF THE COURT THE DEFENDANT IS GUILTY AS
CHARGED AND IS TO BE SENTENCED TO:

STATE DEPARTMENT OF CORRECTIONS: 105 MONTHS ON EACH COUNT, PLUS 60 MONTHS ON EACH
COUNT FOR FIREARMS ENHANCEMENT - FOR A TOTAL OF 330 MONTHS

DAYS OF SENTENCE SUSPENDED:              CREDIT FOR TIME SERVED:

WORK RELEASE:                          COMMENCING: IMMEDIATELY

DAYS CONFINEMENT CONVERTED:          COMMUNITY RESTITUTION HOURS:

COURT ORDERED MONETARY PAYMENTS: COURT COSTS: WAIVED    VICTIM ASSESSMENT: $500.00

ATTORNEY FEES: WAIVED    CRIME LAB FEE: N/A    MANDATORY DRUG FINE: N/A

RESTITUTION/HEARING DATE: $300.00              BIOLOGICAL TESTING FEE: WAIVED

PAYMENTS TO BE MADE: WITHIN 36 MONTHS FROM RELEASE

COMMUNITY SUPERVISION:                  COMMUNITY PLACEMENT:

COMMUNITY CUSTODY: 24-48 MONTHS DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS: YES

DEFENDANT NOTIFIED OF DRIVER'S LICENSE REVOCATION/SUSPENSION:

PRESENCE WAIVED AT SIGNING BY DEFENDANT: YES          DEFENDANT FINGERPRINTED: YES

JUDGMENT AND SENTENCE ENTERED: YES

OTHER:    DEFENDANT'S MOTION TO CONTINUE: DENIED.
          CONNIE EDEN, VICTIM'S MOTHER, PRESENT AND ADDRESSED THE COURT.
          , VICTIM PRESENT AND ADDRESSED THE COURT.   BOBBY EDEN, FATHER OF
THE VICTIM PRESENT AND ADDRESSED THE COURT.
          DEFENDANT'S MOTION FOR AN EXCEPTIONAL SENTENCE DOWNWARD: DENIED.

1                    CRIMINAL SENTENCING/CSV MINUTE ENTRY                    AA
                                                                            104

# APPENDIX D

STATE OF WASHINGTON VS. MATTHEW RUTH
03-1-02451-6

THE DEFENDANT IS TO HAVE NO CONTACT WITH THE VICTIMS FOR LIFE.
THE COURT ADVISES THE DEFENDANT OF HIS RIGHT TO APPEAL WITHIN 30
DAYS.

FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO CRIMINAL RULES
3.5/3.6 ENTERED, TO BE FILED BY COUNSEL.   TEMPORARY ORDER OF COMMITMENT
ENTERED.   PSYCHOLOGICAL EVALUATION REPORT FILED.

CRIMINAL SENTENCING/CSV MINUTE ENTRY

APPENDIX

"C"

MATERIAL
WITNESS
WARRANT

ReNee M. WOERNER

FILED

CO. SHERIFF

2003 DEC 11  AM 9: 27      2003 NOV 13  P 3: 01

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

SO WARRANT CONTROL NO. _____

MATERIAL WITNESS WARRANT OF ARREST

SUPERIOR COURT OF THE STATE OF WASHINGTON - COUNTY OF SNOHOMISH

COURT CASE NUMBER  03-1-02451-6
SEX  F

Name: **RENEE MARIE WOERNER**            RACE W       DOB
MATERIAL WITNESS                         HT 508       WT 120
                                         HAIR BRN     EYES GRN
                                         FBI 553272JB1         SID WA19273781
Defendant: **MATTHEW R. RUTH**           WDL          SS#
THE STATE OF WASHINGTON)
COUNTY OF SNOHOMISH       )               BAIL $50,000

                                         PA#03F04554    DPA JSA/pjb
                                         ORI AGENCY SSO AGENCY CASE 03-25124

The State of Washington to all peace officers, greetings:
In the name of the State of Washington you are commanded forthwith to apprehend the material witness and bring
him or her before the court to be dealt with according to law.

REASON FOR ISSUANCE: MATERIAL WITNESS WARRANT
DESCRIPTION OF CHARGES: FIRST DEGREE ASSAULT WITH A DEADLY WEAPON (FIREARM)
ADDRESS: **11401 3RD AVENUE SE APT F5, EVERETT WA 98208**
ADDITIONAL DATA: TAT:  NECK, L ANKL, R WRS

Please notify the Snohomish County Prosecuting Attorney's Office, 3000 Rockefeller Avenue, Everett, Washington
98201, (425) 388-3333, when this individual is apprehended in Washington or in the designated areas of extradition.

[   ] NCIC. Extradition statewide only.
[   ] NCIC. We will seek extradition from Western States, except Alaska and Hawaii.
[X] NCIC. We will seek extradition from anywhere in the United States.

I hereby certify that I arrested the named defendant on       Given under my hand this
the _____ day of _____, 20____            13TH  NOV  2003

                                                     **RONALD L. CASTLEBERRY**
_____                      JUDGE
OFFICER                                               Pam L. Daniels, County Clerk and Ex Officio
                                                     Clerk of Superior Court
_____
AGENCY                                               by _____ Deputy Clerk

FEES: SVC _____ MLG _____  TOTAL
                                    37$^{00}$

Material Witness Warrant Page 1 of 1                  Snohomish County Prosecuting Attorney
St. v. _____                               S:\felony\forms\warrant\mwwar.ins
PA# _____                                  «Unit»/«DPA_Initials»/«User_Initials»



APPENDIX

"U"

12/11/03   Interview of Connie Hoopiiaina

*Snohomish County Sheriff's Office*

Tape recorded INTERVIEW/STATEMENT                         Event # _S003-25124_

This is the statement of _Renee Woerner_ . The date is _12/16/13_ , and the time is now _1013_ . I am _Willory, K._ of the Snohomish County Sheriff's Office.

This statement is being recorded at _Courthouse_ . There are _5_ persons present in the room. For the purposes of voice identification, would each person present besides _Renee_ , the person who is giving this statement, please state your name and occupation, one at a time.......

Q: _Renee_ , do you understand that this statement is being recorded?

Q: Would you give your full name and spell it please?

Q: Would you give your address please?

Q: Would you give your home telephone number?

Q: Would you give me your date of birth?

1. You have the right to remain silent.

2. Anything you say can be used against you in a court of law.

3. You have the right at this time to talk to a lawyer and have him present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

Juvenile (Optional): If you are under the age of 18, anything you say can be used against you in a juvenile court prosecution for a juvenile offense and can also be used against you in an adult court criminal prosecution if the juvenile court decides that you are to be tried as an adult.

1. Do you understand each of these rights I have explained to you?

2. Having these rights in mind, do you wish to talk to us now?

_Renee Woerner_                                _Kelly H_
(Subject Signature)                            (Witness Signature)

**Questions at end of statement**

Q: Do you have anything else you would like to add to this statement?
Q: At any time during this questioning, have you asked that the questioning or taping be stopped?
Q: At any time during this statement, have you requested an attorney?
Q: Is it true that the facts stated on this tape are true and correct to the best of your knowledge, and that your statement has been made freely, voluntarily, and without threats or promises of any kind?

_Renee Woerner_                                _Kelly H_
(Subject Signature)                            (Witness Signature)

This recording ended at _1101_

# APPENDIX O

# FOLLOW-UP

PAGE ___12__ OF ___45___

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER | |
|---|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | *ASSAULT 1 W/FIREARM* | | REPORT DATE | *SO 03-25124* |

| ...E OF ORIGINAL REPORT | | DATE | RECLASSIFY TO | | CONNECTING REPORT NUMBERS | |
|---|---|---|---|---|---|---|
| *Renee Woerner.* | | | | | *Det. Willoth* | |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y  N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

| | |
|---|---|
| Det. Willoth: | Jeremy didn't come home? |
| R. Woerner: | Jeremy came home the ne...that morning. |
| Det. Willoth: | That morning.  The next morning of the incident? |
| R. Woerner: | Yeah.  The morning of the incident he was all kinda, I think he was kinda messed up.  He hadn't had any sleep. |
| Det. Willoth: | Okay.  Who, who was there that, that morning? |
| R. Woerner: | Dan was there, Nigel rode a bicycle into Lynnwood um, because Jeremy hadn't come home in time for him to go handle his I don't know what it was, pick up his unemployment check or something.  Matt was it was Ni...uh, Dan, Matt, me, Drew, is that his name? |
| Det. Willoth: | Um huh. |
| R. Woerner: | Okay.  Drew was there also.  Um, and then Jeremy came.  I don't know if Jeremy brought Drew, I can't remember if Jeremy brought Drew or not if it or if he was already there. |
| Det. Willoth: | Okay.  When Jeremy showed up, where were all you guys at? |
| R. Woerner: | I was in the trailer in the bed. |
| Det. Willoth: | Okay. |
| R. Woerner: | That's my spot.  That's where I always stayed. |
| Det. Willoth: | Okay. |
| R. Woerner: | And if not I'd be in there cleaning the dishes or having a shower.  I didn't ya know, hang out and mingle with the guys too much cuz Matt didn't like that. |
| Det. Willoth: | Okay.  Where were all the other guys? |
| R. Woerner: | They were all across over in the house.  In the blue house, in the little blue box. |
| Det. Willoth: | Whose house is that? |

| OFFICER NAME/NUMBER | | | APPROVED BY | | |
|---|---|---|---|---|---|
| *Detective Willoth #1335* | | 12 | *12/11/03* | | DATA ENTRY |

| IBR CLEARANCE (NONE) ( ) ARR/A      ( ) EXC/A___ ( ) ARR/J      ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA        ( ) CPS ( ) PAT      ( ) DSHS | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) JUV   ( ) DET: PREC /  CTH  /  SPEC ( ) MH-   ( ) OTHER: | |
|---|---|---|---|---|

SH-245  9/94

ORDER = 8

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|

| NAME OF ORIGINAL VICTIM(S) | | |
|---|---|---|
| **ASSAULT 1 W/FIREARM** | | REPORT DATE |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner DOB | | | **SO 03-25124** |
| | | | *Det. Willoth* |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS | ACTION | ADDITIONAL RECOVERED | TOTAL RECOVERED Y   N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|
| | | $ | | $ | | |

| Det. Willoth: | did, was he using drugs? |
|---|---|
| **R. Woerner:** | Well I mean he used, yeah there were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms. |
| Det. Willoth: | Have you, what have you seen Matt do? |
| **R. Woerner:** | Meth, mushrooms, pot, that'd be it. |
| Det. Willoth: | Okay. Have you ever seen |
| **R. Woerner:** | Oh, cocaine, yeah cocaine. |
| Det. Willoth: | Cocaine too? |
| **R. Woerner:** | They were snortin' coke. |
| Det. Willoth: | Okay. Um, when you say they who do you mean? |
| **R. Woerner:** | All of them. |
| Det. Willoth: | 'kay. Are you talking about |
| **R. Woerner:** | Jeremy, Dan, when that day that of this incident Dan had big old sores all over his face from picking them because he had been scrapped out in the bathroom for ya know, a few days I don't' know. Doing whatever, doing meth I assume but... |
| Det. Willoth: | Okay. So would you say they were, were they in the same business together? Uh, Matt and, and these guys? |
| **R. Woerner:** | Yeah, they were in the whatever their music thing does was what it was. Their karaoke, light show, D.J. studio business. |
| Det. Willoth: | Okay. |
| **R. Woerner:** | And that's what they called it. |
| Det. Willoth: | What was Matt's part in the business? What did he do? |
| **R. Woerner:** | I don't know what he did. I really don't. I, I mean I went with him. They used to go to the karaoke store a lot and they'd look at lights and they'd |

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| *Detective Willoth #1335* | 14 | *12/11/03* | |

| IBR CLEARANCE (CODE) | ( ) INSUFF / CLO | COPIES MADE FOR: | | ( ) COURT: CAS / EVG / SOUTH / EVT | |
|---|---|---|---|---|---|
| ( ) ARR/A   ( ) EXC/A | ( ) OTHER / CLO | ( ) PA   ( ) CPS   ( ) JUV | | ( ) DET: PREC / CTH / SPEC | DATA ENTRY |
| ( ) ARR/J   ( ) EXC/J | ( ) UNF | ( ) PAT   ( ) DSHS   ( ) MH | | ( ) OTHER: | |

SH-245 8/94

ORDER = 8

# FOLLOW-UP

PAGE ___16__OF____45.

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL REPORT | ASSAULT 1 W/FIREARM | REPORT DATE |
| | | SO 03-25124 |

| .PE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner, DOB. | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y   N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

| | |
|---|---|
| Det. Willoth: | What about when Jeremy was gone and you and Matt were home? |
| R. Woerner: | Sometimes he would leave it, sometimes he would lock it and Matt would get mad.. Ya know, he'd go pop the window open in the bathroom and go in or whatever so we could use the bathroom and stuff but... |
| Det. Willoth: | Okay. Cuz I understand you didn't have a there's no bathroom in the trailer? |
| R. Woerner: | Yeah, there's no, and there was no key for the, we didn't have a key to Jeremy's house so... |
| Det. Willoth: | You didn't have a key? |
| R. Woerner: | No. |
| Det. Willoth: | Okay. |
| R. Woerner: | Huh uh [that's a no]. |
| Det. Willoth: | Okay so um, let's go back to that day, Jeremy comes home, you said you were in the trailer |
| R. Woerner: | Um huh [that's a yes]. |
| Det. Willoth: | and... |
| R. Woerner: | They're all outside laughing and doing other things. |
| Det. Willoth: | Okay. |
| R. Woerner: | They were fine. |
| Det. Willoth: | Okay. What happens after that? |
| R. Woerner: | Then all of a sudden I hear em I see em talkin' I would sit on the bed cuz I mean that's ya know, that's where I spent my time and the computers in there or whatever. And I looked out the window and they're kinda being serious. Then they come up to the trailer. I think Matt |
| Det. Willoth: | Who's they? |

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 16 | 12/11/03 | |
| IBR CLEARANCE ((ONE) ( ) INSUFF / CLO ( ) ARR/A ( ) EXC/A ( ) OTHER / CLO ( ) ARR/J ( ) EXC/J ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) PAT ( ) DSHS | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) JUV ( ) MH ( ) OTHER: | DATA ENTRY |

SH-245 9/94                                                                                           ORDER = B

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | | REPORT DATE |

**INCIDENT CLASSIFICATION:** ASSAULT 1 W/FIREARM

**REPORT NUMBER:** SO 03-25124

**NAME OF ORIGINAL VICTIM(S):** Renee Woerner DOB

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS | ACTION | ADDITIONAL RECOVERED | TOTAL RECOVERED Y  N | COMPUTER USED / DRUG RELATED / ALCOHOL RELATED |
|---|---|---|---|---|---|---|
| | $ | | $ | | | |

| | |
|---|---|
| R. Woerner: | Matt, Jeremy and Drew. And Matt was like man check this out. There's a pound of weed missing and they think I stole the shit. And Jeremy's like man I'm not saying you stole it I just wanna check all your stuff and make sure that you didn't take it. |
| Det. Willoth: | Who was he saying that to? |
| R. Woerner: | Matt was saying this to me. |
| Det. Willoth: | To you? |
| R. Woerner: | Yeah. |
| Det. Willoth: | So they had gone inside of the trailer? |
| R. Woerner: | Yeah. At this point they had come into the trailer. They were standing down in the living room. |
| Det. Willoth: | And where was Dan? Was he |
| R. Woerner: | Dan was outside the whole time. |
| Det. Willoth: | Okay. |
| R. Woerner: | And um, he was just, he was lost, he was gone whatever he had done his face all picked off he was like (unintelligible). |
| Det. Willoth: | Okay. |
| R. Woerner: | Um, I was on the bed I was just kinda going well whatever. And Matt and Jeremy were arguing. Jeremy came up and sat on the bed. |
| Det. Willoth: | 'kay. Where on the bed was Jeremy sitting? |
| R. Woerner: | Right in front of me on the edge of the bed. |
| Det. Willoth: | Okay. |
| R. Woerner: | If you go in there I know you've seen it, there's a table right here to the right. There's the computer monitor, there was a computer there which Dan came and brought it to Matt whatever but um, just on the edge of the bed Jeremy was just sittin' on the edge of the bed. |

| OFFICER NAME/NUMBER | | | APPROVED BY | |
|---|---|---|---|---|
| Detective Willoth #1335 | | 17 | 12/11/03 | |

| IBR CLEARANCE (ONE) | ( ) INBUFF / CLO | COPIES MADE FOR: | ( ) COURT/ CAS / EVG / SOUTH / EVT | DATA ENTRY |
|---|---|---|---|---|
| ( ) ARR/A ( ) EXC/A | ( ) OTHER / CLO | ( ) PA ( ) CPS | ( ) DET: PREC / CTH / SPEC | |
| ( ) ARR/J ( ) EXC/J | ( ) UNF | ( ) PAT ( ) DSHS ( ) MH | ( ) OTHER: | |

SH-246  8/94

ORDER = 8

# FOLLOW-UP

PAGE ___18OF___45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | **ASSAULT 1 W/FIREARM** | REPORT DATE    SO 03-25124 |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| *Renee Woerner DOB* | | | *Det. Willoth* |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y    N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**Det. Willoth:** Okay. So he's sitting on the edge of the bed.

**R. Woerner:** In front of me.

**Det. Willoth:** What is he facing?

**R. Woerner:** Matt. Out towards the, out towards the ya know, the shower's on the right he's facing towards the living room.

**Det. Willoth:** Okay.

**R. Woerner:** So...

**Det. Willoth:** And you're sitting on

**R. Woerner:** behind him.

**Det. Willoth:** Behind him? Are you sitting on the side on the right side where the computer is or on the other side?

**R. Woerner:** I'm kind of in the middle like right behind him.

**Det. Willoth:** Okay. In the middle you were in the middle of the bed?

**R. Woerner:** Like ya know, yeah, I mean I was on the bed okay on the pillows.

**Det. Willoth:** Okay. Toward the headboard?

**R. Woerner:** Yeah. It's got that weird little shelf thing. And I'm sitting in the back and he's right in front of me.

**Det. Willoth:** Okay.

**R. Woerner:** So, I mean not right in front I'm not touching him but he's sittin' there and Matt's going no you gotta get outta the trailer. You can't ya know, that's not cool. You're disrespectful. You can't go through my shit.

**Det. Willoth:** They're talking about this?

**R. Woerner:** Yes they're arguing about it.

**Det. Willoth:** 'kay. Where is Drew?

**R. Woerner:** Out in the living room. And I didn't really see a whole lot of him. I was too busy like watching Matt and Jeremy.

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| *Detective Willoth #1335* | 18 | *12/11/03* | |
| IBR CLEARANCE :(ONE) ( ) NONE ( ) EXC/JA ( ) ARR/J ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA   ( ) CPS   ( ) JUV ( ) PAT   ( ) DSHS  ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-246  9/94                                                                                                          ORDER = 8

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE |
| Renee Woerner DOB | | SO 03-25124 |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |

Det. Willoth:    'kay. Where was Matt at that point?

R. Woerner.    Standing in front of Jeremy facing me.

Det. Willoth:    How close to Jeremy was he?

R. Woerner.    'bout that close.

Det. Willoth:    So about a couple feet away?

R. Woerner.    Maybe if that, if that and that's just a guesstimate because I was just kinda trippin' like okay I was like Matt, just calm down ya know.

Det. Willoth:    Okay. Who, at that point when they're discussing this you said Matt calm down, what was Matt's demeanor like?

R. Woerner.    Matt would get this weird look in his face any, any time that he got mad. And he'd just be like well I told you to get out and he had this, his eyes would turn black and he would just Matt, Matt was not really there anymore. You know what I mean, he was getting mad.

Det. Willoth:    Okay. And what was Jeremy's demeanor like?

R. Woerner.    Jeremy's like dude, why you getting' so mad, man I haven't done anything. I just asked you if I could go through your stuff to make sure that there's nothing goin' on here ya know, cuz everybody's a suspect in this. Ya know, I'm not pickin' on you. Ya know, I'm just gonna go through your stuff real quick and then I'll go in the house and go through other stuff and ya know, so on and so forth. And he kinda dug around on the floor right on the side of the bed. And Matt's like see, you're going through my stuff.

Det. Willoth:    And this is about the missing

R. Woerner.    Pound of weed.

Det. Willoth:    pound of weed? Okay.

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 19 | 12/11/03 | |

| IBR CLEARANCE (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) PAT ( ) DSHS | ( ) JUV ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-245  9/94

ORDER = B

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |

| OF ORIGINAL REPORT Renee Woerner DOB | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |
|---|---|---|---|

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |

**R. Woerner:** So I, I'm just sittin' on the bed and I didn't, I didn't say anything more until the shooting started I was. Matt pulled the gun out of the cabinet. Matt was facing the bed, there's a cabinet right here on the left. There's a shower, there's a cabinet and there's a cabinet.

**Det. Willoth:** Okay.

**R. Woerner:** The, the gun was in this cabinet. The top cabinet. He pulled it out and went like this. And I think stuck it in his pants and Jeremy's like wow I feel threatened. And Matt was like you gotta go man, you gotta get outta my house. You can't do this shit. And I was like Matt dude, you gotta, Matt calm down ya know. And but that's all I can say. I'm not gonna say too much cuz I mean he'd shoot me as soon as he'd shoot as well as he would shoot Jeremy. I mean he's already proven that.

**Det. Willoth:** The gun that he got out of the cabinet um, is that where he usually kept the gun?

**R. Woerner:** No he moved it from place to place because, because. I don't know why. He'd usually keep it under the pillow.

**Det. Willoth:** Okay. Did you know, was it in any type of holster?

**R. Woerner:** No, he had it wrapped in a handkerchief.

**Det. Willoth:** Okay.

**R. Woerner:** A blue handkerchief.

**Det. Willoth:** A handkerchief?

**R. Woerner:** Um huh [that's a yes].

**Det. Willoth:** 'kay.' Um, was that at the time he took it out of the cabinet or was that just in

**R. Woerner:** In general, I don't, I don't know. All I saw was that he pulled it out and I saw the ya know, the barrel.

| OFFICER NAME/NUMBER Detective Willoth #1335 | 20 | APPROVED BY 12/11/03 |
|---|---|---|

| IBR CLEARANCE (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) PAT ( ) DSHS | ( ) JUV ( ) MH | ( ) COURT: CAS / EVD / SOUTH / EVT ( ) DET: PMEC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-248 8/94

Exhibit
Four

RAP 13, 5A

( AAG Exhibit 18 )

No. 89906-1

IN THE STATE SUPREME COURT FOR THE STATE OF WASHINGTON

---

IN RE THE PERSONAL RESTRAINT PETITION OF:

MATTHEW R. RUTH,

PETITIONER.

---

MOTION FOR DISCRETIONARY REVIEW
RAP 13.5A

DIVISION ONE COURT OF APPEALS
NO. 68380-2-I

---

*Received*
Washington State Supreme Court

APR - 4 2014

Ronald R. Carpenter
Clerk

MATTHEW R. RUTH
Pro Se, Litigant
DOC# 879492 H4-A-98L
STAFFORD CREEK CORRECTIONS CENTER
191 Constantine Way
Aberdeen, Wa 98520

EXHIBIT 18

## TABLE OF CONTENTS

A. OPENING STATEMENT.................................................1

B. DECISION........................................................2

C. ISSUES PRESENTED FOR REVIEW.....................................5

D. STATEMENT OF CASE...............................................7

E. ARGUMENT OF WHY REVIEW SHOULD BE GRANTED.......................12

1.) WHAT ROLE DOES HISTORY PLAY IN THE EXPERIENCE AND LOGIC TEST? IF HISTORY IS SILENT CAN THE APPELLATE COURT REJECT THE PUBLIC TRIAL RIGHT CLAIM WITHOUT EXAMINING THE LOGIC PRONG? THIS COURT MUST GRANT REVIEW AND CLARIFY HOW TO APPLY THE HISTORY INQUIRY AND HOW TO FAIRLY COMPARE THE PROCEEDING AT ISSUE WITH A SIMILAR PROCEEDING FOR A PROPER HISTORY ANALYSIS..........12

2.) THE VALUES SERVED BY THE RIGHT TO A PUBLIC TRIAL ARE PROTECTED & ADVANCED WHEN ATTACHED TO THE JUAN TYPE PROCEEDING IN MR. RUTH'S CASE & THIS COURT MUST GRANT REVIEW & ADOPT THE "RUTH HEARING" IN ORDER TO PROTECT THE INNOCENT FROM BEING CONVICTED & THE RIGHTS OF THE "CONVICTED INNOCENT"................13

3.) MR. RUTH MUST BE ALLOWED TO CROSS-EXAMINE PROSECUTION WITNESSES ABOUT PERJURY THREATS AND EXCULPATORY PORTIONS OF THEIR ORIGINAL STATEMENTS IN OPEN COURT TO PROTECT FUNDAMENTAL RIGHTS.....................................16

4.) Mr. RUTH ASKS THAT THIS COURT TAKE THE NEXT STEP IN THE EVOLUTION OF COLLATERAL REVIEW BY ADOPTING THE INITIAL-REVIEW COLLATERAL PETITION RULE....18

5.) COLLATERAL REVIEW IS THE PERFECT VEHICLE TO ESTABLISH WHETHER AN ERROR IS STRUCTURAL BECAUSE THE EFFECT MAY BE ASSESSED IN THE CONTEXT OF OFF THE RECORD EVIDENCE STRUCTURAL ERROR IS THE ST. PIERRE HIGHER STANDARD.......18

6.) THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL.........................................................19

7.) THE MORE PROTECTIVE RIGHT TO "APPEAR & DEFEND" WAS VIOLATED BY THE ILLEGAL CLOSURE THE PUBLIC'S & MR. RUTH'S COEXTENSIVE SUPER SAFEGUARD PROTECTS THIS RIGHT...........................................................20

F. CONCLUSION.....................................................20

i

## TABLE OF AUTHORITIES

### WASHINGTON STATE SUPREME COURT

Cohen v. Everett City Counsel, 85 Wash.2d 385, 535 P.2d 801 (1975)....15

In Re Disciplinary of Bonet, 144 Wn.2d 502 (2001)....14

In Re Cook, 114 Wn.2d 802, 811 (1990)....18

In Re Hagler, 97 Wn.2d 818, 825 (1982)....18

In Re Morris, 176 Wn.2d 157, 288 P.3d 1140 (2012)....19

In re Orange, 152 Wash.2d 795, 809, 100 P.3d 291 (2005)....17, 18, 19

In re Sandoval, 249 P.3d 1015, 1019 (Wash.2d 2011)....18

In re St. Pierre, 118 Wn.2d 321, 823 P.2d 492 (1992)....6, 19

In re Yates, 177 Wn.2d 1, 296 P.3d 872 (2013)....1, 12

In Re Recall of Peasall-Stipek, 141 Wn.2d 756 (2000)....14

State v. Irby, 170 Wn.2d 874, 880 n.6 (2011)....20

State v. McFarland, 127 Wn.2d 322 (1995)....19

State v. Sublett, 176 Wn.2d 58, 73, 98-100, 136-42 (2013)....2, 6, 12-13, 19

State v. Wroth, 15 Wash. 621, 47 P. 106, 106-08 (Wash. 1896)....5

### WASHINGTON STATE COURT OF APPEALS

In Re Delgado, 106 Wn.app. 898, 251 P.3d 899, 907 (Wash.App.Div.1 2011)....19

State v. Burdette, 313 P.3d 1235 (Wash.App.Div.3 2013)....6

State v. Carlisle, 871 P.2d 174, 177 (Wash.Div.1 1994)....14

State v. Johnson, 158 Wn.app. 677 (Wash.App.Div.2 2010)....6

State v. Ruiz, 176 Wn.app. 623, 369 P.3d 700 (Wash.App.Div.3 2013)....15

TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT

Arizona v. Fulminante, 499 U.S. 279, 310 (1991)....19

Crane v. Kentucky, 476 U.S. 683, 690 (1986)....16

Duncan v. Louisana, 391 U.S. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968)....15

Harris v. Nelson, 394 U.S. 286, 292 (1969)....18

Maleng v. Cook, 490 U.S. 488, 493, 109 S.Ct. 1923, 1926-27 (1989)....2

Martinez v. Ryan, 132 S.Ct. 1309 (2012)....18

U.S. V. Gonzalez-Lopez, 548 U.S. 140, 149 (2006)....18

U.S. v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982)....14

**Ninth Circuit**

Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008)....6, 17, 19

Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009)....2, 6, 19

Phelps v. Alameida, 596 F.3d 1120 (9th.Cir.2009)....18

U.S. v. Juan, 704 F.3d 1137 (9th.Cir. 2013)....1, 5, 13, 14, 17

U.S. v. Lord, 711 F.2d 887, 891 n 3 (9th Cir. 1983)....14

U.S. v. Rich, 580 F.2d 929, 934 (9th Cir. 1978)....14

U.S. v. Vavages, 151 F.3d 1185, 1193 (9th Cir. 1998)....14

**THIRD CIRCUIT**

U.S. v. Quin, 728 F.3d 243, 258 (C.A.3(PA)2013)....15

**SEVENTH CIRCUIT**

U.S. v. Thomas, 86 F.3d 647, 654 (1996)....16

## TABLE OF AUTHORITIES

Minnesota Law Review Headnotes [98:22 2013] Substantial Government Interference, By: Ruth A. Moyer....16

Washington University Law Review, 1966 Wash.U.L.q. 068 (1966) Duty of the Prosecutor to Call Witnesses Whose Testimony Will Help the Accused to Establish His Innocence....16

Convicting the Innocent, By: James McCkloskey, Director of Centurion Ministries, Inc.,....20

## RULES

CrR 6.15(f)(1)....19, 20

iv

APPENDIX "A" NO. 68380-2-I, Division One, Order of Dismissal

APPENDIX "B" Trial Minute Entry, 2/4/05

Appendix "C" Material Witness Warrant Renee M. Woerner

Appendix "D" 12/11/03 Renee M. Woerner Interview

Appendix "E" Mental Health Evaluation (Renee M. Woerner Interview, 3/17/04; cc:

John Adcock

Exhibit One - Affidavit from Matthew R. Stroud I

Exhibit 2 - Henry Slothang & Renee M. Woerner Interviews by Private Investigator
        Michael Powers

Exhibit 3 - Interview of Henry Slothang By Michael Powers

Exhibit 4 - Mark Stephens Motion to Withdraw & Transcripts

Exhibit 5 - 2 Affidavits from Matthew R. Ruth

Exhibit 6 - Affidavit from DPA Adcock where he commits Perjury

Exhibit 7 - Jury Inquiry

## A. OPENING STATEMENT

The time has come for this Court to take the next step in the evolution of the Personal Restraint procedure. Mr. Ruth has labeled this critical next step an Initial-Review Collateral Petition (IRCP). Due to the Governments abuse of the unique procedural obstacles for an inmate to appeal "Off The Record" Professional Misconduct and "Substantial Government Interference" Mr. Ruth is barred from first tier review of fundamental Bedrock State Constitutional Issue's.

Mr. Ruth also asks that this Court clarify what Role History plays in the Experience Prong. The Lower Court's have misinterpreted Sublett, and are unconstitutionally applying the History inquiry as a Public Trial Right Bar. This Court must clarify the proper use of the History element and application of the Experience and Logic Test to an IRCP Public Trial Right Claim. Also, define the burden placed on the Petitioner to satisfy this test because In Re Yates, 177 Wn.2d 1 (2013) is not being applied Equally & Fairly.

Mr. Ruth asks that this Court Harmonize U.S. v. Juan, 704 F.3d 1137 (9th Cir. 2013) with Washington State's Coextensive Public Trial Right Safeguard; by adopting the "RUTH Hearing" to protect the Innocent from being wrongfully convicted due to off the record "Substantial Government Interference" like Mr. Ruth has proven in this Petition.

The Trial Court's failure to conduct the required Bone-Club Analysis deprived the Public & Mr. Ruth from being informed of their coextensive Rights, objecting, and making Record. This barred Mr. Ruth from direct review of the error's presented in this Petition. Mr. Ruth was never allowed to exhaust his State Constitutional issue's, so the Balancing of Probabilities test cannot apply to an IRCP; and Mr. Ruth is entitled to Direct Review of his Initial-Review Collateral Issue's (IRCI).

-1-

Mr. Ruth was completely denied counsel at a critical stage of trial and **Musladin v. Lamarque**, 555 F.3d 830, 841-43 (9th.Cir.2009), holds that this same error is structural on Collateral Review. Mr. Ruth asserts that pursuant to **Sublett** Public Trial Rights attach to this proceeding to protect Mr. Ruth's Rights to Counsel and "Appear & Defend." CrR 6.15(f)(1) is the functional equivalent of a Bone-Club Analysis during deliberations upon a jury inquiry, however, unlike the Bone-Club Analysis when CrR 6.15(f)(1) is violated so are the Constitutional rights it mirrors and protects.

Mr. Ruth did make a threshold showing on collateral review and is entitled to a full hearing on the merits, or a reference hearing. The A.C.J. erroneously resolved material Factual disputes and made credibility determinations, contrary to the record and the evidence of off the record facts.

The A.C.J.'s decision is based on Material Misrepresentations of Substantive facts made during Trial by DPA Adcock (RP 179-81); and in the State's supplemental Response by DPA Blackman (see Pro Se Reply brief), to erroneously dismiss Mr. Ruth's Meritorious IRCP.

Matthew R. Ruth, Pro Se, ask that this Court grant review of the decision designated in Part B of this Motion. Please Give these pleadings Liberal Interpretations and Hold them to less stringent standards than those drafted by Lawyers. **Maleng v. Cook**, 490 U.S. 488, 493, 109 S.Ct. 1923, 1926-27 (1989).

### B. DECISION

On January 17, 2014 a Division One A.C.J. issued an Order to Dismiss Mr. Ruth's PRP (No. 68380-2-I) under RAP 16.11(b). (Appendix "A" Order of Dismissal).

-2-

The Decision erroneously resolved credibility issue's and Material Disputed Fact's by completely ignoring trial Counsel Mark Stephens Sworn Declaration; On the record Objections to DPA Adcock's version of what was discussed In Chambers and the Context of the Perjury threats. Mr. Ruth is thus restrained from receiving a full hearing on the merits under the proper standard of review. (See pg 1-10 in Pro Se Reply brief).

The A.C.J. Completely ignored all of the "Off the Record" evidence of facts gathered from Private Investigator Michael Powers. The evidence consist of Interviews with members of the Public who witnessed DPA Adcock Assault & Threaten Ms. Woerner for refusing to lie for the State; She wanted to testify truthfully; and an interview with Ms. Woerner that proves her intended Testimony was not Materially contrary to her original statement.

The A.C.J. also ignored Sworn Affidavits from public witnesses who observed the same confrontation. The Decision Restrains Mr. Ruth from receiving a Reference Hearing, or the appropriate remedy for the violation, which is complete Dismissal with prejudice.

The Decision failed to address Mr. Ruth's "Appear & Defend" challenge to the In-Chamber's secret hearing; and whether the Public and Mr. Ruth share a passive coextensive safeguard Right, that triggered during this Secret Proceeding because there is a likelihood of Jeopardy to Mr. Ruth's Constitutional Rights? The Decision prohibits Mr. Ruth from receiving First Tier review of this Off the Record State Constitutional Claim.

The A.C.J. Misinterpreted this Courts Decision in **Sublett**:

"In **Sublett**, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question." Pg.2.

The A.C.J. then distorts Mr. Ruth's argument:

-3-

"Ruth asserts that the trial court violated his right to be present and his right
to counsel by failing to hold a hearing before responding to the jury question.
Because Ruth fails to identify any resulting prejudice, he cannot establish a ground
for relief." n.1. This is contrary to Mr. Ruth's argument see Pro Se Reply Brief
Pg. 19-20.

The Decision Misrepresents the length and type of proceeding that occured

In chambers: "Briefly, the attorneys and the trial judge met in chambers to discuss

scheduling." Pg.3. The Proceeding was 26 Minutes. (See Pro Se Reply, pg 6).

The Decision fails to recognize Mr. Ruth's argument invoking the **WISE** Closure

Rule, when ruling that:

"Without citation to relevant authority, Ruth claims that the trial Judge should
have ended the chambers conference as soon as it 'expanded into a substantive
discussion of a potential witness and the interaction that had occured between
the witness and the prosecutor.' Ruth claims 'the public's presence would have
arguably contributed to the fairness of the proceeding and serves as a potential
check on the power of the prosecutor.' Ruth fails to meet his burden to satisfy
the experience and logic test with such bare assertions." Pg 3.

The A.C.J. ignored the critical argument to the **Castle** challenge which is

that the Prosecutor formulated argument in closing using the Castle language and

trivialized the state's burden of proof, and undermined the presumption of innocence

when combined with the Castle Instruction. "Relying on State v. Bennet, 161 Wn.2d

303, 315-16 (2007), Ruth also contends the use of the Castle reasonable doubt

instruction violated his constitutional rights." Pg 3-4. The Decision deprives

Mr. Ruth of having his claim adjudicated on the merits. (Appendix "A" Order of

Dismissal).

-4-

## C. ISSUES PRESENTED FOR REVIEW

1.) This Court must harmonize the expansion of the "Substantial Government Interference" rule announced in U.S. v. Juan, 704 F.3d 1137 (9th Cir. 2013), with the more protective Washington State Constitutional Rights to "Appear & Defend" and "Open & Fair" administration of Justice by creating a fundamental coextensive safeguard that shall be known as a "RUTH Hearing." Does the Public Trial Right safeguard protect Mr. Ruth's Confrontation Rights under Juan?

2.) IS the Factual basis of the Perjury allegation Material to Mr. Ruth's State & Federal Constitutional Rights to Compulsory Process, Appear & Defend, Fair Trial, and Public Trial Protections, when the allegation is not only fraudulent in fact, but based on the Scienter of DPA Adcock assaulting Ms. Woerner — the sole Res Gestae eye witness favorable to the defense -- and threatening to prosecute her for Perjury "If She Testified" truthfully; and does it present a significant question of Public Interest when this gross Professional Misconduct occured off the record while being witnessed by Public Trial Spectators, who, like Ms. Woerner, were never allowed to Make Record? The Special Emphasis on the presumption of Open Court Proceedings in Wash.Const.Art.1 § 10, is more stringent on this point.

3.) What is the role of the History Inquiry? The Lower Courts are using the History inquiry to bar public trial challenges. Private questioning of potential Jurors "in Chambers is a practice of long-standing & wide use, but this History has played no part in this Court's analysis & Rejection of the practice, before or after Sublett." Mr. Ruth asserts C.J. Madsen correctly observed that if History is silent, the Court must examine the values protected by the right & whether those values are served by requiring the challenged Proceeding to be open. 176 Wash.2d at 98-99. The A.C.J. failed to make that examination, and erroneously stopped the Sublett analysis at the History inquiry. Even the History inquiry was not given proper consideration.

4.) The Jury Trial Right was Designed as "an inestimable Safeguard" against Judge bias and Prosecutor corruption. When the Jury is absent the Public inherits the Juries safeguard function, So Historically Professional Misconduct & "Substantial Government Interference" committed outside the presence of the Jury has been and must always be resolved in Open Court, never cloaked in the shadows of sidebars & Chambers. Why call a Sidebar when the Jury is not present, and from sidebar go into Chambers to resolve the Professional Misconduct of DPA Adcock?

5.) The A.C.J. ignored Mr. Ruth's claim that his More Protective Washington State Constitutional Rights to "Appear & Defend" were violated when excluded from the In-Chambers Hearing. Wash.Const.Art.1 § 22. Since at least 1896 the Right to "Appear & Defend" has been protected by the Open Court Doctrine. Wroth, 15 Wash. 621, 47 P.106, 106-08 (Wash.1896). When the "Superior Right" to Fair Trial is at issue, the Public's & the Accused's Shared Public Trial Right's synchronize to form a single Coextensive "Superior Safeguard," upon the likelihood of Jeopardy to Constitutional Rights, and restricts Closure by the Trial Courts, Absent passing the Bone-Club Test, in Open Court. This Rule is needed to Protect the Right to "Appear & Defend."

-5-

6.) The Current Personal Restraint Procedures prevent First Tier Review of State Constitutional Issues, that cannot be raised on Direct Review, and Cannot be Objected to at Trial. Mr. Ruth ask that this Court restore balance by creating a procedure for Initital-Review Collateral Petition. Does the Balancing of probabilities test announced in Hagler apply to an IRCP? Does Structural Error apply to an IRCP?

7.) Structural error satisfies the conclusive presumption of prejudice requirements, and is the "Higher Standard" that has never been defined. **In Re St. Pierre** was concerned with keeping in step with Federal Habeas Law, so logically this Court must adopt Structural error as the definition of the "Higher standard."

8.) Can an A.C.J. resolve Material disputed facts and credibility issue's to answer the ultimate question of whether Mr. Ruth has met his Burden on Collateral Review? Does ignoring Mr. Ruth's evidence, Facts, and arguments to reach an objectively unreasonable decision present a serious Constitutional question and Issue of Substantial Public Interest?

9.) The Appellate Courts are in conflict on how to resolve Jury inquiry issue's during deliberations. In Mr. Ruth's Case, None of the CrR 6.15(f)(1) procedures were followed, Counsel nor Mr. Ruth were notified of the jury inquiry that involved material disputed facts. In rejecting Mr. Ruth's claim, Division 1, incorrectly stated that "**Sublett** decided that Public Trial Rights do not attach to any jury inquiry." In Contrast, Division 3, Correctly held in **Burdette**, 313 P.3d 1235 (2013), that the **Sublett** Court only found Jury inquiries regarding Jury Instructions, that are resolved with defense Counsel In Chambers do not implicate Public Trial Rights. This Court Must grant review and resolve the confusion by clarifying how to apply the **Sublett** holding to the facts of Mr. Ruth's case.

10.) Does Harmless Error apply to the complete denial of counsel? **Burdette** Correctly found that Non-jury instruction inquiries are critical stages, which is in harmony with **Musladin v. Lamarque**, 555 F.3d 830, 841-43 (9th Cir. 2009); **Frantz v. Hazey**, 533 F.3d 724 (9th Cir.2008). Unlike the Bone-Club Rule, when CrR 6.15(f)(1) is violated, so are the Constitutional Rights it mirrors & Protects. This Court must accept review of this petition to clarify whether under the fact's of Mr. Ruth's case Public Trial Rights attach, to protect the accused from the complete Denial of Counsel; and is the Complete denial of counsel Structural Error on Collateral Review?

11.) When the Trial Court uses the forbidden "Castle" instruction, this Court has never addressed whether an objection or instruction can cure the prejudice inflicted by the Prosecutor fashioning improper arguments from the "Castle" language, that undermines the presumption of innocence, trivialize the Burden of proof, and distorts the Jury's fact-finding function. In **State v. Johnson**, 158 Wn.App. 677 (2010), Division 2, held that this kind of error cannot be cured by objection or curative instruction.

12.) If this Court Grants Review, does Mr. Ruth have the Right, under the Spirit of the Washington State Constitution, to Appear in Person, to argue his case, Pro Se, before this Most Honorable Court? Do Dreams ever Come true?

## D. STATEMENT OF THE CASE

On 12/7/04, Judge Hulbert called the daily recess at 2:56, "Adcock, the prosecuting attorney, walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction." (Exhibit "1" Affidavit of Matthew R. Stroud I). "Henry ... did witness Adcock 'drag' his daughter into a side room where he then heard yelling going on between Adcock and his daughter .... Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. That he left bruises .... She said he called her a stupid Bitch several times." (Exhibit "2" P.I. Michael Powers). "I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction ... Renee said 'I will not lie for you' Adcock replied 'you will say what I tell you to say or I will have you arrested' Renee said 'then arrest me.'" (Exh. "1" Matthew R. Stroud I). "Henry Slothang .... said that the prosecutor got very angry at Renee because Renee wanted to testify to the 'COMPLETE TRUTH AND NOT JUST WHAT WAS IN HER STATEMENT.'" (Exh. "3" P.I. Michael Powers).

"Adcock was very upset and turned and walked into the court room I followed ... I saw Adcock walk to Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Acock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do. I walked to Matthew Ruth's attorney and told him what I had just saw and heard, he told me not to worry .... In the hall was also Renee Woerner's Mother and Dad who also heard everthing." (Exh. "1" Affidavit of Matthew R. Stroud I).

Defense Counsel Mr. Stephens went into the hallway to speak to Ms. Woerner about the Confrontation:

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset, She indicated to me Mr. Adcock had THREATENED to charge her with perjury IF SHE TESTIFIED. She expressed concern to me about the potential legal consequences IF SHE TESTIFIED. I indicated I could not advise her and suggested she seek appointed counsel to answer her questions." (Exh. "4" sworn declaration of Mark Stephens).

"When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the bench. The Judge after hearing Mr. Stephens say something - Which the Public, nor I could hear - called Mr. Adcock over to the bench, this was a side bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min .... After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand .... He promised he would call her to testify, if she was not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent cross-examination, and due to the threats she would break down and begin lying." (Exh. "5" Affidavit of Matthew R. Ruth).

The Public, Ms. Woerner, and Mr. Ruth were not given a chance to object to the closure, make record of the confrontation, or develop the factual basis for the perjury allegation because Judge Hulbert did not conduct a Bone-Club Analysis before the illegal closure. Mr. Ruth and the Public were excluded from the two sidebars & the In-Chamber hearing. The Recess ended at 3:22 when the secret hearing parties exited chambers into a sidebar. The Court admonished the Jury at 3:24, "real quickly" on record In-Chamber Summary at 3:25, Court in recess (adjourned) at 3:28. (App. "B" Trial Minute pg 7).

DPA Adcock misrepresented not only the context of what was discussed In-Chambers, but the context of the perjury allegation:

"I believe he had a conversation with her where she brought up the fact that I had said that IF YOU COMMIT PERJURY, there is going to be consequences. And at that point he concluded that she needed to be advised." RP 180.

That is not what Mr. Stephens said In-Chambers. There is a huge difference between "Threatened to charge her with Perjury 'IF SHE TESTIFIED,'" (Woerner, Stephens, Stroud I version) and "I said that IF YOU COMMIT PERJURY there will be consequences." (Adcocks version of what Mr. Stephens said).

-8-

Not only does Mr. Stephens dispute that this was what was discussed In-Chambers, the Context of the Perjury threat, and that this was all that was said to Ms. Woerner in Exh. 1 (Declaration), but also on record:

"I just might add that's more or less, what's happen .... She indicated concerns about COMMENTS Mr. Adcock made. She Indicated the word PERJRUY was used. I DON'T KNOW WHAT CONTEXT That Was IN." RP 180.

DPA Blackman furthered this misrepresentation in the State's Suppl.Resp. To P.R.P. pg 3-4, by omitting the words "If She Testified" & "She Expressed concern to me about the legal consequences if She Testified," and successfully misled the Court about Mr. Adcock's "Substantial Government Interference" & Professional Misconduct. RPC 8.4(b)(c)(d)(i)(k).

"She recalled the prosecutor 'had threatened to charge her with perjury' (Ex. 21 at 3), there is no evidence in the record that there actually was a 'confrontation,' much less that it was discussed in chambers." Pg. 3-4 State's Suppl.Resp. to P.R.P.

Mr. Blackman misrepresented the evidence & Record because the non-distorted version proves that the In-Chambers hearing was caused by the professional Misconduct of Mr. Adcock, and resolved all motions for mistrial, attorney disciplinary obligations, and Ms. Woerners concerns about the threats by making empty promises to appoint her counsel. This proves the confrontation did happen, was discussed & illegally resolved In-Chambers without a Bone-Club Analysis. Why else appoint Counsel? RP 180-81, (Exh. 4 Mark Stephens).

A Material Witness Warrant was issued for Ms. Woerner on 11/13/03. (App. "C"). "R. Woerner: 'His sister came by and said you have a warrant for your arrest. I FREAKED OUT. I want OH MY GOD I didn't do anything. She's like yeah, they're dead, they're murdered. You have a warrant for your arrest for murder.'" (App. "D" pg 32). After Ms. Woerner turned herself in, she was "in Custody for over a month," before being interviewed. (App "D" pg 42). On 12/10/03 Detective Willoth and DPA Adcock tried to conduct the first interview of Ms. Woerner, and for unknown reasons the interview was stopped after her Miranda rights were read. "Det. Willoth: I'm gonna go ahead and advise of your rights like yesterday, okay?"

-9-

The 45 Page Interview continued on 12/11/03, Five People were present, Detective Willoth, Detective Pince, DPA Adcock, and representing Ms. Woerner, the unethical, Bill Joice (Now Inmate). Ms. Woerner was under the impression Custer & Eden were murdered during the entire interview:

"R. Woerner: 'And Jeremy and Drew are Okay?' Det. Willoth: 'Yes, they're fine.' R.Woerner:'Like Walking, Talking, no bullets inside of them or anything?'" pg 43.

Although, Ms. Woerner's Original Statement at times did make Mr. Ruth out to be Hannibal Lector (Those Portions are inadmissible, and defense's motion to exclude was granted/stipulated. RP 5-6), She also corroborated Mr. Ruth's Defense:

"Det. Willoth: Why did you Go with [RUTH] him? R. Woerner: Because I didn't want to get shot by DRUG DEALERS .... I Can't think of a fancy lie or anything, that's all. I just didn't wanna get shot by drug dealers. And cuz Jeremy [Custer] Said 'NO COPS' when he left. Uh, it scared me .... and because she had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shoot me over a pound of weed? But all this weird stuff had happened and it was stressful, pg 29. Drew I only met him a few times cuz he lived at the Love Israel Ranch or whatnot. Creepy. That's another weird thing I got scared about too. pg 44. Jeremy didn't come home the ne... that morning .... The morning of the incident he was all kinda, I think he was kinda messed up. He hadn't had any sleep, pg 12. [t]here were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms .... They were snortin' coke .... All of them .... Jeremy, dan, when that day of this incident Dan had big old sores all over his face, pg 14.

Then all of the sudden I hear em talkin' I would sit on the bed cuz I mean that's ... and I looked out the window and they're kinda being serious. Then they come up to the trailer, pg 16. Matt, Jeremy, and drew. And Matt was like man check this out. There's a pound of weed missing and they think I stole the shit, pg 17. Matt's going NO you gotta GET OUTTA the trailer. You can't go through my shit, pg 18. He'd just be like well I told you to get out .... And he [Custer] kinda dug around on the floor right on the side of the bed. And matt's like see, you're going through my stuff. Det. Willoth: This is about the missing? R. Woerner: Pound of Weed. pg 19. The gun was in this cabinet ... he pulled it out and went like this. And I think stuck it in his pants .... and Matt was like you gotta go man, you gotta GET OUTTA MY HOUSE. You can't do this shit. pg 20. I was kinda focusing on Jeremy .... I wasn't really looking at matt .... they're arguing ... I'm like oh my God this argument's never gonna end. pg 21.

Jeremy said NO COPS .... went in the house, grabbed a black garbage bag which I'm I've seen that he had pound of weed in it before so that's what, he grabbed the garbage bag and he said no cops like that. I didn't see any blood on him. None at all. pg 25. Det. Willoth: Did he ever talk to you about what his intent was that day or why he did what he did? R. Woerner: No .... We Went our separate ways okay? J. Adcock: When?

-10-

R. Woerner: At Donny's .... He was there I left him there .... He called me and said that they were gonna chase me down. That Cuz I know that the GUY that DROPS OFF the, the DRUGS with uh, JEREMY, and he's an Asian guy, and I don't know what's gonna, I just got scared. pg 26-27. He [Matt] took he would take little, he would take weed and stuff from him .... I don't know if he took the pound of weed. pg 37. Det. Pince: You talk about there being lots of drugs used and around the place [CUSTER'S BLUE APARTMENT] all the time. R. Woerner: Uh huh and underage girls all kinds of strange things. Det. Pince: Were these drugs for personal use or were they selling em? R. Woerner: I know they were selling them .... zip sealed bags and everybody would get a backpack and they'd go about their thing. That's all I can say. Ya know, other than that all I saw was just them partaking of the drugs.

J. Adcock: Well they didn't work regular jobs did they? R. Woerner: I never told Jeremy I quit my job .... he had continued to write these receipts ... so that he could cover his tracks for the tax purposes .... J. Adcock: Do you think that it's possible they used the proceeds for drug sales to finance the lifestyle you had out there? R. Woerner: Uh, yeah. That's definitely ya know, I know that for a fact .... Det. Pince: Was Matt selling drugs?

R. Woerner: Matt acquired quite a bit of crystal meth at one point from one of their friends, and they, everybody was all high .... he was selling little packages of this, of the meth. But mostly JEREMY and them were BUYING it from Matt so it was just this like this inner, little circle. pg 38-39.

Lou is the guy who they get pounds of weed from. I know that. He's an Asian guy that comes in the black little sports car. Then Brings the bag, the garbage bag that Jeremy took to the Durango. He's the one who takes it into Jeremy. I've seen that, that's all I know. pg 40." (App. "D").

DPA Adcock swore under the penalties of perjury that "there was nothing to support the defendant's theory that he was assaulted by drug-crazed dealers who threatened to kill him and rape his fiancee." (Exh. 6 Affidavit of John Adcock).

On 3/17/04, Western State Hospital interview Ms. Woerner:

"Ms. Woerner stated she was not comfortable speaking about the domestic violence ... but volunteered, 'THAT IT NEVER HAPPENED ' .... When Ms. Woerner was questioned about Mr. Ruth's drug use .... She adamantly stated that Mr. Ruth only used drugs recreationally and that he was not a drug dealer or someone who was constantly high 'like the guys next door.' She emphasized, 'the guys next door were the druggies, not Matthew. Mr. Ruth's problems were not a result of drug use but rather a result of his poor mental health. She explained, 'he has been through a lot of trauma in his life and never received any help.'" (App. "E" Mental health report pg 2,6-9, cc: DPA Adcock pg 14).

If Mr. Ruth is the Monster Ms. Woerner portrayed, than what type of Monster must Custer & Eden be? After all she was so scared of Custer & Eden that she ran to Mr. Ruth for protection, not the police. Mr. Ruth is a first time offender who on 11/5/03, was attacked in the safety of his own home, for allegedly stealing drugs; and because Renee M. Woerner (Mr. Ruth's live in girlfriend) snitched on the two Domestic Terrorist (Jeremy Custer & Drew Eden), for drug dealing & money laundering. RP 113-117, 174, 207, 223-25, 241-47, 250-53, 263, 267, 281. Mr. Ruth exercised his Wash.Const.Art.1 § 24 Rights, and defended Ms. Woerner & himself in the safety of his home. RP 92-93, 246-47, 312.

-11-

### E. ARGUMENT OF WHY REVIEW SHOULD BE GRANTED

1.) WHAT ROLE DOES HISTORY PLAY IN THE EXPERIENCE AND LOGIC TEST? IF HISTORY IS SILENT CAN THE APPELLATE COURTS REJECT THE PUBLIC TRIAL RIGHT CLAIM WITHOUT EXAMINING THE LOGIC PRONG? THIS COURT MUST GRANT REVIEW AND CLARIFY HOW TO APPLY THE HISTORY INQUIRY AND HOW TO FAIRLY COMPARE THE PROCEEDING AT ISSUE WITH A SIMILAR PROCEEDING FOR A PROPER HISTORY ANALYSIS

The "Experience & Logic Test" allows this Most Honorable Court to consider the Substance of the actual proceeding at issue without forcing every situation into faulty, misleading, and predefined factors. **State v. Sublett**, 176 Wn.2d 58, 73, 136-42 (2013). The Appeals Courts have defeated this purpose by using the History inquiry to force new challenges into predefined factors, thereby, preventing an examination of the substance.

First, the proceeding is mislabeled, like in the instant case, "scheduling matter," when clearly "Substantial Government Interference" was being resolved. Second, the Appellate Courts claim History does not establish that the mislabeled proceeding is Open, therefore, has failed to meet the **In Re Yates** Burden. Finally, the Appellate Courts erroneously end the **Sublett** Analysis when History is Silent, without conducting the second part. This is the equivalent of a Public Trial Right bar, that is premised on labels rather than substance, and prevents the core values served by the Right to Public Trial, from ever Advancing because experience becomes History. Without experience there can be no History.

C.J. Madsen brilliantly observed that when History is silent the analysis does not end, rather, the Silence demands that the reviewing Court must examine whether the core values would be furthered if the right is applied with respect to the part of the proceeding in question.

"If these values would not be served by concluding that a particular aspect of trial should be public, when this issue is one for which History provides no answer, then there is no Constitutional imperative reason for attaching the Public Trial Right .... Because protecting and Advancing these values are the core concern of the right to a Public Trial." **Sublett** at 98-100.

-12-

The lead applied this Logic in **Sublett**, "none of the values served by the public trial right is violated under the facts of this case." Id. at 77. If the **Sublett** Court would have found a "Constitutional imperative reason for attaching the Public Trial Right," in **Sublett**, then a new trial would have been ordered, despite the silence. This Court Must establish One Rule for the Appellate Court's to follow when Applying the **Sublett** test. 513-14 W.L.R. [VOL. 88:491 2013].

Mr. Ruth presents Significant Constitutional Imperative Issues, that have never been addressed by this Court. The Public Trial Values are advanced when attached to the facts of Mr. Ruth's case, and Protect the Innocent from being Convicted by "off the record" Professional Misconduct cloaked in the shadows of Sidebars & Chambers hearings conducted during the daily recesses.

**2.) THE VALUES SERVED BY THE RIGHT TO A PUBLIC TRIAL ARE PROTECTED & ADVANCED WHEN ATTACHED TO THE JUAN TYPE PROCEEDING IN MR. RUTH'S CASE & THIS COURT MUST GRANT REVIEW & ADOPT THE "RUTH HEARING" IN ORDER TO PROTECT THE INNOCENT FROM BEING CONVICTED & THE RIGHTS OF THE "CONVICTED INNOCENT"**

Mr. Ruth asserts that under the facts of his case the proper Experience and Logic test is satisfied by harmonizing the "Substantial Government Interference" expansion announced in **U.S. v. Juan**, 704 F.3d 1137 (9th Cir. 2013), with the more protective coextensive Public trial right of both the accused & Public under the State Constitution.

The Due Process Clause "guarantees that a criminal defendant will be treated with the fundamental fairness essential to the very Concept of Justice. At its core, the right to Due process is the right to fairly present a defense. Id. at 1140. The Webb v. Texas decision protects a criminal defendant's Sixth Amendment Right to Compulsory Process and Broader Due Process Rights. 409 U.S. 95 (1972). In this Context the 5th and 14th Amendments are coextensive. **Juan** 704 F.3d at n.1.

-13-

The Ninth Circuit stated that "Juan Persuasively argues that WEBB and its progeny should apply to all Witnesses." Id. at 1141. The Ninth Circuit has consistently maintained strict policies that govern the duties of the Prosecution and Trial Court when communicating to witnesses. "Imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights." (U.S. v. Vavages, 151 F.3d 1185, 1193 (9th 1998), (Quoting U.S. v. Rich, 580 F.2d 929, 934 (9th 1978).

"Violating this DUTY by BULLYING a prosecution witness away from testimony that could undermine the governments case is no less distortive of the judicial fact-finding process than improperly meddling with the testimony of a defense witness. Regardless of whose witness is interfered with, the constitutional harm to the defendant is the same -- The inability to mount a FAIR and COMPLETE defense. We see no reason to doubt that the Government's Substantial Interference with the testimony of its own witness can violate the Due Process Clause. See U.S. v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982); Due Process is offended where the defendant is wrongfully denied testimony that "would have been favorable and Material." Id. at 1142.

In order to prevail on a "Substantial Government Interference" Claim, Mr. Ruth must "demonstrate misconduct by a preponderance of the evidence." Vavages, 151 F.3d at 1188 (Citing U.S. v. Lord, 711 F.2d 887, 891 n.3 (9th Cir. 1983). Merely warning a witness of perjury consequences can violate Core Due Process Rights. However, to establish a violation, Mr. Ruth is required to prove that under the totality of the circumstances the prosecutor's perjury threat were expressed to the witness, and the substance of that communication has the potential to affect whether the witness testifies, or alter the testimony. Juan at 1190. DPA Adcock's Misconduct is a "Highly Unethical" issue of significant public interest. In Re Bonet, 144 Wn.2d 502 (2001); State v. Carlisle, 871 P.2d 174, 177 (Wash.Div.1 1994).

Ms. Woerner tried to correct the false portions of her statement on 3/17/04, (App. "E"), before trial, (Exh. 4), and during trial, (Exh. 1,2,3,4,5). Pursuant to RCW 9A.72.060, correcting a False Statement before testifying to a jury is not Perjury. In Re Recall of PearsallStipek, 141 Wn.2d 756 (2000).

-14-

DPA Adcock committed malfeasance when making a perjury accusation based on a Res Gestae witness correcting a known false statement, and then trying to bully Ms. Woerner into committing Perjury. DPA Adcock executed his "deliberate intention of distorting the fact-finding process." **U.S. v. Quin**, 728 F.3d 243, 258 (C.A.3(PA)2013). The Perjury threat even affected, Defense Counsel, who did not call Ms. Woerner to testify because DPA Adcock would impeach her with the false statement. (Exh. 4 Mark Stephens). Mr. Ruth has proven the threat was expressed & actually did affect whether Ms. Woerner testified:

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset, she indicated to me Mr. Adcock had threatened to CHARGE HER with Perjury IF SHE TESTIFIED. She Expressed CONCERNS to ME about the POTENTIAL LEGAL CONSEQUENCES IF SHE TESTIFIED. I indicated I could not advise her and suggested she seek appointed counsel to answer her questions." (Exh. 4 Mark Stephens).

Mr. Stroud I (Exh.1), Ms. Woerner (Exh. 2), & Mr. Slothang (Exh. 2 & 3), all Public Spectators provided corroborating Statements of "Substantial Government Interference". The Sidebar & In-Chambers Hearing cloaked this Misconduct. The Material Issue of whether Ms. Woerner needed an attorney because of her fear stemming from the consequences of DPA Adcock's Threat's, were resolved In-Chambers. Any discussion of Mr. Adcock's actions InChambers is the equivalent of testimony that cannot be taken in secret. **Cohen v. Everett City Counsel**, 85 Wash.2d 385, 535 P.2d 801, 804 (1975).

The Jury Trial Right was designed as "an inestimable safeguard" against the chance of bias & corrupt proceedings created by the misconduct of Prosecutors & Judges. **Duncan v. Louisana**, 391 U.S. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968). The jury trial right is eliminated if that Misconduct can be conducted off the record with impunity. In the juries absence the Public inherites the Jury Safeguard function (Sublett at 723-24), so Historically all Government Misconduct has been resolved in Open Court. Since 1742, History shows that "'The Public has a right to every man's evidence ...' an 'indubitable certainty' that 'cannot be denied.'" **State v. Ruiz**, 176 Wn.app.623, 369 P.3d 700 (Wash.App.Div.3 2013). History does establish that the Public Witnesses of DPA Adcock's Misconduct & Ms. Woerner's favorable testimony must make it into Open Court. The Public, Mr. Ruth, and Ms. Woerner, were not allowed to object to the closure, or make record.

The heavy burden to prove "Substantial Government Interference" demands that proper records is made, and the values of the Public Trial Right Doctrine demand that any warning or allegation of a threat be investigated in Open Court, to deter this type of Misconduct from occurring in the future. Mr. Ruth asserts that any type of warning or threat to a Res Gestae witness must be investigated in open court, or the Prosecution will continue to cloak this Misconduct in the shadows.

"The Water Shed Juan decision provides critical guidance for other courts .... in determining how to properly warn these "difficult" witnesses about the consequences of providing potentially false "exculpatory" Testimony .... Courts will likely need to address whether the presentation of evidence to the factfinder about the government's "warnings" To a prosecution witness can ameliorate the potential prejudice cause in Juan-type situations. Similar, warnings "not on the record" will necessitate further analysis by courts." Substantial Government Interference, Minnesota Law Review Headnotes [98:22, 27, 29-32 2013] Ruth A. Moyer.

In this situation the Prosecutor does have a duty to call Ms. Woerner to testify because she is the sole Res Gestae Material eye Witness who corroborates Mr. Ruth's Defense, and the Prosecutor has an obligation to protect Mr. Ruth's Rights to a Fair & Open Trial. **Duty of the Prosecutor To Call Witnesses Whose Testimony Will Help the Accused to Establish His Innocence**, 1966 WASH.U.L.Q. 068, 69, 72-73, 75-76,80, 96 (1966). Most critical is that this Court protects the innocent from being convicted from the type of off the record "Substantial Government interference" that has occured in Mr. Ruth's case.

This can only be achieved by attaching the more protective coextensive Public Trial Right safeguard to any perjury warning or threat made by the Government to a Res Gestae Witness. A "RUTH HEARING" requires the Trial Court to determine and make record of the warning or threat made; the affect it had on the Res Gestae witness; establish the factual basis for the perjury accusation; and allow the Accused & Public to make record. The "RUTH HEARING" also requires that all warnings are given on the record by a third party.

This type of hearing will ensure the fair administration of Justice by simultaneously protecting Mr. Ruth's Compulsory & Confrontation Rights, by advancing the four core public trial right values. This type of hearing is critical to maintain the integrity of the framework that fairly & accurately determines innocence or guilt, in a Criminal Trial.

3.) MR. RUTH MUST BE ALLOWED TO CROSS-EXAMINE PROSECUTION WITNESSES ABOUT PERJURY THREATS AND EXCULPATORY PORTIONS OF THEIR ORIGINAL STATEMENTS IN OPEN COURT TO PROTECT FUNDAMENTAL RIGHTS

The U.S. Supreme Court has instructed, "Whether directly in the Due Process Clause ... or in the Compulsory Proces or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" **Crane v. Kentucky**, 476 U.S. 683, 690 (1986). **Juan** fundamentally protects a defendant's Sixth amendment right to elicit exculpatory evidence from an "Adverse" Government Witness.

As the Seventh Circuit has stated, "the Evidence of threats is necessary to account for the specific behavior of a witness, that if unexplained, could damage a party's case." **U.S. v. Thomas**, 86 F.3d 647, 654 (1996).

-16-

This court made a similar connection in **Orange**, When recognizing the particular harm of precluding the defendant's family from contributing to the jury selection. 152 Wn.2d at 812. The Prospective Jurors in **Orange** did not see family participation, but "Their conspicuous exclusion from it." 152 Wn.2d at 809. This Court cured that prejudice by attaching the Public Trial Right Safeguard, the same must apply to protect Mr. Ruth's confrontation Rights.

In Mr. Ruth's case, the Jury heard testimony from State Witnesses regarding Mr. Ruth's & Ms. Woerner's relationship, and Ms. Woerner's alleged actions during the shooting. RP 164, 200, 207. Kandy Korder claimed Ms. Woerner & Mr. Ruth were drug addicts. RP 207. The Alleged Victim, Drew Eden, testified Ms. Woerner was screaming for Mr. Ruth to Stop Shooting. RP 164. Mr. Ruth was the sole witness for the defense, and during direct review (and after DPA Adcock's "Substantial Government Interference" prevented Ms. Woerner from testifying) DPA Adcock objected to the Defense's attempts to mitigate the Prejudice of the State's inadmissible Hearsay regarding Ms. Woerner. RP 247. Judge Hulbert not only commented on the evidence under the guise of sustaining the objection, but claimed the State did not bring up Ms. Woerner in their case in Chief. Judge Hulbert then instructed the Jury, "The Jury can draw it's own conclusion about it's recollection." RP 247. When Mr. Ruth tryed to make record of the threats, and account for the absence of Ms. Woerner, in front of the jury, Judge Hulbert, threatened to place Mr. Ruth in restraints. RP 266-67. The Point of that threat is unclear because Mr. Ruth, even if restrained, is entitled to testify.

A Conclusive Presumption of Prejudice was established when the Jury attempted to "draw it's own conclusion," as ordered by Judge Hulbert, and Mid-Deliberations submitted an inquiry about Ms. Woerner's Statement's. (Exh. 7 Jury Inquiry). "The Substance of the Jury's request-for evidence not admitted at trial ... [is] highly unusual." **Frantz v. Hazey**, 533 F.3d 724 (9th.Cir.2008).

Mr. Ruth relied heavily on protecting Ms. Woerner in his self-defense claim. However, the Jury did not see the participation of his girlfriend in trial, just her "Conspicuous Exclusion." **Id.** at 809. As Mr. Ruth's GirlFriend it seems suspicious for her not to testify. If Mr. Ruth was testifying truthfully about defending her, would she not defend him? The Jury verdict in Mr. Ruth's case is the result of Speculation, conjecture, and inadmissible hearsay. The Jury only saw that Ms. Woerner alienated & Abandoned Mr. Ruth.

The **Juan** Rule applied the **Webb** protections to the Confrontation clause, and Mr. Ruth Asks that this Court attach the Coextensive Public Trial Right Safeguard to the **Juan** Rule & Create the "**RUTH HEARING**," to cure the prejudice in this case, and prevent it from happening in the future.

-17-

4.) MR. RUTH ASKS THAT THIS COURT TAKE THE NEXT STEP IN THE EVOLUTION OF COLLATERAL
REVIEW BY ADOPTING THE INITIAL-REVIEW COLLATERAL PETITION RULE

The **Hagler** Court adopted the Balancing of Probabilities test as an exception to the State Procedural Default Doctrine. A Prisoner may obtain Collateral Review of a defaulted claim by showing "Cause" for the default, a Constitutional error, and actual & substantial prejudice rising from the Constitutional error. **In re Hagler**, 97 Wn.2d 818, 825 (1982);(Expanded in **Cook**, 114 Wn.2d 802, 811 (1990)).

These threshold requirements are "necessary to preserve Societal interest of finality, economy, and integrity of the trial process, it also recognizes that the Petitioner has had an opportunity to obtain Judicial Review by Appeal." **In Re Woods**, 154 Wash.2d 400, 409 (2005). An IRCP does not undermine these societal interest because unique procedural obstacles eliminate the opportunity for Direct Appeal. **In re Sandoval**, 249 P.3d 1015, 1019 (Wash.2d 2011); **Phelps v. Alameida**, 596 F.3d 1120 (9th 2009)(Procedure has overshadowed Concerns for basic fairness).

Mr. Ruth asks that this Court adopt an Initial-Review Collateral Procedure, for State Constitutional issues that: (1) Cannot be objected to at trial because the Court did not uphold its obligation to the accused by notifying them of the Right being violated; (2) cannot be raised on direct review because the violation occured off-record; (3) Prejudice cannot be proven because the error is Structural. Mr. Ruth asks that he receive the Standard of Direct Review.

In **Martinez v. Ryan**, 132 S.Ct. 1309 (2012), the Court recognized that IRCP establishes "cause" to excuse Procedural Default. Mr. Ruth asks that the **Hagler/Cook/Rice** Procedural Bars are not applied to the Initial-Review Collateral Issue's presented in this Petition. **Harris v. Nelson**, 394 U.S. 286, 292 (1969).

5.) COLLATERAL REVIEW IS THE PERFECT VEHICLE TO ESTABLISH WHETHER AN ERROR IS
STRUCTURAL BECAUSE THE EFFECT MAY BE ASSESSED IN THE CONTEXT OF OFF THE
RECORD EVIDENCE STRUCTURAL ERROR IS THE ST. PIERRE HIGHER STANDARD

This Court has not decided whether Public Trial Right violation or the Complete Denial of Counsel Constitute Structural Error on Collateral Review, Although, the U.S. Supreme Court has decided they do. **U.S. V. Gonzales-Lopez**, 548 U.S. 140, 149 (2006). The St. Pierre Court never mentioned Structural Error, which is a "Higher Standard" of Per Se Prejudicial Error, and only applies to a very limited class of BedRock Constitutional Principles. **Orange** quoted St. Pierre for the proposition that the burden of establishing prejudice on collateral attack may be waived where the error gives rise to a conclusive presumption of prejudice.

-18-

In re Orange, at 804. A Structural defect renders the Jury verdict unreliable & Fundamentally unfair. Arizona v. Fulminante, 499 U.S. 279, 310 (1991). A Conclusive presumption of Prejudice means that there is no possibility the error did not contribute in the verdict. In Re Delgado, 106 Wn.App. 898, 251 P.3d 899, 907 (Wash.App.Div.1 2011). A Structural Error is a Conclusive Presumption of Prejudice.

The St. Pierre Decision did not address whether Structural Error applies to an IRCP Issue, in fact In re Orange & In re Morris Both involved claims that were on the record. What about Structural Error claims that can only be determined on Collateral Review? "If a defendant wishes to raise issues on appeal that require evidence of facts not in the existing trial record, the appropriate means of doing so is through a PRP." State v. McFarland, 127 Wn.2d 322 (1995). When Structural Error issues are unable to be raised on Direct Appeal as a Consequence of Washington State Appellate Procedures the More Lenient standard of review applicable to Direct Appeal applies. In Re Woods 154 Wn.2d at 510. Structural error applies on IRCP.

6.) THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL

"Any Statement from the trial judge – no matter how innocuous – are likely to have some impact ... influence on the jury's deliberation is difficult to avoid when the jury is troubled enough to seek advice .... Counsel is most acutely needed before a decision about how to respond to the jury is made ... the missed opportunity to influence the trial courts response to a jury question. That is the Significant Moment." Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th.Cir.2009). "The substance of the jury's request-for evidence not at trial ... [is] Highly unusual." Frantz v. Hazey, 533 F.3d 724 (9th.Cir.2008).

The Jury sent an inquiry to Judge Hulbert requesting the statements of Ms. Woerner, Eden, and Custer. (Exh. 7). The State Conceded that Mr. Ruth & Defense counsel were not notified of the inquiry, nor given the opportunity to participate in the formulation of the response. Mr. Ruth asserts his Rights to Counsel were completely denied which is structural, and his Right to "Appear & Defend," which is more protective under the State Constitution.

The Musladin Court reasoned that because all the parties participated in the formulation of the jury instructions, any answer regarding an instruction contains some information from all the parties. The Jury inquiry in the instant case was not about Jury instructions, and contained no information from the parties, and creates a significant Moment, that triggers the Right to Counsel, Public Trial, and "Appear & Defend" safeguards. Sublett reduced the Public Trial rights during deliberations down to the procedures outlined in CrR 6.15(f)(1). J. Stephens pointed out that this rule does mirror the constitutional rights it protects. Mr. Ruth asserts that this means, unlike the Bone-Club analysis, when CrR 6.15 is violated, so are the Constitutional Rights it mirrors & Protects.

-19-

CrR 6.15(f)(1) is the functional equivalent of the Bone-Club Analysis during deliberations, and the only safeguard for the Right to Counsel, "Appear & Defend," and Fair Trial Rights, even if only in the written record.

7.) THE MORE PROTECTIVE RIGHT TO "APPEAR & DEFEND" WAS VIOLATED BY THE ILLEGAL CLOSURES THE PUBLIC'S & MR. RUTH'S COEXTENSIVE SUPER SAFEGUARD PROTECTS THIS RIGHT

Mr. Ruth had a Right under the State & Federal Constitution to "Appear & Defend" during the In-Chamber hearing that discussed DPA Adcock's "Substantial Government Interference" of a Res Gestae Material Eye Witness. Ms. Woerner was the only one out of the four who witnessed the incident, that was not shot or a shooter, and corroborated the sole defense Witness's testimony. The State Constitution is more protective of this Right:

"Unlike Snyder, our decision in Shutzler, does not condition the right to 'Appear & Defend' at a particular 'stage of trial' on what a defendant might do or gain by attending ... or the extent to which the defendants presence may have aided his defense, but rather on the chance that a defendant's 'substantial rights may be affected' at that stage of trial." **State v. Irby**, 170 Wn.2d 874, 880 n. 6 (2011).

Mr. Ruth's & the Public's Mere presence passively contributes to the proceedings even when serving no function in aiding Mr. Ruth's defense. **State v. Bennett**, 275 P.3d 1224, 1229, 1232 n. 6 (2012). In this Context the Public's & Mr. Ruth's Public Trial Rights are Coextensive to protect Mr. Ruth's Right to "Appear & Defend." This Super Safeguard triggers when the "Superior Right" to a Fair Trial is at issue, upon the likelihood of Jeopardy to Constitutional Rights, and restricts Closure by the Trial Court; absent passing the Bone-Club Test, in Open Court & under the facts of Mr. Ruth's case, without conducting a "RUTH HEARING." Please Read Mr. Ruth's Pro Se Reply Brief Pg 15-17.

### F. Conclusion

"Untold numbers of innocents have tumbled into the dark pit of prison .... [The] Cries of Innocence will forever fall on deaf ears and cynical minds. Once [Mr. Ruth Was] convicted, no one in whose hands his life is placed (his lawyer and the appellate judges) either believes him or is concerned about his innocence or guilt .... The body of justice that has evolved over the centuries had many members. But not one part of that function within this whole has been created or is properly equipped specifically to secure the freedom of the incarcerated innocent." **James McCloskey**, Centurion Ministries, Inc. **"Convicting the Innocent"**. The "RUTH HEARING" is a Super Safeguard to protect the Innocent from being Convicted & the "Convicted Innocent." The Appropriate remedy is to Dismiss all Mr. Ruth's charges with Prejudice. In the alternative Remand for a reference hearing.

Respectfully Submitted,

This 30th Day of March, 2014           X _____

APPENDIX
"A"

APPENDIX "A" NO. 68380-2-I, Division One, Order of Dismissal

APPENDIX "B" Trial Minute Entry, 2/4/05

Appendix "C" Material Witness Warrant Renee M. Woerner

Appendix "D" 12/11/03 Renee M. Woerner Interview

Appendix "E" Mental Health Evaluation (Renee M. Woerner Interview, 3/17/04; cc:

John Adcock

Exhibit One - Affidavit from Matthew R. Stroud I

Exhibit 2 - Henry Slothang & Renee M. Woerner Interviews by Private Investigator

Michael Powers

Exhibit 3 - Interview of Henry Slothang By Michael Powers

Exhibit 4 - Mark Stephens Motion to Withdraw & Transcripts

Exhibit 5 - 2 Affidavits from Matthew R. Ruth

Exhibit 6 - Affidavit from DPA Adcock where he commits Perjury

Exhibit 7 - Jury Inquiry

*The Court of Appeals*
of the
*State of Washington*

RICHARD D. JOHNSON,
*Court Administrator/Clerk*

DIVISION I
One Union Square
600 University Street
Seattle, WA
98101-4170
(206) 464-7750
TDD: (206) 587-5505

September 25, 2013

Charles Franklin Blackman
c/o Snohomish County Pros Atty
3000 Rockefeller Ave # MS504
Everett, WA, 98201-4060
cblackman@co.snohomish.wa.us

Thomas J Paulson
20810 Hwy 99 #4
Lynnwood, WA, 98036

CASE #: 69387-5-I
Personal Restraint Petition of Thomas J. Paulson

Counsel:

On July 24, 2013, an order referring petition to the trial court for a reference hearing was entered. The "Agreed Findings of Fact and Conclusions of Law Upon Remand" was received on September 20, 2013. The case has again been submitted to the Acting Chief Judge for final determination. You will be informed when a decision is reached. Any inquiry regarding the status of the personal restraint petition will be placed in the file without further action.

Sincerely,

Richard D. Johnson
Court Administrator/Clerk

law

12-9-04

By *Grace Hampton*

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
# IN AND FOR THE COUNTY OF SNOHOMISH

State of Washington )
                    )
          Plaintiff, )
                    )     CAUSE NO. 03-1-02451-6
     vs.            )
                    )     INQUIRY FROM THE JURY AND
                    )     COURT'S RESPONSE
Matthew Robert Ruth )
          Defendant. )
                    )

**URY INQUIRY:**

1) Transcripts of interview with Renee Warner Dec 10 & 11, 2003

2) Transcript of Interview(s) with Jeremy Custer (Nov 24, 2003)

3) Transcript of interview with Drew Eden (Nov 10, 2003)

DATE AND TIME 08 Dec 2004  16:12

ATE AND TIME RECEIVED BY THE COURT: 12/8/04  4:12 pm

OURT'S RESPONSE: The evidence requested by the jury was

ot admitted into evidence and is not Available to the

ury during deliberations.

Thank you

_____
JUDGE

ATE AND TIME RETURNED TO JURY: 12/8/04  4:15 pm

SAVE -- MUST BE FILED

EXHIBIT
10

## Psychological Testing

The Mental Status Examination revealed that the subject is oriented X3, and did not display confusion and disorganization. He was not labile but somewhat depressed emotionally. There was no evidence of psychotic thinking or impairment of reality testing. His energy level seems fairly normal, but his affect was flat and somewhat labile. His intelligence appeared to be in the average, although formal psychometric testing was not administered. He denied symptoms of mania. He denied suicidal and homicidal thoughts, feelings or plans at this time.

The results of the MMPI-2 indicated rather extreme and possibly exaggerated results. He endorsed extreme persecutory thoughts and feelings, and very poor ego strength. He endorsed a high number of rare and unusual symptoms and complaints. He probably has a chronic personality disturbance, possibly with schizoid or paranoid features. Alienation, both social and emotional, is prominent features of that personality. He is extremely tense, anxious and unhappy.

## Conclusions

The results of my examination revealed an individual who has chronic disturbance of judgment, personality and decision-making that has been greatly exacerbated by his drug abuse. Although he has denied intoxication or withdrawal around the time of the incident, and denied being the aggressor in the incident, it is evident that he was unrealistic, impulsive and reckless in his thinking at the time.

The question of a chronic psychotic disorder remains. He has refused to assert that he was mentally ill at the time, but he probably has disturbance in his thinking that causes him to interpret situations as threatening that might not be as dangerous in reality as they seem to him at the time. This is particularly true if he is intoxicated.

Mr. Ruth's disturbed childhood, with chaos, abuse and severe alienation, has rendered him compromised in his thinking and judgment. He has a wide-ranging and serious drug abuse history, including methamphetamine abuse by his own mother, and his own polysubstance abuse and dependence. His social development and social skills demonstrate the effects of that disturbed lifestyle. Under pressure he probably suffers unrealistic and idiosyncratic thinking as suggested by the schizotypal and paranoid traits of his personality disorder.

There was insufficient basis to conclude that Mr. Ruth was legally insane or lacked the specific capacity to form the mental intent at the time of the offense. However, his thinking, decision-making skills and his ability to anticipate

4

dangerous situations. While he probably was not psychotic at the time of this unfortunate and very dangerous incident, under the pressure of the situation he may have reacted with fear and suspiciousness that was not appropriate and caused him to respond in an unnecessarily violent manner. This event did occur in his "home", a small fifth wheel trailer, and he may have felt invaded and threatened by the trapping nature of this location.

Mr. Ruth's chronic mental condition, while not amounting to a true mental defense, could have been a significant contributing factor to his actions that day. While he did not misunderstand the nature of his actions, he may have interpreted those actions as being legal and appropriate, if as he asserted, he perceived him own life as being at risk.

Diagnosis (DSM-IV-TR)
Axis 1  Polysubstance dependence
        Depressive disorder NOS
        · r/o Psychotic disorder NOS- probably secondary to drug abuse
Axis 2  Personality disorder NOS- with schizotypal and paranoid traits noted
Axis 3  No medical conditions
Axis 4  Severe stresses of current legal proceedings and incarceration
Axis 5  Current GAF Rating- 55-60, moderately impairing symptoms

Thank you for this referral.


Kenneth Muscatel, Ph.D.
Clinical, Forensic and·
Neuropsychology

FILED

2005 FEB -4  PM 12: 02

~~ ... ~~ IELS
COUNTY CLERK
SNOHOMISH CO. WASH.

---

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY**

---

STATE OF WASHINGTON
       **Plaintiff/Petitioner,**

   **VS.**

MATTHEW RUTH
       **Defendant/Respondent.**

CAUSE NO.:   03-1-02451-6

**COVER SHEET**

---

ATTACHED HERETO IS: PSYCHOLOGICAL EVALUATION REPORT

# EXHIBIT 9

I asked Donnie Poole specifically if he recalled telling Mr. Adcock that Matt Ruth had told him (Donnie) that Custer had a gun during the argument between Matt and Custer?  Donnie said that Matt had told him, from the beginning, that Custer had a gun and he recalled mentioning to Mr. Adcock that was the reason that Matt 'freaked out and started shooting" was because Custer had a gun in the trailer. Donnie Poole recalled mentioning to Mr. Adcock that Matt had told him that Custer had a gun. He said that Mr. Adcock did not believe him and started to get red in the face and starting yelling at Donnie.

Mark, Donnie seemed to remember some more about the meeting with Adcock once we started talking some more. He is NOT sure of the order of the conversation but he is sure that he did tell Adcock several things during the interview. Donnie said that as soon as he started to tell Adcock the "truth" about Custer, Adcock started yelling at him saying things like "you're lying to protect your friend, none of this is true, this will never see the light of day."

Donnie remembers telling Adcock that this incident was over "drugs."  Donnie said that at this point Adcock was in his face yelling at him and he (Donnie) was standing in his face yelling back at him.  Donnie recalled that Mr. Adcock "really got mad when I told him that this was all over some drugs that Matt had supposedly stolen from Custer."  Adcock would not believe him.

Donnie recalled that during the last minutes of the interview with Mr. Adcock that he told Adcock that he was being "unprofessional" and he did not scare him.  The interview ended badly.

Donnie Poole told me that the interview with Adcock started off all right but as soon as he heard things that he didn't like to hear that's when Mr. Adcock, according to Donnie, started to get mad and was trying very hard to intimidate Donnie.

Donnie Poole will sit and talk with you if you would like?  He does NOT recall the specific order of questioning by Mr. Adcock but he did remember the above facts without much effort.

I will continue to search out Renee Woerner. Let me know what you want done next?

Thanks,
Michael Powers

**From:** Wlegalworks@aol.com
**Subject:** **Matt Ruth**
**Date:** January 18, 2011 9:54:10 AM PST
**To:** markmestel@comcast.net

Mark,

I was finally able to meet in person with Donnie Poole. I like the guy. He apologized for taking so long to get back in touch with me BUT his phone has not been working so he has not been getting my messages. That is fixed now and so he is ready to help IF he can.

Donnie works daily. He is a cement finisher. He said that if he can help he will. Donnie reminded me that it was over six years ago that he met with Mr. Adcock but he remembers "most of what was said." Donnie told me that he does not recall the entire conversation with Adcock but what he remembers most was that Adcock was "trying to intimidate me."

Donnie asked me if Adcock had recorded their meeting? He was hoping he had so he would have a "better record of what was said and when it was said." I told Donnie that as far as I know there was no recording of the interview between Mr. Adcock and himself. Donnie has been told over the years that Adcock used some of what Donnie ALLEGEDLY said to him during the meeting to convict Matt Ruth. Donnie has no idea as to what Mr. Adcock allegedly used in trial.

Mark, our client gave me a "heads up" to what he recalled Adcock saying during his trial with respect to Donnie Poole's interview.

One of the things that our client said was that Adcock alleged that Donnie Poole told Adcock that Matt Ruth had told him (Donnie) that he just "freaked out" and started shooting. Donnie agreed with Adcock on that statement BUT he said that Adcock forgot to mention that Donnie had told him (Adcock) that the reason that Matt "freaked out and started shooting" was because his life was in danger at the time." Donnie said that he does seem to recall telling Adcock that Matt told him that he (Matt) did say that he "freaked out" BUT it was after he had told him that Matt said that he freaked out after Custer threatened him with a gun. Donnie said this was about when Adcock started to get mad and started to yell at Donnie that he was just "covering for his friend and trying to get his friend off."

Donnie believes that the interview with Adcock started going bad when he TRIED to tell Adcock that he (Donnie) had bought drugs from Custer.

Donnie said that he recalled telling Adcock that Custer showed up at his house, several days after the shooting, he was not exactly sure when but thought it was shortly after the shooting and Custer threatened Donnie and told him that he had better not tell anyone (authorities) about Custer's business and what kind of a guy Custer was. Donnie said that he didn't really worry about what Custer had said to him about "not telling police" about his (Custer) business but he did take it as a threat.

# EXHIBIT 8

EXHIBIT
"7"
Jeremy custer

DECLARATION OF PROOF OF SERVICE

STATE OF WASHINGTON          )
                             ) AFFIDAVIT BY DECLARATION:
COUNTY OF SNOHOMISH          )

I, _Matthew P. Ruhl_____, hereby depose and declare that I properly mailed a true and
accurate copy of the "Note for Motion Calendar" and "MOTION FOR NEW TRIAL OR ARREST OF
JUDGMENT" to which this declaration is affixed directed to opposing counsel of record in the above
numbered cause with First Class Postage arranged on this date under the pains and penalties of perjury
under the laws of the State of Washington.

Signed in Everett, Washington this _17_ day of _March_____, 2004.

/S/ _Matthew R Ruth_____
_Matthew C. Ruhl._____
CIN# 3/0097 Unit _____
1918 Wall Street
Everett, Washington 98201

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 13 of 13

a fair trial.  See, e.g., > <u>State v. Coe</u>, 101 Wash.2d 772, 789, 684 P.2d 668 (1984);  > <u>State v. Badda</u>, 63 Wash.2d 176, 183, 385 P.2d 859 (1963) (three instructional errors and the prosecutor's remarks during voir dire required reversal);  > <u>State v. Alexander</u>, 64 Wash.App. 147, 158, 822 P.2d 1250 (1992) (reversal required because (1) a witness impermissibly suggested the victim's story was consistent and truthful, (2) the prosecutor impermissibly elicited the defendant's identity from the victim's mother, and (3) the prosecutor repeatedly attempted to introduce inadmissible testimony during the trial and in closing);  > <u>State v. Whalon</u>, 1 Wash.App. 785, 804, 464 P.2d 730 (1970) (reversing conviction because (1) court's severe rebuke of the defendant's attorney in the presence of the jury, (2) court's refusal of the testimony of the defendant's wife, and (3) jury listening to tape recording of lineup in the absence of court and counsel)." <u>State v. Greiff</u>, 141 Wash.2d 910, 929, 10 P.3d 390 (2000).

Defendant makes these motions in good faith and believes he is entitled to the relief

requested. He respectfully request that this court grant some relief as it deems proper.

I hereby declare that I have read the aforesaid and verily believe the same to be true under the pains and penalties of perjury under the Laws of The State of Washington.

Signed in Everett, Washington this _14_ day of _March_ ____, 2004.

RESPECTFULLY SUBMITTED,

/S/  _Matthew R. Ruth_

_Matthew R. Ruth_ , pro se

CIN# _310079_  Unit _2-5_  _ca_

1918 Wall Street

Everett, Washington 98201

Witnessed by:

Name:

Address:

Date: _3/19/05_

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 12 of 13

The second necessary element a defendant must show before a trial court can dismiss

charges under CrR 8.3(b) is prejudice affecting the defendant's right to a fair trial. See

State v. Cannon, 130 Wash.2d 313, 328, 922 P.2d 1293 (1996). Such prejudice includes

the right to a speedy trial and the "right to be represented by counsel who has had

sufficient opportunity to adequately prepare a material part of his defense...." State v.

Price, 94 Wash.2d 810, 814, 620 P.2d 994 (1980).

The defendant alleges prosecutor misconduct as follows: The prosecutor
in this case literally went all out to
threaten, harass and intimidate my
witnesses and the state's witnesses.
The prosecutor was responsible for mis-
informing the jury on the laws after being
told by the court what the law was and that
the accused did not have a duty to leave.
That misled the jury and reversed the burden
of proof. Further, the prosecution made
comments that the accused is delusional
and that is not supported by the record
and all of the above was highly prejudicial
and resulted in an unfair trial. The prosecu-
tion also withheld evidence and discovery
from the defense. If not for the prosecutor's
misconduct alone, the result would have been the opposite!

### E.   THE CUMULATIVE EFFECT OF THE ERRORS DENIED THE
### DEFENDANT A FAIR TRIAL.

The defendant claims that the overall effect of the errors denied him a fair trial.

> "[T]he cumulative error doctrine warrants reversal in this case. The application of that
> doctrine is limited to instances when there have been several trial errors that standing
> alone may not be sufficient to justify reversal but when combined may deny a defendant

because the evidence all clearly shows that I am innocent and the state's story at trial is a rediculous fabrication that any reasonable trier of fact would clearly deny given any alternative. The truth is available and it must be presented in the interest of justice. With appointment of conflict free counsel who is allowed or willing to assist, there is every fact in my favor to get a new trial and acquittal.

D.    THE DEFENDANT ALLEGES PROSECUTORIAL MISCONDUCT.

Two things must be shown before a court can require dismissal of charges under CrR

8.3(b). First, a defendant must show arbitrary action or governmental misconduct. >

State v. Blackwell, 120 Wash.2d 822, 831, 845 P.2d 1017 (1993) (citing State v. Lewis,

115 Wash.2d 294, 298, 797 P.2d 1141 (1990)). Governmental misconduct, however,

"need not be of an evil or dishonest nature; simple mismanagement is sufficient."

Blackwell, 120 Wash.2d at 831, 845 P.2d 1017 (emphasis added). Absent a showing of

arbitrary action or governmental misconduct, a trial court cannot dismiss charges under

CrR 8.3(b):

We repeat and emphasize that CrR 8.3(b) "is designed to protect against arbitrary action

or governmental misconduct and not to grant courts the authority to substitute their

judgment for that of the prosecutor." State v. Cantrell, 111 Wash.2d 385, 390, 758 P.2d 1

(1988) (quoting State v. Starrish, 86 Wash.2d 200, 205, 544 P.2d 1 (1975)).

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 10 of 13

The defendant claims that based on the abovesaid facts, the court should find that the appointed counsel's representation fell so far below reasonable standards that the attorney effectively joined the prosecution and prejudice is presumed.

If the court does not agree with this notion, I set forth here the 2 parts required for the Strickland Test. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

1. Counsels Performance Was Deficient by failing to adequately prepare for trial and interview witnesses for both sides. My current counsel's performance is also deficient because he refuses to obtain the facts or try to schedule interview with my witnesses also. He refuses to advance these issues. It is clear that I have been denied effective assistance of counsel and continue to be denied effective assistance due to the fact my new attorney refuses to assert that his long time friend and colleague intentionally failed to conduct a defense. New counsel does not like me or want to help.

2. My trial would have turned out differently and I would not have been prejudiced had it not been for my attorney's deficiency as follows: Had my attorney actually tried to do his job or at least called my witness, Renee Woerner, and conducted interviews, I would have been completely acquitted of these charges

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 9 of 13

defense counsel is completely strangled in his abilities to assist during trial and the client only receives the appearance of counsel who knows nothing of the case, witnesses or any defense strategy. Under Strickland, supra, a defendant must show (1) that counsel's representation "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant. The deprivation of the right to counsel is so inconsistent with the right to a fair trial that it can never be treated as harmless error. Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994) (citation omitted) (citing > Chapman v. California, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In certain cases prejudice is presumed. United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The Sixth Amendment right to counsel "means more than just the opportunity to be physically accompanied by a person privileged to practice law," and "contemplates open communication unencumbered by unnecessary impediments to the exchange of information and advice." Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994) (citations omitted). "A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest. Such an attorney, like unwanted counsel, 'represents' the defendant only through a tenuous and unacceptable legal fiction." In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." Frazer, 18 F.3d at 782-83 (emphasis added) (citation omitted) (quoting United States v. Swanson, 943 F.2d 1070, 1075 (9th Cir.1991) (quoting Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir.1988))).

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 8 of 13