representing a client if the attorney's duties to another materially limit that representation.[1] It is a well known fact that an attorney in Snohomish County is going to be operating under a potential conflict of interest. That conflict depends on whether or not the prosecutor or the court have any prejudices against the particular person or crime or set of crimes and sometimes it is just a matter of the swapping of cases. If the attorney is unwilling to assist his client in any way and allows numerous issues of misconduct by the prosecution and/or the court or both–before, during and after trial, it is most likely that the attorney's been influenced by the persons in those positions whom he holds a higher loyalty to, or even his own interests in advancing his career professionally. This is a common fact prevalent in any number of cases at any given time throughout the county and state due to the breakdown of the system and the lack of resources to maintain the high volume of cases required by an attorney. Sacrifices must be made and unfortunately it occurs all too often to a person's detriment who is not necessarily guilty of the crime he is charged. At times, the prosecution is allowed to pyramid cases and seek grossly exaggerated charges based upon personal biases. This is most often the case, Snohomish County punishes those who dare to go to trial. Typically, defense counsel is not going to conduct *any* pretrial preparation and is always just assuming his client knows the prosecutions tactics. When a person decides to go to trial he is also stuck with the fact

---

[1] RPC 1.7(b) provides:
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

of counsel de novo. Mannhalt v. Reed, 847 F.2d 576, 579 (9th Cir.), cert. denied, > 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). An attorney's conflict of interest may create reversible error in two situations without a showing of actual prejudice. In re Richardson, 100 Wash.2d 669, 675 P.2d 209 (1983). First, "reversal is always necessary where a defendant shows an actual conflict of interest adversely affecting his lawyer's performance." Richardson, 100 Wash.2d at 677, 675 P.2d 209; see Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In addition, a trial court commits reversible error if it "knows or reasonably should know of a particular conflict into which it fails to inquire." Richardson, 100 Wash.2d at 677, 675 P.2d 209; see Wood, supra; Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). These general rules are applicable to any situation where a defendant alleges ineffectiveness of counsel related to counsel's representation of conflicting interests. Richardson, 100 Wash.2d at 677, 675 P.2d 209; see State v. Hatfield, 51 Wash.App. 408, 410, 754 P.2d 136 (1988).

> [T]he rule in conflict cases is "not quite the per se rule of prejudice that exists for [other] Sixth Amendment claims." Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). Rather, "[p]rejudice is presumed only if the defendant demonstrates that the counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " Strickland, 466 U.S. at 692 [104 S.Ct. at 2067] (quoting Cuyler, 446 U.S. at 348, 350 [100 S.Ct. at 1718, 1719]); see also Richardson, 100 Wash.2d at 677 [675 P.2d 209]....

> Hatfield, 51 Wash.App. at 413, 754 P.2d 136.

An actual conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant. State v. Byrd, 30 Wash.App. 794, 798, 638 P.2d 601 (1981). Rule of Professional Conduct (RPC) 1.7(b) prohibits an attorney from

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 6 of 13

the record or upon facts and circumstances outside the record which cannot be made a part thereof. If the order is based upon the record, the court shall give definite reasons of law and facts for its order. If the order is based upon matters outside the record, the court shall state the facts and circumstances upon which it relied.

(e) Disposition of Motion. The motion shall be disposed of before judgment and sentence or order deferring sentence.

### B.   DEFENDANT SEEKS APPOINTMENT OF NEW COUNSEL

The defendant asks this court to allow trial counsel to withdrawal and appoint new

counsel to perfect these issues and make reasonable arguments. The defendant is not

trained in the law and he brings this motion in good faith belief that he is entitled to the

relief requested. The trial attorney would not likely advance the issues pertaining to

ineffective assistance of counsel as well as new counsel who may be appointed by the

court for this purpose. This court should exercise its inherent authority to substitute

counsel in this matter due to the likely conflict and possibility of preconception on self

evaluation by the trial attorney. I hereby seek appointment of new counsel. ⅀ Yes  or ___ No

(Circle One).

### C.   THE DEFENDANT SHOULD BE ENTITLED TO A NEW TRIAL AND/OR ARREST OF JUDGMENT BASED UPON INEFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHTS TO DUE PROCESS UNDER THE PROVISIONS OF THE UNITED STATES CONSTITUTION AMENDMENTS FIVE, SIX AND FOURTEEN.

An indigent defendant in a criminal proceeding is entitled to the due process guaranty of

fundamental fairness under the Fourteenth Amendment. Ake v. Oklahoma, 470 U.S. 68,

76, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); In re Brown, 143 Wn.2d 431, 21 P.3d 687

(2001).  The Sixth Amendment affords a criminal defendant the right to effective

assistance of counsel, free from conflicts of interest. Wood v. Georgia, 450 U.S. 261,

271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981);  State v. Myers, 86 Wash.2d 419, 424,

545 P.2d 538 (1976).  The appellate courts review a challenge to the effective assistance

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 5 of 13

4.    GROUNDS FOR RELIEF AND ARGUMENT

    A.    DEFENDANT SEEKS AN EXTENSION OF TIME TO FILE THIS
        MOTION.

I hereby request this court to grant leave for the filing of a late motion for a new trial and

arrest of judgment. The defendant makes these motions in good faith belief that he is

entitled to the relief requested and claims that he will be unduly prejudiced if this court

does not grant this motion. This motion is based upon the Superior Court Criminal Rule,

(CrR) 7.5(a)(8) and (b); U.S.C.A. Const.Amend. 6.  State v. Bandura 85 Wash.App. 87,

931 P.2d 174, review denied > 132 Wash.2d 1004, 939 P.2d 215 (1997). I hereby seek an

extension of time to file because I am not trained in the law. X Yes  or  ___No (Check One)

    RULE 7.5 NEW TRIAL

        (a) Grounds for New Trial.  The court on motion of a defendant may grant a
new trial for any one of the following causes when it affirmatively appears that a
substantial right of the defendant was materially affected:
        (1) Receipt by the jury of any evidence, paper, document or book not allowed by
the court;
        (2) Misconduct of the prosecution or jury;
        (3) Newly discovered evidence material for the defendant, which the defendant
could not have discovered with reasonable diligence and produced at the trial;
        (4) Accident or surprise;
        (5) Irregularity in the proceedings of the court, jury or prosecution, or any order
of court, or abuse of discretion, by which the defendant was prevented from having a fair
trial;
        (6) Error of law occurring at the trial and objected to at the time by the
defendant;
        (7) That the verdict or decision is contrary to law and the evidence;
        (8) That substantial justice has not been done.
        When the motion is based on matters outside the record, the facts shall be shown
by affidavit.
        (b) Time for Motion;  Contents of Motion.   A motion for new trial must be
served and filed within 10 days after the verdict or decision. The court on application of
the defendant or on its own motion may in its discretion extend the time.
        The motion for a new trial shall identify the specific reasons in fact and law as to
each ground on which the motion is based.
        (c) Time for Affidavits.  When a motion for a new trial is based upon affidavits
they shall be served with the motion.  The prosecution has 10 days after such service
within which to serve opposing affidavits.   The court may extend the period for
submitting affidavits to a time certain for good cause shown or upon stipulation.
        (d) Statement of Reasons.   In all cases where the court grants a motion for a
new trial, it shall, in the order granting the motion, state whether the order is based upon

paid enough money to help and
claimed he was acting " pro bono"
when in fact he was appointed by
the court and being paid. He did not
attempt to obtain more money to
conduct a defense. He allowed to
have a jailhouse snitch provide for
the main evidence and failed to try
to impeach him with numerous
convictions that qualified under
evidence rule 609. He failed to
attempt to impeach witnesses with
their prior inconsistant statement
despite his clients pleas during
trial. The trial was reduced to a
complete and total farce and am
now appointed counsel refuses to
do anything with these numerous
issues but stands in the unit of
the jail making a mockery out of
his client by slandering his girl-
friend loudly so everyone of 80 people
including officer's can hear. It
is his contention that the witness
refuses to talk but the last attorney
was caught doing the same thing and
it was recorded. The court should
appoint counsel from out of County.

The aforesaid facts are hereby declared known by me firsthand to be true under the
penalties of perjury under the Laws of The State of Washington by my signature
appearing at the end of this document.

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 3 of 13

My attorney failed to object or request a
mistrial on those grounds. Further, my
attorney failed to prepare any defense
and appeared to join the prosecution
and efforts to get me convicted. The
failure to prepare and the resulting
prejudice is too numerous to fit in
this Motion form so I have a sworn
statement attached that I would like
to have considered by this reference
to the document titled "Affidavit in
Support of Motion for New Trial or
Relief from Judgment and Sentence,"
annexed hereto.
My attorney allowed the prosecution to
withhold discovery, extort witnesses,
call me names and say I was
delusional before the jury. He did
not bring an issue properly about
a juror seeing me in restraints.
Failed to make an offer of proof
for the record regarding defense
witnesses proposed testimony. My
attorney was given a list of witnesses
and their expected testimony and
he just refused to interview any
of them, he refused to interview
state's witnesses. He failed to try
to get a bail reduction. My attorney
complained that he was not getting

000028515

FILED

2005 MAR 18  PM 12: 12

COUNTY CLERK
SNOHOMISH CO. WASH.

### The Superior Court of the State of Washington
### in and for Snohomish County

STATE OF WASHINGTON, )
                        )    No. 03-1-02451-6
        Plaintiff,   )
                        )
   vs.                   )    MOTION FOR NEW TRIAL
                        )    OR ARREST OF JUDGMENT
MATTHEW R. RUTH      , )
                        )
        Defendant.   )

1.    IDENTITY OF MOVING PARTY

Matthew R. Ruth      , is the Defendant in the above numbered cause. He
seeks the relief designated in section 2.

2.    STATEMENT OF RELIEF SOUGHT

Defendant, pro se, seeks an extension of time to file this action to the date of receipt
based upon the fact he is incarcerated and not trained in the law and has prepared and
filed this actions in as timely of manner as possible; he seeks appointment of new counsel
to advance the legal and factual issues that remain unanswered or improperly presented
and ultimately a new trial and/or arrest of judgment and dismissal of the charges. This
motion is pursuant to CrR 7.5 and 7.4 and based partially upon CrR 8.3(b).

3.    FACTS RELEVENT TO MOTION

Defendant hereby asserts that he is entitled to the relief requested based upon the
following facts relevant to this motion.
Judge David F. Hulbert unnecessarily stated that he would
put me in restraints while I was testifying before the jury.

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 1 of 13

1   11.)   I feel that I need to new counsel, besides Charles Dold, to assist me in presenting my
2   ineffective assistance of counsel claims. I hereby pray that some relief is granted.
3
4
5   I hereby declare that I have read the aforesaid statements and verily believe the same to be true
6   under the penalties of perjury under the laws of the State of Washington pursuant to RCW 9A.72 et
7   seq.
8
9   Signed in _SHELTN_, Washington on this _14_ day of _March_, 2005.
10
11
12                                       /S/ _Matthew R. Ruth_
13                                       Matthew R. Ruth, pro se # 310079
14                                   Address: 1918 Wall Street
15                                       Everett, Washington 98201
16
17
18
19   I, _Burton F. Averill_, am a Notary Public in and for the State of Washington,
20   County of _Mason_, and hereby declare that I know or have sufficient
21   information to believe that the person appearing before me is the person purported to be and it
22   appears that he has signed this document under his own free will for all intents and purposes
23   described therein.
24
25   Signed and dated before me this _15th_ day of _March_, 2004 5
26
27
28
29                                       /S/ _Matthew R. Ruth_
30                                       _Burton F. Averill_
31                                       NOTARY PUBLIC in and for the State of
32                                       Washington, County of _Mason_.
33                                       My Commission Expires _02/18/07_.
34
35
36

Motion for New Trial and Relief from Judgment and Sentence-Page 4 of 4
State v. Mathew R. Ruth, 03-1-02451-6                          Mathew Ruth, pro se
                                                                  1918 Wall Street
                                                              Everett, Washington 98201

1  evidence that the alleged victim was further in the trailer, [where a shooting occurred], and which
2  implied that the defendant was a liar. Although the blanket was available, counsel never had the
3  blood tested for DNA to prove it did not belong to either of the alleged victims; therefore his client
4  was not a liar and was innocent.
5
6  7.)    Counsel yelled at his client in front of the jury, saying he wasn't going to listen to him
7  anymore, when it was his attorney's failure to prepare that caused the confusion in that a witness
8  was angry at his client and testified different than expected to exact a vendetta. Had counsel
9  interviewed the witness, he would have known that she was changing her story and why. The
10  witness has since recanted after discovering the reason for her vendetta was unfounded. The
11  witness thought that the defendant had told on her for the drug activity at her farm which almost
12  caused her to lose it. That fact could have been easily resolved except for the attorney's refusal to
13  act on his client's behalf to interview and question his intended witnesses. It was one of the alleged
14  victims that used to live on her property that caused her to almost lose her farm because he was
15  paying her with drug profits and that information was discovered by the current landowner.
16
17  8.)    A key states witness was a jailhouse snitch named Jeremy Sheridan. This witness had a
18  record a mile long and a history of telling untruths. He was literally paid by receiving more
19  favorable treatment on his charges by talking to the defendant and eliciting certain facts to use
20  against him. The defense attorney failed to attempt to get this testimony suppressed as unlawfully
21  obtained and later the attorney was unable to impeach the evidence given as being inconsistent
22  with previous statements due to the failure to prepare for trial properly. The period of time in which
23  that statement was alleged to have been elicited was during a period of time pending a competency
24  evaluation by Western State Hospital, and after the defendant had been ruled incompetent by the
25  court.
26
27  9.)    Defense counsel attempted to set up a plea hearing to get the defendant to plea guilty in
28  hopes of avoiding the inevitable trial. His intent was to refuse to conduct any defense and force his
29  client to plea guilty. This is a common scheme used in Snohomish County. Mark Stephens was a
30  long time member of the Snohomish County Public Defender's office where he honed these skills.
31  It is very difficult to just ignore someone's pleas to assist in conducting a defense, but after some
32  practice it is like raising children, you get used to the whining. Mark Stephens literally did not
33  conduct any defense for the accused and was so bold as to just set up a hearing to plea guilty for his
34  client without ever discussing it with his client.
35
36  10.)    Current counsel, Charles Dold, that was appointed to represent me after trial, has openly
37  said that I deserve to go to prison and that I shot two people. He claims my girlfriend is wiped out
38  on drugs and cannot help me, however, he has not talked to this person and is only making up lies
39  to avoid helping me. It is believed he has been influenced by my previous counsel, Mark Stephens,
40  whom he used to word with in the same office and whom he maintains constant contact. It is part
41  of the record that Mark Stephens made comments about my witness and I believe that he has
42  spoiled my newly appointed counsel with the same disease.
43

Motion for New Trial and Relief from Judgment and Sentence-Page 3 of 4
State v. Mathew R. Ruth, 03-1-02451-6                                    Mathew Ruth, pro se
                                                                         1918 Wall Street
                                                                         Everett, Washington 98201



the exclusion of the witnesses' testimony which would have likely been detrimental to the state's case and/or changed the outcome of the trial.

3.)   My attorney refused to go over the evidence with me and refused to provide copies of the discovery to me claiming it was too expensive.

4.)   My attorney did not interview any of the defense witnesses which were relevant to impeaching the state's witnesses and establishing his self defense or his credibility all of which was crucial at trial. The defendant provided a list of witness questions and the attorney failed to ask any of them. The defendant was prejudiced by the failure to conduct any defense due to the fact that;

   a.   Witnesses would testify that Jeremy Custer had fled the scene in his black Dodge Durango with two plastic bags from his house;

   b.   And that Dru Eden had hijacked Sarah Bryant in her car then told her he was just shot over drugs and that he was going to kill the defendant;

   c.   Witnesses would testify that Jeremy Custer proceeded to the house of Court Lamb, a witness in the Burkhiemer murder, and there at her house he refused to go to the hospital and wouldn't tell what happened.

   d.   Jeremy Custer testified that Court Lamb's Mother was a nurse and that testimony could have easily been proven to be false.

   e.   Court Lamb would testify that Jeremy Custer returned to the defendant's residence with other armed persons after they had stashed the drugs; she would also testify that the officers never searched these people.

   f.   Court Lamb would testify that Jeremy Custer freaked out and told the officers "I didn't break in, I won't talk to any body without a lawyer, I need a lawyer" and then he tried to run away but he was caught and handcuffed. Jeremy Custer and Dru Eden did not decide to give any statements until two weeks after the incident and then they changed their stories several times to include at trial.

5.)   It is believed that the attorney should have made an offer of proof, off the record, at least, to show that the state had threatened the defense's key witness with adversities such as charges of perjury and threatening that she would not see her children for 10-15 years. The Prosecution was using these tactics continuously to try to get the witness to change her story to this story or that story by telling her, "[this is how it happened] remember, hint, hint!" The witness called the defense attorney and told him, he said, "it doesn't matter" that the state is tampering with the witnesses, "because he is fucked anyways."

6.)   The state was allowed to admit evidence that was not relevant, [falsely claiming blood of a victim], and was prejudicial in that a blanket that had aged menstrual fluid was admitted as

Motion for New Trial and Relief from Judgment and Sentence-Page 2 of 4
State v. Mathew R. Ruth, 03-1-02451-6                    Mathew Ruth, pro se
                                                          1918 Wall Street
                                                          Everett, Washington 98201



FILED

2005 MAR 18  PM 12: 12

COUNTY CLERK
SHOHOMISH CO. WASH.

IN THE SUPERIOR COURT STATE OF WASHINGTON
IN AND FOR SNOHOMISH COUNTY

| STATE OF WASHINGTON, | ) | |
| | ) | No. 03-1-02451-6 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Affidavit in Support of Motion |
| | ) | for New Trial or Relief from |
| MATTHEW R. RUTH, | ) | Judgment and Sentence |
| | ) | |
| Defendant. | ) | |
| | ) | |

STATE OF WASHINGTON          )
                             ) Affidavit by Declaration:
COUNTY OF SNOHOMISH          )

I, Matthew R. Ruth, am the Defendant in the above entitled cause and make this declaration in support of my motion to modify sentence. I hereby declare that I am over 21 years of age and competent to testify herein as the following facts are known by me to be true firsthand unless otherwise stated.

1.)     I hereby claim that my attorney at trial was Mark Stephens and that he failed to provide me with effective assistance of counsel based on the following.

2.)     There were notes from a key witness that could have been used to impeach, or lock in, testimony of a key's witness that was not provided until October 20, 2004 and my attorney failed to object to the late discovery since the state had the evidence for 8 months prior to that date and his failure to act allowed the state's witness to lie and not be impeached. Had counsel objected to the late discovery, it is very likely that the court would have allowed some sanction to include

Motion for New Trial and Relief from Judgment and Sentence-Page 1 of 4
State v. Mathew R. Ruth, 03-1-02451-6                        Mathew Ruth, pro se
                                                            1918 Wall Street
                                                            Everett, Washington 98201



# EXHIBIT 6

2/04/05   Affidavit & Motion for
New trial

The Pleading mr. Rutz Attempted to file
at Sentencing.

This was also taken & I have
No other full copy. Only a few Pages.

God bless you, or whatever entity you believe in,

Sincerely Submitted,

This ___18___ Day of _Sept._ , 2008

Matthew R. Ruth

9/18/08

"OFFICIAL SEAL"
Janelle Gonzales
Notary Public-Arizona
Pinal County
My Commission Expires 3/14/2011

*Legal News, Inc. v. Department of Corrections* 154 Wash.2d 628, 115 P.3d 316 (2005). (Emphasis added)

In interpreting RCW 42.17.255, the Washington Supreme Court has stated that "the right of privacy applies 'only to the intimate details of one's personal and private life,' " in contrast to actions taking place in public. *Dawson v. Daly*, 120 Wash.2d 782, 796, 845 P.2d 995 (1993); *Spokane Police Guild v. Liquor Control Bd.*, 112 Wash.2d 30, 38, 769 P.2d 283 (1989) The public disclosure act contains a specific exemption for records that "are relevant to a controversy to which an agency is a party but which records would not *be available to another party under the rules of pretrial discovery for causes pending in the superior courts.*" A "controversy" is not restricted to ongoing formal litigation. It can begin before the formal commencement of a lawsuit and continue afterward. *Dawson*, 120 Wash.2d at 790, 845 P.2d 995. *Relevant records are exempt from disclosure under the public disclosure act if they would not be available to an adverse party under the superior court discovery rules.* RCW 42.17.310(1)(j); *Limstrom*, 136 Wash.2d at 605, 963 P.2d 869. *Soter v. Cowles Pub. Co.*, 130 P.3d 840, 844, 131 Wn.App. 882, (Wash.App. Div. 3 2006). The state agency bears the burden of proving that a specific exemption applies. RCW 42.17.340(1); *Hoppe*, 90 Wash.2d at 130, 580 P.2d 246. *Prison Legal News, Inc. v. Department of Corrections*, 115 P.3d 316, 320, 154 Wn.2d 628, (Wash. 2005).

In the interest of Justice Please disclose this information to me. I have this issue, and another that are grounds for a dismissal with prejudice. The law doesn't care if I am innocent, only if it can prove my guilt. The appellant Courts don't care if I am innocent, only if I can prove a Constitutional error. This evidence allows me to prove I am not guilty, it proves my innocence. Prosecutor John Adcock used foul means to prove my guilt, to the jury. My case has been granted for review in the Supreme Court on my FASE issue. I am preparing for my Personal Restraint Petition, and will be using all the letters you have sent me in the past, with a copy of this letter as evidence on this issue. I am trying to give your office a chance to make this right with me. It is a shame that a U.S. citizen can receive life in prison for his first time offense when he is exercising Constitutional rights. I can't believe that the Prosecution hid this evidence, and now it is so hard for me to obtain justice which is synonymous with my procurement of the Toxicology results.

The PDF format on CD'S sounds really cool please let me know how much of the requested documents can be put on the CD, and how much will need to be copied at 0.25 cents a page.

Mr. Wold Can I use the PDF format files for my Personal Restraint Petition, exhibit's? Will the Court of Appeals accept them?

I really appreciate all your help, and I am sorry if I sounded Disrespectful in any way. It is not my intent to be disrespectful. This is really important to me, sir. My life is on the line, and I have been working really hard to receive justice in my case. Please forgive any statements I made that sound bad, I don't mean it that way.

The Correct action Mr. Wold, really is, to redact the identity information, but release the

Exculpatory toxicology result's.

> "Courts must take into account the policy of the act "that free and open examination of public records is in the *public interest*, even though such examination may cause inconvenience or *embarrassment to public officials* (Mr. Adcock) or *others* (The Two home invaders)." RCW 42.17.340(3). The *agency bears the burden of proving* that *refusal* to disclose '*is in accordance with a statute tha t exempts or prohibits disclosure in whole or in part of specific information or records...*' *If the requested material contains both exempt and nonexempt material, the exempt material may be redacted but the remaining material must be disclosed*. *Amren*, 131 Wash.2d at 32, 929 P.2d 389. *King County v. Sheehan*, (Wash.App. Div. 1 2002). (Emphasis Added)

Respectfully saying, Mr. Wold, your agency has the duty to prove the specific reason why I am exempt from disclosure of this evidence. This has been going on between us, for three year's. I have provided many on point legal analysis, that prove I am entitled to this information. Also your exemption claimed under RCW 70.02, is vague, and not specific. Finally after I requested the specific section many times, you sent me, "RCW 68.50.105. Autopsies, post mortems--Reports and records confidential--Exceptions," I have the original letter Nov 5, 2007, and this does not exempt me from receiving the Toxicology reports, it has nothing to do with anything. *In that letter you even admitted that the Prosecutor had the Toxicology reports*.

The patient identity will not be disclosed, or any information about the patient's health. Only the fact that on Nov 5, 2003 Jeremy Custer and Dru Eden were high on an assortment of drug's when they illegally invaded my home. This proves my innocence, and that the prosecution hid this evidence from the defense. The results can be disclosed, and in fact that is what is required by law. The Washington State Supreme Court ruled on this issue already reasoning that:

"Washington courts have recognized the definition of "health care information" has "two requisites—*patient identity* and *information about the patient's health care*." *Wright v. Jeckle*, 121 Wash.App. 624, 630, 90 P.3d 65 (2004). On its face the statute appears to allow for disclosure of information such as *maladies, treatments, etc., when the identity of a patient is not disclosed or cannot be readily associated with the patient*." *Prison Legal News, Inc. v. Department of Corrections*, 115 P.3d 316, 154 Wn.2d 628, (Wash. 2005). Where there is a dispute over whether health care information is readily identifiable with a specific patient even when that patient's identity is not disclosed, the trial court can use in camera review should it need to examine unredacted records to make its independent determination, for purposes of medical records statute prohibiting disclosure, without patient's consent, of information that identifies or can readily be associated with identity of patient and directly relates to patient's health care. *Prison*

their right minds.  This gives apprehension of fear, and my actions become reasonable under the self-defense Doctrine.

The failure to disclose requires a Dismissal of my charges.  I can understand why the Prosecutions office does not want you to disclose these documents.  Especially in light of the jury pool at the end of my trial.  Their comments were "We believed him, we didn't want to find him guilty, we needed just one piece of evidence to find him innocent."

I specifically need these documents for My Personal Restraint Petition; I am raising a Government misconduct issue for failure to disclose this "Materially Exculpatory" evidence, and asking that my charges be dismissed with prejudice.  I hope that Mr. Adcock does the right thing, instead of trying to hide this information from me.  He really dislikes me, and there are many other instances of misconduct that I can prove that will be going into my Personal Restraint Petition.

I am not requesting any of the appeal information from this Public Disclosure.

I am requesting:

    1.) The results of the Toxicology reports, not the identity of the Patients.  *Prison Legal News, Inc. v. Department of Corrections*, 154 Wn.2d 628, 115 P.3d 316, 326-328 (Wash. 2005).
    2.) Any and all documents supporting probable cause charges.
    3.) Any documents related to the charges brought upon the prosecution as it relates to my case.
    4.) Prosecuting attorneys litigating files in my case pursuant to *Linstrom v. Ladenburg*, 136 Wn.2d 595, 963 P.2d 869 (1998).
    5.) Lab results and reports used to support my conviction and charging me with my crime, from the alleged victims.
    6.) All lab reports and results from the alleged victims.
    7.) Redact all identifying information, and personal information if needed.

Division one has applied the following to similar Disclosure issue's:

"The central purpose of the act is "nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions."  Our courts have repeatedly held that the act is "a strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wash.2d 123, 127, 580 P.2d 246 (1978); *Amren v. City of Kalama*, 131 Wash.2d 25, 31, 929 P.2d 389 (1997); *PAWS II*, 125 Wash.2d at 251, 884 P.2d 592.  Accordingly, the act's disclosure provisions must be liberally construed, and its exemptions narrowly construed. *King County v. Sheehan*, 114 Wn.App. 325, 57 P.3d 307, (Wash.App. Div. 1 2002).

MATTHEW R. RUTH #879492
C.C.A./F.C.C.
PO BOX 6900
FLORENCE, AZ 85232

DATE:

DAVE H. WOLD
PUBLIC DISCLOSURE SPECIALIST
Robert J. Drewel Building, 7th Floor / M/S 504
3000 Rockefeller Avenue
Everrett, Wa 98201-4046

Re: Resubmission of Public Disclosure/Toxicology reports

Dear, Mr. Wold

Thank you for your very informative letter.  I am now resubmitting my P.D.A. request, under Rcw 42.56.

Also I am providing the relevant legal authority, which allows you to disclose the results of the Toxicology reports for Jeremy Custer, and Dru Eden, whom I shot in my home Nov 5, 2003.

I really appreciate your help Mr. Wold, please don't take the following in a bad way, I don't mean it disrespectful.  I am fighting for my life, and injustice to be corrected, by Justice.  This legal work Stuff is really hard so bear with me please.

The toxicology reports are "materially exculpatory," and should have been disclosed by the Prosecutor under CrR 4.7(iv)(any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and scientific tests, experiments, or comparisons), before trial.  Instead the Prosecutor Mr. Adcock, and Detective Willoth, purposely hid these reports because it proves my innocence.

Not only did Mr. Adcock hide these reports hoping I would never find out about them, he argued contrary to the results of these toxicology reports in trial.

Mr. Adcock failed to call the originally subpoenaed, on duty doctors, which cared for the alleged victims.  These Doctors did the test, and would have testified about this at trial.

Mr. Adcock argued specifically that I was paranoid, agitated, and freaked out on drugs, shooting the alleged victims for no reason.  When Mr. Adcock knew the whole time they were the ones on drugs.  In trial I testified that the alleged victims were all freaked out on drugs, and this is the reason I was so scared over their threats because they were not in

Before the secret in-chamber Closure, the Bone-Club Analysis Must be done.
After all, the Public Trial Doctrine is designed to discourage perjury and encourage
witnesses to come forward. As discussed in WISE, it is impossible to know what
would have happened, what witnesses would have come forward, what Woerner would
have said, if there was even any perjury involved, if the State threatened a
Material eye-witness, without the Bone-Club Analysis.

### Experience and Logic Prongs

The Experience Prong, historically the courts do resolve claims of a material
eye witness being accused of perjury before testifying, and being threatened by
the State on the record in open court.

(Hitorically, Wash.Const. Art 1 section 22 provided: "The Accused shall have the
right to appear and defend in person, and by counsel" State v. Irby, 170 Wn.2d
874, FN 5 (2011).

"We believe that when the framers of our State Constitution drafted Art I section
22 and presented it to the people of the territory of Washington for adoption they
were aware of the linguistic differences between that section and the 6th Amendment
and assumed that the State provided rights that were not provided by the USC....
For that reason, we believe that the COA erred in minimizing the significant textual
differences between Art I section 22 and the sixth amendment, and in concluding
that the 1st and 2cd Gunwall factors did not weigh in favor of an independent
analysis." State v. Martin, 171 Wn.2d 521 (No. 85709-1; 2011).

The Logic Prong, dictates that such a pivotal and significant moment of Trial
be conducted in open court. The Right to Public trial ensures that the State does
not secret these issues away in the shadows of the Judge's Chambers. The Core Values
of the Public Trial Doctrine are so the Public can see that the accused is dealt
with fairly, and the Prosecution and Judges uphold their responsibilities to the
accused, to encourage witnesses to come forward, and discourage perjury, thereby
maintaining a fair trial. This cannnot happen in secret. The Logic prong is
satisfied, and the BoneClub analysis must be performed before closure.

The Trial Judge briefly addressing what was allegedly discussed in-chambers
did not satisfy the Bone-club requirement.

Page Six

The Jury inquiry in our Case, Mark, was not about Jury instructions, and the answer from the Court, absent the defenses participation, contained NO information from the defense. Mapladin.

Justice Antonin Scalia said: "Operating upon the spinal column of American democracy. Some structural errors, like the complete denial of counsel or the denial of public trial, are visible at first glance." NEEDER V. U.S., 527 U.S. 1 (1999) (J.Scalia Dissent). The Superior Court's violation of both of these Doctrines in our case, Mark, slams so hard into the Body of the Bill of rights and the Constitution, that the impact snaps the Spinal column of American Democracy, crumbling our Justice system. A Stand by the Courts Must be made now, so this does not happen in the future.

## WOERNER SECRET PERJURY PROCEEDING

"The Right to Public Trial serves to ensure a Fair Trial, to remind the prosecutor and judge of their responsibilities to the accused and the importance of their functions, to ENCOURAGE WITNESSES TO COME FORWARD, AND TO DISCOURAGE PERJURY." Sablott.

Ms. Woerner is a Material Eye witness, and I always maintained that her "testimony was critical, that he (Mr. Ruth) was very critical of his attorney for not calling her." Sentencing Pg 4. In the secret, in-chamber proceedings, the Judge said Woerner would be appointed Counsel to advise her about her fears of the Prosecutions threats. VRP 179-181. Mr. Stephens did not know if he could call her until she spoke to her attorney, but she was never appointed an attorney. At sentencing, Chad Dold asked for a continuance to "present a motion for a new trial based either on prosecutorial misconduct, ineffective assistance of counsel, or denial of justice, any one of the three, depending on what Ms. Woerner tells me." Sentencing Pg 4-5. "Mr. Ruth never agreed to Mr. Stephens' strategy in that regard and was quite upset... it is not a decision he would ever agree with, and he disagrees with any assessment of tactical or strategic advantage." pg 6.

Up until the State threatened to charge Woerner with perjury if she testified, (States Response, Exhibit 21, Page 3, Section 10), Woerner was testifying. This is a significant moment, which had an unquantifiable amount of subsequent prejudice reverberating throughout, and tainting the entire trial. (the Jury inquired about Ms. Woerner During deliberations).

The State elicited testimony from EDEN and CUSTER about Ms. Woerner screaming for me to stop, and being scared of me, and other damaging stuff. The Judge would not let the defense rebut this testimony. Yet, Woerner never testified, and the Jury was clearly influenced by this because they inquired about her statements during deliberations. With Such an important Eye witness's testimony at stake, it seems that the Public Trial and Fair Trial Doctrine demands that this issue be fleshed out in Public.

Page Five

"In Press II, the underlying case concerned preliminary hearings in California, which are held before trial.... whether the logic prong dictated openness during such proceedings.... it remarked that because there WAS NO jury PRESENT to ACT as a SAFEGUARD, public access was even more significant."

The jury is not present during deliberations either, and Musladin holds that this portion of trial is very fragile, requiring special protections. Obviously our role, the written record public access safeguard was not enough to ensure the Trial Judge performed his function and upheld his responsibilities to the defense because he did not notify the defense, and robbed the defense of the ability to participate in the formulation of the response, and lodge any objections. This constitutes a closure, and no Bone-Club Analysis was performed. Simultaneously, this structural error of the trial court violated rights to representation, and Fair Trial.

### JURY INQUIRY EXPERIENCE AND LOGIC TEST

The Experience Prong, is satisfied, Historically the defense is notified of the Jury inquiry, participates in formulating the response to the Jury, lodges objection, and this is all at the very least mentioned in the record. Justice Stephens, the Ninth Circuit, and CrR 6.15(f) support that.

The Logic Prong, is satisfied, while the Jury is in deliberation Public Access is the only safeguard to ensure the Judge upholds his duties to the defense, and performs that Function in Court. The Sublett Court said, "The appearance of fairness is satisfied by having the question, answer, and any objection placed on record.... The requirement that the answer be in writing serves to remind the Prosecutor and Judge of their responsibilities because the writing will become part of the Public record and subject to Public scrutiny and appellate review." Notifying the defense, and mention of the participation of influencing the answer, should be mentioned in the record as well, it is the only Safeguard to ensure this does not happen in the future, and to uphold the defendant's constitutional rights.

In JASPER, the answer to the Jury specifically stated that all parties were notified and given a chance to participate. In Sublett, it was mentioned in the record that his attorney was in-chambers with the judge participating in the response to the jury.

The Sublett Court says it is not required that the discussion or resolution of the jury inquiry be done in open court, with a transcript being made. However, it is, my position that to be consistent with Public trial protections the notification of the inquiry to all parties, participation in the answer, and any objections, needs to be made part of the record for Public and appellate review.
Page Four

I see the jury inquiry stages like this:

Stage ONE, The inquiry from the Jury initiates the Right to Public Trial, Right to representation, and Fair Trial;

Stage TWO, Notifying all parties of the Juries inquiry; (Must be part of record like in JASPER).

Stage THREE, Requires the defense to participate in the formulation of the response, lodge objection, and make it part of the record; (Public Trial; Right to Representation; Fair Trial);

Stage FOUR, submit response to the Jury; and either re-instruct, or replay evidence, etc. (All cases concern right to be present at this stage only).

The Ninth Circuit, in Musladin, pointed out that any answer from the Court to the Jury during deliberations about the Instructions contains information from the defense because the defense participated in the formulation of the instructions. The Musladin Court said the defense should still be allowed to participate in the shape of the answer even when involving instructions.

In Our Case, Mark, the answer was not about Jury instructions, and contained absolutely no information from the defense. Defense Counsel is most acutely needed before the decision to respond to the jury is made, even if the answer is a negative answer. It is the missed opportunity to influence the response, and have that participation made part of the record, that creates the significant moment; simultaneously violating my rights to public trial and my rights to representation.

## SUBLETT LEAD OPINION

In Sublett, the Supreme Court claims that not one case could be found that holds "these proceedings... violate the defendants constitutional rights, and we can not find one either." Musladin, 555 F.3d 830, is that case.

The Ninth Circuit, in Musladin, described Jury deliberation as a very important stage of trial. A very fragile portion of Trial where anything the Judge says can influence the verdict, and right to Fair Trial.

Musladin conflicts with how the Sublett Court diminishes the significance of Deliberation; "No witnesses are involved at this stage, no testimony is involved, and no risk of perjury exist." Diminishing the significance of deliberations Contradicts their own (Sublett Court) analysis of Press II in adopting the Experience and Logic test:

Page Three

10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.
She indicated to me MR. ADCOCK had THREATENED to Charge her with PERJURY
                              IF SHE TESTIFIED.
She expressed concerns to me about potential consequences if she testifed.

       Would it be wise of us to add her new statement, or portions of it?

                     DEBRA STEPHENS CONCURRENCE IN SUBLETT

       Justice Stephens is adamant about being clear that the Sadler/Rivera test
is rejected.

                     Another important dimension is Footnote 1:

"Additionally, the Court of appeals stated that 'questions from the jury to the
trial court regarding the trial court's instructions are part of jury deliberations
and, as such, are not historically 'a Public Part of the Trial.... There is no
authority for this proposition, the cited cases address the secrecy of jury
deliberations and not the QUESTIONS SUBMITTED by the JURY DURING DELIBERATIONS."

       Mark, she is correct the courts have conflated the many stages of the
processes involved in a jury inquiry during deliberations. A prime example is the
evolution of the Washington Appeals Courts use of CALIGURI, 99 Wash.2d 501 (Wash
5/5/83).

       In Caluguri, the defense did participate in the formulation of the response
to the Jury inquiry, and lodged objections, shaping the manner in which the evidence
would be replayed for the Jury, all of which was at least mentioned on the record.
The issue was that Caliguri, was not present for the replaying of the evidence.
CALIGURI is the Same as SUBLETT, both Attorneys played a role in the formulation
of the response, lodge objections, all which was made part of the record. There
was no significant moment, as the ninth circuit has defined:

"Counsel is most acutely needed before a decision about how to respond to the jury
is made because it is substance of the response, or decision whether to respond
substantively or not, that is crucial... The MISSED OPPORTUNITY to INFLUENCE the
Trial Courts response to a Jury question. That is the SIGNIFICANT MOMENT."
Musladin v. Lamarque, 555 F.3d 830 (9th Cir. 2/12/09)

       The Courts in Caliguri said it is presumed prejudicial when a Judge
communicates with the jury, absent a third party. Caliguri address only the right
to be present at the replaying of the evidence after defense participated, not
the public trial right violation when the defense was not even notified.
Page Two

Dear, Mr. Mestel

I just want to win, try to become a paralegal, get married to Kristina, and be done with prison. You know what your doing, your a winner, I respect what ever you say is our best course to win. The Court of Appeals is hard enough to win in even when we are 100 percent right. Whatever you think increases our chances of winning I am in favor of.

You know the law way better than I ever will, however, I would like to point out a few things I know you are already aware of, sorry.

Morris, No. 84929-3 Supreme Court (Nov 21, 2012):

"We need not address whether a Public trial right violation is also presumed prejudicial on collateral review because we resolve Morris's claim on ineffective assistance of appellate counsel grounds instead."

I have David Zuckerman's Morris briefing on why it is structural on collateral review, and I sent it to you already. We may want to add ineffective assistance of direct appeal counsel in the additional briefing. You did cite Orange in the original briefing.

Another interesting aspect of Morris, is that the Supreme Court really demonstrated that the Sadler/Rivera - factual/legal test has been rejected, and the right to Public Trial does not attach to Rights to be present. Morris waived his right to be present in Chambers, but the Court said he did not waive his Public trial rights, and reversed.

"A defendant must have knowledge of a right to waive it." This Morris quote higlights WISE, No. 82802-4 (Nov 21, 2012):

"Wise did not waive his right to public trial by not objecting, and prejudice is presumed."

It is the Trial Judge's duty to notify the defendant of the Right to Public Trial by conducting a Bone-Club Analysis.

"The reason such structural error is rightly presumed prejudicial is that 'it is often difficult' to 'assess the effect of the error....' To allow such deprivation would erode our open, public system of justice and could ultimately result in unjust and SECRET TRIAL PROCEEDINGS..... Here, we Cannot know what... if the Judge had properly closed the Court under Bone-Club analysis, what Objections, consideration or alternatives might have resulted and yielded.... Because it is impossible to show whether the structural error of deprivation of the Public Trial Right is Prejudicial, we will not require WISE to show prejudice in his case. 'We will not ask defendants to do what the Supreme Court has said is impossible.'" WISE.

The Court can never asses the damage of not conducting a Bone-Club analysis before secreting away over the Woerner Alleged perjury incident. Who would have come forward? What would she have said on record? We know what she said in Blackman's response, Exhibit 21, page 3:

Page one

ATTACHMENT
"1"
Memorandum sent to Mark D. Nestler
Structural error concerns

8.) I AM sorry this is not typed & Notorized. Litigating in Prison is very hard. It's Not just because I have No schooling in the law, or in anything (I Barely received my G.E.D. At 33 in prison), there are No real resources provided to us in Prison for learning the law much less, litigating a case. We just received a few days ago an update to our computer Francee Kriss Kain sends me WLR articles & case law, but the mail room rejects them hal of the time. Even more importantly is the thousands or moron inmates that Put No work into Real legal studies & writing (with what we have anyways), and fill the court with Frivolous garbage making every inmate look bad, we are stigmatized & Not taken serpously. I pray that this court realizes that for the last Ten (Ten years) I have Put my Best & hard work into every Appeal Process, Direct, Rap 10.10, petit for Review, 7.8 on Resentencing, I worked so hard on this Reply to the states supplemental response. Kriss, and I have been working very hard together for the last three years & Pray for Mercy & Justice, a chance to start our lifes together. I want to be a lawyer like (Cloadis Flyod). Thank you,

X _____
Matthew R. Ruth 874492
9-12-13      Benjamin Loos
                 874942 Loos 9.10.13

X Jeremy Read
   Jeremy Read
9-12-13         X Brian Z. _____
                Brian Z. walther

6.) I asked that MARK STephens be interviewed, and asked, "why did you cover up the threats made by the Prosecutor to MS. WOERNER UNTEL you filed a Motion to withdraw?" "Did you tell Mr Ruth before you supprised called him to the stand that MS. WOERNER WAS IN the Hallway, and wouldn't testify because she was scared of MR. Adcocks threats, and you were scared of what she might do under MR. Adcocks aggressive cross-examination because of her fear of the threats?" And why he never intern MS. WOERNER, or any witness, why not put Gary may & Kent Muscatel on the stand?

7.) I have been scared of the structural error bar on collat. review even before wise & morris, I asked my attorney to include some argument of mine into our structural error issue

A) How can a PSP litigant prove prejudice when our state supreme court agreed with the U.S. Supreme court that prejudice for public trial right violations are unquantifi impossible to prove, this creates a WRONG Without a remedy.

B.) In this situation the error is not properly recognized without collateral evidence, not reviewable on direct, so why would a structural error bar apply to Public trial violations?

C) J. Dolliver in St. Pierre adopted the teague analysis to keep in the with the U.S. Supreme courts efforts to Fix Linkletter & the unequal application of retroactivity. In the interest of comity & finality, to cure retroactively, J. Dolliver went a step further & created an unknown higher standard structural error bar, well Schriro fixed teague & st. p. has become Linkletter, and Danforth puts all into proper error. Just adopt the Schriro analysis for res... the structural error Bar...

the jury instruction, & trivializing my
constitutional right to be presumed
innocent, with a broken & malfunctioning
suite of ARMOR. This also proves that/
MR. Adcock's efforts to threaten, and intimidate
every piece of favorable evidence into
not being presented to the trier of fact; (and
the effect the threats & intimidation had
on Defense counsel who helped MR. Adcock
By presenting not one piece of evidence,
and not one witness) (but MR. Ruth - Me -
the Accused); were effective because all
evidence favorable to the Defense were
secret & kept in the shadows.
        I asked that the jury be interviewed,
So affidavits could be provided in this PRP
to prove the castle instruction & Prosecutors
Arguments switch the Burden. Matthew R.
Stroud & & Mark Stephens heard this,
especially from the Jury foreman.

3.) I have received a message from MR. Mestel saying he will be withdrawing from my case. I have Been Reduced To Pro Se Status. How can Prejudice Be proved on collateral Attack when the wisc court said It is Impossible?

4.) I cannot get this affidavit Notarized on time to put in the MapL so I can meet my deadline with this court.

5.) I asked that the Interviews from P.I. Michael Powers be included in ref with an Interview from Myself. I wanted the Jury Interviewed, too, because they told Matthew R. Strowd I, they would have acquited me, they believed me, But I didn't Prove My InNOCence, they said only one Piece of corroborating evidence was Needed. this Proves the Presumption was Switched to "guilt" By the "castle instruction" MR. Alcock's Improper arguments fashioned from

I Matthew R. Ruth swear the following to
Be 100% True, under the Penalties of
Perjury,

1.) I Asked Mark O. Mestel to raise Ineffect.
Assistance of Direct Appeal counsel for faili
to raise Both Public trial right issues, the
right of counsel, and rights to Appear &
Defend issues. I also asked that the "castle
instruction" & Improper argument fashioned from
the prosecutor's use of the castle Instruction
language, with telling the Jury in closing their
main function is to determine the tRuth;
issues be raised under Ineffective assistance
of appellate counsel. I also asked that he
cite to Division I, Johnson & Vonegas.

2.) I typed up a memorandum to Mr. Mestel, &
Attached David B. Zuckerman's Structural erros
argument in Morris, to reinforce My fears
about Structural error being Applied to
collateral attack. My Fiancee Kris A. Kain
sent this communication out through E-mail,
and It is confirmed Mark received & read the
Memorandum. I was also charged for his time,
So the Billing also proves He read this ham
Attachment 1)

Jail would not let me get it notarized. It is all true, and I want to adopt all of it in this Affidavit.

I swear all of this is true and correct to the best of my knowledge, under the penalties of perjury.

Signed in Aberdeen, Washington on This 10th Day of September, 2013.

X _____

Matthew R. Ruth

I, _____ Barbara St Louis _____, am a Notary Public in and for the State of Washington, County of GraysHarbor , and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes describes therein.

Signed and dated before me this 10th day of September, 2013.

/S/ _____

_____ Barbara St Louis

NOTARY PUBLIC in and for the State of Washington, County of Grays Harbor.

My Commission Expires: 6-4-16



Page 4 of 4 - Matthew R. Ruth - Affidavit

for the stolen drugs. She corroborated them too, on where they were in the trailer. The bad stuff she said about me were domestic violence allegations, that she told the Western State Hospital people were not true, and she said because she was mad at me, and scared she would be charged as an accomplice. That is in my western state evaluation. The Domestic violence allegations were ruled not admissible during Motion In-Limine, the Prosecutor agreed. In my Rap 10.10 Issue one, I challenged the Prosecutor breaking this order by admitting the health certificate evidence that show Ms. Woerner had been assaulted. This proves he was trying to get her to bring in the Domestic violence stuff, and she wouldn't lie.

8.) Mr. Stephens never told me he wasn't going to call her after the In-Chambers incident. He never showed me what corroborated the Alleged victim, or was easily impeachable by her original statement, he could not because he never interviewed her about her statement, or intended testimony. In fact after trial I spoke to her on the phone, after released from Isolation, and she told me before trial, Adcock had tryed to get her to remove the parts of her statement that corroborated my defense, she would not, and he threatened her. She called my attorney, and he said it didn't matter because "Matt is F_cked anyways." We three way called him, I confronted him, he agreed that he said that to her, and then made really bad comments about her. She told him the call was recorded. That is what caused the Declaration and motion to leave.

9.) The Judge and Mr. Adcock were mean to me, and really biased, my presence was reduced to nothing, the trial proceeding as if I was not even there. The record at trial and sentencing proves that the Judge and Mr. Adcock were biased against me.

10.) I tried to file a motion for new trial, but the court would not let me file it, I included it and the affidavit in support in my brief as exhibit 6, it was notarized at Shelton because the County

Page 3 of 4 - Matthew R. Ruth - Affidavit

not, too scared to testify from the prosecutors threats. He told
me that his fear was that she also might get on the stand, and start
lying under Mr. Adcock's aggressive and violent Cross-examination,
and due to the threats she would break down and begin lying. I told
Mr. Stephens that she is the only witness who corroborates my defense
that was present, she is critical. I told him to call Gary Way, Donnie
Poole, Bill Storie, Court Lamb, etc. He called nobody, presented
no evidence, and the only witnesses who was exculpatory for me that
was present at trial is Ms. Woerner. He promised he would call her
to testify.

6.) The day the State rested its case, Ms. Woerners parents, and
my Dad were present. Mr. Stephens told me Woerner was not appointed
an attorney, and was too, scared to testify. I asked what happened
to her original attorney Bill Joice? Apparently he had shot another
attorney and was in jail. When I took the stand the Prosecutor and
Judge teamed up on me, and attacked me, yelling at me, and threatening
me, I asked them to stop, and made record that Mr. Adcock Threatened
Ms. Woerner, Coached her, and that is why she would not testify.
The Judge threatened to put me in restraints. I had no contact with
anybody during trial because in a secret hearing without my attorney
present, Mr. Adcock had me put into isolation, I was there for three
months before trial, and returned with absolutely no contact with
anyone every night at trial. I even wrote letters to the Judges office
and ACLU asking why I was in Isolation with no hearing? The Sensory
deprivation really messed me up.

7.) Ms. Woerner's original statement corroborated my defense, she
said they were high on drugs during the shooting, accused me of
stealing drugs, invaded our home, threatened us, there were lots
of them, they would not leave, I kept screaming for them to leave,
and they said they would do what ever it takes to search my home

Page 2 of 4 - Matthew R. Ruth - Affidavit

I Matthew R. Ruth, Swear under the penalties of Perjury the following is true and correct to the best of my Knowledge.

1.) Each Part of the Reply where reference is made to My personal observations, actions, and etc. is part of this affidavit, I swear it is true.

2.) The Judge called the daily recess, and the Jury left the Court room. The Prosecutor John Adcock left to go talk to his Next Witness who was Material Eye-Witness Renee M. Woerner, one of the Four who were present in my home when the Shooting occured.

3.) 20 minutes later Mr. Adcock storms in the Courtroom, Matthew R. Stroud I trailing behind. Mr. Adcock announced very loudly to the entire Courtroom that he would not be calling Renee M. Woerner because she intended to Perjure herself. The Court reporter was not present to make this part of the record. My attorney Mr. Stephens approached Mr. Adcock by the Door out of my hearing. They began talking, and Mathew R. Stroud I, jumped into the conversation. Mr. Adcock left from them, and went to the Judge. Mr. Stephens and Mr. Stroud spoke for awhile, and then Mr. Stephens went out into the hallway.

4.) When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the Judges Bench. The Judge after hearing Mr. Stephens say something – which the Public, nor I could hear – Called Mr. Adcock over to the Bench, This was a Side Bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min.

5.) After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand, and personally interview her, and that I wanted to be present during the interview. He promised he would call her to testify, if she was

Page 1 of 4 – Matthew R. Ruth – Affidavit

# EXHIBIT 5

I was at Matt's trial and they took a recess, Adcock walked out of the court room just before I did. When I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I followed as I walked into the court room I saw Adcock walking over to Matt's attorney Adcock then told Matt's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do.

In the hall was also Renee Woerner's Mother and Dad who also heard everything.

Matthew Stroup.



Kris Kain <kriskain@gmail.com>

## Matthew

**Matthew Stroud** <doc@swis.us>                                Fri, Aug 23, 2013 at 9:25 AM
To: Kris Kain <kriskain@gmail.com>

Hi Kris,

I do not have anything from Mike Powers but I am happy to tell you what I saw and heard myself.

I was at Matt's trial and they took a recess, Adcock walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I fallowed as I walked into the court room I saw Adcock walking over to Matt's attorney Adcock then told Matt's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do.

In the hall was also Renee Woerner's Mother and Dad who also heard everything.

Matthew Stroud.

# EXHIBIT 4

MATTHEW R. STROUD I

This was also in the Brief Taken
on 9-13-13 By the Mail Room. My
only copies of Appendix's &
Exhibits was illegal sent to Headquarters
And I won't get it until Next Month.
Sorry this is the Best I can do.
— KRis A. KAIN has a copy & is trying
To send it to this court

From: Wlegalworks@aol.com
Subject: **Ruth, Matthew**
Date: January 11, 2011 7:45:17 AM PST
To: markmestel@comcast.net

Mark:

I met with an inmate at the Snohomish County Jail by the name of Melvin Roy Decoteau. Melvin is good friends with Renee Woerner. Melvin is currently in jail on a DOC violation. He can and will lead us to Renee when he gets out. Mr. Decoteau has not heard from his DOC officer since he was arrested four days ago. He was wondering of YOU could call Alona Kinch at 425-290-3200 and see if you can find out when he is scheduled to be released. Melvin's DOC number is 996 707. If we can find this out it might help to establish when Melvin is getting out so he could possibly help us locate and interview Ms. Woerner. If you can that's great if not then we will locate her regardless.

I was able to locate Renee Woerner's Dad. Her Dad's name is Henry Slothang. I located Mr. Slothang and sat and talked with him at his home yesterday. We met for almost an hour. In the end Mr. Slothang told me that he talks with Renee at least one time per week, every week. He agreed to talk with Renee and have her sit with me for an interview. Mr. Slothang told me that his daughter does want to help Matthew Ruth. He said that he too was present at the courthouse at the time of Matt's trial. He said that the prosecutor got very angry at Renee because Renee wanted to testify to the "complete truth and not just what was in her statement."

Mark, I feel as if Mr. Slothang will help put Renee and myself together. He tried to reach her while I was sitting in his home. Her voicemail was full. The number I showed him that we had he said was an old number. I am going to concentrate on Renee Woerner for now and then I will sit with Donnie Poole. I know roughly where Mr. Poole lives but he too seems to be trying to avoid myself as well as other members of Matt's family. He could be using also?

I will keep you updated.

Thanks,
Michael Powers

EXHIBIT
"Three"

HENRY Slethony

Custer and Eden were higher than kites at the time of the shooting. She said that he called her a stupid bitch several times. Renee is still unsure as to why Stevens did not have her testify.

Mark, if needed I believe that I can get back in touch with Ms. Woerner. She gave me a private number that I can supposedly reach her at.  Let me know what you think?

I will try to talk with Mark Stevens about the case and why he didn't put Woerner on the stand?


Thanks,
Michael Powers

their bed, Custer would not leave. Custer was reaching down into Renee's purse going through it while saying "we are searching everybody's shit." Renee said that Matt kept pleading with them to get out. Eden was sitting on the couch saying "what's the problem, if you didn't steal it then don't worry, we are going to do this one way or another." Custer was telling Matt and Renee that he was going to search the trailer "one way or another."

Renee said that she didn't recall the specific threats that Custer and Eden were making but she does recall that Matt kept telling them to leave, get out of his trailer. Renee said that Custer was "going through my purse, sitting on the bed when Matt reached up and grabbed his gun." The next thing she knows Matt is firing and the two are running out of the trailer. She did NOT see a gun on either Eden or Custer. She did tell me that Custer carried guns but she didn't recall seeing one on him that day. Renee said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not. I asked Renee if she thought her life or that of Matt's was in immediate danger at the time Matt started shooting? Renee response was "who knows, I didn't see any guns but then again I was not looking and they would not get out of the trailer."

She did confirm that Custer was "high as a kite at the time of the shooting." She feels that Matt grabbed the gun because he "felt trapped in the bedroom." She did recall that she was not able to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse, she can't say for sure.

Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. that he left bruises. She did tell Adcock that it was over drugs and that

The following is a summary of the notes that I took on January 20, 2010 when I interviewed Rene Woerner. Her father Henry was present during the entire interview.

Henry was at the courthouse on the day in question. He did witness Adcock "drag" his daughter into a side room where he then heard yelling going on between Adcock and his daughter. Henry said that he was not able to make out what was being said but when Rene came out of the room she told her Dad that she was not testifying and that Adcock would not listen to what she was TRYING to tell him. Henry did not recall what the subject was about but he does recall that Rene said that she tried to tell him the truth and he didn't want to listen so she no longer had to testify.

Rene told me that she DID tell Adcock, just prior to trial, that this was over drugs and that Eden and Custer "were high at the time of the shooting." Renee said that she does recall what happened on that day, not all but most of what happened.

Renee said that there were a lot of people at the trailer and outside the trailer at the time of the shooting. The only ones IN the trailer were her, Eden, Custer and Matt. She said that Custer and Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs. Matt kept telling them to get out. Eden sat on couch in the living room area and Custer made his way over to the bed where Renee was sitting. She said that Matt kept telling them to get out and that he had not stolen their drugs. Eden and Custer did not believe him. Custer kept saying that they had to search the entire trailer because "we are searching everyone's shit, no exceptions." At some point Custer actually sat on the end of the bed with Renee. Matt was telling him to get out of the trailer and off of

# EXHIBIT 2

1    everybody who is involved.  I just felt I had no

2    choice.

3              THE COURT:  That's fair enough.  Reading

4    between the lines, I gathered that your level of

04:03  5    frustration -- whatever it is, you spoke the actual

6    words that were spoken -- clearly rose to the level

7    where you felt compelled to bring this motion.  Other

8    than that, you wouldn't have done it.

9              MR. STEPHENS:  I think I gave your clerk my

04:03 10    original copy.  I just ask that that be filed.

11              THE COURT:  Yes.

12         So the appointment will take place, and in due

13    course.

14              MR. ADCOCK:  I'll get a new date from Brian.

04:03 15              THE COURT:  Obviously the Court has a method

16    of reaching me.

17              MR. ADCOCK:  Thank you, Judge.

18              THE COURT:  You're very welcome.

19              COURT RECESSED AT 1:11 P.M.

20

21

22

23

24

25

                                                       321

December 28, 2004

*Colloquy*

1    MR. ADCOCK:  That is my concern, judge.  I

2    think in this particular case it's important that you

3    hear the sentencing.

4    THE COURT:  I don't disagree.  We'll make it

5    work.

6    MR. ADCOCK:  Thank you, Judge.

7    THE COURT:  In terms of administratively doing

8    that, how about if I leave between you and Brian the

9    laboring oar to figure out with Judge Wynne how they

10   would like to have us handle that.  There is always at

11   least one courtroom available somewhere around here.

12   MR. ADCOCK:  Yes.  Thank you very much.

13   THE COURT:  Ergo, your motion to withdraw is

14   granted.

15   MR. STEPHENS:  Just so you know, I've

16   contacted Office of Public Defense and they don't see a

17   problem appointing somebody for sentencing.

18   I spent five years at the County Public Defenders

19   Office.  I have handled probably close to 500

20   court-appointed felony cases.  And I've tried probably

21   20 to 25 felonies.  I've handled roughly 40 to 50 jury

22   trials in my eight years of practice.  I've never found

23   myself in this position.  I never have.

24   I guess that's all I want to say.  I felt I had no

25   choice.  So I apologize to counsel.  I apologize to

320

*STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF 29906*

1    don't finish today, they will be asked to come back

2    tomorrow morning at nine o'clock, and basically proceed

3    from there.

4         MR. ADCOCK:   Thank you.

5         COURT RECESSED AT 3:05 P.M.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

318

|     |                                                          |
|-----|----------------------------------------------------------|
| 1   | AFTERNOON PROCEEDINGS                                     |
| 2   | MR. ADCOCK:  State of Washington vs. Matthew             |
| 3   | Robert Ruth; Cause Number 03-1-02451-6.  We're here for  |
| 4   | sentencing.  The defendant is present in custody,        |
| 5   | represented by Mr. Stephens.  John Adcock for the        |
| 6   | State.                                                    |
| 7   | Mr. Stephens, as the Court is probably aware,           |
| 8   | filed a motion this morning.  I've reviewed it.  I       |
| 9   | don't know if the Court has had time to look at it.  I   |
| 10  | have some concerns.  I understand Mr. Stephens'          |
| 11  | predicament.  And because I'm not privy to the          |
| 12  | communication he had -- and rightfully so -- I don't     |
| 13  | know to the level or degree they constitute a problem    |
| 14  | or conflict.                                             |
| 15  | My concern is this:  That it's incumbent, I think,      |
| 16  | in this particular case, that the trial judge do the     |
| 17  | sentencing.  I think in the abstract, if you looked at   |
| 18  | this case, it would not have the impact, I believe,      |
| 19  | that it necessarily needs to have because of the         |
| 20  | testimony.  It's in the State's interest and the         |
| 21  | interest of the victims, I think, to have yourself       |
| 22  | preside over the sentencing.  And so if we had to delay  |
| 23  | these proceedings today because --                       |
| 24  | THE COURT:  I can always come back and the              |
| 25  | county will pay me my exorbitant fee.                     |

STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF  29906

SEE SENTENCING 2/04/05 RP 24-25
JUDGE EXPLAINS WHY MR. Adcock WANTED
HIM At SENTENCING — He then not L.PIle MP D...-11

holding on the phone. My office has a single outside phone line accessible by the public. All calls go to the reception desk, and then are transferred to attorneys and staff.

16. I picked up the line and began to discuss the options for the next day's sentencing with Ruth. We spoke for a minute or two. At some point I made a disparaging remark to Ruth about his "girlfriend".

17. At that point a female voice which I recognized from prior conversations as belonging to Renee Woerner spoke up. I was surprised and shocked, realizing there had been a third person listening in on the conversation without my knowledge or permission. Ms. Woerner then told me "this is being taped" or words to that effect. Ms. Woerner and I exchanged a few more words, and I hung up the phone.

Signed this 28th day of December, 2004, under penalty of perjury, in Everett, Washington.

Mark Stephens, Attorney for the Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue • P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 • Fax 259-2195

8.  On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony.  He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

9.  I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

10.  Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.  She indicated to me Mr. Adcock had threatened to charge her with perjury if she testified.  She expressed concern to me about potential legal consequences if she testified.  I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.

11.  After giving the matter some thought, and conferring with my client, I decided not to call Ms. Woerner as a witness at trial.  I believed her testimony would be either corroborative of the victims' testimony, or easily impeached by her prior statement.

12.  On December 9, 2004 the jury returned verdicts of guilty as charged in this case.

13.  Some time the week of December 20, 2004 my temporary receptionist told me Ruth was trying to call me.  I instructed her to accept his call if I was in the office when he called.

14.  On December 27, 2004 I tried to visit Ruth in jail, but the jail was "locked down" and I was denied access.  I was concerned because some information I wanted to review prior to sentencing had not yet been provided, and I wanted to discuss this with Ruth.

15.  After I returned to my office, my receptionist told me by intercom that Ruth was

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

## DECLARATION OF COUNSEL

Counsel for the defendant declares the following to be true and correct to the best of his belief and information:

1. On November 13, 2003 the State charged Matthew Ruth with First Degree Assault while armed with a firearm, and the State later added a second count of First Degree Assault while armed with a firearm.

2. The incident which led to the charges was witnessed by Renee Woerner, Ruth's girlfriend.

3. After the shooting, the State executed an arrest warrant for Ms. Woerner in California.

4. Some time after filing the case, the State listed Renee Woerner as a State's witness for trial.

5. Shortly after Ms. Woerner's arrival at the Snohomish County Jail, she gave police and the prosecutor a sworn, tape recorded interview which essentially corroborated the accounts of the shooting provided by the two alleged victims. At the time she was represented by attorney Bill Joice.

6. Before trial in December, 2004, Deputy Prosecutor John Adcock indicated to me he intended to call Ms. Woerner to testify as a State's witness at Ruth's trial.

7. On Saturday, December 4, 2004, while preparing for trial, I returned a phone call from Ms. Woerner, in which she suggested she would be testifying differently from what she had said in her taped interview. On the phone Ms. Woerner spoke very rapidly and somewhat incoherently.

Law Office of Mark R. Stephens
2907 Hewitt Avenue · P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 · Fax 259-2195

Motion to Withdraw
Page 2

# EXHIBIT 1

ORIGINAL

Filed In Open Court
12-28-04/20
PAM L. DANIELS
COUNTY CLERK
By _Grace Hampton_
Deputy Clerk

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,                    ) No.03-1-02451-6
                                        )
                 Plaintiff,             )
                                        )
        vs.                             ) MOTION TO WITHDRAW
                                        )
MATTHEW R. RUTH,                        )
                                        )
                 Defendant.             )

Counsel for the defendant in the above entitled cause, Mark Stephens, respectfully

requests this Court allow counsel to withdraw from further representation of the defendant.

Counsel makes this motion based upon the attached declaration.

Respectfully Submitted this 28th day of December, 2004.


MARK STEPHENS, WSBA #26110
Attorney for Defendant


Law Office of Mark R. Stephens
2907 Hewitt Avenue  - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195



## DECLARATION OF COUNSEL

Counsel for the defendant declares the following to be true and correct to the best of his belief and information:

1. On November 13, 2003 the State charged Matthew Ruth with First Degree Assault while armed with a firearm, and the State later added a second count of First Degree Assault while armed with a firearm.

2. The incident which led to the charges was witnessed by Renee Woerner, Ruth's girlfriend.

3. After the shooting, the State executed an arrest warrant for Ms. Woerner in California.

4. Some time after filing the case, the State listed Renee Woerner as a State's witness for trial.

5. Shortly after Ms. Woerner's arrival at the Snohomish County Jail, she gave police and the prosecutor a sworn, tape recorded interview which essentially corroborated the accounts of the shooting provided by the two alleged victims. At the time she was represented by attorney Bill Joice.

6. Before trial in December, 2004, Deputy Prosecutor John Adcock indicated to me he intended to call Ms. Woerner to testify as a State's witness at Ruth's trial.

7. On Saturday, December 4, 2004, while preparing for trial, I returned a phone call from Ms. Woerner, in which she suggested she would be testifying differently from what she had said in her taped interview. On the phone Ms. Woerner spoke very rapidly and somewhat incoherently.

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

8.  On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony.  He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

9.  I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

10.  Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.  She indicated to me Mr. Adcock had threatened to charge her with perjury if she testified.  She expressed concern to me about potential legal consequences if she testified.  I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.

11.  After giving the matter some thought, and conferring with my client, I decided not to call Ms. Woerner as a witness at trial.  I believed her testimony would be either corroborative of the victims' testimony, or easily impeached by her prior statement.

12.  On December 9, 2004 the jury returned verdicts of guilty as charged in this case.

13.  Some time the week of December 20, 2004 my temporary receptionist told me Ruth was trying to call me.  I instructed her to accept his call if I was in the office when he called.

14.  On December 27, 2004 I tried to visit Ruth in jail, but the jail was "locked down" and I was denied access.  I was concerned because some information I wanted to review prior to sentencing had not yet been provided, and I wanted to discuss this with Ruth.

15. After I returned to my office, my receptionist told me by intercom that Ruth was

Law Office of Mark R. Stephans
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

holding on the phone. My office has a single outside phone line accessible by the public. All calls go to the reception desk, and then are transferred to attorneys and staff.

16.   I picked up the line and began to discuss the options for the next day's sentencing with Ruth. We spoke for a minute or two. At some point I made a disparaging remark to Ruth about his "girlfriend".

17.   At that point a female voice which I recognized from prior conversations as belonging to Renee Woerner spoke up. I was surprised and shocked, realizing there had been a third person listening in on the conversation without my knowledge or permission. Ms. Woerner then told me "this is being taped" or words to that effect. Ms. Woerner and I exchanged a few more words, and I hung up the phone.

Signed this 28th day of December, 2004, under penalty of perjury, in Everett, Washington.

_Mark Stephens, Attorney for the Defendant_

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,      )
                              )
            Plaintiff,        )
                              )
       vs.                    )       NO. 03-1-02451-6
                              )
                              )       COURT OF APPEALS
MATTHEW RUTH,                 )          NO. 56318-1-I
                              )
            Defendant.        )

RECEIVED

SEP 1 4 2005

Nielsen, Broman & Koch, P.L.L.C.

VERBATIM REPORT OF PROCEEDINGS

MOTION TO SUBSTITUTE COUNSEL

MARCH 30, 2004

HONORABLE KENNETH L. COWSERT
Judge

Department No. 201
Snohomish County Courthouse
Everett, Washington

Reported by:
Laurel Olson
Official Court Reporter
CR #29906-2645
(425) 388-3088

**APPENDIX C**

2

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,      )
                              )
            Plaintiff,        )
      vs.                     )        NO. 03-1-02451-6
                              )
MATTHEW RUTH,                 )
                              )
            Defendant.        )

VERBATIM REPORT OF PROCEEDINGS

        BE IT REMEMBERED that on the 30th day of March,

2004, the above-entitled and numbered cause came regularly

on for hearing before the Honorable KENNETH L. COWSERT,

one of the judges of the above-entitled court, sitting in

Department No. 201 thereof, at the Snohomish County

Courthouse, in the City of Everett, County of Snohomish,

State of Washington.

        The Plaintiff was represented by CRAIG BRAY, Deputy

Prosecuting Attorney for Snohomish County;

        The Defendant was present and represented by his

attorney, MARK STEPHENS, both appearing via video

teleconferencing;

        WHEREUPON, both sides having announced they were

ready to begin, the following proceedings were had, to wit:

STATE v. MATTHEW RUTH                                          3

```
 1                    2:00 P.M., TUESDAY
                       MARCH 30, 2004
 2              SNOHOMISH COUNTY SUPERIOR COURT

 3              *   *   *   *   *   *   *   *   *

 4

 5          MR. STEPHENS:  The Ruth matter.

 6          MR. BRAY:  This is Cause Number O3-1-02451-6.  I'm

 7    Craig Bray, on behalf of the State, handling the calendar.

 8    The defendant is in custody over at the jail with his

 9    attorney, Mark Stephens.

10          This is on for substitution of counsel.

11          MR. STEPHENS:  Mr. Ruth is currently represented

12    by the Public Defender Association.  It's my understanding

13    that they now have a conflict and are asking to withdraw.  I

14    have agreed to take the case, and I'm asking the Court at

15    this point to allow me to substitute in for the Public

16    Defender's Office.  I'm signing a motion and order for

17    withdrawal and substitution.  With the Court's permission,

18    I'll do that on the record and then bring it over there in a

19    few minutes.

20          THE COURT:  Mr. Ruth, is that okay with you?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  I'll allow that substitution, then.

23    Are you going to bring it over, Mr. Stephens?

24          MR. STEPHENS:  Yes, I'll just bring it over.

25                              (Proceedings concluded.)
```

MOTION TO SUBSTITUTE COUNSEL  -  MARCH 30, 2004

STATE v. MATTHEW RUTH                                          4

```
1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2
     STATE OF WASHINGTON
3    COUNTY OF SNOHOMISH

4

5                  I, Laurel Olson, Certified Court Reporter, one

6    of the official court reporters of the Superior Court of the

7    State of Washington in and for the County of Snohomish, do hereby

8    certify that the Verbatim Report of Proceedings in the foregoing

9    cause was reported stenographically by me and reduced to

10   computerized transcription (including ASCII disk) under my

11   direction;

12                 I further certify that I am not a relative or

13   employee or attorney or counsel of any of the parties to said

14   action, or relative or employee of any such attorney or counsel

15   of any such attorney or counsel, and that I am not financially

16   interested in the said action or the outcome thereof;

17                 I further certify that the Verbatim Report of

18   Proceedings is a full, true and correct transcript of the

19   proceedings to the best of my ability.

20

21

22                             Official Court Reporter

23                             9-12-05

24                                       Date

25
```

COURT REPORTER'S CERTIFICATE

# EXHIBIT 5

I Matthew R. Ruth, Swear under the penalties of Perjury the following is true and correct to the best of my Knowledge.

1.) Each Part of the Reply where reference is made to My personal observations, actions, and etc. is part of this affidavit, I swear it is true.

2.) The Judge called the daily recess, and the Jury left the Court room. The Prosecutor John Adcock left to go talk to his Next Witness who was Material Eye-Witness Renee M. Woerner, one of the Four who were present in my home when the Shooting occured.

3.) 20 minutes later Mr. Adcock storms in the Courtroom, Matthew R. Stroud I trailing behind. Mr. Adcock announced very loudly to the entire Courtroom that he would not be calling Renee M. Woerner because she intended to Perjure herself. The Court reporter was not present to make this part of the record. My attorney Mr. Stephens approached Mr. Adcock by the Door out of my hearing. They began talking, and Mathew R. Stroud I, jumped into the conversation. Mr. Adcock left from them, and went to the Judge. Mr. Stephens and Mr. Stroud spoke for awhile, and then Mr. Stephens went out into the hallway.

4.) When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the Judges Bench. The Judge after hearing Mr. Stephens say something - which the Public, nor I could hear - Called Mr. Adcock over to the Bench, This was a Side Bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min.

5.) After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand, and personally interview her, and that I wanted to be present during the interview. He promised he would call her to testify, if she was

Page 1 of 4 - Matthew R. Ruth - Affidavit

not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent Cross-examination, and due to the threats she would break down and begin lying. I told Mr. Stephens that she is the only witness who corroborates my defense that was present, she is critical. I told him to call Gary Way, Donnie Poole, Bill Storie, Court Lamb, etc. He called nobody, presented no evidence, and the only witnesses who was exculpatory for me that was present at trial is Ms. Woerner. He promised he would call her to testify.

6.) The day the State rested its case, Ms. Woerners parents, and my Dad were present. Mr. Stephens told me Woerner was not appointed an attorney, and was too, scared to testify. I asked what happened to her original attorney Bill Joice? Apparently he had shot another attorney and was in jail. When I took the stand the Prosecutor and Judge teamed up on me, and attacked me, yelling at me, and threatening me, I asked them to stop, and made record that Mr. Adcock Threatened Ms. Woerner, Coached her, and that is why she would not testify. The Judge threatened to put me in restraints. I had no contact with anybody during trial because in a secret hearing without my attorney present, Mr. Adcock had me put into isolation, I was there for three months before trial, and returned with absolutely no contact with anyone every night at trial. I even wrote letters to the Judges office and ACLU asking why I was in Isolation with no hearing? The Sensory deprivation really messed me up.

7.) Ms. Woerner's original statement corroborated my defense, she said they were high on drugs during the shooting, accused me of stealing drugs, invaded our home, threatened us, there were lots of them, they would not leave, I kept screaming for them to leave, and they said they would do what ever it takes to search my home

Page 2 of 4 - Matthew R. Ruth - Affidavit

for the stolen drugs. She corroborated them too, on where they were
in the trailer. The bad stuff she said about me were domestic violence
allegations, that she told the Western State Hospital people were
not true, and she said because she was mad at me, and scared she
would be charged as an accomplice. That is in my western state
evaluation. The Domestic violence allegations were ruled not
admissible during Motion In-Limine, the Prosecutor agreed. In my
Rap 10.10 Issue one, I challenged the Prosecutor breaking this order
by admitting the health certificate evidence that show Ms. Woerner
had been assaulted. This proves he was trying to get her to bring
in the Domestic violence stuff, and she wouldn't lie.

8.) Mr. Stephens never told me he wasn't going to call her after
the In-Chambers incident. He never showed me what corroborated the
Alleged victim, or was easily impeachable by her original statement,
he could not because he never interviewed her about her statement,
or intended testimony. In fact after trial I spoke to her on the
phone, after released from Isolation, and she told me before trial,
Adcock had tryed to get her to remove the parts of her statement
that corroborated my defense, she would not, and he threatened her.
She called my attorney, and he said it didn't matter because "Matt
is F_cked anyways." We three way called him, I confronted him, he
agreed that he said that to her, and than made really bad comments
about her. She told him the call was recorded. That is what caused
the Declaration and motion to leave.

9.) The Judge and Mr. Adcock were mean to me, and really biased,
my presence was reduced to nothing, the trial proceeding as if I
was not even there. The record at trial and sentencing proves that
the Judge and Mr. Adcock were biased against me.

10.) I tried to file a motion for new trial, but the court would
not let me file it, I included it and the affidavit in support in
my brief as exhibit 6, it was notarized at Shelton because the County

Page 3 of 4 - Matthew R. Ruth - Affidavit

Jail would not let me get it notarized. It is all true, and I want to adopt all of it in this Affidavit.

I swear all of this is true and correct tot he best of my knowledge, under the penalties of perjury.

Signed in Aberdeen, Washington on This 10th Day of September, 2013.

X _____

Matthew R. Ruth

I, ____Barbara St Louis____, am a Notary Public in and for the State of Washington, County of _Grays Harbor_, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes describes therein.

Signed and dated before me this 10th day of September, 2013.

/s/ _____

_____ Barbara St Louis

NOTARY PUBLIC in and for the State of Washington, County of Grays Harbor.

My Commission Expires: 6-4-16



Page 4 of 4 - Matthew R. Ruth - Affidavit

I matthew R. Ruth swear the following to
Be 100% True, under the penalties of
Perjury,

1.) I Asked MARK O. Mestel to raise Ineffective
Assistance of Direct appeal counsel for failing
to raise Both Public trial right issues, the
right of counsel, and rights to appear &
Defend issues. I also asked that the "castle
instruction"& Improper argument fashioned from
the prosecutor's use of the castle INSTRUCTION
language; with telling the Jury in closing their
main function is to determine the truth;
issues be raised under ineffective assistance
of appellate counsel. I also asked that he
cite to DIVISION I, Johnson & Venegas.

2.) I typed up a memorandum to MR. Mestel, &
Attached DAVID B. Zuckerman's Structural error
argument in Morris, to reinforce my fears
about structural error being applied to
collateral attack. My Fiancee KRIS A. KAIN
sent this communication out through E-mail,
and It Is confirmed Mark received & read the
Memorandum. I was also charged for his time,
So the Billing also proved He read this. (see
Attachment 1)

Page 1 of 5 matthew R. Ruth AFFIDAVIT

3.) I have received a message from MR. Mestel saying he will be withdrawing from my case. I have Been Reduced To Pro Se Status. How can Prejudice be Proved on collateral Attack when the misc court said it is Impossible?

4.) I cannot get this affidavit Notarized in time to P.A in the MAPL So I can meet my deadline with this court.

5.) I asked that the Interviews from P.I. Michael Powers be included in PRP with an interview from myself. I wanted the Jury interviewed, too, because they told matthew R. Stroud I, they would have acquited me, they believed me, but I didn't prove my innocence, they said only one piece of corroborating evidence was needed, this Proves the Presumption was switched to "guilt" By the "castle instruction" MR Adcocks improper arguments fashioned from

page 2 of 5 matthew R. Ruth Affidavit

the castle instruction, & trivializing my
constitutional Right to be Presumed
innocent, with a BROKEN & malfunctioning
suit of ARMOR. This also Proves that
MR. Adcocks efforts to threaten, and intimidate
every Piece of favorable evidence into
not being Presented to the trier of fact; (and
the effect the threats & intimidation had
on Defense counsel who helped MR. Adcock,
By Presenting not one Piece of evidence,
and not one witness) (but MR. Ruth—me—
the accused); were effective because 911
evidence favorable to the Defense were
secret & kept in the shadows.
        I asked that the Jury be interviewed,
so affidavits could be Provided in this PrP
to Prove the castle instruction & Prosecutors
Arguments switch the Burden. Matthew R.
Stroud & Mark Stephens Heard this,
especially from the Jury foreman.


page 3 of 5 Matthew R. Ruth Affidavit

6.) I asked that MARK Stephens be interviewed, and asked, "why did you cover up the threats made by the prosecutor to MS. WoerNer until you filed a Motion to withdraw?" "Did you tell MR. Ruth before you suprised called him to the stand that MS. woerner was in the Hallway, and wouldn't testify because she was scared of MR. Adcocks threats, and you were scared of what she might do under MR. Adcocks aggressive cross-examination because of her fear of the threats?" And why he Never interviewed MS. woerner, or any witness, why Not put Gary nay & Kenneth MuscateL on the stand?

7.) I have been scared of the structural error bar on collateral review even before wise & Morris, I asked My attorney to include some argument of Mine into our structural error issue.
   A) How can a PFP litigant prove prejudice when our state supreme court agreed with the U.S. supreme court that prejudice for public trial right violations are unquantifiable, impossible to prove, this creates a ~~WRONG~~ without a remedy.
   B.) In this situation the error is Not properly recognized without collateral evidence, Not reviewable on direct, so why would a structural error bar apply to public trial violations?
   C) J. dolliver in St. Pierre adopted the teague analysis to keep IN step with the U.S. supreme courts efforts to fit linkletter & the the teague courts believed it's rule fairly determined when a rule applies to case retroactively, J. dolliver went a step further & created an unknown higher standard structural error bar, well Schiro fixed teague & St. Pierre has become linkletter, and danforth puts all into proper perspective, just adopt the Schiro analysis for retro application as the structural error higher standard.

page 4 of 5 matthew R. Ruth Affidavit

8.) I am sorry this is not typed & notarized. Litigating in prison is very hard. It's not just because I have no schooling in the law, or in anything (I barely received my G.E.D. at 33 in prison), there are no real resources provided to us in prison for learning the law much less, litigating a case. We just received a few days ago an update to our computer, we have some cases up to July 1st, 2013 now! My fiancee Kriss Kapin sends me w/ articles & case law, but the mail room rejects them half of the time. Even more important is the thousands of moron inmates that put no work into real legal studies & writing (with what we have anyways) fill the court with frivolous garbage, making every inmate look bad) we are stigmatized & not taken seriously. I pray that this court realizes that for the last ten (10) years I have put my best & hardest for work into every appeal process, direct, Rap 10.10, petition for review, 7.8 on resentencing. I worked so hard on this reply to the states supplemental response. Keiss & I have been working very hard together for the last and three years & pray for mercy & justice, a chance to start our lifes together. I want to be a lawyer like E. Cleadis Flyod, thank you.

x _____                    x Jeremy Read
Matthew R. Ruth 879492                        Jeremy Read
9-12-13                                         9-12-13
       Teriann Loss 9.12.13                              x Brian Z. Winter  9-12-13
       832000                                            Brian Z. Winter
                                                          #842856

page 5 of 5   Matthew R. Ruth Affidavit

ATTACHMENT
"1"
memorandum sent to Mark D. Mestel
structural error concerns

Dear, Mr. Mestel

 I just want to win, try to become a paralegal, get married to Kristine, and be done with prison. You know what your doing, your a winner. I respect what ever you say is our best course to win. The Court of Appeals is hard enough to win in even when we are 100 percent right. Whatever you think increases our chances of winning I am in favor of.

 You know the law way better than I ever will, however, I would like to point out a few things I know you are already aware of, sorry.

   **Morris**, No, 84929-3 Supreme Court (Nov 21, 2012):
"We need not address whether a Public trial right violation is also presumed prejudicial on collateral review because we resolve Morris's claim on ineffective assistance of appellate counsel grounds instead."

 I have David Zuckerman's Morris briefing on why it is structural on collateral review, and I sent it to you already. We may want to add ineffective assistance of direct appeal counsel in the additional briefing. You did cite Orange in the original briefing.

 Another interesting aspect of Morris, is that the Supreme Court really demonstrated that the Sadler/Rivera - factual/legal test has been rejected, and the right to Public Trial does not attach to Rights to be present. Morris waived his right to be present in Chambers, but the Court said he did not waive his Public trial rights, and reversed.

 "A defendant must have knowledge of a right to waive it." This Morris quote highlights **WISE**, No. 82802-4 (Nov 21, 2012):
"Wise did not waive his right to public trial by not objecting, and prejudice is presumed."

 It is the Trial Judge's duty to notify the defendant of the Right to Public Trial by conducting a Bone-Club Analysis:

"The reason such structural error is rightly presumed prejudicial is that 'it is often difficult' to 'assess the effect of the error.... To allow such deprivation would erode our open, public system of justice and could ultimately result in unjust and SECRET TRIAL PROCEEDINGS.... Here, we Cannot know what... if the Judge had properly closed the Court under Bone-Club analysis, what Objections, consideration or alternatives might have resulted and yielded.... Because it is impossible to show whether the structural error of deprivation of the Public Trial Right is Prejudicial, we will not require WISE to show prejudice in his case. 'We will not ask defendants to do what the Supreme Court has said is impossible.'" **WISE**.

 The Court can never asses the damage of not conducting a Bone-Club analysis before secreting away over the Woerner Alleged perjury incident. Who would have come forward? What would she have said on record? We know what she said in Blackman's response, Exhibit 21, page 3:

Page one

I see the jury inquiry stages like this:

Stage ONE, The inquiry from the Jury initiates the Right to Public Trial, Right to representation, and Fair Trial;

Stage TWO, Notifying all parties of the Juries inquiry; (Must be part of record like in JASPER).

Stage THREE, Requires the defense to participate in the formulation of the response, lodge objection, and make it part of the record; (Public Trial; Right to Representation; Fair Trial);

Stage FOUR, submit response to the Jury; and either re-instruct, or replay evidence, etc. (All cases concern right to be present at this stage only).

The Ninth Circuit, in Musladin, pointed out that any answer from the Court to the Jury during deliberations about the Instructions contains information from the defense because the defense participated in the formulation of the instructions. The Musladin Court said the defense should still be allowed to participate in the shape of the answer even when involving instructions.

In Our Case, Mark, the answer was not about Jury instructions; and contained absolutely no information from the defense. Defense Counsel is most acutely needed before the decision to respond to the jury is made, even if the answer is a negative answer. It is the missed opportunity to influence the response, and have that participation made part of the record, that creates the significant moment; simultaneously violating my rights to public trial and my rights to representation.

SUBLETT LEAD OPINION

In Sublett, the Supreme Court claims that not one case could be found that holds "these proceedings... violate the defendants constitutional rights," and we can not find one either," Musladin, 555 F.3d 830, is that case.

The Ninth Circuit, in Musladin, described Jury deliberation as a very important stage of trial. A very fragile portion of Trial where anything the Judge says can influence the verdict, and right to Fair Trial.

Musladin conflicts with how the Sublett Court diminishes the significance of Deliberation; "No witnesses are involved at this stage, no testimony is involved, and no risk of perjury exist," Diminishing the significance of deliberations Contradicts their own (Sublett Court) analysis of Press II in adopting the Experience and Logic test;

Page Three

The Jury inquiry in our Case, Mark, was not about Jury instructions, and the answer from the Court, absent the defenses participation, contained NO information from the defense. Musladin.

Justice Antonin Scalia said: "Operating upon the spinal column of American democracy. Some structural errors, like the complete denial of counsel or the denial of public trial, are visible at first glance." NEEDER V. U.S., 527 U.S. 1 (1999) (J.Scalia Dissent). The Superior Court's violation of both of these Doctrines in our case, Mark, slams so hard into the Body of the Bill of rights and the Constitution, that the impact snaps the Spinal column of American Democracy, crumbling our Justice system. A Stand by the Courts Must be made now, so this does not happen in the future.

### WOERNER SECRET PERJURY PROCEEDING

"The Right to Public Trial serves to ensure a Fair Trial; to remind the prosecutor and judge of their responsibilities to the accused and the importance of their functions, to ENCOURAGE WITNESSES TO COME FORWARD, AND TO DISCOURAGE PERJURY." Sublett.

Ms. Woerner is a Material Eye witness, and I always maintained that her "testimony was critical, that he (Mr. Ruth) was very critical of his attorney for not calling her." Sentencing Pg. 4. In the secret, in-chamber proceedings, the Judge said Woerner would be appointed Counsel to advise her about her fears of the Prosecutions threats, VRP 179-181, Mr. Stephens did not know if he could call her until she spoke to her attorney, but she was never appointed an attorney. At sentencing, Chad Dold asked for a continuance to "present a motion for a new trial based either on prosecutorial misconduct, ineffective assistance of counsel, or denial of Justice, any one of the three, depending on what Ms. Woerner tells me." Sentencing Pg 4-5, "Mr. Ruth never agreed to Mr. Stephens' strategy in that regard and was quite upset... it is not a decision he would ever agree with, and he disagrees with any assessment of tactical or strategic advantage." pg 6.

Up until the State threatened to charge Woerner with perjury if she testified, (States Response, Exhibit 21, Page 3, Section 10), Woerner was testifying. This is a significant moment, which had an unquantifiable amount of subsequent prejudice reverberating throughout, and tainting the entire trial. (the Jury inquired about Ms. Woerner During deliberations).

The State elicited testimony from EDEN and CUSTER about Ms. Woerner screaming for me to stop, and being scared of me, and other damaging stuff. The Judge would not let the defense rebut this testimony. Yet, Woerner never testified, and the Jury was clearly influenced by this because they inquired about her statements during deliberations. With Such an important Eye witness's testimony at stake, it seems that the Public Trial and Fair Trial Doctrine demands that this issue be fleshed out in Public.

Page Five

MATTHEW R. RUTH #879492
C.C.A./F.C.C.
PO BOX 6900
FLORENCE, AZ 85232

DATE:

DAVE H. WOLD
PUBLIC DISCLOSURE SPECIALIST
Robert J. Drewel Building, 7th Floor / M/S 504
3000 Rockefeller Avenue
Everrett, Wa 98201-4046

Re: Resubmission of Public Disclosure/Toxicology reports

Dear, Mr. Wold

Thank you for your very informative letter. I am now resubmitting my P.D.A. request, under Rcw 42.56.

Also I am providing the relevant legal authority, which allows you to disclose the results of the Toxicology reports for Jeremy Custer, and Dru Eden, whom I shot in my home Nov 5, 2003.

I really appreciate your help Mr. Wold, please don't take the following in a bad way, I don't mean it disrespectful. I am fighting for my life, and injustice to be corrected, by Justice. This legal work Stuff is really hard so bear with me please.

The toxicology reports are "materially exculpatory," and should have been disclosed by the Prosecutor under CrR 4.7(iv)(any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and scientific tests, experiments, or comparisons), before trial. Instead the Prosecutor Mr. Adcock, and Detective Willoth, purposely hid these reports because it proves my innocence.

Not only did Mr. Adcock hide these reports hoping I would never find out about them, he argued contrary to the results of these toxicology reports in trial.

Mr. Adcock failed to call the originally subpoenaed, on duty doctors, which cared for the alleged victims. These Doctors did the test, and would have testified about this at trial.

Mr. Adcock argued specifically that I was paranoid, agitated, and freaked out on drugs, shooting the alleged victims for no reason. When Mr. Adcock knew the whole time they were the ones on drugs. In trial I testified that the alleged victims were all freaked out on drugs, and this is the reason I was so scared over their threats because they were not in

their right minds. This gives apprehension of fear, and my actions become reasonable under the self-defense Doctrine.

The failure to disclose requires a Dismissal of my charges. I can understand why the Prosecutions office does not want you to disclose these documents. Especially in light of the jury pool at the end of my trial. Their comments were "We believed him, we didn't want to find him guilty, we needed just one piece of evidence to find him innocent."

I specifically need these documents for My Personal Restraint Petition; I am raising a Government misconduct issue for failure to disclose this "Materially Exculpatory" evidence, and asking that my charges be dismissed with prejudice. I hope that Mr. Adcock does the right thing, instead of trying to hide this information from me. He really dislikes me, and there are many other instances of misconduct that I can prove that will be going into my Personal Restraint Petition.

I am not requesting any of the appeal information from this Public Disclosure.

I am requesting:

1.) The results of the Toxicology reports, not the identity of the Patients. *Prison Legal News, Inc. v. Department of Corrections*, 154 Wn.2d 628, 115 P.3d 316, 326-328 (Wash. 2005).
2.) Any and all documents supporting probable cause charges.
3.) Any documents related to the charges brought upon the prosecution as it relates to my case.
4.) Prosecuting attorneys litigating files in my case pursuant to *Linstrom v. Ladenburg*, 136 Wn.2d 595, 963 P.2d 869 (1998).
5.) Lab results and reports used to support my conviction and charging me with my crime, from the alleged victims.
6.) All lab reports and results from the alleged victims.
7.) Redact all identifying information, and personal information if needed.

Division one has applied the following to similar Disclosure issue's:

"The central purpose of the act is "nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions." Our courts have repeatedly held that the act is "a strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wash.2d 123, 127, 580 P.2d 246 (1978); *Amren v. City of Kalama*, 131 Wash.2d 25, 31, 929 P.2d 389 (1997); *PAWS II*, 125 Wash.2d at 251, 884 P.2d 592. Accordingly, the act's disclosure provisions must be liberally construed, and its exemptions narrowly construed. *King County v. Sheehan*, 114 Wn.App. 325, 57 P.3d 307, (Wash.App. Div. 1 2002).

*Legal News, Inc. v. Department of Corrections* 154 Wash.2d 628, 115 P.3d 316 (2005). (Emphasis added)

In interpreting RCW 42.17.255, the Washington Supreme Court has stated that "the right of privacy applies 'only to the intimate details of one's personal and private life,' " in contrast to actions taking place in public. *Dawson v. Daly*, 120 Wash.2d 782, 796, 845 P.2d 995 (1993); *Spokane Police Guild v. Liquor Control Bd.*, 112 Wash.2d 30, 38, 769 P.2d 283 (1989) The public disclosure act contains a specific exemption for records that "are relevant to a controversy to which an agency is a party but which records would not *be available to another party under the rules of pretrial discovery for causes pending in the superior courts.*" A "controversy" is not restricted to ongoing formal litigation. It can begin before the formal commencement of a lawsuit and continue afterward. *Dawson*, 120 Wash.2d at 790, 845 P.2d 995. *Relevant records are exempt from disclosure under the public disclosure act if they would not be available to an adverse party under the superior court discovery rules.* RCW 42.17.310(1)(j); *Limstrom*, 136 Wash.2d at 605, 963 P.2d 869. *Soter v. Cowles Pub. Co.*, 130 P.3d 840, 844, 131 Wn.App. 882, (Wash.App. Div. 3 2006). The state agency bears the burden of proving that a specific exemption applies. RCW 42.17.340(1); *Hoppe*, 90 Wash.2d at 130, 580 P.2d 246. *Prison Legal News, Inc. v. Department of Corrections*, 115 P.3d 316, 320, 154 Wn.2d 628, (Wash. 2005).

In the interest of Justice Please disclose this information to me. I have this issue, and another that are grounds for a dismissal with prejudice. The law doesn't care if I am innocent, only if it can prove my guilt. The appellant Courts don't care if I am innocent, only if I can prove a Constitutional error. This evidence allows me to prove I am not guilty, it proves my innocence. Prosecutor John Adcock used foul means to prove my guilt, to the jury. My case has been granted for review in the Supreme Court on my FASE issue. I am preparing for my Personal Restraint Petition, and will be using all the letters you have sent me in the past, with a copy of this letter as evidence on this issue. I am trying to give your office a chance to make this right with me. It is a shame that a U.S. citizen can receive life in prison for his first time offense when he is exercising Constitutional rights. I can't believe that the Prosecution hid this evidence, and now it is so hard for me to obtain justice which is synonymous with my procurement of the Toxicology results.

The PDF format on CD'S sounds really cool please let me know how much of the requested documents can be put on the CD, and how much will need to be copied at 0.25 cents a page.

Mr. Wold Can I use the PDF format files for my Personal Restraint Petition, exhibit's? Will the Court of Appeals accept them?

I really appreciate all your help, and I am sorry if I sounded Disrespectful in any way. It is not my intent to be disrespectful. This is really important to me, sir. My life is on the line, and I have been working really hard to receive justice in my case. Please forgive any statements I made that sound bad, I don't mean it that way.

God bless you, or whatever entity you believe in,

Sincerely Submitted,

This __18__ Day of __Sept.__ , 2008

Matthew R. Ruth

9/18/08

"OFFICIAL SEAL"
Janelle Gonzales
Notary Public-Arizona
Pinal County
My Commission Expires 3/14/2011

Filed in Open Court

12-9-04

COUNTY CLERK

By _Grace Hampton_
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF SNOHOMISH

State of Washington )
)
                    Plaintiff, )
)
    vs.             )
)
Matthew Robert Ruth )
                    Defendant. )
)
)

CAUSE NO. _03 - 1 - 02451 - 6_

**INQUIRY FROM THE JURY AND
COURT'S RESPONSE**

JURY INQUIRY:

1) Transcripts of interview with Renee Warner Dec 10 & 11, 2003

2) Transcript of Interview(s) with Jeremy Custer (Nov 24, 2003)

3) Transcript of interview with Drew Eden (Nov 10, 2003)

DATE AND TIME _08 Dec 2004   16:12_

DATE AND TIME RECEIVED BY THE COURT: _12/8/04  4:12 pm_

COURT'S RESPONSE: The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations.
Thank you

_____ JUDGE

DATE AND TIME RETURNED TO JURY: _12/8/04  4:15 pm_

AA
98

**SAVE -- MUST BE FILED**

OCT-18-2010 MON 10:07 AM S___ CTY PROSECUTING ATTY    FAX NO. 425 36___1986          P. 01

1

2

3

4

5

6                    IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                           IN AND FOR THE COUNTY OF SNOHOMISH
7

8    The State of Washington,                      03-1-02451-6

                         Plaintiff,
9
            vs.
                                                   AFFIDAVIT OF COUNSEL
10   MATTHEW R. RUTH,

11                      Defendant.

12
          The undersigned certifies (or declares) that I am a duly appointed deputy
13   prosecuting attorney for Snohomish County, Washington, and make this affidavit in that
     capacity; and that I was trial counsel in this case for the prosecution.
14

15        1.  There were never any medical examiner reports in this case because the two
     victims, whom the defendant shot, survived. To the best of my knowledge, no
16   toxicology analysis related to the victims in this case was performed by the State
     Toxicology Laboratory. There was certainly none in our possession. The medical
17   reports we did have on Messrs. Custer and Eden were turned over to the defense in
     discovery. The defense had the same medical material we had. While I recall there
18   may have been some indication the defendant's victims may have used marijuana at
     times, there was nothing to support the defendant's theory that he was assaulted by
19   drug-crazed dealers who threatened to kill him and rape his fiancée.
20
     The undersigned certifies under penalty of perjury under the laws of the State of
21   Washington that the foregoing is true and correct.

22

23

     JOHN ADCOCK, # 15714
24   Deputy Prosecuting Attorney

25

26
                                     1
                                                    Snohomish County
                                           Prosecuting Attorney - Criminal Division
                                                 3000 Rockefeller Ave., MS 504
                                                  Everett, Washington 97201-4046
                                            (425) 388-3333 Fax: (425) 388-3572

# APPENDIX C

EXHIBIT

5

Supplemental Brief
Rap 1.2

(AAG Exh. 19)

*Rejected for filing
(see Deputy clerk's letter
dated 10/20/14)

* But, then accepted for filing.
(see Deputy Commissioner's ruling denying
review at p.1#1)

NO. 89906-1

IN THE STATE SUPREME COURT FOR THE STATE OF WASHINGTON

In re The Personal Restraint Petition of:

MATTHEW R. RUTH,

Petitioner.

Received
Washington State Supreme Court

OCT 2 0 2014

Ronald R. Carpenter
Clerk

SUPPLEMENTAL BRIEF
RAP 1.2

MATTHEW R. RUTH
Pro Se Litigant
DOC# 879492 H4-A-98L
Stafford Creek Corr. Center
191 Constantine Way
Aberdeen, Wa 98520

EXHIBIT 19

TABLE OF CONTENTS

1. OPENING STATEMENT....1

2. ISSUES PRESENTED FOR REVIEW....3

3. ARGUMENT ON WHY REVIEW SHOULD BE GRANTED....4

    i. 3 prong SMITH test....6

    ii. BERRYSMITH proves a factual question was at issue in chambers....10

    iii. In Chambers Closure prevented Mr. Ruth from cross-examining Ms. Woerner....14

B. THE RECORD SHOWS THE ENTIRE JURY INQUIRY PROCESS LASTED 3 MIN....19

TABLE OF AUTHORITIES

WASHINGTON STATE SUPREME COURT

Brundridge v. Fluor Federal Services. INC., 164 Wash.2d 432 (2008)....15

In re Disciplinary of Bonet, 144 Wn.2d 502 (2001)....8

In re Yates, 177 Wn.2d 1, 296 P.3d 872 (2013)....1

State v. Frawley, NO. 80727-2 (2014)....2

State v. Irby, 170 Wn.2d 874, 880 n.6 (2011)....17

State v. Jasper, 174 Wn.2d 96 (2012).... 2, 20

State v. Koss, No. 85306-1 (2014)....1, 2, 20

State v. Lormor, 172 Wn.2d 85, 93 (2011)....19

State v. Olson, 92 Wash.2d 134, 594 P.2d at 1340-41 (1979)....12

State v. Slert, No. 87844-7 (2014)....3, 6, 8, 17

State v. Smith, No. 85809-8 (2014)....1, 3-7, 9, 16, 18-19

State v. Stentz, 30 Wash. 134, 70 P. 241, 243 (Wash.1902)....16

State v. Sublett, 176 Wn.2d 58, 292 P.3d 715 (2012)....2, 6, 8, 20

State v. Wroth, 15 Wash. 621, 47 p. 106 (Wash.1896)....17

WASHINGTON STATE COURT OF APPEALS

State v. Bennett, 168 Wash.App. 197, 275 P.3d at 1232 n.6 (2012)....17

State v. Berrysmith, 87 Wash.App. 268, 944 P.2d 397 (1997).... 10, 11

State v. Carisle, 73 Wn.App. 678, 871 P.2d 174 (Wash.App.Div.1 1994)....8

State v. James, 48 Wash.App. 353 (1987)....11

State v. Rainey, No. 69846-4-I (Wash.App.Div.1 2-24-14)...12, 13

State v. Martinez, 105 Wn.App. 775, 20 P.3d 1062 (Wash.App.Div.3 2001)....15

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT

Duncan v. Louisana, 391 U.S. 145, 88 S.Ct. 1444 (1968)....8

Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982)....7

Maleng v. Cook, 490 U.S. 145 (1968)....2

Melendez-Diaz    v.   Massachusetts,   129   S.Ct.   2527,   557   U.S.   305
(U.S.Mass.2009)....16

Press-Enterprise Co., V. Superior Court (1984)....7

Richmond Newspapers....7

Washington v. Texas, 388 U.S. U.S. 14 (1967)....15

White v. Illinois, 112 S.Ct. 736, 502 U.S. 346 (U.S.Ill.1992)....15

### FEDERAL COURT OF APPEALS

Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008)....19

Musladin v. Lamarque, 555 F.3d 830 (9th Cir. 2009)....2, 20

Rovinsky v. McKaskle, 722 F.2d 197 (5th Cir. 1984)....5, 16-17

U.S. v. Juan, 704 F.3d 1137 (9th Cir. 2013)....1, 3, 5, 10, 14

U.S. v. Lopez, 373 U.S. 427 (1963)....16

U.S. v. Sanchez, 176 F.3d 1214 (9th Cir. 1999)....15

U.S. v. vavages, 151 F.3d 1185 (9th Cir. 1998)..... 14

### OTHER JURISDICITON

People v. Raider, 256 Mich. 131 (1931)....16

## 1. OPENING STATEMENT

The new wave of public trial right cases published by this most Honorable Court on 9-25-14 are very important to Mr. Ruth's case, especially, Smith, No. 85809-8 and Koss, No. 85306-1. The facts & Issues presented in Mr. Ruth's case are perfect for this Court to provide the much needed guidance on how to properly conduct the "Experience & Logic" Test.

The decision made by Division One in Mr. Ruth's PRP is in conflict with the State & Federal Constitution; Juan 704 F.3d 1134 (9th.Cir); Koss & Smith:

"without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it 'expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor.' Ruth Claims 'the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor.' Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of yeats [sic], 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013)." No. 68380-2-I/3.

The Smith decision makes clear that it is suspicious to call a sidebar when the jury in not present, especially, when off-the-record Juan type "Substantial Government Interference" caused the sidebar that resulted in a secret in-chambers conference. Since the record proves that the historical scope of mundane sidebar & in Chamber discussions was exceeded, is the Experience prong satisfied?

Mr. Ruth asks this Court to attach the coextensive Art.1 § 10 & 22, Public Trial Right safeguard, to all off-the-record Juan type "Substantial Government Interference," giving the Accused the right to Cross-Examine a State witness about any perjury "threats" or "Warnings" made by the State; and place the burden on the state to prove the factual basis for the perjury allegations, and that perjury cannot be disuaded.

-1-

Next, where <u>Koss</u> fails Mr. Ruth succeeds, the record clearly proves that defense counsel & Mr. Ruth were not notified of the jury inquiry as required by crR 6.15(f)(1). The entire "Jury Inquiry" proceeding occurred in merely 3 minutes. (Exh. 1 "Trial Minutes")(Exh. 2 "Jury inquiry"). Mr. Ruth was in custody, unlike <u>Koss</u> & <u>Jasper</u>. Mr. Ruth did properly present the claims: (1) the trial Court did not follow the CrR 6.15(f)(1) procedure; (2) Mr. Ruth was Completely denied counsel; and (3) Mr. Ruth's Rights to "Appear & Defend" were violated.

The <u>Koss</u> decision makes clear that Division One adjudicated Mr. Ruth's claim contrary to the holding in <u>Sublett</u>. The Acting Chief Judge (ACJ) erroneously interpreted the <u>Sublett</u> holding as:

"In <u>Sublett</u>, the Supreme Court determined that the public trial right does not attack to the consideration of and response to a jury question. Sublett, 176 Wn.2d 75-78. Ruth fails to demonstrate a violation of his public trial right involving the jury question." No. 68380-I-2/3.

Also, the ACJ erroneously required Mr. Ruth to prove prejudice from the complete denial of counsel claim, although, that error is structural. No. 68380-2-I/2 & Fn 1. In <u>Frawley</u> Justice Wiggins stated that complete denial of counsel will always be considered structural. <u>Frawley</u>, No. 80727-2/9,18. That position is consistent with <u>Musladin v. Lamarque</u>, 555 F.3d 830, 841-44 (9th Cir. 2009).

Mr. Ruth will incorporate the relevant facts into the applicable arguments below. Mr. Ruth asks that this Court please not hold him to the same standards as lawyers because he is uneducated in the law. Please give these pleadings liberal interpretations. <u>Maleng v. Cook</u>, 490 U.S. 488, 493 (1989).

-2-

## 2. ISSUES PRESENTED FOR REVIEW

1.) After DPA Adcock had elicited only the adverse portions of (Ms. Woerner) a Material State Eye-Witnesses police statements through the substance of the alleged victims & other state witnesses; does closing the courtroom due to off-the-record Juan type "Substantial Government Interference" between the prosecutor and Ms. Woerner satisfy the three prong Smith test?

2.) In Slert the majority stated that "The experience and Logic test is also a useful analytical tool for determining whether a discussion may be held in Chambers." No. 87844-7/11 fn.4. How can that be true when the ACJ completely ignored the evidence provided by Mr. Ruth; sworn statement of Counsel Stephens; the affidavits & Private Investigation interviews of Ms. Woerner, Matthew R. Stroud I, Henry Slothaug, Donnie G. Poole, Matthew R. Ruth, and Jury Member Leslie Winnie?

3.) If observing the process will aid the public in assessing Mr. Ruth guilt or innocence, then has the process been historically open because "[t]he history and origin of the public trial clause make clear that the open courts right was designed to deter and expose corruption and manipulation in the Justice system." Slert, No. 87844-7/3 (Wiggins Concurring)

4.) Does a fair reading of the record prove that defense counsel & Mr. Ruth were not notified of the Jury inquiry, and therefore deprived of the ability to participate in the formulation of the response to the jury inquiry?

5.) The Jury inquiry requesting Ms. Woerner's police statement was caused by Judge Hulbert preventing Mr. Ruth from defending against the State's "Adverse" Woerner hearsay evidence; Judge Hulbert commented on the Woerner evidence through the disguise of sustaining DPA Adcock's objection, and then Judge Hulbert instructed the Jury to "draw it's own conclusion about it's recollection," as to whether the State used Woerner in chief. RP 247, 266-67.

6.) Mr. Ruth asks this Court to attach the Coextensive public trial right safeguard to off-the-record Juan type "Substantial Government Interference," giving the Accused the right to Cross-Examine a state witness about any perjury "threats" or "warnings" made by the state, and place the burden on the state to prove the factual basis for the perjury allegation and that the perjury cannot be disuaded.

7.) The lower courts are not using the "Experience Prong" to review historical practices, instead History is being used to reject Public Trial Right Challenges based on labels; the guiding principle is not being applied; and "Similar in Nature" comparisons are being ignored. The deciding factor in the Smith "Experience Prong" Analysis seemed to be whether the "Public Interest" was implicated by the Proceeding being challenged. This Court Should grant Review and clarify how to properly apply the "Experience Prong."

8.) Doe Mr. Ruth have to prove prejudice stemming from complete denial of counsel on collateral attack?

-3-

### 3. ARGUMENT ON WHY REVIEW SHOULD BE GRANTED

#### A. THE THREE PRONG SMITH TEST PROVES THAT PERJURY THREATS CANNOT BE DISCUSSED SECRETLY AT SIDEBAR & IN CHAMBERS A NEW TRIAL IS REQUIRED.

The 3 prong Smith test provides much needed guidance on how to determine whether a public trial right violation has occurred. The Smith Majority clarified that the guiding principle that must be applied to both the "Experience & Logic" prongs when conducting this test is "Whether openness will 'enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" Smith, No. 85809-8/6-7. Rather then using history as a Public Trial Right Bar as Division One has done in Mr. Ruth's case, the Smith decision proves that "The new experience and logic test calls for review of historical practices." Anne L. ellington & Jeanine Litzenhiser, In Washington State Open Courts Jurisprudence Consist Mainly of Open Questions, 88 WASH.L.REV. 491, 518 (2013).

The Proceeding being challenged in Mr. Ruth's case occurred during trial, lasted 28 minutes, and caused the jury during deliberations to inquiry about Ms. Woerner. The 28 min. Proceeding started at 2:54 p.m., when the trial Court called the daily recess. DPA Adcock went into the hallway to speak to his next witness, Reene M. Woerner. Ms. Woerner was one of four people who was present for the shooting, and the only one who was not a shooter or shot. She was Mr. Ruth's girlfriend during the shooting.

In the hallway a confrontation occurred where DPA Adcock physically assaulted Ms. Woerner leaving bruises; DPA Adcock called her a "Stupid Bitch" several times; and threatened to charge her with perjury "If she Testified" to what Ms. Woerner & Mr. Slothaug said was the complete truth. (Exh. 3 & 4 - P.I. Michael Powers Interviews of "Renee M. Woerner" & "Henry Slothaug").

-4-

In _Smith_ A critical distinction was made between _Smith_ & _Rovinsky v._
_McKaskle_, 722 F.2d 197, 198 (5th Cir. 1984):

"The sidbars here are further distinguishable from the motions in Ronvinsky
because there is a video and audio recording. Any inquiring member of the
public can discover exactly what happened at sidebar." No 85809-8/11.

Unlike the _Smith_ case in Mr. Ruth's case (like _Rovinsky_) there was no
Switch that was thrown to record what occurred in the hallway between DPA
Adcock & Ms. Woerner, nor the sidebar that led into chambers; and from
chambers back to sidebar. (Exh. 1 - "Trial minutes" at 7).

However, Mr. Ruth has provided a sufficient record to prove what occurred
in the hallway and at the sidebars & in chambers conference. Remember that
this closure was caused by the _Juan_ type "Substantial Government Interference"
that occurred in the hallway. (Exh. 3 & 4 - P.I. Michael Powers interviews
of "Renee M. Woerner" & "Herney Slothaug"); (Exh. 5 - "Matthew R. Stroud
I"); (Exh. 6 - "Mark Stephens"). These Exhibits are from people in the hallway
who are also trial spectators, and all were deprived of making record when
Judge Hulbert failed to conduct the Bone-Club Analysis.

Mr. Ruth has provided an adequate record for this court to determine
that a Public Trial Right violation did occur: (1) The above Exhibits; (2)
on-the-record summary (RP 179-81); (3) Mr. Ruth's attempts during
cross-examination to explain to the jury about why Ms. Woerner was not called
to testify by the state (the perjury threats), and the subsequent threats
from Judge Hulbert to restrain Mr. Ruth for attempting to make record of
the perjury threats (Rp 266-67, 281); (4) the jury inquiry requesting Ms.
Woerner's police statement (Exh. 1 & 2); (5) the biased comments made by
DPA Adcock & Judge Hulbert against Mr. Ruth during sentencing (2-4-05
Sentencing Hearing, Rp 13-14, 17-18, 20, 23-26).

Although the lead in Smith did hold that traditional mundane "sidebars do not implicate the public trial right," a warning was given in F.N. 10:

"We caution that merely characterizing something as a 'sidebar' does not make it so. To avoid implicating the public trial right, sidebars must be limited in content to their traditional subject area, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record. Whether the event in question is actually a sidebar is part of the experience prong inquiry and is not subject to the old legal-factual test." No. 85809-8/9.

In Footnote 4, the Slert Majority applies the same test to chambers discussions, "The experience and Logic test is also a useful analytical tool for determining whether a discussion may be held in chambers." No. 87844-7/11. Similarly, Justice J.M. Johnson in Smith instructed that the analysis applied to sidebars also applies to in chambers conferences. See F.N.3. Mr. Ruth asserts that the Smith analysis applies to the proceeding he is challenging.

The closed proceeding in Mr. Ruth's case is not consistent with the traditional role filled by chambers conferences and does implicate the public trial right. There is no chance that the juries concentration would be broken, or the flow of trial interrupted because the Sidebar & in chambers closure occurred while the jury was not present. The proceeding in Mr. Ruth's case is not analogous with sidebar and in chamber discussions. Mr. Ruth believes the 3 prong Smith test is helpful for this Court to determine whether the In-Chambers proceeding violated Both the Public's & Mr. Ruth's Public trial Rights under Art.1 § 10 & 22, and Mr. Ruth's Rights to "Appear & Defend."

### i. 3 PRONG SMITH TEST

(1) DOES THE PROCEEDING AT ISSUE IMPLICATE THE PUBLIC TRIAL RIGHT?

"The first part of the test, the experience prong, asks 'whether the place and process have historically been open to the press and General public.' 176 Wn.2d at 73." No. 85809-8/6.

-6-

The "Experience Prong" provides the landscape "for review of historical practices." 88 WASH.L.REV. 491, 518 (2013). "Strangely history informs the inquiry at times and is ignored other times." Smith, 8509-8/13 fn 6 (Wiggins, J., Concurring). The lower courts are not applying the guiding principle to the "Experience Prong," instead if Historically the proceeding is not open, the lower courts end the "Experience & Logic" test. This is no different then using labels versus substance.

History is not the determinative question on whether the public trial right is implicated. For example in Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed. 2d 248 (1982), Chief Justice Burger proved that Historically the proceeding at issue was closed, however, for the majority Justice Brennan focused on the positive role openness would play in the functioning of the proceeding in question, so the Logic prong was determinative:

"For the majority, Justice Brennan emphasized the general the general function for self-governance to be served by an open trial and held that a trial might be closed only in specific cases where there was a documented or reasonable harm to such minors. Chief Justice Burger, in dissent, pointed instead to the Historical evidence supporting closure of this particular type of trial. The split between these two approaches from Richmond Newspapers was also evident in Press-Enterprise Co, v, Superior Court (1984)." Lynn Mather, (Professor of Government, Darthmouth College), The Oxford Guide to United States Supreme Court Decisions, Page 259.

The deciding factor in the Smith "Experience" analysis seemed to be whether the "Public Interest" is implicated. In both Bone-Club & Rovinsky the Smith lead reasoned that "Public Interest" was implicated because the proceedings involved substance that is material for "the public to observe the process and weigh the defendant's guilt or innocence for itself." Smith at 12.

-7-

If the scope of mundane sidebar & in chamber discussions is exceeded and the "Public Interest" is implicated then Historically the proceeding in question has been open. This is especially true when "Substantial Government Interference" is being discussed in the closed proceeding being challenged because as Justice Wiggins points out "The history and origin of the public trial clause make clear that the open courts right was designed to deter and expose corruption and manipulation in the Justice system." Slert, No. 87844-7/3.

Also, In Mr. Ruth's case the closure occurred during the daily recess when the Jury was not present; so the Public inherited the entire safeguard against overzealous prosecutors & Bias Judges. Sublett 176 Wash.2d 58, 292 P.3d 715, 723-24 (2012). The Jury Trial Right was designed as "an inestimable safeguard" against any chance of bias and corrupt proceedings created by the Government Misconduct of the Judge & Prosecution. Duncan v. Louisana, 391 U.S. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968).

The prevention of corruption & Manipulation through "Substantial Government Interference" is the very purpose of why the Public & Jury Trial Rights were designed. This Court has held that the type of misconduct that occurred in Mr. Ruth's case, is a Highly unethical issue of "Significant Public Interest," that rendered the ultimate fact of whether the threatened witness testified irrelevant. In re Bonet, 144 Wn.2d 502 (2011).

In State v. Carlisle, 73 Wn.App. 678, 871 P.2d 174, 177 (Wash.App.Div.1 1994), stated that if the prosecutor threatens to charge a witness "If She Testified," then it requires a dismissal. That is exactly what occurred in Mr. Ruth's case; exactly, what caused the closure; and was discussed at the sidebar & in chambers. (Exh. 6 - "Mark Stephens"); RP 179-81. Why else order that Ms. Woerner be appoint an attorney?

-8-

A Proper and fair Similar in Nature comparison is imperative to a proper History analysis. Mr. Ruth must present the relevant facts for a "similar in nature" determination to be made for a fair comparison.

In a sworn statement, Defense Counsel Mark Stephens, stated:

"8. On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony. He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

"9. I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset. She indicated to me Mr. Adcock had THREATENED to CHARGE her with PERJRUY IF SHE TESTIFIED. She expressed CONCERNS to me about potential legal CONSEQUENCES IF SHE TESTIFIED. I indicated I could not advise her and suggested she SEEK appointed COUNSEL to answer her questions." (Exh. 6).

The hallway confrontation between DPA Adcock & Ms. Woerner is the cause of the sidebar called by Judge Hulbert, during the daily recess, that led into chambers. The <u>Smith</u> court pointed out that Historically the purpose of a Sidebar is to prevent interrupting the juries concentration. In light of the sidebar & chambers history why would Judge Hulbert call a sidebar before going in chambers when the Jury was not present?

After admonishing the jury Judge Hulbert requested that DPA Adcock & Mr. Stephens give a brief summary of what was discussed in chambers, this lasted three minutes:

"THE COURT: [R]eal quickly, because Mr. Ruth was not present during a very brief conversation that we had in Chambers, we were simply talking about a scheduling issue. Calling or not calling a particular witness. If you want to just flesh that out.

"MR. ADCOCK: We had a conversation, your Honor .... my next witness, Renee Woerner, indicated to me, without any doubt, that she was going to commit perjury if she were called by the state to testify .... I believe he [Stephens] had a conversation with her where she brought up the fact that I had said that if you commit perjury, there is going to be consequences. And at that point he concluded that she needed to be advised.

-9-

"We're going to make arrangements for the Office of Public Defender to get her an attorney, to consult with her tomorrow about her options, so to speak.

"Mr. Stephens indicated to me that he did not know whether he is going to call her yet but that that was the first step ...."

"MR. STEPHENS: I just might add that's, MORE or LESS, what's happen. When I had my conversation with this potential witness, she indicated to me CONCERNS about COMMENTS Mr. Adcock MADE. She DID INDICATE the word "PERJURY" was used. I dont' know what CONTEXT that was in ... you need you own lawyer."

"THE COURT: Fair enough. Again, primarily for the benefit of Mr. Ruth, who was not present during that conversation, I want to make sure that we laid it all out, what the conversation was in chambers. OBVIOUSLY that facilities communication between you and your attorney." RP 179-81 (Appendix "B" ¶P 177, 179-81).

The label given to this proceeding is "Witness Scheduling," however, the record proves that is not what was discussed in chambers. The record clearly proves that <u>Juan</u> type "Substantial Government Interference" was discussed in Chambers. In fact that is why Ms. Woerner was in need of Counsel.

ii. <u>BERRYSMITH PROVES A FACTUAL QUESTION WAS AT ISSUE IN CHAMBERS.</u>

The in chambers discussion in <u>Berrysmith</u> was whether Defense Counsel was entitled to withdraw from representing Mr. Berrysmith because Defense Counsel Mr. Mulligan believed his client intended to commit perjury. <u>State v. Berrysmith</u>, 87 Wash.App. 268, 273, 944 P.2d 397, 401 (1997). The <u>Berrysmith</u> court reasoned that the "true issue is whether Mr. Mulligan had a sufficient factual basis for his strong belief that perjury was intended and could not be dissuaded, so that continuing with the representation would result in a violation of the rules of professional conduct." Id. So, the question before the <u>Berrysmith</u> court was not whether the client in fact intends to commit perjury, and that cannot be dissuaded. Id.

-10-

The in chambers discussion in Mr. Ruth's case is similar in nature to whether Ms. Woerner was in fact intending to commit perjury, and if so, can it be dissuaded. Ms. Woerner was not represented by any attorney, and the state used Ms. Woerner in chief, so Mr. Ruth's confrontation & Compulsory rights were at issue automatically making the in chambers conference a critical stage. The attorney in Berrysmith had the burden to prove that the belief in perjury was reasonable, and that it could not be dissuaded. "whether the lawyers belief is reasonable depends upon whether it had a firm factual basis. James, 48 Wash.App. 353, 366-67 (1987)(Gut level suspicion is not enough)." Id. at 401-02.

The reasonableness of DPA Adcock's perjury allegation is not at issue because he did not represent Ms. Woerner and she is not the criminal defendant. At issue is whether a firm factual basis for the perjury allegations existed, and if so, whether the perjury can be dissuaded. Mr. Ruth's Fair trial rights depend on the State presenting Ms. Woerner to the jury because without her Mr. Ruth loses not only the State's endorsement of Ms. Woerner, but the powerful tool of cross-examination. If the Defense has the burden to call Ms. Woerner, the State is empowered to impeach any portion of Ms. Woerner's testimony that is exculpatory to Mr. Ruth, while maintaining the integrity of the "adverse" Woerner hearsay through the credibility of the State's Witnesses. 1966 WASH.U.L.Q. 068, 081 (1966).

Judge Hulbert has a historical responsibility to protect Ms. Woerner from the "Substantial Government Interference" of DPA Adock:

"A leading 19th Century commentator, quoted by Dean Wigmore, noted that the english law 'throws every fence round a person accused of perjury,' for 'the obligation of protecting witnesses from oppression, or annoyance, by charges, or threats of charges, of having borne false testimony, is far paramount to that of giving even perjury its deserts(sic).

-11-

"To repress that crime, prevention is better than cure: And the law of England relied, for this purpose, on the means provided for detecting and exposing the crime at the moment of commission, such as publicity, cross-examination, and aid of a jury, Etc.; E.Best, principles of law of evidence s 606 cc. Chamberlayne ed. 1883. See J. Wigmore Evidence 275-276 (3d ed. 1940). State v. Olson, 92 Wash.2d 134, 594 P.2d at 1340-41 (1979).

History has provided Open Court protection of a witness being accused of Perjury. Further supporting Mr. Ruth's position is State v. Rainey, No. 68846-4-I (Wash.Div.1 2-24-14), where Division One held that potential witnesses failure to personally assert her Fifth Amendment privilege against self-incrimination in open court violated Rainey's public trial rights. In reaching that conclusion the Rainey court looked to the procedure in Lougin, 50 Wn.App. 376 (1988). In Lougin defense Counsel told the Jury a codefendent would be testifying, before the court ruled that the codefendant would be subject to full cross-examination, which made her not want to testify. Similarly in Ruth's case, Judge Hulbert had DPA Adcock inform the jury Ms. Woerner was a state's witness. RP 15-16.

The Trial court in Lougin instructed the jury that, due to certain legal rules, the codefendant would not be testifying and that her nonappearance should not be considered in arriving at their verdict. In Mr. Ruth's case no such instruction was given, and in fact when the defense tried to rebut the State's use of Woerner hearsay in their case in chief DPA Adcock objected and Judge Hulbert commented on the evidence when sustaining the objection. RP 247, 266-67.

Here is one example, DPA Adcock asked alleged victim Drew Eden, What Ms. Woerner "was doing during all this?" Drew Eden replied "I remember her being freaked out ... and she was saying, like "Matt, Stop. Stop." RP 164. After, Ms. Woerner was not called by the state, and during Mr. Ruth's Direct-Examination, Defense counsel asked the same question, and DPA Adcock Objected.

-12-

In front of the jury, defense Counsel Stephens explained to Judge Hulbert that DPA Adcock had used Woerner in chief. Judge Hulbert said that was not his recollection and instructed the jury to make their own "conclusion about their recollection." RP 247. However, the Jury had to draw their conclusion without Mr. Ruth being able to defend against DPA Adcock's biased & untruthful one-sided adverse version. The in chambers proceeding combined with the biased ruling from Judge Hulbert prevented Mr. Ruth from defending against the Woerner Hearsay, and from presenting his theory of self-defense. RP 207, 221, 223-228, 247, 266-67, 294-95, 297-01, 309; (Appendix "C" at 3 & 4). The Jury inquired about Ms. Woerner's Police Statement during deliberations. (Exh. 1 & 2). A Manifest Error arises from the combined effect of these serious Constitutional violations. RAP 2.5(a)(3).

The Rainey Court further stated that Lougin Appealed arguing that the trial court erred in allowing the potential witness to make a blanket refusal to testify. Division One agreed and explained how the trial court should have proceeded:

"Lougin suggest that the proper procedure would have been to allow him to call the codefendant and question her. If at any point she claimed a privilege against answering a question, the trial court could rule on her claim as it related to the specific question asked .... It is impossible to know what the codefendant would have done if confronted with specific substantive questions. Conceivably, if properly advised as to the scope of her privilege, she could have testified on Lougins behalf and still avoided incriminating herself."

The same applies to Ms. Woerner. Instead of improperly threatening her off-therecord, and then preventing her from being questioned. The Fair process is to have a third party properly advise her on the record in open court, to the scope of her duties and rights as a witness, then allow the parties to determine if a firm factual basis exist to support the perjury allegation, and if so, whether it could be dissuaded. The result being that Ms. Woerner would have been subjected to cross-examination without committing perjury, or violating Mr. Ruth's Rights.

-13-

Further supporting the need for this procedure is U.S. v. Juan, 704 F.3d 1137 (9th Cir. 2013). Application of the Juan rule is problematic where DPA Adcock's threats to Ms. Woerner do not appear on the record. The more protective Washington State Public Trial Rights of Art. 1 § 10 & 22 can be harmonized with the Juan Rule by requiring any "Warning" to be made in Open Court on the record. However, any off-the-record "threats" must be investigated in a "Ruth Hearing," then depending on "the manner in which the prosecutor ... raises the issue, the language of the warnings, and the prosecutor's ... basis in the record for believing the witness might lie," the prosecutor's warning may be proper. U.S. v. Vavages, 161 F.3d 1185, 1190 (9th Cir. 1998). Mr. Ruth is entitled to cross-examine Ms. Woerner about:

(1) the perjury threats;

(2) the exculpatory portions of her police statement; and

(3) The adverse hearsay elicited by DPA Adcock through the substance of the State witnesses.

"Critically, however, the Ninth Circuit's extension of Webb to the prosecution witnesses also implicitly relies upon the Sixth Amendment right to confront witnesses .... In short Juan Fundamentally protects a defendants Sixth Amendment right to elicit exculpatory evidence from an 'adverse' government witness." Ruth A. Moyer, Substantial Government Interference with Prosecution Witnesses: The Ninth Circuit's Decision in United States v. Juan, Minnesota Law Review Headnotes, 98:22, 28-29 (2013).

iii. IN CHAMBERS CLOSURE PREVENTED MR. RUTH FROM CROSS-EXAMINING MS. WOERNER

If Ms. Woerner would have been cross-examined about her 12-11-03 - police statement, Mr. Ruth would have been able to challenge Jeremy Custer's testimony (RP 137) and elicit the following exculpatory corroborating evidence for his self-defense, defense:

-14-

"WOERNER: Jeremy said 'No Cops' ... went in the house, grabbed a black garbage bag which I've seen that he had a pound of weed in it before so that's what, he grabbed the garbage bag and he said 'No Cops' like that ....

"DET. WILLOTH: Why did you go with him [Ruth]?

"WOERNER: Because I didn't want to get shot by drug dealers .... I can't think of a fancy lie or anything, that's all. I just didn't wanna to get shot by drug dealers. And cuz Jeremy said 'No Cops' when he left. Uh, it scared me .... and because SHE had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shot me over a pound of weed? But all this weird stuff had happened and it was stressful." (Exh "7" 25, 28-29).

During alleged Victim Jeremy Custer's Direct-Examination DPA Adock asked:

"Q - One of the statements someone [Woerner] indicated they heard someone say 'No Cops,' initially. Do remember hearing that. Q - Why did you say that?

"A - Because honestly, I didn't -- he had been a friend and I didn't know if he was just not thinking. Kind of the same reason I said, 'you're shooting me.' Like, do you understand what you're doing? You know. I didn't have the anger, I guess, to -- you know. I knew he was going to get in a lot of trouble." RP 137.

Mr. Ruth was unable to challenge the State's Witnesses without cross-examination of Ms. Woerner. The "accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony .... This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. 14, 19 (1967). The Purpose of the Confrontation Clause includes "Restricting admission of hearsay testimony." White v. Illinois, 112 S.Ct. 736, 502 U.S. 346 (U.S.Ill.1992). "The hearsay prohibition serves to prevent the jury from hearing statements without giving the opposing part a chance to challenge the declarant's assertions." Brundridge v. Fluor Federal Services, INC., 164 Wash.2d 432 (2008). Testimonial hearsay is not made admissible by allowing "the substance of a testifying witnesses [Custer-Eden-Korder] evidence to incorporate out-of-court statement by a declarant [Ms. Woerner] who dies not testify." State v. Martinez, 105 Wn.App. 775, 20 P.3d 1062, 1067 (Wash.App.Div.3 2001)(Citing to U.S. v. Sanchez, 176 F.3d 1214, 1222 (9th Cir. 1999).

-15-

"More fundamental, the confrontation clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527, 2541, 557 U.S. 305 (U.S.Mass.2009).

At common law "a Rule evolved in England in the early nineteenth century that the prosecutor in felony cases was under a duty to call: (1) all eyewitnesses to the offense." 7 Wigmore, Evidence § 2079 (3d ed. 1940). The More protective State Face-to-Face protection imposes a duty & obligation on the State to present a "Res Gestae Witness" for cross-examination to:

(1) Avoid the suppression of evidence favorable to the accused; and

(2) protects the accused against false accusation by giving him the opportunity through cross-examination to elicit exculpatory evidence. U.S. v. Lopez, 373 U.S. 427, 445 (1963); People v. Raider, 256 Mich. 131 (1931).

Any proceeding that limits Mr. Ruth's right to cross-examination must be done in open court. Rovinsky v. McKaskle, 722 F.2d 197 (5th Cir. 1984); State v. Stentz, 30 Wash. 134, 70 p. 241, 243 (Wash.1902). The mundane scope of sidebar & in chamber discussions was exceeded by the closed proceeding in Mr. Ruth's case. The Public has great interest in this process for two reasons. First, the public's observation would aid in determining Mr. Ruths guilt or innocence. Second, had the Bone-Club analysis been conducted the second proponent would have produced objections from the public to the closure, and record of what occurred in the hallway confrontation. Mr. Ruth has satisfied the Experience prong.

The second part of the test the logic prong asks "Whether public access play a significant positive role in the functioning of the particular process in question." In Smith the Logic prong was rejected becuase "Smith articulates no specific interest that is served by ensuring that the public is privy to a sidebar." No. 85809-8/12. Mr. Ruth has already established the proceeding he is challenging was not record, nor contemporaneously memorialized in the record.

-16-

The "Ruth Hearing" will play a positive role in the functioning of any proceeding involving "Substantial Government Interference" & "Perjury," especially, in this proceeding where Mr. Ruth's Confrontation, Compulsory, and Fair Trial Rights are in jeopardy. "By subjecting criminal trials to 'contemporaneous review in the forum of public opinion,' this right prevents the abuse of judicial power, discourages perjury, encourages unidentified potential witness to come forward, and instills in the public the perception that their courts are acting fairly." Rovinsky at 199. This is especially true in Mr. Ruth's case because the alleged perjury will been discouraged, and unidentified public witnesses to the off-the-record "Substantial Government Interference" will come forward and make record. (Exh. 3,4,5).

"Public policy will not sanction any departure from the rule which requires that all communications shall be public, and in the presence of the parties..." State v. Wroth, Wash. 621, 47 p. 106, 106-08 (Wash.1896). "Public scrutiny serves as a check on abuse of judicial power and enhance public trust in the judicial system. These concerns are at play during each and every stage of a judicial proceeding." Slert, No. 87844-7/3-4 (Wiggins).

"The defendant's and public's mere presence passively contributes to the fairness of the proceeding such as deterring deviations from established procedures, reminding the officers of the court of the importance of their function, and subjecting Judges to the check of public scrutiny... The defendant's and the public's mere presence passively contribute to the proceedings" even when serving "no function in aiding the defendant's defense." State v. Bennett, 168 Wash.App.197,275 P.3d at 1229,1232 n.6 (2012).

"Unlike Synder, our decision in Shutzler, does not condition the right to 'appear and defend' at a particular 'stage of trial' on what a defendant might do or gain by attending ... or the extent to which the defendants presence may have aided his defense, but rather on the chance that a defendant's 'substantial rights may be affected' at that stage of trial." State v. Irby, 170 Wn.2d 874, 880, 885 n.6 (2011).

-17-

The Public's & Mr. Ruth's presence creates a coextensive safeguard, that triggers on the chance that Mr. Ruth's substantial right may be affected. As Justice Wiggins pointed out in Smith a Judge may make "biased or improper statements" and "one-sided rulings" when the sidebar & in chamber proceeding is not public. Smith, at 12. The same applies to DPA Adcock because he will be less likely to commit "Substantial Government Interference," when knowing that any "warnings" or "threat" will be investigated in Open Court.

Openness will prevent the State from the following vial tricks: DPA Adcock attacked Mr. Ruth's credibility through "Woerner hearsay" elicited from Kandy Korder, "Renee [Woerner] said Jeremy was into drugs. I felt like Matt & Renee were into drugs more so." RP 207; then during Mr. Ruth's Direct, every time he tried to rebut the Woerner drug hearsay, DPA Adcock objected. RP 226.

"MR. ADCOCK: Object to this line of testimony because it's not relevant. The testimony -- to this point about the shooting indicates there were no drugs present. How is this relevant? This is just an attempt to try to blame the victims or portray them in a negative light without any connection to the issues." RP 228, 295.

Ruth was not allowed to challenge any of the State's testimony regarding Ms. Woerner; nor show the jury why the drug evidence was so important to his self-defense claim. The prejudice stemming from the in chambers closure was augmented by DPA Adcock's closing argument, where he attacked Mr. Ruth's credibility based on the absence of Ms. Woerner's Cross-examination:

"He told you a lot about wild drug accusations, about everybody but himself. But it was interesting because Candy Corder [sic] was here and said, no, I was concerned about Matt and his Girlfriend having a drug problem. It wasn't Jeremy .... But I was concerned about the defendant and his girlfriend. Another indication that you cannot rely on anything the defendant has told you here. Candy Corder [sic] had no ax to grind." RP 299-01, 313-314. "If this is truly self-defense, why didn't he stick around? Say, hey, to the police, these guys attacked me. I had to do what I had to do. No he fled ... and took off with his girlfriend." RP 297-98.
"You have to decide who is telling the truth and who isn't. That's the main function ... And if you do that, you'll have to conclude that the defendant's version of those events is not only preposterous, it's laughable. And frankly, just an attempt to blame the victims of this crime for something they didn't do." RP 294-295.

Mr. Ruth has satisfied the Logic prong, and proven that the public trial right is implicated by the 28 min. proceeding being challenged.

(2) Was there a closure? A closure occurs "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." Lormor, 172 Wn.2d 85, 93 (2011). After the closure Judge Hulbert stated, "Mr. Ruth was not present during a ... conversation that we had in chambers .... Mr. Ruth, who was no present during that conversation." RP 179-81. Mr. Ruth has satisfied the second prong.

(3) Was the closure justified? "A Closure unaccompanied by a Bone-Club analysis on the record will almost never be considered justified." Smith at 15. No Bone-Club analysis was done. Mr. Ruth has satisfied all three prongs of the Smith test. Mr. Ruth asks that this court dismiss all of his charges with prejudice, or in the alternative remand for a new trial.

B. THE RECORD SHOWS THE ENTIRE JURY INQUIRY PROCESS LASTED 3 MINUTES

On page one of the trial minutes at 9:35 it states "Defendant present, in custody, represented by counsel, Mark Stephens," this occurs every time Mr. Ruth & Counsel are present. (Exh. 1). On Page 9, at 3:00 p.m., "the jury retires to deliberate upon their verdict," at 3:04 "defendant's motion for mistrial: denied," at 3:06 "Court in Recess." (Exh. 1). Mr. Ruth was returned to his isolation chamber segregation cell when the court went into recess. One hour and six minutes later, at 4:12 p.m. on December 8, 2004 the jury submitts a written inquiry requesting transcripts of the Renee Woerner, Jeremy Custer, and Drew Eden police interviews. Three minutes later at 4:15 p.m. the trial judge responds in writing that "The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank You." (Exh. 1 at 9). "The substance of the jury's request for evidence not admitted at trial ... [is] highly unusual." Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008).

-19-

SC#8990e-1 PRPof
Matthew
Ruth

The jury foreman knocked on the door at 4:12, then handed the bailiff the inquiry. The Bailiff hand delivered the inquiry to Judge Hulbert. Further time was consumed to read & comprehend the inquiry; formulate & hand write the response. The process ended at 4:15 p.m. (Exh. 2). It is physically impossible to notify the parties in three minutes. Notification is mandatory pursuant to CrR 6.15(f)(1). Mr. Ruth has a Right to participate in the formulation of the response. In Jasper proper record was made that "all Counsel/Parties [had the] opportunity to be heard." 174 Wn.2d 96 (2012). The record proves Mr. Ruth & Counsel were deprived of "an opportunity to comment upon the appropriate response." CrR 6.15(f)(1). A "deviation from CrR 6.15(f)(1) implicates constitutional protections." Koss, No. 85306-1/9 n 4. The Ninth Circuit held that it is the missed opportunity to participate in the formulation of the response that creates the critical stage. Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009).

Pursuant to CrR 6.15(f)(1) the trial Judges must make record that all the parties were notified and participated in the formulation of the response. This Court must send a message to the trial courts regarding the importance of that duty. Mr. Ruth asserts that CrR 6.15(f)(1) is the functional equivalent of the Bone-Club analysis during deliberation, that triggers upon inquiry. Simply filing the response in open court does not cure the violation of Mr. Ruth's Rights to public trial, Counsel, Appear & Defend, and fair trial. Since the Sublett Court reduced the public trial rights to CrR 6.15(f)(1), the Judges failure to make record of notification to the parties, is a closure that can never be justified.

Respectfully Submitted,

9-16-14
9-23-14

X _MATTHEW R. RUTH_

MATTHEW R. RUTH, PRO SE LITIGANT

APPENDIX

"A"

*The Court of Appeals*
of the
*State of Washington*

DIVISION I
One Union Square
600 University Street
Seattle, WA
98101-4170
(206) 464-7750
TDD: (206) 587-5505

RICHARD D. JOHNSON,
*Court Administrator/Clerk*

January 17, 2014

Seth Aaron Fine
Attorney at Law
Snohomish Co Pros Ofc
3000 Rockefeller Ave
Everett, WA, 98201-4060
sfine@snoco.org

Matthew Robert Ruth
#879492
Stafford Creek Correctional Center
191 Constantine Way
Aberdeen, WA, 98520

CASE #: 68380-2-I
Personal Restraint Petition of Matthew Robert Ruth

Counsel:

Enclosed please find a copy of the Order Dismissing Personal Restraint Petition entered by this court in the above case today.

Pursuant to RAP 16.14(c), "the decision is subject to review by the Supreme Court only by a motion for discretionary review on the terms and in the manner provided in Rule 13.5A."

This court's file in the above matter has been closed.

Sincerely,

Richard D. Johnson
Court Administrator/Clerk

law

enclosure

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Personal
Restraint of:

MATTHEW ROBERT RUTH,

           Petitioner.

No. 68380-2-I

ORDER OF DISMISSAL.

Matthew Ruth has filed this personal restraint petition challenging his

conviction in Snohomish County Superior Court No. 03-1-02451-6. In Ruth's direct

appeal, the Supreme Court remanded the matter for resentencing based on the use

of the phrase "deadly weapon" rather than "firearm" in the special verdict forms on

the enhancements in State v. Ruth, 167 Wn.2d 889, 225 P.3d 913 (2010), and issued

the mandate in May 2010. The trial court resentenced Ruth on December 8, 2010.

Ruth did not appeal. Ruth filed the present petition on December 2, 2011, raising

issues relating only to his 2004 jury trial. In particular, Ruth now claims that the trial

court violated his right to a public trial and his rights to the presumption of innocence

and a unanimous verdict.

In order to obtain collateral relief by means of a personal restraint petition,

Ruth must demonstrate either an error of constitutional magnitude that gives rise to

actual prejudice or a nonconstitutional error that inherently results in a "complete

miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d

506 (1990). Bare assertions and conclusory allegations do not warrant relief in a

personal restraint proceeding. In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828

No. 68380-2-I/2

P.2d 1086 (1992). Because Ruth has not made any showing that he can satisfy this threshold burden, the petition is dismissed.

Ruth contends the trial court violated his right to a public trial by answering a jury question in chambers and by holding a conference in chambers about the State's decision not to call a witness. The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution, provide the accused with the right to a public trial. In re Pers. Restraint of Orange, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Certain proceedings must be held in open court unless the five factors listed in State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995) justify closing the courtroom. Orange, 152 Wn.2d at 808-11. The threshold question is whether, under the experience and logic test, the proceeding at issue implicates the public trial right. State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Under that test, courts consider (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Sublett, 176 Wn.2d at 73 (quotations omitted). In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question. Sublett, 176 Wn.2d at 75-78. Ruth fails to demonstrate a violation of his public trial rights involving the jury question.[1]

---

[1] Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. Because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief.

2

No. 68380-2-I/3

As to the conference in chambers regarding the witness, Ruth claims that the particular circumstances here implicated the public trial right. Briefly, the attorneys and the trial judge met in chambers to discuss scheduling. Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record, "in an overabundance of caution, real quickly, because Mr. Ruth was not present." The prosecutor explained that he believed Ruth's girlfriend Rene Woerner would commit perjury if called to testify by the State, that defense counsel had also spoken with Woerner, and that the Office of Public Defense would be providing an attorney to advise Woerner.

Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it "expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor." Ruth claims "the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor." Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of Yeats, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Relying on State v. Bennett, 161 Wn.2d 303, 315-16, 165 P.d 1241 (2007), Ruth also contends the use of the Castle[2] reasonable doubt instruction violated his constitutional rights. In Bennett, the Supreme Court concluded that the Castle instruction is "constitutionally adequate," but used its inherent supervisory power to

---

[2] State v. Castle, 86 Wn. App. 48, 935 P.2d 656 (1997).

3

No. 68380-2-I/4

direct trial courts to use only Washington Pattern Jury Instruction (WPIC) 4.01. <u>Bennett</u>, 161 Wn.2d at 315, 318. Without sufficient explanation, Ruth now claims that the use of the instruction in his 2004 trial undermined his constitutional right to the presumption of innocence and allowed the jury to convict based on a lower standard of proof. Because Ruth's trial took place years before the Supreme Court disapproved of the "constitutionally adequate" instruction in <u>Bennett</u> and he fails to identify or demonstrate a complete miscarriage of justice, this claim fails.

Finally, relying on <u>State v. Bashaw</u>, 169 Wn.2d 133, 234 P.3d 195 (2010), Ruth contends the jury instructions erroneously instructed the jury that it had to be unanimous in order to answer "no" on the special verdict forms. But our Supreme Court recently overruled the nonunanimity rule developed in <u>Bashaw</u>, concluding that it "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." <u>State v. Nuñez</u>, 174 Wn.2d 707, 709-710, 285 P.3d 21 (2012). Because the instructions were not erroneous, Ruth has no grounds for relief.

Now, therefore, it is hereby

ORDERED that the personal restraint petition is dismissed under RAP 16.11(b).

Done this 17th day of January, 2014.

_____
Acting Chief Judge

2014 JAN 17  PM 2: 51

COURT OF APPEALS DIV I
STATE OF WASHINGTON

4

*Colloquy*

1    that nature.  It makes it easier for us to coordinate

2    everything else involved in our case.  And again, we'll

3    open the door about ten minutes before nine, is all.

4    So if you can time it that way, it really doesn't do

06:16    5    you any good to get here a whole lot earlier.  Some of

6    you might have to.  I'm not saying you can't.  But

7    please locate yourselves somewhere away from the

8    courtroom, and come to the jury room at five to nine.

9         Thanks a lot for attending today, and we'll see

06:16    10    you tomorrow.

11         JURY NOT PRESENT

12         THE COURT:  I think in an overabundance of

13    caution, real quickly, because Mr. Ruth was not present

14    during a very brief conversation that we had in

06:17    15    Chambers, we were simply talking about a scheduling

16    issue.  Calling or not calling a particular witness.

17    If you want to just flesh that out.

18         MR. ADCOCK:  We had a conversation, Your

19    Honor.  I informed Mr. Stephens and Your Honor that my

06:17    20    next witness, Renee Woerner, indicated to me, without

21    any doubt, that she was going to commit perjury if she

22    were called by the State to testify in this case.

23    Because of my ethical obligation not to suborn perjury,

24    I made a decision not to call her as a State's witness.

25         After my conversation with her, I spoke to Mr.

179

December 7, 2004

Colloquy

1    Stephens, I explained that to him.  I suggested maybe

2    he wanted to talk to her.  Maybe he was going to call

3    her as a witness.  I believe he had a conversation with

4    her where she brought up the fact that I had said that

06:18  5    if you commit perjury, there is going to be

6    consequences.  And at that point he concluded that she

7    needed to be advised.

8         We're going to make arrangements for the Office of

9    the Public Defender to get her an attorney, to consult

06:18 10    with her tomorrow about her options, so to speak.

11         Mr. Stephens indicated to me that he did not know

12    whether he is going to call her yet but that that was

13    the first step, in any event, and I agree.  And that's

14    where we're at.

06:18 15         MR. STEPHENS:  I just might add that's, more

16    or less, what's happen.  When I had my conversation

17    with this potential witness, she indicated to me

18    concerns about comments Mr. Adcock made.  She did

19    indicate the word "perjury" was used.  I don't know

06:18 20    what context that was in.  I advised her I cannot give

21    you any advice and if you need advice you need your own

22    lawyer.  Which I think was about all I could do with

23    that.

24         THE COURT:  Fair enough.  Again, primarily for

06:19 25    the benefit of Mr. Ruth, who was not present during

180

STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF  29906

APPENDIX

"B"

colloquy

RP 177, 179-81

12/7/04

The guiding principle is "Whether openness will 'enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" No. 85809-8/6-7 (quoting Press-Enter. Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). The Experience prong provides the landscape "for review of historical practices." Anne L. Ellington & Jeanine Blakett Lutzenhiser, In Washington State, Open Cour

December 7, 2004

Colloquy

```
 1              Thank you.
 2              AFTERNOON RECESS TAKEN
 3              JURY PRESENT
 4              THE COURT:  Ladies and Gentlemen of the Jury,
 5  06:13  at this point in time we have had a slight scheduling
 6        change that's being contemplated by parties in this
 7        case.  And also, I think a couple of the witnesses
 8        actually didn't take quite as long as counsel had
 9        anticipated they might.  Sometimes --
10  06:14      The beauty of watching television dramas is that
11        these things are specifically scripted to fill 30
12        minutes or 50 minutes of an hour-long program.  And we
13        don't script our cases like that.  Sometimes people are
14        available or not available.  Changes are made as the
15  06:14  flow of the case goes.
16              All that is to say that we're done for today.  We
17        have no further witnesses available to us this
18        afternoon.  The attorneys tell me they are still right
19        on time as far as what they thought the length of the
20  06:14  case would be, so we're not losing ground in any way.
21        It won't cause an extension of the time of the overall
22        trial.
23              So with that, I'm going to just give you one last
24        brief admonishment, as we do every day.  Please do not
25  06:14  discuss the case.  Do not go to or near the scene.  Do
```

I, Matthew R. Stroud I, swear or affirm:

That I was at Matthew Ruth's trial and they took a recess, Adcock, the prosecuting attorney, walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I fallowed as I walked into the court room I saw Adcock walking over to Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do. I walked over to Matthew Ruths attorney and told him what I had just saw and heard, he told me not to worry he was going to put Renee Woener on the stand.
In the hall was also Renee Woemer's Mother and Dad who also heard everything. After the trial was over the head juror asked to speak with Matt's attorney and me the juror asked Matt's attorney why he did not put the only other witness, Renee Woerner ,on the stand Matt's attorney replied that he wanted to but he could not find her, I spoke up that that was not true as he knew she was in the hall waiting to testify, the Juror said then we convicted an incent man, we all believed Matt but was told if there was any dough we had to find him guilty if Renee woerner had testified we would not of had any dough and would have found him innocent.

I SWEAR OR AFFIRM THAT THE ABOVE AND FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

9/16/2019
Date                    Matthew R. Stroud I

STATE OF WASHINGTON

COUNTY OF SNOHOMISH

I, the undersigned Notary Public, do hereby affirm that Matthew R. Stroud I. personally appeared before me on the 16 day September, and signed the above Affidavit as his free and voluntary act and deed.

Notary Public

AMANDA M. MURRAY
Notary Public
State of Washington
My Commission Expires
November 19, 2016

Exhibit

5

Custer and Eden were higher than kites at the time of the shooting. She said that he called her a stupid bitch several times. Renee is still unsure as to why Stevens did not have her testify.

Mark, if needed I believe that I can get back in touch with Ms. Woerner. She gave me a private number that I can supposedly reach her at. Let me know what you think?

I will try to talk with Mark Stevens about the case and why he didn't put Woerner on the stand?


Thanks,
Michael Powers

their bed, Custer would not leave. Custer was reaching down into Renee's purse going through it while saying "we are searching everybody's shit." Renee said that Matt kept pleading with them to get out. Eden was sitting on the couch saying "what's the problem, if you didn't steal it then don't worry, we are going to do this one way or another." Custer was telling Matt and Renee that he was going to search the trailer "one way or another."

Renee said that she didn't recall the specific threats that Custer and Eden were making but she does recall that Matt kept telling them to leave, get out of his trailer. Renee said that Custer was "going through my purse, sitting on the bed when Matt reached up and grabbed his gun." The next thing she knows Matt is firing and the two are running out of the trailer. She did NOT see a gun on either Eden or Custer. She did tell me that Custer carried guns but she didn't recall seeing one on him that day. Renee said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not. I asked Renee if she thought her life or that of Matt's was in immediate danger at the time Matt started shooting? Renee response was "who knows. I didn't see any guns but then again I was not looking and they would not get out of the trailer."

She did confirm that Custer was "high as a kite at the time of the shooting." She feels that Matt grabbed the gun because he "felt trapped in the bedroom." She did recall that she was not able to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse, she can't say for sure.

I'll meet her on the day of trial. And will give us a call at noon. I told her that we are going there. I that we would
not say. She did tell me she might wave another man. I'm not

The following is a summary of the notes that I took on January 20, 2010 when I interviewed Rene Woerner. Her father Henry was present during the entire interview.

Henry was at the courthouse on the day in question. He did witness Adcock "drag" his daughter into a side room where he then heard yelling going on between Adcock and his daughter. Henry said that he was not able to make out what was being said but when Rene came out of the room she told her Dad that she was not testifying and that Adcock would not listen to what she was TRYING to tell him. Henry did not recall what the subject was about but he does recall that Rene said that she tried to tell him the truth and he didn't want to listen so she no longer had to testify.

Rene told me that she DID tell Adcock, just prior to trial, that this was over drugs and that Eden and Custer "were high at the time of the shooting." Renee said that she does recall what happened on that day; not all but most of what happened.

Renee said that there were a lot of people at the trailer and outside the trailer at the time of the shooting. The only ones IN the trailer were her, Eden, Custer and Matt. She said that Custer and Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs. Matt kept telling them to get out. Eden sat on couch in the living room area and Custer made his way over to the bed where Renee was sitting. She said that Matt kept telling them to get out and that he had not stolen their drugs. Eden and Custer did not believe him. Custer kept saying that they had to search the entire trailer because [illegible] they had searched everyone's and no exception [illegible] reason [illegible] usually sat on the end of the bed [illegible] [illegible]

TABLE OF AUTHORIT

Exhibit

3

MR. Roth sent his only copy
of this exhibit with
the original Motion for
Discretionary Review
Exhibit 3. Please get
it from there. I could Not
get copies from the Prison.

It is also in my pro se
Reply to State's Amended response
To PRP.

Interview of Henry Slothang
By Michael Powers

Filed in Open Court
_12-9-04_ 20
PAUL L. DANIELS
COUNTY CLERK
By _Grace Hampton_
Deputy Clerk

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF SNOHOMISH

State of Washington )
)
Plaintiff, )
)
vs. )
)
Matthew Robert Ruth )
)
Defendant. )
)

CAUSE NO. _03 - 1 - 02451 - 6_

**INQUIRY FROM THE JURY AND
COURT'S RESPONSE**

**JURY INQUIRY:**

1) Transcripts of interview with Renee Warner  Dec 10 & 11, 2003
2) Transcript of Interview(s) with Jeremy Custer (Nov 24, 2003)
3) Transcript of interview with Drew Eden (Nov 10, 2003)

DATE AND TIME _08 Dec 2004   16:12_

DATE AND TIME RECEIVED BY THE COURT: _12/8/04  4:12 pm_

**COURT'S RESPONSE:**  The evidence requested by The jury was not admitted into evidence and is not available to The jury during deliberations.
Thank you

_____
JUDGE

DATE AND TIME RETURNED TO JURY: _12/8/04  4:15 pm_

AA
88

## SAVE -- MUST BE FILED

EXHIBIT

11 2 4

JURY INQUIRY

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5,
Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate
     juror.
     The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

     At 4:12 p.m. on December 8, 2004, the Jury submits a written
     inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10
     & 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov.
     24, 2003; and 3) Transcript of interview with Drew Eden (Nov.
     10, 2003)"

     At 4:15 p.m. on December 8, 2004 the Court responds in writing
     "The evidence requested by the jury was not admitted into
     evidence and is not available to the jury during deliberations.
     Thank you."

     Inquiry from the Jury and Court's Response filed in open court.

**THURSDAY, DECEMBER 9, 2004**              Clerk: Grace Hampton
                                            Reporter: S. Magee
Court opened at 11:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
The jury returns to open court with their verdict.
State of Washington represented through Deputy Prosecuting
Attorney Julie Mohr.  Detective Kelly Willoth seated at counsel
table.
Defendant present, in custody, represented by counsel Mark
Stephens.
Verdict read in open court finding the Defendant guilty of the
crime of First Degree Assault as charged in Count I; and guilty
of the crime of First Degree Assault as charged in Count II.  On
Special Verdict Form A, the Jury found that the defendant was
armed with a deadly weapon at the time of the commission of the
crime in Count I and on Special Verdict Form B, the Jury found
that the defendant was armed with a deadly weapon at the time of
the commission of the crime in Count II.
Jurors polled: verdict unanimous.
Verdict Form A; Special Verdict Form A; Verdict Form B and
Special Verdict Form B are received and filed.
Court's Instructions filed in open court.
Jury is discharged.

9                        **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:28   Redirect examination of Detective Kelly Willoth by the State.
9:30   CANDY CORDER, called by the State, sworn and testified.
9:37   Cross examination of Candy Corder by the Defendant.
9:45   Court in recess.

10:00  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
10:02  EVAN THOMPSON, called by the State, sworn and testified.


       Exhibit no. 53 offered by the State:    ADMITTED 12-8-04
       Exhibit no. 54 offered by the State:    ADMITTED 12-8-04

10:15  Cross examination of Evan Thompson by the Defendant.
10:18  State rests.
10:19  MATTHEW RUTH, called by the Defendant, sworn and testified.
10:26  Attorney conference at sidebar.
10:28  Continuation of testimony of Matthew Ruth on direct examination
       by the Defendant.
11:03  Jury not present.
11:04  Colloquy of Court and counsel.
11:05  Court in recess.

11:25  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
11:26  Cross examination of Matthew Ruth by the State.
11:45  Defense rests.
       State rests.
11:46  Jury not present.
11:48  Colloquy of Court and counsel.
11:50  Court in recess until 2:00 p.m.

 2:00  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury not present.
       The Court takes exceptions and objections to instruction: None
       given.
 2:05  Jury present.
       Not reported.
       The Court instructs the Jury.
 2:20  Reported.
       State opens closing argument.
 2:40  Defendant makes closing argument.
 2:52  State makes final argument.

8                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

1:50   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       JEREMY CUSTER, called by the State, sworn and testified.

       Exhibit no. 49 offered by the State:      ADMITTED 12-7-04
       Exhibit no. 50 offered by the State:      ADMITTED 12-7-04
       Exhibit no. 51 offered by the State:      Not Offered
       Exhibit no. 52 offered by Defendant:      Not Offered

2:15   Cross examination of Jeremy Custer by the Defendant.
2:19   Redirect examination of Jeremy Custer by the State.
2:22   Recross examination of Jeremy Custer by the Defendant.
2:30   DREW EDEN, called by the State, sworn and testified.
2:45   Cross examination of Drew Eden by the Defendant.
2:53   Redirect examination of Drew Eden by the State.
2:55   Recross examination of Drew Eden by the Defendant.
2:56   Court in recess.

3:22   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       Attorney conference at sidebar.
3:24   The Court admonishes the jury and directs them to return on
       December 8, 2004 @ 9:00 a.m.
3:25   Colloquy of Court and counsel.
3:28   Court in recess.

       WEDNESDAY, DECEMBER 8, 2004           Clerk: Grace Hampton
                                             Reporter: S. Magee
       Court opened at 9:12 a.m., David F. Hulbert, Judge.
       The following proceedings were had to wit:
       This matter continued from previous day.
       State of Washington represented through Deputy Prosecuting
       Attorney, John Adcock.  Detective Kelly Willoth seated at
       counsel table.
       Defendant present, in custody, represented by counsel,
       Mark Stephens.
       Jury not present.
       Colloquy of Court and counsel.
9:15   Jury present.
       JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20   Cross examination of Jeremiah Sheridan by the defendant.
9:23   Detective Kelly Willoth, recalled by the State, previously
       sworn, testified.
9:25   Cross examination of Detective Kelly Willoth by the Defendant.

7                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.
9:10 Juror #9, Lesley Winney present.
State's voir dire of Juror #9, Mr. Winney.
Juror #9, Lesley Winney released to go back to the Jury Room.
The Court finds that Juror #9, Lesley Winney was engrossed in
the book he was reading and did not see the defendant being
brought to the Courtroom.

Exhibit no. 43 offered by the State:     ADMITTED 12-7-04
Exhibit no. 44 offered by the State:     Not Offered
Exhibit no. 45 offered by Defendant:     Not Offered

9:13 Court in recess.

9:40 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
9:45 Court in recess.

10:05 Court resumes as heretofore, defendant present, in custody, and
all parties present.
KELLY WILLOTH, called by the State, sworn and testified.

Exhibit no. 46 offered by the State:     ADMITTED 12-8-04

10:55 Court in recess.

11:14 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Cross examination of Kelly Willoth by the Defendant.

Exhibit no. 47 offered by Defendant:     Not Offered

11:28 GEORGE WILKINS, called by the State, sworn and testified.

Exhibit no. 48 offered by the State:     ADMITTED 12-7-04

11:39 Cross examination of George Wilkins by the Defendant.
11:40 Redirect examination of George Wilkins by the State.
11:42 Recross examination of George Wilkins by the Defendant.
11:44 SARAH BRYANT, called by the State, sworn and testified.
11:46 Cross examination of Sarah Bryant by the Defendant.
11:47 Court in recess until 1:30 p.m.

6                        TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27 The following 13 jurors were sworn to try this cause: Juror #1,
      Gary R. Hall is designated as alternate juror.
      1.  Gary R. Hall                7.  Andrea L. Greenlee
      2.  James Sinnema               8.  Robert G. Sears
      3.  Frank Brady                 9.  Lesley Winney
      4.  Barbara Garrett            10.  Marilyn Churchill
      5.  Karen R. Egtvedt           11.  Sharon Walker
      6.  Jennifer R. Clyde          12.  Donna Lee Orr
                                     13.  Mehari Gebrewold

11:28 Attorney conference at sidebar.
11:30 The Court directs general instructions to the Jury.
11:35 Colloquy of Court and counsel.
11:40 Court in recess until 1:00 p.m.

1:08  Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury not present.
      Colloquy of Court and counsel.
1:10  Jury present.
      State makes opening statement.
1:20  Defendant makes opening statement.
1:29  The Court instructs the Jury regarding note taking.
1:31  SUZANNA JOHNSON, called by the State, sworn and testified.
1:40  Cross examination of Suzanna Johnson by the Defendant.
1:42  Attorney conference at sidebar.
1:43  Jury admonished not to discuss this case and return on Tuesday,
      December 7, 2004 @ 9:55 a.m.
1:45  Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

      TUESDAY, DECEMBER 7, 2004                Clerk: Grace Hampton
                                               Reporter: S. Magee
      Court opened at 9:05 a.m., David F. Hulbert, Judge.
      The following proceedings were had to wit:
      This matter continued from previous day.
      State of Washington represented through Deputy Prosecuting
      Attorney, John Adcock.  Detective Kelly Willoth seated at
      counsel table.
      Defendant present, in custody, represented by counsel,
      Mark Stephens.
      Jury not present.

5                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:
13. Mehari E. Gebrewold
14. Frank P. Brady
15. James C. Sinnema
16. Barbara R. Garrett
17. Frances Winters
18. Lesley W. Winney
19. Michael Rucker
20. William Glover
21. Raymond Johnson
22. Richard Hill
23. Ella Larrick
24. Patricia Nakahara
25. Charlene Lindsay
26. Mary E. Barringer
27. I. Jay Fritch
28. Lawrence Thompson
29. Donna R. West
30. Jerry D. Rochford
31. Daniel D. Orme-Doutre
32. Jessica Marie Kinney
33. Dale W. Troupe
34. Brandon Duc Ha
35. Patricia J. Jason

10:20 All prospective jurors sworn: Oath of Voir Dire.
The Court directs general questions to all prospective jurors.
10:35 State's initial voir dire of entire prospective jury panel.
10:51 Defendant's initial voir dire of entire prospective jury panel.
11:13 State waives concluding voir dire of entire prospective jury panel.
11:14 Defendant's concluding voir dire of entire prospective jury panel.
11:20 Challenges for cause: prospective jurors passed for cause.

11:22 Plaintiff's first peremptory challenge: Kandace Aksnes.
Frank Brady picked to qualify as juror #3.
Defendant's first peremptory challenge: Edward Dawson.
James Sinnema picked to qualify as juror #2.

Plaintiff's second peremptory challenge: Jody Mountfield.
Barbara Garrett picked to qualify as juror #4.
Defendant's second peremptory challenge: Accepts Panel.

Plaintiff's third peremptory challenge: Richard Olsen.
Frances Winters picked to qualify as juror #9.
Defendant's limited peremptory challenge: Frank Winters.

4                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:37 State's motion in limine to prevent Defense counsel from using the term of "Snitch" or another derogatory comments regarding State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49 Defense motion in limine to exclude testimony of prior burglary charge around the time of the incident in question: Granted/Stipulated.

9:40 Defense motion in limine to exclude testimony of a prior assault of Renee Woerner: Granted/Stipulated.

9:41 Defense motion in limine to exclude testimony of defendant's criminal activity in Blythe, California: Granted/Stipulated.

9:42 Defense motion in limine to exclude any testimony or evidence of defendant's prior criminal history: Reserved.

9:43 Defense motion in limine exclude any evidence about defendant's last name or alias last names: Granted/Stipulated.

9:45 Defendant motion to strike testimony of State's witnesses, Renee Woerner, because he was unable to interview her, as his subpoena was returned: Denied. The Court finds that the remedy is not exclusion but to allow Defendant to interview the witness prior to testifying.

Exhibit no. 41 offered by the State:    ADMITTED 12-7-04
Exhibit no. 42 offered by Defendant:    Not Offered

9:48 Defendant's motion strike testimony of Jeremiah Sheridan because of defendant's inability to locate and interview this witness: Denied. The Court finds that the remedy is not exclusion but to allow Defendant to interview the witness prior to his testimony.

9:50 Colloquy of Court and counsel.
9:52 Court in recess.

10:15 The following persons were selected to qualify as jurors on this cause and seated in the jury box:

| | | | |
|---|---|---|---|
| 1. | Gary R. Hall | 7. | Andrea L. Greenlee |
| 2. | Edward A. Dawson | 8. | Robert G. Sears |
| 3. | Kandace Aksnes | 9. | Richard E. Olsen |
| 4. | Jody Marie Mountifield | 10. | Marilyn Churchill |
| 5. | Karen R. Egtvedt | 11. | Sharon Walker |
| 6. | Jennifer R. Clyde | 12. | Donna Lee Orr |

3                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6.

```
Exhibit no. 2 offered by the State:      ADMITTED 12-7-04
Exhibit no. 3 offered by the State:      ADMITTED 12-7-04
Exhibit no. 4 offered by the State:      ADMITTED 12-7-04
Exhibit no. 5 offered by the State:      ADMITTED 12-8-04
Exhibit no. 6 offered by the State:      ADMITTED 12-7-04
Exhibit no. 7 offered by the State:      ADMITTED 12-7-04
Exhibit no. 8 offered by the State:      ADMITTED 12-7-04
Exhibit no. 9 offered by the State:      ADMITTED 12-7-04
Exhibit no. 10 offered by the State:     ADMITTED 12-7-04
Exhibit no. 11 offered by the State:     ADMITTED 12-7-04
Exhibit no. 12 offered by the State:     ADMITTED 12-7-04
Exhibit no. 13 offered by the State:     ADMITTED 12-7-04
Exhibit no. 14 offered by the State:     ADMITTED 12-7-04
Exhibit no. 15 offered by the State:     ADMITTED 12-7-04
Exhibit no. 16 offered by the State:     ADMITTED 12-7-04
Exhibit no. 17 offered by the State:     ADMITTED 12-7-04
Exhibit no. 18 offered by the State:     ADMITTED 12-7-04
Exhibit no. 19 offered by the State:     ADMITTED 12-7-04
Exhibit no. 20 offered by the State:     ADMITTED 12-7-04
Exhibit no. 21 offered by the State:     ADMITTED 12-7-04
Exhibit no. 22 offered by the State:     ADMITTED 12-7-04
Exhibit no. 23 offered by the State:     ADMITTED 12-7-04
Exhibit no. 24 offered by the State:     ADMITTED 12-7-04
Exhibit no. 25 offered by the State:     ADMITTED 12-7-04
Exhibit no. 26 offered by the State:     ADMITTED 12-7-04
Exhibit no. 27 offered by the State:     ADMITTED 12-7-04
Exhibit no. 28 offered by the State:     ADMITTED 12-7-04
Exhibit no. 29 offered by the State:     ADMITTED 12-7-04
Exhibit no. 30 offered by the State:     ADMITTED 12-7-04
Exhibit no. 31 offered by the State:     ADMITTED 12-7-04
Exhibit no. 32 offered by the State:     ADMITTED 12-7-04
Exhibit no. 33 offered by the State:     ADMITTED 12-7-04
Exhibit no. 34 offered by the State:     ADMITTED 12-7-04
Exhibit no. 35 offered by the State:     ADMITTED 12-7-04
Exhibit no. 36 offered by the State:     ADMITTED 12-7-04
Exhibit no. 37 offered by the State:     ADMITTED 12-7-04
Exhibit no. 38 offered by the State:     ADMITTED 12-7-04
Exhibit no. 39 offered by the State:     ADMITTED 12-8-04
Exhibit no. 40 offered by the State:     ADMITTED 12-8-04
```

9:35   Arraignment on Second Amended Information.   SEE COURT FILE FOR
       RECORD OF MINUTES.

9:36   State's motion in limine to exclude witnesses except Detective
       Willoth: Granted.

2                          TRIAL MINUTES

FILED IN OPEN COURT

December 6, 2004
Pam L. Daniels
County Clerk

By: _Grace Hampton_
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

| | | |
|---|---|---|
| State of Washington | CAUSE NO.: | 03-1-02451-6 |
| (PLAINTIFF) | JUDGE: | David F. Hulbert |
| VS. | DATE OF TRIAL: | December 6, 2004 |
| Matthew Robert Ruth | REPORTER: | Stephanie Magee |
| (DEFENDANT) | CLERK: | Grace Hampton |

ATTORNEY FOR PLAINTIFF:          ATTORNEY FOR DEFENDANT:

John Adcock                      Mark Stephens

---

Days: 3.5 Days      **FINAL DISPOSITION - VERDICT**
Date trial ended: December 9, 2004
  The Jury found the Defendant guilty of the crime of First Degree
Assault as charged in Count I; and guilty of the crime of First
Degree Assault as charged in Count II.  On Special Verdict Form A,
the Jury found that the defendant was armed with a deadly weapon at
the time of the commission of the crime in Count I and on Special
Verdict Form B, the Jury found that the defendant was armed with a
deadly weapon at the time of the commission of the crime in Count
II.

Sentencing set for December 28, 2004 @ 1:00 p.m. Dept. 5,
Judge Hulbert.

---

9:35  This matter came on regularly for 12-person jury trial.
      State of Washington represented through Deputy Prosecuting
      Attorney, John Adcock.  Detective Kelly Willoth seated at
      counsel table.
      Defendant present, in custody, represented by counsel,
      Mark Stephens.
      Proposed jurors not present.

      Plaintiff's proposed Jury Instructions filed in open court.
      Defendant's Proposed Jury Instructions filed in open court.

      Colloquy of Court and counsel.

      Exhibit no. 1 offered by the State:      ADMITTED 12-7-04

1                          TRIAL MINUTES

AA
85

EXHIBIT

" | / /

TRIAL MINUTES

DPA Adcock objected to the defense's attempt to mitigate the prejudice
of the inadmissible testimonial Woerner Hearsay. Judge Hulbert disputed that
the State used Ms. Woerner in their case in chief, and sustained. RP 247.

### 3. ARGUMENT OF WHY REVIEW MUST BE GRANTED

#### A. HOW SHOULD THE COURTS FAIRLY MAKE A SIMILAR IN NATURE DETERMINATION?

The **Sublett** decision does not provide a proper Rule for the lower Courts
to use in making a fair Similar in Nature determination & Comparison. Without
such guidance from this Court the lower Courts are still using Labels rather
than the Substance to determine if Public Trial Rights attach. "The Right
of defendant to public trial does not turn on whether inquiry of hearing
is factual or doctrinal, substantive or procedural, but, on the relationship
of issue raised at hearing to merits of the charge, outcome of prosecution,
and integrity of administration of Justice. **Gannett Co. v. Depasquale**, 443
U.S. 368, 433-37, 99 S.Ct. 2898, 2933-35 (1979)." **Rovinsky v. McKaskle**, 722
F.2d 197 (5th Cir. 1984)(In Camera hearing on State's motion to restrict
cross-examination of prosecution witness, violated defendant's right to public
trial).

For Example, in Mr. Ruth's Case Judge Hulbert "labeled" the secret
In-Chambers proceeding as a "Witness Scheduling Matter." RP 179-181. No
Bone-Club analysis was done prior to the closure that excluded Mr. Ruth &
the Public, and no record was made for public & appellate review. This "label"
is not accurate, nor fair. Due to the closed Nature of the In-Chambers
proceeding, Mr. Ruth asserts that the substance of the Proceeding must be
examined to fairly make a Similar in Nature determination. This Court must
look at (1) What caused the Closure; (2) What Constitutional Rights are
implicated in the closed proceeding; (3) What impact the result of the closure
has on the implicated rights & trial.

-6-

1-20-10 -- P.I. Michael Powers, interview of R. WOERNER:

She said that Custer & Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs ... She did tell Adcock that it was over drugs & that Custer & Eden were higher than Kites at the time of the shooting. (Exhibit "2" RAP 13.5A)

12-7-04 -- JEREMY CUSTER -- DIRECT (Adcock):
        Q - Have you ever owned a gun? A - NO.

12-7-04 -- EDEN -- DIRECT (ADCOCK): Q - Where was RENNE?
Q - Did you ever threaten the Defendant? A - NEVER.
Q - Did Jeremy ever threaten the Defendant?
A - Not that I ever heard. RP 161.

1-20-10 -- P.I. Michael Powers, Interview -- R. WOERNER:

She did tell me that Custer carried Guns but she didn't recall seeing one on him that day. Renee Said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not.

Renee said that she didn't recall the specific threats that Cuter & Eden were making but she does recall that Matt kept telling them to leave, to get out of his trialer. Renee Said that Custer was "Going through my purse, sitting on the bed when Matt reached up and grabbed his gun ...'. She did recall that she was unable to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse .... She felt that Matt grabbed the gun because he "Felt trapped in the bedroom."

1-18-11 -- P.I. MICHAEL POWERS, Interview of DONNIE POOLE: I asked if he recalled telling Mr. Adcock that Matt Ruth had told him [Poole] that Custer had a gun during the argument between Matt & Custer? Donnie Said that Matt had told him, from the beginning, that Custer had a GUN and he recalled mentioning to Mr. Adcock that was the reason that Matt "Freaked out and started shooting" was because Custer had a gun in the trailer ....

Donnie believes the interview with Adcock started going bad when he tried to tell Adcock that he had bought drugs from Custer .... telling Adcock that Custer showed up at his house, several days after the shooting ... and Custer threatened Donnie and told him he had better not tell anyone about Custer's business and what kind of a guy Custer was .... Donnie said as soon as he started to tell Adcock the "truth" about Custer, Adcock would start yelling things at him saying things like "You're lying to protect your friend, none of this is true, this will never see the light of day" .... Donnie remembers telling Adcock that this incident was over "drugs." Donnie said that at this point Adcock was in his face yelling at him .... Adcock "got really mad when I told him that this was all over some drugs that Matt had supposedly stolen from Custer" .... Adcock was "Trying to intimidate me." (Exhibit "1" Donnie Poole).

-5-

"If this is truly self-defense, why didn't he stick around? Say, Hey, to the police, these guys attacked me. I had to do what I had to do. No, he fled ... and took off with his GIRLFRIEND." RP 297-298.

"He told you a lot about wild drug accusations, about everybody but himself. But it was interesting because Candy corder [sic] was here and said, no, I was concerned about Matt and his Girlfriend having a drug problem. It wasn't Jeremy .... But I was concerned about the defendant and his girlfriend .... In Fact I was writing their eviction letter when this all occurred. Another indication that you cannot rely on anything the defendant has told you here. Candy Corder [sic] has no ax to grind." RP 299-301, 313-314. (Candy Korder, 200-203, "Matt & RENEE had come up to the house a couple of times and indicated that there were problems brewing between Matt & Jeremy .... RENEE Said that Jeremy was into drugs. I felt like Matt & Jeremy — I mean, Matt & RENEE were into drugs more so." RP 207.)

12-7-04 -- JEREMY CUSTER -- DIRECT (Adcock):

Q - Who was present? A - RENEE WAS THERE. RP 121 - 123.

Q - So you asked the defendant if you could go to his trailer and look for these head phones? A - HE said YEP. RP 125.

Q - Do you remember who went in first? A - RENEE.
Q - So it was you, the defendant and RENEE M. WOERNER? A - Um-hum.
Q - Did you follow RENEE? A - SHE went in there FIRST, and I wanted to get in there when I SAW her GO in THERE.
Q - Did he [RUTH] ever attempt to keep you out? A - NO.
Q - When you got inside, where did Renee Go? A - She went and sat on the bed. RP 125-126.

Q - Drew EDEN -- he told a witness this whole thing was about drugs. Is that correct?   A - NO. RP 135.

12/11/03 -- 45 PAGE POLICE INTERVIEW OF RENEE M. WOERNER: Then all of the sudden I hear em talkin' I would sit on the bed cuz I mean that's ... and I looked out the window and they're kinda being serious. Then THEY come up to the TRIALER. Pg 16.

Matt's [Ruth] going NO you GOTTA GET outta the trailer. you CAN'T go through my shit. Pg. 17. And Matt [Ruth] was like check this out. There's like a pound of weed missing and they think I stole the shit. Pg. 18.

He'd [Ruth] just be like well I told you to get out ... and he [Custer] kinda dug around the floor right on the side of the bed. And Matt's like see, you're going through my stuff. Pg 19.

Det. WILLOTH: This is about the Missing? R. Woerner: Pound of Weed. Pg 19. R. WOERNER: I Don't know if he took the pound of weed. Pg 37. (Appendix "D" RAP 13.5A)

-4-

Because I didn't want to get shot by drug dealers .... I just didn't want to get shot by drug dealers. And cuz Jeremy [Custer] said "NO COPS" .... uh, it **SCARED ME**. Pg 29.

Lou is the guy .... He's the Asian guy that .... brings the GARBAGE BAG that JEREMY [CUSTER] took to the DURANGO. He's the one who takes it into JEREMY [CUSTER]. I've SEEN that, that's all I know. Pg 40.

DPA Adcock's substantial government interference prevented Mr. Ruth from Cross-examining Ms. Woerner. DPA Adcock took advantage of this Misconduct by testifying against Mr. Ruth and objecting to Mr. Ruth's drug defense.

12-8-04 - SOLE DEFENSE WITNESS -- **MATTHEW R. RUTH** -- DIRECT (STEPHENS):

"MR. STEPHENS: Every time I try to lay the foundation, he objects." RP 226. DPA Adcock objected every time Mr. Ruth said the word drugs. Eight objections before the Sidebar was called. RP 221, 223-238.

MR. ADCOCK: OBJECT to this line of testimony because it's not relevant. The testimony -- to this point about the shooting indicates there were NO DRUGS present. How is this relevant? This is just an ATTEMPT to TRY to BLAME the VICTIMS or PORTRAY them in a NEGATIVE LIGHT without any CONNECTION to THE ISSUES. RP 228, 295.

THE COURT: Let me see you at sidebar real quickly, if I could. (SIDECAR discussion OFF the RECORD.) RP 228

The denial to cross-examine Ms. Woerner, rendered Mr. Ruth defenseless. DPA Adcock ca pitalized on his Substantial off the record government interference, by making arguments he knew were contrary to the Real Evidence.

DPA **ADCOCK**'S CLOSING ARGUMENTS: "Mr. Stephens ... a parently he thinks that Mr. Custer, after the shooting, ran and got the bag with marijuana in it. But a parently he would have had to get it from the defendant's residence .... The evidence from Jeremy custer, he never said anything about drugs. He said it was about stereo equi pment." RP 309.

"You saw their demeanor on the stand .... Did they act like dealers of pounds and pounds of drugs? No .... That's nonsense, ladies and gentlemen. The instruction says you and you alone determine the credibility of the witnesses in the case .... you have to DECIDE who is telling the TRUTH and who isn't. THAT'S THE MAIN FUNCTION .... And if you do that, you'll have to conclude that the defendant's version of those events is not only preposterous, it's laughable. And frankly, just an ATTEMPT to BLAME the VICTIMS of this CRIME for something they DIDN'T DO. Don't go that way, ladies and gentleman." Rp 294 - 295.

-3-

## 2. FACTS RELEVANT TO REPLY

Judge Hulbert, ordered DPA Adcock to tell the Jury that Ms. Woerner is an endorsed State's Witness. "I have each of you introduce your own witnesses as we introduce you to the jury .... it's your responsibility to make sure you give all the names to the jurors." RP 15-16. DPA Adcock stated that Ms. Woerner is "a CRUCIAL WITNESS. Given the FACTS in this CASE, there was No Doubt about that." RP 9 - 10.

12-7-04 -- **DREW EDEN** -- DIRECT (Adcock):

Q - What was RENNE DOING during all this?

A - I remember her being freaked out .... And she was saying, like "Matt, Stop. Stop." RP 164.

Mr. Ruth did not object to the State eliciting the Substance & direct portions of Ms. Woerner's Out-of-Court police interview, through the alleged victims & other states Witnesses because Mr. Ruth was led to believe that he would get the opportunity to Cross-Examine her. The State's decision not to call Ms. Woerner turned the direct statements & the substance of the statements that were presented to the jury against Mr. Ruth into inadmissible testimonial hearsay evidence. RP 179-81.

12-7-04 -- **JEREMY CUSTER** -- DIRECT (Adcock):

Q - One of the Statements someone indicated they heard someone say "NO COPS," initially. Do remember hearing that. Q - Why did you say that?

A - Because honestly, I didn't -- he had been a friend and I didn't know if he was just not thinking. Kind of the same reason I said, "You're shooting me." Like, do you understand what your're doing? you know. I Didn't have the ANGER, I guess, to. -- you know. I knew he was going to get in a lot of trouble. RP 137.

12-11-03 -- Police interview -- **RENEE M. WOERNER**:

JEREMY [CUSTER] SAID **"NO COPS"** ... went in the house, grabbed a BLACK GARBAGE BAG which I've seen that he had a pound of weed in it before so that's what, he GRABBED the garbage bag and he said **"NO COPS"** like that. Pg 25.

-2-

NO. 89906-1

IN THE STATE SUPREME COURT FOR THE STATE OF WASHINGTON

---

IN RE THE PERSONAL RESTRAINT PETITION OF:

MATTHEW R. RUTH,

Petitioner.

---

REPLY TO STATE'S RESPONSE T C
MOTION FOR DISCRETIONARY REVIEW

DIVISION ONE COURT OF APPEALS
NO. 68380-2-I

---

MATTHEW R. RUTH
Pro Se, Litigant
DOC# 879492 H4-A-98L
STAFFORD CREEK CORRECTIONS CENTER
191 Constantine Way
Aberdeen, Wa 98520

A APPONDIX

"C"

Facts from
Reply to Nothing

*Colloquy*

1    that conversation, I want to make sure that we had laid

2    it all out, what the conversation was in Chambers.

3    Obviously that facilities communication between you and

4    your attorney.  I don't know where it's going to go.

06:19    5    You're ready to proceed tomorrow with other witnesses,

6    obviously.

7         MR. ADCOCK:  Nine o'clock.

8         THE COURT:  Start at nine and do what we can

9    do.

10         COURT RECESSED AT 3:29 P.M.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

181

EXHIBIT

"16"

MARK STEPHENS
DEFENSE COUNSEL

CERTIFIED
COPY

ORIGINAL

Filed In Open Court
12-28-04/20
PAM L. DANIELS
COUNTY CLERK
By _Grace Hampton_
Deputy Clerk

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                 **Plaintiff,**

        vs.

MATTHEW R. RUTH,

                **Defendant.**

No.03-1-02451-6

**MOTION TO WITHDRAW**

    Counsel for the defendant in the above entitled cause, Mark Stephens, respectfully

requests this Court allow counsel to withdraw from further representation of the defendant.

Counsel makes this motion based upon the attached declaration.

    Respectfully Submitted this 28th day of December, 2004.



03-1-02451-6    97

_____
MARK STEPHENS, WSBA #26110
Attorney for Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

Motion to Withdraw
Page 1

AA
97

# EXHIBIT 21

## DECLARATION OF COUNSEL

Counsel for the defendant declares the following to be true and correct to the best of his belief and information:

1. On November 13, 2003 the State charged Matthew Ruth with First Degree Assault while armed with a firearm, and the State later added a second count of First Degree Assault while armed with a firearm.

2. The incident which led to the charges was witnessed by Renee Woerner, Ruth's girlfriend.

3. After the shooting, the State executed an arrest warrant for Ms. Woerner in California.

4. Some time after filing the case, the State listed Renee Woerner as a State's witness for trial.

5. Shortly after Ms. Woerner's arrival at the Snohomish County Jail, she gave police and the prosecutor a sworn, tape recorded interview which essentially corroborated the accounts of the shooting provided by the two alleged victims. At the time she was represented by attorney Bill Joice.

6. Before trial in December, 2004, Deputy Prosecutor John Adcock indicated to me he intended to call Ms. Woerner to testify as a State's witness at Ruth's trial.

7. On Saturday, December 4, 2004, while preparing for trial, I returned a phone call from Ms. Woerner, in which she suggested she would be testifying differently from what she had said in her taped interview. On the phone Ms. Woerner spoke very rapidly and somewhat incoherently.

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

Motion to Withdraw
Page 2

8.   On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony.   He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

9.   I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

10.   Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.   She indicated to me Mr. Adcock had threatened to charge her with perjury if she testified.   She expressed concern to me about potential legal consequences if she testified.   I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.

11.   After giving the matter some thought, and conferring with my client, I decided not to call Ms. Woerner as a witness at trial.   I believed her testimony would be either corroborative of the victims' testimony, or easily impeached by her prior statement.

12.   On December 9, 2004 the jury returned verdicts of guilty as charged in this case.

13.   Some time the week of December 20, 2004 my temporary receptionist told me Ruth was trying to call me.   I instructed her to accept his call if I was in the office when he called.

14.   On December 27, 2004 I tried to visit Ruth in jail, but the jail was "locked down" and I was denied access.   I was concerned because some information I wanted to review prior to sentencing had not yet been provided, and I wanted to discuss this with Ruth.

15. After I returned to my office, my receptionist told me by intercom that Ruth was

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

holding on the phone. My office has a single outside phone line accessible by the public. All calls go to the reception desk, and then are transferred to attorneys and staff.

16.   I picked up the line and began to discuss the options for the next day's sentencing with Ruth. We spoke for a minute or two. At some point I made a disparaging remark to Ruth about his "girlfriend".

17.   At that point a female voice which I recognized from prior conversations as belonging to Renee Woerner spoke up. I was surprised and shocked, realizing there had been a third person listening in on the conversation without my knowledge or permission. Ms. Woerner then told me "this is being taped" or words to that effect. Ms. Woerner and I exchanged a few more words, and I hung up the phone.

Signed this 28th day of December, 2004, under penalty of perjury, in Everett, Washington.


Mark Stephens, Attorney for the Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue  · P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 · Fax 259-2195

EXHIBIT

7

This Exhibit is Appendix "D" of my Motion for Discretionary Review. Sorry I could not get copies.

12/11/03 Renee M. Woerner Police Interview.

EXHIBIT

"8"

Affidavit of
Matthew R. Ruth

I Matthew R. Ruth, Swear under the penalties of Perjury the following is true and correct to the best of my Knowledge.

1.) Each Part of the Reply where reference is made to My personal observations, actions, and etc. is part of this affidavit, I swear it is true.

2.) The Judge called the daily recess, and the Jury left the Court room. The Prosecutor John Adcock left to go talk to his Next Witness who was Material Eye-Witness Renee M. Woerner, one of the Four who were present in my home when the Shooting occured.

3.) 20 minutes later Mr. Adcock storms in the Courtroom, Matthew R. Stroud I trailing behind. Mr. Adcock announced very loudly to the entire Courtroom that he would not be calling Renee M. Woerner because she intended to Perjure herself. The Court reporter was not present to make this part of the record. My attorney Mr. Stephens approached Mr. Adcock by the Door out of my hearing. They began talking, and Mathew R. Stroud I, jumped into the conversation. Mr. Adcock left from them, and went to the Judge. Mr. Stephens and Mr. Stroud spoke for awhile, and then Mr. Stephens went out into the hallway.

4.) When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the Judges Bench. The Judge after hearing Mr. Stephens say something - which the Public, nor I could hear - Called Mr. Adcock over to the Bench. This was a Side Bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min.

5.) After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand, and personally interview her, and that I wanted to be present during the interview. He promised he would call her to testify, if she was

not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent Cross-examination, and due to the threats she would break down and begin lying. I told Mr. Stephens that she is the only witness who corroborates my defense that was present, she is critical. I told him to call Gary Way, Donnie Poole, Bill Storie, Court Lamb, etc. He called nobody, presented no evidence, and the only witnesses who was exculpatory for me that was present at trial is Ms. Woerner. He promised he would call her to testify.

6.) The day the State rested its case, Ms. Woerners parents, and my Dad were present. Mr. Stephens told me Woerner was not appointed an attorney, and was too, scared to testify. I asked what happened to her original attorney Bill Joice? Apparently he had shot another attorney and was in jail. When I took the stand the Prosecutor and Judge teamed up on me, and attacked me, yelling at me, and threatening me, I asked them to stop, and made record that Mr. Adcock Threatened Ms. Woerner, Coached her, and that is why she would not testify. The Judge threatened to put me in restraints. I had no contact with anybody during trial because in a secret hearing without my attorney present, Mr. Adcock had me put into isolation, I was there for three months before trial, and returned with absolutely no contact with anyone every night at trial. I even wrote letters to the Judges office and ACLU asking why I was in Isolation with no hearing? The Sensory deprivation really messed me up.

7.) Ms. Woerner's original statement corroborated my defense, she said they were high on drugs during the shooting, accused me of stealing drugs, invaded our home, threatened us, there were lots of them, they would not leave, I kept screaming for them to leave, and they said they would do what ever it takes to search my home

Page 2 of 4 - Matthew R. Ruth - Affidavit

for the stolen drugs. She corroborated them too, on where they were
in the trailer. The bad stuff she said about me were domestic violence
allegations, that she told the Western State Hospital people were
not true, and she said because she was mad at me, and scared she
would be charged as an accomplice. That is in my western state
evaluation. The Domestic violence allegations were ruled not
admissible during Motion In-Limine, the Prosecutor agreed. In my
Rap 10.10 Issue one, I challenged the Prosecutor breaking this order
by admitting the health certificate evidence that show Ms. Woerner
had been assaulted. This proves he was trying to get her to bring
in the Domestic violence stuff, and she wouldn't lie.

8.) Mr. Stephens never told me he wasn't going to call her after
the In-Chambers incident. He never showed me what corroborated the
Alleged victim, or was easily impeachable by her original statement,
he could not because he never interviewed her about her statement,
or intended testimony. In fact after trial I spoke to her on the
phone, after released from Isolation, and she told me before trial,
Adcock had tryed to get her to remove the parts of her statement
that corroborated my defense, she would not, and he threatened her.
She called my attorney, and he said it didn't matter because "Matt
is F_cked anyways." We three way called him, I confronted him, he
agreed that he said that to her, and then made really bad comments
about her. She told him the call was recorded. That is what caused
the Declaration and motion to leave.

9.) The Judge and Mr. Adcock were mean to me, and really biased,
my presence was reduced to nothing, the trial proceeding as if I
was not even there. The record at trial and sentencing proves that
the Judge and Mr. Adcock were biased against me.

10.) I tried to file a motion for new trial, but the court would
not let me file it, I included it and the affidavit in support in
my brief as exhibit 6, it was notarized at Shelton because the County

Page 3 of 4 - Matthew R. Ruth - Affidavit

Jail would not let me get it notarized. It is all true, and I want to adopt all of it in this Affidavit,

I swear all of this is true and correct to the best of my knowledge, under the penalties of perjury,

Signed in Aberdeen, Washington on This 10th Day of September, 2013.

X _____

Matthew R. Ruth

I, _____Barbara St Louis_____, am a Notary Public in and for the State of Washington, County of Grays Harbor, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes describes therein.

Signed and dated before me this 10th day of September, 2013.

/S/ _____

_____ Barbara St Louis

NOTARY PUBLIC in and for the State of Washington, County of Grays Harbor.

My Commission Expires: 6-4-16



Page 4 of 4 - Matthew R. Ruth - Affidavit



000028516

FILED

2005 MAR 18  PM 12: 12

PAM... DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT STATE OF WASHINGTON
IN AND FOR SNOHOMISH COUNTY

STATE OF WASHINGTON,                    )
                                        )        No. 03-1-02451-6
            Plaintiff,                  )
                                        )
    vs.                                 )        Affidavit in Support of Motion
                                        )        for New Trial or Relief from
MATTHEW R. RUTH,                        )        Judgment and Sentence
                                        )
            Defendant.                  )
                                        )
_____        )

STATE OF WASHINGTON          )
                             ) Affidavit by Declaration:
COUNTY OF SNOHOMISH          )

I, Matthew R. Ruth, am the Defendant in the above entitled cause and make this declaration in support of my motion to modify sentence. I hereby declare that I am over 21 years of age and competent to testify herein as the following facts are known by me to be true firsthand unless otherwise stated.

1.)   I hereby claim that my attorney at trial was Mark Stephens and that he failed to provide me with effective assistance of counsel based on the following.

2.)   There were notes from a key witness that could have been used to impeach, or lock in, testimony of a key state's witness that was not provided until October 20, 2004 and my attorney failed to object to the late discovery since the state had the evidence for 8 months prior to that date and his failure to act allowed the state's witness to lie and not be impeached. Had counsel objected to the late discovery, it is very likely that the court would have allowed some sanction to include

Motion for New Trial and Relief from Judgment and Sentence-Page 1 of 4
State v. Mathew R. Ruth, 03-1-02451-6                        Mathew Ruth, pro se
                                                            1918 Wall Street
                                                            Everett, Washington 98201

1   the exclusion of the witnesses' testimony which would have likely been detrimental to the state's
2   case and/or changed the outcome of the trial.
3
4   3.)      My attorney refused to go over the evidence with me and refused to provide copies of the
5   discovery to me claiming it was too expensive.
6
7   4.)      My attorney did not interview any of the defense witnesses which were relevant to
8   impeaching the state's witnesses and establishing his self defense or his credibility all of which was
9   crucial at trial. The defendant provided a list of witness questions and the attorney failed to ask any
10  of them. The defendant was prejudiced by the failure to conduct any defense due to the fact that;
11
12       a.     Witnesses would testify that Jeremy Custer had fled the scene in his black Dodge
13  Durango with two plastic bags from his house;
14
15       b.     And that Dru Eden had hijacked Sarah Bryant in her car then told her he was just
16  shot over drugs and that he was going to kill the defendant;
17
18       c.     Witnesses would testify that Jeremy Custer proceeded to the house of Court Lamb, a
19  witness in the Burkhiemer murder, and there at her house he refused to go to the hospital and
20  wouldn't tell what happened.
21
22       d.     Jeremy Custer testified that Court Lamb's Mother was a nurse and that testimony
23  could have easily been proven to be false.
24
25       e.     Court Lamb would testify that Jeremy Custer returned to the defendant's residence
26  with other armed persons after they had stashed the drugs; she would also testify that the officers
27  never searched these people.
28
29       f.     Court Lamb would testify that Jeremy Custer freaked out and told the officers "I
30  didn't break in, I won't talk to any body without a lawyer, I need a lawyer" and then he tried to run
31  away but he was caught and handcuffed. Jeremy Custer and Dru Eden did not decide to give any
32  statements until two weeks after the incident and then they changed their stories several times to
33  include at trial.
34
35  5.)      It is believed that the attorney should have made an offer of proof, off the record, at least, to
36  show that the state had threatened the defense's key witness with adversities such as charges of
37  perjury and threatening that she would not see her children for 10-15 years. The Prosecution was
38  using these tactics continuously to try to get the witness to change her story to this story or that
39  story by telling her, "[this is how it happened] remember, hint, hint!" The witness called the
40  defense attorney and told him, he said, "it doesn't matter" that the state is tampering with the
41  witnesses, "because he is fucked anyways."
42
43  6.)      The state was allowed to admit evidence that was not relevant, [falsely claiming blood of a
44  victim], and was prejudicial in that a blanket that had aged menstrual fluid was admitted as

Motion for New Trial and Relief from Judgment and Sentence-Page 2 of 4
State v. Mathew R. Ruth, 03-1-02451-6                                    Mathew Ruth, pro se
                                                                         1918 Wall Street
                                                                         Everett, Washington 98201

1  evidence that the alleged victim was further in the trailer, [where a shooting occurred], and which
2  implied that the defendant was a liar. Although the blanket was available, counsel never had the
3  blood tested for DNA to prove it did not belong to either of the alleged victims; therefore his client
4  was not a liar and was innocent.
5
6  7.)     Counsel yelled at his client in front of the jury, saying he wasn't going to listen to him
7  anymore, when it was his attorney's failure to prepare that caused the confusion in that a witness
8  was angry at his client and testified different than expected to exact a vendetta. Had counsel
9  interviewed the witness, he would have known that she was changing her story and why. The
10 witness has since recanted after discovering the reason for her vendetta was unfounded. The
11 witness thought that the defendant had told on her for the drug activity at her farm which almost
12 caused her to lose it. That fact could have been easily resolved except for the attorney's refusal to
13 act on his client's behalf to interview and question his intended witnesses. It was one of the alleged
14 victims that used to live on her property that caused her to almost lose her farm because he was
15 paying her with drug profits and that information was discovered by the current landowner.
16
17 8.)     A key states witness was a jailhouse snitch named Jeremy Sheridan. This witness had a
18 record a mile long and a history of telling untruths. He was literally paid by receiving more
19 favorable treatment on his charges by talking to the defendant and eliciting certain facts to use
20 against him. The defense attorney failed to attempt to get this testimony suppressed as unlawfully
21 obtained and later the attorney was unable to impeach the evidence given as being inconsistent
22 with previous statements due to the failure to prepare for trial properly. The period of time in which
23 that statement was alleged to have been elicited was during a period of time pending a competency
24 evaluation by Western State Hospital, and after the defendant had been ruled incompetent by the
25 court.
26
27 9.)     Defense counsel attempted to set up a plea hearing to get the defendant to plea guilty in
28 hopes of avoiding the inevitable trial. His intent was to refuse to conduct any defense and force his
29 client to plea guilty. This is a common scheme used in Snohomish County. Mark Stephens was a
30 long time member of the Snohomish County Public Defender's office where he honed these skills.
31 It is very difficult to just ignore someone's pleas to assist in conducting a defense, but after some
32 practice it is like raising children, you get used to the whining. Mark Stephens literally did not
33 conduct any defense for the accused and was so bold as to just set up a hearing to plea guilty for his
34 client without ever discussing it with his client.
35
36 10.)    Current counsel, Charles Dold, that was appointed to represent me after trial, has openly
37 said that I deserve to go to prison and that I shot two people. He claims my girlfriend is wiped out
38 on drugs and cannot help me, however, he has not talked to this person and is only making up lies
39 to avoid helping me. It is believed he has been influenced by my previous counsel, Mark Stephens,
40 whom he used to word with in the same office and whom he maintains constant contact. It is part
41 of the record that Mark Stephens made comments about my witness and I believe that he has
42 spoiled my newly appointed counsel with the same disease.
43

Motion for New Trial and Relief from Judgment and Sentence-Page 3 of 4
State v. Mathew R. Ruth, 03-1-02451-6                    Mathew Ruth, pro se
                                                         1918 Wall Street
                                                         Everett, Washington 98201

11.)   I feel that I need to new counsel, besides Charles Dold, to assist me in presenting my ineffective assistance of counsel claims. I hereby pray that some relief is granted.

I hereby declare that I have read the aforesaid statements and verily believe the same to be true under the penalties of perjury under the laws of the State of Washington pursuant to RCW 9A.72 et seq.

Signed in *Shelton*, Washington on this *19* day of *March*, 2005.

/S/ *Matthew R. Ruth*
Matthew R. Ruth, pro se # 310079
Address: 1918 Wall Street
Everett, Washington 98201

I, *Burton F. Averill*, am a Notary Public in and for the State of Washington, County of *Mason*, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes described therein.

Signed and dated before me this *15th* day of *March*, 2005.

/S/ *Matthew R. Ruth*
     *Burton F. Averill*
NOTARY PUBLIC in and for the State of
Washington, County of *Mason*
My Commission Expires *02/18/07*.

Motion for New Trial and Relief from Judgment and Sentence-Page 4 of 4
State v. Mathew R. Ruth, 03-1-02451-6
Mathew Ruth, pro se
1918 Wall Street
Everett, Washington 98201

000028515

2005 MAR 18  PM 12: 12

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

### The Superior Court of the State of Washington
### in and for Snohomish County

| | |
|---|---|
| STATE OF WASHINGTON, | ) No. O3-1-02451-6 |
| Plaintiff, | ) |
| vs. | ) MOTION FOR NEW TRIAL |
| | ) OR ARREST OF JUDGMENT |
| MATTHEW R. RUTH , | ) |
| Defendant. | ) |

1.   IDENTITY OF MOVING PARTY

Matthew R. Ruth , is the Defendant in the above numbered cause. He seeks the relief designated in section 2.

2.   STATEMENT OF RELIEF SOUGHT

Defendant, pro se, seeks an extension of time to file this action to the date of receipt based upon the fact he is incarcerated and not trained in the law and has prepared and filed this actions in as timely of manner as possible; he seeks appointment of new counsel to advance the legal and factual issues that remain unanswered or improperly presented and ultimately a new trial and/or arrest of judgment and dismissal of the charges. This motion is pursuant to CrR 7.5 and 7.4 and based partially upon CrR 8.3(b).

3.   FACTS RELEVENT TO MOTION

Defendant hereby asserts that he is entitled to the relief requested based upon the following facts relevant to this motion.

Judge David F. Hulbert unnecessarily stated that he would put me in restraints while I was testifying before the jury.

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 1 of 13



My attorney failed to object or request a mistrial on those grounds. Further, my attorney failed to prepare any defense and appeared to join the prosecution and efforts to get me convicted. The failure to prepare and the resulting prejudice is too numerous to fit in this motion form so I have a sworn statement attached that I would like to have considered by this reference to the document titled "Affidavit in Support of Motion for New Trial or Relief from Judgment and Sentence," annexed hereto.

My attorney allowed the prosecution to withhold discovery, extort witnesses, call me names and say I was delusional before the jury. He did not bring an issue properly about a juror seeing me in restraints. Failed to make an offer of proof for the record regarding defense witnesses proposed testimony. My attorney was given a list of witnesses and their expected testimony and he just refused to interview any of them. He refused to interview state's witnesses. He failed to try to get a bail reduction. My attorney complained that he was not getting

The defendant claims that based on the abovesaid facts, the court should find that the

appointed counsel's representation fell so far below reasonable standards that the attorney

effectively joined the prosecution and prejudice is presumed.

If the court does not agree with this notion, I set forth here the 2 parts required for the

Strickland Test. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2067, 80

L.Ed.2d 674 (1984).

1. Counsels Performance Was Deficient by failing to adequately prepare for trial and interview witnesses for both sides. My current counsel's performance is also deficient because he refuses to obtain the facts or try to schedule interview with my witnesses also. He refuses to advance these issues. It is clear that I have been denied effective assistance of counsel and continue to be denied effective assistance due to the fact my new attorney refuses to assert that his long time friend and colleague intentionally failed to conduct a defense. New counsel does not like me or want to help.

2. My trial would have turned out differently and I would not have been prejudiced had it not been for my attorney's deficiency as follows. Had my attorney actually tried to do his job or at least called my witness, Renee Woerner, and conducted interviews, I would have been completely acquitted of these charges

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 9 of 13

because the evidence all clearly shows
that I am innocent and the state's
story at trial is a rediculous fabrication
that any reasonable trier of fact
would clearly deny given any
alternative. The truth is available
and it must be presented in the
interest of justice. With appointment
of conflict free counsel who is allowed
or willing to assist, there is every fact
in my favor to get a new trial and acquittal.

D.   THE DEFENDANT ALLEGES PROSECUTORIAL MISCONDUCT.

Two things must be shown before a court can require dismissal of charges under CrR

8.3(b).  First, a defendant must show arbitrary action or governmental misconduct. >

State v. Blackwell, 120 Wash.2d 822, 831, 845 P.2d 1017 (1993) (citing State v. Lewis,

115 Wash.2d 294, 298, 797 P.2d 1141 (1990)).  Governmental misconduct, however,

"need not be of an evil or dishonest nature; simple mismanagement is sufficient."

Blackwell, 120 Wash.2d at 831, 845 P.2d 1017 (emphasis added). Absent a showing of

arbitrary action or governmental misconduct, a trial court cannot dismiss charges under

CrR 8.3(b):

We repeat and emphasize that CrR 8.3(b) "is designed to protect against arbitrary action

or governmental misconduct and not to grant courts the authority to substitute their

judgment for that of the prosecutor." State v. Cantrell, 111 Wash.2d 385, 390, 758 P.2d 1

(1988) (quoting State v. Starrish, 86 Wash.2d 200, 205, 544 P.2d 1 (1975)).

The second necessary element a defendant must show before a trial court can dismiss

charges under CrR 8.3(b) is prejudice affecting the defendant's right to a fair trial.  See

State v. Cannon, 130 Wash.2d 313, 328, 922 P.2d 1293 (1996).  Such prejudice includes

the right to a speedy trial and the "right to be represented by counsel who has had

sufficient opportunity to adequately prepare a material part of his defense...."  State v.

Price, 94 Wash.2d 810, 814, 620 P.2d 994 (1980).

The defendant alleges prosecutor misconduct as follows: The prosecutor
in this case literally went all out to
threaten, harass and intimidate my
witnesses and the state's witnesses.
The prosecutor was responsible for mis-
informing the jury on the laws after being
told by the court what the law was and that
the accused did not have a duty to leave.
That misled the jury and reversed the burden
of proof. Further, the prosecution made
comments that the accused is delusional
and that is not supported by the record
and all of the above was highly prejudicial
and resulted in an unfair trial. The prosecu-
tion also withheld evidence and discovery
from the defense. If not for the prosecutor's
misconduct alone, the result would have been the opposite!

E.     THE CUMULATIVE EFFECT OF THE ERRORS DENIED THE
       DEFENDANT A FAIR TRIAL.

The defendant claims that the overall effect of the errors denied him a fair trial.

> "[T]he cumulative error doctrine warrants reversal in this case. The application of that
> doctrine is limited to instances when there have been several trial errors that standing
> alone may not be sufficient to justify reversal but when combined may deny a defendant

a fair trial. See, e.g., > State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984);  > State v. Badda, 63 Wash.2d 176, 183, 385 P.2d 859 (1963) (three instructional errors and the prosecutor's remarks during voir dire required reversal);  > State v. Alexander, 64 Wash.App. 147, 158, 822 P.2d 1250 (1992) (reversal required because (1) a witness impermissibly suggested the victim's story was consistent and truthful, (2) the prosecutor impermissibly elicited the defendant's identity from the victim's mother, and (3) the prosecutor repeatedly attempted to introduce inadmissible testimony during the trial and in closing);  > State v. Whalon, 1 Wash.App. 785, 804, 464 P.2d 730 (1970) (reversing conviction because (1) court's severe rebuke of the defendant's attorney in the presence of the jury, (2) court's refusal of the testimony of the defendant's wife, and (3) jury listening to tape recording of lineup in the absence of court and counsel)." State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000).

Defendant makes these motions in good faith and believes he is entitled to the relief

requested. He respectfully request that this court grant some relief as it deems proper.

I hereby declare that I have read the aforesaid and verily believe the same to be true under the pains and penalties of perjury under the Laws of The State of Washington.

Signed in Everett, Washington this _14_ day of _March_ , 2004.

**RESPECTFULLY SUBMITTED,**

/S/  _Matthew R. Ruth_ , pro se

Matthew R. Ruth

CIN# _310079_  Unit _2-5_  _66_

1918 Wall Street

Everett, Washington 98201

Witnessed by:_____     Date: _3/19/05_

Name:_____

Address:_____

_____

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 12 of 13

DECLARATION OF PROOF OF SERVICE

STATE OF WASHINGTON     )
                              ) AFFIDAVIT BY DECLARATION:
COUNTY OF SNOHOMISH     )

I, _Matthew R. Ruth_____, hereby depose and declare that I properly mailed a true and accurate copy of the "Note for Motion Calendar" and "MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT" to which this declaration is affixed directed to opposing counsel of record in the above numbered cause with First Class Postage arranged on this date under the pains and penalties of perjury under the laws of the State of Washington.

Signed in Everett, Washington this _14_ day of _March_____, 2004.

/S/ _Matthew R. Ruth_____
_Matthew R. Ruth_____
CIN# 310079 Unit_____
1918 Wall Street
Everett, Washington 98201

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 13 of 13

EXHIBIT

9

INTERVIEW of JURY MEMBER
lesLey WINNEY

BY KRISTINE A. HAIN

Kristine Kain
1001 N Madison St
Tacoma, WA 98406

Court of Appeals, Division One
Case Number 683802
October 18, 2013

Affidavit

October 15, 2013 1:08 PM & October 17, 2013 Phone conversations with jury member LESLEY WINNEY

*I swear under the penalty of perjury that the following statement is true.* I was in contact with jury member LESLEY WINNEY on the above said days. Of the jurors who were on Matthew Ruth's case, Lesley Winney is so far, the only one that I could find whose phone number was still valid. Any of the information regarding his position as a jury member for Matthew Ruth's case was given at the best of his recollection. He appeared to have a clear memory of what went on during the trial. There were some issues that stood out to me that Mr. Winney, more than once brought to my attention. Specifically that the jury thought Matthew Ruth was innocent up until deliberations where they were misinformed by the Bailiff who provided answers to their inquiries.

Mr. Winney said that the jury for this case was told that they were to only decide if the defendant shot the intruders in self-defense or if he deliberately shot them. Next, was that the present proceeding involving the shooting that they were jury members for was only a small part of a much larger, complex case. They were told that there were more trials or proceedings that involved the defendant and his criminal activity that were taking place or would be taking place. He reiterated that they were told that the only thing that they had to decide on was a minor part of the whole case. He referred to this case as being a case about the illegal use of a firearm. The jury as a whole had to guess what the case was about because when they asked what the charges were they were consistently told that the only thing they had to focus on was the illegal use of a firearm and this was just a small portion of a bigger, complex criminal trial. Mr. Winney had thought that maybe it was an Attempted Murder case? In a later conversation with Mr. Winney, he stated that he had thought this case could have also been about drugs. This was just what he was guessing. Mr. Winney said the jury was never told directly what this case was about. They were told that this was just a small part of a much larger case involving the defendant. Mr. Winney also said that when the jury was in deliberations, they tried to inquire about the case as a whole. He said that the Bailiff would tell them that they didn't need to know these things because their only duty was to determine if Matthew Ruth was guilty of the illegal use of a firearm. Did he shoot in self-defense or did he deliberately shoot them?

Mr. Winney said that he and the other jury members thought that Matthew Ruth was innocent and had reacted by shooting the victims in self-defense to protect his girlfriend from being hurt. It was during deliberations that the jury changed their minds about him being innocent to being guilty. One reason is because Matthew Ruth admitted to shooting them. Mr. Winney made a comment to me in regards to why they even were there if the defendant was going to admit to shooting these people? More importantly and emphasized by Winney throughout both phone conversations I had with him was that the jury was provided information that supports that the victims were shot in the back and at such a far distance from the shooter. Mr. Winney had mentioned that one of the victims was shot while climbing over a fence when he was trying to run away. It was then that the jury decided that the defendant was guilty and had shot the victims deliberately and that it could not have been self-defense. Therefore, this would constitute the illegal use of a firearm. When the jury had questions about this they were told they could not hear the rest of the information about the case. Trial transcripts provide testimony from both parties that the victims were shot in Matthew Ruth's home. The transcripts are confusing and make sense as to why the jury inquired about where the shooting took place. However, the Bailiff responded with information that is not factual. They were told once again that there was a whole lot more going on with this case and that there are other proceedings and trials taking place involving the criminal activity of the defendant. I asked Mr. Winney who answered these questions that the jury had asked and he said it was the Bailiff. He couldn't remember if anyone else provided the answers as well. As far as Ms. Woerner's testimony, they were told it wasn't necessary because she was in a back bedroom down the hallway and didn't see the shooting.

Aside from the information that Mr. Winney provided above he also said that he was led to believe that the defendant was a criminal who was involved in other criminal activity. When told that the defendant was a first time offender and that this conviction was the only thing on his record, he responded by saying that this was the first time he ever heard of this. He believed Matt's criminal record was far more extensive than just this case. When told the length of the sentence that Matt was handed down, he was obviously shocked. He said he didn't know this and that he thought that the crime of Attempted Murder doesn't get that long of a sentence. This reminded me of when I first started the phone conversation with Mr. Winney and had asked him if he was the Lesley Winney on a Snohomish County criminal case where the defendant was convicted on two Assault One charges. Mr. Winney said he was not a jury member on an assault case. He then asked what had happened and I told him that two men were shot in a trailer. He then said that he was on that jury. But, the jury was never told what the defendant was being accused of, just that they were to determine if this was the illegal use of a firearm.

Let me note that Lesley Winney said that he would write a signed affidavit confirming what I have just said. With less than a day's notice, it will be sent to the courts promptly.

*I swear to be true under the penalties of perjury* that I was the designated point of contact between attorney, Mark D. Mestel and Matthew R. Ruth since January of 2011. Almost all correspondence between the two passed through me, for the most part by email. The following pages are email conversations to support the fact that Matthew R. Ruth, many times addressed with Mark Mestel the issue of Ineffective Assistance of Direct Appeal Counsel for failing to raise the public trial rights issue and the issue of Prosecutorial Misconduct for the use of the improper argument based on the Castle instruction. Mark Mestel put in writing in a letter to Coyote Ridge Correctional Center about two years back that Matthew Ruth was an important part of his own legal defense team and asked Ruth for his knowledge and thoughts and what issues he should use when preparing his Personal Restraint Petition and any briefs thereafter. Ruth tried to convey to Mr. Mestel that he wanted the above two issues to be raised and Mark Mestel chose not to.

*I swear to be true under the penalties of perjury* that the Private Investigator who Mark D. Mestel hired for Matthew R. Ruth's case was Mike Powers. I have recently contacted Mike Powers to ask him a simple question and he has evaded the question with such comments as,

"Matt is going to need me at some point so if we can save any "favors" until they are really needed that would be great."

We have no idea what he is referring to and he refuses to answer when this comment is addressed. Mike Powers was hired to investigate key eye witnesses such as Court Lamb, Daniel Gist and Nigel Colbert who were never asked to testify at Ruth's trial even though they were present on the day that Matthew Ruth shot Dru Eden and Jeremy Custer. He was also asked to interview the jury members as well as with Gary Way who was the first investigator on Ruth's case and Mark Stephenson, who was his attorney then. Ruth requested that Mike Powers interview the police who interacted with Eden and Custer on that date as well as with the emergency room doctors and the toxicologists because of conflicting hospital records and to find out why one of the victims received ibuprofen and the other victim something a bit stronger, but still not the medication a gunshot victim would receive. Mike Powers was supposed to find out what the two victims said in order for them to have such minor medications administered. Mr. Powers did not interview any of the above said people who Matthew Ruth requested while conducting his investigation making Matthew Ruth's case improperly investigated.

*I swear to be true under the penalties of perjury* that I tried to contact Mark Stephen's, Matthew Ruth's trial attorney. My main objective in trying to reach Mr. Stephen's was to find out what the jury members said to him after trial and to ask him why he didn't put on record until his motion to withdraw that the prosecutor, Adcock, had threatened Renee Woerner if she testified? Also, why he didn't correct the prosecutor for misstating his own words while in chambers? Mr. Stephens has failed to return any of my phone calls or messages I had left him through his websites Contact page.

*I swear to be true under the penalties of perjury* that during the second week of October 2013, I did contact and speak to Gary Way in regards to this case. At first Mr. Way did not remember the case. He then found a memo that was about his interview with Dru Eden. This is the interview that Matthew Ruth has requested to see several times over the past nine years. Mr. Way said he would send it out to Mr. Ruth. He was aware of the October 21, 2013 deadline in the Court of Appeals. I sent him by email and also left him phone messages reminding him of this. He has not returned my calls and has failed to send Mr. Ruth the content of that interview.

I did finally receive an email message from Mr. Way stating that he did find all of the interviews that were requested of him by the defense attorney, Mark Stephens at the time. However, they also have not been received by Mr. Ruth. I also tried to hire Gary Way and Mike Powers to re-investigate this case. Neither one of them would take on this task that they would be paid for and with no explanation as to why.

*I swear to be true under the penalties of perjury* that on August 20, 2013 I received an email from Mark D. Mestel stating that if the unpaid part of Matthew Ruth's bill was not paid by the end of the month, he would be withdrawing as counsel for his case. This is the only conversation I have had with Mr. Mestel since that date. Mr. Mestel did file a motion to withdrawal as counsel on September 16, 2013 claiming that Ruth agreed for him to withdraw from his case. Matthew Ruth has not conversed with Mark Mestel about him withdrawing from his case. Ruth received notice of this motion on September 18, which was the same day as his Reply to Response to PRP was due. To date, Ruth has not received his Discovery from Mark Mestel, which he will need to properly litigate his case.

Signed in Washington State, County of Pierce on October 18, 2013 _Kristin Kain_

_State of Washington_
_Pierce County_
_Sherry A. Lamb_
_Sherry A. Lamb_
_Notary Public_
_Expires 06/01/2014_



Exhibit

10

Interview of Drew Eden
By Gary Way

**WAY INVESTIGATIONS**                           (360) 321-7901
**P.O. BOX 1313**                                (425) 231-6397
**LANGLEY, WA 98260**

---

**CONFIDENTIAL MEMO**

**TO:** Mark Stephens

**FROM: Gary T. Way, (425) 231-6397**

**RE: Ruth, Matt**

**DATE:** 10/11/04

Summary of interview with Drew Eden

On 10/7 I met with Drew at his parent's residence to interview him regarding this case. His parents reside at 219 Elder in Everett. It is unclear where Drew currently resides although he indicated Arlington at one point and at another said he was "pretty much" staying with his parents. There was no on else present when I spoke with Drew. Drew says he has no criminal record and has only been cited for Racing in the past.

Drew has known Jeremy for "years." He says he has known Matt only a couple of months. He met him at Jeremy's house. He also described being gone for a time hanging out at the Garlic Farm with some gal. He wasn't around Jeremy much then. He says they are all "DJs" except Matt.

I asked Drew to describe for me what happened that day. He said he went over to Jeremy's to visit and Jeremy's wasn't home. He recalled that Dan was around and Matt came over but seemed unable to recall exactly what Matt did. Drew then decided Matt came over to use the bathroom. Drew said Matt made a comment about not wanting to go inside the house because he would get accused of stealing something. This was unclear because Drew said he thought Matt did go inside. Drew did not recall what Dan was doing then or at that time. Drew then said he thought Matt took a shower, but wasn't positive. I asked what they were all doing before Jeremy came home and he could not recall.

Drew then said that Matt appeared to be high on Meth but did not know if he was. He described Matt as "crazy" all the time. He then asked me if I had seen his girlfriend. When I told him I had not Drew said she was "pretty bad." He said she was with Matt all the time. I asked Drew what happened next. He said Jeremy came home and that he "seemed to know right away something was missing." He said Jeremy asked everyone (except him) about what was missing and then went out to Matt's trailer. I asked Drew what Jeremy was looking for. Drew said he didn't know and then said he heard he was looking for a "pound of weed." Drew then quickly said he only "heard" that and did not know for sure.

Drew then said Jeremy was looking for their studio equipment. He said there was a lot of equipment inside the house and said this house was basically "all studio." I asked what happened next. He said Jeremy went to Matt's trailer and said he could hear "shouting" and that it sounded "confrontational." Drew made the comment that he heard something like "get the hell out of my trailer" from Matt. Drew said he went over after this.

I asked Drew if the door was open or how he entered the trailer. He said the door was open and described how it would swing all the way open. Drew described where everyone was located when he went inside. He said Matt was standing on the "lower part" on the left as you entered the trailer and Jeremy was sitting on the bed with his elbows on his knees. He said they were not talking at this point and Matt had a "grimace" on his face. He said Renee was also on the bed to the left of Jeremy towards the back of the bed.

Drew said it "seemed calmer" after he went inside compared to what he heard before he went in. Drew said he went inside because he did not want them to fight. He said the atmosphere was tense. Drew said he was inside for about one minute and then Matt shoots Jeremy. He said he shot him while Jeremy was on the bed. I asked about how long the shooting lasted. He said it was about five minutes because Matt paused between each shot. Drew said he was shocked and was trying to hide near the shower. There is a lot of yelling and Jeremy is asking Matt why he is doing this. Drew said Matt responded calmly when Jeremy screamed that he was "killing him" with the statement, "Yes I am." Matt also yelled for Renee to "get out." Drew again said Matt would take a "big pause" between shots.

I asked Drew how he was shot. Drew said he was still inside the trailer and turned to run out when he was shot in the back. He said he ran out behind Renee. He thought he was still in the small hallway area when he was shot. Drew said he ran and jumped over the fence and stopped a car. He said this person took him to the hospital. He said he was not shot as he was running out the door. Drew said he jumped out in front of the car and told the driver to "let me in." He said the driver didn't believe that he was shot and Drew became upset with her because she was "going too slow." Drew said his mother met him at the hospital.

Drew then told me he thought Matt's plan was to kill Jeremy for the studio equipment. He said they had over $3,600 in equipment not including the records. I asked if Jeremy found what he was looking for when he went inside the trailer. Drew said he "didn't know." I asked Drew if anything was said when he first entered the trailer. He said Matt and Jeremy "said something." Drew thought Jeremy said something like "let me eliminate you as a suspect." He said Matt said something like "why am I being accused of stealing?" Drew said there were headphones missing and they were worth about $200. Drew then said he helped Jeremy pay for the equipment.

Drew is still carrying the bullet in his back. He said it was inches from his spine. He said because he has no medical insurance the doctors "left it up to him" about getting it removed. He said Jeremy knew Matt had the gun and also said Matt would tell them all "bull shit" stories about things he has done in the past. As I was preparing to leave Drew's residence he said, "Isn't this about my getting shot and not whether it was about some weed?" He seemed

frustrated with the attention given to how this happened and that it should not matter what the dispute was over between Jeremy and Matt.

Drew also said Jeremy was not at his listed address and was selling cars in Monroe seven days a week and hard to reach.  He said he would tell Jeremy I wanted to talk with him and give him my number.  I have not heard from him.

End of Memo

EXHIBIT
11

Gary Way

**WAY INVESTIGATIONS**        (360) 321-7901
**P.O. BOX 1313**        (425) 231-6397
**LANGLEY, WA 98260**

**CONFIDENTIAL MEMO**

**TO:** Mark Stephens

**FROM: Gary T. Way, (425) 231-6397**

**RE: Ruth**

**DATE: 12/10/04**

Summary of witness contacts

Per your instructions in the letter dated 11/11/04 I attempted to contact various witnesses in regards to the testimony of Jeremiah Sheridan in Matt's case. I made contact with the following witnesses in that regard:

1. On 11/17 Roy Schofield called me back from a phone message I left him regarding this case. I spoke with him at that time regarding Matt's case and the Sheridan. Roy said he did not know Matt but did know Sheridan from family connections. Roy said he was known as "Uncle Charger" to Sheridan. Roy said he was in custody and recalls being with a number of inmates waiting for transport to or from a court appearance and hearing the he, "Charger", was supposed to take care of some witnesses for Matt's case. It was not clear to Roy is he was supposed to contact them and ask them not to appear but he said he did not know anything about this and confronted Sheridan. Roy said he did not know anything about this witness stuff and told Sheridan that. Roy has not talked with Matt about this matter. He does not know what Sheridan was up to but believes the witness contacting was all his idea to get out of jail. He does not know this for a fact and only believes this to be true based on what he knows about Sheridan. He does not think Sheridan should be trusted or believed regarding this matter. Roy does not know anything about Sheridan's contacts with police or with Matt while he was in custody.

2. On 11/18/04 I made contact with Neil McCloud at the Snohomish County Jail. I asked Neil what he could tell me about this matter. Neil said "Sheridan pulled some shit to get out of jail." Neil said Sheridan "caught on to something and hustled Matt." He said Matt got comfortable with Sheridan and the next thing he knows Sheridan is "out of here." McCloud said Sheridan told him he was going to "hustle some information" and get a deal to get out. McNeil claims he told Sheridan not to do this. McNeil said Sheridan was "crazy and slow." He said Sheridan "courted" Matt and got some information from him. He said Sheridan was a junky. McCloud could not tell me specifically if Sheridan acted at the direction of anyone. He had no knowledge of Sheridan's contacts with Detectives in regards to Matt's case. I asked if he knew

about the written information Matt supposedly gave to Sheridan. McNeil paused and said, "Oh, I forgot about that." He does not know how this occurred or why it happened. McNeil seemed puzzled that Matt would give Sheridan this information. I concluded my conversation at that point.

3.  I made numerous calls to the other witnesses and did not get any return calls except for a "Marilyn" in regards to Steve Kiona. I called Marilyn back and left her a message why I was trying to reach Steve. I did not get a return call from her.

End of Memo

EXHIBIT

12

Interview of Donnie G. Pode
By Michael Powers

From:  Wiegalworks@aol.com
Subject:  Matt Ruth
Date:  January 18, 2011 9:54:10 AM PST
To:  markmestel@comcast.net

Mark,

i was finally able to meet in person with Donnie Poole. I like the guy. He apologized for taking so long to get back in touch with me BUt his phone has not been working so he has not been getting my messages. That is fixed now and so he is ready to help if he can.

Donnie works daily. He is a cement finisher. He said that if he can help he will. Donnie reminded me that it was over six years ago that he met with Mr. Adcock but he remembers "most of what was said." Donnie told me that he does not recall the entire conversation with Adcock but what he remembers most was that Adcock was "trying to intimidate me."

Donnie asked me if Adcock had recorded their meeting? He was hoping he had so he would have a "better record of what was said and when it was said." I told Donnie that as far as I know there was no recording of the interview between Mr. Adcock and himself. Donnie has been told over the years that Adcock used some of what Donnie ALLEGEDLY said to him during the meeting to convict Matt Ruth. Donnie has no idea as to what Mr. Adcock allegedly used in trial.

Mark, our client gave me a "heads up" to what he recalled Adcock saying during his trial with respect to Donnie Poole's interview.

One of the things that our client said was that Adcock alleged that Donnie Poole told Adcock that Matt Ruth had told him (Donnie) that he just "freaked out" and started shooting. Donnie agreed with Adcock on that statement BUT he said that Adcock forgot to mention that Donnie had told him, Adcock, that the reason that Matt "freaked out and started shooting" was because his life was in danger at the time." Donnie said that he does seem to recall telling Adcock that Matt told him that he (Matt) did say that he "freaked out" BUT it was after he had told him that Matt said that he freaked out after Custer threatened him with a gun. Donnie said this was about when Adcock started to get mad and stared to yell at Donnie that he was just "covering for his friend and trying to get his friend off."

[illegible line] Donnie Poole's that he remembered Matt Ruth had started going over the [illegible] he said that [illegible] Custer had bought drugs from Custer

[illegible faded paragraph]

I asked Donnie Poole specifically if he recalled telling Mr. Adcock that Matt Ruth had told him (Donnie) that Custer had a gun during the argument between Matt and Custer? Donnie said that Matt had told him, from the beginning, that Custer had a gun and he recalled mentioning to Mr. Adcock that was the reason that Matt "freaked out and started shooting" was because Custer had a gun in the trailer. Donnie Poole recalled mentioning to Mr. Adcock that Matt had told him that Custer had a gun. He said that Mr. Adcock did not believe him and started to get red in the face and starting yelling at Donnie.

Mark, Donnie seemed to remember some more about the meeting with Adcock once we started talking some more. He is NOT sure of the order of the conversation but he is sure that he did tell Adcock several things during the interview. Donnie said that as soon as he started to tell Adcock the "truth" about Custer, Adcock started yelling at him saying things like "you're lying to protect your friend, none of this is true, this will never see the light of day."

Donnie remembers telling Adcock that this incident was over "drugs." Donnie said that at this point Adcock was in his face yelling at him and he (Donnie) was standing in his face yelling back at him. Donnie recalled that Mr. Adcock "really got mad when I told him that this was all over some drugs that Matt had supposedly stolen from Custer." Adcock would not believe him.

Donnie recalled that during the last minutes of the interview with Mr. Adcock that he told Adcock that he was being "unprofessional" and he did not scare him. The interview ended badly.

Donnie Poole told me that the interview with Adcock started off all right but as soon as he heard things that he didn't like to hear that's when Mr. Adcock, according to Donnie, started to get mad and was trying very hard to intimidate Donnie.

Donnie Poole will sit and talk with you if you would like? He does NOT recall the specific order of questioning by Mr. Adcock but he did remember the above facts without much effort.

I will continue to search out Renee Woerner. Let me know what you want done next?

Thanks
Michael Powers

Exhibit
Six

Motion to Modify
RAP 17.7

( AAG Exh. 23)

No. 89906-1

IN THE STATE SUPREME COURT OF WASHINGTON STATE

Received
Washington State Supreme Court

FEB - 6 2015

Ronald R. Carpenter
Clerk

In the Matter of the
Personal Restraint Petition of:

MATTHEW ROBERT RUTH,

       Petitioner.

MOTION TO MODIFY DEPUTY
COMMISSIONER'S RULING; RAP 17.7

## 1. IDENTITY OF MOVING PARTY

Pro se litigant, Matthew R. Ruth, asks for the relief designated in Part 2.

## 2. STATEMENT OF RELIEF SOUGHT

Modify the ruling of the Deputy Commissioner filed on 12-5-14. (Appendix "A" Order denying review). In direct conflict with Koss, Smith, and Sublett, the Deputy Commissioner denied review of Mr. Ruth's Motion for Discretionary Review; RAP 13.5A. This most Honorable Court should grant review because Mr. Ruth met his burden under RAP 13.4(b).

## 3. FACTS RELEVANT TO MOTION

Mr. Ruth objects to the Deputy Commissioner's version of the facts because they are contrary to the record and evidence of off the record facts submitted as exhibits in the PRP & RAP 13.5A. The Facts & Exhibits are set out in Section D (Pg 7-11) of the original motion to the commissioner. (Appendix "B" STATEMENT OF THE CASE IN ORIGINAL RAP 13.5A).

-1-

EXHIBIT 23

Mr. Ruth's "Motion for Permission to File Supplemental Brief" was granted. (Appendix "C" Motion for Permission). In the "Supplemental Brief" Mr. Ruth incorporated the relevant facts into part 3, "Argument on why review Should be Granted." Mr. Ruth asks this court to please reference the facts & Exhibits on pages 4-5, 8-10, 12-15, 18-20. (Appendix "D" Supplemental Brief). The deputy commissioner completely ignored the "Supplemental Brief" in reaching the decision to deny review.

Mr. Ruth must incorporate the "Table of Contents" & "II. Relevant Facts" set out in the "Petitioner's Reply Memorandum to State's Supplemental Response to Personal Restraint Petition." (Appendix "E" Facts COA# 683802-I).

A. THE DEPUTY COMMISSIONER COMPLETELY MISSTATES THE FACTS & LIES

On Nov 5th, 2003, two armed domestic terrorists, Jeremy Custer & Drew Eden, invaded Mr. Ruth's home in direct violation of Wash. Const. 1 § 7. Mr. Ruth exercised his Wash. Const. Art. 1 § 24 right to use a firearm in defense of himself, Ms. Woerner, and property, when non-lethally shooting the two home invaders. Who were going to do "whatever it took" to search Mr. Ruth's Home. RP 142. Mr. Ruth had no criminal history before being attacked in the safety of his own home, for allegedly stealing Jeremy Custer's drugs and because Renee M. Woerner (Mr. Ruth's then-girlfriend) snitched on the alleged victims, for dealing drugs & money laundering. RP 113-17, 174, 207, 223-25, 241-47, 250-53, 263, 267, 281.

Ms. Woerner was one of only four people inside of Mr. Ruth's home during the shooting. At the beginning of trial DPA Adcock informed the jury that Ms. Woerner was a state's witness. RP 15-16. DPA Adcock stated that Ms. Woerner is "a crucial witness. Given the facts in this case, there was no doubt about that." RP 9-10.

-2-

Before the Public Trial Right violation occurred, that resulted in the State being relieved of their duty to present Ms. Woerner to the Jury & the Public for the defense to Cross-Examine. The State introduced only the adverse portions of Ms. Woerner's "police statement" through the substance of the states witnesses' testimony. RP 137, 164, 200, 207, 228. The state relied heavily on Ms. Woerner in their case in chief, especially, in closing arguments. RP 294-95, 297-301, 309. Mr. Ruth was not allowed to rebut any of the Woerner hearsay, nor challenge the portions of the alleged victims testimony that used Ms. Woerner substantively. RP 247, 266-67. This prejudiced the entire trial.

The first violation started in the hallway during the afternoon recess, when DPA Adcock was conferring with his next witness, Ms. Woerner. The Coy v. Iowa & Wash.Const.Art 1 § 22, Face-to-Face safeguard kicked in, and Ms. Woerner refused to further lie for DPA Adcock. 108 S.Ct. 2798, 2803. The trial Spectators witnesses DPA Adcock assault Ms. Woerner. (Exh. 1 P.I. Interview of Woernar & Slothuag). DPA Adcock dragged Ms. Woerner from public view and threatened to charge her with perjury if she testified, contrary to RCW 9A.72.060. (Exh. 2 Sworn Statement of Mark Stephans). Matthew R. Stroud I, a trial Spectator, followed DPA Adcock back into the courtroom. Mr. Stroud I, states that he heard DPA Adcock lie to the Court & defense counsel Stephens when claiming Ms. Woerner intended to perjure herself. Mr. Stroud I, told Mr. Stephens what transpired in the hallway, then Mr. Stephens left to speak to Ms. Woerner. (Exh. "3" Affidavit of Mr. Stroud I).

On pg. 2 of the "Order Denying Review" the Deputy Commissioner lies when stating:

"Defense counsel then spoke with Ms. Woerner, and she told him that the prosecutor had warned her of consequences of committing perjury."

-3-

That is a flat out lie! In fact please read Appendix "E" pg. 1 & 3,

Mr. Ruth proved to the Court of Appeals that DPA Blackman misrepresented

the same fact by omitting the words "If She Testified" from the end of "had

threatened to charge her with perjury." Defense Counsel Stephens stated:

Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.

She indicated to me Mr. Adcock had threatened to <u>CHARGE</u> her with PERJURY
IF SHE TESTIFIED.

She EXPRESSED concern to me about the potential LEGAL CONSEQUENCES
IF SHE TESTIFIED.

I indicated I could not advise her and suggested she seek
appointed counsel to answer her questions.

(Exh. 2 Sworn Statement of Mark Stephens)

Why is everyone ignoring what actually happened? This is more than enough

for a reference hearing. Ms. Woerner did not say DPA Adcock merely WARNED

her. In fact, read her interview with private investigator Michael Powers,

she also says that DPA Adcock called her a Stupid Bitch and assaulted her.

This is corroborated by her father. (Exhibit "1" P.I. Interview of Ms.

Woerner). During the Stephens interview, Ms. Woerner was also concerned of

the consequences of DPA Adcock's threats, if she testified. Mr. Stephens

adivsed her to obtain counsel. (Exh. "2" Mark Stephens). Mr. Stephens want

directly to Judge Hulbert with this information from Ms. Woerner. (Exh. "4"

Affidavit of Matthew R. Ruth). The Judge called a sidebar and from sidebar

both counsel & Judge Hulbert disappeared into chambers. Why call a sidebar

when the jury is not present?

The Deputy Commissioner misstates the record again when claiming "Defense

counsel confirmed to the court that the events as related by the prosecutor

had occurred ...." Appendix "A" at 2.

-4-

Nothing could be further from the truth, as can be seen from Mr. Stephens' sworn statement. (Exh. "2" Mark Stephens). Mr. Ruth proves this on pages 8-9 of the original motion. (Appendix "B" RAP 13.5A). Mr. Ruth points out that "Not only does Mr. Stephens dispute that this was what was discussed In-Chambers, the context of the perjury threat, and that this was all that was said to Ms. Woerner in [the sworn statement of Mr. Stephens exh. 2], but also on the record:

I just might add that's more or less, what's happen .... She indicated concerns about comments Mr. Adcock made. She indicated the word perjury was used. I don't know what context that was in. RP 180."

Mr. Stephens disputed the context the word "Perjury" was used in, and added that Ms. Woerner was concerned about "Comments" DPA Adcock had made. This Court knows from Exh. 1 & 2, that those comments were threats to charge her with perjury, if she testifies, and DPA Adcock called her a "STUPID BITCH" several times. (Exh. 1 pg. 2-3)(Exh. 2 pg. 3 paragraph 10)(Exh. "5" pg. 2 paragraph 5 & pg. 11). This is of great public interest and presents significant constitutional questions. In Re Disciplinary of Bonet, 144 Wn.2d 502 (2001); U.S. v. Juan, 704 F.3d 1137 (9th.Cir. 2013).

Mr. Ruth did not find out about the Juan-type misconduct until he testified the next day. "When Mr. Ruth tried to make record of the threats, and account for the absence of Ms. Woerner, in front of the jury, Judge Hulbert threatened to place Mr. Ruth in restraints. RP 266-67. The point of that threat is unclear because Mr. Ruth even if restrained, is entitled to testify." See Motion for Discretionary Review at 17; (Exh. "4" Matthew r. Ruth);(Exh. "5" Affidavit & Pro Se Motion for New Trial that Mr. Ruth attempted to file at the original 2 /\ /05 sentencing).

-5-

B. <u>WOERNER'S STATEMENT IS THE ONLY EVIDENCE CORROBORATING MR. RUTH'S DEFENSE</u>

Through the substance of the State witnesses' testimony, the Jury & Public were only introduced to the adverse portions of Ms. Woerner's "Police Statement" that corroborated certain portions of the alleged victims version of events. RP 121-23, 125-26, 137, 161, 164, 200-03, 207, 228, 247, 294-95, 297-301, 309; (Appendix "D" pg. 5, 9-10, 12-15, 18); (Appendix "F" pg 2-6). The reason this is prejudicial is because Ms. Woerner's "Police Statement" is the only evidence that corroborated Mr. Ruth's defense and disputed key portions of the alleged victims testimony. (Appendix "B" Pg. 10-11); (Appendix "D" Pg. 14-15, 18); (Appendix "F"); (Exh. "1" Rene Woerner). The first public trial right violation covered up the <u>Juan</u>-type "Substantial Government Interference" and exculpatory portions of Ms. Woerner's statement. Mr. Ruth can only challenge the other State witnesses' testimony and elicit the substantively exculpatory portions of Ms. Woerner's "Police Statement" through cross-examination.

The Deputy Commissioner repeated the same prejudicial error by completely ignoring the exculpatory Woerner facts in the "Police Statement" and stating:

> "Ms. Woerner had previously given a sworn statement to police and the prosecutor corroborating the victims' account of events."
> Appendix "A" at 2.

Here is one example of Ms. Woerner's "police Statement" disputing the alleged victims. In anticipation of Ms. Woerner's testimony, DPA Adcock asked Jeremy Custer why he said "No Cops," Mr. Custer replied:

"Because honestly, I didn't -- he had been a friend and I didn't know if he was just not thinking. Kind of the same reason I said, 'you're shooting me.' Like do you understand what you're doing? You know. I didn't have the anger, I guess, to -- you know. I knew he was going to get in a lot of trouble." RP 137.

-6-

In Ms. Woerner's 12-11-03 Police Statement she stated:

"Woerner: Jeremy said 'No Cops' ... went in the house, grabbed a black garbage bag which I've seen that he had a pound of weed in it before so that's what, he grabbed the garbage bag and he said 'no cops' like that ...

Det. Willoth: Why did you go with him [Ruth]?

Woerner: Because I didn't want to get shot by drug dealers ... I can't think of a fancy lie or anything, that's all. I just didn't wanna to get shot by drug dealers. And cuz Jeremy said 'NO COPS' when he left. Uh, it scared me ... and because She had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shot me over a pound of weed? But all this weird stuff had happened and it was stressful. (Exh "7" 25, 28-29)." (Appendix "D" Pg. 14-15).

Without cross-examination, Mr. Ruth was unable to defend against Mr. Custer's account of why he said "No Cops," which is clearly different than Ms. Woerner's account. Mr. Ruth has proven with Ms. Woerner's "Police Statement" that the Deputy Commissioner's above factual account is not accurate and is very misleading. See Appendix "B" pg. 10-11. The two Public trial right violations that occurred in Mr. Ruth's case prevented the Jury & the Public from assessing the portions of Ms. Woerner's "Police Statement" that corroborated Mr. Ruth's testimony.

Contrary to the Deputy Commissioner's implications, Ms. Woerner's anticipated testimony was not merely cumulative of other witnesses. Kandy Corder testified that Mr. Ruth & Ms. Woerner were drug addicts. RP 207. The State used Ms. Corder's testimony substantively in closing, and Mr. Ruth could not defend against it without Ms. Woerner. RP 299-301, 313-14. In Ms. Woerner's "Police Statement" she stated:

'Jeremy didn't come home ... that morning .... The morning of the incident he was all kinda, I think he was kinda messed up. He hadn't had any sleep, pg. 12. There were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms ... They were snortin coke ... All of them .... Jeremy, dan, when, when that day of this incident Dan had big old sores all over his face, pg. I looked out the window and they're kinda serious. Then they come up to the trailer, pg. 16. Matt [Ruth] was like man check this out. There's a pound of weed missing and they think I stole the shit, pg. 17. He called me and said that they were gonna chase me down. That cuz I know that the guy that drops off the, the drugs with uh, Jeremy, and he's an Asian guy, and I don't know what's gonna, I just got scared. Pg 2627. Det. Pinoe: You talk about there being lots of drugs used and around the place all the time. [Custer's apartment].

-7-

R. Woerner: Uh huh and underage girls all kinds of strange things .... I
know they were selling them .... Zip sealed bags and everybody would get
a backpack and they'd go about their thing .... Jeremy ... Continued to write
these receipts ... so he could cover his tracks for tax purposes ... Matt
[Ruth] had acquired quite a bit of crystal meth at one point from one of
their friends, and they, everybody was all high .... he was selling little
packages of this, of the meth. But mostly Jeremy and them were buying it
from Matt so it was just this like this inner, little circle, pg. 38-39."
(Appendix "B" Pg. 10-11).

During Mr. Ruth's direct-examination the defense attempted to rebut

the States drug testimony and the <u>Woerner</u> hearsay, however, DPA Adcock

testified in the form of an objection.

Mr. Adcock: Object to this line of testimony because it's not relevant. The
testimony -- to this point about the shooting indicates there were no drugs
present. How is this relevant? This is just an attempt to try to blame the
victims or portray them in a negative light without any connection to the
issues. RP 228, 295.

DPA Adcock objected every time Mr. Ruth attempted to rebut the <u>Woerner</u>

drug accusations and lay a foundation for his self-defense claim. RP 221,

223-228. In dispute at trial was whether the alleged victims were drug dealers

who carried guns, and whether they were high on crystal meth when they invaded

Mr. Ruth's home. Both Custer & Eden claimed Mr. Ruth invited them into his

home, and never asked them to leave. Mr. Ruth testified that they forced

their way into his home, and he was screaming for them to leave the entire

time. Ms. Woerner corroborated Mr. Ruth:

'Matt's going no you gotta get outta of the trailer. You can't go through
my shit, Pg. 18. He'd just be like well I told you to get out, pg. 19. The
gun was in the cabinet .. he pulled it out and went like this [cocked it].
And I think he stuck it in his pants ... and Matt was like you gotta go man,
you gotta get outta my house. You can't do this shit. Pg. 20.

Mr. Custer & Mr. Ruth lived across from each other. Mr. Custer was seen

placing garbage bags in his Durango. Mr. Custer then disappeared from the

crime scene for many hours. Mr. Custer testified that the bags were full

of equipment. Mr. Ruth testified the bags were full of drugs. Ms. Woerner

Stated "Lou is the guy who they get pounds of weed from .... brings the bag,

the garbage bag that Jeremy took to the Durango. pg. 40." (Appendix "B" 11).

-8-

C. THE FIRST PUBLIC TRIAL VIOLATION CAUSED THE SECOND VIOLATION WHEN
JUDGE HULBERT PREVENTED MR. RUTH FROM REBUTTING THE WOERNER HEARSAY

The jury also heard testimony from State witnesses regarding Mr. Ruth & Ms. Woerner's relationship and Ms. Woerner's alleged actions during the shooting. RP 164, 200, 207. For example, after being asked by DPA Adcock what Ms. Woerner "Was doing during all this?" Drew Eden replied "I remember her being freaked out ... and she was saying, like 'Matt [Ruth], stop. Stop." RP 164. After the Juan-type "Substantial Government Interference" was covered up in the shadows of the Judge's chambers, and relieved the state of presenting Ms. Woerner for cross-examination, Mr. Stephens asked Mr. Ruth the same question. However, DPA Adcock objected. RP 247. In front of the jury Mr. Stephens explained to Judge Hulbert that DPA Adcock had used Ms. Woerner in their case-in-chief. Judge Hulbert commented on the evidence stating that was not his recollection and instructed the jury to make their own "Conclusion about their recollection," while sustaining the objection. RP 247.

Judge Hulbert's instruction to the Jury caused the second Public Trial Right violation, and the first denial of counsel violation. The reason being that during deliberations the jury tried to draw their own conclusion about the Woerner hearsay based on the one-sided version presented by the state. The Jury must have been confused because the they submitted an inquiry to the Judge asking for Ms. Woerner's "Police Statement." (Exh. "6" Jury Inquiry). Both the Jury inquiry and the trial minutes prove that Mr. Ruth and defense counsel were not notified of the inquiry. Judge Hulbert formulated the response to the jury inquiry in less than three minutes. (Exh. "7" Trial minutes).

-9-

## 4. GROUNDS FOR RELIEF AND ARGUMENT

### A. THE DEPUTY COMMISSIONER OPINION IS CONTRARY TO THIS COURTS SUBLETT AND KOSS DECISIONS

The Deputy Commissioner incorrectly stated that the "Consideration of and responses to jury inquires are not subject to the right to a public trial. Sublett, 176 Wn.2d at 77-78." (Appendix "A" Pg. 4). This Court in Sublett did not make that holding, in fact, "the Sublett Court only held that an in chamber consideration of a jury inquiry, by defense counsel & trial judge, regarding the jury instructions, does not implicate the public trial right." (Appendix "C" Motion for Permission to File Supplemental brief at 7).

Mr. Ruth demonstrated in his supplemental brief that unlike the record in Koss, the record in Mr. Ruth's case clearly proves that defense counsel and Mr. Ruth were not notified of the jury inquiry as is required by CrR 6.15(f)(1). Mr. Ruth also raised a denial of counsel claim, and argued that in Frawley Justice Wiggins stated that a complete denial of counsel will always be considered structural. No. 80727-2 ¶, 18. Justice Wiggins position is consistent with Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009). The Deputy Commissioner completely ignored this argument.

The trial minutes show every time Mr. Ruth (in custody) and defense counsel Stephens are present. On page 9, at 3:00 p.m. "the jury retires to deliberate upon their verdict." At 3:06 "Court in recess." (Exh. 7). Mr. Ruth was returned to segregation. One hour and six minutes later at 4:12 p.m. on 12-8-04, the jury submits a written inquiry requesting transcripts of the Renea Woerner, Jeremy Custer, and Drew Eden police interviews. Three Minutes later at 4:15 p.m. the trial Judge respond in writing that "The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank you." (Exh. 6 & 7).

-10-

"It is physically impossible to notify the parties in three minutes. Notification is mandatory pursuant to crR 6.15(f)(1)." (Appendix "D" Supplemental Brief at 20). Mr. Ruth has an absolute right to participate in the formulation of the response. Musladin at 841-44. "In Jasper proper record was made that 'all counsel/parties [had the] opportunity to be heard.' 174 Wn.2d 96 (2012). The record proves Mr. Ruth & Counsel were deprived of 'an opportunity to comment upon the appropriate response.' CrR 6.15(f)(1)." (Appendix "D" at 20).

The Deputy Commissioner again erroneously stated:

'Mr. Ruth complains that the trial court did not follow the procedures for answering jury inquiries specified by CrR 6.15(f)(1). But again, this has nothing to do with the constitutional right to a public trial. Any interest under the public trial right are protected by the placement of the inquiry and the response in the public record, as the trial court did here."
(Appendix "A" at 4).

The Deputy Commissioner is way off base 'Pursuant to CrR 6.15(f)(1) the trial Judge must make record that all the parties were notified and participated in the formulation of the response. This Court must send a message to the trial courts regarding the importance of that duty. Mr. Ruth asserts that CrR 6.15(f)(1) is the functional equivalent of the Bone-Club analysis during deliberation, that triggers upon inquiry. Simply filing the response in open court does not cure the violation of Mr. Ruth's Rights to public trial, Counsel, Appear & Defend, and Fair Trial. Since the Sublett Court reduced the public trial rights to CrR 6.15(f)(1), the Judges failure to make record of notification to the parties, is a closure that can never be justified." (Appendix "D" at 20).

The Deputy Commissioner stated:

"And to the extent Mr. Ruth claims error based only on the failure to strictly follow the rule, he demonstrates no actual and substantial prejudice stemming from constitutional error." (Appendix "A" at 4).

-11-

In <u>Koss</u> this Court points out that Chief Justice Madsen and Justice Stephens both share the opinion that a "deviation from CrR 6.15(f)(1) implicates constitutional protections." <u>Koss</u>, No. 85306-1/9 n.4. Mr. Ruth argued that the Ninth Circuit in <u>Musladin</u> held that it is the missed opportunity to participate in the formulation of the response that creates the critical Stage. Since, the jury inquiry was not about the jury instruction <u>Musladin</u> controls and the deviation from CrR 6.15 violates Mr. Ruth's right to be represented by counsel at a critical stage. Mr. Ruth also argued that he has a State Constitutional right to "Appear & Defend" and pursuant to <u>State v. Irby</u>, 170 Wn.2d 874, 885-86, fn 6 (2011), that right triggers under the chance that a substantial right may be in jeopardy. Mr. Ruth's right to counsel and public trial rights are substantial.

The Jury inquired about evidence not admitted in trial because of DPA Adcock's "Substantial Government Interference" and the In-Chambers closure that covered up the <u>Juan</u> violation. "The Substance of the jury's request-for evidence not admitted at trial ... [is] highly unusual." <u>Frantz v. Hazey</u>, 533 F.3d 724 (9th Cir. 2008). Since no Bone-Club analysis was conducted the Public & Ms. Woerner were unable to object & make record of the <u>Juan</u> violation. "The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The Ends of Justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depends on a full disclosure of all the fact." <u>Taylor v. Illinois</u>, 404 U.S. 400, 108 S.Ct. 646, 652-53 (U.S.Ill.1988).

-12-

The jury inquiry proves that Mr. Ruth's Confrontation, Compulsory, and Fair Trial Rights were violated by the first public trial violation. A conclusive presumption of prejudice is established when the jury followed Judge Hulbert's instructions (RP 247), and attempted to draw their "own conclusion" about the adverse Woerner evidence. That conclusion was drawn without Mr. Ruth being able to defend against the adverse Woerner evidence in direct-examination, and with cross-examination of Ms. Woerner. Rovinsky v. McKaskle, 722 F.2d 197, 198 (5th Cir. 1984); State v. Stentz, 30 Wash. 134, 70 p. 241, 243 (Wash.1902).

Mr. Ruth was stripped of the ability to defend against DPA Adcock's biased & untruthful one-sided adverse version. This created a Manifest error under RAP 2.5(a)(3) because the Juan violation that was covered up in chambers combined with the above prejudicial ruling from Judge Hulbert prevented Mr. Ruth from defending against the Woerner hearsay, and from presenting Mr. Ruth's theory of self-defense. RP 179-81, 207, 221, 223-38, 247, 266-67, 294-95, 297-301, 309.

If Mr. Ruth would have been allowed to participate in the formulation of the response, Mr. Ruth would have requested that the exculpatory portions of Ms. Woerner's "Police Statement" were allowed to be admitted to the jury. Mr. Ruth is entitled to have the exculpatory portions of Ms. Woerner's "Police statement" submitted to the jury for deliberations. Mr. Ruth has proven actual & Substantial Prejudice. Without Ms. Woerner's testimony or exculpatory portions of her "Police Statement" the State was allowed to be an architect of the trial, and convict Mr. Ruth based on only the adverse portions of Ms. Woerner's statement. If the jury would have heard Ms. Woerner's evidence Mr. Ruth would have been acquitted, the jury inquiry proves that Ms. Woerner's absence affected the verdict and tainted the entire fact-finding process.

-13-

Mr. Ruth has proven a conclusive presumption of innocence and should be given direct review. Mr. Ruth has met the standard in RAP 2.5(a)(3). Please read Kristine A. Kain's interview with jury Member Leslie Winney. (Exh. "8" Interview of Mr. Winney). Mr. Ruth asks that this court reverse and remand for a new trial, or dismiss all charges with prejudice.

**B. THE DEPUTY COMMISSIONER DID NOT FAIRLY DETERMINE WHAT PROCESS IS SIMILAR IN NATURE TO THE PROCEEDING BEING CHALLENGED MR. RUTH ASKS THIS COURT GRANT REVIEW AND GIVE GUIDANCE ON HOW TO MAKE A FAIR SIMILAR IN NATURE COMPARISON WHEN CONDUCTING THE EXPERIENCE & LOGIC TEST**

The Deputy Commissioner unfairly labeled the proceeding being challenged as "what witnesses the prosecutor or defense counsel intends to call, and the reasons for calling or not calling a witness." (Appendix "A" at 3). Mr. Ruth asks this court to announce a rule that gives guidance on how to properly make a fair similar in nature comparison. Mr. Ruth asserts that the reviewing court must (1) look at what rights are implicated in the proceeding; and (2) what impact the result of the closure had on the implicated rights, to determine the Similar nature for comparison. Mr. Ruth argues that the proceeding being challenged in his case is similar in nature to three different processes: (1) a Juan-type violation; (2) A Berrysmith perjury hearing; and (3) A Rovinsky hearing that prevented cross-examination of a a crucial State witness.

### i. THE JUAN-TYPE VIOLATION

The Deputy Commissioner added an additional element to the Juan test that the Ninth Circuit does not require. The Deputy Commissioner erroneously believes that Defense Counsel Stephens feeling are determinative of a Juan Violation. "Defense Counsel did not claim that the prosecutor had interfered with Ms. Woerner's testimony, and he did not request a hearing to explore the matter, which if held presumably would have been open." (Appendix "A" at 3).

-14-

In Juan the Ninth Circuit only requires that Mr. Ruth "demonstrate by a preponderance of the evidence that the totality of the circumstances proves that DPA Adcock's perjury warnings or threats were expressed to the witness, and the substance of that communication had the potential to affect whether the witness testifies, or alter the testimony. Juan at 1190. Defense Counsel stated that Ms. Woerner was emotionally erratic and concerned of the potential legal consequences of the prosecutor threats, if she testified. (Exh. 2). Mr. Ruth had met the Juan test.

The in-chambers hearing was caused from the Juan-type "Substantial Interference." The record clearly proves this was the topic of the In Chambers conversation. RP 179-81. The fact that "Substantial Government Interference" was resolved in the shadows of the judge's chambers, is proven by:

(1) Judge Hulbert agreeing that appointing Ms. Woerner counsel was 'Fair enough," RP 180-81; and

(2) During sentencing, after new defense counsel Mr. Dold asked for a continuance to interview Ms. Woerner so that he could file "a motion for new trial based on either prosecutorial misconduct, ineffective assistance of counsel, or denial of justice, any of the three," DPA Adcock responded "We have been through this before ... given the fact it won't change anything. I'd ask you to deny the motion for continuance. (2 /05 Sentencing hearing RP 3-5, 6-7);(Appendix "E" Pg. 6-7).

The above second offer of proof flies in the face of The Deputy Commissioner's erroneous statement that "Defense counsel did not claim that the prosecutor had interfered with Ms. Woerner's testimony, and he did not request a hearing to explore the matter, which if held presumably would have been open." (Appendix "A" at 3).

-15-

~~First, Mr. Stephens did express that DPA Adcock had interfered with~~
Ms. Woerner's testimony and requested that she be appointed counsel before
he decided whether he would call her as a witness. RP 179-81. The duty to
present to the jury & Public, what DPA Adcock deemed "a crucial witness"
(RP 15-16), is not Mr. Ruth's. That burden is on DPA Adcock. Any proceeding
that switches the burden to call Ms. Woerner on the defense violates Mr.
Ruth's Right to cross-examine Ms. Woerner.

Second, the in chambers hearing was not recorded, so nobody knows whether
defense counsel requested a hearing to explore the matter and, according
to DPA Adcock in chambers, the parties did go through motions for denial
of justice and prosecutorial misconduct. (2/4/05 Sentencing Hearing RP 6-7).

Finally, If Judge Hulbert would have conducted the Bone-Club Analysis,
the public and Ms. Woerner would have objected to the closure, and made record
of the hallway assault & threats. In the Motion for Discretionary review,
Mr. Ruth uses affidavits from the public, Private investigator Interviews
of the public, & Ms. Woerner, to give an accurate account of the proceeding
that violated Mr. Ruth's Public Trial Rights. (Appendix "B" Pg. 7-11).

Mr. Ruth was denied the right to cross-examine Ms. Woerner due to the
Juan-type (704 F.3d 1137) "Substantial Government Interference," that occurred
off record (and was witnessed by the public) between DPA Adcock & Ms. Woerner.
The Trial Judge cloaked this misconduct in the shadows of an In Chamber
hearing & two sidebars. RP 179-81.

## ii. BERRYSMITH HEARING IS HARMONIC WITH JUAN

Ms. Woerner was used substantively against Mr. Ruth, "it was the plain
duty of the prosecution," to present Ms. Woerner to the jury. Strange v.
People, 24 Mich. 1, 10 (1871). At common law a rule evolved in England in

-16-

the early nineteenth century that the prosecutor in felony cases was under a duty to call all eyewitnesses to the offense. 7 Wigmore, Evidence § 2079 (3d ed. 1940). The term Res Gestae witness indicates a witness who must be called because they posses knowledge of part of the criminal transaction. 6 Wigmore, Evidence §§ 1767-69 (3d. ed. 1940). DPA Adcock cannot empowered to switch the duty of presenting a state witness on the defense merely by making a false perjury accusation.

This proceeding is similar in nature to <u>State v. Berrysmith</u>, 87 Wash.App. 268, 273, 944 P.2d 397, 401 (1997).

In <u>Berrysmith</u> the in chambers discussion was about whether defense counsel was entitled to withdraw from representing Mr. Berrysmith because counsel believed his client intended to commit perjury. Id. at 401. The in chambers discussion in Mr. Ruth's case is similar in nature to whether Ms. Woerner was intending to commit perjury. The <u>Berrysmith</u> court reasoned that the "true issue is whether Mr. Mulligan had a sufficient factual basis for his strong belief that perjury was intended and could not be dissuaded, so that continuing with representation would result in a violation of the rules of professional misconduct." Id. 401.

Ms. Woerner was not represented by any attorney, and the State used Ms. Woerner in their case-in-chief, so Mr. Ruth's confrontation & compulsory rights were at issue automatically making the in chambers hearing a critical stage. Mr. Ruth's right to "Appear & defense" are violated by being excluded from this hearing. The attorney in <u>Berysmith</u> had the burden to prove that the belief in perjury was reasonable, and that it could not be dissuaded.

-17-

Mr. Ruth argues that DPA Adcock has a duty in open court to meet this same burden because Mr. Ruth Fair Trial Rights are implicated by Ms. Woerner not be presented for Cross-examination. "Whether a lawyers belief is reasonable depends upon whether it had a firm factual basis. James, 48 Wash.App. 353, 366-67 (1987)(Gut level suspicion is not enough). Id. at 401-402.

"The reasonableness of DPA Adcock's perjury allegation is not at issue because he did not represent Ms. Woerner and she is not a criminal defendant. At issue is whether a firm factual basis for the perjury allegations existed, and if so, whether the perjury can be dissuaded. Mr. Ruth's Fair Trial rights depend on the State presenting Ms. Woerner to the jury because without her Mr. Ruth loses not only the State's endorsement of Ms. Woerner, but the powerful tool of cross-examination. If the defense has the burden to call Ms. Woerner, the State is empowered to impeach any portion of Ms. Woerner's testimony that is exculpatory to Mr. Ruth, while maintaining the integrity of the "Adverse" Woerner hearsay through the credibility of the State's witnesses. 1966 WASH.U.L.Q. 068, 081 (19966)." (Appendix "D" at 11).

To repress the crime of perjury prevention is better than cure "and the law of England relied, for this purpose, on the means provided for detecting and exposing the crime at the moment of commission, such as PUBLICITY, CROSS-EXAMINATION, and the aid of the jury." State v. Olson, 92 Wash.2d 134, 594 P.2d at 1340-41 (1979). Mr. Ruth has proved that history places any perjury accusation in the view of the public & jury. Mr. Ruth asks that this Court make a "Ruth Hearing" that requires the trial court to determine and make record of the warning or threat made by the prosecution, the affect it had on the witness, establish the factual basis for the perjury accusation pursuant to Berrysmith, and allow the accused & Public to make record. Mr. Ruth also asked that all warnings are given on the record by a third party.

-18-

### iii. MR. RUTH WAS DENIED THE ABILITY TO CROSS-EXAMINE MS. WOERNER

In <u>Slert</u> this court added as an element of the Experience prong, whether observing the process will aid the public in assessing the guilt or innocence of the accused? No. 87944-7/3. Mr. Ruth proved in the facts section that Ms. Woerner's testimony was critical for the Jury & Public to determine Mr. Ruth's guilt or innocence. It is an "ancient proposition of law .... 'that the public ... has a right to every man's evidence." <u>U.S. v. Nixon</u>, 418 U.S. 683, 94 S.Ct. 3090, 3108 (1974). "The very integrity of the judicial system and public confidence in the system depends on a full disclosure of the fact." <u>Taylor</u> at 108 S.Ct. 653. "[T]he confrontation clause imposes a burden on the prosecution to present it witnesses, not on the defendant to bring those adverse witnesses into court." <u>Melendez-Diaz v. Massachusetts</u>, 129 S.Ct. 2527, 2541, 557 U.S. 305 (U.S.Mass.2009). The more protective State Face-to-Face protection imposes a duty & obligation on the state to present a "Res Gestae witness" for cross-examination to:

(1) Avoid the suppression of evidence favorable to the accused; and

(2) protects the accused against false accusation by giving him the opportunity through cross-examination to elicit exculpatory evidence. <u>U.S. v. Lopez</u> 373 U.S. 427, 445 (1963).

Any proceeding that limits Mr. Ruth's right to cross-examination must be done in open court. <u>Rovinsky</u> Supra; <u>Stentz</u> Supra. The mundane scope of Sidebar & inchambers discussion was exceeded by the closed process for two reasons.

First, the public's observation would aid in determining Mr. Ruth's guilt or innocence. Second, had the Bone-Club analysis been conducted the second proponent would have produced objection from the public to the closure, and record of what occurred in the hallway confrontation. Mr. Ruth has

-19-

satisfied the Experience and Logic test. Unlike Smith, Mr. Ruth has demonstrated that the public has a specific interest that is served by being privy to the sidebars & in chamber proceeding being challenged. No. 85809-8/12.

The "Ruth Hearing" will play a positive role in the functioning of any proceeding involving a Juan violation that prevents cross-examination. Mr. Ruth is entitled to cross-examine Ms. Woerner in front of the jury about the threats of Mr. Adcock. "The Evidence of threats is necessary to account for the specific behavior of a witness, that if unexplained, could damage a party's case." U.S. v. Thomas, 86 F.3d 647, 654 (1996). This Court made a similar connection in Orange, when recognizing the particular harm of precluding the defendant's family from contributing to the jury selection. 152 Wn.2d at 812. The prospective jurors in Orange did not see family participation, but their "conspicuous exclusion from it." 152 Wn.2d at 809. This court cured that prejudice by attaching the public trial right safeguard, the same must apply to Mr. Ruth's confrontation rights.

Mr. Ruth relied heavily on protecting Ms. Woerner in his self-defense claim. However, the jury did not see the participation of his girlfriend in trial, just her 'Conspicuous Exclusion." As Mr. Ruth's girlfriend it seems suspicious for her not to testify. If Mr. Ruth was testifying truthfully about defending her, would she not defend him? The Juan rule applied the Webb protection to the Confrontation Clause, and Mr. Ruth asks that this court attach the public trial right to the Juan rule and crate the 'Ruth Hearing" to cure the prejudice in this case. The jury inquiry proves that the verdict is the result of speculation, conjecture, and only the adverse portions of MS. Woerner's "Police Statement."

Respectfully Submitted,
1-4-15
X _____
MATTHEW R. RUTH, Pro se litigant

-20-

EXHIBIT

7

THE COURT OF APPEALS
DIVISION
ONE
No. 68380-2-I

ORDER OF DISMISSAL

(AAG Exh. 17)

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Personal )
Restraint of: )          No. 68380-2-I
)
)
MATTHEW ROBERT RUTH, )          ORDER OF DISMISSAL
)
Petitioner. )
_____)

Matthew Ruth has filed this personal restraint petition challenging his

conviction in Snohomish County Superior Court No. 03-1-02451-6. In Ruth's direct

appeal, the Supreme Court remanded the matter for resentencing based on the use

of the phrase "deadly weapon" rather than "firearm" in the special verdict forms on

the enhancements in State v. Ruth, 167 Wn.2d 889, 225 P.3d 913 (2010), and issued

the mandate in May 2010. The trial court resentenced Ruth on December 8, 2010.

Ruth did not appeal. Ruth filed the present petition on December 2, 2011, raising

issues relating only to his 2004 jury trial. In particular, Ruth now claims that the trial

court violated his right to a public trial and his rights to the presumption of innocence

and a unanimous verdict.

In order to obtain collateral relief by means of a personal restraint petition,

Ruth must demonstrate either an error of constitutional magnitude that gives rise to

actual prejudice or a nonconstitutional error that inherently results in a "complete

miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d

506 (1990). Bare assertions and conclusory allegations do not warrant relief in a

personal restraint proceeding. In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828

EXHIBIT 17

No. 68380-2-I/2

P.2d 1086 (1992). Because Ruth has not made any showing that he can satisfy this threshold burden, the petition is dismissed.

Ruth contends the trial court violated his right to a public trial by answering a jury question in chambers and by holding a conference in chambers about the State's decision not to call a witness. The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution, provide the accused with the right to a public trial. In re Pers. Restraint of Orange, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Certain proceedings must be held in open court unless the five factors listed in State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995) justify closing the courtroom. Orange, 152 Wn.2d at 808-11. The threshold question is whether, under the experience and logic test, the proceeding at issue implicates the public trial right. State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Under that test, courts consider (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Sublett, 176 Wn.2d at 73 (quotations omitted). In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question. Sublett, 176 Wn.2d at 75-78. Ruth fails to demonstrate a violation of his public trial rights involving the jury question.[1]

---

[1] Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. Because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief.

2

No. 68380-2-I/3

As to the conference in chambers regarding the witness, Ruth claims that the particular circumstances here implicated the public trial right. Briefly, the attorneys and the trial judge met in chambers to discuss scheduling. Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record, "in an overabundance of caution, real quickly, because Mr. Ruth was not present." The prosecutor explained that he believed Ruth's girlfriend Rene Woerner would commit perjury if called to testify by the State, that defense counsel had also spoken with Woerner, and that the Office of Public Defense would be providing an attorney to advise Woerner.

Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it "expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor." Ruth claims "the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor." Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of Yeats, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Relying on State v. Bennett, 161 Wn.2d 303, 315-16, 165 P.d 1241 (2007), Ruth also contends the use of the Castle[2] reasonable doubt instruction violated his constitutional rights. In Bennett, the Supreme Court concluded that the Castle instruction is "constitutionally adequate," but used its inherent supervisory power to

---

[2] State v. Castle, 86 Wn. App. 48, 935 P.2d 656 (1997).

3

No. 68380-2-I/4

direct trial courts to use only Washington Pattern Jury Instruction (WPIC) 4.01. Bennett, 161 Wn.2d at 315, 318. Without sufficient explanation, Ruth now claims that the use of the instruction in his 2004 trial undermined his constitutional right to the presumption of innocence and allowed the jury to convict based on a lower standard of proof. Because Ruth's trial took place years before the Supreme Court disapproved of the "constitutionally adequate" instruction in Bennett and he fails to identify or demonstrate a complete miscarriage of justice, this claim fails.

Finally, relying on State v. Bashaw, 169 Wn.2d 133, 234 P.3d 195 (2010), Ruth contends the jury instructions erroneously instructed the jury that it had to be unanimous in order to answer "no" on the special verdict forms. But our Supreme Court recently overruled the nonunanimity rule developed in Bashaw, concluding that it "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." State v. Nuñez, 174 Wn.2d 707, 709-710, 285 P.3d 21 (2012). Because the instructions were not erroneous, Ruth has no grounds for relief.

Now, therefore, it is hereby

ORDERED that the personal restraint petition is dismissed under RAP 16.11(b).

Done this ___17th___ day of ___January___, 2014.

_____
Acting Chief Judge

2014 JAN 17 PM 2: 51

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

4

EXHIBIT
8

State's Response To PRP
Pages 21-24

If this is dispositive on direct appeal as harmless error, it should hold all the more on collateral attack, where the defendant must show actual and substantial prejudice. See In re St. Pierre, 118 Wn.2d at 328-29.

As for the question of the defendant's presence, the Sixth Amendment's confrontation clause confers upon the accused the right to be confronted with the witnesses against him – that is, to confront those who bear testimony. U.S. Const. amend VI (1791); State v. Jasper, 174 Wn.2d at 109. A jury inquiry does not fall within this category. A defendant does have a due-process right to be present during all critical stages of a criminal proceeding. U.S. Const. amend XIV, § 1 (1868); State v. Jasper, 158 Wn. App. at 538. A "critical stage" is one where the defendant's presence has a reasonably substantial relationship to the fullness of his or her opportunity to defend against the charge. Jasper, 158 Wn. App. at 539, citing In re Pers. Restraint of Benn, 134 Wn.2d 868, 920, 952 P.2d 116 (1998). Generally, in-chambers conferences between the court and counsel on legal matters are not critical stages except when the issues raised involve disputed facts. Jasper, 158 Wn. App. at 539, citing In re Pers. Restraint of Lord, 123 Wash.2d 296, 306, 868 P.2d 835 (1994). A jury inquiry that raises only a question

of law and no issues of disputed facts is similarly not a critical stage, and a defendant's presence in such instance is not constitutionally required. Jasper, 158 Wn. App. at 539; accord, State v. Sublett, 156 Wn. App. 160, 182, 231 P.3d 231 (2010).[2] Thus, his claim fails.

### E. NEITHER THE RESPONSE TO THE JURY INQUIRY NOR THE BRIEF DISCLOSURE IN CHAMBERS VIOLATED THE DEFENDANT'S RIGHT TO A PUBLIC VTRIAL.

The petitioner argues that both the jury inquiry and response, as well as the midtrial disclosure in chambers that the State would not be calling Renee Woerner as a witness, violated his right to a public trial. The former, as discussed above, involved no disputed facts – rather, the jury was told it could not see evidence that had not been admitted. Ex. 16 at 9; Ex. 17. The latter merely involved the State disclosing to the court and opposing counsel that it was not calling an endorsed witness, and why. 1 Trial RP 179-81; 2 Trial RP 182; Sent'g RP 5-6.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to a public trial. State v. Sublett, 156 Wn. App. at 181. "The public trial right applies to the evidentiary

---

[2] Review granted, 170 Wn.2d 1016 (2010). Oral argument was June 16, 2011.

phases of the trial, and to other 'adversary proceedings.'" State v. Rivera, 108 Wn. App. 645, 652-53, 32 P.3d 292 (2001). The right to public trial is linked to the defendant's constitutional right to be present during the critical phases of trial; thus, "a defendant has a right to an open court whenever evidence is taken, during a suppression hearing, . . . during voir dire," and during the jury selection process. Rivera, 108 Wn. App. at 653, 32 P.3d 292 (citing Press–Enter. Co. v. Superior Court of California, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629). "A defendant does not, however, have a right to a public hearing on purely ministerial or legal issues that do not require the resolution of disputed facts." State v. Sadler, 147 Wn. App. 97, 114, 193 P.3d 1108 (2008), citing, e.g., State v. Rivera, 108 Wn. App. 645, 652, 32 P.3d 292 (2001) (court addressed juror's complaint about another juror's hygiene in closed courtroom); and State v. Bremer, 98 Wn. App. 832, 835, 991 P.2d 118 (2000) (chambers conference re instructions).

The two instances complained of here fall into the "ministerial or legal" category. The matter disclosed to the court in chambers presented nothing for the judge to rule on; rather, the prosecutor simply informed why he was not going to call Ms. Woerner as a witness after all. This hardly required the resolution

of disputed facts. It did not even involve a question of law. And it was put on the record later that same afternoon. 1 Trial RP 179-81; 2 Trial RP 182; Sent'g RP 5-6. The jury inquiry during deliberations presented a straightforward and undisputed issue as well: they wanted to see evidence that had not been admitted, and the judge told them no. This did not require the resolution of disputed facts, either.

In Sublett, the jury was confused over the mens rea in accomplice instructions. Counsel agreed with the court in chambers that the only answer would be to re-read the instructions. Sublett, 156 Wn. App. at 178-79. Division II held that this presented "a purely legal issue . . . that did not require the resolution of disputed facts" and thus the defendants' right to a public trial did not apply in this context." Sublett, 156 Wn. App. at 182.

This is dispositive. The petitioner in fact concedes that Sublett is adverse to his position. Pet'n for Review 9. He notes that review was granted, however, and therefore he ought to prevail. Certainly review has been granted. See n.2 above. At the most the grant of review might justify a stay here; it hardly affords, by itself, a basis for relief. Moreover, a jury inquiry concerning the

Exhibit

9

THE SUPREME COURT
OF THE
STATE OF WASHINGTON

Ruling Denying Review

No. 89906-1

( AAG Exh.          )

Filed
Washington State Supreme Court

DEC - 5 2014

Ronald R. Carpenter
Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In the Matter of the Personal Restraint of:

MATTHEW ROBERT RUTH,

              Petitioner.

NO. 8 9 9 0 6 - 1

RULING DENYING REVIEW

      Matthew Ruth was convicted of two counts of first degree assault. The sentence included firearm enhancements, but because the jury returned verdicts finding only that Mr. Ruth was armed with a deadly weapon, this court remanded for entry of deadly weapon enhancements in place of firearm enhancements. *State v. Williams-Walker*, 167 Wn.2d 889, 225 P.3d 913 (2010). After resentencing, Mr. Ruth did not appeal, but he timely filed a personal restraint petition in Division One of the Court of Appeals raising errors relating to his trial. Finding no basis for relief, the acting chief judge dismissed the petition. Mr. Ruth now seeks this court's discretionary review. RAP 16.14(c).[1]

      To obtain this court's review, Mr. Ruth must show that the acting chief judge's decision conflicts with a decision of this court or with another Court of Appeals decision, or that he is raising a significant constitutional question or an issue

---

[1] Mr. Ruth has also moved to file a supplemental motion for discretionary review. That motion is granted, and the supplemental motion is therefore accepted for filing.

of substantial public interest. RAP 13.4(b); RAP 13.5A(a)(1), (b). He does not make this showing. In his motion for discretionary review, Mr. Ruth reasserts only his claim below that his constitutional right to a public trial was violated in two respects: first, in relation to the decision of the prosecutor and defense counsel to not call Mr. Ruth's former girlfriend as a witness, and second in relation to the trial court's response to a jury inquiry during deliberations.

The first circumstance arose when the trial court noted on the record and outside the jury's presence that a "very brief conversation" had taken place in chambers about not calling a particular witness, and the court asked the attorneys to "flesh out" what had been discussed. Report of Proceedings (Dec. 7, 2004) at 179. The prosecutor then explained that in the chambers discussion he told defense counsel and the court that he had spoken with the former girlfriend, Renee Woerner, whom he had intended to call as a witness, and had decided not to call her because he believed she would commit perjury. (Ms. Woerner had previously given a sworn statement to police and the prosecutor corroborating the victims' account of events.) After his conversation with Ms. Woerner, the prosecutor explained his decision to defense counsel and suggested counsel might want to talk to Ms. Woerner. Defense counsel then spoke with Ms. Woerner, and she told him that the prosecutor had warned her of consequences of committing perjury. Defense counsel at that point determined that Ms. Woerner needed independent legal advice. Defense counsel confirmed to the court that the events as related by the prosecutor had occurred, and that he did not know then whether he would call Ms. Woerner as a defense witness. Counsel later explained in a declaration that after giving the matter thought and conferring with Mr. Ruth, he decided not to call Ms. Woerner as a witness, believing that she would either corroborate the victims' testimony or be easily impeached by her prior sworn statement.

Mr. Ruth does not show that the "very brief" in-chambers conference in which the prosecutor revealed he would not call Ms. Woerner as a witness violated his right to a public trial. Whether a particular part of a criminal trial must be open to the public is evaluated under the "experience and logic" test, under which the reviewing court first determines whether the place and process at issue have historically been open to the public, and then whether public access plays a significant positive role in the functioning of the particular process in question. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012); *State v. Smith*, 334 P.3d 1049, 1052-53 (2014). Mr. Ruth does not show with citation to authority or with persuasive analysis that discussions about what witnesses the prosecutor or defense counsel intends to call, and the reasons for calling or not calling a witness, have either historically been open to the public or would be positively affected by public view, especially where, as here, what transpired in chambers was memorialized in the public record. Mr. Ruth suggests that public view would have been beneficial here to guard against the possibility that the prosecutor had substantially interfered with Ms. Woerner's potential testimony by improperly threatening her with perjury. *See United States v. Juan*, 704 F.3d 1137, 1141-42 (9th Cir. 2013) (principle that prosecutor may not substantially interfere with witnesses' testimony extends to prosecution witnesses). He further argues he had a right to cross-examine Ms. Woerner about the matter. But this has nothing to do with the right to a public trial in the circumstances of this case. Defense counsel did not claim that the prosecutor had interfered with Ms. Woerner's testimony, and he did not request a hearing to explore the matter, which if held presumably would have been open. All that transpired in chambers as related on the record is that the prosecutor explained why he would not be calling Ms. Woerner as a witness, and defense counsel related that he had spoken with Ms. Woerner and that she would be appointed independent counsel in light of her concern about perjury. And defense counsel could

have called Ms. Woerner as a witness, but after speaking with her and consulting with Mr. Ruth, he decided not to do so. Mr. Ruth does not show that these proceedings implicated the constitutional right to a public trial.[2]

As for the jury inquiry, the jury asked during deliberations to see transcripts of interviews with the victims and Ms. Woerner. The trial court responded that the jury could not view these documents because they were not admitted into evidence. Consideration of and responses to jury inquiries are not subject to the right to a public trial. *Sublett*, 176 Wn.2d at 77-78. Mr. Ruth complains that the trial court did not follow the procedures for answering jury inquiries specified by CrR 6.15(f)(1). But again, this has nothing to do with the constitutional right to a public trial. Any interests under the public trial right are protected by placement of the inquiry and the response in the public record, as the trial court did here. *See Sublett*, 176 Wn.2d at 77. And to the extent Mr. Ruth claims error based only on the failure to strictly follow the rule, he demonstrates no actual and substantial prejudice stemming from constitutional error or a complete miscarriage of justice resulting from nonconstitutional error. *See In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (standard of relief in personal restraint petition).

The motion for discretionary review is denied.

DEPUTY COMMISSIONER

December 5, 2014

---

[2] Mr. Ruth also complains of his absence from the in-chambers discussion, seemingly suggesting his right to be present was violated. But even if he had a right to be present, he does not demonstrate he was prejudiced by his absence. *See State v. Irby*, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011) (violation of right to be present subject to harmless error analysis).

EXHIBIT
10

Psychological
evaluation

FILED

2005 FEB -4  PM 12: 02

PAUL DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

---

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

---

STATE OF WASHINGTON
      Plaintiff/Petitioner,

  VS.

MATTHEW RUTH
      Defendant/Respondent.

CAUSE NO.:   03-1-02451-6

COVER SHEET

---

ATTACHED HERETO IS: PSYCHOLOGICAL EVALUATION REPORT



Psychological Testing

The Mental Status Examination revealed that the subject is oriented X3, and did not display confusion and disorganization. He was not labile but somewhat depressed emotionally. There was no evidence of psychotic thinking or impairment of reality testing. His energy level seems fairly normal, but his affect was flat and somewhat labile. His intelligence appeared to be in the average, although formal psychometric testing was not administered. He denied symptoms of mania. He denied suicidal and homicidal thoughts, feelings or plans at this time.

The results of the MMPI-2 indicated rather extreme and possibly exaggerated results. He endorsed extreme persecutory thoughts and feelings, and very poor ego strength. He endorsed a high number of rare and unusual symptoms and complaints. He probably has a chronic personality disturbance, possibly with schizoid or paranoid features. Alienation, both social and emotional, is prominent features of that personality. He is extremely tense, anxious and unhappy.

Conclusions

The results of my examination revealed an individual who has chronic disturbance of judgment personality and decision-making that has been greatly exacerbated by his drug abuse. Although he has denied intoxication or withdrawal around the time of the incident, and denied being the aggressor in the incident, it is evident that he was unrealistic, impulsive and reckless in his thinking at the time.

The question of a chronic psychotic disorder remains. He has refused to assert that he was mentally ill at the time, but he probably has disturbance in his thinking that causes him to interpret situations as threatening that might not be as dangerous in reality as they seem to him at the time. This is particularly true if he is intoxicated.

Mr. Ruth's disturbed childhood, with chaos, abuse and severe alienation has rendered him compromised in his thinking and judgment. He has a wide-ranging and serious drug abuse history, including methamphetamine abuse by his own mother and his own polysubstance abuse and dependence. His social development and social skills demonstrate the effects of that disturbed lifestyle. Under pressure he probably suffers unrealistic and idiosyncratic thinking as suggested by the schizotypal and paranoid traits of his personality disorder.

There was insufficient basis to conclude that Mr. Ruth was legally insane or lacked the specific capacity to form the mental intent at the time of the offense. However, his thinking, decision-making skills and his ability to anticipate

dangerous situations. While he probably was not psychotic at the time of this unfortunate and very dangerous incident, under the pressure of the situation he may have reacted with fear and suspiciousness that was not appropriate and caused him to respond in an unnecessarily violent manner. This event did occur in his "home", a small fifth wheel trailer, and he may have felt invaded and threatened by the trapping nature of this location.

Mr. Ruth's chronic mental condition, while not amounting to a true mental defense, could have been a significant contributing factor to his actions that day. While he did not misunderstand the nature of his actions, he may have interpreted those actions as being legal and appropriate, if as he asserted, he perceived him own life as being at risk.

Diagnosis (DSM-IV-TR)
Axis 1  Polysubstance dependence
        Depressive disorder NOS
        r/o Psychotic disorder NOS- probably secondary to drug abuse
Axis 2  Personality disorder NOS- with schizotypal and paranoid traits noted
Axis 3  No medical conditions
Axis 4  Severe stresses of current legal proceedings and incarceration
Axis 5  Current GAF Rating- 55-60, moderately impairing symptoms

Thank you for this referral.


Kenneth Muscatel, Ph.D.
Clinical, Forensic and
Neuropsychology

EXhIBIT
10

1

2

3

4

5

THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY

6

7   STATE OF WASHINGTON

8                  *Respondent,*

9   v.

10  MATTHEW RUTH,

11                 *Appellant.*

CAUSE NO. 03-1-02451-6

DESIGNATION OF CLERK'S PAPERS
SUPPLEMENTAL
COURT OF APPEALS NO. 56318-1-I

Clerk's Action Required

12

13

14  TO:   Superior Court Clerk

15        Please prepare and transmit to the Court of Appeals, Division One, the following Clerk's

16  Papers and Exhibits.

17

18

19  Exhibit No.    Exhibit

20  23          8.5" x 11" original: Portrait photo taken from bathroom into bedroom

21  25          8.5" x 11" original: Landscape photo showing closet

22  26          8.5" x 11" original: Landscape photo showing bed

23  27          8.5" x 11" original: Landscape photo, taken from bathroom toward bedroom

24  28          8.5" x 11" original: Landscape photo close-up of bedding

25  29          8.5" x 11" original: Landscape photo, electrical outlet on left

SUPPLEMENTAL DESIGNATION OF
CLERK'S PAPERS - 1

NIELSEN, BROMAN & KOCH, P.L.L.C.
1908 East Madison Street
Seattle, WA  98122
(206) 623-2373

46          Small evidence bag

DATED this 8th day of February, 2006.

Andrew Zinner, WSBA ID No. 18631
NIELSEN, BROMAN & KOCH P.L.L.C.
Attorneys for Appellant

Today I deposited in the mails of the United States of America a
properly stamped and addressed envelope directed to attorneys of
record of ~~respondent/appellant/plaintiff~~ containing a copy of the
document to which this declaration is attached.
Snohomish Co. clerk + pros.
I certify under penalty of perjury of the laws of the State of
Washington that the foregoing is true and correct.

_____          2-8-06
Name          Done in Seattle, WA   Date

RECEIVED
COURT OF APPEALS
DIVISION ONE

FEB - 8 2006

SUPPLEMENTAL DESIGNATION OF
CLERK'S PAPERS - 2

NIELSEN, BROMAN & KOCH, P.L.L.C.
1908 East Madison Street
Seattle, WA 98122
(206) 623-2373

EXHIBIT
11

Jeremy Custer

o 2-liters Alcohol
o 3x Shots
o Not sure why
o Red & Yellow case Next to Drug Abuse

| 18 | **Multiple Trauma**   (5) |
|---|---|

MD / PA _Banco_   DATE: _11/5/08_ TIME: _1700_

HISTORIAN: _✓_ patient __ spouse __ paramedics

EMS arrival / assessment reviewed.

HX / __ EXAM LIMITED BY: _____

---

**HPI   chief complaint:** (Injury to) _limbs_

**occurred:**
__ just PTA
_✓_ today
__ yesterday
____ days PTA

**where:**
__ home          __ school
__ neighbor's   __ city park
__ work           __ street

**context:** _1330 at friends trail_
_a drill a 22 gauge hand gun x1_
_Pt not sure why._

**quality:** _____

**location of pain / injuries:**

| | right | | left | |
|---|---|---|---|---|
| head  face  mouth | shldr | hip | shldr | hip |
| neck  chest  abdomen | arm | thigh | arm | thigh |
| back  upper mid- lower | elbow | knee | elbow | knee |
| – radiating to R / L thigh / leg. | f-arm | leg | f-arm | leg |
| | wrist | ankle | wrist | ankle |
| | hand | foot | hand | foot |

**severity of pain:**
(mild)
moderate
severe

**associated symptoms:**
__ lost consciousness / dazed
duration: _____
remembers:
(impact   (coming to hospital)
__ seizure

---

**ROS** (all systems neg except as mrkd)
__ loss feeling / power arms / legs
__ headache
__ double vision / hearing loss
__ weakness
__ palpitations
__ anxiety
__ depression

__ trouble breathing / chest pain
__ nausea / vomiting
__ loss of bladder function
__ skin laceration
__ recent fever / illness
__ DVT _postnasal_
__ diabetes: _gtt x 2d_
__ hypothyroid _cough →_

**SOCIAL HX** __ recent ETOH __✓ smoker __ drug abuse _neg_
_→_ _bilcus_ _yellow_

**PAST HX** _✓_ negative __ prior records reviewed
_semonts_

Meds- __ none / _✓_ see nurses note.
Allergies- __ NKDA / _✓_ see nurses note.

---

**PHYSICAL EXAM**

__✓_ Nursing Assessment Reviewed  __✓_ V.S. reviewed __ all except ____
__✓_ Tetanus immun. UTD

VS Temp ____ Pulse ____ RR ____ BP _166/117_

Alert __ Lethargic __ Anxious

Distress: __ NAD __ mild __ moderate __ severe

Other- __ c-collar ( PTA / in ED )  __ back-board __ IV __ splint

**HEAD**
__ no evidence of          __ see diagram
   trauma                       __ Battle's sign / Raccoon Eyes ____

**NECK**
__ non-tender              __ see diagram
__ painless ROM          __ vertebral point-tenderness ____
__ trachea midline        __ muscle spasm / decreased ROM ____
                                    __ pain on movement of neck ____



**EYES**
__ PERRL                    __ unequal pupils  R ___ mm  L ___ mm
__ EOMI                      __ EOM entrapment / palsy ____
                                    __ subconjunctival hemorrhage ____

**ENT**
__ nml external           __ hemotympanum ____
   inspection               __ TM obscured by wax ____
__ no dental injury      __ clotted nasal blood ____
                                    __ dental injury / malocclusion ____

**RESP / CVS**
__ chest non-tender     __ see diagram ( on reverse ) ____
__ breath sounds nml   __ decreased breath sounds ____
__ heart sounds nml     __ wheezing / rales ____
                                    __ splinting / paradoxical movements ____
_July cough_

**ABDOMEN**
__ non-tender             __ see diagram ( on reverse ) ____
__ no organomegaly    __ tenderness / guarding / rebound ____
                                    __ mass / organomegaly ____

**GENITAL / RECTAL**
__ nml genital exam     __ perineal hematoma ____
__ nml vaginal exam    __ blood at urethral meatus ____
__ nml rectal exam      __ decreased rectal tone ____
__ heme negative stool

**NEURO / PSYCH**
__ oriented x3             __ confusion / disorientation ____
__ mood & affect         __ EOM palsy / anisocoria ____
__ CN's nml                __ facial asymmetry ____
__ as tested                __ unsteady / ataxic gait ____
__ sensation &           __ sensory / motor deficit ____
__ motor nml.



© 1996 - 2002 T-System, Inc. Circle or check affirmatives, backslash ( ) negatives.

**Providence Everett Medical Center**
**EMERGENCY PHYSICIAN RECORD**

CUSTER, JEREMY D        11/05/03  1652
03309-01194       03/05/80  23Y    M

EXHIBIT
12

Jeremy D. Custer

IBUPROFEN (Motrin)

Why No Narcotics?

Because He was high on Drugs

 **Providence General Medical Center**

**ED Discharge Instructions for:**

# JEREMY D. CUSTER

PGMC, 1321 Colby, Everett, WA 98201  425-261-3000
PPC, 916 Pacific Ave, Everett, WA 98206  425-258-7555

| | | | |
|---|---|---|---|
| Name: | JEREMY D. CUSTER | Medical Rec #: | 0001107782 |
| Address: | 12019 185TH AVE SE | Phone: | (425)422-9336 |
| | SNOHOMISH, WA 98290 | | (425)422-9336 |

Visit Date/Time:   November 5, 2003 16:52        Pt. Account #:  0330901194

## Evaluation

Evaluation in the Emergency Department included triage by a nurse, and a screening exam by the physician. You were treated by the following Emergency Department staff:
Emergency Md(s): RANDAL BENSEN.

## Tests

X-RAYS - These x-rays were preliminarily read by the emergency department physician and will be read by a radiologist. If there are any problems, we will notify you or your physician. The following tests were performed:
  FEMUR
  HUMERUS
  HIPS

## Diagnosis-1

Based on the evaluation and tests, the following diagnoses have been made. Remember that these are preliminary diagnoses and follow up with your referral physician may be necessary.

* MULTIPLE GUN SHOT WOUNDS

## Diagnosis-2

* PUNCTURE WOUND RIGHT UPPER ARM AND RIGHT THIGH

## Diagnosis-3

* ABRASION L HIP

## Take Home Medications

Do NOT let anyone else use your medications. Take your medications as prescribed.
ADVIL
IBUPROFEN (Motrin)
Motrin is a non-steriodal anti-inflammatory medication used to relieve pain, swelling, and inflammation.
If you did not receive a prescription from the doctor for this, you can purchase it over the counter at most stores. . Please ask for directions on dosage.
WARNINGS:
1. Do not take Motrin if you: have a history of ulcers, problems with bleeding or blood clotting, liver or kidney disease.

265

EXHIBIT

13

Attending Doctors

DR. Randan Bensen

DR. Daniel ZAK

Sub PoENA
Never testified

FILED

2004 MAY 24  AM 10: 45

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| THE STATE OF WASHINGTON,<br>Plaintiff,<br><br>vs.<br><br>RUTH, MATTHEW ROBERT<br>Defendant. | No. 03-1-02451-6<br><br>Jury Trial SUBPOENA |

State of Washington to :

DR. RANDAL BENSEN
PROVIDENCE MED CENTER - COLBY CAMPUS
1321 COLBY
EVERETT, WA 98201

In the name of the State of Washington, you are hereby commanded to appear at the CRIMINAL
HEARINGS COURTROOM (ROOM 201) OF THE SUPERIOR COURT, 2ND FLOOR, COURTHOUSE IN
EVERETT, WASHINGTON on the 26th day of July, 2004, at 1:00 PM, Snohomish County, Washington,
then and there to give evidence in the above-entitled cause pending, and to remain in attendance at said
court until discharged by the Court.

Dated this 21st day of May, 2004

JOHN S. ADCOCK #15714
Deputy Prosecuting Attorney

| PA Number | Originating Agency | Originating Case # | Offense Date |
|-----------|--------------------|--------------------|--------------|
| 03F04554 | SSO | 0325124 | 11/5/2003 |

Upon receipt of this subpoena
please call Chris Yue, Legal
Assistant to the above signed
attorney at (425) 388-3663.
cyue@co.snohomish.wa.us

FILED

04 OCT 11 PM 2: 37

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| THE STATE OF WASHINGTON,<br>                              Plaintiff, | No. 03-1-02451-6 |
|         vs. | Jury Trial SUBPOENA |
| RUTH, MATTHEW ROBERT<br>                              Defendant. | |

State of Washington to :

DR DANIEL ZAK
PROV GEN MEDICAL CTR - COLBY CAMPUS
PO BOX 1147
EVERETT, WA 98201

In the name of the State of Washington, you are hereby commanded to appear at the SNOHOMISH
COUNTY PROSECUTOR'S OFFICE, 1ST FLOOR, COURTHOUSE IN EVERETT, WASHINGTON on the
25th day of October, 2004, at 1:00 PM, Snohomish County, Washington, then and there to give evidence
in the above-entitled cause pending, and to remain in attendance at assigned court until discharged by
the Court.

Dated this 8th day of October, 2004

JOHN S. ADSOCK #15714
Deputy Prosecuting Attorney

| PA Number | Originating Agency | Originating Case # | Offense Date |
|---|---|---|---|
| 03F04554 | SSO | 0325124 | 11/5/2003 |

mailed 10/11/04