EXHIBIT

THREE

Petitioner's Reply Memorandum
To State's Supplemental Response
To Personal Restraint Petition

( AAG Answer EXHIBIT 16 )

SCANNED
mm-5/19/14

No. 68380-2-I

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
### DIVISION ONE

------------------------------------------------

MATTHEW R. RUTH,

Petitioner,

Vs.

State of Washington,

Respondent.

------------------------------------------------

## PETITIONER'S REPLY MEMORANDUM
To State Supplemental Response to Personal Restraint Petition

------------------------------------------------

Matthew R. Ruth
Pro Se Litigant
Doc 879492 H4-A-88U
Stafford Creek Correctional Center
191 Constantine Way
Aberdeen, Wa 98520





EXHIBIT 16

## TABLE OF CONTENTS

I. Opening Statement..........................................1

II. Relevant Fact's..........................................2

The State's Response brief omits key words to Change Context of threats
Pg 3

The Public Witnessed The Prosecutor Assault Ms. Woerner
And threaten to arrest Her If She Tells The Complete Truth
Pg 3

Mr. Ruth Objected to Mr. Adcock Threatening Ms. Woerner and Established She wasn't
Testifying because of the threats; The trial Judge Threatened to place Mr. Ruth in
Restraints in Front of the JURY for Objecting
Pg 4

Mr. Ruth demanded Ms. Woerner Testify; No Factual Basis for Perjury exist;
No legitimate Strategic or Tactical Reason to not call Woerner; Mr. Adcock
Admits a Motion for Mistrial was ruled on During the In-Chambers Hearing
Pg 5

Ms. Woerners Original Statement and Intended Testimony are identical in the
Portions that support Mr. Ruth's defense; Mr. Adcock violated Confrontation
rights; Mr. Adcock induced Mr. Poole not to testify failed to disclose and
Misrepresented Interview to impeach Mr. Ruth with two non-testfying witnesses
Pg 8

III. Argument..........................................12

I. THE STATE'S VERSION OF THE EXPERIENCE PRONG IS CONTRARY TO SUBLETT WISE MORRIS
Pg 12

A. FAIRNESS TRIGGERS THE PUBLIC AND ACCUSED SAFEGUARD
Pg 13

B. THE FRAMERS OF THE WASHINGTON STATE CONSTITUTION SEPARATED APPEAR AND DEFEND
Pg 15

C. CORRUPT PROCEEDINGS CREATED BY PROFESSIONAL MISCONDUCT ARE THE INCARNATE OF
WHAT PUBLIC AND JURY TRIAL RIGHTS WERE DESIGNED TO PREVENT
Pg 17

II. THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL
Pg 19

III. THE STRUCTURAL ERROR BAR FOR COLLATERAL REVIEW HAS NOT BEEN DEFINED
Pg 20

i

## TABLE OF AUTHORITIES

**STATE SUPREME COURT**                                        **Pg**

Cohen v. Everret City Council, 85 Wash.2d 385,
535 P.2d 801, 804 (1975)....................................18

In Re Bonet, 144 Wn.2d 502 (2001)..........................17

In Re LongAcre, 155 Wash.2d at 728, 741-42,
193 P.3d 1074..............................................17

In Re Personal Restraint of Morris, 84929-3,
Wash: Supreme Court (2012).................................12

Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 37-39,
640 P.2d 716, 719-20 (1982).............................13, 18

State v. Bone-Club, 128 Wash.2d 254, 259,
900 P.2d 325, 328 (1995)...............................14,18

State v. Burri, 87 Wn.2d 175, 550 P.2d 507, 513 (1976)....18

State v. Esterling, 157 Wash.2d 167, 179,
137 P.3d 825, 830 (2006)...................................13

State v. Haas, 86 Wn.2d 51 (1975)..........................19

State v. Irby, 170 Wn.2d 874, 880, 885 n.6 (2011)......15,16

State v. Ledford, 195 Wash. 581, 81 P.2d 830, 832 (1938)..18

State v. Martin, 171 Wn.2d 521 (2011)......................15

State v. McCuistion, 174 Wash.2d 369, 387
(2012).....................................................15

State v. Shutzler, 82 Wash. 365, 114 p. 284, 285 (1914)...15

State v. Sublett, 176 Wash.2d 58,
292 P.3d 715 (2012)....................12, 15, 16, 18, 20

Lead opinion, 292 P.3d 715, 723...................16, 18, 20
C.J. Madsen Concurrence, 292 P.3d at 736..................12
J. Wiggins Concurrence, 292 P.3d at 761..................12
J.Stephens Concurrence, 292 P.3d at 754-56, Fn.1..15, 16, 20

State v. Wise, 176 Wash.2d at 18,
288 P.3d at 1121, n.2 (2012)...................12, 14, 16

State v. Wroth, 15 Wash.621,
47 p. 106, 106-08 (Wash.1896)......................16, 20

ii

## TABLE OF AUTHORITIES

### COURT OF APPEALS DIVISION I

Hundtofte v. Encarnacion, 169 Wn.App. 498,
280 P.3d 513, 520 (Wash.App.Div.I 2012)....................19

State v. Carlisle, 73 Wn.app. 678, 871 P.2d 174,
177 (Wash.App.Div.I 1994)............................17, 18

### DIVISION II

State v. Bennet, 168 Wash.App. 197,
275 P.3d 1224, 1229-30, 1232 n.6 (2012)..............16, 19

State v. Berrysmith, 87 Wash.app. at 273,
944 P.2d 400................................................18

State v. Jones, 2013 WL 2407119 at 9-12..........13, 15, 16

State v. Varnell, No. 42575-1-II (9-4-13)(Unpublished)....13

### UNITED STATES SUPREME COURT

Danforth v. Minnesota, 128 S.Ct. 1029 (2008).............20

Duncan v. Louisana, 391 U.S. 145, 156,
88 S.Ct. 1444, 1449, 1451-52 (1968)......................17

In Re Oliver, 333 U.S. 257, 270 n.25 (1948)..............15

Malang v. Cook, 490 U.S. 488, 493,
109 S.Ct. 1923, 1926-27 (1989)............................1

Presley v. Georgia, 130 S.Ct. 731 (2010)................14

Press-Enterprise Co. V. Superior Court, 478 U.S. 1, 8-10,
106 S.Ct. 2735, 92 L.ed.2d 1 (1986).....................13

Richmond Newspapers v. Virginia, 448 U.S. 555,
564 (1980)...............................................14

Schriro V. Summerlin, 542 U.S. 348 (2004)...............20

Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646,
653-54 (U.S.Ill.1988)....................................18

Teague V. Lane, 489 U.S. 288, (1989)....................20

Webb v. Texas, 409 U.S. 95 (1972).......................18

## TABLE OF AUTHORITIES

**THE NINTH CIRCUIT**

MUSLADIN V. LAMARQUE, 555 F.3d 830, 841-43,
(9th.Cir.2009).................................................19, 20

U.S. V. Lord, 711 F.2d 887, 893
(C.A.9(Wash)1983)..............................................19

**OTHER AUTHORITIES**

Anne L. Ellington and Jeanine B. Lutzenhiser,
Washington Law Review (2013) Vol. 88:491, 514, 518........12

Jeanine B. Lutzenhiser, Washington Law Review,
(2012) Vol. 87:1203, 1209, 1228 n.259, 1244...........14, 18

Jeremy Bentham, Washington Law Review,
(2012) Vol. 87:1203, 1207................................19

**RULES AND CONSTUTIONAL PROVISIONS**

RPC 1.1 Competence.......................................9

RPC 1.2(a)(1)............................................5

RPC 1.4(2)(3)(5)(B)......................................5

RPC 3.4(b)..............................................17

RPC 8.3................................................17

**RPC 8.4                 PROFESSIONAL MISCONDUCT**

(A).....................................................1
(B)...............................................11, 17
(c)............................................1, 11, 17
(D)..............................................11, 17
(i)....................................................11
(k).............................................1, 11

CrR 6.15(f)(1)..........................................20

CrR 7.5................................................17

CrR 8.3(b).............................................17

**WASH.CONST. ART I Section 10 ADMINISTRATION OF JUSTICE**

Justice in all cases SHALL be administered openly,
and without unnecessary delay.

**WASH.CONST. ART I Section 22 RIGHTS OF THE ACCUSED.**

In criminal prosecutions the accused SHALL have the right to APPEAR
and Defend in PERSON... to Testify in his own behalf, to meet the
witnesses against him FACE to FACE, to have COMPULSORY process to
compel the attendance of witnesses in his OWN BEHALF,
to have a Speedy PUBLIC TRIAL by an impartial jury...

**WASH.CONST. ART I Section 24 RIGHT TO BEAR ARMS.**

The right of the individual citizen to bear arms in
DEFENSE of HIMSELF... SHALL not be impaired....

## TRIAL AND SENTENCING TRANSCRIPT

RP 142 (Custer-Search Mr. Ruth's Home one way or another)..5

Rp 164 (Mr. Eden's Hearsay about Ms. Woerner)..............9
Rp 247 (Defense Cannot rebut Hearsay of
        Non-testifying Witness).........................10

RP 179-81 (In-Chamber Summary Appendix "A").......2-3, 6, 17

Rp 171-74 (Mr. Stephens fails to perfect impeachment
           of Mr. Eden with P.I. Gary Way)................8

Rp 195-97..................................................8
(Custer demanded an attorney; refused Medical attention;
Screamed he didn't break in; wouldn't cooperate with Police)

Rp 228 (Mr. Adcock objects to sole Defense theory;
        drug selling and use; Judge called a side bar)....11

Rp 266-67..............................................4, 19
(Mr. Ruth made Record that Ms. Woerner was not testifying
because of Mr. Adcocks threats; the Judge threatened to place
Mr. Ruth in restraints, in front of the jury)

Rp 281 (Mr. Adcock claims Mr. Ruth's and Ms. Woerner's
        lifes are not justification enough to defend).....11

Rp 281-82 (Mr. Adcock keeps screaming and yelling
           at Mr. Ruth, Cross-examination of Fury)........11
2/5/05 Sentencing Rp 19 (References Cross of Fury)........11

▼

Rp 310...............................................11
(Misrepresentation Impeachment; Non-testfying witness)

2/5/05 Sentencing Rp 1-7........................5-7, 19
(Mr. Ruth demanded Ms. Woerner be called; Ask for continuance
to file motion for new trial; Mr. Ruth attempts to file pleadings;
Mr. Adcock admits a Motion to dismiss was discussed In Chambers)

2/5/05 Sentencing Rp 23-25.....................11, 19
(Judge Admits to being biased against Mr. Ruth)

### APPENDIX AND EXHIBITS

Appendix "A"
On the record Summary of In-Chambers Hearing......2-3, 6, 17

Appendix "B"
2/5/05 Sentencing..........................5-7,11, 19

Appendix "C"...................................9
(Jury Instructions 15, 16, 17)

Exhibit One...................................4, 17
(Trial Counsel Mark D. Stephens - Motion to Withdraw)
Pg 1, Section 7...............................7, 19
Pg 3, Section 10........................2-3, 13, 19
Pg 4, Section 16-17.........................18, 19

Exhibit Two....................3-5, 8-9, 17, 19
(P.I. Michael Powers, Henry Slothang and Renne M. Woerner)

Exhibit Three...................4-5, 17, 19
(P.I. Michael Powers - Henry Slothang)

Exhibit Four...................4-5, 17, 19
(Matthew R. Stroud I)

Exhibit 5......................5, 8-9, 17, 19
(Matthew R. Ruth)

Exhibit 6......................5-8, 17, 19
(Pleadings attempted to file at 2/5/05 sentencing)

Exhibit Seven...................8, 19
(P.I. Michael Powers - Jeremy Custer)

Exhibit Eight...................9, 10, 19
(P.I. Michael Powers - Donnie Poole)

Exhibit Nine...................9, 19
(Psychological evaluation - Dr. Muscatel)

Exhibit Ten...................11, 19
(Jury mid-Deliberation inquiry)

# I. OPENING STATEMENT

The Petitioner, Matthew R. Ruth, Humbly asks this Most Honorable Court to Please not hold him to the same standards as a Lawyer, since he is acting Pro Se and has no legal training. Please give these pleadings Liberal Interpretations and hold them to less stringent standards then those drafted by Lawyers.

Maleng v. Cook, 490 U.S. 488, 493, 109 S.Ct. 1923, 1926-27 (1989).

Mr. Blackman has violated RPC 8.4(a)(c)(k) in the State's response, by misrepresenting material facts, to assist the trial Court in further cloaking evidence that Mr. Adcock, attempted to Suborn Perjury and when failing, physically assaulted the sole Material eye-witness Ms. Woerner; then abused the power of his office, to prevent this crucial testimony from being presented to the jury, by threatening to arrest and prosecute Ms. Woerner for perjury "IF SHE TESTIFIED."

Ten Exhibit's are attached that prove when Ms. Woerner refused to lie for Mr. Adcock, he inflicted bruises on her, while calling her a "Stupid Bitch", and threatening to arrest her for perjury "IF SHE TESTIFIED". This is the reason Judge Hulbert - even though the Jury was gone - called a side bar, that led into Chambers. The Factual basis for Mr. Adcock's In-Chamber Perjury allegation, is that Ms. Woerner wanted to testify to the complete truth.

Any issue of Fairness Synchronizes the "Open Administration of Justice" and Mr. Ruth's Public Trial Right's into a safeguard that triggers at any proceeding when Fair Trial rights are at issue, on the likelihood of Jeopardy to Constitutional Rights; and restricts the Court from Closure absent a Bone-Club analysis. The right to Jury trial was designed as a safeguard against Misconduct of Prosecutors and Judges. Any Proceeding concerning Highly unethical Professional Misconduct that prejudices the Administration of Justice has Historically and must always be an Open Proceeding; Never cloaked by the label "In-Chambers Conference."

Mr. Ruth has included a detailed factual account of the relevant record to clear the confusion of Mr. Blackman's most Colorable Response.

1

## II. RELEVANT FACT'S

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.

She indicated to me Mr. Adcock had THREATENED to CHARGE her with PERJURY IF SHE TESTIFIED.

She expressed concern to me about the potential legal consequences IF SHE TESTIFIED.

I indicated I could not advise her and suggested she seek appointed counsel to answer her questions."

(Exhibit One, Trial Counsel Mark Stephens, Declaration in motion to withdraw, 12-28-04, About Conversation with Renee M. Woerner during trial 12-7-04)(State's Exhibit 21).

On the record in the Summary of what was discussed during the Secret In-Chambers hearing, Mr. Adcock misrepresented the facts of the Stephens/Woerner Conversation:

"I believe he had a conversation with her where she brought up the fact that I had said that IF YOU COMMIT PERJURY, there is going to be consequences. And at that point he concluded that she needed to be advised." RP 180.

That is not what Mr. Stephens said In-Chambers. There is a huge difference between "if you commit perjury there will be consequences" (Adcock Version) and "threatened to charge her with Perjury IF SHE TESTIFIED." (Woerner, Stephens, Stroud I Version).

Although, Mr. Stephens did not correct the Misrepresentation made by Mr. Adcock during the summary on the record, he did dispute the "Context" and what was "discussed" In-Chambers:

"I just might add that's, more or less, what's happen. When I had my conversation with this potential witness, she indicated to me concerns about comments Mr. Adcock made. She indicated the word "PERJURY" was used. I DON'T KNOW WHAT "CONTEXT" THAT WAS IN. I advised her I cannot give you any advice and if you need advice you need your own lawyer. Which I think was about all I could do with that." RP 180.

It is not clear why Mr. Stephens did not repeat what was really said In-Chambers which is presented in Exhibit one, pg. 3 section 10, but he did dispute Mr. Adcocks misrepresentation. Rp 180.

2

### THE STATE'S RESPONSE BRIEF OMITS KEY WORDS TO CHANGE CONTEXT OF THREATS

The State's Suppl.Resp. to P.R.P. pg 3-4 omits the Words "IF SHE TESTIFIED" and "She expressed concern to me about the legal consequences if she testified", in an attempt to mislead this Court about the Confrontation, Mr. Adcock's professional misconduct, and what was discussed In-Chambers.

On Pg. 4 of the Suppl.Resp. to P.R.P., Mr. Blackman wrote:

"she recalled the prosecutor 'had threatened to charge her with perjury' (ex.21 at 3), there is no evidence in the record that there actually was a 'confrontation,' much less that it was discussed in chambers."

Please Look at Exhibit one at 3 section 10, Mr. Blackman removed the words "If she testified", to make the context fit Mr. Adcocks version of events. In reality Ms. Woerner said:

"Mr. Adcock had threatened to charge her with perjury IF SHE TESTIFIED."

Mr. Blackman also removed the last two sentences which established Mr. Adcocks threats made Ms. Woerner concerned about being arrested and prosecuted for perjury, IF SHE TESTIFIED; and Mr. Stephens advising her to seek counsel. Mr. Blackman Misrepresented the record because it proves that the In-chambers hearing was caused by the Professional misconduct of Mr. Adcock, and resolved Ms. Woerners concerns about the threats by making plans to appoint her counsel. Rp 180. Which proves this confrontation did happen, was discussed, and partially resolved In-Chambers. Why else appoint Counsel? RP 180; (Exhibit One).

### THE PUBLIC WITNESSED THE PROSECUTOR ASSAULT MS. WOERNER AND THREATEN TO ARREST HER IF SHE TELLS THE COMPLETE TRUTH

"Henry was at the courthouse on the day in question. He did witness Adcock 'drag' his daughter into a side room where he then heard yelling going on between Adcock and his daughter.... Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. That he left bruises.... She said that he called her a stupid bitch several times." (Exhibit Two, Private Investigator Micheal Powers interview of Henry Slothang and Renne M. Woerner).

3

"Mr. Slothang told me that.... he too was present at the courthouse at the time of Matt's trial. He said that the Prosecutor got very angry at Renee because Renee wanted to testify to the 'complete truth and not just what was in her statement.'" (Exhibit Three, Michael Powers interview with Henry Slothang).

Mr. Stroud who was also present watched Mr. Adcock drag Ms. Woerner into a side room, heard the yelling. When they reappeared Mr. Adcock threatened to have her arrested if she took the stand. Ms. Woerner told Mr. Adcock that she would not lie for him. Mr. Stroud followed Mr. Adcock back into the Court room, where Mr. Adcock lied to Defense Counsel, Mr. Stephens, telling him Ms. Woerner intended to perjure herself. Mr. Stroud told Defense Counsel Stephens that is not true, Ms. Woerner is trying to tell the truth, and Mr. Adcock threatened her. Mr. Stephens told Mr. Stroud to calm down, he would put Ms. Woerner on the stand. Mr. Stephens then went to talk to Ms. Woerner in the hallway, and pulled her into a side room where the discussion in Exhibit one took place. After that discussion Mr. Stephens approached the bench, and shortly after, the secret In-Chambers hearing took place. (Exhibit Four, Affidavit of Matthew R. Stroud I).

There was no Bone-club analysis before the Closure, and that prevented the public from objecting and making record of this confrontation and misconduct.

**MR. RUTH OBJECTED TO MR. ADCOCK THREATENING MS. WOERNER AND ESTABLISHED SHE WASN'T TESTIFYING BECAUSE OF THE THREATS; THE TRIAL JUDGE THREATENED TO PLACE MR. RUTH IN RESTRAINTS IN FRONT OF THE JURY FOR OBJECTING**

A. You're the one who threatened witnesses.

A. — And Coached Witnesses.

A. That's why my girlfriend is not here to testify.

The Court: You will be quiet or restrained. Am I very Clear about that?

RP 266-67. (Mr. Ruth Cross-examination by Mr. Adcock)

4

This is the first time Mr. Ruth was allowed to make record after learning why and that Ms. Woerner was not testifying. Ms. Woerners Parents were both in the Court room, on the day Mr. Ruth Testified. Mr. Stephens told Mr. Ruth that Ms. Woerner Would not testify because She was scared of the Threats made by Mr. Adcock. (Exhibit 5, Affidavit of Mathew R. Ruth). Mr. Ruth demanded that Ms. Woerner be called to testify at all times. See 2/5/05 Sent'g RP 3-7. Defense Counsel did not communicate with Mr. Ruth about what Ms. Woerner said before approaching the bench and going In-Chambers. RPC 1.2(a)(1);RPC 1.4(2)(3)(5)(b); (Exhibit 5 Affidavit of Matthew R. Ruth).

Defense counsel told Mr. Ruth that Ms. Woerner was scared of Mr. Adcocks threats, and attempts to get her to lie. The original statement Ms. Woerner gave corroborated Mr. Ruth's defense on crucial parts; she said the alleged victims were high on drugs; accusing Mr. Ruth of stealing drugs; forced their way into the trailer after making threats. Finally she said the alleged victims said they would do whatever it takes to search the trailer "one way or another", this part is Corroborated by Custer at trial Rp 142. Mr. Stephens told Mr. Ruth, that Mr. Adcock was trying to get Ms. Woerner to change those parts of her statement, and bring in the Domestic violence allegations, when she refused Mr. Adcock threatened her with arrest and prosecution if she testified to the truth. (Exhibits 1,2,3,4,5,6).

**MR. RUTH DEMANDED MS. WOERNER TESTIFY; NO FACTUAL BASIS FOR PERJURY EXIST; NO LEGITIMATE STRATEGIC OR TACTICAL REASON TO NOT CALL WOERNER; MR. ADCOCK ADMITS A MOTION FOR MISTRIAL WAS RULED ON DURING THE IN-CHAMBERS HEARING**

The State's Suppl.Resp. To P.R.P. pg 3-4, in a deceitful manner attempts to make this Court believe the decision not to call Ms. Woerner by the defense was, first, made at the same time as the state; second, with Mr. Ruth's consent;

5

Third, a legitimate strategic decision because allegedly her intended testimony would corroborate the alleged victims, or easily be impeached by her prior statement. None of this is true, nor is there a factual basis; support from the record; or any substance to the state's claims. Also, Mr. Blackman claims that no evidence exist to support that a "Confrontation" occured, or was "Discussed" in the three part closure: Side bar, into chambers, out to sidebar.

(12-7-4 2:56 Recess; 3:22 - (The professional misconduct proceeding was 26 Min.) - The Court resumes with the sidebar still in progress that occured immediately upon exiting the In-Chambers hearing; 3:24 The Court admonishes the Jury: "Sometimes people are available or they are not available." Rp 177; 3:25 "real quickly" In-Chambers Summary; 3:28 Court in recess. (Appendix "D")).

> "We're going to make arrangements for the office of the Public defender
> To get HER an ATTORNEY, to consult with her tomorrow about her options, so to speak."

> "Mr. Stephens indicated to me that HE DID NOT KNOW whether he WAS going to CALL HER
> YET but that was the first step, in any event, and I agree." Rp 180.

12-28-04 Mr. Stephens withdrew from the case when caught making unethical comments about Ms. Woerner. See (Exhibit 1 Declaration/transcripts Rp 319-321). Charles H. Dold was appointed, and investigated the Woerner Proceeding:

> "I met with Mr. Ruth, and determined that one of the main issues that he had indicated needed to be investigated was the testimony of Renee Woerner.... Mr. Ruth advised me that Ms. Woerner's testimony was critical, that he was very critical of his attorney for not calling her....
> I have not had a chance to interview her at length about this incident and about what her testimony would be and about WHAT MAY IN FACT BE AN APPARENT CONFLICT BETWEEN STATEMENTS that she had made PREVIOUSLY VERSUS WHATEVER HER TESTIMONY WOLD BE.
> As a result, I AM NOT PREPARED to PRESENT a MOTION for a NEW TRIAL based on either PROSECUTORIAL MISCONDUCT, ineffective assistance of counsel, or DENIAL OF JUSTICE, any of the three.... Mr. Ruth wanted me to ask the court, because of that, to continue this proceeding...
> Mr. Ruth has prepared some pleadings that would effectively make that request." 2/4/05 Sentencing Rp 3-5; (Exhibit 6 Affidavit and pleadings).

In response to this Mr. Adcock (Like Mr. Blackman Supp.Resp.to.P.R.P. pg 3) referred to Mr. Stephens declaration to claim Defense Counsel also chose not to call Ms. Woerner based on legitimate tactics and strategy, and allegedly Mr. Ruth agreed. Most important, though, is Mr. Adcock admits that a motion for dismissal occured during the In-Chambers hearing at issue:

6

"Mr. Stephens also declines to call her as a witness. He filed a declaration at the first sentencing date -- when he was asking leave to withdraw -- in which he states that after conferring with his client, he decided not to call her as a witness because he believed her testimony would be either corroborative of what she told the police in the original statement or that, if she lied, she would be easily impeached; and, therefore, there was no tactical or practical advantage of calling her as a witness.

WE HAVE BEEN THROUGH THIS BEFORE... Given the fact it won't change anything. I'd ask you to deny the motion for continuance.

Mr. Dold: The only comment in response is that he may have conferred with Mr. Ruth. Mr. Ruth never agreed to Mr. Stephens' strategy in that regard and was quite upset... he has indicated that that's not a decision he ever would have agreed with, and he disagrees with any assessment of tactical or strategic advantage.

The Court: Thats fine. Those are all post-trial issues. We'll proceed to sentencing." 2/5/05 Sentencing RP 6-7.

Where did Mr. Adcock, the Trial Judge, and Defense Counsel go through a motion for new trial based on Ms. Woerners intended testimony, the Professional misconduct of the Prosecutor, and denial of justice? The only place this was at issue was during the In-Chambers hearing.

The Pleadings Mr. Ruth had prepared and attempted to file on 2/5/05 at sentencing, is attached as exhibit 6. Mr. Ruth states on page 2 of the affidavit:

"5.) It is believed that the attorney should have made an offer of proof... to show that the state had threatened the defense's key witness with adversities such as charges of perjury and threatening that she would not see her children for 10-15 years. The prosecution was using these tactics continuously to try to get the witness to change her story to this story or that story by telling her, 'this is how it happened remember, hint, hint!' the witness called the defense attorney and told him, he said, 'it doesn't matter' that the state is tampering with witnesses, 'because he is fucked anyways." see (Exhibit 6, see motion for new trial pg 2 "Pros. extorted witnesses"; pg 9 "Defense Counsel failed to interview Ms. Woerner"; pg 11 "Pros. threatened and harassed witnesses").

This is Corroborated by Mr. Stephens declaration pg 1 section 7. On 12-4-04, before trial Ms. Woerner called defense counsel, and told him about Mr. Adcock trying to get her to change key points in her original statement that corroborated the defense. After trial, Ms. Woerner told Mr. Ruth that his defense counsel said it didn't matter because Mr. Ruth "is fucked", and would not listened to her.

7

Mr. Ruth called Mark Stephens with Ms. Woerner on the phone to confront him about this, Mr. Stephens confirmed the statement, and made disparaging remarks about Ms. Woerner, and that is why he motioned to withdraw. (Exhibit One, pg 4 section 16, 17).

**MS. WOERNERS ORIGINAL STATEMENT AND INTENDED TESTIMONY ARE IDENTICAL IN THE PORTIONS THAT SUPPORT MR. RUTH'S DEFENSE; MR. ADCOCK VIOLATED CONFRONTATION RIGHTS; MR. ADCOCK INDUCED DONNIE POOLE NOT TO TESTIFY FAILED TO DISCLOSE AND MISREPRESENTED INTERVIEW TO IMPEACH MR. RUTH WITH TWO NONTESTIFYING WITNESSES**

.Ms. Woerners original statement corroborated Mr. Ruth's defense on crucial points. She is one of four people who witnessed the shooting. Mr. Stephens did not admit one piece of evidence, and presented one witness, Mr. Ruth. Ms. Woerner's original statement did contained a lot of bad stuff about Mr. Ruth, all of which was not true, nor admissible because it was alleged domestic disputes between Ms. Woerner and Mr. Ruth. The Domestic stuff was already ruled not admissible in the Motion in limine. Ms. Woerner was not thrilled about the case because of the rough relationship she had with Mr. Ruth. Why would she lie?  (Exhibit 7, interview of Jeremy Custer 1-20-11).

Ms. Woerner always maintained there was a lot of people out side the trailer; Custer and Eden came in without permission; Mr. Ruth told them to get out; Custer and Eden accused Mr. Ruth of stealing drugs; "Searching everyone's Shit, no exceptions"; Threats were made by Custer and Eden; Custer and Eden Were High as a Kite. This corroborated Mr. Ruth's Testimony, self-defense theory, and is the only eye-witness evidence that is not biased because she was not shot, nor the shooter. (Exhibit 2, 5, 6). On 10-11-04, Alleged Victim Eden, gave a statement to Defense Investigator Gary Way, that Corroborated Ms. Woerner and Mr. Ruth on the above key points. Defense Counsel did not call Gary Way as a witness, although, he tried to impeach Eden with the statement. RP 171-74, 195-97.

The original statement and intended testimony corroborated the alleged victims in places as well. Ms. Woerner said Custer sat on the bed with her; Eden sat on the Couch behind Mr. Ruth. This is the extent of the Corroboration, and under the "Act on Appearance" Self-defense instruction 16; bolsters Mr. Ruth's Reasonableness to defend Ms. Woerner; instruction 17. (Exhibit 2, 5)(Appendix "c" Instructions).

12-6-04 at 9:45, Mr. Stephens motions to strike testimony of Woerner because he was unable to interview her. (Appendix "D" pg 3). Compare that to Saturday 12-4-04, Mr. Stephens: "I returned a phone call from Ms. Woerner, in which she suggested..." (Exhibit 1 Pg 1 Section 7).

There is no legitimate tactical or Strategic reason not to call Ms. Woerner. Her intended testimony (Exh. 2) is consistent with her original statement to the material facts that support Mr. Ruth's defense. Mr. Stephens did not provide competent Representation, he was not prepared for Trial, he never interviewed Ms. Woerner, even he said at the Motion In-Limine that he had not interviewed her, and he didn't interview after the threats. RPC 1,1 Competence.

Ms. Woerner and Mr. Poole both corroborated that Mr. Custer carried around guns, sold Drugs, and invaded MR. Ruth's house over stolen Drug's. (Exh 2, 7, 8). Without reading the Evaluation, Mr. Woerner corroborated Kenneth Muscatel, Ph.d in that Mr. Ruth shot the alleged victims because:

"Under the pressure of the situation he may have acted with fear and suspiciousness,... This EVENT did OCCUR in HIS 'HOME' a SMALL fifth Wheel Trailer, and he may have FELT INVADED and THREATENED by the TRAPPING nature of this Location.... he may have interpreted those actions as being legal and appropriate, if as he asserted, he perceived his own life as being at risk." (Exhibit 9, Muscatel, Ph.D)("She felt that she grabbed the Gun because he 'felt trapped in the bedroom.'" Exh.2).

Mr. Adcock brought in hearsay testimony of Ms. Woerner through numerous witnesses, the most prejudicial is during alleged victim Mr. Eden's testimony:

Q- What was Renee doing during all This?

A- I remember her being freaked out. Although it could — I can't really observe everything as it's going on, I don't know if she was vocally freaked out, but I know she was at least distraught by this. And SHE WAS SAYING, like, "WAIT STOP, STOP." Rp 164

9

Any proceeding concerning Ms. Woerners testimony is now attached to Mr. Ruth's rights to Confrontation because Ms. Woerner has to perfect Mr. Eden's testimony. After Mr. Adcock knew Ms. Woerner would not be testifying-after the In-Chambers hearing- during Mr. Ruth's Direct examination the following occured:

Q-Let me ask this. Before that, do you remember what Renee's reaction was to all this Choas?

Mr. Adcock: Objection.

A-She was screaming for them to get out.
The Court: Excuse me. There's an objection.

Mr. Adcock: Objection. Relevance.

Mr. Stephens: I believe it came up in the state's case in chief.

The Court: That's not my recollection. The Jury can draw it's own conclusion about it's recollection. I've sustained the objection. Rp 247.

In support of Mr. Adcock's professional misconduct, Donnie Poole (Mr. Ruth's friend who's house he went to immediately after the shooting), stated that he also was harassed by Mr. Adock.

"Donnie told me that... what he remembers most was that Adcock was 'trying to intimidate me'.... Matt said that he freaked out after Custer threatened him with a gun. Donnie said that was about when Adcock started to get mad and started to yell...
Donnie believes the interview with Adcock started to go bad when he tried to tell Adcock that he had bought drugs from Custer....
Custer showed up at his house... after the shooting... and Custer threatened Donnie and told him that he had better not tell anyone about Cuter's business and what kind of guy Custer was... Mr. Adcock did not believe him and started getting red in the face and yelling at Donnie... Adcock started yelling... 'you're lying to protect your friend, none of this is true, this will never see the light of day'....
Donnie told Adcock the incident was over 'drugs.' Donnie said that at this point Adcock was in his face yelling at him... Donnie recalled that Mr. Adcock 'really got mad when I told him this was all over some drugs that Matt had supposedly stolen from Custer'...
as soon as he heard things that he didn't like to hear that's when Mr. Adcock... started to get mad and was trying very hard to intimidate Donnie."
(Exhibit 8, interview with Donnie poola).

10

This interview was never disclosed to the defense, and Donnie Poole did not testify. During Mr. Ruth's Cross-examination Mr. Adcock Misrepresented what Mr. Poole said, and impeached Mr. Ruth with the Material Misrepresentation of a Non-Testifying Witness, Rp 310; RPC 8.4(b)(c)(d)(i)(k).

Mr. Adcock knew this incident was over drugs and the Alleged victims were high, so he prevented any evidence that proves this from being presented to the jury, even when the sole defense witness, Mr. Ruth testified:

"Object to this line of testimony – to this POINT about the shooting indicates THERE WERE NO DRUGS PRESENT. How is this relevant? This is just an attempt to try to BLAME the VICTIMS or portray them in a negative light without really any connection to the issues." Rp 228.

This caused Judge Hulbert to call a side bar, and afterwards no more questioning about the drugs ensued from the defense, which is what the entire defense is based on. Rp 228.

Mr. Adcock kept screaming at Mr. Ruth during cross, and Mr. Ruth asked him to Stop. Rp 281-82. Defense Counsel Dold pointed this out, "Mr. Adcock is saying he doesn't like Mr. Ruth. He uses terms like sociopath to describe Mr. Ruth. We know he doesn't like Mr. Ruth. I think that probably became evident in Cross-examination." 2/4/05 Sentencing Rp 19. This is the same professional Misconduct used to scare Ms. Woerner and Mr. Poole.

Mr. Adcock stated that Mr. Ruth's and Ms. Woerner's lives are not worth defending, even when threatened in their own home. Rp 281. Judge Hulbert expressed his personal dislike for Mr. Ruth, this existed he said throughout the entire trial (Even In-Chambers). 2/4/05 Sentencing Rp 24-25.

The Jury inquired about Ms. Woerner's statement during deliberations. (Exhibit 10). The defense was not allowed to participate in the formulation of the answer to the Jury, nor lodge any objections because the Trial Court did not notify the Defense.

11

## III. ARGUMENT

### I. THE STATE'S VERSION OF THE EXPERIENCE PRONG IS CONTRARY TO SUBLETT WISE MORRIS

The state incorrectly argues that case law is the only source to establish history under the experience prong, and that when case law is silent the experience prong cannot be satisfied. Chief Justice Madsen explains the proper experience prong analysis in her Sublett concurrence.

"Under the experience and logic test, history is one source of guidance as to whether a particular part of the proceeding is one to which the right to a public trial attaches. If precedent or other history, or both, are silent, then the second part of the analysis involves inquiry into whether the particular procedure, hearing, discussion, decision, or other aspect of the case is one to which the public trial right should apply. This demands an examination of the values served by the right to a public trial and whether they would be furthered if the right is applied with respect to the part of the proceeding in question...
These values are ensuring that the defendant has a Fair Trial, to remind the trial Judge and Prosecution of the importance of their function and the obligation to the accuse to carry out their responsibilities, and to encourage witnesses to come forward and testify truthfully... Because protecting and advancing these values are the core concern of the right to a public trial." State v. Sublett, 176 Wash.2d 58, 292 P.3d 715, 736 (2012).

What then is the role of the history inquiry? "Questioning potential jurors In-Chambers is a practice of long-standing and wide use, but history has played no part in the Court's analysis (and rejection) of the practice before or after Sublett." Washington Law Review (2013) Vol. 88:491, Pg 514, 518 (By Anne L. Ellington and Jeanine B. Lutzenhiser).

The Correct Experience Prong analysis is to determine if the core values of the Public trial right would be protected and advanced when attached to the particular stage in question. History is only a guide to help make this determination. The label given to the proceeding does not determine if Public trial rights attach because "Corruption and manipulation can slip into any phase of the trial." 292 P.3d at 761.

12

This has been recently demonstrated in <u>State v. Varmell</u>, where Counsel went In-Chambers - without Bone-Club inquiry - briefly to discuss excusing two potential jurors for cause of employment, and other issues that would not allow them to sit on the jury. This was not put on the record until the next day during a very brief summary. The Appeals Court relied on the summary and result of the In-Chambers hearing to determine Public Trial Rights attached, reverse and remanded. No. 42575-1-II (94-13 Div.II)(unpublished); Also <u>State v. Jones</u>, 2013 WL 2407119.

The summary, Exhibit 1 pg 3, and result of the In-Chambers conference, proves Ms. Woerner was appointed counsel because she was scared to testify due to Mr. Adcock's threats; She Ultimately did not testify; The Jury inquired about her Statement in Deliberations; Professional Misconduct was cloaked; Ms. Woerner and Public were prevented from making record of assault and threats.

Mr. Ruth contends that when Fair Trial rights are at issue the likelihood of Jeopardy to Substantial rights of the Accused simultaneously triggers the protection of both section 10 and 22. This Safeguard restricts the trial court from closure by triggering the Bone-Club Analysis.

## A. FAIRNESS TRIGGERS THE PUBLIC AND ACCUSED SAFEGUARD

In <u>ISHIKAWA</u> the Courts held that the Public's access to open courts can be restricted only when a likelihood of Jeopardy to constitutional rights exist, "where the right to Fair Trial is at Issue." 97 Wash.2d 30, 37-39, 640 P.2d 716, 719-20 (1982).

Logically the same protection must apply to restrict illegal closure by the trial Courts when the right to fair trial is at issue. Our State Supreme Court found the right to an open public trial is a shared right of the accused under section 22 and the Public under section 10 "The common concern being the issue of Fairness." <u>State V. Esterling</u>, 157 Wash.2d 167, 179, 137 P.3d 825, 830 (2006)(Quoting Press-II, 478 U.S. 1, 7 (1980)).

Both sections 10 and 22 "Serve complementary and interdependent functions in assuring the fairness of our judiciary system. In particular, the Public Trial right operates as an essential cog in the Constitutional design of Fair Trial safeguards." State v. Bone-Club, 128 Wasg.2d 254, 259, 900 P.2d 325, 328 (1995); See also, Washington Law Review (2012) Vol 87:1203 Pg 1209, 1228 Fn 259 (by Jeannie B. Lutzenhiser). The Protection of the "Superior Right" to Fair Trial is Fundamental. Richmond Newspapers v, Virginia, 448 u.s. 555, 564 (1980).

The Bone-Club test was designed to analyze the Constitutional sufficiency of the need for Closure under Both Section's 10 and 22. This Coextensive analysis protects Fair Trial rights during the Administration of Justice. "It is the Frame work of our system we must protect against erosion of the Public Trial Right." State v. Wise, 176 Wash.2d at 18, 288 P.3d at 1121 (2012).

In Presley v. Georgia, the U.S. Supreme court found that some stages of trial are so important to the Administration of Justice that even if only the Publics right is implicated; the accused has an equal right to the protection provided by the Core Values served by the Public Trial Rights at that stage. 130 S.Ct. 731 (2010).

The Presley Court reasoned that "there could be no explanation for barring the accused from raising a Constitutional right that is unmistakably for his or her benefit." Id. When the proceeding is a Matter of importance to the criminal Justice System, the Public has a right to be present whether or not any party has asserted the right.

The experience and logic test was developed under the First Amendment, However, the Sublett Court has applied it to Section 22. This means that like the Bone-Club analysis, the Experience and Logic analysis is coextensive to the Public and Accused right to "Appear" under the more protective Washington Constitution.

14

The Bone-club and Sublett test are both part of a more protective coextensive "Fair Trial" right "safeguard" that restricts Closure when there is a "chance that a defendants 'substantial rights may be affected' at that stage of trial." State v. Irby, 170 Wn.2d 874, 880, 885 n. 6 (2011); State v. Jones, 2013 WL 2407119, at 11.

## B. THE FRAMERS OF THE WASHINGTON STATE CONSTITUTION SEPARATED APPEAR AND DEFEND

"Constitutional questions are reviewed De Novo." State v. McCuistion, 174 Wash.2d 369, 387 (2012). The right to "Appear" under the Washington State Constitution does not depend on the Due Process right to defend, as the Federal Right to be present does. Id. IRBY; JONES, Supra.

"We have never held that if the defendant can be excluded without offending his Due Process rights, then there is no Public Trial Right.... The benefits of a public trial sweep more broadly than the defendant's Due Process interests. see In Re Oliver, 333 U.S. 257, 270 n.25 (1948)." Sublett, 292 P.3d at 756.

"We believe that when the framers of our State Constitution drafted Art I section 22 and presented it to the people of the territory of Washington for adoption they were aware of the linquistic differences between that section and the 6th Amendment and assumed that the State provided rights that were not provided by the USC." State v. Martin, 171 Wn.2d 521 (2011).

"Unlike Snyder, our decision in Shutzler, does not condition the right to 'appear and defend' at a particular 'stage of trial' on what a defendant might do or gain by attending... or the extent to which the defendants presence may have aided his defense, but rather on the chance that a defendant's 'substantial rights may be affected' at that stage of trial." IRBY at 885 Fn 6.

"It is no answer to say that in the particular proceeding nothing was done which might not lawfully have been done had he been personally present. The excuse, if good for the particular proceeding, would be good for the entire proceedings; the result being a trial and conviction without his presence at all. The wrong lies in the act itself, the violation of Constitutional and statutory rights of the accused to be present and defend." Shutzler, 82 Wash. 365, 114 p. 284, 285 (1914).

The right to Appear historically attaches independent of the Due Process right to Defend, as part of the Public's and defendant's Public trial right safeguard.

15

There is no per se rule that the issues raised during In-Chambers conference are not subject to Public Scrutiny and the defendants right to appear. State v. Bennett, 168 Wash.App. 197, 275 P.3d 1224, 1229-30 (2012).

"Even proceedings involving purely legal matters, the public's presence may ensure the fairness of such proceedings.... The Defendant's and Public's... mere presence passively contributes to the fairness of the proceedings such as deterring deviations from established procedures, reminding the officers of the court of the importance of their functions, and subjecting Judges to the Check of public Scrutiny... The defendant's and the Public's mere presence passively contribute to the proceedings" even when serving "No function in aiding the defendant's defense." Id. 275 P.3d at 1229, 1232 n.6, (quoting Irby n.6).

Sublett rejected the "Sadler" test, that is built from the Federal Right to be present standard. Under this Federal right the Due Process standard to "Defend" must be overcome before the Right to be present is activated. Irby, n.6.

With the rejection of the "Sadler" test, the wide majority also rejected any notion that the Federal Due Process standard to "Defend" is Conflated with the Washington State Constitution's Mandatory Right of both the defendant and Public's to "Appear". Sublett at 292 P.3d at 723, 754-56; Wise at n.2(Gunwall?).

Justice Wiggins recently made this clear, in Jones, when holding that the Right to "Appear" triggered at an illegal closure, and Public trial rights attached even though the error was Harmless under the Due Process right to "Defend". 2013 WL2407119 at 9-12. Historically, when the right to "appear" is triggered that proceeding is Open to the Public:

"It is the lawful right of a party to have his cause tried in open court, with opportunity to be present and heard in respect to everything transcribed.... Aside from the rights of the parties, Public policy will not sanction any departure from the rule which requires that all communication SHALL be PUBLIC, and in the presence of the Parties..." State v. Wroth, 15 Wash.621, 47 P.106, 106-108 (Wash.1896).

Mr. Ruth argues that when the "Superior right" to Fair Trial is at issue, the Public trial coextensive protection attaches, upon the likelihood of Jeopardy to Constitutional rights, and restricts closure by the Trial Court; absent passing the Bone-Club test (in open court).

## C. CORRUPT PROCEEDINGS CREATED BY PROFESSIONAL MISCONDUCT ARE THE INCARNATE OF WHAT PUBLIC AND JURY TRIAL RIGHTS WERE DESIGNED TO PREVENT

The Jury trial Right was designed as "an inestimable SafeGuard" against the chance of bias and corrupt proceedings created by the Professional misconduct of the Prosecutor, or Judge. Duncan v. Louisana, 391 u.s. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968). Which is equivalent to the "corrupt" and "biased" In-Chambers Proceeding at issue in the present case. The Court was in recess, Jury removed; the Public inherited the Jury safeguard function (Sublett, 723-24); What is the Purpose of a Side-bar when the jury is not present? The Side-bar did not restrict the Defendant's and Public's access enough because the Judge furthered the Closure by taking Mr. Stephens, and Mr. Adcock In-Chambers; and afterwards endorsed Mr. Adcock's Misrepresentation of the material facts discussed In-Chambers. Rp 179.

Trial Prosecutor Mr. Adcock's Professional Misconduct prejudice the Fair Administration of Justice. In Re Bonet, 144 Wn.2d 502 (2001). In Bonet the prosecutor violated RPC 3.4(b), 8.4(b)(c)(d), when misrepresenting Material Facts; and used charging power in an attempt to induce a witness not to testify. The Supreme Court found this to be a "Highly Unethical" issue of Significant Public interest, that rendered the ultimate fact of whether the witnesses testified, or not, irrelevant. The same applies to Ms. Woerner, and triggers Right's to "Appear".

Mr. Adcock misrepresented the Material facts of the perjury allegation and what was discussed In-Chambers; Attempted to Suborn Perjury; Assaulted Ms. Woerner; then Personally threatened to arrest and prosecute her for Perjury "If She Testified." State v. Carlisle, 73 Wn.App. 678, 871 P.2d 174, 177 (Wash.App.Div.1 1994)(Exh. 1-6). Both Mr. Stephens and Judge Hulbert, have a duty to motion for a mistrial at this point, (CrR 7.5/8.3(b)), and to report this Misconduct, (RPC 8.3). This Cloak defeats the purpose of the Attorney discipline Safeguard:

"The purpose of discipline is primarily to protect the public and maintain public confidence and trust in the legal system and secondarily to deter other lawyers from similar behavior." In Re LongAcre, 155 Wash.2d at 728, 741-42, 193 P.3d 1074.

This Court held that a direct threat from the prosecutor to charge a material witness "If she testified" violates the Defendants Rights to Compulsory Process, and requires DISMISSAL. Carisle, 871 P.2d at 177; Webb v. Texas, 409 u.s. 95 (1972)(Compulsory violation for telling sole witness about perjury even on record).

Mr. Ruth has a Compulsory process right to ascertain what the sole Material Eye-witness's testimony will be. The Fundamental Due Process Right to Present the Defendants version of the facts can only be protected if presented to the Jury, so they may decide where the truth lies. This element goes directly to the right to present a defense. State v. Berri, 87 Wn.2d 175, 550 P.2d 507, 513 (1976).

The ends of Justice would be defeated if Judgments were to be founded on a partial or speculative representation of Facts. The guarantee to develop all relevant facts in the Adversary system is both Fundamental and Comprehensive. Taylor v. Illinois, 484 u.s. 400, 108 S.Ct. 646, 653-54 (U.S.Ill.1988). The Courts must safeguard this Right with meticulous care because it can be violated by the ACTIONS of the Prosecutor as well as the Judge. Berri at 513. Any discussion of Mr. Adcock's actions In-Chambers is the equivalent of testimony, and that cannot be taken in Secret. Cohen v. Everett City Council, 85 Wash.2d 385, 535 P.2d 801, 804 (1975).

Mr. Ruth and the Public have a right to "Appear" during this corrupt proceeding to develop all the relevant facts; ascertain what the inteded testimony will be; if a sufficient factual basis supports a strong belief in perjury and that perjury cannot be disuaded (Berrysmith, 87 Wash.app. at 273); Perjury cannot be predicated on false statement corrected before the submission to the jury (Ledford, 195 Wash. 581, 81 P.2d 830, 832). This Closure does not ensure a Fair Trial, it encourages Professional Misconduct, Perjury, and Discourages witnesses from coming forward. Sublett, at 723. Proponent Two of the Bone-Club Analysis is very critical in this case:

"Giving all parties and the Public enough information about a proposed closure and an opportunity to register their objections furthers the objectives of open court. In the event of an objection, the Court can hear and assess the arguments." WLR Vol. 87:1203 pg 1244 (Ishikawa and Bone-club).

The Exhibits, Sentencing Rp 1-6, 24-25, and Rp 266-67, clearly establish that the relevant facts would have been determined in the Bone-Club analysis. The Judge has a Mandatory obligation to protect the Open Administration of Justice. Hundtofte v. Encarnacion, 280 P.3d 513, 520 (Wash.Div.I 2012). The Foundation to the Fair and Open administration of justice is broken by this secret hearing:

"Without publicity, all other checks are of small account, recordation, appeal, whatever other institutions might be present themselves in the character of checks, would be forced to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." WLR Vol. 87:1203, 1207.

How can the Appeals Court review the entire context of the record to determine if the Constitution has been violated, when the corrupt misconduct is cloaked in a Bias In-Chamber conference, and misrepresented as a scheduling matter, or decision to call a witness? When even that decision can only be reviewed by a Fair and accurate complete record. State v. Koss, 86 Wn.2d 51 (1975); Bennett, 275 P.3d at 1250. U.S. v. Lord, 711 F.2d 887, 893 (C.A.9(wash)1983)(Denied a fair trial when Judge failed to determine if prosecutors threats affected Material Witness).

The professional misconduct involved in the In-Chambers proceeding prevented Mr. Ruth from developing critical facts; removed any favorable evidence from the jury, and cloaked Mr. Adcock's misconduct. Mr. Ruth prays for mercy and Justice from this Most Honorable Court. An evidentiary hearing may be ordered for the witnesses in the Exhibits.

## II. THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL

"Any statements from the trial judge – no matter how innocuous – are likely to have some impact... even if the response is not improper, we recognize that some influence on the jury's deliberation is difficult to avoid when the jury is troubled enough to seek advice.... Counsel is most acutely needed before a decision about how to respond to the jury is made because it is substance of the response, or decision whether to respond substantively or not, that is crucial... The missed opportunity to influence the trial courts response to a jury question. That is the significant moment." Musladin v. Lamarque, 555 F.3d 830, 841-43 (9th.Cir.2009).

The Musladin Court reasoned that because all parties participated in the formulation of the jury inquiry, any answer to an inquiry regarding instructions contains some information from all the parties, even absent notifying the Defense. Allen/Russell, like Sublett and Musladin, involved inquiries about Jury instructions. An inquiry not about Jury instructions, like in the instant case,

contains no information from the parties, and creates a significant moment that triggers right to counsel, and right to Appear and defend.

Sublett reduced Public Trial rights during deliberations to the written record in accordance with the CrR 6.15(f)(1) procedure. J. Stephens pointed out in Sublett that this rule mirrors the constitutional rights it protects. This means unlike the Bone-Club rule, when CrR 6.15(f)(1) is violated, so is the Constitutional Rights it mirrors. CrR 6.15(f)(1) is the functional equivalent of the Bone-Club analysis during deliberations which triggers upon any jury inquiry. The only Safeguard for the right to counsel, Fair Trial, and Appear/Defend at this stage is the Public Trial Right, even if only in written record form. There is no other way at this stage to safeguard the defendants and Publics rights. Which Historically as J.Stephens (n.1) and Wroth point out has been an open proceeding.

III. THE STRUCTURAL ERROR BAR FOR COLLATERAL REVIEW HAS NOT BEEN DEFINED

Wise held that prejudice is unquantifiable; requiring a showing of prejudice creates a wrong without a remedy. How can this magically change on Collateral review, when the error is in the fundamental framework of the Fair and Open Administration of Justice? The effect shatters all trust and confidence that no innocent will be found guilty. A Cloak prevents direct review of the Public Trial violation, and only collateral evidence can establish the error even occured. If the structural error bar applies to Ruth's case, it creates a vehicle for the Courts to cloak misconduct and bar it from review. Creating a wrong without a remedy.

The St. Pierre "Higher Standard" is the Linkletter of Structural error. Since J. Dolliver was concerned about keeping in step with Teague, when announcing the unknown "Higher Standard", It would make sense to adopt the Schriro, 542 U.S. 348 and Danforth, 128 S.Ct. 1029 (Both fixed Teague), retroactivity standards as the "Higher Standard" for determining when Structural error applies. The State Supreme court hinted at this in In Re Eastmond, when announcing the RUTH Rule is new.

This 14th Day of September, 2013

X _Matthew R. Ruth_
Matthew R. Ruth                                    20

APPENDIX

"A"

December 7, 2004

*EDEN - Cross (Stephens)*

1  Q  Is that a yes?

2  A  Yes.

3  Q  Do you remember Mr. Way asking you in that interview

4     what Jeremy was looking for on the day in question?

05:39  5  A  No.  I'm sure he asked, but I don't remember that.

6  Q  Well, is it possible that you responded that you had

7     heard that he was looking for a pound of weed?

8  A  No.

9  Q  Between the time of the day of the shooting and the day

05:39  10    that you sat for the interview with Detective Willoth,

11    did you discuss the incident with Jeremy Custer?  Did

12    you talk about it with him?

13  A  Yeah.

14  Q  You remember how many times?

05:40  15  A  We didn't want to talk about it too much, so not too

16    many times.

17  Q  You guys were good friends?

18  A  Yeah.

19  Q  Had to come up.

05:40  20  A  Yes.

21  Q  Is it possible that you -- Strike that.

22        Was it your testimony on direct examination that

23    one of the reasons you stopped by Jeremy Custer's

24    apartment on November 5, 2003, was with the expectation

5:40  25    there might have been a pound of weed there?

172

December 7, 2004

*EDEN - Cross (Stephens)*

1  A  It's a home.

2      And that was the rumor.

3  Q  Your response is that it's a home, and that was a

4    rumor?

05:40  5  A  You said apartment. It's Jeremy Custer's home. And

6    that was something I had heard about.

7  Q  So you went to Jeremy Custer's home thinking there

8    might be a pound of weed there?

9  A  Yes.

05:41  10  Q  Getting back to the interview you did with Gary Way in

11    October of 2004, you remember telling Gary Way, first

12    of all, that you heard shouting in the trailer?

13  A  Um-hum.

14  Q  I assume that is accurate. And it sounded

05:41  15    confrontational?

16  A  Yeah.

17  Q  Thought there might be a fight?

18  A  Yes.

19  Q  And I guess that's what motivated you to go into the

05:41  20    trailer, to try to prevent a fight between Jeremy and

21    Matt?

22  A  Um-hum.

23  Q  That's yes?

24  A  Yes.

5:41  25  Q  I'm sorry. It's easier for the court reporter.

### EDEN - Cross (Stephens)

1   Do you recall making the comment to Gary Way that

2   you here something along the lines or something like,

3   "Get the hell out of my trailer," from Matt Ruth on the

4   day in question?

05:41  5  A   I do not recall those exact words on that day.

6  Q   Is it possible that's what you said to Mr. Way?

7  A   It's a possibility I could have said something like

8      that to Gary Way.  All of the -- *page 171 line 17 person*

9  Q   Thank you.  You answered the question.

05:42  10     Now, there was some discussion with the police

11     about a bandana.  You remember that?

12  A   Um-hum.

13  Q   You remember telling Detective Willoth that you

14     believed that you saw the bandana a few days after the

35:42  15     shooting?

16  A   Yeah.

17  Q   And you saw that on the floor of the trailer; is that

18     right?  *contaminated crime scene*

19  A   Yeah.

35:42  20  Q   So you actually went back to the trailer after the

21     shooting?

22  A   Um-hum.

23  Q   That's yes?

24  A   Yes, yes.

5:42  25     MR. STEPHENS:  If I could just have a moment.

174

*EDEN - Redirect (Adcock)*

1      That's all I have of.

2                    REDIRECT EXAMINATION

3    BY MR. ADCOCK:

4    Q    You were asked a question by Mr. Stephens about a

05:43   5         question his investigator asked you.  And I got the

6         impression you wanted to finish the answer.  Do you

7         remember the question?

8    A    Yes, it was:  Is it possible I told Investigator Way

9         that I heard the words "Get the hell out of the

05:43  10         trailer"?  And I wanted to say that most of the

11         conversations are not at my best memory.  The most --

12         the biggest thing in my mind is the shooting.  And I

13         don't really recall quite the exact words of

14         conversations.

05:44  15    Q    And now, he asked you also if you went back a few days

16         later and saw a bandana.

17    A    Um-hum.

18    Q    You don't know -- did you see a bandana on the day this

19         happened?  Do you remember a bandana?

05:44  20    A    I remember a bandana.

21    Q    Where did you see that?

22    A    I remember it being associated with the gun.  Around

23         the gun.  Maybe on his waistband near the gun, if he

24         had it there.  I just remember the bandana.

05:44  25    Q    But you don't know if the bandana you saw a couple of

175

December 7, 2004

EDEN - Recross (Stephens)

*Why wouldn't*
*The Police collect*
*the bandana*

1    days later is the same bandana?

2  A  I don't know for sure, no.

3         MR. ADCOCK:  Thank you.  I have no further

4    questions.

05:44  5        THE COURT:  Counsel?

6              RECROSS-EXAMINATION

7  BY MR. STEPHENS:

8  Q  I guess my question is:  It's been over a year since

9    this happened, right?

55:45  10  A  Yeah.

11  Q  And is it fair to say then you may well have said to

12    Gary Way you remember hearing something like "Get the

13    hell out of my trailer," from Matt, you're just not

14    sure if that's accurate?  Is that your testimony?

55:45  15  A  I'm not sure if that's accurate.  Also, I don't

16    remember any point Matt really wanting Jeremy out of

17    the trailer.  It seemed the whole time he definitely

18    wanted Jeremy in the trailer.

19         MR. STEPHENS:  That's all I have.

'5:45  20        MR. ADCOCK:  I have nothing further.

21         THE COURT:  Sir, thank you.  You may step

22    down.

23       With that, we'll take our afternoon recess then.

24    Ladies and Gentlemen, we'll take a fifteen-minute

5:46  25    afternoon recess.

December 7, 2004
*Colloquy*

1          Thank you.

2                    AFTERNOON RECESS TAKEN

3                         JURY PRESENT

4               THE COURT:  Ladies and Gentlemen of the Jury,

06:13    5     at this point in time we have had a slight scheduling

6     change that's being contemplated by parties in this

7     case.  And also, I think a couple of the witnesses

8     actually didn't take quite as long as counsel had

9     anticipated they might.  Sometimes --

06:14   10          The beauty of watching television dramas is that

11     these things are specifically scripted to fill 30

12     minutes or 50 minutes of an hour-long program.  And we

13     don't script our cases like that.  Sometimes people are

14     available or not available.  Changes are made as the

06:14   15     flow of the case goes.

16          All that is to say that we're done for today.  We

17     have no further witnesses available to us this

18     afternoon.  The attorneys tell me they are still right

19     on time as far as what they thought the length of the

06:14   20     case would be, so we're not losing ground in any way.

21     It won't cause an extension of the time of the overall

22     trial.

23          So with that, I'm going to just give you one last

24     brief admonishment, as we do every day.  Please do not

06:14   25     discuss the case.  Do not go to or near the scene.  Do

177

*Colloquy*

1      not remain anywhere near anyone who may be discussing

2      ·the case.  I know you are fully aware of those

3      restrictions and I appreciate your willingness to

4      adhere to those.

06:15   5      You understand why we do these things, and it's

6      obviously very important to a fair trial that I at

7      least remind you briefly every evening of those

8      restrictions.

9      Counsel, I'm assuming we can start tomorrow at

06:15  10      nine.

11              MR. ADCOCK:  That's fine.

12              MR. STEPHENS:  That's fine.

13              THE COURT:  Be in the jury room, if you can,

14      by 8:55.  Do our very best to do that.

16:15  15      And just for what it's worth, it is obviously --

16      your transportation issues as far as getting here and

17      so forth are different.  We all vary.  Some car pool,

18      ride a bus, drive your own car.  Whatever.  If you can

19      please do the following.  If you're going to get here

16:15  20      early -- by early meaning 15, 20 minutes, up to half an

21      hour before nine o'clock -- if you could simply find

22      yourself a location in the courthouse that is not

23      immediately adjacent to the courtroom up here.  In

24      other words, don't sit up on the second floor anyway,

6:16   25      anywhere.  Stay in the jurors lounge or something of

1    that nature.  It makes it easier for us to coordinate

2    everything else involved in our case.  And again, we'll

3    open the door about ten minutes before nine, is all.

4    So if you can time it that way, it really doesn't do

06:16  5    you any good to get here a whole lot earlier.  Some of

6    you might have to.  I'm not saying you can't.  But

7    please locate yourselves somewhere away from the

8    courtroom, and come to the jury room at five to nine.

9         Thanks a lot for attending today, and we'll see

06:16  10    you tomorrow.

11                    JURY NOT PRESENT

12         THE COURT:  I think in an overabundance of

13    caution, real quickly, because Mr. Ruth was not present

14    during a very brief conversation that we had in

16:17  15    Chambers, we were simply talking about a scheduling

16    issue.  Calling or not calling a particular witness.

17    If you want to just flesh that out.

18         MR. ADCOCK:  We had a conversation, Your

19    Honor.  I informed Mr. Stephens and Your Honor that my

5:17  20    next witness, Renee Woerner, indicated to me, without

21    any doubt, that she was going to commit perjury if she

22    were called by the State to testify in this case.

23    Because of my ethical obligation not to suborn perjury,

24    I made a decision not to call her as a State's witness.

25         After my conversation with her, I spoke to Mr.

*Colloquy*

December 1, 2004

1   Stephens, I explained that to him.  I suggested maybe

2   he wanted to talk to her.  Maybe he was going to call

3   her as a witness.  I believe he had a conversation with

4   her where she brought up the fact that I had said that

06:18   5   if you commit perjury, there is going to be

6   consequences.  And at that point he concluded that she

7   needed to be advised.

8        We're going to make arrangements for the Office of

9   the Public Defender to get her an attorney, to consult

06:18  10   with her tomorrow about her options, so to speak.

11        Mr. Stephens indicated to me that he did not know

12   whether he is going to call her yet but that that was

13   the first step, in any event, and I agree.  And that's

14   where we're at.

06:18  15        MR. STEPHENS:  I just might add that's, more

16   or less, what's happen.  When I had my conversation

17   with this potential witness, she indicated to me

18   concerns about comments Mr. Adcock made.  She did

19   indicate the word "perjury" was used.  I don't know

06:18  20   what context that was in.  I advised her I cannot give

21   you any advice and if you need advice you need your own

22   lawyer.  Which I think was about all I could do with

23   that.

24        THE COURT:  Fair enough.  Again, primarily for

06:19  25   the benefit of Mr. Ruth, who was not present during

*Colloquy*

1    that conversation, I want to make sure that we had laid

2    it all out, what the conversation was in Chambers.

3    Obviously that facilities communication between you and

4    your attorney.  I don't know where it's going to go.

5    You're ready to proceed tomorrow with other witnesses,

6    obviously.

7              MR. ADCOCK:  Nine o'clock.

8              THE COURT:  Start at nine and do what we can

9    do.

10             COURT RECESSED AT 3:29 P.M.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appendix X
#11
Sentencing transcripts

1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | RECEIVED |
| | ) | |
| | ) | SEP 1 4 2005 |
| Plaintiff, | ) | |
| | ) | •rayer. Bryman & cern. Pt . |
| vs. | ) | NO. 03-1-02451-6 |
| | ) | |
| | ) | COURT OF APPEALS |
| MATTHEW RUTH, | ) | NO. 56318-1-I |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

VERBATIM REPORT OF PROCEEDINGS

---

SENTENCING HEARING

FEBRUARY 4, 2005

HONORABLE DAVID F. HULBERT
Judge

Department No. 6
Snohomish County Courthouse
Everett, Washington

Reported by:
Laurel Olson
Official Court Reporter
CR #29906-2645
425) 388-3088

DISK
ENCLOSED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. 03-1-02451-6 |
| | ) | |
| MATTHEW RUTH, | ) | |
| | ) | |
| Defendant. | ) | |

VERBATIM REPORT OF PROCEEDINGS

BE IT REMEMBERED that on the 4th day of February,
2005, the above-entitled and numbered cause came on for
sentencing before the Honorable DAVID F. HULBERT, one of
the judges of the above-entitled court, sitting in
Department No. 6 thereof, at the Snohomish County
Courthouse, in the City of Everett, County of Snohomish,
State of Washington.

The Plaintiff was represented by JOHN ADCOCK,
Deputy Prosecuting Attorney for Snohomish County;

The Defendant was present and represented by his
attorney, CHARLES DOLD.

WHEREUPON, both sides having announced they were
ready to begin, the following proceedings were had, to wit:

1                    11:00 A.M., FRIDAY
                      FEBRUARY 4, 2005
2         SNOHOMISH COUNTY SUPERIOR COURT

3            *   *   *   *   *   *   *   *   *   *

4

5         MR. ADCOCK:  Good morning, Judge.

6      State of Washington v. Matthew Robert Ruth, Cause

7   Number 03-1-02451-6.  The defendant is present, in custody,

8   represented by Chad Dold.  John Adcock for the State.

9      We are here for sentencing.  I know, as a preliminary

10  matter, counsel had some motions that he would like to put

11  on the record.

12         THE COURT:  Counsel.

13         MR. DOLD:  Yes, your Honor.

14      A couple things.  One, I was appointed to represent Mr.

15  Ruth after the trial, so I did not attend the trial.  I was

16  contacted by Mr. Stephens, who represented Mr. Ruth; and he

17  provided me with a portion of the discovery, feeling that

18  that was the portion I needed.

19      I met with Mr. Ruth, and I determined that one of the

20  main issues that he had indicated needed to be investigated

21  was the testimony of Renee Woerner.  I think the Court will

22  recall that Ms. Woerner was a listed witness; that she was

23  brought back from California; she was represented by Mr.

24  Joice.  When she was brought back, I think she was released

25  with a promise to appear.  She appeared at trial and was not

1   called.  I won't go into the circumstances of not calling

2   her.  I wasn't there, I don't know, and I haven't reviewed

3   the transcript.

4        Mr. Ruth advised me that Ms. Woerner's testimony was

5   critical, that he was very critical of his attorney for not

6   calling her.  I've spoken briefly to Mr. Adcock about that,

7   and I've spoken briefly to Mr. Stephens about that.  I've

8   made a very serious effort to reach Ms. Woerner.  I had left

9   two phone numbers for her; I have left numbers for her on a

10  number of occasions.  She called me once; we had a brief

11  conversation.  She left a message for me yesterday on the

12  number that goes to my answering machine rather than my cell

13  phone; I had given her my cell phone number so that we could

14  talk.  I have not yet had a chance to interview her at

15  length about this incident and about what her testimony

16  would be and about what may in fact be an apparent conflict

17  between statements that she had made previously versus

18  whatever her testimony would be.

19       As a result, I am not prepared to present a motion for

20  a new trial based either on prosecutorial misconduct,

21  ineffective assistance of counsel or denial of justice, any

22  one of the three, depending on what Ms. Woerner tells me.

23       I apologize to the Court.  I've made my best efforts to

24  reach her.  Mr. Ruth has assisted me as far as he's been

25  able to.  She is not readily available.  I've gotten to know

1   her parents very well, and they have been very kind in

2   passing on my number to Ms. Woerner. I am not prepared. I

3   will continue to try and reach her, and I will continue to

4   try and develop a motion for a new trial.

5        Mr. Ruth wanted to ask the Court, because of that, to

6   continue this proceeding. I advised him that that would

7   have to be brought up now. Those are the grounds on which

8   I'm asking to do that.

9        Does that correctly state what you wanted to do, Matt?

10            THE DEFENDANT:  Yes.

11           MR. DOLD:  Mr. Ruth has prepared some pleadings

12   that would effectively make that request. I have not

13   reviewed them.

14           MR. ADCOCK:  I think that motion should be denied,
                              HOPE
15   your Honor.  With respect to Ms. Woerner, she was a State's

16   witness.  When she was brought back from the state of

17   California, she gave a lengthy statement to detectives under

18   oath; it was taped, and a transcript was prepared and

19   provided to the defendant through the course of discovery,

20   in which she clearly indicated she watched the defendant,

21   without provocation, shoot the two victims in this case.

22       My intention was to call her to testify to that. On

23   the day that she was supposed to testify, I met with her.

24   She was highly agitated, she seemed very upset, and she

25   immediately repudiated her statement. I decided at that

1    point that I could not call her as a witness, as I have an

2    obligation not to suborn perjury; and if the Court recalls,

3    I brought it to the Court's attention and so stated on the

4    record at the time.

5        Mr. Stephens also declined to call her as a witness.

6    He filed a declaration at the first sentencing date -- when

7    he was asking leave to withdraw -- in which he states that

8    after conferring with his client, he decided not to call her

9    as a witness because he believed her testimony would be

10   either corroborative of what she told the police in the

11   original sworn statement or that, if she lied, she would be

12   easily impeached; and, therefore, there was no tactical or

13   practical advantage of calling her as a witness.

14       We have been through this before.  I see no reason at

15   all to delay this hearing today.  The victims are present.

16   Given the fact that it won't change anything, I'd ask you to

17   deny that motion to continue.

18           .  MR. DOLD:  The only comment in response is that he

19   may have conferred with Mr. Ruth.  Mr. Ruth never agreed to

20   Mr. Stephens' strategy in that regard and was quite upset --

21   again, I wasn't here, I don't know what happened in the

22   courtroom; but in my dealings with him, he has indicated

23   that that's not a decision he ever would have agreed with,

24   and he disagrees with any assessment of tactical or

25   strategic advantage.

STATE V. MATTHEW RUTH                                          7

1              THE COURT:  That's fine.  Those are all post-trial

2       issues.  We'll proceed to sentencing.

3              MR. DOLD:  Before we proceed to sentencing, your

4       Honor, I'd ask the Court to just take a moment and review

5       the jury instructions with me.  I reviewed them last

6       evening.  My recollection is that Instructions Numbers 10

7       and 12 --

8                   THE COURT:  Let me locate them here, first.

9                   MR. ADCOCK:  12 and 14, actually.

10                  MR. DOLD:  Well, okay.

11                  MR. ADCOCK:  I have my copy right here, Judge.

12                  MR. DOLD:  Let me just advise the Court what I

13      found.  The defendant was charged with two counts of assault

14      in the first degree while armed with a deadly weapon.  The

15      firearm language was mentioned with respect to assault in

16      the first degree as an element of the offense, and a firearm

17      was mentioned as the aggravating factor in the Information.

18      That same information was contained in the to-convict

19      instructions.  When you take a look at the Special Verdict

20      Forms, however, the jury was asked to find whether or not

21      the crime was committed with a deadly weapon rather than a

22      firearm.

23             The jury never was given the question of whether or not

24      the defendant was armed with a firearm at the time the crime

25      was committed.

1            THE COURT: All right.

2            MR. DOLD: I trust that's -- that's my reading of

3       the instructions that the jury was given.

4            THE COURT: Looking at Special Verdict Forms A and

5       B, and, "Was the defendant Matthew Robert Ruth armed with a

6       deadly weapon at the time of the commission of the Crime in

7       Count I," that's A; and B is reiterating the same language.

8            MR. DOLD: Okay. Going to RCW 9.94A.533(3), "The

9       following additional times shall be added to the standard

10      sentence range for felony crimes committed after July 23,

11      1995, if the offender or an accomplice was armed with a

12      firearm as defined by 9.41.010...."

13           If we take a look at subsection (4), the language is

14      exactly the same: "...if the offender or an accomplice was

15      armed with a deadly weapon...."

16           The punishments are very different. The definitions

17      are very different. It's our position that there is no

18      necessary overlap between firearm and deadly weapon; and, as

19      a result, the jury was never asked if Mr. Ruth was armed

20      with a firearm. As a result, we take the position that

21      there is no enhancement that can be imposed at this time.

22           I am aware of State v. Serrano, and I provided Mr.

23      Adcock a copy of materials that I found. As I say, I read

24      the instructions last evening; I did this research last

25      evening. In Serrano, it appears a very similar fact pattern

1          MR. DOLD:  Did anybody else want to address the

2     court?

3          THE COURT:  Apparently not.

4          MR. DOLD:  I didn't want to foreclose on them if

5     they did.

6          THE COURT:  I have the advantage of being able to

7     see behind you.  They are gesturing no.

8          MR. DOLD:  Okay.

9     I'd ask the Court to consider what Dr. Muscatel wrote.

10    I think that explains Mr. Adcock's being as upset as he is,

11    very well.  Dr. Muscatel did not have the benefit of Mr.

12    Adcock's thoughts when he wrote his report.  He didn't have

13    the benefit of the report from Western State Hospital, which

14    I have not reviewed; I understand it is in the file.  His

15    analysis in fact is consistent with Western State Hospital's

16    analysis of Mr. Ruth.  In sending him to Western, I assume

17    that there were some rather serious concerns about his

18    competency, his capacity to assist counsel.

19         MR. ADCOCK:  I misspoke.  He didn't go to Western.

20    He just went to Lee.

21         MR. DOLD:  Gustafson?

22         MR. ADCOCK:  Yes.

23         MR. DOLD:  I thought I remembered some reference

24    to a report from Western that was written by --

25         THE COURT:  I did, too.  At some point early on,

1    there was an initial evaluation in terms of legal

2    competence.

3              MR. ADCOCK:  That must have been the first

4    attorney.

5              THE COURT:  Yes.  I think that's probably what

6    we're talking about.

7              MR. DOLD:  The personality dynamics referenced by

8    Dr. Muscatel are consistent with all of those observations

9    and with Mr. Adcock being as upset as he is.  They aren't

10   aggravators, however; they are mitigators.  9.94A.535 speaks

11   about mitigators, what they are, how they operate, and when

12   this court should consider them.

13        Our position is that the psychological defects, while

14   not amounting to a defense to the charges, are seriously

15   mitigating factors.  The fact that there was polysubstance

16   abuse prior to this event which had a serious impact on Mr.

17   Ruth's ability to appreciate his behavior, the consequences

18   of his behavior both in terms of the incident itself, his

19   relationship with his attorneys, his relationship to the

20   world around him, are substantially mitigating and I believe

21   should be considered by the Court to be such.

22        Dr. Muscatel I think explains very clearly what the

23   impact of this circumstance on Mr. Ruth is and that, in

24   fact, it was substantial.

25              Second, Mr. Ruth has no prior criminal history.  This

1   is not a person who has called himself to law enforcement's

2   attention time and time again.  This is a person who, with

3   the confluence of the personality disorder, the drug-induced

4   psychosis, the post-drug-induced psychosis and the other

5   circumstances going on at the time, acted in a way that was

6   uncharacteristic of him.

7        I understand putting people away for long periods of

8   time when they develop a consistent pattern of behavior

9   which indicates that they are a sociopath.  I would ask the

10  Court to disregard the seat-of-the-pants diagnosis, however.

11       Mr. Adcock is saying he doesn't like Mr. Ruth.  He uses

12  the term "sociopath" to describe that feeling of not liking

13  Mr. Ruth.  We know he doesn't like Mr. Ruth.  I think that

14  probably became evident in cross-examination.  That doesn't

15  make Mr. Ruth a sociopath, however.  A sociopath has a very

16  specific legal definition and, in fact, could be the basis

17  for recommending a term beyond the standard range under the

18  old Sentencing Reform Act; future dangerousness.  There is

19  no evidence of future dangerousness in this case.  Nothing

20  in his past, nothing in his present would indicate any form

21  of future dangerousness.

22       Psychopathy is not what we are about here.  There's

23  nothing to support that.  Dr. Muscatel doesn't find it.

24  What he finds is a personality disorder which, in layman's

25  terms, means this is a person who is very difficult to get



1   along with.  Mr. Ruth has continued to clear while he's been

2   in the jail.  He's been very cooperative with me.

3           THE COURT:  He has continued to what?

4           MR. DOLD:  To clear.  I got a picture of the

5   person that I was going to meet from Mr. Stephens.  Mr. Ruth

6   has not lived up to the billing that Mr. Stephens gave me.

7   He's been very cooperative with me.

8           THE COURT:  I see what you're saying; his

9   condition has continued to clear, or his thinking, as far

10  as --

11          MR. DOLD:  Whatever.  I'm using it --

12          THE COURT:  I didn't know what you meant by

13  "continued to clear."

14          MR. DOLD:  I'm using it in a generic sense.  What

15  I was led to believe was that I would be running into a very

16  difficult person, somebody that I would have tremendous

17  difficulty working with.  Mr. Stephens is a very good

18  lawyer, and he's worked with very difficult clients in the

19  past.  In fact, he and I have shared some very difficult

20  clients in the past.  Mr. Ruth has worked very well with me.

21  He's been cooperative.  I don't know if he appears any

22  different today than when he appeared in front of the court.

23          THE COURT:  Not substantially.

24          MR. DOLD:  He's brought his motion.  He didn't get

25  up and shout about it.  He's tried very hard to cooperate

1   with the process.  I think that whatever happened back then

2   and what has worked its way through will continue to do so.

3       There is no reason for a high-end sentence.  I'm going

4   to recommend to the Court a sentence of 70 months, and

5   that's 23 months, basically 2 years below the standard

6   range, 4 years below the standard range on both counts.  He

7   will have to serve the 120 months on the firearms

8   enhancement that the Court has imposed.  That's mandatory;

9   there is no good time.  He will serve 10 years to accomplish

10   that sentence.  With another 140 months tacked on, 70 and

11   70, that would be a total of 260 months.  That is a very

12   long time.  Mr. Ruth is 22 now; right?

13          THE DEFENDANT:  25.

14          MR. DOLD:  25 now.  He will be in custody during

15   the period of his life that statistics show us people commit

16   crimes.  He will only be released after he's passed that

17   part of his life.  The likelihood of his reoffending at that

18   point is minimal.

19       Under the circumstances, we believe, in light of the

20   firearm enhancements that the Court has found, that the

21   multiple offenses policy suggests that a sentence of

22   360 months is too long, that the 93 and 93 plus 120 is too

23   long a sentence; and so on those three grounds, we'd ask the

24   Court to impose a 70-month sentence, a sentence below the

25   standard range.

22

1        With respect to the restitution, we have no issue.  Mr.

2   Ruth will be in custody for a long period of time.  I take

3   no position on the money that should go back to the County

4   or the State other than to advise the Court that Mr. Ruth

5   will have a very limited ability to pay that; that it will

6   bear interest at the rate of 12 percent until he gets out of

7   prison and be much more formidable then than it is now.

8        THE COURT:  Mr. Ruth, you have an opportunity to

9   address the Court.  Would you like to do so?

10       THE DEFENDANT:  No, sir.

11       THE COURT:  All right.  Thank you.

12       MR. ADCOCK:  Can I respond to Mr. Dold's argument?

13       THE COURT:  Yes.

14       MR. ADCOCK:  He's asking the Court to impose an

15   exceptional sentence down on spurious grounds, because, you

16   know, he's a polydrug user so we should give this guy a

17   break because he uses a lot of drugs.

18       I don't think so.

19       It may have affected his thinking?  Tough.  He took

20   them.  He did the shooting in this case.  His psychiatric

21   difficulties do not rise to the level that can be

22   sufficiently mitigated or mitigate the Court to impose an

23   exceptional sentence down.

24       The law is clear; you do this, this is the range, it's

25   consecutive.  Sorry.  Maybe he should have thought about

1    that before he shot these two guys.

2        As far as not liking Mr. Ruth, frankly, I don't care

3    about Mr. Ruth.  What I care about is the safety of my

4    community and what happened to these two kids who got shot

5    for no reason.  My personal belief is that the defendant

6    represents a substantial danger, and I base that on the fact

7    that he shot two people without provocation.  I don't think

8    you have to be a rocket scientist or a psychologist to say

9    that people that do that present a danger to society.

10       It's my position, given the facts in this case, given

11   what he did and the circumstances under which he did it, an

12   exceptional sentence below the standard range is not

13   justified and in fact is a repudiation of what happened to

14   these victims and would be slap in their face; and this

15   Court should impose the high end, consecutive to the

16   firearms enhancements.

17       There's no legal justification to impose an exceptional

18   sentence down, Judge.

19           THE COURT:  Just give me a quick calculation.  If

20   I follow your recommendation, what is the total amount of

21   time that Mr. Ruth would serve?

22           MR. ADCOCK:  366 months.

23           MR. DOLD:  30 years, 6 months.

24           THE COURT:  A couple of things come to mind

25   initially with this case.  Having heard the case myself,

1    having heard all the evidence and so forth, I came away with

2    a couple of impressions, I guess, which will obviously be

3    translated into some sort of a legal result here before this

4    morning is over.

5        One of the impressions that I had was -- and again,

6    it's not something I can directly use in terms of

7    sentencing, but I was amazed, frankly, that Mr. Ruth had not

8    had some sort of prior contact with the legal system,

9    because Mr. Ruth appeared to me, during the course of this

10   trial, to be an extremely frightening individual, what he

11   was capable of doing under the circumstances.

12       Also, Mr. Ruth cannot take advantage of the fact that

13   he didn't kill these people.  You can't come in and say,

14   well -- and, obviously, you haven't raised that.  The point

15   is that it could have easily been a double homicide, from my

16   understanding of how the case went down.

17       · I found Mr. Ruth's testimony to be entirely incredible,

18   uncredible, unbelievable, not to be believed; any

19   permutation of that definition you want to use.  It was just

20   simply not helpful to the jury at all.  I think their

21   verdict and how they handled the case proved very clearly

22   that they utterly repudiated his testimony.  And I did, too;

23   I did, as well.  I mean, I couldn't find it to be credible

24   at all.

25       I think Mr. Ruth presents a grave danger to this

1    community. He's a time bomb, waiting to be provoked. His

2    drug use in the past obviously is not a mitigating factor in

3    this particular case, I don't believe. Mr. Ruth walks in

4    sort of that area between being fully engaged in the

5    community and understanding completely, I think, what's

6    going on, and some other place; but he is a participating

7    member of society, and if he's not in prison, he will be

8    free, then, to constitute an ongoing and continuing danger.

9          Now, the question is, having made those determinations,

10   does this particular case, in light of the fact that there

11   is no criminal history, does it justify a high-end sentence,

12   which ends up being 30 years in prison, which is a very long

13   time for a person. I have to then balance that with the

14   fact -- I guess we have to analyze it based on what did he

15   actually do regardless of what the outcome was. He was no

16   longer in charge of the outcome. Once he pulled the trigger

17   and started firing, the results were up to a Higher Power

18   and not Mr. Ruth, although he had certainly put himself in a

19   position where any number of results could have obtained,

20   including the death of these individuals.

21         However, given the overall circumstances of this case,

22   I am going to impose 105 months of imprisonment for each

23   count, added to which will be the 60 months of firearms

24   enhancement, for a total of 165 months --

25              MR. DOLD: A total of 330.

1          THE COURT:  -- for a total of 330 months.  I
2   believe that that accomplishes the following:  Number 1, it
3   removes Mr. Ruth from this community for a very long time,
4   long enough to -- and I agree with Mr. Dold, long enough for
5   there to be the natural maturation that occurs; not that·
6   elderly people or older people cannot commit crimes, they
7   do, we see that all the time, and sometimes they commit
8   violent crimes, but very rarely in comparison to the number
9   of violent crimes that are committed by youthful offenders.
10  I guess some of the juice just runs out of us, and we just
11  no longer are as interested in being as violent as we were
12  when we were young.
13         But it also reflects the fact that this is a first-time
14  offense and that I personally believe that, in the totality
15  of the circumstances, the total sentence recommended by the
16  Prosecutor's Office would have been a bit excessive; if not
17  excessive, I don't think it's merited.
18         Again, 24 to 48 months of community custody following
19  release.  At least that's what the law is now, so I'll
20  impose that.  I'll waive all non-mandatory fees, penalties
21  and assessments.  The only one I cannot waive is the $500
22  mandatory victim penalty assessment, which I will impose.
23         Restitution; are you going to agree to that?
24         MR. DOLD:  We agree to that, your Honor.  It's
25  $300 and change.  Looking at the two gentlemen here, I don't



APPEND ix
" c "

**ORIGINAL**

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,                           )        No.03-1-02451-6
                                               )
               **Plaintiff,**               )
                                               )
      vs.                                     )        **NOTICE OF DEFENSE**
                                               )
MATTHEW R. RUTH,                               )
                                               )
               **Defendant.**              )

     The Defendant in the above entitled action, through his attorney Mark Stephens, hereby

notifies this Court, and the Prosecutor, pursuant to CrR 4.7 (b)(xiv), RCW 9A.16.110 and RCW

9A.16.020 (3), of his intent to assert Reasonable Defense of Self, Defense of Another Person,

and/or Defense of Property at trial.

     Respectfully Submitted this 8th day of October, 2004.


MARK STEPHENS, WSBA #26110
Attorney for Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue  - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191  - Fax 259-2195

Notice of Defense
Page 1

DFDT. NO. _____

INSTRUCTION NO. _15_

    It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

DFDT. NO._____

INSTRUCTION NO. _16_

A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is in actual danger of great bodily harm, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

DFDT. NO. _____

INSTRUCTION NO. __/7__

It is a defense to a charge of Assault in the First Degree that the force used was lawful as defined in this instruction.

The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured or by someone lawfully aiding a person who he reasonably believes is about to be injured in preventing or attempting to prevent an offense against the person or a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary.

The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

APPENDIX
" D "
TRIAL MINUTES



FILED IN OPEN COURT

December 6, 2004
Pam L. Daniels
County Clerk

By: _____
Deputy Clerk

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

State of Washington
    (PLAINTIFF)
      VS.
Matthew Robert Ruth
    (DEFENDANT)

CAUSE NO.:    03-1-02451-6
JUDGE:    David F. Hulbert
DATE OF TRIAL:  December 6, 2004
REPORTER:  Stephanie Magee
CLERK:    Grace Hampton

**ATTORNEY FOR PLAINTIFF:**

John Adcock

**ATTORNEY FOR DEFENDANT:**

Mark Stephens

---

Days: 3.5 Days      **FINAL DISPOSITION - VERDICT**
Date trial ended: December 9, 2004
  The Jury found the Defendant guilty of the crime of First Degree
Assault as charged in Count I; and guilty of the crime of First
Degree Assault as charged in Count II.  On Special Verdict Form A,
the Jury found that the defendant was armed with a deadly weapon at
the time of the commission of the crime in Count I and on Special
Verdict Form B, the Jury found that the defendant was armed with a
deadly weapon at the time of the commission of the crime in Count
II.

Sentencing set for December 28, 2004 @ 1:00 p.m. Dept. 5,
Judge Hulbert.

9:35  This matter came on regularly for 12-person jury trial.
    State of Washington represented through Deputy Prosecuting
    Attorney, John Adcock.  Detective Kelly Willoth seated at
    counsel table.
    Defendant present, in custody, represented by counsel,
    Mark Stephens.
    Proposed jurors not present.

    Plaintiff's proposed Jury Instructions filed in open court.
    Defendant's Proposed Jury Instructions filed in open court.

    Colloquy of Court and counsel.

    Exhibit no. 1 offered by the State:    ADMITTED 12-7-04

1

## TRIAL MINUTES

A4
85

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

```
Exhibit no.  2 offered by the State:    ADMITTED 12-7-04
Exhibit no.  3 offered by the State:    ADMITTED 12-7-04
Exhibit no.  4 offered by the State:    ADMITTED 12-7-04
Exhibit no.  5 offered by the State:    ADMITTED 12-8-04
Exhibit no.  6 offered by the State:    ADMITTED 12-7-04
Exhibit no.  7 offered by the State:    ADMITTED 12-7-04
Exhibit no.  8 offered by the State:    ADMITTED 12-7-04
Exhibit no.  9 offered by the State:    ADMITTED 12-7-04
Exhibit no. 10 offered by the State:    ADMITTED 12-7-04
Exhibit no. 11 offered by the State:    ADMITTED 12-7-04
Exhibit no. 12 offered by the State:    ADMITTED 12-7-04
Exhibit no. 13 offered by the State:    ADMITTED 12-7-04
Exhibit no. 14 offered by the State:    ADMITTED 12-7-04
Exhibit no. 15 offered by the State:    ADMITTED 12-7-04
Exhibit no. 16 offered by the State:    ADMITTED 12-7-04
Exhibit no. 17 offered by the State:    ADMITTED 12-7-04
Exhibit no. 18 offered by the State:    ADMITTED 12-7-04
Exhibit no. 19 offered by the State:    ADMITTED 12-7-04
Exhibit no. 20 offered by the State:    ADMITTED 12-7-04
Exhibit no. 21 offered by the State:    ADMITTED 12-7-04
Exhibit no. 22 offered by the State:    ADMITTED 12-7-04
Exhibit no. 23 offered by the State:    ADMITTED 12-7-04
Exhibit no. 24 offered by the State:    ADMITTED 12-7-04
Exhibit no. 25 offered by the State:    ADMITTED 12-7-04
Exhibit no. 26 offered by the State:    ADMITTED 12-7-04
Exhibit no. 27 offered by the State:    ADMITTED 12-7-04
Exhibit no. 28 offered by the State:    ADMITTED 12-7-04
Exhibit no. 29 offered by the State:    ADMITTED 12-7-04
Exhibit no. 30 offered by the State:    ADMITTED 12-7-04
Exhibit no. 31 offered by the State:    ADMITTED 12-7-04
Exhibit no. 32 offered by the State:    ADMITTED 12-7-04
Exhibit no. 33 offered by the State:    ADMITTED 12-7-04
Exhibit no. 34 offered by the State:    ADMITTED 12-7-04
Exhibit no. 35 offered by the State:    ADMITTED 12-7-04
Exhibit no. 36 offered by the State:    ADMITTED 12-7-04
Exhibit no. 37 offered by the State:    ADMITTED 12-7-04
Exhibit no. 38 offered by the State:    ADMITTED 12-7-04
Exhibit no. 39 offered by the State:    ADMITTED 12-8-04.
Exhibit no. 40 offered by the State:    ADMITTED 12-8-04.
```

9:35   Arraignment on Second Amended Information.   SEE COURT FILE FOR
       RECORD OF MINUTES.

9:36   State's motion in limine to exclude witnesses except Detective
       Willoth: Granted.

2                          **TRIAL MINUTES**

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

9:37  State's motion in limine to prevent Defense counsel from using
the term of "Snitch" or another derogatory comments regarding
State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49  Defense motion in limine to exclude testimony of prior burglary
charge around the time of the incident in question:
Granted/Stipulated.

9:40  Defense motion in limine to exclude testimony of a prior assault
of Renee Woerner: Granted/Stipulated.

9:41  Defense motion in limine to exclude testimony of defendant's
criminal activity in Blythe, California: Granted/Stipulated.

9:42  Defense motion in limine to exclude any testimony or evidence of
defendant's prior criminal history: Reserved.

9:43  Defense motion in limine exclude any evidence about defendant's
last name or alias last names: Granted/Stipulated.

9:45  Defendant motion to strike testimony of State's witnesses, Renee
Woerner, because he was unable to interview her, as his subpoena
was returned: Denied.  The Court finds that the remedy is not
exclusion but to allow Defendant to interview the witness prior
to testifying.

Exhibit no. 41 offered by the State:    **ADMITTED 12-7-04**
Exhibit no. 42 offered by Defendant:    Not Offered

9:48  Defendant's motion strike testimony of Jeremiah Sheridan because
of defendant's inability to locate and interview this witness:
Denied.  The Court finds that the remedy is not exclusion but to
allow Defendant to interview the witness prior to his testimony.

9:50  Colloquy of Court and counsel.
9:52  Court in recess.

10:15 The following persons were selected to qualify as jurors on this
cause and seated in the jury box:
1.  Gary R. Hall              7.   Andrea L. Greenlee
2.  Edward A. Dawson          8.   Robert G. Sears
3.  Kandace Aksnes            9.   Richard E. Olsen
4.  Jody Marie Mountifield    10.  Marilyn Churchill
5.  Karen R. Egtvedt          11.  Sharon Walker
6.  Jennifer R. Clyde         12.  Donna Lee Orr

3                          **TRIAL MINUTES**

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:
13.  Mehari E. Gebrewold
14.  Frank P. Brady
15.  James C. Sinnema
16.  Barbara R. Garrett
17.  Frances Winters
18.  Lesley W. Winney
19.  Michael Rucker
20.  William Glover
21.  Raymond Johnson
22.  Richard Hill
23.  Ella Larrick
24.  Patricia Nakahara
25.  Charlene Lindsay
26.  Mary E. Barringer
27.  I. Jay Fritch
28.  Lawrence Thompson
29.  Donna R. West
30.  Jerry D. Rochford
31.  Daniel D. Orme-Doutre
32.  Jessica Marie Kinney
33.  Dale W. Troupe
34.  Brandon Duc Ha
35.  Patricia J. Jason

10:20 All prospective jurors sworn: Oath of Voir Dire.
The Court directs general questions to all prospective jurors.
10:35 State's initial voir dire of entire prospective jury panel.
10:51 Defendant's initial voir dire of entire prospective jury panel.
11:13 State waives concluding voir dire of entire prospective jury panel.
11:14 Defendant's concluding voir dire of entire prospective jury panel.
11:20 Challenges for cause: prospective jurors passed for cause.

11:22 Plaintiff's first peremptory challenge: Kandace Aksnes.
Frank Brady picked to qualify as juror #3.
Defendant's first peremptory challenge: Edward Dawson.
James Sinnema picked to qualify as juror #2.

Plaintiff's second peremptory challenge: Jody Mountfield.
Barbara Garrett picked to qualify as juror #4.
Defendant's second peremptory challenge: Accepts Panel.

Plaintiff's third peremptory challenge: Richard Olsen.
Frances Winters picked to qualify as juror #9.
Defendant's limited peremptory challenge: Frank Winters.

4                              **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27 The following 13 jurors were sworn to try this cause: Juror #1,
Gary R. Hall is designated as alternate juror.

| | | | |
|---|---|---|---|
| 1. | Gary R. Hall | 7. | Andrea L. Greenlee |
| 2. | James Sinnema | 8. | Robert G. Sears |
| 3. | Frank Brady | 9. | Lesley Winney |
| 4. | Barbara Garrett | 10. | Marilyn Churchill |
| 5. | Karen R. Egtvedt | 11. | Sharon Walker |
| 6. | Jennifer R. Clyde | 12. | Donna Lee Orr |
| | | 13. | Mehari Gebrewold |

11:28 Attorney conference at sidebar.
11:30 The Court directs general instructions to the Jury.
11:35 Colloquy of Court and counsel.
11:40 Court in recess until 1:00 p.m.

1:08 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
1:10 Jury present.
State makes opening statement.
1:20 Defendant makes opening statement.
1:29 The Court instructs the Jury regarding note taking.
1:31 SUZANNA JOHNSON, called by the State, sworn and testified.
1:40 Cross examination of Suzanna Johnson by the Defendant.
1:42 Attorney conference at sidebar.
1:43 Jury admonished not to discuss this case and return on Tuesday,
December 7, 2004 @ 9:55 a.m.
1:45 Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

TUESDAY, DECEMBER 7, 2004                Clerk: Grace Hampton
                                         Reporter: S. Magee
Court opened at 9:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock. Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Jury not present.

5                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.
9:10   Juror #9, Lesley Winney present.
State's voir dire of Juror #9, Mr. Winney.
Juror #9, Lesley Winney released to go back to the Jury Room.
The Court finds that Juror #9, Lesley Winney was engrossed in
the book he was reading and did not see the defendant being
brought to the Courtroom.

Exhibit no. 43 offered by the State:      ADMITTED 12-7-04
Exhibit no. 44 offered by the State:      Not Offered
Exhibit no. 45 offered by Defendant:      Not Offered

9:13  Court in recess.

9:40  Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
9:45  Court in recess.

10:05 Court resumes as heretofore, defendant present, in custody, and
all parties present.
KELLY WILLOTH, called by the State, sworn and testified.

Exhibit no. 46 offered by the State:      ADMITTED 12-8-04

10:55 Court in recess.

11:14 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Cross examination of Kelly Willoth by the Defendant.

Exhibit no. 47 offered by Defendant:      Not Offered

11:28 GEORGE WILKINS, called by the State, sworn and testified.

Exhibit no. 48 offered by the State:      ADMITTED 12-7-04

11:39 Cross examination of George Wilkins by the Defendant.
11:40 Redirect examination of George Wilkins by the State.
11:42 Recross examination of George Wilkins by the Defendant.
11:44 SARAH BRYANT, called by the State, sworn and testified.
11:46 Cross examination of Sarah Bryant by the Defendant.
11:47 Court in recess until 1:30 p.m.

6                          TRIAL MINUTES

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

1:50  Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
      JEREMY CUSTER, called by the State, sworn and testified.

      Exhibit no. 49 offered by the State:      ADMITTED 12-7-04
      Exhibit no. 50 offered by the State:      ADMITTED 12-7-04
      Exhibit no. 51 offered by the State:      Not Offered
      Exhibit no. 52 offered by Defendant:      Not Offered

2:15  Cross examination of Jeremy Custer by the Defendant.
2:19  Redirect examination of Jeremy Custer by the State.
2:22  Recross examination of Jeremy Custer by the Defendant.
2:30  DREW EDEN, called by the State, sworn and testified.
2:45  Cross examination of Drew Eden by the Defendant.
2:53  Redirect examination of Drew Eden by the State.
2:55  Recross examination of Drew Eden by the Defendant.
2:56  Court in recess.

3:22  Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
      Attorney conference at sidebar.
3:24  The Court admonishes the jury and directs them to return on
      December 8, 2004 @ 9:00 a.m.
3:25  Colloquy of Court and counsel.
3:28  Court in recess.

      WEDNESDAY, DECEMBER 8, 2004                Clerk: Grace Hampton
                                                 Reporter: S. Magee
      Court opened at 9:12 a.m., David F. Hulbert, Judge.
      The following proceedings were had to wit:
      This matter continued from previous day.
      State of Washington represented through Deputy Prosecuting
      Attorney, John Adcock.  Detective Kelly Willoth seated at
      counsel table.
      Defendant present, in custody, represented by counsel,
      Mark Stephens.
      Jury not present.
      Colloquy of Court and counsel.
9:15  Jury present.
      JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20  Cross examination of Jeremiah Sheridan by the defendant.
9:23  Detective Kelly Willoth, recalled by the State, previously
      sworn, testified.
9:25  Cross examination of Detective Kelly Willoth by the Defendant.

7                              **TRIAL MINUTES**

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:28 Redirect examination of Detective Kelly Willoth by the State.
9:30 CANDY CORDER, called by the State, sworn and testified.
9:37 Cross examination of Candy Corder by the Defendant.
9:45 Court in recess.

10:00 Court resumes as heretofore, defendant present; in custody, and
      all parties present.
      Jury present.
10:02 EVAN THOMPSON, called by the State, sworn and testified.


      Exhibit no. 53 offered by the State:    ADMITTED 12-8-04
      Exhibit no. 54 offered by the State:    ADMITTED 12-8-04

10:15 Cross examination of Evan Thompson by the Defendant.
10:18 State rests.
10:19 MATTHEW RUTH, called by the Defendant, sworn and testified.
10:26 Attorney conference at sidebar.
10:28 Continuation of testimony of Matthew Ruth on direct examination
      by the Defendant.
11:03 Jury not present.
11:04 Colloquy of Court and counsel.
11:05 Court in recess.

11:25 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
11:26 Cross examination of Matthew Ruth by the State.
11:45 Defense rests.
      State rests.
11:46 Jury not present.
11:48 Colloquy of Court and counsel.
11:50 Court in recess until 2:00 p.m.

 2:00 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury not present.
      The Court takes exceptions and objections to instruction: None
      given.
 2:05 Jury present.
      Not reported.
      The Court instructs the Jury.
 2:20 Reported.
      State opens closing argument.
 2:40 Defendant makes closing argument.
 2:52 State makes final argument.

8                       TRIAL MINUTES

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate juror.
The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

At 4:12 p.m. on December 8, 2004, the Jury submits a written inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10 & 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov. 24, 2003; and 3) Transcript of interview with Drew Eden (Nov. 10, 2003)"

At 4:15 p.m. on December 8, 2004 the Court responds in writing "The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank you."

Inquiry from the Jury and Court's Response filed in open court.

**THURSDAY, DECEMBER 9, 2004**              Clerk: Grace Hampton
                                           Reporter: S. Magee
Court opened at 11:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
The jury returns to open court with their verdict.
State of Washington represented through Deputy Prosecuting Attorney Julie Mohr.  Detective Kelly Willoth seated at counsel table.
Defendant present, in custody, represented by counsel Mark Stephens.
Verdict read in open court finding the Defendant guilty of the crime of First Degree Assault as charged in Count I; and guilty of the crime of First Degree Assault as charged in Count II.  On Special Verdict Form A, the Jury found that the defendant was armed with a deadly weapon at the time of the commission of the crime in Count I and on Special Verdict Form B, the Jury found that the defendant was armed with a deadly weapon at the time of the commission of the crime in Count II.
Jurors polled: verdict unanimous.
Verdict Form A; Special Verdict Form A; Verdict Form B and Special Verdict Form B are received and filed.
Court's Instructions filed in open court.
Jury is discharged.

9                              **TRIAL MINUTES**

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5,
Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

**TRIAL MINUTES**



FILED

2005 FEB -4  PM 12: 02

03-1-02451-6          104

## SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY
SNOHOMISH CO. WASH.

| | |
|---|---|
| STATE OF WASHINGTON | CAUSE NO.: 03-1-02451-6 |
| | JUDGE: DAVID F. HULBERT |
| VS. | REPORTER: LAUREL OLSON |
| | CLERK: HEIDI PERCY |
| MATTHEW RUTH | DATE: 2-4-05 @ 11:00 PM |
| (DEFENDANT) | |

THIS MATTER CAME ON FOR: SENTENCING

CONTINUED/CODE:                          DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: JOHN ADCOCK          C.C.O.:

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: CHARLES DOLD

FAILED TO APPEAR:      WARRANT AUTHORIZED:      ISSUED:      BAIL AMOUNT:

REQUESTED COUNSEL:      REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

IT IS THE JUDGMENT AND SENTENCE OF THE COURT THE DEFENDANT IS GUILTY AS CHARGED AND IS TO BE SENTENCED TO:

STATE DEPARTMENT OF CORRECTIONS: 105 MONTHS ON EACH COUNT, PLUS 60 MONTHS ON EACH COUNT FOR FIREARMS ENHANCEMENT - FOR A TOTAL OF 330 MONTHS

DAYS OF SENTENCE SUSPENDED:          CREDIT FOR TIME SERVED:

WORK RELEASE:          COMMENCING: IMMEDIATELY

DAYS CONFINEMENT CONVERTED:          COMMUNITY RESTITUTION HOURS:

COURT ORDERED MONETARY PAYMENTS: COURT COSTS: WAIVED     VICTIM ASSESSMENT: $500.00

ATTORNEY FEES: WAIVED    CRIME LAB FEE: N/A      MANDATORY DRUG FINE: N/A

RESTITUTION/HEARING DATE: $300.00          BIOLOGICAL TESTING FEE: WAIVED

PAYMENTS TO BE MADE: WITHIN 36 MONTHS FROM RELEASE

COMMUNITY SUPERVISION:          COMMUNITY PLACEMENT:

COMMUNITY CUSTODY: 24-48 MONTHS DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS: YES

DEFENDANT NOTIFIED OF DRIVER'S LICENSE REVOCATION/SUSPENSION:

PRESENCE WAIVED AT SIGNING BY DEFENDANT: YES          DEFENDANT FINGERPRINTED: YES

JUDGMENT AND SENTENCE ENTERED: YES

OTHER:  —DEFENDANT'S MOTION TO CONTINUE: DENIED.
        CONNIE EDEN, VICTIM'S MOTHER, PRESENT AND ADDRESSED THE COURT.
        , VICTIM PRESENT AND ADDRESSED THE COURT.   BOBBY EDEN, FATHER OF
THE VICTIM PRESENT AND ADDRESSED THE COURT.
        DEFENDANT'S MOTION FOR AN EXCEPTIONAL SENTENCE DOWNWARD: DENIED.

AA
104

1          CRIMINAL SENTENCING/CSV MINUTE ENTRY

APPENDIX D

## STATE OF WASHINGTON VS. MATTHEW RUTH
### 03-1-02451-6

THE DEFENDANT IS TO HAVE NO CONTACT WITH THE VICTIMS FOR LIFE.
THE COURT ADVISES THE DEFENDANT OF HIS RIGHT TO APPEAL WITHIN 30
DAYS.

FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO CRIMINAL RULES
3.5/3.6 ENTERED, TO BE FILED BY COUNSEL.   TEMPORARY ORDER OF COMMITMENT
ENTERED.   PSYCHOLOGICAL EVALUATION REPORT FILED.

APPENDIX

" "

E

AFFIDAVIT OF:
Kenneth TIBBS

I lived in lake steven's and my friend's introduced me to this dude
named Jermy Custer because he would deliver weed, acid, exstasy, or glass
, or coke. This guy drove a Tan Doge durango He is tall, with redish hair
he also carry's a gun, and is part of the Northwest Mafia. He would come
over to my friend's house to sell us drug's him , and his frind's. Then I
went to his house on cavilero Rd. a few times. It was a small blue house,
and there was a fence around the outside of it with a horse field, and a
5th wheele trialer lined up in the horse feild directly with Jermy Custer
front door in fact his only door. If you were coming out of the house to
the left is the drive way, and cavilero Rd., and straight ahead is the
trailer where this dude named Matthew R. Ruth, and his girl friend lived.
Matthew was alway's at Custer house making music with turntable's,
keyboard's, guiatar's, and a computer. Matthew made some cool rave, metal
music. Jermy had a crazy party house, and everyone did drug's, and drank
beer. Jermy would alway's brag about robing people, and how he shoot's
people. Also his friend john Anderson would get lot's of praise for being
crazy, and Jermy would talk about all the fight's, and stuff they got
into.

On Nov,5, 2003 Me and my friend went to buy some weed from jermy in the
early afternoon. We got to the house, and their were lot's of people
their like usual. We bought are weed then started smoking with everyone.
Jermy was mad yelling about Matthew, and his girl friend stealing drug's
from him. Jermy had his gun's out, and said he was going to kill Matt,
and Renne if they did not give back their drug's. Then he said that
Renne had snitched on them to the land lord for selling drug's but the
land lord buy's from them, and told them. Then Custer went outside, and
everyone followed he had just got done smoking some Glass, and was acting
all crazy. Me, and my friend decided to leave, as we were going to the
car we saw Matthew come out of the trailer with his long hair. Then it
appeared Jermy was yelling at Matthew, and then after a few minutes
Matthew ran back into his trialer, And Jermy Custer, And one of his
friend's followed. It looked like they were trying to get the door out of
Matthew's hand's  the door is one of the wierd one's that open's out
instead of inward. By that time we were already pulling out of the drive
way. I did not hear about what happened until a long time after. The only
reason i am writting this is because it is not fair that Matthew is in
trouble for getting attacked by Jermy that guy is scary. I hope that he
will not find out I wrote this, and I will testify to this in court.

   I declare under penalty of perjury that the fore going is true and
correct to the best of my knowledge.
         Dated this  1   day of  Nov     ,2005

                                    _____
                                    AFFIANT
                                    Subscribed and sworn to before me this
                                    1 day of  Nov      ,2005.

                                    _____
                                    Notary Public in and for the State of
                                    Washington, residing at Monroe, Wa 98272
                                    My commission expires:  3/10/07

                         AFFIDAVIT-1

# EXHIBIT 1

# ORIGINAL

Filed In Open Court
12-28-04/20
PAM L. DANIELS
COUNTY CLERK
By _Grace Hampton_
Deputy Clerk

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 03-1-02451-6 |
| Plaintiff, | |
| vs. | MOTION TO WITHDRAW |
| MATTHEW R. RUTH, | |
| Defendant. | |

Counsel for the defendant in the above entitled cause, Mark Stephens, respectfully

requests this Court allow counsel to withdraw from further representation of the defendant.

Counsel makes this motion based upon the attached declaration.

Respectfully Submitted this 28th day of December, 2004.

MARK STEPHENS, WSBA #26110
Attorney for Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195



## DECLARATION OF COUNSEL

Counsel for the defendant declares the following to be true and correct to the best of his belief and information:

1. On November 13, 2003 the State charged Matthew Ruth with First Degree Assault while armed with a firearm, and the State later added a second count of First Degree Assault while armed with a firearm.

2. The incident which led to the charges was witnessed by Renee Woerner, Ruth's girlfriend.

3. After the shooting, the State executed an arrest warrant for Ms. Woerner in California.

4. Some time after filing the case, the State listed Renee Woerner as a State's witness for trial.

5. Shortly after Ms. Woerner's arrival at the Snohomish County Jail, she gave police and the prosecutor a sworn, tape recorded interview which essentially corroborated the accounts of the shooting provided by the two alleged victims. At the time she was represented by attorney Bill Joice.

6. Before trial in December, 2004, Deputy Prosecutor John Adcock indicated to me he intended to call Ms. Woerner to testify as a State's witness at Ruth's trial.

7. On Saturday, December 4, 2004, while preparing for trial, I returned a phone call from Ms. Woerner, in which she suggested she would be testifying differently from what she had said in her taped interview. On the phone Ms. Woerner spoke very rapidly and somewhat incoherently.

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2185

Motion to Withdraw
Page 2



8. On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony. He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

9. I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset. She indicated to me Mr. Adcock had threatened to charge her with perjury if she testified. She expressed concern to me about potential legal consequences if she testified. I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.

11. After giving the matter some thought, and conferring with my client, I decided not to call Ms. Woerner as a witness at trial. I believed her testimony would be either corroborative of the victims' testimony, or easily impeached by her prior statement.

12. On December 9, 2004 the jury returned verdicts of guilty as charged in this case.

13. Some time the week of December 20, 2004 my temporary receptionist told me Ruth was trying to call me. I instructed her to accept his call if I was in the office when he called.

14. On December 27, 2004 I tried to visit Ruth in jail, but the jail was "locked down" and I was denied access. I was concerned because some information I wanted to review prior to sentencing had not yet been provided, and I wanted to discuss this with Ruth.

15. After I returned to my office, my receptionist told me by intercom that Ruth was

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

Motion to Withdraw
Page 3

holding on the phone.  My office has a single outside phone line accessible by the public.

All calls go to the reception desk, and then are transferred to attorneys and staff.

16.  I picked up the line and began to discuss the options for the next day's

sentencing with Ruth.  We spoke for a minute or two.  At some point I made a disparaging

remark to Ruth about his "girlfriend".

17.  At that point a female voice which I recognized from prior conversations as

belonging to Renee Woerner spoke up.  I was surprised and shocked, realizing there had

been a third person listening in on the conversation without my knowledge or permission.

Ms. Woerner then told me "this is being taped" or words to that effect.  Ms. Woerner and I

exchanged a few more words, and I hung up the phone.

Signed this 28th day of December, 2004, under penalty of perjury, in Everett,

Washington.

Mark Stephens, Attorney for the Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue  - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

| | |
|---|---|
| 1 | AFTERNOON PROCEEDINGS |
| 2 | MR. ADCOCK:  State of Washington vs. Matthew |
| 3 | Robert Ruth; Cause Number 03-1-02451-6.  We're here for |
| 4 | sentencing.  The defendant is present in custody, |
| 04:00   5 | represented by Mr. Stephens.  John Adcock for the |
| 6 | State. |
| 7 | Mr. Stephens, as the Court is probably aware, |
| 8 | filed a motion this morning.  I've reviewed it.  I |
| 9 | don't know if the Court has had time to look at it.  I |
| 04:00  10 | have some concerns.  I understand Mr. Stephens' |
| 11 | predicament,  And because I'm not privy to the |
| 12 | communication he had -- and rightfully so -- I don't |
| 13 | know to the level or degree they constitute a problem |
| 14 | or conflict. |
| 04:01  15 | My concern is this:  That it's incumbent, I think, |
| 16 | in this particular case, that the trial judge do the |
| 17 | sentencing.  I think in the abstract, if you looked at |
| 18 | this case, it would not have the impact, I believe, |
| 19 | that it necessarily needs to have because of the |
| 04:01  20 | testimony.  It's in the State's interest and the |
| 21 | interest of the victims, I think, to have yourself |
| 22 | preside over the sentencing.  And so if we had to delay |
| 23 | these proceedings today because -- |
| 24 | THE COURT:  I can always come back and the |
| 04:01  25 | county will pay me my exorbitant fee. |

319

SEE SENTENCING 2/04/05 RP 24-25
JUDGE EXPLAINS WHY MR. Adcock WANTED
HIM AT Sentencing - He llth not LIke MR Ditch

*December 28, 2004*

*Colloquy*

1    MR. ADCOCK:  That is my concern, judge.  I

2    think in this particular case it's important that you

3    hear the sentencing.

4         THE COURT:  I don't disagree.  We'll make it

5    work.

6         MR. ADCOCK:  Thank you, Judge.

7         THE COURT:  In terms of administratively doing

8    that, how about if I leave between you and Brian the

9    laboring oar to figure out with Judge Wynne how they

10   would like to have us handle that.  There is always at

11   least one courtroom available somewhere around here.

12        MR. ADCOCK:  Yes.  Thank you very much.

13        THE COURT:  Ergo, your motion to withdraw is

14   granted.

15        MR. STEPHENS:  Just so you know, I've

16   contacted Office of Public Defense and they don't see a

17   problem appointing somebody for sentencing.

18        I spent five years at the County Public Defenders

19   Office.  I have handled probably close to 500

20   court-appointed felony cases.  And I've tried probably

21   20 to 25 felonies.  I've handled roughly 40 to 50 jury

22   trials in my eight years of practice.  I've never found

23   myself in this position.  I never have.

24        I guess that's all I want to say.  I felt I had no

25   choice.  So I apologize to counsel.  I apologize to

1    everybody who is involved.  I just felt I had no

2    choice.

3             THE COURT:  That's fair enough.  Reading

4    between the lines, I gathered that your level of

5    frustration -- whatever it is, you spoke the actual

6    words that were spoken -- clearly rose to the level

7    where you felt compelled to bring this motion.  Other

8    than that, you wouldn't have done it.

9             MR. STEPHENS:  I think I gave your clerk my

10   original copy.  I just ask that that be filed.

11            THE COURT:  Yes.

12        So the appointment will take place, and in due

13   course.

14            MR. ADCOCK:  I'll get a new date from Brian.

15            THE COURT:  Obviously the Court has a method

16   of reaching me.

17            MR. ADCOCK:  Thank you, Judge.

18            THE COURT:  You're very welcome.

19            COURT RECESSED AT 1:11 P.M.

20

21

22

23

24

25

*STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF   29906*

1    don't finish today, they will be asked to come back

2    tomorrow morning at nine o'clock, and basically proceed

3    from there.

4              MR. ADCOCK:    Thank you.

5              COURT RECESSED AT 3:05 P.M.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF  29906*

# EXHIBIT 2

The following is a summary of the notes that I took on January 20, 2010 when I interviewed Rene Woerner. Her father Henry was present during the entire interview.

Henry was at the courthouse on the day in question. He did witness Adcock "drag" his daughter into a side room where he then heard yelling going on between Adcock and his daughter. Henry said that he was not able to make out what was being said but when Rene came out of the room she told her Dad that she was not testifying and that Adcock would not listen to what she was TRYING to tell him. Henry did not recall what the subject was about but he does recall that Rene said that she tried to tell him the truth and he didn't want to listen so she no longer had to testify.

Rene told me that she DID tell Adcock, just prior to trial, that this was over drugs and that Eden and Custer "were high at the time of the shooting." Renee said that she does recall what happened on that day, not all but most of what happened.

Renee said that there were a lot of people at the trailer and outside the trailer at the time of the shooting. The only ones IN the trailer were her, Eden, Custer and Matt. She said that Custer and Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs. Matt kept telling them to get out. Eden sat on couch in the living room area and Custer made his way over to the bed where Renee was sitting. She said that Matt kept telling them to get out and that he had not stolen their drugs. Eden and Custer did not believe him. Custer kept saying that they had to search the entire trailer because "we are searching everyone's shit, no exceptions." At some point Custer actually sat on the end of the bed with Renee. Matt was telling him to get out of the trailer and off of

their bed, Custer would not leave. Custer was reaching down into Renee's purse going through it while saying "we are searching everybody's shit." Renee said that Matt kept pleading with them to get out. Eden was sitting on the couch saying "what's the problem, if you didn't steal it then don't worry, we are going to do this one way or another." Custer was telling Matt and Renee that he was going to search the trailer "one way or another."

Renee said that she didn't recall the specific threats that Custer and Eden were making but she does recall that Matt kept telling them to leave, get out of his trailer. Renee said that Custer was "going through my purse, sitting on the bed when Matt reached up and grabbed his gun." The next thing she knows Matt is firing and the two are running out of the trailer. She did NOT see a gun on either Eden or Custer. She did tell me that Custer carried guns but she didn't recall seeing one on him that day. Renee said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not. I asked Renee if she thought her life or that of Matt's was in immediate danger at the time Matt started shooting? Renee response was "who knows, I didn't see any guns but then again I was not looking and they would not get out of the trailer."

She did confirm that Custer was "high as a kite at the time of the shooting." She feels that Matt grabbed the gun because he "felt trapped in the bedroom." She did recall that she was not able to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse, she can't say for sure.

Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. that he left bruises. She did tell Adcock that it was over drugs and that

Custer and Eden were higher than kites at the time of the shooting. She said that he called her a stupid bitch several times. Renee is still unsure as to why Stevens did not have her testify.

Mark, if needed I believe that I can get back in touch with Ms. Woerner. She gave me a private number that I can supposedly reach her at. Let me know what you think?

I will try to talk with Mark Stevens about the case and why he didn't put Woerner on the stand?


Thanks,
Michael Powers

Exhibit
"Three"

iTeNRY Slathany

From: Wlegalworks@aol.com
Subject: **Ruth, Matthew**
Date: January 11, 2011 7:45:17 AM PST
To: markmestel@comcast.net

Mark:

I met with an inmate at the Snohomish County Jail by the name of Melvin Roy Decoteau. Melvin is good friends with Renee Woerner. Melvin is currently in jail on a DOC violation. He can and will lead us to Renee when he gets out. Mr. Decoteau has not heard from his DOC officer since he was arrested four days ago. He was wondering of YOU could call Alona Kinch at 425-290-3200 and see if you can find out when he is scheduled to be released. Melvin's DOC number is 996 707. If we can find this out it might help to establish when Melvin is getting out so he could possibly help us locate and interview Ms. Woerner. If you can that's great if not then we will locate her regardless.


I was able to locate Renee Woerner's Dad. Her Dad's name is Henry Slothang. I located Mr. Slothang and sat and talked with him at his home yesterday. We met for almost an hour. In the end Mr. Slothang told me that he talks with Renee at least one time per week, every week. He agreed to talk with Renee and have her sit with me for an interview. Mr. Slothang told me that his daughter does want to help Matthew Ruth. He said that he too was present at the courthouse at the time of Matt's trial. He said that the prosecutor got very angry at Renee because Renee wanted to testify to the "complete truth and not just what was in her statement."

Mark, I feel as if Mr. Slothang will help put Renee and myself together. He tried to reach her while I was sitting in his home. Her voicemail was full. The number I showed him that we had he said was an old number. I am going to concentrate on Renee Woerner for now and then I will sit with Donnie Poole. I know roughly where Mr. Poole lives but he too seems to be trying to avoid myself as well as other members of Matt's family. He could be using also?

I will keep you updated.

Thanks,
Michael Powers

# EXHIBIT 4

MATTHEW R. STROUD I

This was also in the Brief Taken
on 9-13-13 by the Maic Room. My
only copies of Appendix's &
Exhibits was illegal sent to Headquarters
And I won't get it until Next Month.
Sorry this is the Best I can do.
— Kris A. Kain has a copy & is trying
To Send it to this court

I, Matthew R. Stroud I, swear or affirm:

That I was at Matthew Ruth's trial and they took a recess, Adcock, the prosecuting attorney,  walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I fallowed as I walked into the court room I saw Adcock walking over to Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do. I walked over to Matthew Ruths attorney and told him what I had just saw and heard, he told me not to worry he was going to put Renee Woener on the stand.

In the hall was also Renee Woerner's Mother and Dad who also heard everything. After the trial was over the head juror asked to speak with Matt's attorney and me the juror asked Matt's attorney why he did not put the only other witness, Renee Woerner ,on the stand Matt's attorney replied that he wanted to but he could not find her, I spoke up that that was not true as he knew she was in the hall waiting to testify, the Juror said then we convicted an incent man, we all believed Matt but was told if there was any dough we had to find him guilty if Renee woerner had testified we would not of had any dough and would have found him innocent.

I SWEAR OR AFFIRM THAT THE ABOVE AND FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

9/16/2013                    Matthew R. Stroud I
Date              Matthew R, Stroud I

STATE OF WASHINGTON

COUNTY OF SNOHOMISH

I, the undersigned Notary Public, do hereby affirm that Matthew R. Stroud I. personally appeared before me on the 16 day September, and signed the above Affidavit as his free and voluntary act and deed.

Notary Public

AMANDA M. MURRAY
Notary Public
State of Washington
My Commission Expires
November 19, 2016

 **Kris Kain <kriskain@gmail.com>**

## Matthew

**Matthew Stroud <doc@swis.us>**                                    Fri, Aug 23, 2013 at 9:25 AM
To: Kris Kain <kriskain@gmail.com>

Hi Kris,

I do not have anything from Mike Powers but I am happy to tell you what I saw and heard myself.

I was at Matt's trial and they took a recess, Adcock walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I fallowed as I walked into the court room I saw Adcock walking over to Matt's attorney Adcock then told Matt's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do.

In the hall was also Renee Woerner's Mother and Dad who also heard everything.

Matthew Stroud.

I was at Matt's trial and they took a recess, Adcock walked out of the court room just before I did. when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner. Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I followed as I walked into the court room I saw Adcock walking over to Matt's attorney Adcock then told Matt's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do.

In the hall was also Renee Woerner's Mother and Dad who also heard everything.

Matthew Stroud.

# EXHIBIT 5

I Matthew R. Ruth, Swear under the penalties of Perjury the following is true and correct to the best of my Knowledge.

1.) Each Part of the Reply where reference is made to My personal observations, actions, and etc. is part of this affidavit, I swear it is true.

2.) The Judge called the daily recess, and the Jury left the Court room. The Prosecutor John Adcock left to go talk to his Next Witness who was Material Eye-Witness Renee M. Woerner, one of the Four who were present in my home when the Shooting occured.

3.) 20 minutes later Mr. Adcock storms in the Courtroom, Matthew R. Stroud I trailing behind. Mr. Adcock announced very loudly to the entire Courtroom that he would not be calling Renee M. Woerner because she intended to Perjure herself. The Court reporter was not present to make this part of the record. My attorney Mr. Stephens approached Mr. Adcock by the Door out of my hearing. They began talking, and Mathew R. Stroud I, jumped into the conversation. Mr. Adcock left from them, and went to the Judge. Mr. Stephens and Mr. Stroud spoke for awhile, and then Mr. Stephens went out into the hallway.

4.) When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the Judges Bench. The Judge after hearing Mr. Stephens say something – which the Public, nor I could hear – Called Mr. Adcock over to the Bench, This was a Side Bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min.

5.) After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand, and personally interview her, and that I wanted to be present during the interview. He promised he would call her to testify, if she was

Page 1 of 4 – Matthew R. Ruth – Affidavit

not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent Cross-examination, and due to the threats she would break down and begin lying. I told Mr. Stephens that she is the only witness who corroborates my defense that was present, she is critical. I told him to call Gary Way, Donnie Poole, Bill Storie, Court Lamb, etc. He called nobody, presented no evidence, and the only witnesses who was exculpatory for me that was present at trial is Ms. Woerner. He promised he would call her to testify.

6.) The day the State rested its case, Ms. Woerners parents, and my Dad were present. Mr. Stephens told me Woerner was not appointed an attorney, and was too, scared to testify. I asked what happened to her original attorney Bill Joice? Apparently he had shot another attorney and was in jail. When I took the stand the Prosecutor and Judge teamed up on me, and attacked me, yelling at me, and threatening me, I asked them to stop, and made record that Mr. Adcock Threatened Ms. Woerner, Coached her, and that is why she would not testify. The Judge threatened to put me in restraints. I had no contact with anybody during trial because in a secret hearing without my attorney present, Mr. Adcock had me put into isolation, I was there for three months before trial, and returned with absolutely no contact with anyone every night at trial. I even wrote letters to the Judges office and ACLU asking why I was in Isolation with no hearing? The Sensory deprivation really messed me up.

7.) Ms. Woerner's original statement corroborated my defense, she said they were high on drugs during the shooting, accused me of stealing drugs, invaded our home, threatened us, there were lots of them, they would not leave, I kept screaming for them to leave, and they said they would do what ever it takes to search my home

Page 2 of 4 - Matthew R. Ruth - Affidavit

for the stolen drugs. She corroborated them too, on where they were in the trailer. The bad stuff she said about me were domestic violence allegations, that she told the Western State Hospital people were not true, and she said because she was mad at me, and scared she would be charged as an accomplice. That is in my western state evaluation. The Domestic violence allegations were ruled not admissible during Motion In-Limine, the Prosecutor agreed. In my Rap 10.10 Issue one, I challenged the Prosecutor breaking this order by admitting the health certificate evidence that show Ms. Woerner had been assaulted. This proves he was trying to get her to bring in the Domestic violence stuff, and she wouldn't lie.

8.) Mr. Stephens never told me he wasn't going to call her after the In-Chambers incident. He never showed me what corroborated the Alleged victim, or was easily impeachable by her original statement, he could not because he never interviewed her about her statement, or intended testimony. In fact after trial I spoke to her on the phone, after released from Isolation, and she told me before trial, Adcock had tryed to get her to remove the parts of her statement that corroborated my defense, she would not, and he threatened her. She called my attorney, and he said it didn't matter because "Matt is F_cked anyways." We three way called him, I confronted him, he agreed that he said that to her, and then made really bad comments about her. She told him the call was recorded. That is what caused the Declaration and motion to leave.

9.) The Judge and Mr. Adcock were mean to me, and really biased, my presence was reduced to nothing, the trial proceeding as if I was not even there. The record at trial and sentencing proves that the Judge and Mr. Adcock were biased against me.

10.) I tried to file a motion for new trial, but the court would not let me file it, I included it and the affidavit in support in my brief as exhibit 6, it was notarized at Shelton because the County

Page 3 of 4 - Matthew R. Ruth - Affidavit

Jail would not let me get it notarized. It is all true, and I want to adopt all of it in this Affidavit.

I swear all of this is true and correct to the best of my knowledge, under the penalties of perjury.

Signed in Aberdeen, Washington on This 10th Day of September, 2013.

x _____

Matthew R. Ruth


I, _____Barbara St Louis_____, am a Notary Public in and for the State of Washington, County of _Grays Harbor_, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes describes therein.


Signed and dated before me this 10th day of September, 2013.

/S/ _____

_____ Barbara St Louis

NOTARY PUBLIC in and for the State of Washington, County of Grays Harbor.

My Commission Expires: 6-4-16



Page 4 of 4 - Matthew R. Ruth - Affidavit

I Matthew R. Ruth swear the following to
Be 100% True, under the Penalties of
Perjury,

1.) I Asked Mark O. Mestel to raise Ineffect.
Assistance of Direct Appeal counsel for failli
to raise Both Publictrial right issues, the
right of counsel, and rights to appear &
Defend issues. I also asked that the "castle
instruction" & improper argument fashioned from
the Prosecutor's use of the castle instruction
language; with telling the Jury in closing their
main function is to determine the truth;
issues be raised under ineffective assistance
of appellate counsel. I also asked that he
cite to Division I, Johnson & Venegas.

2.) I typed up a memorandum to Mr. Mestel, &
Attained David B. Zuckerman's structural error
argument in Morris, to reinforce my fears
about structural error being applied to
collateral attack. My Fiancee Kris A. Kain
sent this communication out through E-mail,
and it is confirmed Mark received & read the
Memorandum. I was also charged for his time,
So the Billing also proves He read this from
Attachment 1).

3.) I have received a message from MR. Mestel saying he will be withdrawing from my case. I have been reduced to pro se status. How can prejudice be proved on collateral attack when the WISC court said it is impossible?

4.) I cannot get this affidavit notarized in time to put in the mail so I can meet my deadline with this court.

5.) I asked that the interviews from P.I. Michael Powers be included in ref, with an interview from myself. I wanted the jury interviewed, too, because they told Matthew R. Stroud I, they would have acquited me, they believed me, but I didn't prove my innocence, they said only one piece of corroborating evidence was needed. This proves the presumption was switched to "guilt" by the "castle instruction" MR. Alcocks improper arguments fashioned from

inceptinstr INSTRUCTION, & trivializing my
constitutional Right to be Presumed
innocent, with a Broken & malfunctional
suit of ARMOR. This also Proves that/
MR. Adcock's efforts to threaten, and Intimid
every piece of favorable evidence into
not being Presented to the trier of fact; (and
the effect the threats & intimidation had
on Defense counsel who helped MR. Adcock
By Presenting not one Piece of evidence,
and not one witness)(but MR. Ruth — me —
the accused); Were effective because all
evidence favorable to the Defense were
secret & kept in the shadows.
        I asked that the Jury Be interviewed,
So affidavits could be Provided in this PrP
to Prove the castle instruction & Prosecutors
Arguments switch the Burden. Matthew R.
Stroud I & Mark Stephens Heard this,
especially from the Jury foreman.

6.) I asked that MARK Stephens be interviewed, and asked, "why did you cover up the threats made by the prosecuter to Ms. Woerner until you filed a Motion to withdraw?" "Did you tell Mr Ruth before you suprised called him to the stand that Ms. Woerner was in the hallway, and wouldnt testify because she was scared of Mr. Adcocks threats; and you were scared of what she might do under Mr. Adcocks aggressive cross-examination because of her fear of the threats?" And why he never intervw Ms. Woerner, or any witness, why not put Gary may & Kevin Muscatel on the stand?

7.) I have been scared of the structural error bar on collat. review even before Wise & Morris. I asked my attorney to include some argument of mine into our structural error issue
A) How can a Prf litigant prove prejudice when our state supreme court agreed with the U.S. Supreme court that prejudice for public trial right violations are unquantifi impossible to prove, this creates a WRONG without a remedy.

B.) In this situation the error is not properly recognized without collateral evidence, not reviewable on direct, so why would a structural error bar apply to public trial violations?

C.) J. Dolliver in St. Pierre adopted the Teague analysis to keep in ste. with the U.S. supreme courts efforts to fix Linkletter & the linequal application of Retroactivity. In the interest of comity & finality the Teague courts believed its rule fairly determined when a rule applie to case retroactively. J. Dolliver went a step further & created an unknown higher standard structural error bar; well Schriro fixed teague & sla— has become Linkletter, and Danforth puts all into Proper Error ... just adopt the schriro analysis for res... the structural error bar...

8.) I am sorry this is not typed & notorized. Litigating in prison is very hard. It's not just because I have no schooling in the law, or in anything (I barely received my G.E.D. at 33 in prison), there are no real resources provided to us in prison for learning the law much less, litigating a case. We just recieved a few days ago an update to our comput Frankee Reiss Kapn sends me w/ articles & of the time. Even more important is the we have some cases up to July 1st, 2013 now! My case law, but the mail room rejects them half Moran inmates that put no work into real legal the thousands of Studies & writing (with what we have anyways), and fill the court with frivolous garbage making every inmate look bad, we are stigmatized & not taken seriously. I pray that this court realizes that for the last ten (ten years) I have put my best & hard work into every appeal process, direct, Rap 10.10, petit for review, 7.8 on resentencing. I worked so hard on this Reply to the states supplemental response. Reiss, and I have been working very hard together for the last three years & pray for mercy & justice, a chance to start our lifes together. I want to be a lawyer like Cleadis Flyod. Thank you.

X _____  
Matthew R. Ruth 879492  
9-12-13    _____

X Jeremy Read  
9-13-13

ATTACHMENT
"1"

Memorandum sent to Mark D. Mested
Structural error concerns

Dear, Mr. Mestel

I just want to win, try to become a paralegal, get married to Kristina, and be done with prison. You know what your doing, your a winner. I respect what ever you say is our best course to win. The Court of Appeals is hard enough to win in even when we are 100 percent right. Whatever you think increases our chances of winning I am in favor of.

You know the law way better than I ever will, however, I would like to point out a few things I know you are already aware of, sorry.

Morris. No. 84929-3 Supreme Court (Nov 21, 2012):

"We need not address whether a Public trial right violation is also presumed prejudicial on collateral review because we resolve Morris's claim on ineffective assistance of appellate counsel grounds instead."

I have David Zuckerman's Morris briefing on why it is structural on collateral review, and I sent it to you already. We may want to add ineffective assistance of direct appeal counsel in the additional briefing. You did cite Orange in the original briefing.

Another interesting aspect of Morris, is that the Supreme Court really demonstrated that the Sadler/Rivera — factual/legal test has been rejected, and the right to Public Trial does not attach to Rights to be present. Morris waived his right to be present in Chambers, but the Court said he did not waive his Public trial rights, and reversed.

"A defendant must have knowledge of a right to waive it." This Morris quote higlights WISE, No. 82802-4 (Nov 21, 2012):

"Wise did not waive his right to public trial by not objecting, and prejudice is presumed.".

It is the Trial Judge's duty to notify the defendant of the Right to Public Trial by conducting a Bone-Club Analysis.

"The reason such structural error is rightly presumed prejudicial is that 'it is often difficult' to 'assess the effect of the error....' To allow such deprivation would erode our open, public system of justice and could ultimately result in unjust and SECRET TRIAL PROCEEDINGS..... Here, we Cannot know what... if the Judge had properly closed the Court under Bone-Club analysis, what Objections, consideration or alternatives might have resulted and yielded.... Because it is impossible to show whether the structural error of deprivation of the Public Trial Right is Prejudicial, we will not require WISE to show prejudice in his case. 'We will not ask defendants to do what the Supreme Court has said is impossible.'" WISE.

The Court can never asses the damage of not conducting a Bone-Club analysis before secreting away over the Woerner Alleged perjury incident. Who would have come forward? What would she have said on record? We know what she said in Blackman's response, Exhibit 21, page 3:

Page one

10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.
She indicated to me MR. ADCOCK had THREATENED to Charge her with PERJURY
<u>IF SHE TESTIFIED.</u>
She expressed concerns to me about potential consequences if she testifed.

Would it be wise of us to add her new statement, or portions of it?

<u>DEBRA STEPHENS CONCURRENCE IN SUBLETT</u>

Justice Stephens is adamant about being clear that the Sadler/Rivera test
is rejected.

Another important dimension is Footnote 1:

"Additionally, the Court of appeals stated that 'questions from the jury to the
trial court regarding the trial court's instructions are part of jury deliberations
and, as such, are not historically a Public Part of the Trial.... There is no
authority for this proposition, the cited cases address the secrecy of jury
deliberations and not the <u>QUESTIONS SUBMITTED</u> by the <u>JURY DURING DELIBERATIONS</u>."

Mark, she is correct the courts have conflated the many stages of the
processes involved in a jury inquiry during deliberations. A prime example is the
evolution of the Washington Appeals Courts use of <u>CALIGURI</u>, 99 Wash.2d 501 (Wash
5/5/83).

In Caliguri, the defense did participate in the formulation of the response
to the Jury inquiry, and lodged objections, shaping the manner in which the evidence
would be replayed for the Jury, all of which was at least mentioned on the record.
The issue was that Caliguri, was not present for the replaying of the evidence.
CALIGURI is the Same as SUBLETT, both Attorneys played a role in the formulation
of the response, lodge objections, all which was made part of the record. There
was no significant moment, as the ninth circuit has defined:

"Counsel is most acutely needed before a decision about how to respond to the jury
is made because it is substance of the response, or decision whether to respond
substantively or not, that is crucial... The MISSED OPPORTUNITY to INFLUENCE the
Trial Courts response to a Jury question. That is the SIGNIFICANT MOMENT."
<u>Musladin v. Lamarque</u>, 555 F.3d 830 (9th Cir. 2/12/09)

The Courts in Caliguri said it is presumed prejudicial when a Judge
communicates with the jury, absent a third party. Caliguri address only the right
to be present at the replaying of the evidence after defense participated, not
the public trial right violation when the defense was not even notified.
Page Two

I see the jury inquiry stages like this:.

Stage ONE, The inquiry from the Jury initiates the Right to Public Trial, Right to representation, and Fair Trial;

Stage TWO, Notifying all parties of the Juries inquiry; (Must be part of record like in JASPER).

Stage THREE, Requires the defense to participate in the formulation of the response, lodge objection, and make it part of the record; (Public Trial; Right to Representation; Fair Trial);

Stage FOUR, submit response to the Jury; and either re-instruct, or replay evidence, etc. (All cases concern right to be present at this stage only).

The Ninth Circuit, in Musladin, pointed out that any answer from the Court to the Jury during deliberations about the Instructions contains information from the defense because the defense participated in the formulation of the instructions. The Musladin Court said the defense should still be allowed to participate in the shape of the answer even when involving instructions.

In Our Case, Mark, the answer was not about Jury instructions, and contained absolutely no information from the defense. Defense Counsel is most acutely needed before the decision to respond to the jury is made, even if the answer is a negative answer. It is the missed opportunity to influence the response, and have that participation made part of the record, that creates the significant moment; simultaneously violating my rights to public trial and my rights to representation.

## SUBLETT LEAD OPINION

In Sublett, the Supreme Court claims that not one case could be found that holds "these proceedings... violate the defendants constitutional rights, and we can not find one either." Musladin, 555 F.3d 830, is that case.

The Ninth Circuit, in Musladin, described Jury deliberation as a very important stage of trial. A very fragile portion of Trial where anything the Judge says can influence the verdict, and right to Fair Trial.

Musladin conflicts with how the Sublett Court diminishes the significance of Deliberation: "No witnesses are involved at this stage, no testimony is involved, and no risk of perjury exist." Diminishing the significance of deliberations Contradicts their own (Sublett Court) analysis of Press II in adopting the Experience and Logic test:

Page Three

"In Press II, the underlying case concerned preliminary hearings in California, which are held before trial.... whether the logic prong dictated openness during such proceedings.... it remarked that because there WAS NO jury PRESENT to ACT as a SAFEGUARD, public access was even more significant."

The jury is not present during deliberations either, and Musladin holds that this portion of trial is very fragile, requiring special protections. Obviously our role the written record public access safeguard was not enough to ensure the Trial Judge performed his function and upheld his responsibilities to the defense because he did not notify the defense, and robbed the defense of the ability to participate in the formulation of the response, and lodge any objections. This constitutes a closure, and no Bone-Club Analysis was performed. Simultaneously, this structural error of the trial court violated rights to representation, and Fair Trial.

### JURY INQUIRY EXPERIENCE AND LOGIC TEST

The Experience Prong, is satisfied, Historically the defense is notified of the Jury inquiry, participates in formulating the response to the Jury, lodges objection, and this is all at the very least mentioned in the record. Justice Stephens, the Ninth Circuit, and CrR 6.15(f) support that.

The Logic Prong, is satisfied, while the Jury is in deliberation Public Access is the only safeguard to ensure the Judge upholds his duties to the defense, and performs that Function in Court. The Sublett Court said, "The appearance of fairness is satisfied by having the question, answer, and any objection placed on record.... The requirement that the answer be in writing serves to remind the Prosecutor and Judge of their responsibilities because the writing will become part of the Public record and subject to Public scrutiny and appellate review." Notifying the defense, and mention of the participation of influencing the answer, should be mentioned in the record as well, it is the only Safeguard to ensure this does not happen in the future, and to uphold the defendant's constitutional rights.

In JASPER, the answer to the Jury specifically stated that all parties were notified and given a chance to participate. In Sublett, it was mentioned in the record that his attorney was in-chambers with the judge participating in the response to the jury.

The Sublett Court says it is not required that the discussion or resolution of the jury inquiry be done in open court, with a transcript being made. However, it is my position that to be consistent with Public trial protections the notification of the inquiry to all parties, participation in the answer, and any objections, needs to be made part of the record for Public and appellate review.
Page Four

The Jury inquiry in our Case, Mark, was not about Jury instructions, and the answer from the Court, absent the defenses participation, contained NO information from the defense. Mauladin.

Justice Antonin Scalia said: "Operating upon the spinal column of American democracy. Some structural errors, like the complete denial of counsel or the denial of public trial, are visible at first glance." NEEDER V, U.S., 527 U.S. 1 (1999) (J.Scalia Dissent). The Superior Court's violation of both of these Doctrines in our case, Mark, slams so hard into the Body of the Bill of rights and the Constitution, that the impact snaps the Spinal column of American Democracy, crumbling our Justice system. A Stand by the Courts Must be made now, so this does not happen in the future.

### WOERNER SECRET PERJURY PROCEEDING

"The Right to Public Trial serves to ensure a Fair Trial, to remind the prosecutor and judge of their responsibilities to the accused and the importance of their functions, to ENCOURAGE WITNESSES TO COME FORWARD, AND TO DISCOURAGE PERJURY." Sublett.

Ms. Woerner is a Material Eye witness, and I always maintained that her "testimony was critical, that he (Mr. Ruth) was very critical of his attorney for not calling her." Sentencing Pg 4. In the secret, in-chamber proceedings, the Judge said Woerner would be appointed Counsel to advise her about her fears of the Prosecutions threats. VRP 179-181. Mr. Stephens did not know if he could call her until she spoke to her attorney, but she was never appointed an attorney. At sentencing, Chad Dold asked for a continuance to "present a motion for a new trial based either on prosecutorial misconduct, ineffective assistance of counsel, or denial of justice, any one of the three, depending on what Ms. Woerner tells me." Sentencing Pg 4-5. "Mr. Ruth never agreed to Mr. Stephens' strategy in that regard and was quite upset... it is not a decision he would ever agree with, and he disagrees with any assessment of tactical or strategic advantage." pg 6.

Up until the State threatened to charge Woerner with perjury if she testified, (States Response, Exhibit 21, Page 3, Section 10), Woerner was testifying. This is a significant moment, which had an unquantifiable amount of subsequent prejudice reverberating throughout, and tainting the entire trial. (the Jury inquired about Ms. Woerner During deliberations).

The State elicited testimony from EDEN and CUSTER about Ms. Woerner screaming for me to stop, and being scared of me, and other damaging stuff. The Judge would not let the defense rebut this testimony. Yet, Woerner never testified, and the Jury was clearly influenced by this because they inquired about her statements during deliberations. With Such an important Eye witness's testimony at stake, it seems that the Public Trial and Fair Trial Doctrine demands that this issue be fleshed out in Public.

Page Five

Before the secret in-chamber Closure, the Bone-Club Analysis Must be done. After all, the Public Trial Doctrine is designed to discourage perjury and encourage witnesses to come forward. As discussed in WISE, it is impossible to know what would have happened, what witnesses would have come forward, what Woerner would have said, if there was even any perjury involved, if the State threatened a Material eye-witness, without the Bone-Club Analysis.

### Experience and logic Prongs

The Experience Prong, historically the courts do resolve claims of a material eye witness being accused of perjury before testifying, and being threatened by the State on the record in open court.

(Hitorically, Wash.Const. Art 1 section 22 provided: "The Accused shall have the right to appear and defend in person, and by counsel" State v. Irby, 170 Wn.2d 874, FN 5 (2011).

"We believe that when the framers of our State Constitution drafted Art I section 22 and presented it to the people of the territory of Washington for adoption they were aware of the linquistic differences between that section and the 6th Amendment and assumed that the State provided rights that were not provided by the USC.... For that reason, we believe that the COA erred in minimizing the significant textual differences between Art I section 22 and the sixth amendment, and in concluding that the 1st and 2cd Gunwall factors did not weigh in favor of an independent analysis." State v. Martin, 171 Wn.2d 521 (No. 83709-1; 2011).

The Logic Prong, dictates that such a pivotal and significant moment of Trial be conducted in open court. The Right to Public trial ensures that the State does not secret these issues away in the shadows of the Judge's Chambers. The Core Values of the Public Trial Doctrine are so the Public can see that the accused is dealt with fairly, and the Prosecution and Judges uphold their responsibilities to the accused, to encourage witnesses to come forward, and discourage perjury, thereby maintaining a fair trial. This cannnot happen in secret. The Logic prong is satisfied, and the BoneClub analysis must be performed before closure.

The Trial Judge briefly addressing what was allegedly discussed in-chambers did not satisfy the Bone-club requirement.

Page Six

MATTHEW R. RUTH #879492
C.C.A./F.C.C.
PO BOX 6900
FLORENCE, AZ 85232

DATE:

DAVE H. WOLD
PUBLIC DISCLOSURE SPECIALIST
Robert J. Drewel Building, 7th Floor / M/S 504
3000 Rockefeller Avenue
Everrett, Wa 98201-4046

Re: Resubmission of Public Disclosure/Toxicology reports

Dear, Mr. Wold

Thank you for your very informative letter. I am now resubmitting my P.D.A. request, under Rcw 42.56.

Also I am providing the relevant legal authority, which allows you to disclose the results of the Toxicology reports for Jeremy Custer, and Dru Eden, whom I shot in my home Nov 5, 2003.

I really appreciate your help Mr. Wold, please don't take the following in a bad way, I don't mean it disrespectful. I am fighting for my life, and injustice to be corrected, by Justice. This legal work Stuff is really hard so bear with me please.

The toxicology reports are "materially exculpatory," and should have been disclosed by the Prosecutor under CrR 4.7(iv)(any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and scientific tests, experiments, or comparisons), before trial. Instead the Prosecutor Mr. Adcock, and Detective Willoth, purposely hid these reports because it proves my innocence.

Not only did Mr. Adcock hide these reports hoping I would never find out about them, he argued contrary to the results of these toxicology reports in trial.

Mr. Adcock failed to call the originally subpoenaed, on duty doctors, which cared for the alleged victims. These Doctors did the test, and would have testified about this at trial.

Mr. Adcock argued specifically that I was paranoid, agitated, and freaked out on drugs, shooting the alleged victims for no reason. When Mr. Adcock knew the whole time they were the ones on drugs. In trial I testified that the alleged victims were all freaked out on drugs, and this is the reason I was so scared over their threats because they were not in

their right minds. This gives apprehension of fear, and my actions become reasonable under the self-defense Doctrine.

The failure to disclose requires a Dismissal of my charges. I can understand why the Prosecutions office does not want you to disclose these documents. Especially in light of the jury pool at the end of my trial. Their comments were "We believed him, we didn't want to find him guilty, we needed just one piece of evidence to find him innocent."

I specifically need these documents for My Personal Restraint Petition; I am raising a Government misconduct issue for failure to disclose this "Materially Exculpatory" evidence, and asking that my charges be dismissed with prejudice. I hope that Mr. Adcock does the right thing, instead of trying to hide this information from me. He really dislikes me, and there are many other instances of misconduct that I can prove that will be going into my Personal Restraint Petition.

I am not requesting any of the appeal information from this Public Disclosure.

I am requesting:

1.) The results of the Toxicology reports, not the identity of the Patients. *Prison Legal News, Inc. v. Department of Corrections*, 154 Wn.2d 628, 115 P.3d 316, 326-328 (Wash. 2005).
2.) Any and all documents supporting probable cause charges.
3.) Any documents related to the charges brought upon the prosecution as it relates to my case.
4.) Prosecuting attorneys litigating files in my case pursuant to *Linstrom v. Ladenburg*, 136 Wn.2d 595, 963 P.2d 869 (1998).
5.) Lab results and reports used to support my conviction and charging me with my crime, from the alleged victims.
6.) All lab reports and results from the alleged victims.
7.) Redact all identifying information, and personal information if needed.

Division one has applied the following to similar Disclosure issue's:

"The central purpose of the act is "nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions." Our courts have repeatedly held that the act is "a strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wash.2d 123, 127, 580 P.2d 246 (1978); *Amren v. City of Kalama*, 131 Wash.2d 25, 31, 929 P.2d 389 (1997); *PAWS II*, 125 Wash.2d at 251, 884 P.2d 592. Accordingly, the act's disclosure provisions must be liberally construed, and its exemptions narrowly construed. *King County v. Sheehan*, 114 Wn.App. 325, 57 P.3d 307, (Wash.App. Div. 1 2002).

*Legal News, Inc. v. Department of Corrections* 154 Wash.2d 628, 115 P.3d 316 (2005).
(Emphasis added)

In interpreting RCW 42.17.255, the Washington Supreme Court has stated that "the right
of privacy applies 'only to the intimate details of one's personal and private life,' " in
contrast to actions taking place in public. *Dawson v. Daly*, 120 Wash.2d 782, 796, 845
P.2d 995 (1993); *Spokane Police Guild v. Liquor Control Bd.*, 112 Wash.2d 30, 38, 769
P.2d 283 (1989) The public disclosure act contains a specific exemption for records that
"are relevant to a controversy to which an agency is a party but which records would not
*be available to another party under the rules of pretrial discovery for causes pending in
the superior courts*." A "controversy" is not restricted to ongoing formal litigation. It
can begin before the formal commencement of a lawsuit and continue afterward.
*Dawson*, 120 Wash.2d at 790, 845 P.2d 995, *Relevant records are exempt from
disclosure under the public disclosure act if they would not be available to an adverse
party under the superior court discovery rules*. RCW 42.17.310(1)(j); *Limstrom*, 136
Wash.2d at 605, 963 P.2d 869. *Soter v. Cowles Pub. Co.*, 130 P.3d 840, 844, 131
Wn.App. 882, (Wash.App. Div. 3 2006). The state agency bears the burden of proving
that a specific exemption applies. RCW 42.17.340(1); *Hoppe*, 90 Wash.2d at 130, 580
P.2d 246. *Prison Legal News, Inc. v. Department of Corrections*, 115 P.3d 316, 320,
154 Wn.2d 628, (Wash. 2005).

In the interest of Justice Please disclose this information to me. I have this issue, and
another that are grounds for a dismissal with prejudice. The law doesn't care if I am
innocent, only if it can prove my guilt. The appellant Courts don't care if I am innocent,
only if I can prove a Constitutional error. This evidence allows me to prove I am not
guilty, it proves my innocence. Prosecutor John Adcock used foul means to prove my
guilt, to the jury. My case has been granted for review in the Supreme Court on my
FASE issue. I am preparing for my Personal Restraint Petition, and will be using all the
letters you have sent me in the past, with a copy of this letter as evidence on this issue. I
am trying to give your office a chance to make this right with me. It is a shame that a
U.S. citizen can receive life in prison for his first time offense when he is exercising
Constitutional rights. I can't believe that the Prosecution hid this evidence, and now it is
so hard for me to obtain justice which is synonymous with my procurement of the
Toxicology results.

The PDF format on CD'S sounds really cool please let me know how much of the
requested documents can be put on the CD, and how much will need to be copied at 0.25
cents a page.

Mr. Wold Can I use the PDF format files for my Personal Restraint Petition, exhibit's?
Will the Court of Appeals accept them?

I really appreciate all your help, and I am sorry if I sounded Disrespectful in any way. It
is not my intent to be disrespectful. This is really important to me, sir. My life is on the
line, and I have been working really hard to receive justice in my case. Please forgive
any statements I made that sound bad, I don't mean it that way.

God bless you, or whatever entity you believe in,

Sincerely Submitted,

This _18_ Day of _Sept._, 2008

_Matthew R. Ruth signature_

Matthew R. Ruth

9/18/08

"OFFICIAL SEAL"
Janelle Gonzales
Notary Public-Arizona
Pinal County
My Commission Expires 3/14/2011