# EXHIBIT 6

2/04/05   Affidavit & Motion for
New trial

The Pleading mr. Rutz Attempted to file
at Sentencing.

This was also taken & I have
No other full copy. Only a few Pages.

FILED

2005 MAR 18 PM 12: 12

COUNTY CLERK
SNOHOMISH CO. WASH.

000028516

IN THE SUPERIOR COURT STATE OF WASHINGTON
IN AND FOR SNOHOMISH COUNTY

STATE OF WASHINGTON,              )
                                  )        No. 03-1-02451-6
            Plaintiff,            )
                                  )
    vs.                           )        Affidavit in Support of Motion
                                  )        for New Trial or Relief from
MATTHEW R. RUTH,                  )        Judgment and Sentence
                                  )
            Defendant.            )
                                  )
_____)

STATE OF WASHINGTON          )
                             ) Affidavit by Declaration:
COUNTY OF SNOHOMISH          )

I, Matthew R. Ruth, am the Defendant in the above entitled cause and make this declaration in
support of my motion to modify sentence. I hereby declare that I am over 21 years of age and
competent to testify herein as the following facts are known by me to be true firsthand unless
otherwise stated.

1.)     I hereby claim that my attorney at trial was Mark Stephens and that he failed to provide me
with effective assistance of counsel based on the following.

2.)     There were notes from a key witness that could have been used to impeach, or lock in,
testimony of a key state's witness that was not provided until October 20, 2004 and my attorney
failed to object to the late discovery since the state had the evidence for 8 months prior to that date
and his failure to act allowed the state's witness to lie and not be impeached. Had counsel objected
to the late discovery, it is very likely that the court would have allowed some sanction to include

Motion for New Trial and Relief from Judgment and Sentence-Page 1 of 4
State v. Mathew R. Ruth, 03-1-02451-6                    Mathew Ruth, pro se
                                                         1918 Wall Street
                                                         Everett, Washington 98201



1  the exclusion of the witnesses' testimony which would have likely been detrimental to the state's
2  case and/or changed the outcome of the trial.

3
4  3.)   My attorney refused to go over the evidence with me and refused to provide copies of the
5  discovery to me claiming it was too expensive.

6
7  4.)   My attorney did not interview any of the defense witnesses which were relevant to
8  impeaching the state's witnesses and establishing his self defense or his credibility all of which was
9  crucial at trial. The defendant provided a list of witness questions and the attorney failed to ask any
10  of them. The defendant was prejudiced by the failure to conduct any defense due to the fact that;

11
12      a.    Witnesses would testify that Jeremy Custer had fled the scene in his black Dodge
13  Durango with two plastic bags from his house;

14
15      b.    And that Dru Eden had hijacked Sarah Bryant in her car then told her he was just
16  shot over drugs and that he was going to kill the defendant;

17
18      c.    Witnesses would testify that Jeremy Custer proceeded to the house of Court Lamb, a
19  witness in the Burkhiemer murder, and there at her house he refused to go to the hospital and
20  wouldn't tell what happened.

21
22      d.    Jeremy Custer testified that Court Lamb's Mother was a nurse and that testimony
23  could have easily been proven to be false.

24
25      e.    Court Lamb would testify that Jeremy Custer returned to the defendant's residence
26  with other armed persons after they had stashed the drugs; she would also testify that the officers
27  never searched these people.

28
29      f.    Court Lamb would testify that Jeremy Custer freaked out and told the officers "I
30  didn't break in, I won't talk to any body without a lawyer, I need a lawyer" and then he tried to run
31  away but he was caught and handcuffed. Jeremy Custer and Dru Eden did not decide to give any
32  statements until two weeks after the incident and then they changed their stories several times to
33  include at trial.

34
35  5.)   It is believed that the attorney should have made an offer of proof, off the record, at least, to
36  show that the state had threatened the defense's key witness with adversities such as charges of
37  perjury and threatening that she would not see her children for 10-15 years. The Prosecution was
38  using these tactics continuously to try to get the witness to change her story to this story or that
39  story by telling her, "[this is how it happened] remember, hint, hint!" The witness called the
40  defense attorney and told him, he said, "it doesn't matter" that the state is tampering with the
41  witnesses, "because he is fucked anyways."

42
43  6.)   The state was allowed to admit evidence that was not relevant, [falsely claiming blood of a
44  victim], and was prejudicial in that a blanket that had aged menstrual fluid was admitted as

Motion for New Trial and Relief from Judgment and Sentence-Page 2 of 4
State v. Mathew R. Ruth, 03-1-02451-6                    Mathew Ruth, pro se
                                                        1918 Wall Street
                                                        Everett, Washington 98201

1   evidence that the alleged victim was further in the trailer, [where a shooting occurred], and which
2   implied that the defendant was a liar. Although the blanket was available, counsel never had the
3   blood tested for DNA to prove it did not belong to either of the alleged victims; therefore his client
4   was not a liar and was innocent.
5
6   7.)   Counsel yelled at his client in front of the jury, saying he wasn't going to listen to him
7   anymore, when it was his attorney's failure to prepare that caused the confusion in that a witness
8   was angry at his client and testified different than expected to exact a vendetta. Had counsel
9   interviewed the witness, he would have known that she was changing her story and why. The
10   witness has since recanted after discovering the reason for her vendetta was unfounded. The
11   witness thought that the defendant had told on her for the drug activity at her farm which almost
12   caused her to lose it. That fact could have been easily resolved except for the attorney's refusal to
13   act on his client's behalf to interview and question his intended witnesses. It was one of the alleged
14   victims that used to live on her property that caused her to almost lose her farm because he was
15   paying her with drug profits and that information was discovered by the current landowner.
16
17   8.)   A key states witness was a jailhouse snitch named Jeremy Sheridan. This witness had a
18   record a mile long and a history of telling untruths. He was literally paid by receiving more
19   favorable treatment on his charges by talking to the defendant and eliciting certain facts to use
20   against him. The defense attorney failed to attempt to get this testimony suppressed as unlawfully
21   obtained and later the attorney was unable to impeach the evidence given as being inconsistent
22   with previous statements due to the failure to prepare for trial properly. The period of time in which
23   that statement was alleged to have been elicited was during a period of time pending a competency
24   evaluation by Western State Hospital, and after the defendant had been ruled incompetent by the
25   court.
26
27   9.)   Defense counsel attempted to set up a plea hearing to get the defendant to plea guilty in
28   hopes of avoiding the inevitable trial. His intent was to refuse to conduct any defense and force his
29   client to plea guilty. This is a common scheme used in Snohomish County. Mark Stephens was a
30   long time member of the Snohomish County Public Defender's office where he honed these skills.
31   It is very difficult to just ignore someone's pleas to assist in conducting a defense, but after some
32   practice it is like raising children, you get used to the whining. Mark Stephens literally did not
33   conduct any defense for the accused and was so bold as to just set up a hearing to plea guilty for his
34   client without ever discussing it with his client.
35
36   10.)   Current counsel, Charles Dold, that was appointed to represent me after trial, has openly
37   said that I deserve to go to prison and that I shot two people. He claims my girlfriend is wiped out
38   on drugs and cannot help me, however, he has not talked to this person and is only making up lies
39   to avoid helping me. It is believed he has been influenced by my previous counsel, Mark Stephens,
40   whom he used to word with in the same office and whom he maintains constant contact. It is part
41   of the record that Mark Stephens made comments about my witness and I believe that he has
42   spoiled my newly appointed counsel with the same disease.
43

Motion for New Trial and Relief from Judgment and Sentence-Page 3 of 4
State v. Mathew R. Ruth, 03-1-02451-6                                  Mathew Ruth, pro se
                                                                       1918 Wall Street
                                                                       Everett, Washington 98201



1  11.)   I feel that I need to new counsel, besides Charles Dold, to assist me in presenting my
2  ineffective assistance of counsel claims. I hereby pray that some relief is granted.
3
4
5  I hereby declare that I have read the aforesaid statements and verily believe the same to be true
6  under the penalties of perjury under the laws of the State of Washington pursuant to RCW 9A.72 et
7  seq.
8
9  Signed in _S:i.FLT:N_____, Washington on this _19_ day of _March_____, 2005.
10
11
12                              /S/ _Matthew R. Ruth_____
13                                  Matthew R. Ruth, pro se # 310079
14                                  Address: 1918 Wall Street
15                                  Everett, Washington 98201
16
17
18
19  I, _Burton F. Averill_____, am a Notary Public in and for the State of Washington,
20  County of ___Mason_____, and hereby declare that I know or have sufficient
21  information to believe that the person appearing before me is the person purported to be and it
22  appears that he has signed this document under his own free will for all intents and purposes
23  described therein.
24
25  Signed and dated before me this _15th_ day of _March_____, 2004.5
26
27
28
29                              /S/ _Matthew R. F. Hll_____
30                                  _Sllda F. Averll_
31                                  NOTARY PUBLIC in and for the State of
32                                  Washington, County of _Mason_____.
33                                  My Commission Expires _02/18/07_.
34
35
36

Motion for New Trial and Relief from Judgment and Sentence-Page 4 of 4
State v. Mathew R. Ruth, 03-1-02451-6                    Mathew Ruth, pro se
                                                        1918 Wall Street
                                                        Everett, Washington 98201



000028515

FILED

2005 MAR 18  PM 12: 12

COUNTY CLERK
SNOHOMISH CO. WASH.

## The Superior Court of the State of Washington
### in and for Snohomish County

STATE OF WASHINGTON,          )
                              )   No. 03-1-02451-6
    Plaintiff,          )
                              )
    vs.                       )   MOTION FOR NEW TRIAL
                              )   OR ARREST OF JUDGMENT
MATTHEW R. RUTH          ,    )
                              )
    Defendant.          )

1.    IDENTITY OF MOVING PARTY

Matthew R. Ruth          , is the Defendant in the above numbered cause. He
seeks the relief designated in section 2.

2.    STATEMENT OF RELIEF SOUGHT

Defendant, pro se, seeks an extension of time to file this action to the date of receipt
based upon the fact he is incarcerated and not trained in the law and has prepared and
filed this actions in as timely of manner as possible; he seeks appointment of new counsel
to advance the legal and factual issues that remain unanswered or improperly presented
and ultimately a new trial and/or arrest of judgment and dismissal of the charges. This
motion is pursuant to CrR 7.5 and 7.4 and based partially upon CrR 8.3(b).

3.    FACTS RELEVENT TO MOTION

Defendant hereby asserts that he is entitled to the relief requested based upon the
following facts relevant to this motion.
Judge David F. Hulbert unnecessarily stated that he would
put me in restraints while I was testifying before the jury.

MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT-Page 1 of 13



My attorney failed to object or request a mistrial on those grounds. Further, my attorney failed to prepare any defense and appeared to join the prosecution and efforts to get me convicted. The failure to prepare and the resulting prejudice is too numerous to fit in this Motion form so I have a sworn statement attached that I would like to have considered by this reference to the document titled "Affidavit in Support of Motion for New Trial or Relief from Judgment and Sentence," annexed hereto.

My attorney allowed the prosecution to withhold discovery, extort witnesses, call me names and say I was delusional before the jury. He did not bring an issue properly about a juror seeing me in restraints. Failed to make an offer of proof for the record regarding defense witnesses proposed testimony. My attorney was given a list of witnesses and their expected testimony and he just refused to interview any of them. He refused to interview state's witnesses. He failed to try to get a bail reduction. My attorney complained that he was not getting

paid enough money to help and claimed he was acting "pro bono" when in fact he was appointed by the court and being paid. He did not attempt to obtain more money to conduct a defense. He allowed to have a jailhouse snitch provide for the main evidence and failed to try to impeach him with numerous convictions that qualified under evidence rule 609. He failed to attempt to impeach witnesses with their prior inconsistant statement despite his clients pleas during trial. The trial was reduced to a complete and total farce and am now appointed counsel refuses to do anything with these numerous issues but stands in the unit of the jail making a mockery out of his client by slandering his girl-friend loudly so everyone of 80 people including officer's can hear. It is his contention that the witness refuses to talk but the last attorney was caught doing the same thing and it was recorded. The court should appoint counsel from out of County.

The aforesaid facts are hereby declared known by me firsthand to be true under the penalties of perjury under the Laws of The State of Washington by my signature appearing at the end of this document.

4.    GROUNDS FOR RELIEF AND ARGUMENT

   A.    DEFENDANT SEEKS AN EXTENSION OF TIME TO FILE THIS
         MOTION.

I hereby request this court to grant leave for the filing of a late motion for a new trial and

arrest of judgment. The defendant makes these motions in good faith belief that he is

entitled to the relief requested and claims that he will be unduly prejudiced if this court

does not grant this motion. This motion is based upon the Superior Court Criminal Rule,

(CrR) 7.5(a)(8) and (b); U.S.C.A. Const.Amend. 6. State v. Bandura  85 Wash.App. 87,

931 P.2d 174, review denied > 132 Wash.2d 1004, 939 P.2d 215 (1997). I hereby seek an

extension of time to file because I am not trained in the law. ✗ Yes  or ___No (Check One)

   RULE 7.5 NEW TRIAL

         (a) Grounds for New Trial.   The court on motion of a defendant may grant a
   new trial for any one of the following causes when it affirmatively appears that a
   substantial right of the defendant was materially affected:
         (1) Receipt by the jury of any evidence, paper, document or book not allowed by
   the court;
         (2) Misconduct of the prosecution or jury;
         (3) Newly discovered evidence material for the defendant, which the defendant
   could not have discovered with reasonable diligence and produced at the trial;
         (4) Accident or surprise;
         (5) Irregularity in the proceedings of the court, jury or prosecution, or any order
   of court, or abuse of discretion, by which the defendant was prevented from having a fair
   trial;
         (6) Error of law occurring at the trial and objected to at the time by the
   defendant;
         (7) That the verdict or decision is contrary to law and the evidence;
         (8) That substantial justice has not been done.
         When the motion is based on matters outside the record, the facts shall be shown
   by affidavit.
         (b) Time for Motion; Contents of Motion.   A motion for new trial must be
   served and filed within 10 days after the verdict or decision. The court on application of
   the defendant or on its own motion may in its discretion extend the time.
         The motion for a new trial shall identify the specific reasons in fact and law as to
   each ground on which the motion is based.
         (c) Time for Affidavits.   When a motion for a new trial is based upon affidavits
   they shall be served with the motion.  The prosecution has 10 days after such service
   within which to serve opposing affidavits.   The court may extend the period for
   submitting affidavits to a time certain for good cause shown or upon stipulation.
         (d) Statement of Reasons.   In all cases where the court grants a motion for a
   new trial, it shall, in the order granting the motion, state whether the order is based upon

the record or upon facts and circumstances outside the record which cannot be made a part thereof. If the order is based upon the record, the court shall give definite reasons of law and facts for its order. If the order is based upon matters outside the record, the court shall state the facts and circumstances upon which it relied.

(e) Disposition of Motion.    The motion shall be disposed of before judgment and sentence or order deferring sentence.

### B.    DEFENDANT SEEKS APPOINTMENT OF NEW COUNSEL

The defendant asks this court to allow trial counsel to withdrawal and appoint new counsel to perfect these issues and make reasonable arguments. The defendant is not trained in the law and he brings this motion in good faith belief that he is entitled to the relief requested. The trial attorney would not likely advance the issues pertaining to ineffective assistance of counsel as well as new counsel who may be appointed by the court for this purpose. This court should exercise its inherent authority to substitute counsel in this matter due to the likely conflict and possibility of preconception on self evaluation by the trial attorney. I hereby seek appointment of new counsel. X Yes  or ___ No (Circle One).

### C.    THE DEFENDANT SHOULD BE ENTITLED TO A NEW TRIAL AND/OR ARREST OF JUDGMENT BASED UPON INEFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHTS TO DUE PROCESS UNDER THE PROVISIONS OF THE UNITED STATES CONSTITUTION AMENDMENTS FIVE, SIX AND FOURTEEN.

An indigent defendant in a criminal proceeding is entitled to the due process guaranty of fundamental fairness under the Fourteenth Amendment. Ake v. Oklahoma, 470 U.S. 68, 76, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); In re Brown, 143 Wn.2d 431, 21 P.3d 687 (2001). The Sixth Amendment affords a criminal defendant the right to effective assistance of counsel, free from conflicts of interest. Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); State v. Myers, 86 Wash.2d 419, 424, 545 P.2d 538 (1976). The appellate courts review a challenge to the effective assistance

of counsel de novo. Mannhalt v. Reed, 847 F.2d 576, 579 (9th Cir.), cert. denied, > 488

U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). An attorney's conflict of interest may

create reversible error in two situations without a showing of actual prejudice. In re

Richardson, 100 Wash.2d 669, 675 P.2d 209 (1983). First, "reversal is always necessary

where a defendant shows an actual conflict of interest adversely affecting his lawyer's

performance." Richardson, 100 Wash.2d at 677, 675 P.2d 209; see Cuyler v. Sullivan,

446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In addition, a trial court commits

reversible error if it "knows or reasonably should know of a particular conflict into which

it fails to inquire." Richardson, 100 Wash.2d at 677, 675 P.2d 209; see Wood, supra;

Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). These

general rules are applicable to any situation where a defendant alleges ineffectiveness of

counsel related to counsel's representation of conflicting interests. Richardson, 100

Wash.2d at 677, 675 P.2d 209; see State v. Hatfield, 51 Wash.App. 408, 410, 754 P.2d

136 (1988).

> [T]he rule in conflict cases is "not quite the per se rule of prejudice that
> exists for [other] Sixth Amendment claims." Strickland v. Washington,
> 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). Rather,
> "[p]rejudice is presumed only if the defendant demonstrates that the
> counsel 'actively represented conflicting interests' and that 'an actual
> conflict of interest adversely affected his lawyer's performance.' "
> Strickland, 466 U.S. at 692 [104 S.Ct. at 2067] (quoting Cuyler, 446 U.S.
> at 348, 350 [100 S.Ct. at 1718, 1719]); see also Richardson, 100 Wash.2d
> at 677 [675 P.2d 209]....

> Hatfield, 51 Wash.App. at 413, 754 P.2d 136.

An actual conflict of interest exists when a defense attorney owes duties to a party whose

interests are adverse to those of the defendant. State v. Byrd, 30 Wash.App. 794, 798, 638

P.2d 601 (1981). Rule of Professional Conduct (RPC) 1.7(b) prohibits an attorney from

representing a client if the attorney's duties to another materially limit that representation.[1] It is a well known fact that an attorney in Snohomish County is going to be operating under a potential conflict of interest. That conflict depends on whether or not the prosecutor or the court have any prejudices against the particular person or crime or set of crimes and sometimes it is just a matter of the swapping of cases. If the attorney is unwilling to assist his client in any way and allows numerous issues of misconduct by the prosecution and/or the court or both–before, during and after trial, it is most likely that the attorney's been influenced by the persons in those positions whom he holds a higher loyalty to, or even his own interests in advancing his career professionally. This is a common fact prevalent in any number of cases at any given time throughout the county and state due to the breakdown of the system and the lack of resources to maintain the high volume of cases required by an attorney. Sacrifices must be made and unfortunately it occurs all too often to a person's detriment who is not necessarily guilty of the crime he is charged. At times, the prosecution is allowed to pyramid cases and seek grossly exaggerated charges based upon personal biases. This is most often the case, Snohomish County punishes those who dare to go to trial. Typically, defense counsel is not going to conduct *any* pretrial preparation and is always just assuming his client knows the prosecutions tactics. When a person decides to go to trial he is also stuck with the fact

---

[1] RPC 1.7(b) provides:
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected;  and
(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure).  When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

defense counsel is completely strangled in his abilities to assist during trial and the client only receives the appearance of counsel who knows nothing of the case, witnesses or any defense strategy. Under Strickland, supra, a defendant must show (1) that counsel's representation "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant. The deprivation of the right to counsel is so inconsistent with the right to a fair trial that it can never be treated as harmless error. Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994) (citation omitted) (citing > Chapman v. California, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In certain cases prejudice is presumed. United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The Sixth Amendment right to counsel "means more than just the opportunity to be physically accompanied by a person privileged to practice law," and "contemplates open communication unencumbered by unnecessary impediments to the exchange of information and advice." Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994) (citations omitted).   "A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest. Such an attorney, like unwanted counsel, 'represents' the defendant only through a tenuous and unacceptable legal fiction." In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." Frazer, 18 F.3d at 782-83 (emphasis added) (citation omitted) (quoting United States v. Swanson, 943 F.2d 1070, 1075 (9th Cir.1991) (quoting Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir .1988))).

The defendant claims that based on the abovesaid facts, the court should find that the appointed counsel's representation fell so far below reasonable standards that the attorney effectively joined the prosecution and prejudice is presumed.

If the court does not agree with this notion, I set forth here the 2 parts required for the Strickland Test. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

1. Counsels Performance Was Deficient by failing to adequately prepare for trial and interview witnesses for both sides. My current counsel's performance is also deficient because he refuses to obtain the facts or try to schedule interview with my witnesses also. He refuses to advance these issues. It is clear that I have been denied effective assistance of counsel and continue to be denied effective assistance due to the fact my new attorney refuses to assert that his long time friend and colleague intentionally failed to conduct a defense. New counsel does not like me or want to help.

2. My trial would have turned out differently and I would not have been prejudiced had it not been for my attorney's deficiency as follows: Had my attorney actually tried to do his job or at least called my witness, Renee Woerner, and conducted interviews, I would have been completely acquitted of these charges

because the evidence all clearly shows that I am innocent and the state's story at trial is a rediculous fabrication that any reasonable trier of fact would clearly deny given any alternative. The truth is available and it must be presented in the interest of justice. With appointment of conflict free counsel who is allowed or willing to assist, there is every fact in my favor to get a new trial and acquittal.

D.    THE DEFENDANT ALLEGES PROSECUTORIAL MISCONDUCT.

Two things must be shown before a court can require dismissal of charges under CrR

8.3(b).  First, a defendant must show arbitrary action or governmental misconduct. >

State v. Blackwell, 120 Wash.2d 822, 831, 845 P.2d 1017 (1993) (citing State v. Lewis,

115 Wash.2d 294, 298, 797 P.2d 1141 (1990)).  Governmental misconduct, however,

"need not be of an evil or dishonest nature; simple mismanagement is sufficient."

Blackwell, 120 Wash.2d at 831, 845 P.2d 1017 (emphasis added). Absent a showing of

arbitrary action or governmental misconduct, a trial court cannot dismiss charges under

CrR 8.3(b):

We repeat and emphasize that CrR 8.3(b) "is designed to protect against arbitrary action

or governmental misconduct and not to grant courts the authority to substitute their

judgment for that of the prosecutor." State v. Cantrell, 111 Wash.2d 385, 390, 758 P.2d 1

(1988) (quoting State v. Starrish, 86 Wash.2d 200, 205, 544 P.2d 1 (1975)).

The second necessary element a defendant must show before a trial court can dismiss

charges under CrR 8.3(b) is prejudice affecting the defendant's right to a fair trial.  See

State v. Cannon, 130 Wash.2d 313, 328, 922 P.2d 1293 (1996).  Such prejudice includes

the right to a speedy trial and the "right to be represented by counsel who has had

sufficient opportunity to adequately prepare a material part of his defense...."  State v.

Price, 94 Wash.2d 810, 814, 620 P.2d 994 (1980).

The defendant alleges prosecutor misconduct as follows: The prosecutor
in this case literally went all out to
threaten, harass and intimidate my
witnesses and the state's witnesses.
The prosecutor was responsible for mis-
informing the jury on the laws after being
told by the court what the law was and that
the accused did not have a duty to leave.
That misled the jury and reversed the burden
of proof. Further, the prosecution made
comments that the accused is delusional
and that is not supported by the record
and all of the above was highly prejudicial
and resulted in an unfair trial. The prosecu-
tion also withheld evidence and discovery
from the defense. If not for the prosecutor's
misconduct alone, the result would have been the opposite!

    E.    THE CUMULATIVE EFFECT OF THE ERRORS DENIED THE
        DEFENDANT A FAIR TRIAL.

The defendant claims that the overall effect of the errors denied him a fair trial.

> "[T]he cumulative error doctrine warrants reversal in this case. The application of that
> doctrine is limited to instances when there have been several trial errors that standing
> alone may not be sufficient to justify reversal but when combined may deny a defendant

DECLARATION OF PROOF OF SERVICE

STATE OF WASHINGTON        )
                           ) AFFIDAVIT BY DECLARATION:
COUNTY OF SNOHOMISH        )

I, _Matthew P. Ruth_____, hereby depose and declare that I properly mailed a true and accurate copy of the "Note for Motion Calendar" and "MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT" to which this declaration is affixed directed to opposing counsel of record in the above numbered cause with First Class Postage arranged on this date under the pains and penalties of perjury under the laws of the State of Washington.

Signed in Everett, Washington this _17_ day of _March_____, 2004.

/S/ _Matthew R Ruth_
_Matthew C. Ruth_
CIN# _3/0097_ Unit____
1918 Wall Street
Everett, Washington 98201

a fair trial. See, e.g., > State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984);  > State v. Badda, 63 Wash.2d 176, 183, 385 P.2d 859 (1963) (three instructional errors and the prosecutor's remarks during voir dire required reversal);  > State v. Alexander, 64 Wash.App. 147, 158, 822 P.2d 1250 (1992) (reversal required because (1) a witness impermissibly suggested the victim's story was consistent and truthful, (2) the prosecutor impermissibly elicited the defendant's identity from the victim's mother, and (3) the prosecutor repeatedly attempted to introduce inadmissible testimony during the trial and in closing);  > State v. Whalon, 1 Wash.App. 785, 804, 464 P.2d 730 (1970) (reversing conviction because (1) court's severe rebuke of the defendant's attorney in the presence of the jury, (2) court's refusal of the testimony of the defendant's wife, and (3) jury listening to tape recording of lineup in the absence of court and counsel)." State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000).

Defendant makes these motions in good faith and believes he is entitled to the relief

requested. He respectfully request that this court grant some relief as it deems proper.

I hereby declare that I have read the aforesaid and verily believe the same to be true under the pains and penalties of perjury under the Laws of The State of Washington.

Signed in Everett, Washington this _14_ day of _March_ _____, 2004.

**RESPECTFULLY SUBMITTED,**

/S/ _Matthew R. Ruth_

_Matthew R. Ruth_ , pro se

CIN# _510079_ Unit _2-5_ _____

1918 Wall Street

Everett, Washington 98201

Witnessed by:_____ Date: _3/14/05_

Name:_____

Address:_____

EXHIBIT
"J"
Jeremy custer

# EXHIBIT 8

From: Wlegalworks@aol.com
Subject: **Matt Ruth**
Date: January 18, 2011 9:54:10 AM PST
To: markmestel@comcast.net

Mark,

I was finally able to meet in person with Donnie Poole. I like the guy. He apologized for taking so long to get back in touch with me BUT his phone has not been working so he has not been getting my messages. That is fixed now and so he is ready to help IF he can.

Donnie works daily. He is a cement finisher. He said that if he can help he will. Donnie reminded me that it was over six years ago that he met with Mr. Adcock but he remembers "most of what was said." Donnie told me that he does not recall the entire conversation with Adcock but what he remembers most was that Adcock was "trying to intimidate me."

Donnie asked me if Adcock had recorded their meeting? He was hoping he had so he would have a "better record of what was said and when it was said." I told Donnie that as far as I know there was no recording of the interview between Mr. Adcock and himself. Donnie has been told over the years that Adcock used some of what Donnie ALLEGEDLY said to him during the meeting to convict Matt Ruth. Donnie has no idea as to what Mr. Adcock allegedly used in trial.

Mark, our client gave me a "heads up" to what he recalled Adcock saying during his trial with respect to Donnie Poole's interview.

One of the things that our client said was that Adcock alleged that Donnie Poole told Adcock that Matt Ruth had told him (Donnie) that he just "freaked out" and started shooting. Donnie agreed with Adcock on that statement BUT he said that Adcock forgot to mention that Donnie had told him (Adcock) that the reason that Matt "freaked out and started shooting" was because his life was in danger at the time." Donnie said that he does seem to recall telling Adcock that Matt told him that he (Matt) did say that he "freaked out" BUT it was after he had told him that Matt said that he freaked out after Custer threatened him with a gun. Donnie said this was about when Adcock started to get mad and started to yell at Donnie that he was just "covering for his friend and trying to get his friend off."

Donnie believes that the interview with Adcock started going bad when he TRIED to tell Adcock that he (Donnie) had bought drugs from Custer.

Donnie said that he recalled telling Adcock that Custer showed up at his house, several days after the shooting, he was not exactly sure when but thought it was shortly after the shooting and Custer threatened Donnie and told him that he had better not tell anyone (authorities) about Custer's business and what kind of a guy Custer was. Donnie said that he didn't really worry about what Custer had said to him about "not telling police" about his (Custer) business but he did take it as a threat.

I asked Donnie Poole specifically if he recalled telling Mr. Adcock that Matt Ruth had told him (Donnie) that Custer had a gun during the argument between Matt and Custer?  Donnie said that Matt had told him, from the beginning, that Custer had a gun and he recalled mentioning to Mr. Adcock that was the reason that Matt 'freaked out and started shooting" was because Custer had a gun in the trailer. Donnie Poole recalled mentioning to Mr. Adcock that Matt had told him that Custer had a gun. He said that Mr. Adcock did not believe him and started to get red in the face and starting yelling at Donnie.

Mark, Donnie seemed to remember some more about the meeting with Adcock once we started talking some more. He is NOT sure of the order of the conversation but he is sure that he did tell Adcock several things during the interview. Donnie said that as soon as he started to tell Adcock the "truth" about Custer, Adcock started yelling at him saying things like "you're lying to protect your friend, none of this is true, this will never see the light of day."

Donnie remembers telling Adcock that this incident was over "drugs."  Donnie said that at this point Adcock was in his face yelling at him and he (Donnie) was standing in his face yelling back at him.  Donnie recalled that Mr. Adcock "really got mad when I told him that this was all over some drugs that Matt had supposedly stolen from Custer."  Adcock would not believe him.

Donnie recalled that during the last minutes of the interview with Mr. Adcock that he told Adcock that he was being "unprofessional" and he did not scare him.  The interview ended badly.

Donnie Poole told me that the interview with Adcock started off all right but as soon as he heard things that he didn't like to hear that's when Mr. Adcock, according to Donnie, started to get mad and was trying very hard to intimidate Donnie.

Donnie Poole will sit and talk with you if you would like?  He does NOT recall the specific order of questioning by Mr. Adcock but he did remember the above facts without much effort.

I will continue to search out Renee Woerner. Let me know what you want done next?


Thanks,
Michael Powers

# EXHIBIT 9

FILED

2005 FEB -4  PM 12: 02

R. . . . . . . . ELS
C. . . . TY CLERK
SNOHOMISH CO. WASH.

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

STATE OF WASHINGTON
      Plaintiff/Petitioner,

  VS.

MATTHEW RUTH
      Defendant/Respondent.

CAUSE NO.:   03-1-02451-6

COVER SHEET

ATTACHED HERETO IS: PSYCHOLOGICAL EVALUATION REPORT

<u>Psychological Testing</u>
The Mental Status Examination revealed that the subject is oriented X3, and did not display confusion and disorganization. He was not labile but somewhat depressed emotionally. There was no evidence of psychotic thinking or impairment of reality testing. His energy level seems fairly normal, but his affect was flat and somewhat labile. His intelligence appeared to be in the average, although formal psychometric testing was not administered. He denied symptoms of mania. He denied suicidal and homicidal thoughts, feelings or plans at this time.

The results of the MMPI-2 indicated rather extreme and possibly exaggerated results. He endorsed extreme persecutory thoughts and feelings, and very poor ego strength. He endorsed a high number of rare and unusual symptoms and complaints. He probably has a chronic personality disturbance, possibly with schizoid or paranoid features. Alienation, both social and emotional, is prominent features of that personality. He is extremely tense, anxious and unhappy.

<u>Conclusions</u>
The results of my examination revealed an individual who has chronic disturbance of judgment, personality and decision-making that has been greatly exacerbated by his drug abuse. Although he has denied intoxication or withdrawal around the time of the incident, and denied being the aggressor in the incident, it is evident that he was unrealistic, impulsive and reckless in his thinking at the time.

The question of a chronic psychotic disorder remains. He has refused to assert that he was mentally ill at the time, but he probably has disturbance in his thinking that causes him to interpret situations as threatening that might not be as dangerous in reality as they seem to him at the time. This is particularly true if he is intoxicated.

Mr. Ruth's disturbed childhood, with chaos, abuse and severe alienation, has rendered him compromised in his thinking and judgment. He has a wide-ranging and serious drug abuse history, including methamphetamine abuse by his own mother, and his own polysubstance abuse and dependence. His social development and social skills demonstrate the effects of that disturbed lifestyle. Under pressure he probably suffers unrealistic and idiosyncratic thinking as suggested by the schizotypal and paranoid traits of his personality disorder.

There was insufficient basis to conclude that Mr. Ruth was legally insane or lacked the specific capacity to form the mental intent at the time of the offense. However, his thinking, decision-making skills and his ability to anticipate

4

dangerous situations. While he probably was not psychotic at the time of this unfortunate and very dangerous incident, under the pressure of the situation he may have reacted with fear and suspiciousness that was not appropriate and caused him to respond in an unnecessarily violent manner. This event did occur in his "home", a small fifth wheel trailer, and he may have felt invaded and threatened by the trapping nature of this location.

Mr. Ruth's chronic mental condition, while not amounting to a true mental defense, could have been a significant contributing factor to his actions that day. While he did not misunderstand the nature of his actions, he may have interpreted those actions as being legal and appropriate, if as he asserted, he perceived him own life as being at risk.

Diagnosis (DSM-IV-TR)
Axis 1  Polysubstance dependence
        Depressive disorder NOS
        r/o Psychotic disorder NOS- probably secondary to drug abuse
Axis 2  Personality disorder NOS- with schizotypal and paranoid traits noted
Axis 3  No medical conditions
Axis 4  Severe stresses of current legal proceedings and incarceration
Axis 5  Current GAF Rating- 55-60, moderately impairing symptoms

Thank you for this referral.


Kenneth Muscatel, Ph.D.
Clinical, Forensic and
Neuropsychology

EXHIBIT
10

12-9-04

By Frau Hampton

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF SNOHOMISH

State of Washington
_____
Plaintiff,

vs.

Matthew Robert Ruth
_____
Defendant.

CAUSE NO. 03 - 1 - 02451 - 6

INQUIRY FROM THE JURY AND
COURT'S RESPONSE

JURY INQUIRY:

1) Transcripts of interview with Renee Warner Dec 10 & 11, 2003
2) Transcript of interview(s) with Jeremy Custer (Nov 24, 2003)
3) Transcript of interview with Drew Eden (Nov 10, 2003)

DATE AND TIME 08 Dec 2004  16:12

DATE AND TIME RECEIVED BY THE COURT: 12/8/04  4:12 pm

COURT'S RESPONSE: The evidence requested by the jury was not admitted into evidence and is not Available to the jury during deliberations.
Thank you

_____
JUDGE

DATE AND TIME RETURNED TO JURY: 12/8/04  4:15 pm

SAVE -- MUST BE FILED

Exhibit
Four

RAP 13, 5A

State Supreme Court
No. 89906-1

( AAG Exhibit 18 )

No. 89906-1

## IN THE STATE SUPREME COURT FOR THE STATE OF WASHINGTON

---

IN RE THE PERSONAL RESTRAINT PETITION OF:

MATTHEW R. RUTH,

PETITIONER.

---

### MOTION FOR DISCRETIONARY REVIEW
### RAP 13.5A

DIVISION ONE COURT OF APPEALS
NO. 68380-2-I

---

Received
Washington State Supreme Court

APR - 4 2014

Ronald R. Carpenter
Clerk

MATTHEW R. RUTH
Pro Se, Litigant
DOC# 879492 H4-A-98L
STAFFORD CREEK CORRECTIONS CENTER
191 Constantine Way
Aberdeen, Wa 98520

EXHIBIT 18

## TABLE OF CONTENTS

A. OPENING STATEMENT...............................................1

B. DECISION......................................................2

C. ISSUES PRESENTED FOR REVIEW...................................5

D. STATEMENT OF CASE.............................................7

E. ARGUMENT OF WHY REVIEW SHOULD BE GRANTED.....................12

1.) WHAT ROLE DOES HISTORY PLAY IN THE EXPERIENCE AND LOGIC TEST? IF HISTORY IS
    SILENT CAN THE APPELLATE COURT REJECT THE PUBLIC TRIAL RIGHT CLAIM WITHOUT
    EXAMINING THE LOGIC PRONG? THIS COURT MUST GRANT REVIEW AND CLARIFY HOW TO
    APPLY THE HISTORY INQUIRY AND HOW TO FAIRLY COMPARE THE PROCEEDING AT ISSUE
    WITH A SIMILAR PROCEEDING FOR A PROPER HISTORY ANALYSIS...........12

2.) THE VALUES SERVED BY THE RIGHT TO A PUBLIC TRIAL ARE PROTECTED & ADVANCED WHEN
    ATTACHED TO THE JUAN TYPE PROCEEDING IN MR. RUTH'S CASE & THIS COURT MUST GRANT
    REVIEW & ADOPT THE "RUTH HEARING" IN ORDER TO PROTECT THE INNOCENT FROM BEING
    CONVICTED & THE RIGHTS OF THE "CONVICTED INNOCENT"................13

3.) MR. RUTH MUST BE ALLOWED TO CROSS-EXAMINE PROSECUTION WITNESSES ABOUT PERJURY
    THREATS AND EXCULPATORY PORTIONS OF THEIR ORIGINAL STATEMENTS IN OPEN COURT
    TO PROTECT FUNDAMENTAL RIGHTS....................................16

4.) Mr. RUTH ASKS THAT THIS COURT TAKE THE NEXT STEP IN THE EVOLUTION OF COLLATERAL
    REVIEW BY ADOPTING THE INITIAL-REVIEW COLLATERAL PETITION RULE....18

5.) COLLATERAL REVIEW IS THE PERFECT VEHICLE TO ESTABLISH WHETHER AN ERROR IS
    STRUCTURAL BECAUSE THE EFFECT MAY BE ASSESSED IN THE CONTEXT OF OFF THE RECORD
    EVIDENCE STRUCTURAL ERROR IS THE ST. PIERRE HIGHER STANDARD.......18

6.) THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING
    REVERSAL.........................................................19

7.) THE MORE PROTECTIVE RIGHT TO "APPEAR & DEFEND" WAS VIOLATED BY THE ILLEGAL
    CLOSURE THE PUBLIC'S & MR. RUTH'S COEXTENSIVE SUPER SAFEGUARD PROTECTS THIS
    RIGHT............................................................20

F. CONCLUSION...................................................20

i

## TABLE OF AUTHORITIES

### WASHINGTON STATE SUPREME COURT

Cohen v. Everett City Counsel, 85 Wash.2d 385, 535 P.2d 801 (1975)....15

In Re Disciplinary of Bonet, 144 Wn.2d 502 (2001)....14

In Re Cook, 114 Wn.2d 802, 811 (1990)....18

In Re Hagler, 97 Wn.2d 818, 825 (1982)....18

In Re Morris, 176 Wn.2d 157, 288 P.3d 1140 (2012)....19

In re Orange, 152 Wash.2d 795, 809, 100 P.3d 291 (2005)....17, 18, 19

In re Sandoval, 249 P.3d 1015, 1019 (Wash.2d 2011)....18

In re St. Pierre, 118 Wn.2d 321, 823 P.2d 492 (1992)....6, 19

In re Yates, 177 Wn.2d 1, 296 P.3d 872 (2013)....1, 12

In Re Recall of Peasall-Stipek, 141 Wn.2d 756 (2000)....14

State v. Irby, 170 Wn.2d 874, 880 n.6 (2011)....20

State v. McFarland, 127 Wn.2d 322 (1995)....19

State v. Sublett, 176 Wn.2d 58, 73, 98-100, 136-42 (2013)....2, 6, 12-13, 19

State v. Wroth, 15 Wash. 621, 47 P. 106, 106-08 (Wash. 1896)....5

### WASHINGTON STATE COURT OF APPEALS

In Re Delgado, 106 Wn.app. 898, 251 P.3d 899, 907 (Wash.App.Div.1 2011)....19

State v. Burdette, 313 P.3d 1235 (Wash.App.Div.3 2013)....6

State v. Carisle, 871 P.2d 174, 177 (Wash.Div.1 1994)....14

State v. Johnson, 158 Wn.app. 677 (Wash.App.Div.2 2010)....6

State v. Ruiz, 176 Wn.app. 623, 369 P.3d 700 (Wash.App.Div.3 2013)....15

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT

Arizona v. Fulminante, 499 U.S. 279, 310 (1991)....19

Crane v. Kentucky, 476 U.S. 683, 690 (1986)....16

Duncan v. Louisana, 391 U.S. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968)....15

Harris v. Nelson, 394 U.S. 286, 292 (1969)....18

Maleng v. Cook, 490 U.S. 488, 493, 109 S.Ct. 1923, 1926-27 (1989)....2

Martinez v. Ryan, 132 S.Ct. 1309 (2012)....18

U.S. V. Gonzalez-Lopez, 548 U.S. 140, 149 (2006)....18

U.S. v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982)....14

### Ninth Circuit

Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008)....6, 17, 19

Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009)....2, 6, 19

Phelps v. Alameida, 596 F.3d 1120 (9th.Cir.2009)....18

U.S. v. Juan, 704 F.3d 1137 (9th.Cir. 2013)....1, 5, 13, 14, 17

U.S. v. Lord, 711 F.2d 887, 891 n 3 (9th Cir. 1983)....14

U.S. v. Rich, 580 F.2d 929, 934 (9th Cir. 1978)...,14

U.S. v. Vavages, 151 F.3d 1185, 1193 (9th Cir. 1998)....14

### THIRD CIRCUIT

U.S. v. Quin, 728 F.3d 243, 258 (C.A.3(PA)2013)....15

### SEVENTH CIRCUIT

U.S. v. Thomas, 86 F.3d 647, 654 (1996)....16

## TABLE OF AUTHORITIES

Minnesota Law Review Headnotes [98:22 2013] Substantial Government Interference, By: Ruth A. Moyer....16

Washington University Law Review, 1966 Wash.U.L.q. 068 (1966) Duty of the Prosecutor to Call Witnesses Whose Testimony Will Help the Accused to Establish His Innocence....16

Convicting the Innocent, By: James McCkloskey, Director of Centurion Ministries, Inc.,....20

## RULES

CrR 6.15(f)(1)....19, 20

iv

APPENDIX "A" NO. 68380-2-I, Division One, Order of Dismissal

APPENDIX "B" Trial Minute Entry, 2/4/05

Appendix "C" Material Witness Warrant Renee M. Woerner

Appendix "D" 12/11/03 Renee M. Woerner Interview

Appendix "E" Mental Health Evaluation (Renee M. Woerner Interview, 3/17/04; cc:

John Adcock

Exhibit One - Affidavit from Matthew R. Stroud I

Exhibit 2 - Henry Slothang & Renee M. Woerner Interviews by Private Investigator

Michael Powers

Exhibit 3 - Interview of Henry Slothang By Michael Powers

Exhibit 4 - Mark Stephens Motion to Withdraw & Transcripts

Exhibit 5 - 2 Affidavits from Matthew R. Ruth

Exhibit 6 - Affidavit from DPA Adcock where he commits Perjury

Exhibit 7 - Jury Inquiry

## A. OPENING STATEMENT

The time has come for this Court to take the next step in the evolution of the Personal Restraint procedure. Mr. Ruth has labeled this critical next step an Initial-Review Collateral Petition (IRCP). Due to the Governments abuse of the unique procedural obstacles for an inmate to appeal "Off The Record" Professional Misconduct and "Substantial Government Interference" Mr. Ruth is barred from first tier review of fundamental Bedrock State Constitutional Issue's.

Mr. Ruth also asks that this Court clarify what Role History plays in the Experience Prong. The Lower Court's have misinterpreted **Sublett**, and are unconstitutionally applying the History inquiry as a Public Trial Right Bar. This Court must clarify the proper use of the History element and application of the Experience and Logic Test to an IRCP Public Trial Right Claim. Also, define the burden placed on the Petitioner to satisfy this test because **In Re Yates**, 177 Wn.2d 1 (2013) is not being applied Equally & Fairly.

Mr. Ruth asks that this Court Harmonize **U.S. v. Juan**, 704 F.3d 1137 (9th Cir. 2013) with Washington State's Coextensive Public Trial Right Safeguard; by adopting the "RUTH Hearing" to protect the Innocent from being wrongfully convicted due to off the record "Substantial Government Interference" like Mr. Ruth has proven in this Petition.

The Trial Court's failure to conduct the required Bone-Club Analysis deprived the Public & Mr. Ruth from being informed of their coextensive Rights, objecting, and making Record. This barred Mr. Ruth from direct review of the error's presented in this Petition. Mr. Ruth was never allowed to exhaust his State Constitutional issue's, so the Balancing of Probabilities test cannot apply to an IRCP; and Mr. Ruth is entitled to Direct Review of his Initial-Review Collateral Issue's (IRCI).

-1-

Mr. Ruth was completely denied counsel at a critical stage of trial and **Musladin v. Lamarque**, 555 F.3d 830, 841-43 (9th.Cir.2009), holds that this same error is structural on Collateral Review. Mr. Ruth asserts that pursuant to **Sublett** Public Trial Rights attach to this proceeding to protect Mr. Ruth's Rights to Counsel and "Appear & Defend." CrR 6.15(f)(1) is the functional equivalent of a Bone-Club Analysis during deliberations upon a jury inquiry, however, unlike the Bone-Club Analysis when CrR 6.15(f)(1) is violated so are the Constitutional rights it mirrors and protects.

Mr. Ruth did make a threshold showing on collateral review and is entitled to a full hearing on the merits, or a reference hearing. The A.C.J. erroneously resolved material Factual disputes and made credibility determinations, contrary to the record and the evidence of off the record facts.

The A.C.J.'s decision is based on Material Misrepresentations of Substantive facts made during Trial by DPA Adcock (RP 179-81); and in the State's supplemental Response by DPA Blackman (see Pro Se Reply brief), to erroneously dismiss Mr. Ruth's Meritorious IRCP.

Matthew R. Ruth, Pro Se, ask that this Court grant review of the decision designated in Part B of this Motion. Please Give these pleadings Liberal Interpretations and Hold them to less stringent standards than those drafted by Lawyers. **Maleng v. Cook**, 490 U.S. 488, 493, 109 S.Ct. 1923, 1926-27 (1989).

### B. DECISION

On January 17, 2014 a Division One A.C.J. issued an Order to Dismiss Mr. Ruth's PRP (No. 68380-2-I) under RAP 16.11(b). (Appendix "A" Order of Dismissal).

-2-

The Decision erroneously resolved credibility issue's and Material Disputed Fact's by completely ignoring trial Counsel Mark Stephens Sworn Declaration; On the record Objections to DPA Adcock's version of what was discussed In Chambers and the Context of the Perjury threats. Mr. Ruth is thus restrained from receiving a full hearing on the merits under the proper standard of review. (See pg 1-10 in Pro Se Reply brief).

The A.C.J. Completely ignored all of the "Off the Record" evidence of facts gathered from Private Investigator Michael Powers. The evidence consist of Interviews with members of the Public who witnessed DPA Adcock Assault & Threaten Ms. Woerner for refusing to lie for the State; She wanted to testify truthfully; and an interview with Ms. Woerner that proves her intended Testimony was not Materially contrary to her original statement.

The A.C.J. also ignored Sworn Affidavits from public witnesses who observed the same confrontation. The Decision Restrains Mr. Ruth from receiving a Reference Hearing, or the appropriate remedy for the violation, which is complete Dismissal with prejudice.

The Decision failed to address Mr. Ruth's "Appear & Defend" challenge to the In-Chamber's secret hearing; and whether the Public and Mr. Ruth share a passive coextensive safeguard Right, that triggered during this Secret Proceeding because there is a likelihood of Jeopardy to Mr. Ruth's Constitutional Rights? The Decision prohibits Mr. Ruth from receiving First Tier review of this Off the Record State Constitutional Claim.

The A.C.J. Misinterpreted this Courts Decision in **Sublett**:

"In **Sublett**, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question." Pg.2.

The A.C.J. then distorts Mr. Ruth's argument:

"Ruth asserts that the trial court violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. Because Ruth fails to identify any resulting prejudice, he cannot establish a ground for relief." n.1. This is contrary to Mr. Ruth's argument see Pro Se Reply Brief Pg. 19-20.

The Decision Misrepresents the length and type of proceeding that occured In chambers: "Briefly, the attorneys and the trial judge met in chambers to discuss scheduling." Pg.3. The Proceeding was 26 Minutes. (See Pro Se Reply, pg 6).

The Decision fails to recognize Mr. Ruth's argument invoking the **WISE** Closure Rule, when ruling that:

"Without citation to relevant authority, Ruth claims that the trial Judge should have ended the chambers conference as soon as it 'expanded into a substantive discussion of a potential witness and the interaction that had occured between the witness and the prosecutor.' Ruth claims 'the public's presence would have arguably contributed to the fairness of the proceeding and serves as a potential check on the power of the prosecutor.' Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions." Pg 3.

The A.C.J. ignored the critical argument to the **Castle** challenge which is that the Prosecutor formulated argument in closing using the Castle language and trivialized the state's burden of proof, and undermined the presumption of innocence when combined with the Castle Instruction. "Relying on State v. Bennet, 161 Wn.2d 303, 315-16 (2007), Ruth also contends the use of the Castle reasonable doubt instruction violated his constitutional rights." Pg 3-4. The Decision deprives Mr. Ruth of having his claim adjudicated on the merits. (Appendix "A" Order of Dismissal).

-4-

## C. ISSUES PRESENTED FOR REVIEW

1.) This Court must harmonize the expansion of the "Substantial Government Interference" rule announced in U.S. v. Juan, 704 F.3d 1137 (9th Cir. 2013), with the more protective Washington State Constitutional Rights to "Appear & Defend" and "Open & Fair" administration of Justice by creating a fundamental coextensive safeguard that shall be known as a "RUTH Hearing." Does the Public Trial Right safeguard protect Mr. Ruth's Confrontation Rights under Juan?

2.) IS the Factual basis of the Perjury allegation Material to Mr. Ruth's State & Federal Constitutional Rights to Compulsory Process, Appear & Defend, Fair Trial, and Public Trial Protections, when the allegation is not only fraudulent in fact, but based on the Scienter of DPA Adcock assaulting Ms. Woerner -- the sole Res Gestae eye witness favorable to the defense -- and threatening to prosecute her for Perjury "If She Testified" truthfully; and does it present a significant question of Public Interest when this gross Professional Misconduct occured off the record while being witnessed by Public Trial Spectators, who, like Ms. Woerner, were never allowed to Make Record? The Special Emphasis on the presumption of Open Court Proceedings in Wash.Const.Art.1 § 10, is more stringent on this point.

3.) What is the role of the History Inquiry? The Lower Courts are using the History inquiry to bar public trial challenges. Private questioning of potential Jurors "in Chambers is a practice of long-standing & wide use, but this History has played no part in this Court's analysis & Rejection of the practice, before or after Sublett." Mr. Ruth asserts C.J. Madsen correctly observed that if History is silent, the Court must examine the values protected by the right & whether those values are served by requiring the challenged Proceeding to be open. 176 Wash.2d at 98-99. The A.C.J. failed to make that examination, and erroneously stopped the Sublett analysis at the History inquiry. Even the History inquiry was not given proper consideration.

4.) The Jury Trial Right was Designed as "an inestimable Safeguard" against Judge bias and Prosecutor corruption. When the Jury is absent the Public inherits the Juries safeguard function, So Historically Professional Misconduct & "Substantial Government Interference" committed outside the presence of the Jury has been and must always be resolved in Open Court, never cloaked in the shadows of sidebars & Chambers. Why call a Sidebar when the Jury is not present, and from sidebar go into Chambers to resolve the Professional Misconduct of DPA Adcock?

5.) The A.C.J. ignored Mr. Ruth's claim that his More Protective Washington State Constitutional Rights to "Appear & Defend" were violated when excluded from the In-Chambers Hearing. Wash.Const.Art.1 § 22. Since at least 1896 the Right to "Appear & Defend" has been protected by the Open Court Doctrine. Wroth, 15 Wash. 621, 47 P.106, 106-08 (Wash.1896). When the "Superior Right" to Fair Trial is at issue, the Public's & the Accused's Shared Public Trial Right's synchronize to form a single Coextensive "Superior Safeguard," upon the likelihood of Jeopardy to Constitutional Rights, and restricts Closure by the Trial Courts, Absent passing the Bone-Club Test, in Open Court. This Rule is needed to Protect the Right to "Appear & Defend."

6.) The Current Personal Restraint Procedures prevent First Tier Review of State Constitutional Issues, that cannot be raised on Direct Review, and Cannot be Objected to at Trial. Mr. Ruth ask that this Court restore balance by creating a procedure for Initital-Review Collateral Petition. Does the Balancing of probabilities test announced in Hagler apply to an IRCP? Does Structural Error apply to an IRCP?

7.) Structural error satisfies the conclusive presumption of prejudice requirements, and is the "Higher Standard" that has never been defined. **In Re St. Pierre** was concerned with keeping in step with Federal Habeas Law, so logically this Court must adopt Structural error as the definition of the "Higher standard."

8.) Can an A.C.J. resolve Material disputed facts and credibility issue's to answer the ultimate question of whether Mr. Ruth has met his Burden on Collateral Review? Does ignoring Mr. Ruth's evidence, Facts, and arguments to reach an objectively unreasonable decision present a serious Constitutional question and Issue of Substantial Public Interest?

9.) The Appellate Courts are in conflict on how to resolve Jury inquiry issue's during deliberations. In Mr. Ruth's Case, None of the CrR 6.15(f)(1) procedures were followed, Counsel nor Mr. Ruth were notified of the jury inquiry that involved material disputed facts. In rejecting Mr. Ruth's claim, Division 1, incorrectly stated that "**Sublett** decided that Public Trial Rights do not attach to any jury inquiry." In Contrast, Division 3, Correctly held in **Burdette**, 313 P.3d 1235 (2013), that the **Sublett** Court only found Jury inquiries regarding Jury Instructions, that are resolved with defense Counsel In Chambers do not implicate Public Trial Rights. This Court Must grant review and resolve the confusion by clarifying how to apply the **Sublett** holding to the facts of Mr. Ruth's case.

10.) Does Harmless Error apply to the complete denial of counsel? **Burdette** Correctly found that Non-jury instruction inquiries are critical stages, which is in harmony with **Musladin v. Lamarque**, 555 F.3d 830, 841-43 (9th Cir. 2009); **Frantz v. Hazey**, 533 F.3d 724 (9th Cir.2008). Unlike the Bone-Club Rule, when CrR 6.15(f)(1) is violated, so are the Constitutional Rights it mirrors & Protects. This Court must accept review of this petition to clarify whether under the fact's of Mr. Ruth's case Public Trial Rights attach, to protect the accused from the complete Denial of Counsel; and is the Complete denial of counsel Structural Error on Collateral Review?

11.) When the Trial Court uses the forbidden "Castle" instruction, this Court has never addressed whether an objection or instruction can cure the prejudice inflicted by the Prosecutor fashioning improper arguments from the "Castle" language, that undermines the presumption of innocence, trivialize the Burden of proof, and distorts the Jury's fact-finding function. In **State v. Johnson**, 158 Wn.App. 677 (2010), Division 2, held that this kind of error cannot be cured by objection or curative instruction.

12.) If this Court Grants Review, does Mr. Ruth have the Right, under the Spirit of the Washington State Constitution, to Appear in Person, to argue his case, Pro Se, before this Most Honorable Court? Do Dreams ever Come true?

D. **STATEMENT OF THE CASE**

On 12/7/04, Judge Hulbert called the daily recess at 2:56, "Adcock, the prosecuting attorney, walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction." (Exhibit "1" Affidavit of Matthew R. Stroud I). "Henry ... did witness Adcock 'drag' his daughter into a side room where he then heard yelling going on between Adcock and his daughter .... Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. That he left bruises .... She said he called her a stupid Bitch several times." (Exhibit "2" P.I. Michael Powers). "I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction ... Renee said 'I will not lie for you' Adcock replied 'you will say what I tell you to say or I will have you arrested' Renee said 'then arrest me.'" (Exh. "1" Matthew R. Stroud I). "Henry Slothang .... said that the prosecutor got very angry at Renee because Renee wanted to testify to the 'COMPLETE TRUTH AND NOT JUST WHAT WAS IN HER STATEMENT.'" (Exh. "3" P.I. Michael Powers).

"Adcock was very upset and turned and walked into the court room I followed ... I saw Adcock walk to Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do. I walked to Matthew Ruth's attorney and told him what I had just saw and heard, he told me not to worry .... In the hall was also Renee Woerner's Mother and Dad who also heard everthing." (Exh. "1" Affidavit of Matthew R. Stroud I).

Defense Counsel Mr. Stephens went into the hallway to speak to Ms. Woerner about the Confrontation:

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset, She indicated to me Mr. Adcock had THREATENED to charge her with perjury IF SHE TESTIFIED. She expressed concern to me about the potential legal consequences IF SHE TESTIFIED. I indicated I could not advise her and suggested she seek appointed counsel to answer her questions." (Exh. "4" sworn declaration of Mark Stephens).

-7-

"When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the bench. The Judge after hearing Mr. Stephens say something - Which the Public, nor I could hear - called Mr. Adcock over to the bench, this was a side bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min .... After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand .... He promised he would call her to testify, if she was not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent cross-examination, and due to the threats she would break down and begin lying." (Exh. "5" Affidavit of Matthew R. Ruth).

The Public, Ms. Woerner, and Mr. Ruth were not given a chance to object to the closure, make record of the confrontation, or develop the factual basis for the perjury allegation because Judge Hulbert did not conduct a Bone-Club Analysis before the illegal closure. Mr. Ruth and the Public were excluded from the two sidebars & the In-Chamber hearing. The Recess ended at 3:22 when the secret hearing parties exited chambers into a sidebar. The Court admonished the Jury at 3:24, "real quickly" on record In-Chamber Summary at 3:25, Court in recess (adjourned) at 3:28. (App. "B" Trial Minute pg 7).

DPA Adcock misrepresented not only the context of what was discussed In-Chambers, but the context of the perjury allegation:

"I believe he had a conversation with her where she brought up the fact that I had said that IF YOU COMMIT PERJURY, there is going to be consequences. And at that point he concluded that she needed to be advised." RP 180.

That is not what Mr. Stephens said In-Chambers. There is a huge difference between "Threatened to charge her with Perjury 'IF SHE TESTIFIED,'" (Woerner, Stephens, Stroud I version) and "I said that IF YOU COMMIT PERJURY there will be consequences." (Adcocks version of what Mr. Stephens said).

-8-

Not only does Mr. Stephens dispute that this was what was discussed In-Chambers, the Context of the Perjury threat, and that this was all that was said to Ms. Woerner in Exh. 1 (Declaration), but also on record:

"I just might add that's more or less, what's happen .... She indicated concerns about COMMENTS Mr. Adcock made. She Indicated the word PERJRUY was used. I DON'T KNOW WHAT CONTEXT That Was IN." RP 180.

DPA Blackman furthered this misrepresentation in the State's Suppl.Resp. To P.R.P. pg 3-4, by omitting the words "If She Testified" & "She Expressed concern to me about the legal consequences if She Testified," and successfully misled the Court about Mr. Adcock's "Substantial Government Interference" & Professional Misconduct. RPC 8.4(b)(c)(d)(i)(k).

"She recalled the prosecutor 'had threatened to charge her with perjury' (Ex. 21 at 3), there is no evidence in the record that there actually was a 'confrontation,' much less that it was discussed in chambers." Pg. 3-4 State's Suppl.Resp. to P.R.P.

Mr. Blackman misrepresented the evidence & Record because the non-distorted version proves that the In-Chambers hearing was caused by the professional Misconduct of Mr. Adcock, and resolved all motions for mistrial, attorney disciplinary obligations, and Ms. Woerners concerns about the threats by making empty promises to appoint her counsel. This proves the confrontation did happen, was discussed & illegally resolved In-Chambers without a Bone-Club Analysis. Why else appoint Counsel? RP 180-81, (Exh. 4 Mark Stephens).

A Material Witness Warrant was issued for Ms. Woerner on 11/13/03. (App. "C"). "R. Woerner: 'His sister came by and said you have a warrant for your arrest. I FREAKED OUT. I want OH MY GOD I didn't do anything. She's like yeah, they're dead, they're murdered. You have a warrant for your arrest for murder.'" (App. "D" pg 32). After Ms. Woerner turned herself in, she was "in Custody for over a month," before being interviewed. (App "D" pg 42). On 12/10/03 Detective Willoth and DPA Adcock tried to conduct the first interview of Ms. Woerner, and for unknown reasons the interview was stopped after her Miranda rights were read. "Det. Willoth: I'm gonna go ahead and advise of your rights like yesterday, okay?"

-9-

The 45 Page Interview continued on 12/11/03, Five People were present, Detective Willoth, Detective Pince, DPA Adcock, and representing Ms. Woerner, the unethical, Bill Joice (Now Inmate). Ms. Woerner was under the impression Custer & Eden were murdered during the entire interview:

"R. Woerner: 'And Jeremy and Drew are Okay?' Det. Willoth: 'Yes, they're fine.' R.Woerner:'Like Walking, Talking, no bullets inside of them or anything?'" pg 43.

Although, Ms. Woerner's Original Statement at times did make Mr. Ruth out to be Hannibal Lector (Those Portions are inadmissible, and defense's motion to exclude was granted/stipulated. RP 5-6), She also corroborated Mr. Ruth's Defense:

"Det. Willoth: Why did you Go with [RUTH] him? R. Woerner: Because I didn't want to get shot by DRUG DEALERS .... I Can't think of a fancy lie or anything, that's all. I just didn't wanna get shot by drug dealers. And cuz Jeremy [Custer] Said 'NO COPS' when he left. Uh, it scared me .... and because she had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shoot me over a pound of weed? But all this weird stuff had happened and it was stressful, pg 29. Drew I only met him a few times cuz he lived at the Love Israel Ranch or whatnot. Creepy. That's another weird thing I got scared about too. pg 44. Jeremy didn't come home the ne... that morning .... The morning of the incident he was all kinda, I think he was kinda messed up. He hadn't had any sleep, pg 12. [t]here were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms .... They were snortin' coke .... All of them .... Jeremy, dan, when that day of this incident Dan had big old sores all over his face, pg 14.
    Then all of the sudden I hear em talkin' I would sit on the bed cuz I mean that's ... and I looked out the window and they're kinda being serious. Then they come up to the trailer, pg 16. Matt, Jeremy, and drew. And Matt was like man check this out. There's a pound of weed missing and they think I stole the shit, pg 17. Matt's going NO you gotta GET OUTTA the trailer. You can't go through my shit, pg 18. He'd just be like well I told you to get out .... And he [Custer] kinda dug around on the floor right on the side of the bed. And matt's like see, you're going through my stuff. Det. Willoth: This is about the missing? R. Woerner: Pound of Weed. pg 19. The gun was in this cabinet ... he pulled it out and went like this. And I think stuck it in his pants .... and Matt was like you gotta go man, you gotta GET OUTTA MY HOUSE. You can't do this shit. pg 20. I was kinda focusing on Jeremy .... I wasn't really looking at matt .... they're arguing ... I'm like oh my God this argument's never gonna end. pg 21.
    Jeremy said NO COPS .... went in the house, grabbed a black garbage bag which I'm I've seen that he had pound of weed in it before so that's what, he grabbed the garbage bag and he said no cops like that. I didn't see any blood on him. None at all. pg 25. Det. Willoth: Did he ever talk to you about what his intent was that day or why he did what he did? R. Woerner: No .... We Went our separate ways okay? J. Adcock: When?

-10-

R. Woerner: At Donny's .... He was there I left him there .... He called me and said that they were gonna chase me down. That Cuz I know that the GUY that DROPS OFF the, the DRUGS with uh, JEREMY, and he's an Asian guy, and I don't know what's gonna, I just got scared. pg 26-27. He [Matt] took he would take little, he would take weed and stuff from him .... I don't know if he took the pound of weed. pg 37. Det. Pince: You talk about there being lots of drugs used and around the place [CUSTER'S BLUE APARTMENT] all the time. R. Woerner: Uh huh and underage girls all kinds of strange things. Det. Pince: Were these drugs for personal use or were they selling em? R. Woerner: I know they were selling them .... zip sealed bags and everybody would get a backpack and they'd go about their thing. That's all I can say. Ya know, other than that all I saw was just them partaking of the drugs.

J. Adcock: Well they didn't work regular jobs did they? R. Woerner: I never told Jeremy I quit my job .... he had continued to write these receipts ... so that he could cover his tracks for the tax purposes .... J. Adcock: Do you think that it's possible they used the proceeds for drug sales to finance the lifestyle you had out there? R. Woerner: Uh, yeah. That's definitely ya know, I know that for a fact .... Det. Pince: Was Matt selling drugs?

R. Woerner: Matt acquired quite a bit of crystal meth at one point from one of their friends, and they, everybody was all high .... he was selling little packages of this, of the meth. But mostly JEREMY and them were BUYING it from Matt so it was just this like this inner, little circle. pg 38-39.

Lou is the guy who they get pounds of weed from. I know that. He's an Asian guy that comes in the black little sports car. Then Brings the bag, the garbage bag that Jeremy took to the Durango. He's the one who takes it into Jeremy. I've seen that, that's all I know. pg 40." (App. "D").

DPA Adcock swore under the penalties of perjury that "there was nothing to support the defendant's theory that he was assaulted by drug-crazed dealers who threatened to kill him and rape his fiancee." (Exh. 6 Affidavit of John Adcock).

On 3/17/04, Western State Hospital interview Ms. Woerner:

"Ms. Woerner stated she was not comfortable speaking about the domestic violence ... but volunteered, 'THAT IT NEVER HAPPENED' .... When Ms. Woerner was questioned about Mr. Ruth's drug use .... She adamantly stated that Mr. Ruth only used drugs recreationally and that he was not a drug dealer or someone who was constantly high 'like the guys next door.' She emphasized, 'the guys next door were the druggies, not Matthew. Mr. Ruth's problems were not a result of drug use but rather a result of his poor mental health. She explained, 'he has been through a lot of trauma in his life and never received any help.'" (App. "E" Mental health report pg 2,6-9, cc: DPA Adcock pg 14).

If Mr. Ruth is the Monster Ms. Woerner portrayed, than what type of Monster must Custer & Eden be? After all she was so scared of Custer & Eden that she ran to Mr. Ruth for protection, not the police. Mr. Ruth is a first time offender who on 11/5/03, was attacked in the safety of his own home, for allegedly stealing drugs; and because Renee M. Woerner (Mr. Ruth's live in girlfriend) snitched on the two Domestic Terrorist (Jeremy Custer & Drew Eden), for drug dealing & money laundering. RP 113-117, 174, 207, 223-25, 241-47, 250-53, 263, 267, 281. Mr. Ruth exercised his Wash.Const.Art.1 § 24 Rights, and defended Ms. Woerner & himself in the safety of his home. RP 92-93, 246-47, 312.

## E. ARGUMENT OF WHY REVIEW SHOULD BE GRANTED

1.) WHAT ROLE DOES HISTORY PLAY IN THE EXPERIENCE AND LOGIC TEST? IF HISTORY IS SILENT CAN THE APPELLATE COURTS REJECT THE PUBLIC TRIAL RIGHT CLAIM WITHOUT EXAMINING THE LOGIC PRONG? THIS COURT MUST GRANT REVIEW AND CLARIFY HOW TO APPLY THE HISTORY INQUIRY AND HOW TO FAIRLY COMPARE THE PROCEEDING AT ISSUE WITH A SIMILAR PROCEEDING FOR A PROPER HISTORY ANALYSIS

The "Experience & Logic Test" allows this Most Honorable Court to consider the Substance of the actual proceeding at issue without forcing every situation into faulty, misleading, and predefined factors. **State v. Sublett**, 176 Wn.2d 58, 73, 136-42 (2013). The Appeals Courts have defeated this purpose by using the History inquiry to force new challenges into predefined factors, thereby, preventing an examination of the substance.

First, the proceeding is mislabeled, like in the instant case, "scheduling matter," when clearly "Substantial Government Interference" was being resolved. Second, the Appellate Courts claim History does not establish that the mislabeled proceeding is Open, therefore, has failed to meet the **In Re Yates** Burden. Finally, the Appellate Courts erroneously end the **Sublett** Analysis when History is Silent, without conducting the second part. This is the equivalent of a Public Trial Right bar, that is premised on labels rather than substance, and prevents the core values served by the Right to Public Trial, from ever Advancing because experience becomes History. Without experience there can be no History.

C.J. Madsen brilliantly observed that when History is silent the analysis does not end, rather, the Silence demands that the reviewing Court must examine whether the core values would be furthered if the right is applied with respect to the part of the proceeding in question.

"If these values would not be served by concluding that a particular aspect of trial should be public, when this issue is one for which History provides no answer, then there is no Constitutional imperative reason for attaching the Public Trial Right .... Because protecting and Advancing these values are the core concern of the right to a Public Trial." **Sublett** at 98-100.

-12-

The lead applied this Logic in **Sublett**, "none of the values served by the public trial right is violated under the facts of this case." Id. at 77. If the **Sublett** Court would have found a "Constitutional imperative reason for attaching the Public Trial Right," in **Sublett**, then a new trial would have been ordered, despite the silence. This Court Must establish One Rule for the Appellate Court's to follow when Applying the **Sublett** test. 513-14 W.L.R. [VOL. 88:491 2013].

Mr. Ruth presents Significant Constitutional Imperative Issues, that have never been addressed by this Court. The Public Trial Values are advanced when attached to the facts of Mr. Ruth's case, and Protect the Innocent from being Convicted by "off the record" Professional Misconduct cloaked in the shadows of Sidebars & Chambers hearings conducted during the daily recesses.

**2.) THE VALUES SERVED BY THE RIGHT TO A PUBLIC TRIAL ARE PROTECTED & ADVANCED WHEN ATTACHED TO THE JUAN TYPE PROCEEDING IN MR. RUTH'S CASE & THIS COURT MUST GRANT REVIEW & ADOPT THE "RUTH HEARING" IN ORDER TO PROTECT THE INNOCENT FROM BEING CONVICTED & THE RIGHTS OF THE "CONVICTED INNOCENT"**

Mr. Ruth asserts that under the facts of his case the proper Experience and Logic test is satisfied by harmonizing the "Substantial Government Interference" expansion announced in **U.S. v. Juan**, 704 F.3d 1137 (9th Cir. 2013), with the more protective coextensive Public trial right of both the accused & Public under the State Constitution.

The Due Process Clause "guarantees that a criminal defendant will be treated with the fundamental fairness essential to the very Concept of Justice. At its core, the right to Due process is the right to fairly present a defense. Id. at 1140. The Webb v. Texas decision protects a criminal defendant's Sixth Amendment Right to Compulsory Process and Broader Due Process Rights. 409 U.S. 95 (1972). In this Context the 5th and 14th Amendments are coextensive. **Juan** 704 F.3d at n.1.

-13-

The Ninth Circuit stated that "Juan Persuasively argues that WEBB and its progeny should apply to all Witnesses." Id. at 1141. The Ninth Circuit has consistently maintained strict policies that govern the duties of the Prosecution and Trial Court when communicating to witnesses. "Imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights." (U.S. v. Vavages, 151 F.3d 1185, 1193 (9th 1998), (Quoting U.S. v. Rich, 580 F.2d 929, 934 (9th 1978).

"Violating this DUTY by BULLYING a prosecution witness away from testimony that could undermine the governments case is no less distortive of the judicial fact-finding process than improperly meddling with the testimony of a defense witness. Regardless of whose witness is interfered with, the constitutional harm to the defendant is the same -- The inability to mount a FAIR and COMPLETE defense. We see no reason to doubt that the Government's Substantial Interference with the testimony of its own witness can violate the Due Process Clause. See U.S. v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982); Due Process is offended where the defendant is wrongfully denied testimony that "would have been favorable and Material." Id. at 1142.

In order to prevail on a "Substantial Government Interference" Claim, Mr. Ruth must "demonstrate misconduct by a preponderance of the evidence." Vavages, 151 F.3d at 1188 (Citing U.S. v. Lord, 711 F.2d 887, 891 n.3 (9th Cir. 1983). Merely warning a witness of perjury consequences can violate Core Due Process Rights. However, to establish a violation, Mr. Ruth is required to prove that under the totality of the circumstances the prosecutor's perjury threat were expressed to the witness, and the substance of that communication has the potential to affect whether the witness testifies, or alter the testimony. Juan at 1190. DPA Adcock's Misconduct is a "Highly Unethical" issue of significant public interest. In Re Bonet, 144 Wn.2d 502 (2001); State v. Carlisle, 871 P.2d 174, 177 (Wash.Div.1 1994).

Ms. Woerner tried to correct the false portions of her statement on 3/17/04, (App. "E"), before trial, (Exh. 4), and during trial, (Exh. 1,2,3,4,5). Pursuant to RCW 9A.72.060, correcting a False Statement before testifying to a jury is not Perjury. In Re Recall of PearsallStipek, 141 Wn.2d 756 (2000).

-14-

DPA Adcock committed malfeasance when making a perjury accusation based on a Res Gestae witness correcting a known false statement, and then trying to bully Ms. Woerner into committing Perjury. DPA Adcock executed his "deliberate intention of distorting the fact-finding process." **U.S. v. Quin**, 728 F.3d 243, 258 (C.A.3(PA)2013). The Perjury threat even affected, Defense Counsel, who did not call Ms. Woerner to testify because DPA Adcock would impeach her with the false statement. (Exh. 4 Mark Stephens). Mr. Ruth has proven the threat was expressed & actually did affect whether Ms. Woerner testified:

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset, she indicated to me Mr. Adcock had threatened to CHARGE HER with Perjury IF SHE TESTIFIED. She Expressed CONCERNS to ME about the POTENTIAL LEGAL CONSEQUENCES IF SHE TESTIFIED. I indicated I could not advise her and suggested she seek appointed counsel to answer her questions." (Exh. 4 Mark Stephens).

Mr. Stroud I (Exh.1), Ms. Woerner (Exh. 2), & Mr. Slothang (Exh. 2 & 3), all Public Spectators provided corroborating Statements of "Substantial Government Interference". The Sidebar & In-Chambers Hearing cloaked this Misconduct. The Material Issue of whether Ms. Woerner needed an attorney because of her fear stemming from the consequences of DPA Adcock's Threat's, were resolved In-Chambers. Any discussion of Mr. Adcock's actions InChambers is the equivalent of testimony that cannot be taken in secret. **Cohen v. Everett City Counsel**, 85 Wash.2d 385, 535 P.2d 801, 804 (1975).

The Jury Trial Right was designed as "an inestimable safeguard" against the chance of bias & corrupt proceedings created by the misconduct of Prosecutors & Judges. **Duncan v. Louisana**, 391 U.S. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968). The jury trial right is eliminated if that Misconduct can be conducted off the record with impunity. In the juries absence the Public inherites the Jury Safeguard function (Sublett at 723-24), so Historically all Government Misconduct has been resolved in Open Court. Since 1742, History shows that "'The Public has a right to every man's evidence ...' an 'indubitable certainty' that 'cannot be denied.'" **State v. Ruiz**, 176 Wn.app.623, 369 P.3d 700 (Wash.App.Div.3 2013). History does establish that the Public Witnesses of DPA Adcock's Misconduct & Ms. Woerner's favorable testimony must make it into Open Court. The Public, Mr. Ruth, and Ms. Woerner, were not allowed to object to the closure, or make record.

The heavy burden to prove "Substantial Government Interference" demands that proper records is made, and the values of the Public Trial Right Doctrine demand that any warning or allegation of a threat be investigated in Open Court, to deter this type of Misconduct from occurring in the future. Mr. Ruth asserts that any type of warning or threat to a Res Gestae witness must be investigated in open court, or the Prosecution will continue to cloak this Misconduct in the shadows.

-15-

"The Water Shed Juan decision provides critical guidance for other courts .... in determining how to properly warn these "difficult" witnesses about the consequences of providing potentially false "exculpatory" Testimony .... Courts will likely need to address whether the presentation of evidence to the factfinder about the government's "warnings" To a prosecution witness can ameliorate the potential prejudice cause in Juan-type situations. Similar, warnings "not on the record" will necessitate further analysis by courts." Substantial Government Interference, Minnesota Law Review Headnotes [98:22, 27, 29-32 2013] Ruth A. Moyer.

In this situation the Prosecutor does have a duty to call Ms. Woerner to testify because she is the sole Res Gestae Material eye Witness who corroborates Mr. Ruth's Defense, and the Prosecutor has an obligation to protect Mr. Ruth's Rights to a Fair & Open Trial. **Duty of the Prosecutor To Call Witnesses Whose Testimony Will Help the Accused to Establish His Innocence**, 1966 WASH.U.L.Q. 068, 69, 72-73, 75-76,80, 96 (1966). Most critical is that this Court protects the innocent from being convicted from the type of off the record "Substantial Government interference" that has occured in Mr. Ruth's case.

This can only be achieved by attaching the more protective coextensive Public Trial Right safeguard to any perjury warning or threat made by the Government to a Res Gestae Witness. A "RUTH HEARING" requires the Trial Court to determine and make record of the warning or threat made; the affect it had on the Res Gestae witness; establish the factual basis for the perjury accusation; and allow the Accused & Public to make record. The "RUTH HEARING" also requires that all warnings are given on the record by a third party.

This type of hearing will ensure the fair administration of Justice by simultaneously protecting Mr. Ruth's Compulsory & Confrontation Rights, by advancing the four core public trial right values. This type of hearing is critical to maintain the integrity of the framework that fairly & accurately determines innocence or guilt, in a Criminal Trial.

3.) MR. RUTH MUST BE ALLOWED TO CROSS-EXAMINE PROSECUTION WITNESSES ABOUT PERJURY THREATS AND EXCULPATORY PORTIONS OF THEIR ORIGINAL STATEMENTS IN OPEN COURT TO PROTECT FUNDAMENTAL RIGHTS

The U.S. Supreme Court has instructed, "Whether directly in the Due Process Clause ... or in the Compulsory Proces or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" **Crane v. Kentucky**, 476 U.S. 683, 690 (1986). **Juan** fundamentally protects a defendant's Sixth amendment right to elicit exculpatory evidence from an "Adverse" Government Witness.

As the Seventh Circuit has stated, "the Evidence of threats is necessary to account for the specific behavior of a witness, that if unexplained, could damage a party's case." **U.S. v. Thomas**, 86 F.3d 647, 654 (1996).

-16-

This court made a similar connection in **Orange**, When recognizing the particular harm of precluding the defendant's family from contributing to the jury selection. 152 Wn.2d at 812. The Prospective Jurors in **Orange** did not see family participation, but "Their conspicuous exclusion from it." 152 Wn.2d at 809. This Court cured that prejudice by attaching the Public Trial Right Safeguard, the same must apply to protect Mr. Ruth's confrontation Rights.

In Mr. Ruth's case, the Jury heard testimony from State Witnesses regarding Mr. Ruth's & Ms. Woerner's relationship, and Ms. Woerner's alleged actions during the shooting. RP 164, 200, 207. Kandy Korder claimed Ms. Woerner & Mr. Ruth were drug addicts. RP 207. The Alleged Victim, Drew Eden, testified Ms. Woerner was screaming for Mr. Ruth to Stop Shooting. RP 164. Mr. Ruth was the sole witness for the defense, and during direct review (and after DPA Adcock's "Substantial Government Interference" prevented Ms. Woerner from testifying) DPA Adcock objected to the Defense's attempts to mitigate the Prejudice of the State's inadmissible Hearsay regarding Ms. Woerner. RP 247. Judge Hulbert not only commented on the evidence under the guise of sustaining the objection, but claimed the State did not bring up Ms. Woerner in their case in Chief. Judge Hulbert then instructed the Jury, "The Jury can draw it's own conclusion about it's recollection." RP 247. When Mr. Ruth tried to make record of the threats, and account for the absence of Ms. Woerner, in front of the jury, Judge Hulbert, threatened to place Mr. Ruth in restraints. RP 266-67. The Point of that threat is unclear because Mr. Ruth, even if restrained, is entitled to testify.

A Conclusive Presumption of Prejudice was established when the Jury attempted to "draw it's own conclusion," as ordered by Judge Hulbert, and Mid-Deliberations submitted an inquiry about Ms. Woerner's Statement's. (Exh. 7 Jury Inquiry). "The Substance of the Jury's request-for evidence not admitted at trial ... [is] highly unusual." **Frantz v. Hazey**, 533 F.3d 724 (9th.Cir.2008).

Mr. Ruth relied heavily on protecting Ms. Woerner in his self-defense claim. However, the Jury did not see the participation of his girlfriend in trial, just her "Conspicuous Exclusion." **Id.** at 809. As Mr. Ruth's GirlFriend it seems suspicious for her not to testify. If Mr. Ruth was testifying truthfully about defending her, would she not defend him? The Jury verdict in Mr. Ruth's case is the result of Speculation, conjecture, and inadmissible hearsay. The Jury only saw that Ms. Woerner alienated & Abandoned Mr. Ruth.

The **Juan** Rule applied the **Webb** protections to the Confrontation clause, and Mr. Ruth Asks that this Court attach the Coextensive Public Trial Right Safeguard to the **Juan** Rule & Create the "**RUTH HEARING**," to cure the prejudice in this case, and prevent it from happening in the future.

-17-

4.) MR. RUTH ASKS THAT THIS COURT TAKE THE NEXT STEP IN THE EVOLUTION OF COLLATERAL REVIEW BY ADOPTING THE INITIAL-REVIEW COLLATERAL PETITION RULE

The **Hagler** Court adopted the Balancing of Probabilities test as an exception to the State Procedural Default Doctrine. A Prisoner may obtain Collateral Review of a defaulted claim by showing "Cause" for the default, a Constitutional error, and actual & substantial prejudice rising from the Constitutional error. **In re Hagler**, 97 Wn.2d 818, 825 (1982);(Expanded in **Cook**, 114 Wn.2d 802, 811 (1990)).

These threshold requirements are "necessary to preserve Societal interest of finality, economy, and integrity of the trial process, it also recognizes that the Petitioner has had an opportunity to obtain Judicial Review by Appeal." **In Re Woods**, 154 Wash.2d 400, 409 (2005). An IRCP does not undermine these societal interest because unique procedural obstacles eliminate the opportunity for Direct Appeal. **In re Sandoval**, 249 P.3d 1015, 1019 (Wash.2d 2011); **Phelps v. Alameida**, 596 F.3d 1120 (9th 2009)(Procedure has overshadowed Concerns for basic fairness).

Mr. Ruth asks that this Court adopt an Initial-Review Collateral Procedure, for State Constitutional issues that: (1) Cannot be objected to at trial because the Court did not uphold its obligation to the accused by notifying them of the Right being violated; (2) cannot be raised on direct review because the violation occured off-record; (3) Prejudice cannot be proven because the error is Structural. Mr. Ruth asks that he receive the Standard of Direct Review.

In **Martinez v. Ryan**, 132 S.Ct. 1309 (2012), the Court recognized that IRCP establishes "cause" to excuse Procedural Default. Mr. Ruth asks that the **Hagler/Cook/Rice** Procedural Bars are not applied to the Initial-Review Collateral Issue's presented in this Petition. **Harris v. Nelson**, 394 U.S. 286, 292 (1969).

5.) COLLATERAL REVIEW IS THE PERFECT VEHICLE TO ESTABLISH WHETHER AN ERROR IS STRUCTURAL BECAUSE THE EFFECT MAY BE ASSESSED IN THE CONTEXT OF OFF THE RECORD EVIDENCE STRUCTURAL ERROR IS THE ST. PIERRE HIGHER STANDARD

This Court has not decided whether Public Trial Right violation or the Complete Denial of Counsel Constitute Structural Error on Collateral Review, Although, the U.S. Supreme Court has decided they do. **U.S. V. Gonzalez-Lopez**, 548 U.S. 140, 149 (2006). The St. Pierre Court never mentioned Structural Error, which is a "Higher Standard" of Per Se Prejudicial Error, and only applies to a very limited class of BedRock Constitutional Principles. **Orange** quoted St. Pierre for the proposition that the burden of establishing prejudice on collateral attack may be waived where the error gives rise to a conclusive presumption of prejudice.

-18-

In re Orange, at 804. A Structural defect renders the Jury verdict unreliable & Fundamentally unfair. Arizona v. Fulminante, 499 U.S. 279, 310 (1991). A Conclusive presumption of Prejudice means that there is no possibility the error did not contribute in the verdict. In Re Delgado, 106 Wn.App. 898, 251 P.3d 899, 907 (Wash.App.Div.1 2011). A Structural Error is a Conclusive Presumption of Prejudice.

The St. Pierre Decision did not address whether Structural Error applies to an IRCP Issue, in fact In re Orange & In re Morris Both involved claims that were on the record. What about Structural Error claims that can only be determined on Collateral Review? "If a defendant wishes to raise issues on appeal that require evidence of facts not in the existing trial record, the appropriate means of doing so is through a PRP." State v. McFarland, 127 Wn.2d 322 (1995). When Structural Error issues are unable to be raised on Direct Appeal as a Consequence of Washington State Appellate Procedures the More Lenient standard of review applicable to Direct Appeal applies. In Re Woods 154 Wn.2d at 510. Structural error applies on IRCP.

6.) THE SIGNIFICANT MOMENT WAS TRIGGERED DURING DELIBERATIONS REQUIRING REVERSAL

"Any Statement from the trial judge - no matter how innocuous - are likely to have some impact ... influence on the jury's deliberation is difficult to avoid when the jury is troubled enough to seek advice .... Counsel is most acutely needed before a decision about how to respond to the jury is made ... the missed opportunity to influence the trial courts response to a jury question. That is the Significant Moment." Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th.Cir.2009). "The substance of the jury's request-for evidence not at trial ... [is] Highly unusual." Frantz v. Hazey, 533 F.3d 724 (9th.Cir.2008).

The Jury sent an inquiry to Judge Hulbert requesting the statements of Ms. Woerner, Eden, and Custer. (Exh. 7). The State Conceded that Mr. Ruth & Defense counsel were not notified of the inquiry, nor given the opportunity to participate in the formulation of the response. Mr. Ruth asserts his Rights to Counsel were completely denied which is structural, and his Right to "Appear & Defend," which is more protective under the State Constitution.

The Musladin Court reasoned that because all the parties participated in the formulation of the jury instructions, any answer regarding an instruction contains some information from all the parties. The Jury inquiry in the instant case was not about Jury instructions, and contained no information from the parties, and creates a significant Moment, that triggers the Right to Counsel, Public Trial, and "Appear & Defend" safeguards. Sublett reduced the Public Trial rights during deliberations down to the procedures outlined in CrR 6.15(f)(1). J. Stephens pointed out that this rule does mirror the constitutional rights it protects. Mr. Ruth asserts that this means, unlike the Bone-Club analysis, when CrR 6.15 is violated, so are the Constitutional Rights it mirrors & Protects.

-19-

CrR 6.15(f)(1) is the functional equivalent of the Bone-Club Analysis during deliberations, and the only safeguard for the Right to Counsel, "Appear & Defend," and Fair Trial Rights, even if only in the written record.

7.) THE MORE PROTECTIVE RIGHT TO "APPEAR & DEFEND" WAS VIOLATED BY THE ILLEGAL CLOSURES THE PUBLIC'S & MR. RUTH'S COEXTENSIVE SUPER SAFEGUARD PROTECTS THIS RIGHT

Mr. Ruth had a Right under the State & Federal Constitution to "Appear & Defend" during the In-Chamber hearing that discussed DPA Adcock's "Substantial Government Interference" of a Res Gestae Material Eye Witness. Ms. Woerner was the only one out of the four who witnessed the incident, that was not shot or a shooter, and corroborated the sole defense Witness's testimony. The State Constitution is more protective of this Right:

"Unlike Snyder, our decision in Shutzler, does not condition the right to 'Appear & Defend' at a particular 'stage of trial' on what a defendant might do or gain by attending ... or the extent to which the defendants presence may have aided his defense, but rather on the chance that a defendant's 'substantial rights may be affected' at that stage of trial." **State v. Irby,** 170 Wn.2d 874, 880 n. 6 (2011).

Mr. Ruth's & the Public's Mere presence passively contributes to the proceedings even when serving no function in aiding Mr. Ruth's defense. **State v. Bennett,** 275 P.3d 1224, 1229, 1232 n. 6 (2012). In this Context the Public's & Mr. Ruth's Public Trial Rights are Coextensive to protect Mr. Ruth's Right to "Appear & Defend." This Super Safeguard triggers when the "Superior Right" to a Fair Trial is at issue, upon the likelihood of Jeopardy to Constitutional Rights, and restricts Closure by the Trial Court; absent passing the Bone-Club Test, in Open Court & under the facts of Mr. Ruth's case, without conducting a "RUTH HEARING." Please Read Mr. Ruth's Pro Se Reply Brief Pg 15-17.

### F. Conclusion

"Untold numbers of innocents have tumbled into the dark pit of prison .... [The] Cries of Innocence will forever fall on deaf ears and cynical minds. Once [Mr. Ruth Was] convicted, no one in whose hands his life is placed (his lawyer and the appellate judges) either believes him or is concerned about his innocence or guilt .... The body of justice that has evolved over the centuries had many members. But not one part of that function within this whole has been created or is properly equipped specifically to secure the freedom of the incarcerated innocent." **James McCloskey,** Centurion Ministries, Inc. **"Convicting the Innocent".** The "RUTH HEARING" is a Super Safeguard to protect the Innocent from being Convicted & the "Convicted Innocent." The Appropriate remedy is to Dismiss all Mr. Ruth's charges with Prejudice. In the alternative Remand for a reference hearing.

Respectfully Submitted,

This 30th Day of March, 2014                    x _MJ.RR) R. RR_

APPENDIX "A" NO. 68380-2-I, Division One, Order of Dismissal

APPENDIX "B" Trial Minute Entry, 2/4/05

Appendix "C" Material Witness Warrant Renee M. Woerner

Appendix "D" 12/11/03 Renee M. Woerner Interview

Appendix "E" Mental Health Evaluation (Renee M. Woerner Interview, 3/17/04; cc:

John Adcock

Exhibit One - Affidavit from Matthew R. Stroud I

Exhibit 2 - Henry Slothang & Renee M. Woerner Interviews by Private Investigator

Michael Powers

Exhibit 3 - Interview of Henry Slothang By Michael Powers

Exhibit 4 - Mark Stephens Motion to Withdraw & Transcripts

Exhibit 5 - 2 Affidavits from Matthew R. Ruth

Exhibit 6 - Affidavit from DPA Adcock where he commits Perjury

Exhibit 7 - Jury Inquiry

APPENDIX

"A"

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Personal )
Restraint of: )      No. 68380-2-I
)
)
MATTHEW ROBERT RUTH, )      ORDER OF DISMISSAL
)
            Petitioner. )
_____ )

        Matthew Ruth has filed this personal restraint petition challenging his

conviction in Snohomish County Superior Court No. 03-1-02451-6. In Ruth's direct

appeal, the Supreme Court remanded the matter for resentencing based on the use

of the phrase "deadly weapon" rather than "firearm" in the special verdict forms on

the enhancements in State v. Ruth, 167 Wn.2d 889, 225 P.3d 913 (2010), and issued

the mandate in May 2010. The trial court resentenced Ruth on December 8, 2010.

Ruth did not appeal. Ruth filed the present petition on December 2, 2011, raising

issues relating only to his 2004 jury trial. In particular, Ruth now claims that the trial

court violated his right to a public trial and his rights to the presumption of innocence

and a unanimous verdict.

        In order to obtain collateral relief by means of a personal restraint petition,

Ruth must demonstrate either an error of constitutional magnitude that gives rise to

actual prejudice or a nonconstitutional error that inherently results in a "complete

miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d

506 (1990). Bare assertions and conclusory allegations do not warrant relief in a

personal restraint proceeding. In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828

No. 68380-2-I/2

P.2d 1086 (1992). Because Ruth has not made any showing that he can satisfy this threshold burden, the petition is dismissed.

Ruth contends the trial court violated his right to a public trial by answering a jury question in chambers and by holding a conference in chambers about the State's decision not to call a witness. The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution, provide the accused with the right to a public trial. In re Pers. Restraint of Orange, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Certain proceedings must be held in open court unless the five factors listed in State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995) justify closing the courtroom. Orange, 152 Wn.2d at 808-11. The threshold question is whether, under the experience and logic test, the proceeding at issue implicates the public trial right. State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Under that test, courts consider (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Sublett, 176 Wn.2d at 73 (quotations omitted). In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question. Sublett, 176 Wn.2d at 75-78. Ruth fails to demonstrate a violation of his public trial rights involving the jury question.[1]

---

[1] Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. Because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief.

2

No. 68380-2-I/3

As to the conference in chambers regarding the witness, Ruth claims that the particular circumstances here implicated the public trial right. Briefly, the attorneys and the trial judge met in chambers to discuss scheduling. Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record, "in an overabundance of caution, real quickly, because Mr. Ruth was not present." The prosecutor explained that he believed Ruth's girlfriend Rene Woerner would commit perjury if called to testify by the State, that defense counsel had also spoken with Woerner, and that the Office of Public Defense would be providing an attorney to advise Woerner.

Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it "expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor." Ruth claims "the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor." Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of Yeats, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Relying on State v. Bennett, 161 Wn.2d 303, 315-16, 165 P.d 1241 (2007), Ruth also contends the use of the Castle[2] reasonable doubt instruction violated his constitutional rights. In Bennett, the Supreme Court concluded that the Castle instruction is "constitutionally adequate," but used its inherent supervisory power to

---

[2] State v. Castle, 86 Wn. App. 48, 935 P.2d 656 (1997).

3

No. 68380-2-I/4

direct trial courts to use only Washington Pattern Jury Instruction (WPIC) 4.01. Bennett, 161 Wn.2d at 315, 318. Without sufficient explanation, Ruth now claims that the use of the instruction in his 2004 trial undermined his constitutional right to the presumption of innocence and allowed the jury to convict based on a lower standard of proof. Because Ruth's trial took place years before the Supreme Court disapproved of the "constitutionally adequate" instruction in Bennett and he fails to identify or demonstrate a complete miscarriage of justice, this claim fails.

Finally, relying on State v. Bashaw, 169 Wn.2d 133, 234 P.3d 195 (2010), Ruth contends the jury instructions erroneously instructed the jury that it had to be unanimous in order to answer "no" on the special verdict forms. But our Supreme Court recently overruled the nonunanimity rule developed in Bashaw, concluding that it "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." State v. Nuñez, 174 Wn.2d 707, 709-710, 285 P.3d 21 (2012). Because the instructions were not erroneous, Ruth has no grounds for relief.

Now, therefore, it is hereby

ORDERED that the personal restraint petition is dismissed under RAP 16.11(b).

Done this 17th day of _January_, 2014.

_____
Acting Chief Judge

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2014 JAN 17 PM 2: 51

4

APPENDIX
"B"
TRIAL & SONTENCING
MINUTE ENTRY

Pg 7

FILED

2005 FEB -4 PM 12: 02



03-1-02451-6      104

SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY
SNOHOMISH CO. WASH.

| | |
|---|---|
| STATE OF WASHINGTON | CAUSE NO.: 03-1-02451-6 |
| | JUDGE: DAVID F. HULBERT |
| VS. | REPORTER: LAUREL OLSON |
| | CLERK: HEIDI PERCY |
| MATTHEW RUTH | DATE: 2-4-05 @ 11:00 PM |
| (DEFENDANT) | |

THIS MATTER CAME ON FOR: SENTENCING

CONTINUED/CODE:                                    DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: JOHN ADCOCK              C.C.O.:

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: CHARLES DOLD

FAILED TO APPEAR:    WARRANT AUTHORIZED:    ISSUED:    BAIL AMOUNT:

REQUESTED COUNSEL:    REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

IT IS THE JUDGMENT AND SENTENCE OF THE COURT THE DEFENDANT IS GUILTY AS CHARGED AND IS TO BE SENTENCED TO:

STATE DEPARTMENT OF CORRECTIONS: 105 MONTHS ON EACH COUNT, PLUS 60 MONTHS ON EACH COUNT FOR FIREARMS ENHANCEMENT - FOR A TOTAL OF 330 MONTHS

DAYS OF SENTENCE SUSPENDED:              CREDIT FOR TIME SERVED:

WORK RELEASE:                              COMMENCING: IMMEDIATELY

DAYS CONFINEMENT CONVERTED:              COMMUNITY RESTITUTION HOURS:

COURT ORDERED MONETARY PAYMENTS: COURT COSTS: WAIVED    VICTIM ASSESSMENT: $500.00

ATTORNEY FEES: WAIVED    CRIME LAB FEE: N/A    MANDATORY DRUG FINE: N/A

RESTITUTION/HEARING DATE: $300.00              BIOLOGICAL TESTING FEE: WAIVED

PAYMENTS TO BE MADE: WITHIN 36 MONTHS FROM RELEASE

COMMUNITY SUPERVISION:                    COMMUNITY PLACEMENT:

COMMUNITY CUSTODY: 24-48 MONTHS DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS: YES

DEFENDANT NOTIFIED OF DRIVER'S LICENSE REVOCATION/SUSPENSION:

PRESENCE WAIVED AT SIGNING BY DEFENDANT: YES        DEFENDANT FINGERPRINTED: YES

JUDGMENT AND SENTENCE ENTERED: YES

OTHER:   —DEFENDANT'S MOTION TO CONTINUE: DENIED.
         CONNIE EDEN, VICTIM'S MOTHER, PRESENT AND ADDRESSED THE COURT.
         VICTIM PRESENT AND ADDRESSED THE COURT.  BOBBY EDEN, FATHER OF
THE VICTIM PRESENT AND ADDRESSED THE COURT.
         DEFENDANT'S MOTION FOR AN EXCEPTIONAL SENTENCE DOWNWARD: DENIED.

1                   CRIMINAL SENTENCING/CSV MINUTE ENTRY

**APPENDIX D**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

```
Exhibit no.  2 offered by the State:     ADMITTED 12-7-04
Exhibit no.  3 offered by the State:     ADMITTED 12-7-04
Exhibit no.  4 offered by the State:     ADMITTED 12-7-04
Exhibit no.  5 offered by the State:     ADMITTED 12-8-04
Exhibit no.  6 offered by the State:     ADMITTED 12-7-04
Exhibit no.  7 offered by the State:     ADMITTED 12-7-04
Exhibit no.  8 offered by the State:     ADMITTED 12-7-04
Exhibit no.  9 offered by the State:     ADMITTED 12-7-04
Exhibit no. 10 offered by the State:     ADMITTED 12-7-04
Exhibit no. 11 offered by the State:     ADMITTED 12-7-04
Exhibit no. 12 offered by the State:     ADMITTED 12-7-04
Exhibit no. 13 offered by the State:     ADMITTED 12-7-04
Exhibit no. 14 offered by the State:     ADMITTED 12-7-04
Exhibit no. 15 offered by the State:     ADMITTED 12-7-04
Exhibit no. 16 offered by the State:     ADMITTED 12-7-04
Exhibit no. 17 offered by the State:     ADMITTED 12-7-04
Exhibit no. 18 offered by the State:     ADMITTED 12-7-04
Exhibit no. 19 offered by the State:     ADMITTED 12-7-04
Exhibit no. 20 offered by the State:     ADMITTED 12-7-04
Exhibit no. 21 offered by the State:     ADMITTED 12-7-04
Exhibit no. 22 offered by the State:     ADMITTED 12-7-04
Exhibit no. 23 offered by the State:     ADMITTED 12-7-04
Exhibit no. 24 offered by the State:     ADMITTED 12-7-04
Exhibit no. 25 offered by the State:     ADMITTED 12-7-04
Exhibit no. 26 offered by the State:     ADMITTED 12-7-04
Exhibit no. 27 offered by the State:     ADMITTED 12-7-04
Exhibit no. 28 offered by the State:     ADMITTED 12-7-04
Exhibit no. 29 offered by the State:     ADMITTED 12-7-04
Exhibit no. 30 offered by the State:     ADMITTED 12-7-04
Exhibit no. 31 offered by the State:     ADMITTED 12-7-04
Exhibit no. 32 offered by the State:     ADMITTED 12-7-04
Exhibit no. 33 offered by the State:     ADMITTED 12-7-04
Exhibit no. 34 offered by the State:     ADMITTED 12-7-04
Exhibit no. 35 offered by the State:     ADMITTED 12-7-04
Exhibit no. 36 offered by the State:     ADMITTED 12-7-04
Exhibit no. 37 offered by the State:     ADMITTED 12-7-04
Exhibit no. 38 offered by the State:     ADMITTED 12-7-04
Exhibit no. 39 offered by the State:     ADMITTED 12-8-04
Exhibit no. 40 offered by the State:     ADMITTED 12-8-04
```

9:35  Arraignment on Second Amended Information.   SEE COURT FILE FOR
RECORD OF MINUTES.

9:36  State's motion in limine to exclude witnesses except Detective
Willoth: Granted.

2                           TRIAL MINUTES

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

9:37   State's motion in limine to prevent Defense counsel from using the term of "Snitch" or another derogatory comments regarding State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49   Defense motion in limine to exclude testimony of prior burglary charge around the time of the incident in question: Granted/Stipulated.

9:40   Defense motion in limine to exclude testimony of a prior assault of Renee Woerner: Granted/Stipulated.

9:41   Defense motion in limine to exclude testimony of defendant's criminal activity in Blythe, California: Granted/Stipulated.

9:42   Defense motion in limine to exclude any testimony or evidence of defendant's prior criminal history: Reserved.

9:43   Defense motion in limine exclude any evidence about defendant's last name or alias last names: Granted/Stipulated.

9:45   Defendant motion to strike testimony of State's witnesses, Renee Woerner, because he was unable to interview her, as his subpoena was returned: Denied. The Court finds that the remedy is not exclusion but to allow Defendant to interview the witness prior to testifying.

      Exhibit no. 41 offered by the State:    **ADMITTED 12-7-04**
      Exhibit no. 42 offered by Defendant:    Not Offered

9:48   Defendant's motion strike testimony of Jeremiah Sheridan because of defendant's inability to locate and interview this witness: Denied. The Court finds that the remedy is not exclusion but to allow Defendant to interview the witness prior to his testimony.

9:50   Colloquy of Court and counsel.
9:52   Court in recess.

10:15 The following persons were selected to qualify as jurors on this cause and seated in the jury box:

| | | | |
|---|---|---|---|
| 1. | Gary R. Hall | 7. | Andrea L. Greenlee |
| 2. | Edward A. Dawson | 8. | Robert G. Sears |
| 3. | Kandace Aksnes | 9. | Richard E. Olsen |
| 4. | Jody Marie Mountifield | 10. | Marilyn Churchill |
| 5. | Karen R. Egtvedt | 11. | Sharon Walker |
| 6. | Jennifer R. Clyde | 12. | Donna Lee Orr |

3                    **TRIAL MINUTES**

## STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:

13. Mehari E. Gebrewold
14. Frank P. Brady
15. James C. Sinnema
16. Barbara R. Garrett
17. Frances Winters
18. Lesley W. Winney
19. Michael Rucker
20. William Glover
21. Raymond Johnson
22. Richard Hill
23. Ella Larrick
24. Patricia Nakahara
25. Charlene Lindsay
26. Mary E. Barringer
27. I. Jay Fritch
28. Lawrence Thompson
29. Donna R. West
30. Jerry D. Rochford
31. Daniel D. Orme-Doutre
32. Jessica Marie Kinney
33. Dale W. Troupe
34. Brandon Duc Ha
35. Patricia J. Jason

10:20 All prospective jurors sworn: Oath of Voir Dire.
The Court directs general questions to all prospective jurors.
10:35 State's initial voir dire of entire prospective jury panel.
10:51 Defendant's initial voir dire of entire prospective jury panel.
11:13 State waives concluding voir dire of entire prospective jury panel.
11:14 Defendant's concluding voir dire of entire prospective jury panel.
11:20 Challenges for cause: prospective jurors passed for cause.

11:22 Plaintiff's first peremptory challenge: Kandace Aksnes.
Frank Brady picked to qualify as juror #3.
Defendant's first peremptory challenge: Edward Dawson.
James Sinnema picked to qualify as juror #2.

Plaintiff's second peremptory challenge: Jody Mountfield.
Barbara Garrett picked to qualify as juror #4.
Defendant's second peremptory challenge: Accepts Panel.

Plaintiff's third peremptory challenge: Richard Olsen.
Frances Winters picked to qualify as juror #9.
Defendant's limited peremptory challenge: Frank Winters.

4                          **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27 The following 13 jurors were sworn to try this cause: Juror #1,
Gary R. Hall is designated as alternate juror.

| | | | |
|---|---|---|---|
| 1. | Gary R. Hall | 7. | Andrea L. Greenlee |
| 2. | James Sinnema | 8. | Robert G. Sears |
| 3. | Frank Brady | 9. | Lesley Winney |
| 4. | Barbara Garrett | 10. | Marilyn Churchill |
| 5. | Karen R. Egtvedt | 11. | Sharon Walker |
| 6. | Jennifer R. Clyde | 12. | Donna Lee Orr |
| | | 13. | Mehari Gebrewold |

11:28 Attorney conference at sidebar.
11:30 The Court directs general instructions to the Jury.
11:35 Colloquy of Court and counsel.
11:40 Court in recess until 1:00 p.m.

1:08 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
1:10 Jury present.
State makes opening statement.
1:20 Defendant makes opening statement.
1:29 The Court instructs the Jury regarding note taking.
1:31 SUZANNA JOHNSON, called by the State, sworn and testified.
1:40 Cross examination of Suzanna Johnson by the Defendant.
1:42 Attorney conference at sidebar.
1:43 Jury admonished not to discuss this case and return on Tuesday,
December 7, 2004 @ 9:55 a.m.
1:45 Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

TUESDAY, DECEMBER 7, 2004                    Clerk: Grace Hampton
                                             Reporter: S. Magee
Court opened at 9:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
State of Washington represented through Deputy Prosecuting
Attorney, John Adcock.  Detective Kelly Willoth seated at
counsel table.
Defendant present, in custody, represented by counsel,
Mark Stephens.
Jury not present.

5                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.

9:10 Juror #9, Lesley Winney present.
State's voir dire of Juror #9, Mr. Winney.
Juror #9, Lesley Winney released to go back to the Jury Room.
The Court finds that Juror #9, Lesley Winney was engrossed in
the book he was reading and did not see the defendant being
brought to the Courtroom.

Exhibit no. 43 offered by the State:     ADMITTED 12-7-04
Exhibit no. 44 offered by the State:     Not Offered
Exhibit no. 45 offered by Defendant:     Not Offered

9:13 Court in recess.

9:40 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
9:45 Court in recess.

10:05 Court resumes as heretofore, defendant present, in custody, and
all parties present.
KELLY WILLOTH, called by the State, sworn and testified.

Exhibit no. 46 offered by the State:     ADMITTED 12-8-04

10:55 Court in recess.

11:14 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Cross examination of Kelly Willoth by the Defendant.

Exhibit no. 47 offered by Defendant:     Not Offered

11:28 GEORGE WILKINS, called by the State, sworn and testified.

Exhibit no. 48 offered by the State:     ADMITTED 12-7-04

11:39 Cross examination of George Wilkins by the Defendant.
11:40 Redirect examination of George Wilkins by the State.
11:42 Recross examination of George Wilkins by the Defendant.
11:44 SARAH BRYANT, called by the State, sworn and testified.
11:46 Cross examination of Sarah Bryant by the Defendant.
11:47 Court in recess until 1:30 p.m.

6                      TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

1:50   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       JEREMY CUSTER, called by the State, sworn and testified.

       Exhibit no. 49 offered by the State:      **ADMITTED 12-7-04**
       Exhibit no. 50 offered by the State:      **ADMITTED 12-7-04**
       Exhibit no. 51 offered by the State:      Not Offered
       Exhibit no. 52 offered by Defendant:      Not Offered

2:15   Cross examination of Jeremy Custer by the Defendant.
2:19   Redirect examination of Jeremy Custer by the State.
2:22   Recross examination of Jeremy Custer by the Defendant.
2:30   DREW EDEN, called by the State, sworn and testified.
2:45   Cross examination of Drew Eden by the Defendant.
2:53   Redirect examination of Drew Eden by the State.
2:55   Recross examination of Drew Eden by the Defendant.
2:56   Court in recess.

3:22   Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
       Attorney conference at sidebar.
3:24   The Court admonishes the jury and directs them to return on
       December 8, 2004 @ 9:00 a.m.
3:25   Colloquy of Court and counsel.
3:28   Court in recess.

       **WEDNESDAY, DECEMBER 8, 2004**               Clerk: Grace Hampton
                                                     Reporter: S. Magee
       Court opened at 9:12 a.m., David F. Hulbert, Judge.
       The following proceedings were had to wit:
       This matter continued from previous day.
       State of Washington represented through Deputy Prosecuting
       Attorney, John Adcock.  Detective Kelly Willoth seated at
       counsel table.
       Defendant present, in custody, represented by counsel,
       Mark Stephens.
       Jury not present.
       Colloquy of Court and counsel.
9:15   Jury present.
       JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20   Cross examination of Jeremiah Sheridan by the defendant.
9:23   Detective Kelly Willoth, recalled by the State, previously
       sworn, testified.
9:25   Cross examination of Detective Kelly Willoth by the Defendant.


7                           **TRIAL MINUTES**

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

9:28  Redirect examination of Detective Kelly Willoth by the State.
9:30  **CANDY CORDER**, called by the State, sworn and testified.
9:37  Cross examination of Candy Corder by the Defendant.
9:45  Court in recess.

10:00  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
10:02  **EVAN THOMPSON**, called by the State, sworn and testified.


       Exhibit no. 53 offered by the State:   **ADMITTED 12-8-04**
       Exhibit no. 54 offered by the State:   **ADMITTED 12-8-04**

10:15  Cross examination of Evan Thompson by the Defendant.
10:18  State rests.
10:19  **MATTHEW RUTH**, called by the Defendant, sworn and testified.
10:26  Attorney conference at sidebar.
10:28  Continuation of testimony of Matthew Ruth on direct examination
       by the Defendant.
11:03  Jury not present.
11:04  Colloquy of Court and counsel.
11:05  Court in recess.

11:25  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury present.
11:26  Cross examination of Matthew Ruth by the State.
11:45  Defense rests.
       State rests.
11:46  Jury not present.
11:48  Colloquy of Court and counsel.
11:50  Court in recess until 2:00 p.m.

 2:00  Court resumes as heretofore, defendant present, in custody, and
       all parties present.
       Jury not present.
       The Court takes exceptions and objections to instruction: None
       given.
 2:05  Jury present.
       Not reported.
       The Court instructs the Jury.
 2:20  Reported.
       State opens closing argument.
 2:40  Defendant makes closing argument.
 2:52  State makes final argument.


8                         **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate
juror.
The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

At 4:12 p.m. on December 8, 2004, the Jury submits a written
inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10
& 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov.
24, 2003; and 3) Transcript of interview with Drew Eden (Nov.
10, 2003)"

At 4:15 p.m. on December 8, 2004 the Court responds in writing
"The evidence requested by the jury was not admitted into
evidence and is not available to the jury during deliberations.
Thank you."

Inquiry from the Jury and Court's Response filed in open court.

**THURSDAY, DECEMBER 9, 2004**              Clerk: Grace Hampton
                                           Reporter: S. Magee
Court opened at 11:05 a.m., David F. Hulbert, Judge.
The following proceedings were had to wit:
This matter continued from previous day.
The jury returns to open court with their verdict.
State of Washington represented through Deputy Prosecuting
Attorney Julie Mohr.  Detective Kelly Willoth seated at counsel
table.
Defendant present, in custody, represented by counsel Mark
Stephens.
Verdict read in open court finding the Defendant guilty of the
crime of First Degree Assault as charged in Count I; and guilty
of the crime of First Degree Assault as charged in Count II.  On
Special Verdict Form A, the Jury found that the defendant was
armed with a deadly weapon at the time of the commission of the
crime in Count I and on Special Verdict Form B, the Jury found
that the defendant was armed with a deadly weapon at the time of
the commission of the crime in Count II.
Jurors polled: verdict unanimous.
Verdict Form A; Special Verdict Form A; Verdict Form B and
Special Verdict Form B are received and filed.
Court's Instructions filed in open court.
Jury is discharged.

9                          **TRIAL MINUTES**

**STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6**

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5,
Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

10                              **TRIAL MINUTES**

FILED

2005 FEB -4 PM 12:02



03-1-02451-6          104

## SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY
SNOHOMISH CO. WASH.

| | |
|---|---|
| STATE OF WASHINGTON | CAUSE NO.: 03-1-02451-6 |
| | JUDGE: DAVID F. HULBERT |
| VS. | REPORTER: LAUREL OLSON |
| | CLERK: HEIDI PERCY |
| MATTHEW RUTH | DATE: 2-4-05 @ 11:00 PM |
| (DEFENDANT) | |

THIS MATTER CAME ON FOR: SENTENCING

CONTINUED/CODE:                              DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: JOHN ADCOCK                    C.C.O.:

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: CHARLES DOLD

FAILED TO APPEAR:      WARRANT AUTHORIZED:      ISSUED:      BAIL AMOUNT:

REQUESTED COUNSEL:      REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

IT IS THE JUDGMENT AND SENTENCE OF THE COURT THE DEFENDANT IS GUILTY AS
CHARGED AND IS TO BE SENTENCED TO:

STATE DEPARTMENT OF CORRECTIONS: 105 MONTHS ON EACH COUNT, PLUS 60 MONTHS ON EACH
COUNT FOR FIREARMS ENHANCEMENT - FOR A TOTAL OF 330 MONTHS

DAYS OF SENTENCE SUSPENDED:          CREDIT FOR TIME SERVED:

WORK RELEASE:                    COMMENCING: IMMEDIATELY

DAYS CONFINEMENT CONVERTED:          COMMUNITY RESTITUTION HOURS:

COURT ORDERED MONETARY PAYMENTS: COURT COSTS: WAIVED    VICTIM ASSESSMENT: $500.00

ATTORNEY FEES: WAIVED    CRIME LAB FEE: N/A    MANDATORY DRUG FINE: N/A

RESTITUTION/HEARING DATE: $300.00              BIOLOGICAL TESTING FEE: WAIVED

PAYMENTS TO BE MADE: WITHIN 36 MONTHS FROM RELEASE

COMMUNITY SUPERVISION:                COMMUNITY PLACEMENT:

COMMUNITY CUSTODY: 24-48 MONTHS DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS: YES

DEFENDANT NOTIFIED OF DRIVER'S LICENSE REVOCATION/SUSPENSION:

PRESENCE WAIVED AT SIGNING BY DEFENDANT: YES          DEFENDANT FINGERPRINTED: YES

JUDGMENT AND SENTENCE ENTERED: YES

OTHER:      DEFENDANT'S MOTION TO CONTINUE: DENIED.
          CONNIE EDEN, VICTIM'S MOTHER, PRESENT AND ADDRESSED THE COURT.
          , VICTIM PRESENT AND ADDRESSED THE COURT.  BOBBY EDEN, FATHER OF
THE VICTIM PRESENT AND ADDRESSED THE COURT.
          DEFENDANT'S MOTION FOR AN EXCEPTIONAL SENTENCE DOWNWARD: DENIED.

1                    CRIMINAL SENTENCING/CSV MINUTE ENTRY                    AA
                                                                            104

## APPENDIX D

STATE OF WASHINGTON VS. MATTHEW RUTH
03-1-02451-6

THE DEFENDANT IS TO HAVE NO CONTACT WITH THE VICTIMS FOR LIFE.
THE COURT ADVISES THE DEFENDANT OF HIS RIGHT TO APPEAL WITHIN 30
DAYS.

FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO CRIMINAL RULES
3.5/3.6 ENTERED, TO BE FILED BY COUNSEL.   TEMPORARY ORDER OF COMMITMENT
ENTERED.   PSYCHOLOGICAL EVALUATION REPORT FILED.

2          CRIMINAL SENTENCING/CSV MINUTE ENTRY

APPENDIX

"C"

MATERIAL
WITNESS
WARRANT

RENEE M. WOERNER

FILED

CO. SHERIFF
ETT WA

2003 DEC 11  AM 9: 27     2003 NOV 13  P 3: 01

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

SO WARRANT CONTROL NO. _____

MATERIAL WITNESS WARRANT OF ARREST

SUPERIOR COURT OF THE STATE OF WASHINGTON - COUNTY OF SNOHOMISH

Name: **RENEE MARIE WOERNER**
MATERIAL WITNESS

Defendant: **MATTHEW R. RUTH**
THE STATE OF WASHINGTON)
COUNTY OF SNOHOMISH    )

COURT CASE NUMBER **03-1-02451-6**
SEX **F**
RACE **W**          DOB
HT **508**          WT **120**
HAIR **BRN**        EYES **GRN**
FBI **553272JB1**      SID **WA19273781**
WDL                SS#

BAIL **$50,000**

PA#**03F04554**    DPA **JSA/pjb**
ORI AGENCY **SSO** AGENCY CASE **03-25124**

The State of Washington to all peace officers, greetings:
In the name of the State of Washington you are commanded forthwith to apprehend the material witness and bring him or her before the court to be dealt with according to law.

REASON FOR ISSUANCE: MATERIAL WITNESS WARRANT
DESCRIPTION OF CHARGES: **FIRST DEGREE ASSAULT WITH A DEADLY WEAPON (FIREARM)**
ADDRESS: **11401 3RD AVENUE SE APT F5, EVERETT WA 98208**
ADDITIONAL DATA: TAT: **NECK, L ANKL, R WRS**

Please notify the Snohomish County Prosecuting Attorney's Office, 3000 Rockefeller Avenue, Everett, Washington 98201, (425) 388-3333, when this individual is apprehended in Washington or in the designated areas of extradition.

[  ] NCIC. Extradition statewide only.
[  ] NCIC. We will seek extradition from Western States, except Alaska and Hawaii.
[X] NCIC. We will seek extradition from anywhere in the United States.

I hereby certify that I arrested the named defendant on
the _____ day of _____ , 20 _____

_____
OFFICER

_____
AGENCY

FEES: SVC _____ MLG _____ TOTAL _____
                                   37.00

Given under my hand this
13TH  NOV  2003

**RONALD L. CASTLEBERRY**
JUDGE
Pam L. Daniels, County Clerk and Ex Officio
                    Clerk of Superior Court

by _____ Deputy Clerk

Material Witness Warrant Page 1 of 1
St. v. _____
PA# _____



APPENDIX
"D"

12/11/03   Interview of Connie Woerner

Police Interview of   Renne Woerner

*Snohomish County Sheriff's Office*

*Tape recorded INTERVIEW/STATEMENT*                    Event # _S003-25124_

This is the statement of _Renee Woerner_ . The date is _12/18/03_ , and the time is now _1013_ . I am _Willorn, K_ of the Snohomish County Sheriff's Office.

This statement is being recorded at _Courthouse_ . There are _3_ persons present in the room. For the purposes of voice identification, would each person present besides _Renee_ , the person who is giving this statement, please state your name and occupation, one at a time.......

Q: _Renee_ , do you understand that this statement is being recorded?

Q: Would you give your full name and spell it please?

Q: Would you give your address please?

Q: Would you give your home telephone number?

Q: Would you give me your date of birth?

1. You have the right to remain silent.

2. Anything you say can be used against you in a court of law.

3. You have the right at this time to talk to a lawyer and have him present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

Juvenile (Optional): If you are under the age of 18, anything you say can be used against you in a juvenile court prosecution for a juvenile offense and can also be used against you in an adult court criminal prosecution if the juvenile court decides that you are to be tried as an adult.

1. Do you understand each of these rights I have explained to you?

2. Having these rights in mind, do you wish to talk to us now?

_Renee Woerner_                              _Kelly Ht_
(Subject Signature)                          (Witness Signature)

### Questions at end of statement

Q: Do you have anything else you would like to add to this statement?
Q: At any time during this statement, have you asked that the questioning or taping be stopped?
Q: At any time during this statement, have you requested an attorney?
Q: Is it true that the facts stated on this tape are true and correct to the best of your knowledge, and that your statement has been made freely, voluntarily, and without threats or promises of any kind?

_Renee Woerner_                              _[signature]_
(Subject Signature)                          (Witness Signature)

This recording ended at _1106_

# APPENDIX O

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|

| NAME OF ORIGINAL VICTIM(S) | | REPORT DATE |
|---|---|---|
| | *ASSAULT 1 W/FIREARM* | SO 03-25124 |

| ...E OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y   N | [ ] COMPUTER USED [ ] DRUG RELATED [ ] ALCOHOL RELATED |
|---|---|---|---|---|---|---|

Det. Willoth:    Jeremy didn't come home?

R. Woerner:    Jeremy came home the ne...that morning.

Det. Willoth:    That morning. The next morning of the incident?

R. Woerner:    Yeah. The morning of the incident he was all kinda, I think he was kinda messed up. He hadn't had any sleep.

Det. Willoth:    Okay. Who, who was there that, that morning?

R. Woerner:    Dan was there, Nigel rode a bicycle into Lynnwood um, because Jeremy hadn't come home in time for him to go handle his I don't know what it was, pick up his unemployment check or something. Matt was it was Ni...uh, Dan, Matt, me, Drew, is that his name?

Det. Willoth:    Um huh.

R. Woerner:    Okay. Drew was there also. Um, and then Jeremy came. I don't know if Jeremy brought Drew, I can't remember if Jeremy brought Drew or not or if or if he was already there.

Det. Willoth:    Okay. When Jeremy showed up, where were all you guys at?

R. Woerner:    I was in the trailer in the bed.

Det. Willoth:    Okay.

R. Woerner:    That's my spot. That's where I always stayed.

Det. Willoth:    Okay.

R. Woerner:    And if not I'd be in there cleaning the dishes or having a shower. I didn't ya know, hang out and mingle with the guys too much cuz Matt didn't like that.

Det. Willoth:    Okay. Where were all the other guys?

R. Woerner:    They were all across over in the house. In the blue house, in the little blue box.

Det. Willoth:    Whose house is that?

| OFFICER NAME/NUMBER | | | APPROVED BY | |
|---|---|---|---|---|
| *Detective Willoth #1335* | 12 | | 12/11/03 | |
| IBR CLEARANCE :(ONE) [ ] ARR/A    [ ] EXC/A [ ] ARR/J    [ ] EXC/J | [ ] INSUFF / CLD [ ] OTHER / CLO [ ] UNF | COPIES MADE FOR: [ ] PA    [ ] CPS [ ] PAT   [ ] DSHS | [ ] COURT: CAS / EVG / SOUTH / EVT [ ] JUV   [ ] DET; PREC / CTH / SPEC [ ] MH-  [ ] OTHER: | DATA ENTRY |

SH-245 9/94

ORDER = 8

# FOLLOW-UP

PAGE ___14___ OF ___45___

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE |
| TYPE OF ORIGINAL REPORT | | SO 03-25124 |

| | | | DATE | RECLASSIFY TO | | CONNECTING REPORT NUMBERS | |
|---|---|---|---|---|---|---|---|

Renee Woerner DOB

Det. Willoth

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y    N | COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**Det. Willoth:** did, was he using drugs?

**R. Woerner:** Well I mean he used, yeah there were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms.

**Det. Willoth:** Have you, what have you seen Matt do?

**R. Woerner:** Meth, mushrooms, pot, that'd be it.

**Det. Willoth:** Okay. Have you ever seen

**R. Woerner:** Oh, cocaine, yeah cocaine.

**Det. Willoth:** Cocaine too?

**R. Woerner:** They were snortin' coke.

**Det. Willoth:** Okay. Um, when you say they who do you mean?

**R. Woerner:** All of them.

**Det. Willoth:** 'kay. Are you talking about

**R. Woerner:** Jeremy, Dan, when that day that of this incident Dan had big old sores all over his face from picking them because he had been scrapped out in the bathroom for ya know, a few days I don't' know. Doing whatever, doing meth I assume but...

**Det. Willoth:** Okay. So would you say they were, were they in the same business together? Uh, Matt and, and these guys?

**R. Woerner:** Yeah, they were in the whatever their music thing does was what it was. Their karaoke, light show, D.J. studio business.

**Det. Willoth:** Okay.

**R. Woerner:** And that's what they called it.

**Det. Willoth:** What was Matt's part in the business? What did he do?

**R. Woerner:** I don't know what he did. I really don't. I, I mean I went with him. They used to go to the karaoke store a lot and they'd look at lights and they'd

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 14 | 12/11/03 | |

| NIBR CLEARANCE (ONE) | | COPIES MADE FOR: | | | COURT: CAS / EVG / SOUTH / EVT | DATA ENTRY |
|---|---|---|---|---|---|---|
| ( ) ARR/A   ( ) EXC/A | ( ) UNSUFF / CLO ( ) OTHER / CLO | ( ) PA ( ) CPS ( ) JUV | ( ) DET: PREC / CTH / SPEC | | |
| ( ) ARR/J   ( ) EXC/J | ( ) UNF | ( ) PAT ( ) DSHS ( ) MH ( ) OTHER: | | |

SH-245 5/94

ORDER = B

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|

| NAME OF ORIGINAL VICTIM(S) | | REPORT DATE |
|---|---|---|
| | ASSAULT 1 W/FIREARM | SO 03-25124 |

| .PE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner, DOB | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS | ACTION | ADDITIONAL RECOVERED | TOTAL RECOVERED Y   N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|
| | | $ | | $ | | |

| | |
|---|---|
| Det. Willoth: | What about when Jeremy was gone and you and Matt were home? |
| R. Woerner: | Sometimes he would leave it, sometimes he would lock it and Matt would get mad.. Ya know, he'd go pop the window open in the bathroom and go in or whatever so we could use the bathroom and stuff but... |
| Det. Willoth: | Okay.  Cuz I understand you didn't have a there's no bathroom in the trailer? |
| R. Woerner: | Yeah, there's no, and there was no key for the, we didn't have a key to Jeremy's house so... |
| Det. Willoth: | You didn't have a key? |
| R. Woerner: | No. |
| Det. Willoth: | Okay. |
| R. Woerner: | Huh uh [that's a no]. |
| Det. Willoth: | Okay so um, let's go back to that day, Jeremy comes home, you said you were in the trailer |
| R. Woerner: | Um huh [that's a yes]. |
| Det. Willoth: | and... |
| R. Woerner: | They're all outside laughing and doing other things. |
| Det. Willoth: | Okay. |
| R. Woerner: | They were fine. |
| Det. Willoth: | Okay.  What happens after that? |
| R. Woerner: | Then all of a sudden I hear em I see em talkin' I would sit on the bed cuz I mean that's ya know, that's where I spent my time and the computers in there or whatever.  And I looked out the window and they're kinda being serious.  Then they come up to the trailer.  I think Matt |
| Det. Willoth: | Who's they? |

| OFFICER NAME/NUMBER | | | APPROVED BY | | |
|---|---|---|---|---|---|
| Detective Willoth #1335 | | 16 | 12/11/03 | | |
| IBR CLEARANCE (ONE) ( ) ARR/A ( ) ARR/J | ( ) INSUFF / CLD ( ) EXC/A ( ) EXC/J | COPIES MADE FOR: ( ) INSUFF / CLD ( ) OTHER / CLD ( ) UNF | ( ) PA ( ) PAT | CPS JUV DSHS | ( ) COURT:  CAS / EVG / SOUTH / EVT ( ) DET:  PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-246  9/94

ORDER = 8

# FOLLOW-UP

PAGE ___1_ OF ___45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER | |
|---|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | **ASSAULT 1 W/FIREARM** | | REPORT DATE | |
| | | | SO 03-25124 | |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS | |
|---|---|---|---|---|
| *Renee Woerner DOB* | | | *Det. Willoth* | |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS | ACTION | ADDITIONAL RECOVERED | TOTAL RECOVERED Y | N | [ ] COMPUTER USED [ ] DRUG RELATED [ ] ALCOHOL RELATED |
|---|---|---|---|---|---|---|---|
| | $ | | | $ | | | |

| | |
|---|---|
| R. Woerner: | Matt, Jeremy and Drew. And Matt was like man check this out. There's a pound of weed missing and they think I stole the shit. And Jeremy's like man I'm not saying you stole it I just wanna check all your stuff and make sure that you didn't take it. |
| Det. Willoth: | Who was he saying that to? |
| R. Woerner: | Matt was saying this to me. |
| Det. Willoth: | To you? |
| R. Woerner: | Yeah. |
| Det. Willoth: | So they had gone inside of the trailer? |
| R. Woerner: | Yeah. At this point they had come into the trailer. They were standing down in the living room. |
| Det. Willoth: | And where was Dan? Was he |
| R. Woerner: | Dan was outside the whole time. |
| Det. Willoth: | Okay. |
| R. Woerner: | And um, he was just, he was lost, he was gone whatever he had done his face all picked off he was like (unintelligible). |
| Det. Willoth: | Okay. |
| R. Woerner: | Um, I was on the bed I was just kinda going well whatever. And Matt and Jeremy were arguing. Jeremy came up and sat on the bed. |
| Det. Willoth: | 'kay. Where on the bed was Jeremy sitting? |
| R. Woerner: | Right in front of me on the edge of the bed. |
| Det. Willoth: | Okay. |
| R. Woerner: | If you go in there I know you've seen it, there's a table right here to the right. There's the computer monitor, there was a computer there which Dan came and brought it to Matt whatever but um, just on the edge of the bed Jeremy was just sittin' on the edge of the bed. |

| OFFICER NAME/NUMBER | | | APPROVED BY | | |
|---|---|---|---|---|---|
| *Detective Willoth #1335* | | 17 | *12/11/03* | | DATA ENTRY |

| IBR CLEARANCE (ONE) [ ] ARR/A [ ] ARR/J | [ ] EXC/A [ ] EXC/J | [ ] INSUFF / CLO [ ] OTHER / CLO [ ] UNF | COPIES MADE FOR: [ ] PA [ ] CPS [ ] PAT [ ] DSHS | [ ] JUV [ ] MH | [ ] COURT: CAS / EVG / SOUTH / EVT [ ] DET: PREC / CTH / SPEC [ ] OTHER: |
|---|---|---|---|---|---|

SH-246  9/94

ORDER = 8

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|

| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
|---|---|---|

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner DOB | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**Det. Willoth:** Okay. So he's sitting on the edge of the bed.

**R. Woerner:** In front of me.

**Det. Willoth:** What is he facing?

**R. Woerner:** Matt. Out towards the, out towards the ya know, the shower's on the right he's facing towards the living room.

**Det. Willoth:** Okay.

**R. Woerner:** So...

**Det. Willoth:** And you're sitting on

**R. Woerner:** behind him.

**Det. Willoth:** Behind him? Are you sitting on the side on the right side where the computer is or on the other side?

**R. Woerner:** I'm kind of in the middle like right behind him.

**Det. Willoth:** Okay. In the middle you were in the middle of the bed?

**R. Woerner:** Like ya know, yeah, I mean I was on the bed okay on the pillows.

**Det. Willoth:** Okay. Toward the headboard?

**R. Woerner:** Yeah. It's got that weird little shelf thing. And I'm sitting in the back and he's right in front of me.

**Det. Willoth:** Okay.

**R. Woerner:** So, I mean not right in front I'm not touching him but he's sittin' there and Matt's going no you gotta get outta the trailer. You can't ya know, that's not cool. You're disrespectful. You can't go through my shit.

**Det. Willoth:** They're talking about this?

**R. Woerner:** Yes they're arguing about it.

**Det. Willoth:** 'kay. Where is Drew?

**R. Woerner:** Out in the living room. And I didn't really see a whole lot of him. I was too busy like watching Matt and Jeremy.

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 18 | | 12/11/03 |

| IBR CLEARANCE (ONE) ( ) ARR/A   ( ) EXC/A ( ) ARR/J   ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA    ( ) CPS ( ) PAT   ( ) DSHS | ( ) JUV ( ) MM | ( ) COURT:  CAS / EVG / SOUTH / EVT ( ) DET:  PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |
|---|---|---|---|---|---|

SH-245  9/94

ORDER = B

# FOLLOW-UP

| | |
|---|---|
| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |

| NAME OF ORIGINAL VICTIM(S) | | REPORT DATE |
|---|---|---|
| | **ASSAULT 1 W/FIREARM** | SO 03-25124 |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner DOB | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y / N | [ ] COMPUTER USED [ ] DRUG RELATED [ ] ALCOHOL RELATED |
|---|---|---|---|---|---|---|

| | |
|---|---|
| Det. Willoth: | 'kay.  Where was Matt at that point? |
| R. Woerner: | Standing in front of Jeremy facing me. |
| Det. Willoth: | How close to Jeremy was he? |
| R. Woerner: | 'bout that close. |
| Det. Willoth: | So about a couple feet away? |
| R. Woerner: | Maybe if that, if that and that's just a guesstimate because I was just kinda trippin' like okay I was like Matt, just calm down ya know. |
| Det. Willoth: | Okay.  Who, at that point when they're discussing this you said Matt calm down, what was Matt's demeanor like? |
| R. Woerner: | Matt would get this weird look in his face any, any time that he got mad. And he'd just be like well I told you to get out and he had this, his eyes would turn black and he would just Matt, Matt was not really there anymore.  You know what I mean, he was getting mad. |
| Det. Willoth: | Okay.  And what was Jeremy's demeanor like? |
| R. Woerner: | Jeremy's like dude, why you gettin' so mad, man I haven't done anything.  I just asked you if I could go through your stuff to make sure that there's nothing goin' on here ya know, cuz everybody's a suspect in this.  Ya know, I'm not pickin' on you.  Ya know, I'm just gonna go through your stuff real quick and then I'll go in the house and go through other stuff and ya know, so on and so forth.  And he kinda dug around on the floor right on the side of the bed.  And Matt's like see, you're going through my stuff. |
| Det. Willoth: | And this is about the missing |
| R. Woerner: | Pound of weed. |
| Det. Willoth: | pound of weed?  Okay. |

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 19 | 12/11/03 |

| IBR CLEARANCE :(ONE) | [ ] INSUFF / CLD | COPIES MADE FOR: | | | [ ] COURT: CAS / EVG / SOUTH / EVT | DATA ENTRY |
|---|---|---|---|---|---|---|
| [ ] EXC/A [ ] ARR/A | [ ] OTHER / CLD | [ ] PA [ ] CPS | [ ] JUV | [ ] DET: PREC / CTH / SPEC | |
| [ ] ARR/J [ ] EXC/J | [ ] UNF | [ ] PAT [ ] DSHS | [ ] MH | [ ] OTHER: | |

SH-245  9/94

ORDER = B

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE  SO 03-25124 |

| OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| Renee Woerner DOB | | | Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**R. Woerner:** So I, I'm just sittin' on the bed and I didn't, I didn't say anything more until the shooting started I was. Matt pulled the gun out of the cabinet. Matt was facing the bed, there's a cabinet right here on the left. There's a shower, there's a cabinet and there's a cabinet.

**Det. Willoth:** Okay.

**R. Woerner:** The, the gun was in this cabinet. The top cabinet. He pulled it out and went like this. And I think stuck it in his pants and Jeremy's like wow I feel threatened. And Matt was like you gotta go man, you gotta get outta my house. You can't do this shit. And I was like Matt dude, you gotta, Matt calm down ya know. And but that's all I can say. I'm not gonna say too much cuz I mean he'd shoot me as soon as he'd shoot as well as he would shoot Jeremy. I mean he's already proven that.

**Det. Willoth:** The gun that he got out of the cabinet um, is that where he usually kept the gun?

**R. Woerner:** No he moved it from place to place because, because. I don't know why. He'd usually keep it under the pillow.

**Det. Willoth:** Okay. Did you know, was it in any type of holster?

**R. Woerner:** No, he had it wrapped in a handkerchief.

**Det. Willoth:** Okay.

**R. Woerner:** A blue handkerchief.

**Det. Willoth:** A handkerchief?

**R. Woerner:** Um huh [that's a yes].

**Det. Willoth:** 'kay. Um, was that at the time he took it out of the cabinet or was that just in

**R. Woerner:** In general, I don't, I don't know. All I saw was that he pulled it out and I saw the ya know, the barrel.

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 20 | 12/11/03 | |

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ***ASSAULT 1 W/FIREARM*** | REPORT DATE |

SO 03-25124

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS |
|---|---|---|---|
| *Renee Woerner, DOB* | | | *Det. Willoth* |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS | ACTION | ADDITIONAL RECOVERED | TOTAL RECOVERED | ( ) COMPUTER USED |
|---|---|---|---|---|---|---|
| | | $ | | $ | Y          N | ( ) DRUG RELATED ( ) ALCOHOL RELATED |

| | |
|---|---|
| Det. Willoth: | Okay. Was it the, the same gun that you had seen that he obtained when you were living in the apartment in Lake City? |
| *R. Woerner:* | Yeah, the same gun he stuck down my throat, the same gun he hit me in the head with. |
| Det. Willoth: | Okay. And I'll let you go on from there. Then he grabs the gun, he puts it in his uh, front waistband? |
| *R. Woerner:* | Yeah and then he kept arguing. And Jeremy's going dude, I feel threatened. I don't think that any of us thought that Matt would actually pull the trigger. Ya know what I mean? I, I don't know. Jeremy was like dude, why you threatening me like this. I'm coming in here nicely. I just wanna go through your stuff and find out where, where this stuff, who took my stuff is missing. And Matt I don't even remember what happened or like if Drew said anything or what I just heard a wierd pop sound. And I was like what the...and then I don't even remember I was like oh my God Matt stop and he just kept pop, pop, pop. |
| Det. Willoth: | 'kay. When you first heard the pop sound |
| *R. Woerner:* | Um huh [that's a yes]. |
| Det. Willoth: | did you know what it was? |
| *R. Woerner:* | No, not at all. It didn't sound like a gun. It didn't hurt my ears or anything. |
| Det. Willoth: | Were you looking at Matt at the time or where were you? |
| *R. Woerner:* | Like Jeremy was I was kinda focusing on Jeremy. I mean not, I wasn't really looking at Matt. I was, Jeremy was right in front of me and Matt was in front of him. I was just kinda I don't know I was just sitting there like they're arguing and I kinda looked at him and I was kinda looking at the computer and I'm like oh my God this argument's never gonna end. |

| OFFICER NAME/NUMBER | | | APPROVED BY | |
|---|---|---|---|---|
| *Detective Willoth #1335* | | 21 | *12/11/03* | |

| ISR CLEARANCE :(ONE) | ( ) INSUFF / CLO | COPIES MADE FOR: | ( ) COURT: CAS / EVG / SOUTH / EVT | DATA ENTRY |
|---|---|---|---|---|
| ( ) ARR/A       ( ) EXC/A | ( ) OTHER / CLO | ( ) PA    ( ) CPS    ( ) JUV | ( ) DET: PREC / CTH / SPEC | |
| ( ) ARR/J       ( ) EXC/J | ( ) UNF | ( ) PAT    ( ) DSHS    ( ) MH | ( ) OTHER: | |

SH-245  9/94

ORDER = 8

# FOLLOW-UP

| | | | | | |
|---|---|---|---|---|---|
| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION ASSAULT 1 W/FIREARM | | | REPORT NUMBER | SO 03-25124 |

NAME OF ORIGINAL VICTIM(S)

**Renee Woerner DOB**

TYPE OF ORIGINAL REPORT          DATE          RECLASSIFY TO

REPORT DATE

**Det. Willoth**

CONNECTING REPORT NUMBERS

PROPERTY CHANGES:   ACTION   $   ADDITIONAL

pasture and got up and ran towards the fence. Then Matt and Jeremy

came tumbling out of the trailer together. And um, I don't remember

what they said or anything.

Det. Willoth:     Did you, when Matt came out of the trailer did he still have the gun?

R. Woerner:       Yes. I, I couldn't see where, which hand he had it in but I know he had

the gun. Because I heard another pop and the horses went runnin'.

And then Jeremy and Matt went runnin' up towards the lady's house and

Jere...this is all, I mean I'm not, not super clear on this. I'm guessin'.

Det. Willoth:     That's okay.

R. Woerner:       Ya know what I mean. I'm only super clear on what's going on, what's

goin on inside when I was sitting on the bed. That was that will always

be super clear to me in my head, always. But then Jeremy ran that way,

he kinda did a tumble also. And him and Drew ran into the street and

they're like oh my God we've been shot what do we do? Jeremy said no

cops. They came back, I don't remember which way he came back. If

he came up the driveway or if he came up over the fence, went in the

house, grabbed a black garbage bag which I'm I've seen that he had

pound of weed in it before so that's what, he grabbed the garbage bag

and he said no cops like that. I didn't see any blood at all on him. None

at all. Got in the Durango and drove off. Somebody in a white car I

think picked up Drew. There was a big moving truck that was taking

garbage that day. Wasn't a regular garbage truck, that had, was right on

the side street right there. I know that and then Drew got in the car.

And he's like I've been shot and I don't know if it was later the man was

like what are you talking about. He lifted up his shirt and was like look,

I've been shot in the back twice and then got in the car and drove off.

**Detective Willoth #1335                          25                          12/11/03**

OFFICER NAME/NUMBER                                                    APPROVED BY

| IBR CLEARANCE (ONE) | | COPIES MADE FOR: | | | COURT: CAS / EVG / SOUTH / EVT | DATA ENTRY |
|---|---|---|---|---|---|---|
| ( ) ARR/A   ( ) EXC/A | ( ) INSUFF / CLO | ( ) PA | ( ) CPS | ( ) JUV | ( ) DET: PREC / CTH / SPEC | |
| ( ) ARR/J   ( ) EXC/J | ( ) OTHER / CLO | ( ) PAT | ( ) DSHS | ( ) MH | ( ) OTHER: | |
| | ( ) UNF | | | | | |

SH-246 9/94

ORDER = B

## FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER | |
|---|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | **ASSAULT 1 W/FIREARM** | | REPORT DATE | SO 03-25124 |
| TITLE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS | |
| Renee Woerner DOB | | | Det. Willoth | |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | [ ] COMPUTER USED [ ] DRUG RELATED [ ] ALCOHOL RELATED |
|---|---|---|---|---|---|---|

**R. Woerner:**  No.  He called Donny at work and he called his friend Bill, D.J. Wills whatever and told them both, I shot him. And his friend was like dude you're not suppose to when you fight with somebody shoot em you're suppose to ya know like punch him and go for balls if you have a problem with him.  You're not suppose to shoot em.  And he was like yeah man, I don't know I just freaked out and I got weirded out and I shot him.  I shot him and that was that.  So

**Det. Willoth:**  Okay.  So what happened after you left was it Bill's house?

**R. Woerner:**  Donny's house.  We, we got on a train and went down to California.

**Det. Willoth:**  Okay.

**J. Adcock:**  How'd you pay for that?

**R. Woerner:**  He had money and a new gun.

**Det. Willoth:**  'kay.  Where'd he get the money and the new gun?

**R. Woerner:**  He just said he got it from whatever.  I don't know he had a secret stash. He got it out of the yard.  I don't know.  This is what happened.  We went our separate ways okay?

**J. Adcock:**  When?

**R. Woerner:**  At Donny's.  I went with my friend Michelle.  Okay, he went, he didn't go anywhere.  He was there I left him there.  I went to my friend Michelle's. He called me and said that they were gonna chase me down.  That cuz I know that the guy that drops off the, the drugs with uh, Jeremy, and he's an Asian guy, and I don't know what's gonna, I just got scared and Matt is a master of manipulation or I'm just a real big idiot.  And he was like okay, these people are coming to get you.  They're gonna shoot you over this pound of weed and Jeremy getting shot.  And that so we went

| OFFICER NAME/NUMBER | | | APPROVED BY | |
|---|---|---|---|---|
| Detective Willoth #1335 | | 27 | 12/11/03 | |
| IBR CLEARANCE: [ ]ONE] [ ] ARR/A   [ ] EXC/A [ ] ARR/J   [ ] EXC/J | [ ] INSUFF / CLO [ ] OTHER / CLO [ ] UNF | COPIES MADE FOR: [ ] PA   [ ] CPS [ ] PAT   [ ] DSHS | [ ] JUV [ ] M4- | [ ] COURT: CAS / EVG / SOUTH / EVT [ ] DET: PREC / CTH / SPEC [ ] OTHER: | DATA ENTRY |

SH-245 9/94

ORDER = B

# FOLLOW-UP

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | | REPORT NUMBER | |
|---|---|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | | REPORT DATE | SO 03-25124 |
| Renee Woerner DOB | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS | |
| ) . . OF ORIGINAL REPORT | | | Det. Willoth | |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y    N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

Matt came back and grabbed me and was like come on let's go. I don't know, I didn't know if he had the gun on him or what and he so I went with him. Waited and Candy's mom or whatever her name is that farm lady came home and Matt got a ride from her. Dan went and got the computer and the shoes for me. He got my shoes and brought back the computer. Um, I didn't know if Matt still had the gun on him or not. I didn't see, he didn't start waving a gun around at this point.

**Det. Willoth:** Did Matt have any conversation with you at that point? Did he say

**R. Woerner:** He's like just stand here. Don't move. And at that point that's what I did. Because I didn't know if he had the gun on him or not. I know whatever but um, then she gave us a ride to Monroe and dropped us off at Donny's house. The computer's still there.

**Det. Willoth:** Okay. What happened when you got to Donny's?

**R. Woerner:** Donny wasn't home. Donny's dad let us in and we had like four cigarettes. Sat downstairs in the basement, watched TV.

**Det. Willoth:** Any conversation between you and Matt about what happened?

**R. Woerner:** All it was, was I just cried because that was the most terrifying thing I've ever experienced in my life. I was like oh my God ya know, those are your friends. And I cried. He was like hee-hee-hee, hee does this weird thing when he gets excited. Like when he hit me in the head with the gun and shoved it down my throat and did all that weird stuff he does this thing. He gets all excited. It was really psychotic, it's creepy and he did that he's like maybe I'll be on TV I'll be famous. And I was just like oh my God. And yeah.

**Det. Willoth:** Did he ever talk to you about what his intent was that day or why he did what he did?

| OFFICER NAME/NUMBER | | | APPROVED BY | | |
|---|---|---|---|---|---|
| Detective Willoth #1335 | | 26 | 12/11/03 | | |
| IBR CLEARANCE (ONE) ( ) ARR/A    ( ) EXC/A ( ) ARR/J    ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA     ( ) CPS ( ) PAT    ( ) DSHS | ( ) JUV ( ) MM- | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH /  SPEC ( ) OTHER: | DATA ENTRY |

SH-245 9/94

ORDER = 8

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT **ASSAULT 1 W/FIREARM** | REPORT NUMBER **SO 03-25124** |
|---|---|---|
| .E / DOB OF PERSON(S) INTERVIEWED *Renee Woerner  DOB* | | INTERVIEW REQUESTED BY *Det. Willoth* |

**R. Woerner:**   A thousand dollars or ss....yeah, a thousand dollars I believe.

**Det. Willoth:**   A thousand dollars?  Where does Michelle live?

**R. Woerner:**   Michelle lives in Silver Lake.

**Det. Willoth:**   Okay.  Okay so after um, the burglary happened how did you end up hooking back up with him?

**R. Woerner:**   He called, he said we've got to go.  They're gonna come and they're gonna shoot you blah di blah.  And because she had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shoot me over a pound of weed?  But all this weird stuff had happened and it was stressful and I didn't know, I didn't know what to do.  Ya know and so I did, I, I left.  I didn't think about oh my God, the police are looking for me or anything like that cuz I didn't do anything wrong.  I didn't, I didn't shoot anybody.  Ya know and

**Det. Willoth:**   Why did you go with him?

**R. Woerner:**   Because I didn't wanna get shot by drug dealers.

**Det. Willoth:**   Okay.

**R. Woerner:**   That's all I mean I can't, there's no other reason.  There's not.  I can't think of a fancy lie or anything, that's all.  I just didn't wanna get shot by by drug dealers.  And cuz Jeremy said no cops when he left.  Uh, it scared me.

**Det. Willoth:**   Okay.

**J. Adcock:**   How did he get a hold of you?  At Michelle's?

**R. Woerner:**   On, on her cell phone.

**J. Adcock:**   Did she call him or how did that (unintelligible)

**R. Woerner:**   He had her number.  He

**J. Adcock:**   Okay he knew...allright

| I., ...RVIEWER NAME/NUMBER *Detective Willoth #1335* | 29 | DATE OF INTERVIEW *12/11/03* |
|---|---|---|

# INTERVIEW

PAGE ____ 32 ____ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| E / DOB OF PERSON(S) INTERVIEWED Renee Woerner DOB | | INTERVIEW REQUESTED BY Det. Willoth |

Det. Willoth:    Yeah.

R. Woerner:    Okay.  She said yeah, I'm hidin' from the police too.  I'm lookin' at six years.  You guys can stay here.  So then she apparently, they were shooting up in the bathroom.  I was sitting in the living room the whole time and um, they were shootin' up in the bathroom.  Matt started pounding on me.  That's when all her friends came in and said let go of her man.  And that's when he tried to pop my eyes out.  And uh, they're like dude let go of her.  And he had me all wrapped up like this and I that was the last, that was the last day I spent with Matt.  She took me and hid me down at a cousins.  Matt they ran him off whatever he kept he didn't call me because I was at her cousins.  He didn't know where I was at.  That's when I called my mom and I was like I need to get outta here, I need to come home.  That's when his sister came by and said you have a warrant for your arrest.  I freaked out.  I went oh my God I didn't do anything.  She's like yeah, they're dead, they're murdered.  You have a warrant for your arrest for murder.  And I was like oh my God.  My mom's gonna buy me a bus ticket and I was gonna come up here and handle it.  Matt I don't know where he was.  Running around in the shadows.  I was afraid he was gonna catch me and at that point he was gonna take me to his, his plan was gonna take me to Mexico and or kill me and throw me out in the desert.  I wanted to come home.

Det. Willoth:    Did he tell you that?

R. Woerner:    That is what he told me yeah.  He was gonna kill me and then take me and bury me out in the desert, go find my kids, slit my daughter from her vagina to her throat, that's what he told me.  So um, trying to think.

| IEWER NAME/NUMBER Detective Willoth #1335 | 32 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

5/02

1060-255



# INTERVIEW

PAGE _____ 37 ___ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT **ASSAULT 1 W/FIREARM** | REPORT NUMBER **SO 03-25124** |
|---|---|---|
| NE / DOB OF PERSON(S) INTERVIEWED *Renee Woerner DOB* | | INTERVIEW REQUESTED BY *Det. Willoth* |

**Det. Willoth:** Do you know if Matt ever stole stuff from Jeremy? Did he ever take things from him?

**R. Woerner:** He took he would take little, he would take weed and stuff from him. I don't know anything about anything else. But I know he'd take weed from him, yeah. I don't know if he took the pound of weed.

**Det. Willoth:** Okay.

**R. Woerner:** I don't know about that.

**Det. Willoth:** Did you ever see any of Jeremy's property inside of Matt's trailer?

**R. Woerner:** No. Dishes that we used.

**Det. Willoth:** Okay. Nothing else other than that?

**R. Woerner:** No huh uh. Nope.

**Det. Willoth:** 'kay.

**R. Woerner:** They would have it was a constant argument in the house. With Jeremy and everybody. Who stole my this? Who took my that? Ya know, it was mostly weed. Ya know like if he left his bag of weed out or whatnot and people would dig in it or whatever. But

**Det. Willoth:** Okay.

**R. Woerner:** that's all I know that was ever missing was like drugs.

**Det. Willoth:** Okay. Anybody else in the house or anybody else at the house at the trailer before this happened that I need to know about? Is there any other people that came by or any other people that were in the trailer?

**R. Woerner:** Huh uh [that's a no].

**Det. Willoth:** Nobody at all?

**R. Woerner:** No, not that, no. It was Drew was in the living room and Jeremy was on the bed and I was behind him and Matt was standing there.

| INTERVIEWER NAME/NUMBER *Detective Willoth #1335* | 37 | DATE OF INTERVIEW *12/11/03* |
|---|---|---|

5/02

1080-253



# INTERVIEW

PAGE ____38____ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED Renee Woerner DOB | | INTERVIEW REQUESTED BY Det. Willoth |

| | |
|---|---|
| Det. Willoth: | Okay. And Nigel? |
| R. Woerner: | Nigel rode a bicycle into Lynnwood because Jeremy had not come home the night before and, and usually Jeremy would come home late, Nigel would take the car in the morning and go down into Lynnwood or whatever to his dad's and handle his unemployment check and do the thing. |
| Det. Willoth: | So he wasn't there during this? |
| R. Woerner: | Huh uh [that's a no]. |
| Det. Willoth: | Okay. |
| Det. Pince: | One question. Um, you talk about there being lots of drugs used and around the place all the time. |
| R. Woerner: | Uh huh and underage girls all kinds of strange things. |
| Det. Pince: | Were these drugs for personal use or were they selling em? |
| R. Woerner: | Ya know, I, I know they were selling them. I can't say that they were selling them. They weren't doing it like that. They would put it ya know, whatever uh, ya know, the, the zip sealed bags and everybody would get a backpack and they'd go about their thing. That's all I can say. Ya know, other than that all I saw was just them partaking of the drugs. |
| J. Adcock: | Well they didn't work regular jobs did they? |
| R. Woerner: | Well uh huh [that's a no] and they used the music thing and whatever and I know there's a stack of receipts that have my name on it that said paid for Matt's music lessons or D.J. lessons some such thing like that. That that's not real. It's just not real and he kept asking me when you gonna go back to work? I never told Jeremy that I quit my job. I just told him I was on leave because of my head injuries my head wounds and so he needed to know because he had continued to write these receipts for |

| INTERVIEWER NAME/NUMBER Detective Willoth #1335 | 38 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

5/02

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT **ASSAULT 1 W/FIREARM** | REPORT NUMBER **SO 03-25124** |
|---|---|---|
| ..AE / DOB OF PERSON(S) INTERVIEWED  Renee Woerner  DOB ( | | INTERVIEW REQUESTED BY  *Det. Willoth* |

|  |  |
|---|---|
|  | these music lessons or whatever they were D.J. lesson's for Matt so that he could cover his tracks for the tax purposes and whatnot. And when he'd gone to tax class and all that and the library and all that so... |
| J. Adcock: | Do you think it's possible they used the proceeds for drug sales to finance the lifestyle you had out there? |
| R. Woerner: | Uh, yeah. That's definitely ya know, I know that for a fact but I ya know, that's not ya know, I didn't see this I mean hand for hand like I said ya know. |
| Det. Pince: | Was Matt selling drugs? |
| R. Woerner: | Matt, I know Matt acquired quite a bit of crystal meth at one point from one of their friends and they, everybody was all high. Everybody was all high and um, I just sat up in the trailer cuz it was crazy and that's yeah, that's when I got beat in the head and uh, |
| Det. Willoth: | Okay. One thing I just realized |
| R. Woerner: | But he was selling little packages of this, of the meth. But mostly Jeremy and them were buying it from Matt so it was just like this inner, this little circle. |
| Det. Willoth: | You're down in the jail down in California. |
| R. Woerner: | Um huh [that's a yes]. |
| Det. Willoth: | And uh, your mom had called me and spoke about some notes that you got. |
| R. Woerner: | Um huh [that's a yes]. |
| Det. Willoth: | Um, when did you get those and what, what was the deal with the notes? |
| R. Woerner: | God, they're just, I thought I don't know. Um, I don't 'member when I got the notes but the notes were disappointing first of all. So I thought okay, |

| RVIEWER NAME/NUMBER  *Detective Willoth #1335* | 39 | DATE OF INTERVIEW  *12/11/03* |
|---|---|---|

5/02

1080-253

# INTERVIEW

| | TYPE OF INCIDENT | REPORT NUMBER |
|---|---|---|
| **SNOHOMISH COUNTY SHERIFF'S OFFICE** | *ASSAULT 1 W/FIREARM* | *SO 03-25124* |
| NAME / DOB OF PERSON(S) INTERVIEWED | | INTERVIEW REQUESTED BY |
| *Renee Woerner DOB* | | *Det. Willoth* |

well maybe they might say he's sorry for bashing my head in and ya know, whatever. Ya know, just a last little string of hope. This is all been very traumatizing and that I know that I'm not, I should not have gone down to California with him. I should have ya know, I don't know, if I coulda done it different ya know, I, but the notes say something about Lou and Lou is the guy who they get the pounds of weed from. I know that. He's an Asian guy that comes in the black little sports car. Then brings the bag, garbage bag that Jeremy took out in the Durango. He's the one that takes it into Jeremy. That's all. I've seen that, that's all I know. But um, Matt wrote in there it's too bad that Lou came in and tried to rape you and hit you in the head with the gun and pistol whips you. It's a real ignorant, they're ignorant letters. And he's writing this and I'm goin oh my God, and when I, my cell mate is reading it and going oh my God, he's, he's telling you what to say. I got a Christmas card with the same crap up in it. I was like oh my God, ya know, at least write me a nice note or something.

**Det. Willoth:** Okay. So there was no, there was nothing that was direct in there like you have to say this?

**R. Woerner:** No, uh uh [that's a no].

**Det. Willoth:** It was telling you...

**R. Woerner:** I talked to a sheriff and he said that because they tried to rape you and tried to ya know, and I wrestled the gun out of his hand and somebody got shot

**Det. Willoth:** 'kay. And those were from Matt, the notes?

**R. Woerner:** Um huh [that's a yes]. And I wrote him back and I was like yeah, everything's all good. I love you, I miss you, whatever and he sent the



# INTERVIEW

PAGE __4__ OF __45__

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT<br>*ASSAULT 1 W/FIREARM* | REPORT NUMBER<br>SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED<br>*Renee Woerner  DOB* | | INTERVIEW REQUESTED BY<br>*Det. Willoth* |

|  |  |
|---|---|
| | Chaplain over to try and marry me over at Riverside. I was like yeah, probably not. I was like you don't even know what we've, what I've been through because he was like well yeah, that's what I was tellin' Matt and he kinda jumps with the gun. I was like yeah, no pun intended. Ya know, it was very creepy and strange and that's when I had my mom call. I said you don't understand that it's getting weird down here. |
| Det. Willoth: | Okay. |
| **R. Woerner:** | Ya know, cuz his mom's a corrections officer and because of the incident in 2002 and nobody did anything. I started to feel like okay, I'm never gonna get out of California. They're gonna set this up and it's gonna get strange. And so ya know |
| Det. Willoth: | Okay. |
| **R. Woerner:** | yeah, the notes. |
| Det. Willoth: | So there's two notes? |
| **R. Woerner:** | Yes. They should, they when I left Riverside when they came to transport me she gave me like 2.3 seconds to gather my stuff. Okay? They were in my Bible. That's the only thing I brought so, they should be in the Bible. |
| Det. Willoth: | And you don't have a problem with us getting those |
| **R. Woerner:** | No, go ahead. |
| Det. Willoth: | out of your property and taking a look at em? |
| **R. Woerner:** | Huh uh [that's a no]. |
| Det. Willoth: | Okay. Um, |
| J. Adcock: | I need to ask you about your drug use cuz that's gonna come up. |
| **R. Woerner:** | Um huh [that's a yes]. |
| J. Adcock: | Why don't you tell me? Do you use? |

| INTERVIEWER NAME/NUMBER<br>*Detective Willoth #1335* | 41 | DATE OF INTERVIEW<br>*12/11/03* |
|---|---|---|

6/02

# INTERVIEW

PAGE _____ 42__ OF _____ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT<br>**ASSAULT 1 W/FIREARM** | REPORT NUMBER<br>**SO 03-25124** |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED<br>**Renee Woerner  DOB** | | INTERVIEW REQUESTED BY<br>**Det. Willoth** |

| | |
|---|---|
| **R. Woerner.** | No I, I'm not using drugs at this time.  I have been, since before, before the pistol whipping I quit using drugs.  I, I can't tell you I haven't used drugs ya know.  I can't tell you I haven't done crystal meth.  I haven't done cocaine.  I live with Angie I mean come on and um, ya know, I smoke a little pot now and then.  Um, but if you check my blood now I mean I'm clean.  And |
| J. Adcock: | Well you've been in custody |
| **R. Woerner.** | I've been in custody for over a month so ya know that's that but ya know, when I go home |
| J. Adcock: | Were you using when the shooting occurred? |
| **R. Woerner.** | No. |
| J. Adcock: | And you indicated you stopped after you got hit in the head? |
| **R. Woerner.** | Yeah it was in, around October so I've been about, it'd only been about a month.  It wasn't very long. |
| J. Adcock: | Okay. |
| **R. Woerner.** | But ya know, with a concussion that's all I did was want to sleep. |
| J. Adcock: | Okay.  Alright. |
| Det. Pince: | Renee, you pointed to a mark on your eye and said that uh |
| **R. Woerner.** | Right here? |
| Det. Pince: | he tried to poke your eye out or something? |
| **R. Woerner.** | He tried to pop it out. |
| Det. Pince: | 'kay.  Do you have any other injuries |
| **R. Woerner.** | Like that. |
| Det. Pince: | related to your relationship with Matt? |
| **R. Woerner.** | I've got all kinds of scars yeah.  Um huh [that's a yes]. |
| Det. Pince: | 'kay. |

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| Detective Willoth #1335 | 42 | 12/11/03 |

8/02

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT ASSAULT 1 W/FIREARM | REPORT NUMBER SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED Renee Woerner DOB | | INTERVIEW REQUESTED BY Det. Willoth |

| | |
|---|---|
| R. Woerner: | And I have scars, these scars here where the skin is all gone and right there. And on my head the scars from the pistol whipping. |
| Det. Pince: | How 'bout specifically from your trip to California? Anything that happened down there that... |
| R. Woerner: | The only thing I have from there is my bracelet that has the picture of my black eye. That's all. |
| Det. Pince: | 'kay. |
| J. Adcock: | When he pistol whipped you did he use the gun that he used to shoot? |
| R. Woerner: | Yes sir. And his friend Arrow is the one who cleaned it. His friend Arrow helped stop him but he said if Matt had a killed ya I'm sorry I woulda had to bury your body tonight? |
| Det. Pince: | So when you were booked in California, you had a black eye? |
| R. Woerner: | Yes sir. |
| Det. Pince: | 'kay. |
| R. Woerner: | Yep. It's on my bracelet. They took it after they took this ugly picture. Good Lord. |
| Det. Willoth: | It's not very kind (laughs). But yeah. |
| Det. Pince: | 'kay. |
| R. Woerner: | I feel better. |
| Det. Willoth: | 'kay. |
| R. Woerner: | And Jeremy and Drew are okay? |
| Det. Willoth: | Yes, they're fine. Luckily. |
| R. Woerner: | Like walking, talking, no bullets left inside of them or anything? |
| J. Adcock: | One of em does have a bullet left in him. |
| Det. Willoth: | Yes, Jeremy does. |

| INTERVIEWER NAME/NUMBER Detective Willoth #1335 | 43 | DATE OF INTERVIEW 12/11/03 |
|---|---|---|

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT<br>*ASSAULT 1 W/FIREARM* | REPORT NUMBER<br>*SO 03-25124* |
|---|---|---|
| NME / DOB OF PERSON(S) INTERVIEWED<br>*Renee Woerner DOB* | | INTERVIEW REQUESTED BY<br>*Det. Willoth* |

| | |
|---|---|
| J. Adcock: | They couldn't operate. I mean they can't, it's too dangerous to take it out. |
| R. Woerner. | Yeah, that's why I know that's a .22 but I'm ya know, concerned because like I said Jeremy was a nice guy. Ya know, and Drew I only met him a few times cuz he lived at that Love Israel Ranch or whatnot. Creepy. That's another weird thing I got scared about too. That ya know, but Jeremy was always a nice guy. |
| Det. Willoth: | Okay. Renee, do you have anything else you'd like to add to this statement that you think's important or anything that you've left out? |
| R. Woerner. | I've told the story. That's all, that's all I, that's it. |
| Det. Willoth: | 'kay. |
| J. Adcock: | I, would you be willing at some point to show us the uh, property and where people were and |
| R. Woerner. | Um huh [that's a yes]. |
| J. Adcock: | point out? Okay. |
| R. Woerner. | Yes. I have no problem at all. |
| Det. Willoth: | Okay. Okay. At any time during this statement have you asked that the questioning or taping be stopped? |
| R. Woerner. | No. No. |
| Det. Willoth: | Okay. At any time during this statement have you requested an attorney? He's already here so no you haven't. Is it true that the facts stated on this tape are true and correct to the best of your knowledge, and that your statement has been made freely, voluntarily, and without threats or promises of any kind? |
| R. Woerner. | Yes ma'am. |
| Det. Willoth: | Okay. I'll have you sign the form. |

| .RVIEWER NAME/NUMBER<br>*Detective Willoth #1335* | 44 | DATE OF INTERVIEW<br>*12/11/03* |
|---|---|---|

6/02

1080-253

# INTERVIEW

PAGE _____ 45_F _____ 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT | REPORT NUMBER |
|---|---|---|
| | ASSAULT 1 W/FIREARM | SO 03-25124 |
| NAME / DOB OF PERSON(S) INTERVIEWED | | INTERVIEW REQUESTED BY |
| Renee Woerner DOB | | Det. Willoth |

R. Woerner:       Okay.  Down here too?

Det. Willoth:     Yeah.

R. Woerner:       Okay.

Det. Willoth:     Okay.  This concludes this statement.  It is 1108 hours.

> Transcribed 12/11/03 by L.E. Secretary M. Noland #4116..
>
> Reviewed and corrected by Det. K. Willoth #1335

| INTERVIEWER NAME/NUMBER | DATE OF INTERVIEW |
|---|---|
| Detective Willoth #1335        45 | 12/11/03 |

5/02

1080-2327