APPENDIX

" E "

MENTAL HEALTH

EVALUATION

Western State

**Forensic Psychological Report**                          March 19, 2004
**RE: Matthew Robert Ruth**                                      Page 14

As the evaluation of Matthew Ruth is now complete with the submission of this report,
he has been released into the custody of the Snohomish County Sheriff and has been
transported to the Snohomish County Adult Detention Center to await further
disposition by the Court. Please contact us if we may be of further service to the Court
in this matter.

Laurie Green, M.A.
Psychology Intern
Center for Forensic Services -
Western State Hospital

R. M. Hart, Ph.D.
Licensed Psychologist, #1180
253-756-2877

LG:kf

cc:     Presiding Judge, Snohomish County Superior Court
        John Adcock, DPA
        Jon T. Scott, Defense Counsel
        Preston Hess, Snohomish CDMHP
        Greg White, Snohomish County Jail Liaison

 

FILED

**STATE OF WASHINGTON**  04 MAR 24  PM 4:03

**DEPARTMENT OF SOCIAL AND HEALTH SERVICES**  M.N L. DANIELS

WESTERN STATE HOSPITAL  COUNTY CLERK
W27-19 • 9601 Steilacoom Blvd SW • Tacoma WA 98498-7213 (253) 582-8900
SNOHOMISH CO. WASH.

**March 19, 2004**

**FORENSIC PSYCHOLOGICAL REPORT**

| RE: | **STATE OF WASHINGTON** | **CAUSE NO: 03-1-02451-6** |
|---|---|---|
| | **VS.** | **WSH NO:   387056** |
| | **MATTHEW ROBERT RUTH** | **DOB:** |
| | **AKA: Matthew Robert Stroud** | |

The forensic mental health evaluation, as reflected in this report, was conducted pursuant to court order under the authority of RCW 10.77.060. This document has been released only to the Court, its officers, and other persons legally authorized to receive it and is intended for their use only. Any other use or distribution of this report is not intended by the undersigned.

**REASON FOR REFERRAL:**
Pursuant to a Snohomish County Superior Court order issued on 1/16/04, Matthew Robert Ruth was admitted to Western State Hospital on 3/04/04. He was court ordered to the hospital for a period of up to 15 days for an evaluation of his mental condition, his competency to proceed, his sanity at the time of the alleged offense, his imminent risk of danger to self or others under RCW 71.05, and his future risk of dangerousness under RCW 10.77.060.

Mr. Ruth is charged by Information in the Superior Court for Snohomish County with one count of Assault in the First Degree. According to the Certificate of Probable Cause and other supporting documents, the state alleges that on or about 11/05/03, Mr. Ruth shot two of his friends, Jeremy Custer and Drew Eden. At the time, Mr. Ruth lived with his girlfriend Renee Woerner in a fifth wheel trailer located at 3125 78th Ave., Everett, Washington. Victim Custer also resided at the same address in a small house. At the time of the incident Victim Eden and Witness Daniel Gist were visiting Victim Custer. Allegedly, Victim Custer arrived home the morning of the alleged incident to find some of his property missing. According to both victims and Witness Gist, the property was a set of music headphones. According to Witness Woerner and Mr. Ruth, the property was one pound of marijuana. Mr. Ruth allegedly complied with a request from Victim Custer to search his trailer for the missing property. Upon entering the trailer an argument ensued. Victim Eden then entered the trailer to inquire about the yelling he heard. Mr. Ruth was reportedly



**APPENDIX G**

**Forensic Psychological Report**                          March 19, 2004
**RE: Matthew Robert Ruth**                                        Page 11

understanding of the roles of various legal personnel. When explanations were provided
to him he was able to repeat the explanations in his own words showing that he could
comprehend and then use the information. He stated that his lawyer's name was "Jon
Scott" and that he first met his lawyer at the "Omnibus hearing." He further
demonstrated an understanding of the meaning and consequences of guilty and not
guilty pleas and findings.

Capacity to Assist in His Own Defense:
It is our opinion that Mr. Ruth currently possesses the capacity to assist in his own
defense.

Mr. Ruth demonstrated an intact capacity to disclose pertinent facts to his attorney. He
was able to explain his version of the alleged crime in a clear and coherent manner.
Additionally, he has adequate verbal reception and expression skills to engage in a
discussion of the facts with his attorney. He clearly appears motivated to defend himself
against the charge and he appears quite capable of choosing in his own best interest.

Mr. Ruth demonstrated an ability to manifest appropriate courtroom behavior during
our interviews He was well mannered and appropriate throughout. Although he
informed us that he has had trouble understanding the hearings in the past he stated,
"I think I would understand now, if not I would talk to my lawyer."

Mr. Ruth also demonstrated an ability to plan and strategize around his defense. His
attempts to exaggerate his symptoms and downplay his knowledge of the legal system
are examples of his ability to plan and strategize. Additionally, when given a
hypothetical scenario involving a plea option, Mr. Ruth asked appropriate questions to
aid in his decision making such as "How much time would I get if I took the plea?" Mr.
Ruth then listed the circumstances of the alleged crime and concluded that he would
not take the plea because he believed a jury would recognize that the victims were
lying and he would likely be found not guilty. He clearly demonstrated rational, though
possibly uninformed, decision making ability.

**SANITY AT THE TIME OF THE ALLEGED OFFENSE:**
The requirements for legal insanity in the state of Washington are found within RCW
9A.12.010.

**Forensic Psychological Report**　　　　　　　　　　　March 19, 2004
**RE:  Matthew Robert Ruth**　　　　　　　　　　　　　　　　　Page 9

In his life and has never received any help." When asked what behaviors he has demonstrated that specifically concern her, she vaguely responded that Mr. Ruth talks about demons.

Consultation with Cheryl Coupe, Mental Health Practitioner at the Snohomish County Adult Detention Center, indicated that Mr. Ruth was not a behavior problem while incarcerated. In a voice mail message Ms. Coupe stated that Mr. Ruth complained of hallucinations and was "somewhat sad," but that "he kept a low profile" and the mental health department had few interactions with him.

Criminal History:
Records indicate that Mr. Ruth has minimal criminal history. He was arrested in 1999 for driving under the influence and for driving with a suspended license. The status of this arrest is unknown. There were also three protection orders issued against Mr. Ruth. Two were issued recently for the victims of the current alleged crime and another was issued on 5/23/03 by a Theresa Velasquez. Records also indicate a 1994 arrest as a juvenile; however, the details and status of the arrest are unclear. Mr. Ruth additionally stated that he believes he has an "Assault Four" on his record for slapping an employer once while quitting his job.

Current Hospital Admission:
Mr. Ruth was admitted to this service on 3/4/04. He was prescribed Seroquil (an antipsychotic) and Trazodone (an antidepressant) and he took them voluntarily. He was described by ward staff as cooperative, mannerly and as "having a low profile." No behavioral problems or overt signs of psychosis were noted.

**CLINICAL FORMULATION:**
Mr. Ruth is a young man with a significant history of substance abuse and dependence. According to his parent's report, Mr. Ruth's psychotic symptoms developed at approximately the same time he began using large amounts of LSD and ecstasy. His pattern of drug use and the nature of his symptoms are consistent with a diagnosis of Polysubstance Induced Psychotic Disorder. His family history might suggest that he is more vulnerable to the effects of mood altering chemicals. While it appears that some of his symptoms are legitimate, Mr. Ruth's endorsement of virtually every first rank symptom, in combination with his fairly organized presentation is highly suspicious and a rule out of Malingering should be considered. Finally, Mr. Ruth's preoccupation with paranormal phenomena and difficulty in close relationships is consistent with a Personality Disorder NOS with Schizotypal features. However, it not clear whether these

**Forensic Psychological Report**
**RE: Matthew Robert Ruth**

Psychiatric History:

Mr. Ruth's family is positive for a psychiatric history. His mother, Susan Stroud, volunteered that she attempted suicide in 1995, was hospitalized for a few weeks, and was diagnosed with Bipolar Disorder. Ms. Stroud also stated that both of Mr. Ruth's sisters have mental health problems. His sister, Alicia, was hospitalized for three years from the age of 16 to 18 and had a "Schizophrenia and Bipolar diagnoses." Mr. Stroud reported that Alicia was again hospitalized for two years sometime later. Ms. Stroud reported that Mr. Ruth's other sister, Melissa, was diagnosed at the age of 16 with Bipolar Disorder, but she has always taken her medication and received treatment on an outpatient basis. Reportedly, Mr. Ruth's maternal grandmother had severe mental health problems as well, and his maternal aunt and uncle abused drugs.

Mr. Ruth reported that he has never received any previous mental health treatment. During his intake interview he stated that he has been able to talk to aliens since he was a child and that he once lived in a house as a child that had demons in it and that the demons would possess him. In our follow up interview, when Mr. Ruth was repeating this assertion, he finished his statement with, "That's what I was told." We did not question him on this discrepancy; not wanting to draw attention to our skepticism at that point. For reasons noted previously, these reports are of questionable validity. His mother believed that Mr. Ruth fist began showing signs of psychosis at the age of 18. She noticed him talking to people who weren't there and talking about aliens and out of body experiences. She explained, "You just never know if he is going to be himself or a really whacked out person." Mr. Ruth stated that the only concerning behavior he noted in Mr. Ruth as an adolescent was his drug use. He began noticing odd behaviors within the last four to five years. For example, he would periodically catch Mr. Ruth talking to himself or speaking about astro-travel and aliens. Mr. Stroud made weekly visits to Mr. Ruth while he was in detained at the Snohomish County Adult Detention Center. When asked about Mr. Ruth's presentation during these visits, Mr. Stroud stated that "he seemed very medicated" but that he was otherwise all right. When asked specifically if he noted any concerning behaviors or indications that he might be seeing or hearing things, he answered that he thinks his son may have made a joke about seeing aliens, but that Mr. Ruth "tries to downplay any alien stuff" when speaking with him.

Renee Woerner also commented about Mr. Ruth's mental health issues. She specifically made the point that Mr. Ruth's problems were not a result of drug use but rather a result of his poor mental health. She explained, "He has been through a lot of trauma

**Forensic Psychological Report**
**RE: Matthew Robert Ruth**

March 19, 2004
Page 7

Mr. Ruth first stated that his aunt gave him cocaine as a baby. He first used cocaine as an adult when "he started kickin' it with strippers." He first stated that his last use was a couple weeks prior to his arrest; however, he later stated that his last use was September 6, 2004.

He acknowledged that he used methamphetamine "when he was younger" with his mother, but then informed us that he abused this drug primarily for the last year and a half "with the strippers." He stated, "I shot it, smoked it, and hot railed it." He reported that his last use was September 6, 2004.

Mr. Ruth reported frequent use of ecstasy (MDMA). He started abusing this drug around the age of 18 when he began attending raves. He explained that he would often mix it with "acid" (LSD).

Mr. Ruth also acknowledged the use of Psilocybin (psychedelic mushrooms), explaining that he used to grow them. He has also used Peyote "in Arizona with the Indians." Mr. Ruth denied the use of Phencyclidine (PCP), inhalants, or abuse of prescription mediations.

Mr. Ruth explained that on September 6, 2004 he had a seizure after using large quantities of drugs and that his girlfriend threatened to leave him if he did not quit. He explained that he has not used any drugs other than marijuana since that time.

Mr. Ruth reported that he used to sell a lot of drugs primarily when he was 18 and 19 years old. He stated that his neighbor, Victim Custer, is currently a drug dealer and is connected with the Cambodian Mafia. He stated that Victim Custer always gave him drugs and wanted Mr. Ruth to go into a DJ business with him.

When Ms. Woerner was questioned about Mr. Ruth's drug use she was very vague and stated she did not know when he last used because she was not paying attention. She adamantly stated that Mr. Ruth only used drugs recreationally and that he was not a drug dealer or someone who was constantly high "like the guys next door." She emphasized, "The guys next door were the druggies, not Mathew."

It is our clinical opinion that Mr. Ruth has a significant illicit substance abuse problem. We think that there is a very high probability that he grossly under reported his involvement with and personal consumption of illicit substances.

**Forensic Psychological Report**
**RE: Matthew Robert Ruth**

March 19, 2004
Page 6

*he eventually begins to show up late to work, or not show up at all and will then get
fired. Mr. Ruth does not receive any governmental assistance.*

Mr. Ruth has minimal prosocial support. Although his father has reportedly visited Mr.
Ruth once a week while he was in jail, the quality of his relationship with his parents is
unclear. Mr. Ruth stated that his mother does not like him and that she "is weird." His
friends and his sisters allegedly abuse drugs. Mr. Ruth frequently referred to his female
friends as "the strippers" who often provided him drugs, bought him clothes and let him
stay with them. He also has a girlfriend, Renee Woerner, of the last two years who also
used drugs and was employed as an exotic dancer in the past. This relationship was
reportedly tumultuous, and Ms. Woerner has alleged serious domestic violence (e.g., r r
she stated to police that Mr. Ruth once "pistol whipped her" causing her to loose
consciousness and to seek medical treatment. Hospital records relating to this alleged
incident report that she presented with head contusions and lacerations and was
diagnosed as having a concussion.) When questioned about this. Mr. Ruth stated that
Renee becomes jealous of other women and accuses him of cheating on her. She then
hurts herself and makes up the allegations and blames him for the injuries. In her
phone interview with this evaluator, Ms. Woerner stated she was not comfortable
discussing the domestic violence charges, but then volunteered, "It never happened."

Medical History:
Mr. Ruth does not have a significant medical history. His father reported that as a child
he received a couple minor head injuries requiring stitches and that he was in a car
accident as an adolescent; however, he did not receive a head injury during this
accident. Ms. Stroud stated that Mr. Ruth has always been physically healthy.

Substance Abuse:
Mr. Ruth has a significant substance abuse history. Overall, he was very vague about
the amount and frequency of his use. He stated that he first used alcohol as a child
with his mother. He then stated "I used to drink a little, but I stopped because I need
to stop putting bad stuff in my body."

He first used marijuana at the age of 13. He stated that he used it everyday from the
age of 13 to 20. He last used it just prior to his arrest.

Mr. Ruth stated he first used LSD with his uncle when he was 16 years old. He has used
it "a lot" since then, primarily when attending raves.

**Forensic Psychological Report**                          March 19, 2004
**RE: Matthew Robert Ruth**                                      Page 2

upset about being accused of stealing the property and having his trailer searched. Witness Woerner was also in the trailer observing the incident. While arguing Mr. Ruth reportedly pulled out a gun and shot Victim Custer non-fatally three times. While Victim Eden was trying to leave the trailer, Mr. Ruth allegedly non-fatally shot him in the back. Victim Eden reported that he ran to the street, flagged down a motorist, and had the motorist take him to the hospital. Victim Custer reportedly ran to his truck and drove off; however, Witness Woerner reported to police that he ran to his house, retrieved a bag of Marijuana, told Victim Eden "no cops" and then left in his truck. Mr. Ruth and Witness Woerner left the scene before police arrived. An arrest warrant was issued for both Mr. Ruth and Ms. Woerner.  The couple was next located by officials in Blythe, California on 11/15/03 at the residence of Mr. Ruth's mother. The couple fled from the officers and were not apprehended at that time. Mr. Ruth reportedly turned himself into the Blythe Police Department on 11/20/04 and was officially arrested at that time without incident. Ms. Woerner also turned herself into the Blythe Police Department on the same day. Ms. Woerner's statement to the police indicates that she was the victim of repeated domestic violence assault inflicted by Mr. Ruth and that she fled with Mr. Ruth because he ordered her to and she feared for her own safety. She further reported to police that he physically beat her during their time in California.

**Database:**
Following his admission to the hospital, Mr. Ruth was placed on the evaluation ward in the Center for Forensic Services to undergo psychiatric, psychological, physical, and social examinations, to include 24-hour clinical observation. For purposes of this evaluation, Dr. Lee Brock, Staff Psychiatrist and Dr. R.M. Hart, Staff Psychologist, comprised the sanity commission. Laurie Green, M.A., Psychology Intern, also participated in the evaluation. In formulating our opinion for the Court, we have considered information from the following:

1. Two independent interviews with the defendant, 3/4/04 & 3/12/04.
2. State's Discovery materials.
3. Criminal History Printouts of the Washington State Patrol: Washington Access to Criminal History (WSP:WATCH) and the National Crime Information Center (NCIC).
4. Phone interview of Matthew Robert Stroud, defendant's father, 3/4/04.
5. Phone interview of Susan Stroud, defendant's mother, 3/8/04.
6. Voice mail message by Cheryl Coupe, Snohomish County Adult Detention Center Mental Health Professional, 3/9/04.
7. Phone interview of Renee Woerner, defendant's girlfriend and witness in the instant offense, 3/17/04.

# EXHIBIT 1

I, Matthew R. Stroud I, swear or affirm:

That I was at Matthew Ruth's trial and they took a recess, Adcock, the prosecuting
attorney,  walked out of the court room just before I did, when I walked out of the court
room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I
walked towards his direction, Adcock then told Renee to come with him down the hall. I
watched Adcock and Renee walk down the hall and turn right then they were gone from
my sight and I could not hear them anymore, a few minutes later I heard Renee and
Adcock yelling at each other and then seen both of them come back into the hall
walking fast my direction as they got closer to me I heard Renee say "I will not lie for
you" Adcock replied "you will say what I tell you to say or I will have you arrested"
Renee said "then arrest me" Adcock was very upset and turned and walked into the
court room I fallowed as I walked into the court room I saw Adcock walking over to
Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put
Renee Woemer on the stand because she told him she was going to lie and Adcock
said I will not put anyone on the stand that tells me they are going to lie which is the
opposite of what Renee said she was going to do. I walked over to Matthew Ruths
attorney and told him what I had just saw and heard, he told me not to worry he was
going to put Renee Woener on the stand.
In the hall was also Renee Woerner's Mother and Dad who also heard everything.
After the trial was over the head juror asked to speak with Matt's attorney and me the
juror asked Matt's attorney why he did not put the only other witness, Renee
Woemer ,on the stand Matt's attorney replied that he wanted to but he could not find her,
I spoke up that that was not true as he knew she was in the hall waiting to testify, the
Juror said then we convicted an incent man, we all believed Matt but was told if there
was any dough we had to find him guilty if Renee woerner had testified we would not of
had any dough and would have found him innocent.


I SWEAR OR AFFIRM THAT THE ABOVE AND FOREGOING REPRESENTATIONS ARE
TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

9/16/2013        _____
Date                Matthew R, Stroud I

STATE OF WASHINGTON

COUNTY OF SNOHOMISH

I, the undersigned Notary Public, do hereby affirm that Matthew R. Stroud I. personally
appeared before me on the 16 day September, and signed the above Affidavit as his free and
voluntary act and deed.

_____
Notary Public

AMANDA M. MURRAY
Notary Public
State of Washington
My Commission Expires
November 19, 2016

# EXHIBIT 2

The following is a summary of the notes that I took on
January 20, 2010 when I interviewed Rene Woerner. Her
father Henry was present during the entire interview.

Henry was at the courthouse on the day in question. He did
witness Adcock "drag" his daughter into a side room where
he then heard yelling going on between Adcock and his
daughter. Henry said that he was not able to make out what
was being said but when Rene came out of the room she
told her Dad that she was not testifying and that Adcock
would not listen to what she was TRYING to tell him. Henry
did not recall what the subject was about but he does recall
that Rene said that she tried to tell him the truth and he didn't
want to listen so she no longer had to testify.

Rene told me that she DID tell Adcock, just prior to trial, that
this was over drugs and that Eden and Custer "were high at
the time of the shooting." Renee said that she does recall
what happened on that day, not all but most of what
happened.

Renee said that there were a lot of people at the trailer and
outside the trailer at the time of the shooting. The only ones
IN the trailer were her, Eden, Custer and Matt. She said that
Custer and Eden came into the trailer without permission.
Matt was telling them to get out. They were accusing Matt of
stealing Custer's drugs. Matt kept telling them to get out.
Eden sat on couch in the living room area and Custer made
his way over to the bed where Renee was sitting. She said
that Matt kept telling them to get out and that he had not
stolen their drugs. Eden and Custer did not believe him.
Custer kept saying that they had to search the entire trailer
because "we are searching everyone's shit, no exceptions."
At some point Custer actually sat on the end of the bed with
Renee. Matt was telling him to get out of the trailer and off of

their bed, Custer would not leave. Custer was reaching down into Renee's purse going through it while saying "we are searching everybody's shit." Renee said that Matt kept pleading with them to get out. Eden was sitting on the couch saying "what's the problem, if you didn't steal it then don't worry, we are going to do this one way or another." Custer was telling Matt and Renee that he was going to search the trailer "one way or another."

Renee said that she didn't recall the specific threats that Custer and Eden were making but she does recall that Matt kept telling them to leave, get out of his trailer. Renee said that Custer was "going through my purse, sitting on the bed when Matt reached up and grabbed his gun." The next thing she knows Matt is firing and the two are running out of the trailer. She did NOT see a gun on either Eden or Custer. She did tell me that Custer carried guns but she didn't recall seeing one on him that day. Renee said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not. I asked Renee if she thought her life or that of Matt's was in immediate danger at the time Matt started shooting? Renee response was "who knows, I didn't see any guns but then again I was not looking and they would not get out of the trailer."

She did confirm that Custer was "high as a kite at the time of the shooting." She feels that Matt grabbed the gun because he "felt trapped in the bedroom." She did recall that she was not able to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse, she can't say for sure.

Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. that he left bruises. She did tell Adcock that it was over drugs and that

Custer and Eden were higher than kites at the time of the shooting. She said that he called her a stupid bitch several times. Renee is still unsure as to why Stevens did not have her testify.

Mark, if needed I believe that I can get back in touch with Ms. Woerner. She gave me a private number that I can supposedly reach her at. Let me know what you think?

I will try to talk with Mark Stevens about the case and why he didn't put Woerner on the stand?


Thanks,
Michael Powers

# EXHIBIT 3

From: Wlegalworks@aol.com
Subject: **Ruth, Matthew**
Date: January 11, 2011 7:45:17 AM PST
To: markmestel@comcast.net

Mark:

I met with an inmate at the Snohomish County Jail by the name of Melvin Roy Decoteau. Melvin is good friends with Renee Woerner. Melvin is currently in jail on a DOC violation. He can and will lead us to Renee when he gets out. Mr. Decoteau has not heard from his DOC officer since he was arrested four days ago. He was wondering of YOU could call Alona Kinch at 425-290-3200 and see if you can find out when he is scheduled to be released. Melvin's DOC number is 996 707. If we can find this out it might help to establish when Melvin is getting out so he could possibly help us locate and interview Ms. Woerner. If you can that's great if not then we will locate her regardless.

I was able to locate Renee Woerner's Dad. Her Dad's name is Henry Slothang. I located Mr. Slothang and sat and talked with him at his home yesterday. We met for almost an hour. In the end Mr. Slothang told me that he talks with Renee at least one time per week, every week. He agreed to talk with Renee and have her sit with me for an interview. Mr. Slothang told me that his daughter does want to help Matthew Ruth. He said that he too was present at the courthouse at the time of Matt's trial. He said that the prosecutor got very angry at Renee because Renee wanted to testify to the "complete truth and not just what was in her statement."

Mark, I feel as if Mr. Slothang will help put Renee and myself together. He tried to reach her while I was sitting in his home. Her voicemail was full. The number I showed him that we had he said was an old number. I am going to concentrate on Renee Woerner for now and then I will sit with Donnie Poole. I know roughly where Mr. Poole lives but he too seems to be trying to avoid myself as well as other members of Matt's family. He could be using also?

I will keep you updated.

Thanks,
Michael Powers

# EXHIBIT 4



CERTIFIED
COPY

ORIGINAL

Filed In Open Court
_12-28-04_/20___
PAM L. DANIELS
COUNTY CLERK
By _Grace Hampton_
Deputy Clerk

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No.03-1-02451-6 |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **MOTION TO WITHDRAW** |
| | ) | |
| MATTHEW R. RUTH, | ) | |
| **Defendant.** | ) | |

Counsel for the defendant in the above entitled cause, Mark Stephens, respectfully

requests this Court allow counsel to withdraw from further representation of the defendant.

Counsel makes this motion based upon the attached declaration.

Respectfully Submitted this 28th day of December, 2004.

03-1-02451-6        97

_____
MARK STEPHENS, WSBA #26110
Attorney for Defendant



In Response
DCA Blockmans

Motion to Withdraw
Page 1

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

AA
97

# EXHIBIT 21

## DECLARATION OF COUNSEL

Counsel for the defendant declares the following to be true and correct to the best of his belief and information:

1. On November 13, 2003 the State charged Matthew Ruth with First Degree Assault while armed with a firearm, and the State later added a second count of First Degree Assault while armed with a firearm.

2. The incident which led to the charges was witnessed by Renee Woerner, Ruth's girlfriend.

3. After the shooting, the State executed an arrest warrant for Ms. Woerner in California.

4. Some time after filing the case, the State listed Renee Woerner as a State's witness for trial.

5. Shortly after Ms. Woerner's arrival at the Snohomish County Jail, she gave police and the prosecutor a sworn, tape recorded interview which essentially corroborated the accounts of the shooting provided by the two alleged victims. At the time she was represented by attorney Bill Joice.

6. Before trial in December, 2004, Deputy Prosecutor John Adcock indicated to me he intended to call Ms. Woerner to testify as a State's witness at Ruth's trial.

7. On Saturday, December 4, 2004, while preparing for trial, I returned a phone call from Ms. Woerner, in which she suggested she would be testifying differently from what she had said in her taped interview. On the phone Ms. Woerner spoke very rapidly and somewhat incoherently.

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

Motion to Withdraw
Page 2

8.   On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony.   He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

9.   I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

10.   Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.   She indicated to me Mr. Adcock had threatened to charge her with perjury if she testified.   She expressed concern to me about potential legal consequences if she testified.   I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.

11.   After giving the matter some thought, and conferring with my client, I decided not to call Ms. Woerner as a witness at trial.   I believed her testimony would be either corroborative of the victims' testimony, or easily impeached by her prior statement.

12.   On December 9, 2004 the jury returned verdicts of guilty as charged in this case.

13.   Some time the week of December 20, 2004 my temporary receptionist told me Ruth was trying to call me.   I instructed her to accept his call if I was in the office when he called.

14.   On December 27, 2004 I tried to visit Ruth in jail, but the jail was "locked down" and I was denied access.   I was concerned because some information I wanted to review prior to sentencing had not yet been provided, and I wanted to discuss this with Ruth.

15.   After I returned to my office, my receptionist told me by intercom that Ruth was

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

holding on the phone. My office has a single outside phone line accessible by the public. All calls go to the reception desk, and then are transferred to attorneys and staff.

16. I picked up the line and began to discuss the options for the next day's sentencing with Ruth. We spoke for a minute or two. At some point I made a disparaging remark to Ruth about his "girlfriend".

17. At that point a female voice which I recognized from prior conversations as belonging to Renee Woerner spoke up. I was surprised and shocked, realizing there had been a third person listening in on the conversation without my knowledge or permission. Ms. Woerner then told me "this is being taped" or words to that effect. Ms. Woerner and I exchanged a few more words, and I hung up the phone.

Signed this 28th day of December, 2004, under penalty of perjury, in Everett, Washington.

Mark Stephens, Attorney for the Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue · P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 · Fax 259-2195

Motion to Withdraw
Page 4

1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,   )
                              )
                              )
        Plaintiff,     )
                              )
   vs.                  )  NO. 03-1-02451-6
                              )
MATTHEW RUTH,          )  COURT OF APPEALS
                              )  NO. 56318-1-I
        Defendant.     )

RECEIVED

SEP 1 4 2005

Nielsen, Broman & Koch, P.L.L.C.

---

VERBATIM REPORT OF PROCEEDINGS

---

MOTION TO SUBSTITUTE COUNSEL

MARCH 30, 2004

HONORABLE KENNETH L. COWSERT
Judge

Department No. 201
Snohomish County Courthouse
Everett, Washington

<u>Reported by:</u>
Laurel Olson
Official Court Reporter
CR #29906-2645
425) 388-3088

# APPENDIX C

2

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,          )
                                  )
            Plaintiff,            )
    vs.                           )        NO. 03-1-02451-6
                                  )
MATTHEW RUTH,                     )
                                  )
            Defendant.            )

VERBATIM REPORT OF PROCEEDINGS

        BE IT REMEMBERED that on the 30th day of March,
2004, the above-entitled and numbered cause came regularly
on for hearing before the Honorable KENNETH L. COWSERT,
one of the judges of the above-entitled court, sitting in
Department No. 201 thereof, at the Snohomish County
Courthouse, in the City of Everett, County of Snohomish,
State of Washington.

        The Plaintiff was represented by CRAIG BRAY, Deputy
Prosecuting Attorney for Snohomish County;

        The Defendant was present and represented by his
attorney, MARK STEPHENS, both appearing via video
teleconferencing;

        WHEREUPON, both sides having announced they were
ready to begin, the following proceedings were had, to wit:

```
 1                    2:00 P.M., TUESDAY
                        MARCH 30, 2004
 2              SNOHOMISH COUNTY SUPERIOR COURT

 3          *    *    *    *    *    *    *    *    *    *

 4

 5          MR. STEPHENS:  The Ruth matter.

 6          MR. BRAY:  This is Cause Number O3-1-02451-6.  I'm

 7     Craig Bray, on behalf of the State, handling the calendar.

 8     The defendant is in custody over at the jail with his

 9     attorney, Mark Stephens.

10          This is on for substitution of counsel.

11          MR. STEPHENS:  Mr. Ruth is currently represented

12     by the Public Defender Association.  It's my understanding

13     that they now have a conflict and are asking to withdraw.  I

14     have agreed to take the case, and I'm asking the Court at

15     this point to allow me to substitute in for the Public

16     Defender's Office.  I'm signing a motion and order for

17     withdrawal and substitution.  With the Court's permission,

18     I'll do that on the record and then bring it over there in a

19     few minutes.

20          THE COURT:  Mr. Ruth, is that okay with you?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  I'll allow that substitution, then.

23     Are you going to bring it over, Mr. Stephens?

24          MR. STEPHENS:  Yes, I'll just bring it over.

25                              (Proceedings concluded.)
```

STATE v. MATTHEW RUTH                    4

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

STATE OF WASHINGTON
3   COUNTY OF SNOHOMISH

4

5            I, Laurel Olson, Certified Court Reporter, one

6   of the official court reporters of the Superior Court of the

7   State of Washington in and for the County of Snohomish, do hereby

8   certify that the Verbatim Report of Proceedings in the foregoing

9   cause was reported stenographically by me and reduced to

10   computerized transcription (including ASCII disk) under my

11   direction;

12            I further certify that I am not a relative or

13   employee or attorney or counsel of any of the parties to said

14   action, or relative or employee of any such attorney or counsel

15   of any such attorney or counsel, and that I am not financially

16   interested in the said action or the outcome thereof;

17            I further certify that the Verbatim Report of

18   Proceedings is a full, true and correct transcript of the

19   proceedings to the best of my ability.

20

21

22               Official Court Reporter

23              9-12-05

24               Date

25

COURT REPORTER'S CERTIFICATE

# EXHIBIT 5

I Matthew R. Ruth, Swear under the penalties of Perjury the following is true and correct to the best of my Knowledge.

1.) Each Part of the Reply where reference is made to My personal observations, actions, and etc. is part of this affidavit, I swear it is true.

2.) The Judge called the daily recess, and the Jury left the Court room. The Prosecutor John Adcock left to go talk to his Next Witness who was Material Eye-Witness Renee M. Woerner, one of the Four who were present in my home when the Shooting occured.

3.) 20 minutes later Mr. Adcock storms in the Courtroom, Matthew R. Stroud I trailing behind. Mr. Adcock announced very loudly to the entire Courtroom that he would not be calling Renee M. Woerner because she intended to Perjure herself. The Court reporter was not present to make this part of the record. My attorney Mr. Stephens approached Mr. Adcock by the Door out of my hearing. They began talking, and Mathew R. Stroud I, jumped into the conversation. Mr. Adcock left from them, and went to the Judge. Mr. Stephens and Mr. Stroud spoke for awhile, and then Mr. Stephens went out into the hallway.

4.) When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the Judges Bench. The Judge after hearing Mr. Stephens say something - which the Public, nor I could hear - Called Mr. Adcock over to the Bench, This was a Side Bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min.

5.) After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand, and personally interview her, and that I wanted to be present during the interview. He promised he would call her to testify, if she was

not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent Cross-examination, and due to the threats she would break down and begin lying. I told Mr. Stephens that she is the only witness who corroborates my defense that was present, she is critical. I told him to call Gary Way, Donnie Poole, Bill Storie, Court Lamb, etc. He called nobody, presented no evidence, and the only witnesses who was exculpatory for me that was present at trial is Ms. Woerner. He promised he would call her to testify.

6.) The day the State rested its case, Ms. Woerners parents, and my Dad were present. Mr. Stephens told me Woerner was not appointed an attorney, and was too, scared to testify. I asked what happened to her original attorney Bill Joice? Apparently he had shot another attorney and was in jail. When I took the stand the Prosecutor and Judge teamed up on me, and attacked me, yelling at me, and threatening me, I asked them to stop, and made record that Mr. Adcock Threatened Ms. Woerner, Coached her, and that is why she would not testify. The Judge threatened to put me in restraints. I had no contact with anybody during trial because in a secret hearing without my attorney present, Mr. Adcock had me put into isolation, I was there for three months before trial, and returned with absolutely no contact with anyone every night at trial. I even wrote letters to the Judges office and ACLU asking why I was in Isolation with no hearing? The Sensory deprivation really messed me up.

7.) Ms. Woerner's original statement corroborated my defense, she said they were high on drugs during the shooting, accused me of stealing drugs, invaded our home, threatened us, there were lots of them, they would not leave, I kept screaming for them to leave, and they said they would do what ever it takes to search my home

Page 2 of 4 - Matthew R. Ruth - Affidavit

for the stolen drugs. She corroborated them too, on where they were in the trailer. The bad stuff she said about me were domestic violence allegations, that she told the Western State Hospital people were not true, and she said because she was mad at me, and scared she would be charged as an accomplice. That is in my western state evaluation. The Domestic violence allegations were ruled not admissible during Motion In-Limine, the Prosecutor agreed. In my Rap 10.10 Issue one, I challenged the Prosecutor breaking this order by admitting the health certificate evidence that show Ms. Woerner had been assaulted. This proves he was trying to get her to bring in the Domestic violence stuff, and she wouldn't lie.

8.) Mr. Stephans never told me he wasn't going to call her after the In-Chambers incident. He never showed me what corroborated the Alleged victim, or was easily impeachable by her original statement, he could not because he never interviewed her about her statement, or intended testimony. In fact after trial I spoke to her on the phone, after released from Isolation, and she told me before trial, Adcock had tryed to get her to remove the parts of her statement that corroborated my defense, she would not, and he threatened her. She called my attorney, and he said it didn't matter because "Matt is F_cked anyways." We three way called him, I confronted him, he agreed that he said that to her, and then made really bad comments about her. She told him the call was recorded. That is what caused the Declaration and motion to leave.

9.) The Judge and Mr. Adcock were mean to me, and really biased, my presence was reduced to nothing, the trial proceeding as if I was not even there. The record at trial and sentencing proves that the Judge and Mr. Adcock were biased against me.

10.) I tried to file a motion for new trial, but the court would not let me file it, I included it and the affidavit in support in my brief as exhibit 6, it was notarized at Shelton because the County

Page 3 of 4 - Matthew R. Ruth - Affidavit

Jail would not let me get it notarized. It is all true, and I want to adopt all of it in this Affidavit.

I swear all of this is true and correct tot he best of my knowledge, under the penalties of perjury.

Signed in Aberdeen, Washington on This 10th Day of September, 2013.

X _____

Matthew R. Ruth


I, _____Barbara St Louis_____, am a Notary Public in and for the State of Washington, County of GraysHarbor, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes describes therein.


Signed and dated before me this 10th day of September, 2013.

/S/ _____

_____ Barbara St Louis

NOTARY PUBLIC in and for the State of Washington, County of Grays Harbor.

My Commission Expires: 6-4-16



Page 4 of 4 - Matthew R. Ruth - Affidavit

I matthew R. Ruth swear the following to
Be 100% True, under the penalties of
perjury,

1.) I Asked MARK O. Mestel to raise ineffective
assistance of direct appeal counsel for failing
to raise Both Publictrial right issues, the
right of counsel, and rights to appear &
defend issues. I also asked that the "castle
instruction"& improper argument fashioned from
the prosecutor's use of the castle instruction
language; with telling the Jury in closing their
main function is to determine the truth;
issues be raised under ineffective assistance
of appellate counsel. I also asked that he
cite to division II, Johnson & Venegas.

2.) I typed up a memorandum to Mr. Mestel, &
attached David B. Zuckerman's structural error
argument in Morris, to reinforce my fears
about structural error being applied to
collateral attack. My Fiancee KRIS A. KAIN
sent this communication out through E-mail,
and it is confirmed mark received & read the
Memorandum. I was also charged for his time,
So the Billing also proves he read this. (see
Attachment 1)

Page 1 of 5 matthew R. Ruth affidavit

3.) I have received a message from MR. Mestel saying he will be withdrawing from my case. I have been Reduced To Pro Se Status. How can Prejudice be proved on collateral Attack when the misc court said it is impossible?

4.) I cannot get this affidavit Notarized in time to P.A in the MaPL so I can meet my deadline with this court.

5.) I asked that the interviews from P.I. Michael Powers be included in PRP, with an interview from myself. I wanted the Jury interviewed, too, because they told matthew R. Stroud I, they would have acquited me, they believed me, but I didn't prove my innocence, they said only one piece of corroborating evidence was needed. This proves the presumption was switched to "guilt" by the "castle instruction" MR. Adcocks improper arguments fashioned from

Page 2 of 5 matthew R. Ruth Affidavit

The castle instruction, & trivializing my constitutional right to be presumed innocent, with a broken & malfunctioning suite of Armor. This also proves that Mr. Adcocks efforts to threaten, and intimidate every piece of favorable evidence into not being presented to the trier of fact. (and the effect the threats & intimidation had on defense counsel who helped Mr. Adcock, by presenting not one piece of evidence, and not one witness) (but Mr. Ruth – me – the accused); were effective because all evidence favorable to the defense were secret & kept in the shadows.

I asked that the jury be interviewed, so affidavits could be provided in this PSP to prove the castle instruction & prosecutors arguments switch the burden. Matthew R. Strand & Mark Stephens heard this, especially from the jury foreman.

page 3 of 5 matthew R. Ruth Affidavit

6.) I asked that MARK Stephens be interviewed, and asked, "why did you cover up the threats made by the Prosecutor to Ms. Woerner until you filed a Motion to withdraw?" "Did you tell Mr. Ruth before you suprised called him to the stand that Ms. Woerner was in the hallway, and wouldn't testify because she was scared of Mr. Adcocks threats, and you were scared of what she might do under Mr. Adcocks aggressive cross-examination because of her fear of the threats?" And why he Never interviewed Ms. Woerner, or any witness, why Not put Gary Nay & Kenneth Muscatel on the stand?

7.) I have been scared of the structural error bar on collateral review even before Wise & Morris, I asked My attorney to include some argument of mine into our structural error issue.
A.) How can a PRP litigant prove prejudice when our state Supreme court agreed with the u.s. Supreme court that Prejudice for Public trial right violations are unquantifiable, impossible to prove, this creates a WRONG without a remedy.

B.) In this situation the error is not properly recognized without collateral evidence, Not reviewable on direct, so why would a structural error Bar apply to Public trial violations?

C.) J. Dolliver in St. Pierre adopted the teague analysis to keep in step with the u.s. Supreme courts efforts to fix Linkletter & the unequal application of retroactivity. In the interest of comity & finality the teague courts believed it's rule fairly determined when a rule applies to case retroactively, J. Dolliver went a step further & created an unknown higher standard structural error bar, well Schriro fixed teague & St. Pierre has become Linkletter, and Danforth puts all into proper perspective, just adopt the Schriro analysis for retro application as the structural error higher standard.

page 4 of 5 matthew R. Ruth Affidavit

8.) I am sorry this is not typed & notorized. Litigating in prison is very hard. It's not just because I have no schooling in the law, or in anything (I barely received my G.E.D. at 33 in prison), there are no real resources provided to us in prison for learning the law much less, litigating a case. We just received a few days ago an update to our computer, we have some cases up to July 1st, 2013 now! My fiancee Kriss Kain sends me W/R articles & case law, but the mail room rejects them half of the time. Even more important is the thousands of moron inmates that put no work into real legal studies & writing (with what we have anyways), fill the court with frivolous garbage making every inmate look bad, we are stigmatized & not taken seriously. I pray that this court realizes that for the last ten (ten years) I have put my best & hardest work into every appeal process, direct, RAP 10.10, petition for review, 7.8 on resentencing. I worked so hard on this reply to the states supplemental response. Krissy and I have been working very hard together for the last three years & pray for mercy & justice, a chance to start our lives together. I want to be a lawyer like Cleadis Flyod, thank you.

x _Matthew R. Ruth_
Matthew R. Ruth 874492

9-12-13

x _Jeremy Read_
x Jeremy Read

9-12-13

x _Brian Z. Winter_  9-12-13
Brian Z. Winter
#842856

x _Ewan_
_Ewan Lloss_ 9.12.13
932000

page 5 of 5   Matthew R. Ruth affidavit

ATTACHMENT
"1"

memorandum sent to Mark D. Mestel

Structural error concerns

Dear, Mr. Mestel

I just want to win, try to become a paralegal, get married to Kristine, and be done with prison. You know what your doing, your a winner. I respect what ever you say is our best course to win. The Court of Appeals is hard enough to win in even when we are 100 percent right. Whatever you think increases our chances of winning I am in favor of.

You know the law way better than I ever will, however, I would like to point out a few things I know you are already aware of, sorry.

Morris, No. 84929-3 Supreme Court (Nov 21, 2012):
"We need not address whether a Public trial right violation is also presumed prejudicial on collateral review because we resolve Morris's claim on ineffective assistance of appellate counsel grounds instead."

I have David Zuckerman's Morris briefing on why it is structural on collateral review, and I sent it to you already. We may want to add ineffective assistance of direct appeal counsel in the additional briefing. You did cite Orange in the original briefing.

Another interesting aspect of Morris, is that the Supreme Court really demonstrated that the Sadler/Rivera - factual/legal test has been rejected, and the right to Public Trial does not attach to Rights to be present. Morris waived his right to be present in Chambers, but the Court said he did not waive his Public trial rights, and reversed.

"A defendant must have knowledge of a right to waive it." This Morris quote higlights WISE, No. 82802-4 (Nov 21, 2012):
"Wise did not waive his right to public trial by not objecting, and prejudice is presumed."

It is the Trial Judge's duty to notify the defendant of the Right to Public Trial by conducting a Bone-Club Analysis:
"The reason such structural error is rightly presumed prejudicial is that 'it is often difficult' to 'assess the effect of the error.... To allow such deprivation would erode our open, public system of justice and could ultimately result in unjust and SECRET TRIAL PROCEEDINGS.... Here, we Cannot know what... if the Judge had properly closed the Court under Bone-Club analysis, what Objections, consideration or alternatives might have resulted and yielded.... Because it is impossible to show whether the structural error of deprivation of the Public Trial Right is Prejudicial, we will not require WISE to show prejudice in his case. 'We will not ask defendants to do what the Supreme Court has said is impossible.'" WISE.

The Court can never asses the damage of not conducting a Bone-Club analysis before secreting away over the Woerner Alleged perjury incident. Who would have come forward? What would she have said on record? We know what she said in Blackman's response, Exhibit 21, page 3:

Page one

I see the jury inquiry stages like this:

Stage ONE, The inquiry from the Jury initiates the Right to Public Trial, Right to representation, and Fair Trial;

Stage TWO, Notifying all parties of the Juries inquiry; (Must be part of record like in JASPER).

Stage THREE, Requires the defense to participate in the formulation of the response, lodge objection, and make it part of the record; (Public Trial; Right to Representation; Fair Trial);

Stage FOUR, submit response to the Jury; and either re-instruct, or replay evidence, etc. (All cases concern right to be present at this stage only).

The Ninth Circuit, in Musladin, pointed out that any answer from the Court to the Jury during deliberations about the Instructions contains information from the defense because the defense participated in the formulation of the instructions. The Musladin Court said the defense should still be allowed to participate in the shape of the answer even when involving instructions.

In Our Case, Mark, the answer was not about Jury instructions, and contained absolutely no information from the defense. Defense Counsel is most acutely needed before the decision to respond to the jury is made, even if the answer is a negative answer. It is the missed opportunity to influence the response, and have that participation made part of the record, that creates the significant moment; simultaneously violating my rights to public trial and my rights to representation.

<u>SUBLETT LEAD OPINION</u>

In Sublett, the Supreme Court claims that not one case could be found that holds "these proceedings... violate the defendants constitutional rights" and we can not find one either." <u>Musladin</u>, 555 F.3d 830, is that case.

The Ninth Circuit, in <u>Musladin</u>, described Jury deliberation as a very important stage of trial. A very fragile portion of Trial where anything the Judge says can influence the verdict, and right to Fair Trial.

<u>Musladin</u> conflicts with how the Sublett Court diminishes the significance of Deliberation: "No witnesses are involved at this stage, no testimony is involved, and no risk of perjury exist." Diminishing the significance of deliberations Contradicts their own (Sublett Court) analysis of <u>Press II</u> in adopting the Experience and Logic test.

Page Three

The Jury Inquiry in our Case, Mark, was not about Jury instructions, and the answer from the Court, absent the defenses participation, contained NO information from the defense. Musladin.

Justice Antonin Scalia said: "Operating upon the spinal column of American democracy. Some structural errors, like the complete denial of counsel or the denial of public trial, are visible at first glance." NEEDER V. U.S., 527 U.S. 1 (1999) (J.Scalia Dissent). The Superior Court's violation of both these Doctrines in our case, Mark, slams so hard into the Body of the Bill of rights and the Constitution, that the impact snaps the Spinal column of American Democracy, crumbling our Justice system. A Stand by the Courts Must be made now, so this does not happen in the future.

### WOERNER SECRET PERJURY PROCEEDING

"The Right to Public Trial serves to ensure a Fair Trial, to remind the prosecutor and judge of their responsibilities to the accused and the importance of their functions, to ENCOURAGE WITNESSES TO COME FORWARD, AND TO DISCOURAGE PERJURY." Eublate.

Ms. Woerner is a Material Eye witness, and I always maintained that her "testimony was critical, that he (Mr. Ruth) was Very critical of his attorney for not calling her." Sentencing.Pg.4. In the secret, in-chamber proceedings, the Judge said Woerner would be appointed Counsel to advise her about her fears of the Prosecutions threats. VRP 179-181, Mr. Stephens did not know if he could call her until she spoke to her attorney, but she was never appointed an attorney. At sentencing, Chad Dold asked for a continuance to "present a motion for a new trial based either on prosecutorial misconduct, ineffective assistance of counsel, or denial of justice, any one of the three, depending on what Ms. Woerner tells me." Sentencing Pg 4-5. "Mr. Ruth never agreed to Mr. Stephens' strategy in that regard and was quite upset... it is not a decision he would ever agree with, and he disagrees with any assessment of tactical or strategic advantage." pg 6.

Up until the State threatened to charge Woerner with perjury if she testified, (States Response, Exhibit 21, Page 3, Section 10), Woerner was testifying. This is a significant moment, which had an unquantifiable amount of subsequent prejudice reverberating throughout, and tainting the entire trial. (the Jury inquired about Ms. Woerner During deliberations).

The State elicited testimony from EDEN and CUSTER about Ms. Woerner screaming for me to stop, and being scared of me, and other damaging stuff. The Judge would not let the defense rebut this testimony. Yet, Woerner never testified, and the Jury was clearly influenced by this because they inquired about her statements during deliberations. With Such an important Eye witness's testimony at stake, it seems that the Public Trial and Fair Trial Doctrine demands that this issue be fleshed out in Public.

Page Five

EXHIBIT
6

AFFIDAVIT FROM DPA ADCOCK
Where he Commits Perjury


RAP 13.5A
(Ext. 4 of Traverse)

OCT-18-2010 MON 10:07 AM S... CTY PROSECUTING ATTY    FAX NO. 425 36...886               P. 01

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

The State of Washington,                        03-1-02451-8

                              Plaintiff,

        vs.                                     AFFIDAVIT OF COUNSEL

MATTHEW R. RUTH,

                              Defendant.

        The undersigned certifies (or declares) that I am a duly appointed deputy
prosecuting attorney for Snohomish County, Washington, and make this affidavit in that
capacity; and that I was trial counsel in this case for the prosecution.

        1.  There were never any medical examiner reports in this case because the two
victims, whom the defendant shot, survived.  To the best of my knowledge, no
toxicology analysis related to the victims in this case was performed by the State
Toxicology Laboratory.  There was certainly none in our possession.  The medical
reports we did have on Messrs. Custer and Eden were turned over to the defense in
discovery.  The defense had the same medical material we had.  While I recall there
may have been some indication the defendant's victims may have used marijuana at
times, there was nothing to support the defendant's theory that he was assaulted by
drug-crazed dealers who threatened to kill him and rape his fiancée.

The undersigned certifies under penalty of perjury under the laws of the State of
Washington that the foregoing is true and correct.

JOHN ADCOCK, # 15714
Deputy Prosecuting Attorney

                                      1
Snohomish County
Prosecuting Attorney - Criminal Division
3000 Rockefeller Ave., M/S 504
Everett, Washington 98201-4046
(425) 388-3333 Fax: (425) 388-3872

# APPENDIX C

Exhibit 7

Jury Inquiry

RGP 13.5A
(Ext. 4 of traverse)

Superior Court
12-9-04
COUNTY CLERK

By _Grace Hampton_
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF SNOHOMISH

State of Washington
_____
Plaintiff,

vs.

Matthew Robert Ruth
_____
Defendant.

CAUSE NO. _03 - 1 - 02451 - 6_

**INQUIRY FROM THE JURY AND
COURT'S RESPONSE**

**JURY INQUIRY:**

1) Transcripts of interview with Renee Warner Dec 10 & 11, 2003
2) Transcript of Interview(s) with Jeremy Custer (Nov 24, 2003)
3) Transcript of interview with Drew Eden (Nov 10, 2003)

DATE AND TIME _08 Dec 2004   16:12_

DATE AND TIME RECEIVED BY THE COURT: _12/8/04  4:12 PM_

COURT'S RESPONSE:  The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations.
Thank you

_____
JUDGE

DATE AND TIME RETURNED TO JURY: _12/8/04  4:15 PM_

AA
98

**SAVE -- MUST BE FILED**

EXHIBIT

5

state supreme court
SUPPlemental Brief

RAP 1.2

No. 89906-1

See IN Back of this ExhiBit 5
EXHiBiT 5A  "Motion For Permission
To File SupPlemental Brief"
Attacks Division one AcJ's Factual Dispute FINDINGS
ANd credIBIlity FINDINGS without An EvidentiaRy Hearing

(AAG Exh. 19)

*Rejected for filing
(See Deputy clerk's letter
dated 10/20/14)
* But, then accepted for filing.
(See Deputy Commissioner's ruling denying
review at p.1, n.1)

NO. 89906-1

IN THE STATE SUPREME COURT FOR THE STATE OF WASHINGTON

In re The Personal Restraint Petition of:

MATTHEW R. RUTH,

Petitioner.

Received
Washington State Supreme Court

OCT 2 0 2014

Ronald R. Carpenter
Clerk

SUPPLEMENTAL BRIEF
RAP 1.2

MATTHEW R. RUTH
Pro Se Litigant
DOC# 879492 H4-A-98L
Stafford Creek Corr. Center
191 Constantine Way
Aberdeen, Wa 98520

EXHIBIT 19

TABLE OF CONTENTS

1. OPENING STATEMENT....1

2. ISSUES PRESENTED FOR REVIEW....3

3. ARGUMENT ON WHY REVIEW SHOULD BE GRANTED....4

    i. 3 prong SMITH test....6

    ii. BERRYSMITH proves a factual question was at issue in chambers....10

    iii. In Chambers Closure prevented Mr. Ruth from cross-examining Ms. Woerner....14

B. THE RECORD SHOWS THE ENTIRE JURY INQUIRY PROCESS LASTED 3 MIN....19

TABLE OF AUTHORITIES

WASHINGTON STATE SUPREME COURT

Brundridge v. Fluor Federal Services. INC., 164 Wash.2d 432 (2008)....15

In re Disciplinary of Bonet, 144 Wn.2d 502 (2001)....8

In re Yates, 177 Wn.2d 1, 296 P.3d 872 (2013)....1

State v. Frawley, NO. 80727-2 (2014)....2

State v. Irby, 170 Wn.2d 874, 880 n.6 (2011)....17

State v. Jasper, 174 Wn.2d 96 (2012).... 2, 20

State v. Koss, No. 85306-1 (2014)....1, 2, 20

State v. Lormor, 172 Wn.2d 85, 93 (2011)....19

State v. Olson, 92 Wash.2d 134, 594 P.2d at 1340-41 (1979)....12

State v. Slert, No. 87844-7 (2014)....3, 6, 8, 17

State v. Smith, No. 85809-8 (2014)....1, 3-7, 9, 16, 18-19

State v. Stentz, 30 Wash. 134, 70 P. 241, 243 (Wash.1902)....16

State v. Sublett, 176 Wn.2d 58, 292 P.3d 715 (2012)....2, 6, 8, 20

State v. Wroth, 15 Wash. 621, 47 p. 106 (Wash.1896)....17

WASHINGTON STATE COURT OF APPEALS

State v. Bennett, 168 Wash.App. 197, 275 P.3d at 1232 n.6 (2012)....17

State v. Berrysmith, 87 Wash.App. 268, 944 P.2d 397 (1997).... 10, 11

State v. Carisle, 73 Wn.App. 678, 871 P.2d 174 (Wash.App.Div.1 1994)....8

State v. James, 48 Wash.App. 353 (1987)....11

State v. Rainey, No. 69846-4-I (Wash.App.Div.1 2-24-14)...12, 13

State v. Martinez, 105 Wn.App. 775, 20 P.3d 1062 (Wash.App.Div.3 2001)....15

i

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT

Duncan v. Louisana, 391 U.S. 145, 88 S.Ct. 1444 (1968)....8

Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982)....7

Maleng v. Cook, 490 U.S. 145 (1968)....2

Melendez-Diaz   V.   Massachusetts,   129   S.Ct.   2527,   557   U.S.   305 (U.S.Mass.2009)....16

Press-Enterprise Co., V. Superior Court (1984)....7

Richmond Newspapers....7

Washington v. Texas, 388 U.S. U.S. 14 (1967)....15

White v. Illinois, 112 S.Ct. 736, 502 U.S. 346 (U.S.Ill.1992)....15

### FEDERAL COURT OF APPEALS

Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008)....19

Musladin v. Lamarque, 555 F.3d 830 (9th Cir. 2009)....2, 20

Rovinsky v. McKaskle, 722 F.2d 197 (5th Cir. 1984)....5, 16-17

U.S. v. Juan, 704 F.3d 1137 (9th Cir. 2013)....1, 3, 5, 10, 14

U.S. v. Lopez, 373 U.S. 427 (1963)....16

U.S. v. Sanchez, 176 F.3d 1214 (9th Cir. 1999)....15

U.S. v. vavages, 151 F.3d 1185 (9th Cir. 1998)..... 14

### OTHER JURISDICTION

People v. Raider, 256 Mich. 131 (1931)....16

1. OPENING STATEMENT

The new wave of public trial right cases published by this most Honorable Court on 9-25-14 are very important to Mr. Ruth's case, especially, Smith, No. 85809-8 and Koss, No. 85306-1. The facts & Issues presented in Mr. Ruth's case are perfect for this Court to provide the much needed guidance on how to properly conduct the "Experience & Logic" Test.

The decision made by Division One in Mr. Ruth's PRP is in conflict with the State & Federal Constitution; Juan 704 F.3d 1134 (9th.Cir); Koss & Smith:

"without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it 'expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor.' Ruth Claims 'the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor.' Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of yeats [sic], 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013)." No. 68380-2-I/3.

The Smith decision makes clear that it is suspicious to call a sidebar when the jury in not present, especially, when off-the-record Juan type "Substantial Government Interference" caused the sidebar that resulted in a secret in-chambers conference. Since the record proves that the historical scope of mundane sidebar & in Chamber discussions was exceeded, is the Experience prong satisfied?

Mr. Ruth asks this Court to attach the coextensive Art.1 § 10 & 22, Public Trial Right safeguard, to all off-the-record Juan type "Substantial Government Interference," giving the Accused the right to Cross-Examine a State witness about any perjury "threats" or "Warnings" made by the State; and place the burden on the state to prove the factual basis for the perjury allegations, and that perjury cannot be disuaded.

-1-

Next, where Koss fails Mr. Ruth succeeds, the record clearly proves that defense counsel & Mr. Ruth were not notified of the jury inquiry as required by crR 6.15(f)(1). The entire "Jury Inquiry" proceeding occurred in merely 3 minutes. (Exh. 1 "Trial Minutes")(Exh. 2 "Jury inquiry"). Mr. Ruth was in custody, unlike Koss & Jasper. Mr. Ruth did properly present the claims: (1) the trial Court did not follow the CrR 6.15(f)(1) procedure; (2) Mr. Ruth was Completely denied counsel; and (3) Mr. Ruth's Rights to "Appear & Defend" were violated.

The Koss decision makes clear that Division One adjudicated Mr. Ruth's claim contrary to the holding in Sublett. The Acting Chief Judge (ACJ) erroneously interpreted the Sublett holding as:

"In Sublett, the Supreme Court determined that the public trial right does not attack to the consideration of and response to a jury question. Sublett, 176 Wn.2d 75-78. Ruth fails to demonstrate a violation of his public trial right involving the jury question." No. 68380-I-2/3.

Also, the ACJ erroneously required Mr. Ruth to prove prejudice from the complete denial of counsel claim, although, that error is structural. No. 68380-2-I/2 & Fn 1. In Frawley Justice Wiggins stated that complete denial of counsel will always be considered structural. Frawley, No. 80727-2/9,18. That position is consistent with Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009).

Mr. Ruth will incorporate the relevant facts into the applicable arguments below. Mr. Ruth asks that this Court please not hold him to the same standards as lawyers because he is uneducated in the law. Please give these pleadings liberal interpretations. Maleng v. Cook, 490 U.S. 488, 493 (1989).

-2-

## 2. ISSUES PRESENTED FOR REVIEW

1.) After DPA Adcock had elicited only the adverse portions of (Ms. Woerner) a Material State Eye-Witnesses police statements through the substance of the alleged victims & other state witnesses; does closing the courtroom due to off-the-record Juan type "Substantial Government Interference" between the prosecutor and Ms. Woerner satisfy the three prong Smith test?

2.) In Slert the majority stated that "The experience and Logic test is also a useful analytical tool for determining whether a discussion may be held in Chambers." No. 87844-7/11 fn.4. How can that be true when the ACJ completely ignored the evidence provided by Mr. Ruth; sworn statement of Counsel Stephens; the affidavits & Private Investigation interviews of Ms. Woerner, Matthew R. Stroud I, Henry Slothaug, Donnie G. Poole, Matthew R. Ruth, and Jury Member Leslie Winnie?

3.) If observing the process will aid the public in assessing Mr. Ruth guilt or innocence, then has the process been historically open because "[t]he history and origin of the public trial clause make clear that the open courts right was designed to deter and expose corruption and manipulation in the Justice system." Slert, No. 87844-7/3 (Wiggins Concurring)

4.) Does a fair reading of the record prove that defense counsel & Mr. Ruth were not notified of the Jury inquiry, and therefore deprived of the ability to participate in the formulation of the response to the jury inquiry?

5.) The Jury inquiry requesting Ms. Woerner's police statement was caused by Judge Hulbert preventing Mr. Ruth from defending against the State's "Adverse" Woerner hearsay evidence; Judge Hulbert commented on the Woerner evidence through the disguise of sustaining DPA Adcock's objection, and then Judge Hulbert instructed the Jury to "draw it's own conclusion about it's recollection," as to whether the State used Woerner in chief. RP 247, 266-67.

6.) Mr. Ruth asks this Court to attach the Coextensive public trial right safeguard to off-the-record Juan type "Substantial Government Interference," giving the Accused the right to Cross-Examine a state witness about any perjury "threats" or "warnings" made by the state, and place the burden on the state to prove the factual basis for the perjury allegation and that the perjury cannot be disuaded.

7.) The lower courts are not using the "Experience Prong" to review historical practices, instead History is being used to reject Public Trial Right Challenges based on labels; the guiding principle is not being applied; and "Similar in Nature" comparisons are being ignored. The deciding factor in the Smith "Experience Prong" Analysis seemed to be whether the "Public Interest" was implicated by the Proceeding being challenged. This Court Should grant Review and clarify how to properly apply the "Experience Prong."

8.) Doe Mr. Ruth have to prove prejudice stemming from complete denial of counsel on collateral attack?

-3-

### 3. ARGUMENT ON WHY REVIEW SHOULD BE GRANTED

#### A. THE THREE PRONG SMITH TEST PROVES THAT PERJURY THREATS CANNOT BE DISCUSSED SECRETLY AT SIDEBAR & IN CHAMBERS A NEW TRIAL IS REQUIRED.

The 3 prong <u>Smith</u> test provides much needed guidance on how to determine whether a public trial right violation has occurred. The <u>Smith</u> Majority clarified that the guiding principle that must be applied to both the "Experience & Logic" prongs when conducting this test is "whether openness will 'enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" <u>Smith</u>, No. 85809-8/6-7. Rather then using history as a Public Trial Right Bar as Division One has done in Mr. Ruth's case, the <u>Smith</u> decision proves that "The new experience and logic test calls for review of historical practices." Anne L. ellington & Jeanine Litzenhiser, In Washington State Open Courts Jurisprudence Consist Mainly of Open Questions, 88 WASH.L.REV. 491, 518 (2013).

The Proceeding being challenged in Mr. Ruth's case occurred during trial, lasted 28 minutes, and caused the jury during deliberations to inquiry about Ms. Woerner. The 28 min. Proceeding started at 2:54 p.m., when the trial Court called the daily recess. DPA Adcock went into the hallway to speak to his next witness, Reene M. Woerner. Ms. Woerner was one of four people who was present for the shooting, and the only one who was not a shooter or shot. She was Mr. Ruth's girlfriend during the shooting.

In the hallway a confrontation occurred where DPA Adcock physically assaulted Ms. Woerner leaving bruises; DPA Adcock called her a "Stupid Bitch" several times; and threatened to charge her with perjury "If she Testified" to what Ms. Woerner & Mr. Slothaug said was the complete truth. (Exh. 3 & 4 - P.I. Michael Powers Interviews of "Renee M. Woerner" & "Henry Slothaug").

-4-

In Smith A critical distinction was made between Smith & Rovinsky v. McKaskle, 722 F.2d 197, 198 (5th Cir. 1984):

"The sidbars here are further distinguishable from the motions in Ronvinsky because there is a video and audio recording. Any inquiring member of the public can discover exactly what happened at sidebar." No 85809-8/11.

Unlike the Smith case in Mr. Ruth's case (like Rovinsky) there was no Switch that was thrown to record what occurred in the hallway between DPA Adcock & Ms. Woerner, nor the sidebar that led into chambers; and from chambers back to sidebar. (Exh. 1 - "Trial minutes" at 7).

However, Mr. Ruth has provided a sufficient record to prove what occurred in the hallway and at the sidebars & in chambers conference. Remember that this closure was caused by the Juan type "Substantial Government Interference" that occurred in the hallway. (Exh. 3 & 4 - P.I. Michael Powers interviews of "Renee M. Woerner" & "Herney Slothaug"); (Exh. 5 - "Matthew R. Stroud I"); (Exh. 6 - "Mark Stephens"). These Exhibits are from people in the hallway who are also trial spectators, and all were deprived of making record when Judge Hulbert failed to conduct the Bone-Club Analysis.

Mr. Ruth has provided an adequate record for this court to determine that a Public Trial Right violation did occur: (1) The above Exhibits; (2) on-the-record summary (RP 179-81); (3) Mr. Ruth's attempts during cross-examination to explain to the jury about why Ms. Woerner was not called to testify by the state (the perjury threats), and the subsequent threats from Judge Hulbert to restrain Mr. Ruth for attempting to make record of the perjury threats (Rp 266-67, 281); (4) the jury inquiry requesting Ms. Woerner's police statement (Exh. 1 & 2); (5) the biased comments made by DPA Adcock & Judge Hulbert against Mr. Ruth during sentencing (2-4-05 Sentencing Hearing, Rp 13-14, 17-18, 20, 23-26).

-5-

Although the lead in Smith did hold that traditional mundane "sidebars do not implicate the public trial right," a warning was given in F.N. 10:

"We caution that merely characterizing something as a 'sidebar' does not make it so. To avoid implicating the public trial right, sidebars must be limited in content to their traditional subject area, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record. Whether the event in question is actually a sidebar is part of the experience prong inquiry and is not subject to the old legal-factual test." No. 85809-8/9.

In Footnote 4, the Slert Majority applies the same test to chambers discussions, "The experience and Logic test is also a useful analytical tool for determining whether a discussion may be held in chambers." No. 87844-7/11. Similarly, Justice J.M. Johnson in Smith instructed that the analysis applied to sidebars also applies to in chambers conferences. See F.N.3. Mr. Ruth asserts that the Smith analysis applies to the proceeding he is challenging.

The closed proceeding in Mr. Ruth's case is not consistent with the traditional role filled by chambers conferences and does implicate the public trial right. There is no chance that the juries concentration would be broken, or the flow of trial interrupted because the Sidebar & in chambers closure occurred while the jury was not present. The proceeding in Mr. Ruth's case is not analogous with sidebar and in chamber discussions. Mr. Ruth believes the 3 prong Smith test is helpful for this Court to determine whether the In-Chambers proceeding violated Both the Public's & Mr. Ruth's Public trial Rights under Art.1 § 10 & 22, and Mr. Ruth's Rights to "Appear & Defend."

### i. 3 PRONG SMITH TEST

(1) DOES THE PROCEEDING AT ISSUE IMPLICATE THE PUBLIC TRIAL RIGHT?

"The first part of the test, the experience prong, asks 'whether the place and process have historically been open to the press and General public.' 176 Wn.2d at 73." No. 85809-8/6.

-6-

The "Experience Prong" provides the landscape "for review of historical practices." 88 WASH.L.REV. 491, 518 (2013). "Strangely history informs the inquiry at times and is ignored other times." Smith, 8509-8/13 fn 6 (Wiggins, J., Concurring). The lower courts are not applying the guiding principle to the "Experience Prong," instead if Historically the proceeding is not open, the lower courts end the "Experience & Logic" test. This is no different then using labels versus substance.

History is not the determinative question on whether the public trial right is implicated. For example in Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed. 2d 248 (1982), Chief Justice Burger proved that Historically the proceeding at issue was closed, however, for the majority Justice Brennan focused on the positive role openness would play in the functioning of the proceeding in question, so the Logic prong was determinative:

"For the majority, Justice Brennan emphasized the general the general function for self-governance to be served by an open trial and held that a trial might be closed only in specific cases where there was a documented or reasonable harm to such minors. Chief Justice Burger, in dissent, pointed instead to the Historical evidence supporting closure of this particular type of trial. The split between these two approaches from Richmond Newspapers was also evident in Press-Enterprise Co, v, Superior Court (1984)." Lynn Mather, (Professor of Government, Darthmouth College), The Oxford Guide to United States Supreme Court Decisions, Page 259.

The deciding factor in the Smith "Experience" analysis seemed to be whether the "Public Interest" is implicated. In both Bone-Club & Rovinsky the Smith lead reasoned that "Public Interest" was implicated because the proceedings involved substance that is material for "the public to observe the process and weigh the defendant's guilt or innocence for itself." Smith at 12.

-7-

If the scope of mundane sidebar & in chamber discussions is exceeded and the "Public Interest" is implicated then Historically the proceeding in question has been open. This is especially true when "Substantial Government Interference" is being discussed in the closed proceeding being challenged because as Justice Wiggins points out "The history and origin of the public trial clause make clear that the open courts right was designed to deter and expose corruption and manipulation in the Justice system." Slert, No. 87844-7/3.

Also, In Mr. Ruth's case the closure occurred during the daily recess when the Jury was not present; so the Public inherited the entire safeguard against overzealous prosecutors & Bias Judges. Sublett 176 Wash.2d 58, 292 P.3d 715, 723-24 (2012). The Jury Trial Right was designed as "an inestimable safeguard" against any chance of bias and corrupt proceedings created by the Government Misconduct of the Judge & Prosecution. Duncan v. Louisana, 391 U.S. 145, 156, 88 S.Ct. 1444, 1449, 1451-52 (1968).

The prevention of corruption & Manipulation through "Substantial Government Interference" is the very purpose of why the Public & Jury Trial Rights were designed. This Court has held that the type of misconduct that occurred in Mr. Ruth's case, is a Highly unethical issue of "Significant Public Interest," that rendered the ultimate fact of whether the threatened witness testified irrelevant. In re Bonet, 144 Wn.2d 502 (2011).

In State v. Carlisle, 73 Wn.App. 678, 871 P.2d 174, 177 (Wash.App.Div.1 1994), stated that if the prosecutor threatens to charge a witness "If She Testified," then it requires a dismissal. That is exactly what occurred in Mr. Ruth's case; exactly, what caused the closure; and was discussed at the sidebar & in chambers. (Exh. 6 - "Mark Stephens"); RP 179-81. Why else order that Ms. Woerner be appoint an attorney?

-8-

A Proper and fair Similar in Nature comparison is imperative to a proper History analysis. Mr. Ruth must present the relevant facts for a "similar in nature" determination to be made for a fair comparison.

In a sworn statement, Defense Counsel Mark Stephens, stated:

"8. On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony. He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

"9. I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

"10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset. She indicated to me Mr. Adcock had THREATENED to CHARGE her with PERJRUY IF SHE TESTIFIED. She expressed CONCERNS to me about potential legal CONSEQUENCES IF SHE TESTIFIED. I indicated I could not advise her and suggested she SEEK appointed COUNSEL to answer her questions." (Exh. 6).

The hallway confrontation between DPA Adcock & Ms. Woerner is the cause of the sidebar called by Judge Hulbert, during the daily recess, that led into chambers. The Smith court pointed out that Historically the purpose of a Sidebar is to prevent interrupting the juries concentration. In light of the sidebar & chambers history why would Judge Hulbert call a sidebar before going in chambers when the Jury was not present?

After admonishing the jury Judge Hulbert requested that DPA Adcock & Mr. Stephens give a brief summary of what was discussed in chambers, this lasted three minutes:

"THE COURT: [R]eal quickly, because Mr. Ruth was not present during a very brief conversation that we had in Chambers, we were simply talking about a scheduling issue. Calling or not calling a particular witness. If you want to just flesh that out.

"MR. ADCOCK: We had a conversation, your Honor .... my next witness, Renee Woerner, indicated to me, without any doubt, that she was going to commit perjury if she were called by the state to testify .... I believe he [Stephens] had a conversation with her where she brought up the fact that I had said that if you commit perjury, there is going to be consequences. And at that point he concluded that she needed to be advised.

-9-

"We're going to make arrangements for the Office of Public Defender to get her an attorney, to consult with her tomorrow about her options, so to speak.

"Mr. Stephens indicated to me that he did not know whether he is going to call her yet but that that was the first step ...."

"MR. STEPHENS: I just might add that's, MORE or LESS, what's happen. When I had my conversation with this potential witness, she indicated to me CONCERNS about COMMENTS Mr. Adcock MADE. She DID INDICATE the word "PERJURY" was used. I dont' know what CONTEXT that was in ... you need you own lawyer."

"THE COURT: Fair enough. Again, primarily for the benefit of Mr. Ruth, who was not present during that conversation, I want to make sure that we laid it all out, what the conversation was in chambers. OBVIOUSLY that facilities communication between you and your attorney." RP 179-81 (Appendix "B" RP 177, 179-81).

The label given to this proceeding is "Witness Scheduling," however, the record proves that is not what was discussed in chambers. The record clearly proves that <u>Juan</u> type "Substantial Government Interference" was discussed in Chambers. In fact that is why Ms. Woerner was in need of Counsel.

ii. BERRYSMITH PROVES A FACTUAL QUESTION WAS AT ISSUE IN CHAMBERS.

The in chambers discussion in <u>Berrysmith</u> was whether Defense Counsel was entitled to withdraw from representing Mr. Berrysmith because Defense Counsel Mr. Mulligan believed his client intended to commit perjury. <u>State v. Berrysmith,</u> 87 Wash.App. 268, 273, 944 P.2d 397, 401 (1997). The <u>Berrysmith</u> court reasoned that the "true issue is whether Mr. Mulligan had a sufficient factual basis for his strong belief that perjury was intended and could not be dissuaded, so that continuing with the representation would result in a violation of the rules of professional conduct." Id. So, the question before the <u>Berrysmith</u> court was not whether the client in fact intends to commit perjury, and that cannot be dissuaded. Id.

-10-

The in chambers discussion in Mr. Ruth's case is similar in nature to whether Ms. Woerner was in fact intending to commit perjury, and if so, can it be dissuaded. Ms. Woerner was not represented by any attorney, and the state used Ms. Woerner in chief, so Mr. Ruth's confrontation & Compulsory rights were at issue automatically making the in chambers conference a critical stage. The attorney in <u>Berrysmith</u> had the burden to prove that the belief in perjury was reasonable, and that it could not be dissuaded. "whether the lawyers belief is reasonable depends upon whether it had a firm factual basis. <u>James</u>, 48 Wash.App. 353, 366-67 (1987)(Gut level suspicion is not enough)." Id. at 401-02.

The reasonableness of DPA Adcock's perjury allegation is not at issue because he did not represent Ms. Woerner and she is not the criminal defendant. At issue is whether a firm factual basis for the perjury allegations existed, and if so, whether the perjury can be dissuaded. Mr. Ruth's Fair trial rights depend on the State presenting Ms. Woerner to the jury because without her Mr. Ruth loses not only the State's endorsement of Ms. Woarner, but the powerful tool of cross-examination. If the Defense has the burden to call Ms. Woerner, the State is empowered to impeach any portion of Ms. Woerner's testimony that is exculpatory to Mr. Ruth, while maintaining the integrity of the "adverse" Woerner hearsay through the credibility of the State's Witnesses. 1966 WASH.U.L.Q. 068, 081 (1966).

Judge Hulbert has a historical responsibility to protect Ms. Woerner from the "Substantial Government Interferance" of DPA Adock:

"A leading 19th Century commentator, quoted by Dean Wigmore, noted that the english law 'throws every fence round a person accused of perjury,' for 'the obligation of protecting witnesses from oppression, or annoyance, by charges, or threats of charges, of having borne false testimony, is far paramount to that of giving even perjury its deserts(sic).

"To repress that crime, prevention is better than cure: And the law of England relied, for this purpose, on the means provided for detecting and exposing the crime at the moment of commission, such as publicity, cross-examination, and aid of a jury, Etc.; E.Best, principles of law of evidence s 606 cc. Chamberlayne ed. 1883. See J. Wigmore Evidence 275-276 (3d ed. 1940). State v. Olson, 92 Wash.2d 134, 594 P.2d at 1340-41 (1979).

History has provided Open Court protection of a witness being accused of Perjury. Further supporting Mr. Ruth's position is State v. Rainey, No. 68846-4-I (Wash.Div.1 2-24-14), where Division One held that potential witnesses failure to personally assert her Fifth Amendment privilege against self-incrimination in open court violated Rainey's public trial rights. In reaching that conclusion the Rainey court looked to the procedure in Lougin, 50 Wn.App. 376 (1988). In Lougin defense Counsel told the Jury a codefendant would be testifying, before the court ruled that the codefendant would be subject to full cross-examination, which made her not want to testify. Similarly in Ruth's case, Judge Hulbert had DPA Adcock inform the jury Ms. Woerner was a state's witness. RP 15-16.

The Trial court in Lougin instructed the jury that, due to certain legal rules, the codefendant would not be testifying and that her nonappearance should not be considered in arriving at their verdict. In Mr. Ruth's case no such instruction was given, and in fact when the defense tried to rebut the State's use of Woerner hearsay in their case in chief DPA Adcock objected and Judge Hulbert commented on the evidence when sustaining the objection. RP 247, 266-67.

Here is one example, DPA Adcock asked alleged victim Drew Eden, What Ms. Woerner "was doing during all this?" Drew Eden replied "I remember her being freaked out ... and she was saying, like "Matt, Stop. Stop." RP 164. After, Ms. Woerner was not called by the state, and during Mr. Ruth's Direct-Examination, Defense counsel asked the same question, and DPA Adcock Objected.

-12-

In front of the jury, defense Counsel Stephens explained to Judge Hulbert that DPA Adcock had used Woerner in chief. Judge Hulbert said that was not his recollection and instructed the jury to make their own "conclusion about their recollection." RP 247. However, the Jury had to draw their conclusion without Mr. Ruth being able to defend against DPA Adcock's biased & untruthful one-sided adverse version. The in chambers proceeding combined with the biased ruling from Judge Hulbert prevented Mr. Ruth from defending against the Woerner Hearsay, and from presenting his theory of self-defense. RP 207, 221, 223-228, 247, 266-67, 294-95, 297-01, 309; (Appendix "C" at 3 & 4). The Jury inquired about Ms. Woerner's Police Statement during deliberations. (Exh. 1 & 2). A Manifest Error arises from the combined effect of these serious Constitutional violations. RAP 2.5(a)(3).

The Rainey Court further stated that Lougin Appealed arguing that the trial court erred in allowing the potential witness to make a blanket refusal to testify. Division One agreed and explained how the trial court should have proceeded:

"Lougin suggest that the proper procedure would have been to allow him to call the codefendant and question her. If at any point she claimed a privilege against answering a question, the trial court could rule on her claim as it related to the specific question asked .... It is impossible to know what the codefendant would have done if confronted with specific substantive questions. Conceivably, if properly advised as to the scope of her privilege, she could have testified on Lougins behalf and still avoided incriminating herself."

The same applies to Ms. Woerner. Instead of improperly threatening her off-therecord, and then preventing her from being questioned. The Fair process is to have a third party properly advise her on the record in open court, to the scope of her duties and rights as a witness, then allow the parties to determine if a firm factual basis exist to support the perjury allegation, and if so, whether it could be dissuaded. The result being that Ms. Woerner would have been subjected to cross-examination without committing perjury, or violating Mr. Ruth's Rights.

-13-

Further supporting the need for this procedure is <u>U.S. v. Juan</u>, 704 F.3d 1137 (9th Cir. 2013). Application of the Juan rule is problematic where DPA Adcock's threats to Ms. Woerner do not appear on the record. The more protective Washington State Public Trial Rights of Art. 1 § 10 & 22 can be harmonized with the <u>Juan</u> Rule by requiring any "Warning" to be made in Open Court on the record. However, any off-the-record "threats" must be investigated in a "Ruth Hearing," then depending on "the manner in which the prosecutor ... raises the issue, the language of the warnings, and the prosecutor's ... basis in the record for believing the witness might lie," the prosecutor's warning may be proper. <u>U.S. v. Vavages</u>, 161 F.3d 1185, 1190 (9th Cir. 1998). Mr. Ruth is entitled to cross-examine Ms. Woerner about:

(1) the perjury threats;

(2) the exculpatory portions of her police statement; and

(3) The adverse hearsay elicited by DPA Adcock through the substance of the State witnesses.

"Critically, however, the Ninth Circuit's extension of Webb to the prosecution witnesses also implicitly relies upon the Sixth Amendment right to confront witnesses .... In short Juan Fundamentally protects a defendants Sixth Amendment right to elicit exculpatory evidence from an 'adverse' government witness." Ruth A. Moyer, Substantial Government Interference with Prosecution Witnesses: The Ninth Circuit's Decision in United States v. Juan, Minnesota Law Review Headnotes, 98:22, 28-29 (2013).

### iii. IN CHAMBERS CLOSURE PREVENTED MR. RUTH FROM CROSS-EXAMINING MS. WOERNER

If Ms. Woerner would have been cross-examined about her 12-11-03 - police statement, Mr. Ruth would have been able to challenge Jeremy Custer's testimony (RP 137) and elicit the following exculpatory corroborating evidence for his self-defense, defense:

-14-

"WOERNER: Jeremy said 'No Cops' ... went in the house, grabbed a black garbage bag which I've seen that he had a pound of weed in it before so that's what, he grabbed the garbage bag and he said 'No Cops' like that ....

"DET. WILLOTH: Why did you go with him [Ruth]?

"WOERNER: Because I didn't want to get shot by drug dealers .... I can't think of a fancy lie or anything, that's all. I just didn't wanna to get shot by drug dealers. And cuz Jeremy said 'No Cops' when he left. Uh, it scared me .... and because SHE had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shot me over a pound of weed? But all this weird stuff had happened and it was stressful." (Exh "7" 25, 28-29).

During alleged Victim Jeremy Custer's Direct-Examination DPA Adock asked:

"Q - One of the statements someone [Woerner] indicated they heard someone say 'No Cops,' initially. Do remember hearing that. Q - Why did you say that?

"A - Because honestly, I didn't -- he had been a friend and I didn't know if he was just not thinking. Kind of the same reason I said, 'you're shooting me.' Like, do you understand what you're doing? You know. I didn't have the anger, I guess, to -- you know, I knew he was going to get in a lot of trouble." RP 137.

Mr. Ruth was unable to challenge the State's Witnesses without cross-examination of Ms. Woerner. The "accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony .... This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. 14, 19 (1967). The Purpose of the Confrontation Clause includes "Restricting admission of hearsay testimony." White v. Illinois, 112 S.Ct. 736, 502 U.S. 346 (U.S.Ill.1992). "The hearsay prohibition serves to prevent the jury from hearing statements without giving the opposing part a chance to challenge the declarant's assertions." Brundridge v. Fluor Federal Services. INC., 164 Wash.2d 432 (2008). Testimonial hearsay is not made admissible by allowing "the substance of a testifying witnesses [Custer-Eden-Korder] evidence to incorporate out-of-court statement by a declarant [Ms. Woerner] who dies not testify." State v. Martinez, 105 Wn.App. 775, 20 P.3d 1062, 1067 (Wash.App.Div.3 2001)(Citing to U.S. v. Sanchez, 176 F.3d 1214, 1222 (9th Cir. 1999).

-15-

"More fundamental, the confrontation clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527, 2541, 557 U.S. 305 (U.S.Mass.2009).

At common law "a Rule evolved in England in the early nineteenth century that the prosecutor in felony cases was under a duty to call: (1) all eyewitnesses to the offense." 7 Wigmore, Evidence § 2079 (3d ed. 1940). The More protective State Face-to-Face protection imposes a duty & obligation on the State to present a "Res Gestae Witness" for cross-examination to:

(1) Avoid the suppression of evidence favorable to the accused; and

(2) protects the accused against false accusation by giving him the opportunity through cross-examination to elicit exculpatory evidence. U.S. v. Lopez, 373 U.S. 427, 445 (1963); People v. Raider, 256 Mich. 131 (1931).

Any proceeding that limits Mr. Ruth's right to cross-examination must be done in open court. Rovinsky v. McKaskle, 722 F.2d 197 (5th Cir. 1984); State v. Stentz, 30 Wash. 134, 70 p. 241, 243 (Wash.1902). The mundane scope of sidebar & in chamber discussions was exceeded by the closed proceeding in Mr. Ruth's case. The Public has great interest in this process for two reasons. First, the public's observation would aid in determining Mr. Ruths guilt or innocence. Second, had the Bone-Club analysis been conducted the second proponent would have produced objections from the public to the closure, and record of what occurred in the hallway confrontation. Mr. Ruth has satisfied the Experience prong.

The second part of the test the logic prong asks "Whether public access play a significant positive role in the functioning of the particular process in question." In Smith the Logic prong was rejected because "Smith articulates no specific interest that is served by ensuring that the public is privy to a sidebar." No. 85809-8/12. Mr. Ruth has already established the proceeding he is challenging was not record, nor contemporaneously memorialized in the record.

The "Ruth Hearing" will play a positive role in the functioning of any proceeding involving "Substantial Government Interference" & "Perjury," especially, in this proceeding where Mr. Ruth's Confrontation, Compulsory, and Fair Trial Rights are in jeopardy. "By subjecting criminal trials to 'contemporaneous review in the forum of public opinion,' this right prevents the abuse of judicial power, discourages perjury, encourages unidentified potential witness to come forward, and instills in the public the perception that their courts are acting fairly." Rovinsky at 199. This is especially true in Mr. Ruth's case because the alleged perjury will been discouraged, and unidentified public witnesses to the off-the-record "Substantial Government Interference" will come forward and make record. (Exh. 3,4,5).

"Public policy will not sanction any departure from the rule which requires that all communications shall be public, and in the presence of the parties..." State v. Wroth, Wash. 621, 47 p. 106, 106-08 (Wash.1896). "Public scrutiny serves as a check on abuse of judicial power and enhance public trust in the judicial system. These concerns are at play during each and every stage of a judicial proceeding." Slert, No. 87844-7/3-4 (Wiggins).

"The defendant's and public's mere presence passively contributes to the fairness of the proceeding such as deterring deviations from established procedures, reminding the officers of the court of the importance of their function, and subjecting Judges to the check of public scrutiny... The defendant's and the public's mere presence passively contribute to the proceedings" even when serving "no function in aiding the defendant's defense." State v. Bennett, 168 Wash.App.197,275 P.3d at 1229,1232 n.6 (2012).

"Unlike Synder, our decision in Shutzler, does not condition the right to 'appear and defend' at a particular 'stage of trial' on what a defendant might do or gain by attending ... or the extent to which the defendants presence may have aided his defense, but rather on the chance that a defendant's 'substantial rights may be affected' at that stage of trial." State v. Irby, 170 Wn.2d 874, 880, 885 n.6 (2011).

-17-

The Public's & Mr. Ruth's presence creates a coextensive safeguard, that triggers on the chance that Mr. Ruth's substantial right may be affected. As Justice Wiggins pointed out in Smith a Judge may make "biased or improper statements" and "one-sided rulings" when the sidebar & in chamber proceeding is not public. Smith, at 12. The same applies to DPA Adcock because he will be less likely to commit "Substantial Government Interference," when knowing that any "warnings" or "threat" will be investigated in Open Court.

Openness wil prevent the State from the following vial tricks: DPA Adcock attacked Mr. Ruth's credibility through "Woerner hearsay" elicited from Kandy Korder, "Renee [Woerner] said Jeremy was into drugs. I felt like Matt & Renee were into drugs more so." RP 207; then during Mr. Ruth's Direct, every time he tried to rebut the Woerner drug hearsay, DPA Adcock objected. RP 226.

"MR. ADCOCK: Object to this line of testimony because it's not relevant. The testimony -- to this point about the shooting indicates there were no drugs present. How is this relevant? This is just an attempt to try to blame the victims or portray them in a negative light without any connection to the issues." RP 228, 295.

Ruth was not allowed to challenge any of the State's testimony regarding Ms. Woerner; nor show the jury why the drug evidence was so important to his self-defense claim. The prejudice stemming from the in chambers closure was augmented by DPA Adcock's closing argument, where he attacked Mr. Ruth's credibility based on the absence of Ms. Woerner's Cross-examination:

"He told you a lot about wild drug accusations, about everybody but himself. But it was interesting because Candy Corder [sic] was here and said, no, I was concerned about Matt and his Girlfriend having a drug problem. It wasn't Jeremy .... But I was concerned about the defendant and his girlfriend. Another indication that you cannot rely on anything the defendant has told you here. Candy Corder [sic] had no ax to grind." RP 299-01, 313-314. "If this is truly self-defense, why didn't he stick around? Say, hey, to the police, these guys attacked me. I had to do what I had to do. No he fled ... and took off with his girlfriend." RP 297-98.
"You have to decide who is telling the truth and who isn't. That's the main function ... And if you do that, you'll have to conclude that the defendant's version of those events is not only preposterous, it's laughable. And frankly, just an attempt to blame the victims of this crime for something they didn't do." RP 294-295.

-18-

Mr. Ruth has satisfied the Logic prong, and proven that the public trial right is implicated by the 28 min. proceeding being challenged.

(2) Was there a closure? A closure occurs "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." Lormor, 172 Wn.2d 85, 93 (2011). After the closure Judge Hulbert stated, "Mr. Ruth was not present during a ... conversation that we had in chambers .... Mr. Ruth, who was no present during that conversation." RP 179-81. Mr. Ruth has satisfied the second prong.

(3) Was the closure justified? "A Closure unaccompanied by a Bone-Club analysis on the record will almost never be considered justified." Smith at 15. No Bone-Club analysis was done. Mr. Ruth has satisfied all three prongs of the Smith test. Mr. Ruth asks that this court dismiss all of his charges with prejudice, or in the alternative remand for a new trial.

## B. THE RECORD SHOWS THE ENTIRE JURY INQUIRY PROCESS LASTED 3 MINUTES

On page one of the trial minutes at 9:35 it states "Defendant present, in custody, represented by counsel, Mark Stephens," this occurs every time Mr. Ruth & Counsel are present. (Exh. 1). On Page 9, at 3:00 p.m., "the jury retires to deliberate upon their verdict," at 3:04 "defendant's motion for mistrial: denied," at 3:06 "Court in Recess." (Exh. 1). Mr. Ruth was returned to his isolation chamber segregation cell when the court went into recess. One hour and six minutes later, at 4:12 p.m. on December 8, 2004 the jury submitts a written inquiry requesting transcripts of the Renee Woerner, Jeremy Custer, and Drew Eden police interviews. Three minutes later at 4:15 p.m. the trial judge responds in writing that "The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank You." (Exh. 1 at 9). "The substance of the jury's request-for evidence not admitted at trial ... [is] highly unusual." Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008).

SCt#89906-1 PRPof
Matthew
Ruth

The jury foreman knocked on the door at 4:12, then handed the bailiff the inquiry. The Bailiff hand delivered the inquiry to Judge Hulbert. Further time was consumed to read & comprehend the inquiry; formulate & hand write the response. The process ended at 4:15 p.m. (Exh. 2). It is physically impossible to notify the parties in three minutes. Notification is mandatory pursuant to CrR 6.15(f)(1). Mr. Ruth has a Right to participate in the formulation of the response. In Jasper proper record was made that "all Counsel/Parties [had the] opportunity to be heard." 174 Wn.2d 96 (2012). The record proves Mr. Ruth & Counsel were deprived of "an opportunity to comment upon the appropriate response." CrR 6.15(f)(1). A "deviation from CrR 6.15(f)(1) implicates constitutional protections." Koss, No. 85306-1/9 n 4. The Ninth Circuit held that it is the missed opportunity to participate in the formulation of the response that creates the critical stage. Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009).

Pursuant to CrR 6.15(f)(1) the trial Judges must make record that all the parties were notified and participated in the formulation of the response. This Court must send a message to the trial courts regarding the importance of that duty. Mr. Ruth asserts that CrR 6.15(f)(1) is the functional equivalent of the Bone-Club analysis during deliberation, that triggers upon inquiry. Simply filing the response in open court does not cure the violation of Mr. Ruth's Rights to public trial, Counsel, Appear & Defend, and fair trial. Since the Sublett Court reduced the public trial rights to CrR 6.15(f)(1), the Judges failure to make record of notification to the parties, is a closure that can never be justified.

Respectfully Submitted,

9-16-14

9-23-14

X _____

MATTHEW R. RUTH, PRO SE LITIGANT

-20-

APPENDIX

" A "

Order dismissing PRP
From ACJ Division one
Case # 68380-2-1

*The Court of Appeals*
of the
*State of Washington*

RICHARD D. JOHNSON,
*Court Administrator/Clerk*

DIVISION I
One Union Square
600 University Street
Seattle, WA
98101-4170
(206) 464-7750
TDD: (206) 587-5505

January 17, 2014

Seth Aaron Fine
Attorney at Law
Snohomish Co Pros Ofc
3000 Rockefeller Ave
Everett, WA, 98201-4060
sfine@snoco.org

Matthew Robert Ruth
#879492
Stafford Creek Correctional Center
191 Constantine Way
Aberdeen, WA, 98520

CASE #: 68380-2-I
Personal Restraint Petition of Matthew Robert Ruth

Counsel:

Enclosed please find a copy of the Order Dismissing Personal Restraint Petition entered by this court in the above case today.

Pursuant to RAP 16.14(c), "the decision is subject to review by the Supreme Court only by a motion for discretionary review on the terms and in the manner provided in Rule 13.5A."

This court's file in the above matter has been closed.

Sincerely,

Richard D. Johnson
Court Administrator/Clerk

law

enclosure

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Personal
Restraint of:

MATTHEW ROBERT RUTH,

Petitioner.

)
)
)
)
)
)
)
)
)

No. 68380-2-I

ORDER OF DISMISSAL.

Matthew Ruth has filed this personal restraint petition challenging his

conviction in Snohomish County Superior Court No. 03-1-02451-6. In Ruth's direct

appeal, the Supreme Court remanded the matter for resentencing based on the use

of the phrase "deadly weapon" rather than "firearm" in the special verdict forms on

the enhancements in State v. Ruth, 167 Wn.2d 889, 225 P.3d 913 (2010), and issued

the mandate in May 2010. The trial court resentenced Ruth on December 8, 2010.

Ruth did not appeal. Ruth filed the present petition on December 2, 2011, raising

issues relating only to his 2004 jury trial. In particular, Ruth now claims that the trial

court violated his right to a public trial and his rights to the presumption of innocence

and a unanimous verdict.

In order to obtain collateral relief by means of a personal restraint petition,

Ruth must demonstrate either an error of constitutional magnitude that gives rise to

actual prejudice or a nonconstitutional error that inherently results in a "complete

miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d

506 (1990). Bare assertions and conclusory allegations do not warrant relief in a

personal restraint proceeding. In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828

No. 68380-2-I/2

P.2d 1086 (1992).  Because Ruth has not made any showing that he can satisfy this threshold burden, the petition is dismissed.

Ruth contends the trial court violated his right to a public trial by answering a jury question in chambers and by holding a conference in chambers about the State's decision not to call a witness.  The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution, provide the accused with the right to a public trial.  In re Pers. Restraint of Orange, 152 Wn.2d 795, 804, 100 P.3d 291 (2004).  Certain proceedings must be held in open court unless the five factors listed in State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995) justify closing the courtroom.  Orange, 152 Wn.2d at 808-11.  The threshold question is whether, under the experience and logic test, the proceeding at issue implicates the public trial right.  State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012).  Under that test, courts consider (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question."  Sublett, 176 Wn.2d at 73 (quotations omitted).  In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question.  Sublett, 176 Wn.2d at 75-78.  Ruth fails to demonstrate a violation of his public trial rights involving the jury question.[1]

---

[1] Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question.  Because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief.

2

No. 68380-2-I/3

As to the conference in chambers regarding the witness, Ruth claims that the particular circumstances here implicated the public trial right. Briefly, the attorneys and the trial judge met in chambers to discuss scheduling. Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record, "in an overabundance of caution, real quickly, because Mr. Ruth was not present." The prosecutor explained that he believed Ruth's girlfriend Rene Woerner would commit perjury if called to testify by the State, that defense counsel had also spoken with Woerner, and that the Office of Public Defense would be providing an attorney to advise Woerner.

Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it "expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor." Ruth claims "the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor." Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of Yeats, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Relying on State v. Bennett, 161 Wn.2d 303, 315-16, 165 P.d 1241 (2007), Ruth also contends the use of the Castle[2] reasonable doubt instruction violated his constitutional rights. In Bennett, the Supreme Court concluded that the Castle instruction is "constitutionally adequate," but used its inherent supervisory power to

---

[2] State v. Castle, 86 Wn. App. 48, 935 P.2d 656 (1997).

3

No. 68380-2-I/4

direct trial courts to use only Washington Pattern Jury Instruction (WPIC) 4.01. Bennett, 161 Wn.2d at 315, 318. Without sufficient explanation, Ruth now claims that the use of the instruction in his 2004 trial undermined his constitutional right to the presumption of innocence and allowed the jury to convict based on a lower standard of proof. Because Ruth's trial took place years before the Supreme Court disapproved of the "constitutionally adequate" instruction in Bennett and he fails to identify or demonstrate a complete miscarriage of justice, this claim fails.

Finally, relying on State v. Bashaw, 169 Wn.2d 133, 234 P.3d 195 (2010), Ruth contends the jury instructions erroneously instructed the jury that it had to be unanimous in order to answer "no" on the special verdict forms. But our Supreme Court recently overruled the nonunanimity rule developed in Bashaw, concluding that it "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." State v. Nuñez, 174 Wn.2d 707, 709-710, 285 P.3d 21 (2012). Because the instructions were not erroneous, Ruth has no grounds for relief.

Now, therefore, it is hereby

ORDERED that the personal restraint petition is dismissed under RAP 16.11(b).

Done this 17th day of January, 2014.

_____
Acting Chief Judge

2014 JAN 17  PM 2: 51
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

4

Appendix

"B"

colloquy

RP 177, 179-81

12/7/04

The guiding principle is "Whether openness will 'enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" No. 85809-8/6-7 (quoting Press-Enter. Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). The Experience prong provides the landscape "for review of historical practices." Anne L. Ellington & Jeanine Blakett Lutzenhiser, In Washington State, Open Cour

December 7, 2004

*Colloquy*

1        Thank you.

2                    AFTERNOON RECESS TAKEN

3                         JURY PRESENT

4        THE COURT:  Ladies and Gentlemen of the Jury,

06:13   5   at this point in time we have had a slight scheduling

6   change that's being contemplated by parties in this

7   case.  And also, I think a couple of the witnesses

8   actually didn't take quite as long as counsel had

9   anticipated they might.  Sometimes --

06:14   10      The beauty of watching television dramas is that

11   these things are specifically scripted to fill 30

12   minutes or 50 minutes of an hour-long program.  And we

13   don't script our cases like that.  Sometimes people are

14   available or not available.  Changes are made as the

06:14   15   flow of the case goes.

16      All that is to say that we're done for today.  We

17   have no further witnesses available to us this

18   afternoon.  The attorneys tell me they are still right

19   on time as far as what they thought the length of the

06:14   20   case would be, so we're not losing ground in any way.

21   It won't cause an extension of the time of the overall

22   trial.

23      So with that, I'm going to just give you one last

24   brief admonishment, as we do every day.  Please do not

06:14   25   discuss the case.  Do not go to or near the scene.  Do

177

*STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF  29906*

*Colloquy*

1    that nature.  It makes it easier for us to coordinate

2    everything else involved in our case.  And again, we'll

3    open the door about ten minutes before nine, is all.

4    So if you can time it that way, it really doesn't do

06:16   5    you any good to get here a whole lot earlier.  Some of

6    you might have to.  I'm not saying you can't.  But

7    please locate yourselves somewhere away from the

8    courtroom, and come to the jury room at five to nine.

9         Thanks a lot for attending today, and we'll see

06:16   10   you tomorrow.

11              JURY NOT PRESENT

12              THE COURT:  I think in an overabundance of

13   caution, real quickly, because Mr. Ruth was not present

14   during a very brief conversation that we had in

06:17   15   Chambers, we were simply talking about a scheduling

16   issue.  Calling or not calling a particular witness.

17   If you want to just flesh that out.

18              MR. ADCOCK:  We had a conversation, Your

19   Honor.  I informed Mr. Stephens and Your Honor that my

06:17   20   next witness, Renee Woerner, indicated to me, without

21   any doubt, that she was going to commit perjury if she

22   were called by the State to testify in this case.

23   Because of my ethical obligation not to suborn perjury,

24   I made a decision not to call her as a State's witness.

25        After my conversation with her, I spoke to Mr.

December 7, 2004

Colloquy

1    Stephens, I explained that to him.  I suggested maybe

2    he wanted to talk to her.  Maybe he was going to call

3    her as a witness.  I believe he had a conversation with

4    her where she brought up the fact that I had said that

06:18    5    if you commit perjury, there is going to be

6    consequences.  And at that point he concluded that she

7    needed to be advised.

8         We're going to make arrangements for the Office of

9    the Public Defender to get her an attorney, to consult

06:18   10    with her tomorrow about her options, so to speak.

11        Mr. Stephens indicated to me that he did not know

12    whether he is going to call her yet but that that was

13    the first step, in any event, and I agree.  And that's

14    where we're at.

06:18   15         MR. STEPHENS:  I just might add that's, more

16    or less, what's happen.  When I had my conversation

17    with this potential witness, she indicated to me

18    concerns about comments Mr. Adcock made.  She did

19    indicate the word "perjury" was used.  I don't know

06:18   20    what context that was in.  I advised her I cannot give

21    you any advice and if you need advice you need your own

22    lawyer.  Which I think was about all I could do with

23    that.

24         THE COURT:  Fair enough.  Again, primarily for

06:19   25    the benefit of Mr. Ruth, who was not present during

180

December 7, 2004

*Colloquy*

1    that conversation, I want to make sure that we had laid

2    it all out, what the conversation was in Chambers.

3    Obviously that facilities communication between you and

4    your attorney.  I don't know where it's going to go.

06:19   5    You're ready to proceed tomorrow with other witnesses,

6    obviously.

7              MR. ADCOCK:  Nine o'clock.

8              THE COURT:  Start at nine and do what we can

9    do.

10              COURT RECESSED AT 3:29 P.M.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*STEPHANIE MAGEE, OFFICIAL COURT REPORTER, CSR REF   29906*

A Appendix

"C"

Facts from
Reply to Nothing

NO. 89906-1

IN THE STATE SUPREME COURT FOR THE STATE OF WASHINGTON

------------------------------------------------------------

IN RE THE PERSONAL RESTRAINT PETITION OF:

MATTHEW R. RUTH,

Petitioner.

------------------------------------------------------------

REPLY TO STATE'S RESPONSE T C
MOTION FOR DISCRETIONARY REVIEW

DIVISION ONE COURT OF APPEALS
NO. 68380-2-I

------------------------------------------------------------

MATTHEW R. RUTH
Pro Se, Litigant
DOC# 879492 H4-A-98L
STAFFORD CREEK CORRECTIONS CENTER
191 Constantine Way
Aberdeen, Wa 98520

## 2. FACTS RELEVANT TO REPLY

Judge Hulbert, ordered DPA Adcock to tell the Jury that Ms. Woerner is an endorsed State's Witness. "I have each of you introduce your own witnesses as we introduce you to the jury .... it's your responsibility to make sure you give all the names to the jurors." RP 15-16. DPA Adcock stated that Ms. Woerner is "a CRUCIAL WITNESS. Given the FACTS in this CASE, there was No Doubt about that." RP 9 - 10.

12-7-04 -- DREW EDEN -- DIRECT (Adcock):

Q - What was RENNE DOING during all this?

A - I remember her being freaked out .... And she was saying, like "Matt, Stop. Stop." RP 164.

Mr. Ruth did not object to the State eliciting the Substance & direct portions of Ms. Woerner's Out-of-Court police interview, through the alleged victims & other states Witnesses because Mr. Ruth was led to believe that he would get the opportunity to Cross-Examine her. The State's decision not to call Ms. Woerner turned the direct statements & the substance of the statements that were presented to the jury against Mr. Ruth into inadmissible testimonial hearsay evidence. RP 179-81.

12-7-04 -- JEREMY CUSTER -- DIRECT (Adcock):

Q - One of the Statements someone indicated they heard someone say "NO COPS," initially. Do remember hearing that. Q - Why did you say that?

A - Because honestly, I didn't -- he had been a friend and I didn't know if he was just not thinking. Kind of the same reason I said, "You're shooting me." Like, do you understand what your're doing? you know. I Didn't have the ANGER, I guess, to. -- you know. I knew he was going to get in a lot of trouble. RP 137.

12-11-03 -- Police interview -- RENEE M. WOERNER:

JEREMY [CUSTER] SAID "NO COPS" ... want in the house, grabbed a BLACK GARBAGE BAG which I've seen that he had a pound of weed in it before so that's what, he GRABBED the garbage bag and he said "NO COPS" like that. Pg 25.

-2-

Because I didn't want to get shot by drug dealers .... I just didn't want to get shot by drug dealers. And cuz Jeremy [Custer] said "NO COPS" .... uh, it **SCARED ME**. Pg 29.

Lou is the guy .... He's the Asian guy that .... brings the GARBAGE BAG that JEREMY [CUSTER] took to the DURANGO. He's the one who takes it into JEREMY [CUSTER]. I've SEEN that, that's all I know. Pg 40.

DPA Adcock's substantial government interference prevented Mr. Ruth from cross-examining Ms. Woerner. DPA Adcock took advantage of this Misconduct by testifying against Mr. Ruth and objecting to Mr. Ruth's drug defense.

12-8-04 – SOLE DEFENSE WITNESS –– **MATTHEW R. RUTH** –– DIRECT (STEPHENS): "MR. STEPHENS: Every time I try to lay the foundation, he objects." RP 226. DPA Adcock objected every time Mr. Ruth said the word drugs. Eight objections before the Sidebar was called. RP 221, 223-238.

MR. ADCOCK: OBJECT to this line of testimony because it's not relevant. The testimony –– to this point about the shooting indicates there were NO DRUGS present. How is this relevant? This is just an ATTEMPT to TRY to BLAME the VICTIMS or PORTRAY them in a NEGATIVE LIGHT without any CONNECTION to THE ISSUES. RP 228, 295.

THE COURT: Let me see you at sidebar real quickly, if I could. (SIDEBAR discussion OFF the RECORD.) RP 228

The denial to cross-examine Ms. Woerner, rendered Mr. Ruth defenseless. DPA Adcock capitalized on his Substantial off the record government interference, by making arguments he knew were contrary to the Real Evidence.

DPA **ADCOCK**'S CLOSING ARGUMENTS: "Mr. Stephens ... apparently he thinks that Mr. Custer, after the shooting, ran and got the bag with marijuana in it. But apparently he would have had to get it from the defendant's residence .... The evidence from Jeremy Custer, he never said anything about drugs. He said it was about stereo equipment." RP 309.

"You saw their demeanor on the stand .... Did they act like dealers of pounds and pounds of drugs? No .... That's nonsense, ladies and gentlemen. The instruction says you and you alone determine the credibility of the witnesses in the case .... you have to DECIDE who is telling the TRUTH and who isn't. THAT'S THE MAIN FUNCTION .... And if you do that, you'll have to conclude that the defendant's version of those events is not only preposterous, it's laughable. And frankly, just an ATTEMPT to BLAME the VICTIMS of this CRIME for something they DIDN'T DO. Don't go that way, ladies and gentleman." Rp 294 – 295.

-3-

"If this is truly self-defense, why didn't he stick around? Say, Hey, to the police, these guys attacked me. I had to do what I had to do. No, he fled ... and took off with his GIRLFRIEND." RP 297-298.

"He told you a lot about wild drug accusations, about everybody but himself. But it was interesting because Candy corder [sic] was here and said, no, I was concerned about Matt and his Girlfriend having a drug problem. It wasn't Jeremy .... But I was concerned about the defendant and his girlfriend .... In Fact I was writing their eviction letter when this all occurred. Another indication that you cannot rely on anything the defendant has told you here. Candy Corder [sic] has no ax to grind." RP 299-301, 313-314. (Candy Korder, 200-203, "Matt & RENEE had come up to the house a couple of times and indicated that there were problems brewing between Matt & Jeremy .... RENEE Said that Jeremy was into drugs. I felt like Matt & Jeremy -- I mean, Matt & RENEE were into drugs more so." RP 207.)

12-7-04 -- JEREMY CUSTER -- DIRECT (Adcock):

Q - Who was present? A - RENEE WAS THERE. RP 121 - 123.

Q - So you asked the defendant if you could go to his trailer and look for these head phones? A - HE said YEP. RP 125.

Q - Do you remember who went in first? A - RENEE.
Q - So it was you, the defendant and RENEE M. WOERNER? A - Un-hum.
Q - Did you follow RENEE? A - SHE went in there FIRST, and I wanted to get in there when I SAW her GO in THERE.
Q - Did he [RUTH] ever attempt to keep you out? A - NO.
Q - When you got inside, where did Renee Go? A - She went and sat on the bed. RP 125-126.

Q - Drew EDEN -- he told a witness this whole thing was about drugs. Is that correct? A - NO. RP 135.

12/11/03 -- 45 PAGE POLICE INTERVIEW OF RENEE M. WOERNER: Then all of the sudden I hear em talkin' I would sit on the bed cuz I mean that's ... and I looked out the window and they're kinda being serious. Then THEY come up to the TRIALER. Pg 16.

Matt's [Ruth] going NO you GOTTA GET outta the trailer. you CAN'T go through my shit. Pg. 17. And Matt [Ruth] was like check this out. There's like a pound of weed missing and they think I stole the shit. Pg. 18.

He'd [Ruth] just be like well I told you to get out ... and he [Custer] kinda dug around the floor right on the side of the bed. And Matt's like see, you're going through my stuff. Pg 19.

Det. WILLOTH: This is about the Missing? R. Woerner: Pound of Weed. Pg 19. R. WOERNER: I Don't know if he took the pound of weed. Pg 37. (Appendix "D" RAP 13.5A)

-4-

1-20-10 -- P.I. Michael Powers, interview of R. WOERNER:

She said that Custer & Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs ... She did tell Adcock that it was over drugs & that Custer & Eden were higher than Kites at the time of the shooting. (Exhibit "2" RAP 13.5A)

12-7-04 -- JEREMY CUSTER -- DIRECT (Adcock):
Q - Have you ever owned a gun? A - NO.

12-7-04 -- EDEN -- DIRECT (ADCOCK): Q - Where was RENNE?
Q - Did you ever threaten the Defendant? A - NEVER.
Q - Did Jeremy ever threaten the Defendant?
A - Not that I ever heard. RP 161.

1-20-10 -- P.I. Michael Powers, interview -- R. WOERNER:

She did tell me that Custer carried Guns but she didn't recall seeing one on him that day. Renee Said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not.

Renee said that she didn't recall the specific threats that Cuter & Eden were making but she does recall that Matt kept telling them to leave, to get out of his trialer. Renee Said that Custer was "Going through my purse, sitting on the bed when Matt reached up and grabbed his gun ..... She did recall that she was unable to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse .... She felt that Matt grabbed the gun because he "Felt trapped in the bedroom."

1-18-11 -- P.I. MICHAEL POWERS, Interview of DONNIE POOLE: I asked if he recalled telling Mr. Adcock that Matt Ruth had told him [Poole] that Custer had a gun during the argument between Matt & Custer? Donnie Said that Matt had told him, from the beginning, that Custer had a GUN and he recalled mentioning to Mr. Adcock that was the reason that Matt "Freaked out and started shooting" was because Custer had a gun in the trailer ....

Donnie believes the interview with Adcock started going bad when he tried to tell Adcock that he had bought drugs from Custer .... telling Adcock that Custer showed up at his house, several days after the shooting ... and Custer threatened Donnie and told him he had better not tell anyone about Custer's business and what kind of a guy Custer was .... Donnie Said as soon as he started to tell Adcock the "truth" about Custer, Adcock would start yelling things at him saying things like "You're lying to protect your friend, none of this is true, this will never see the light of day" .... Donnie remembers telling Adcock that this incident was over "drugs." Donnie said that at this point Adcock was in his face yelling at him .... Adcock "got really mad when I told him that this was all over some drugs that Matt had supposedly stolen from Custer" .... Adcock was "Trying to intimidate me." (Exhibit "1" Donnie Poole).

-5-

DPA Adcock objected to the defense's attempt to mitigate the prejudice of the inadmissible testimonial Woerner Hearsay. Judge Hulbert disputed that the State used Ms. Woerner in their case in chief, and sustained. RP 247.

### 3. ARGUMENT OF WHY REVIEW MUST BE GRANTED

### A. HOW SHOULD THE COURTS FAIRLY MAKE A SIMILAR IN NATURE DETERMINATION?

The **Sublett** decision does not provide a proper Rule for the lower Courts to use in making a fair Similar in Nature determination & Comparison. Without such guidance from this Court the lower Courts are still using Labels rather than the Substance to determine if Public Trial Rights attach. "The Right of defendant to public trial does not turn on whether inquiry of hearing is factual or doctrinal, substantive or procedural, but, on the relationship of issue raised at hearing to merits of the charge, outcome of prosecution, and integrity of administration of Justice. Gannett Co. v. Depasquale, 443 U.S. 368, 433-37, 99 S.Ct. 2898, 2933-35 (1979)." Rovinsky v. McKaskle, 722 F.2d 197 (5th Cir. 1984)(In Camera hearing on State's motion to restrict cross-examination of prosecution witness, violated defendant's right to public trial).

For Example, in Mr. Ruth's Case Judge Hulbert "labeled" the secret In-Chambers proceeding as a "Witness Scheduling Matter." RP 179-181. No Bone-Club analysis was done prior to the closure that excluded Mr. Ruth & the Public, and no record was made for public & appellate review. This "label" is not accurate, nor fair. Due to the closed Nature of the In-Chambers proceeding, Mr. Ruth asserts that the substance of the Proceeding must be examined to fairly make a Similar in Nature determination. This Court must look at (1) What caused the Closure; (2) What Constitutional Rights are implicated in the closed proceeding; (3) What impact the result of the closure has on the implicated rights & trial.

-6-

EXHIBIT

" 1 / /

TRIAL MINUTES

FILED IN OPEN COURT

December 6, 2004
Pam L. Daniels
County Clerk

By: _Grace Hampton_
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

State of Washington      | CAUSE NO.:      | 03-1-02451-6
(PLAINTIFF)              | JUDGE:          | David F. Hulbert
VS.                      | DATE OF TRIAL:  | December 6, 2004
Matthew Robert Ruth      | REPORTER:       | Stephanie Magee
(DEFENDANT)              | CLERK:          | Grace Hampton

**ATTORNEY FOR PLAINTIFF:**          **ATTORNEY FOR DEFENDANT:**

John Adcock                          Mark Stephens

---

Days: 3.5 Days      **FINAL DISPOSITION - VERDICT**
Date trial ended: December 9, 2004
The Jury found the Defendant guilty of the crime of First Degree
Assault as charged in Count I; and guilty of the crime of First
Degree Assault as charged in Count II.  On Special Verdict Form A,
the Jury found that the defendant was armed with a deadly weapon at
the time of the commission of the crime in Count I and on Special
Verdict Form B, the Jury found that the defendant was armed with a
deadly weapon at the time of the commission of the crime in Count
II.

Sentencing set for December 28, 2004 @ 1:00 p.m. Dept. 5,
Judge Hulbert.

9:35   This matter came on regularly for 12-person jury trial.
       State of Washington represented through Deputy Prosecuting
       Attorney, John Adcock.  Detective Kelly Willoth seated at
       counsel table.
       Defendant present, in custody, represented by counsel,
       Mark Stephens.
       Proposed jurors not present.

       Plaintiff's proposed Jury Instructions filed in open court.
       Defendant's Proposed Jury Instructions filed in open court.

       Colloquy of Court and counsel.

       Exhibit no. 1 offered by the State:      ADMITTED 12-7-04

1                          TRIAL MINUTES

AA
85

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

```
Exhibit no. 2 offered by the State:       ADMITTED 12-7-04
Exhibit no. 3 offered by the State:       ADMITTED 12-7-04
Exhibit no. 4 offered by the State:       ADMITTED 12-7-04
Exhibit no. 5 offered by the State:       ADMITTED 12-8-04
Exhibit no. 6 offered by the State:       ADMITTED 12-7-04
Exhibit no. 7 offered by the State:       ADMITTED 12-7-04
Exhibit no. 8 offered by the State:       ADMITTED 12-7-04
Exhibit no. 9 offered by the State:       ADMITTED 12-7-04
Exhibit no. 10 offered by the State:      ADMITTED 12-7-04
Exhibit no. 11 offered by the State:      ADMITTED 12-7-04
Exhibit no. 12 offered by the State:      ADMITTED 12-7-04
Exhibit no. 13 offered by the State:      ADMITTED 12-7-04
Exhibit no. 14 offered by the State:      ADMITTED 12-7-04
Exhibit no. 15 offered by the State:      ADMITTED 12-7-04
Exhibit no. 16 offered by the State:      ADMITTED 12-7-04
Exhibit no. 17 offered by the State:      ADMITTED 12-7-04
Exhibit no. 18 offered by the State:      ADMITTED 12-7-04
Exhibit no. 19 offered by the State:      ADMITTED 12-7-04
Exhibit no. 20 offered by the State:      ADMITTED 12-7-04
Exhibit no. 21 offered by the State:      ADMITTED 12-7-04
Exhibit no. 22 offered by the State:      ADMITTED 12-7-04
Exhibit no. 23 offered by the State:      ADMITTED 12-7-04
Exhibit no. 24 offered by the State:      ADMITTED 12-7-04
Exhibit no. 25 offered by the State:      ADMITTED 12-7-04
Exhibit no. 26 offered by the State:      ADMITTED 12-7-04
Exhibit no. 27 offered by the State:      ADMITTED 12-7-04
Exhibit no. 28 offered by the State:      ADMITTED 12-7-04
Exhibit no. 29 offered by the State:      ADMITTED 12-7-04
Exhibit no. 30 offered by the State:      ADMITTED 12-7-04
Exhibit no. 31 offered by the State:      ADMITTED 12-7-04
Exhibit no. 32 offered by the State:      ADMITTED 12-7-04
Exhibit no. 33 offered by the State:      ADMITTED 12-7-04
Exhibit no. 34 offered by the State:      ADMITTED 12-7-04
Exhibit no. 35 offered by the State:      ADMITTED 12-7-04
Exhibit no. 36 offered by the State:      ADMITTED 12-7-04
Exhibit no. 37 offered by the State:      ADMITTED 12-7-04
Exhibit no. 38 offered by the State:      ADMITTED 12-7-04
Exhibit no. 39 offered by the State:      ADMITTED 12-8-04
Exhibit no. 40 offered by the State:      ADMITTED 12-8-04
```

9:35  Arraignment on Second Amended Information.   SEE COURT FILE FOR
RECORD OF MINUTES.

9:36  State's motion in limine to exclude witnesses except Detective
Willoth: Granted.

2                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:37  State's motion in limine to prevent Defense counsel from using
      the term of "Snitch" or another derogatory comments regarding
      State's witness, Jeremy Sheridan: Granted/Stipulated.

9:49  Defense motion in limine to exclude testimony of prior burglary
      charge around the time of the incident in question:
      Granted/Stipulated.

9:40  Defense motion in limine to exclude testimony of a prior assault
      of Renee Woerner: Granted/Stipulated.

9:41  Defense motion in limine to exclude testimony of defendant's
      criminal activity in Blythe, California: Granted/Stipulated.

9:42  Defense motion in limine to exclude any testimony or evidence of
      defendant's prior criminal history: Reserved.

9:43  Defense motion in limine exclude any evidence about defendant's
      last name or alias last names: Granted/Stipulated.

9:45  Defendant motion to strike testimony of State's witnesses, Renee
      Woerner, because he was unable to interview her, as his subpoena
      was returned: Denied.  The Court finds that the remedy is not
      exclusion but to allow Defendant to interview the witness prior
      to testifying.

      Exhibit no. 41 offered by the State:     ADMITTED 12-7-04
      Exhibit no. 42 offered by Defendant:     Not Offered

9:48  Defendant's motion strike testimony of Jeremiah Sheridan because
      of defendant's inability to locate and interview this witness:
      Denied.  The Court finds that the remedy is not exclusion but to
      allow Defendant to interview the witness prior to his testimony.

9:50  Colloquy of Court and counsel.
9:52  Court in recess.

10:15 The following persons were selected to qualify as jurors on this
      cause and seated in the jury box:
      1.  Gary R. Hall                        7.   Andrea L. Greenlee
      2.  Edward A. Dawson                    8.   Robert G. Sears
      3.  Kandace Aksnes                      9.   Richard E. Olsen
      4.  Jody Marie Mountifield             10.   Marilyn Churchill
      5.  Karen R. Egtvedt                   11.   Sharon Walker
      6.  Jennifer R. Clyde                  12.   Donna Lee Orr

3                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

And seated sequentially on the courtroom seats:
13.   Mehari E. Gebrewold
14.   Frank P. Brady
15.   James C. Sinnema
16.   Barbara R. Garrett
17.   Frances Winters
18.   Lesley W. Winney
19.   Michael Rucker
20.   William Glover
21.   Raymond Johnson
22.   Richard Hill
23.   Ella Larrick
24.   Patricia Nakahara
25.   Charlene Lindsay
26.   Mary E. Barringer
27.   I. Jay Fritch
28.   Lawrence Thompson
29.   Donna R. West
30.   Jerry D. Rochford
31.   Daniel D. Orme-Doutre
32.   Jessica Marie Kinney
33.   Dale W. Troupe
34.   Brandon Duc Ha
35.   Patricia J. Jason

10:20 All prospective jurors sworn: Oath of Voir Dire.
      The Court directs general questions to all prospective jurors.
10:35 State's initial voir dire of entire prospective jury panel.
10:51 Defendant's initial voir dire of entire prospective jury panel.
11:13 State waives concluding voir dire of entire prospective jury panel.
11:14 Defendant's concluding voir dire of entire prospective jury panel.
11:20 Challenges for cause: prospective jurors passed for cause.

11:22 Plaintiff's first peremptory challenge: Kandace Aksnes.
      Frank Brady picked to qualify as juror #3.
      Defendant's first peremptory challenge: Edward Dawson.
      James Sinnema picked to qualify as juror #2.

      Plaintiff's second peremptory challenge: Jody Mountfield.
      Barbara Garrett picked to qualify as juror #4.
      Defendant's second peremptory challenge: Accepts Panel.

      Plaintiff's third peremptory challenge: Richard Olsen.
      Frances Winters picked to qualify as juror #9.
      Defendant's limited peremptory challenge: Frank Winters.

4                        TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Lesley Winney picked to qualify as juror #9.

State's fourth peremptory challenge: Accepts Panel.
Defendant's limited peremptory challenge: Accepts Panel.

11:27 The following 13 jurors were sworn to try this cause: Juror #1,
      Gary R. Hall is designated as alternate juror.
      1.  Gary R. Hall                     7.   Andrea L. Greenlee
      2.  James Sinnema                     8.   Robert G. Sears
      3.  Frank Brady                       9.   Lesley Winney
      4.  Barbara Garrett                  10.   Marilyn Churchill
      5.  Karen R. Egtvedt                 11.   Sharon Walker
      6.  Jennifer R. Clyde                12.   Donna Lee Orr
                                          13.   Mehari Gebrewold

11:28 Attorney conference at sidebar.
11:30 The Court directs general instructions to the Jury.
11:35 Colloquy of Court and counsel.
11:40 Court in recess until 1:00 p.m.

1:08  Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury not present.
      Colloquy of Court and counsel.
1:10  Jury present.
      State makes opening statement.
1:20  Defendant makes opening statement.
1:29  The Court instructs the Jury regarding note taking.
1:31  **SUZANNA JOHNSON**, called by the State, sworn and testified.
1:40  Cross examination of Suzanna Johnson by the Defendant.
1:42  Attorney conference at sidebar.
1:43  Jury admonished not to discuss this case and return on Tuesday,
      December 7, 2004 @ 9:55 a.m.
1:45  Court in recess until Tuesday, December 7, 2004 @ 9:00 a.m.

**TUESDAY, DECEMBER 7, 2004**              Clerk: Grace Hampton
                                          Reporter: S. Magee
      Court opened at 9:05 a.m., David F. Hulbert, Judge.
      The following proceedings were had to wit:
      This matter continued from previous day.
      State of Washington represented through Deputy Prosecuting
      Attorney, John Adcock.  Detective Kelly Willoth seated at
      counsel table.
      Defendant present, in custody, represented by counsel,
      Mark Stephens.
      Jury not present.

5                          **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Colloquy of Court and counsel re juror who may have witnessed
the bringing of the defendant to the Courtroom.
9:10  Juror #9, Lesley Winney present.
State's voir dire of Juror #9, Mr. Winney.
Juror #9, Lesley Winney released to go back to the Jury Room.
The Court finds that Juror #9, Lesley Winney was engrossed in
the book he was reading and did not see the defendant being
brought to the Courtroom.

Exhibit no. 43 offered by the State:      ADMITTED 12-7-04
Exhibit no. 44 offered by the State:      Not Offered
Exhibit no. 45 offered by Defendant:      Not Offered

9:13 Court in recess.

9:40 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury not present.
Colloquy of Court and counsel.
9:45 Court in recess.

10:05 Court resumes as heretofore, defendant present, in custody, and
all parties present.
KELLY WILLOTH, called by the State, sworn and testified.

Exhibit no. 46 offered by the State:      ADMITTED 12-8-04

10:55 Court in recess.

11:14 Court resumes as heretofore, defendant present, in custody, and
all parties present.
Jury present.
Cross examination of Kelly Willoth by the Defendant.

Exhibit no. 47 offered by Defendant:      Not Offered

11:28 GEORGE WILKINS, called by the State, sworn and testified.

Exhibit no. 48 offered by the State:      ADMITTED 12-7-04

11:39 Cross examination of George Wilkins by the Defendant.
11:40 Redirect examination of George Wilkins by the State.
11:42 Recross examination of George Wilkins by the Defendant.
11:44 SARAH BRYANT, called by the State, sworn and testified.
11:46 Cross examination of Sarah Bryant by the Defendant.
11:47 Court in recess until 1:30 p.m.

TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

1:50  Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
      JEREMY CUSTER, called by the State, sworn and testified.

      Exhibit no. 49 offered by the State:      ADMITTED 12-7-04
      Exhibit no. 50 offered by the State:      ADMITTED 12-7-04
      Exhibit no. 51 offered by the State:      Not Offered
      Exhibit no. 52 offered by Defendant:      Not Offered

2:15  Cross examination of Jeremy Custer by the Defendant.
2:19  Redirect examination of Jeremy Custer by the State.
2:22  Recross examination of Jeremy Custer by the Defendant.
2:30  DREW EDEN, called by the State, sworn and testified.
2:45  Cross examination of Drew Eden by the Defendant.
2:53  Redirect examination of Drew Eden by the State.
2:55  Recross examination of Drew Eden by the Defendant.
2:56  Court in recess.

3:22  Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
      Attorney conference at sidebar.
3:24  The Court admonishes the jury and directs them to return on
      December 8, 2004 @ 9:00 a.m.
3:25  Colloquy of Court and counsel.
3:28  Court in recess.

      WEDNESDAY, DECEMBER 8, 2004            Clerk: Grace Hampton
                                            Reporter: S. Magee
      Court opened at 9:12 a.m., David F. Hulbert, Judge.
      The following proceedings were had to wit:
      This matter continued from previous day.
      State of Washington represented through Deputy Prosecuting
      Attorney, John Adcock.  Detective Kelly Willoth seated at
      counsel table.
      Defendant present, in custody, represented by counsel,
      Mark Stephens.
      Jury not present.
      Colloquy of Court and counsel.
9:15  Jury present.
      JEREMIAH SHERIDAN, called by the State, sworn and testified.
9:20  Cross examination of Jeremiah Sheridan by the defendant.
9:23  Detective Kelly Willoth, recalled by the State, previously
      sworn, testified.
9:25  Cross examination of Detective Kelly Willoth by the Defendant.

7                          TRIAL MINUTES

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

9:28  Redirect examination of Detective Kelly Willoth by the State.
9:30  **CANDY CORDER**, called by the State, sworn and testified.
9:37  Cross examination of Candy Corder by the Defendant.
9:45  Court in recess.

10:00 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
10:02 **EVAN THOMPSON**, called by the State, sworn and testified.


      Exhibit no. **53** offered by the State:    ADMITTED **12-8-04**
      Exhibit no. **54** offered by the State:    ADMITTED **12-8-04**

10:15 Cross examination of Evan Thompson by the Defendant.
10:18 State rests.
10:19 **MATTHEW RUTH**, called by the Defendant, sworn and testified.
10:26 Attorney conference at sidebar.
10:28 Continuation of testimony of Matthew Ruth on direct examination
      by the Defendant.
11:03 Jury not present.
11:04 Colloquy of Court and counsel.
11:05 Court in recess.

11:25 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury present.
11:26 Cross examination of Matthew Ruth by the State.
11:45 Defense rests.
      State rests.
11:46 Jury not present.
11:48 Colloquy of Court and counsel.
11:50 Court in recess until 2:00 p.m.

 2:00 Court resumes as heretofore, defendant present, in custody, and
      all parties present.
      Jury not present.
      The Court takes exceptions and objections to instruction: None
      given.
 2:05 Jury present.
      Not reported.
      The Court instructs the Jury.
 2:20 Reported.
      State opens closing argument.
 2:40 Defendant makes closing argument.
 2:52 State makes final argument.


8                         **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

3:00 The Court excuses Juror #1, Gary R. Hall, as the alternate
     juror.
     The Jury retires to deliberate upon their verdict.

3:04 Defendant's motion for mistrial: Denied.

3:06 Court in recess.

    At 4:12 p.m. on December 8, 2004, the Jury submits a written
    inquiry: "1) Transcripts of interview with Renee Warner, Dec. 10
    & 11, 2003; 2) Transcripts of interview with Jeremy Custer (Nov.
    24, 2003; and 3) Transcript of interview with Drew Eden (Nov.
    10, 2003)"

    At 4:15 p.m. on December 8, 2004 the Court responds in writing
    "The evidence requested by the jury was not admitted into
    evidence and is not available to the jury during deliberations.
    Thank you."

    Inquiry from the Jury and Court's Response filed in open court.

**THURSDAY, DECEMBER 9, 2004**              Clerk: Grace Hampton
                                            Reporter: S. Magee
    Court opened at 11:05 a.m., David F. Hulbert, Judge.
    The following proceedings were had to wit:
    This matter continued from previous day.
    The jury returns to open court with their verdict.
    State of Washington represented through Deputy Prosecuting
    Attorney Julie Mohr.  Detective Kelly Willoth seated at counsel
    table.
    Defendant present, in custody, represented by counsel Mark
    Stephens.
    Verdict read in open court finding the Defendant guilty of the
    crime of First Degree Assault as charged in Count I; and guilty
    of the crime of First Degree Assault as charged in Count II.  On
    Special Verdict Form A, the Jury found that the defendant was
    armed with a deadly weapon at the time of the commission of the
    crime in Count I and on Special Verdict Form B, the Jury found
    that the defendant was armed with a deadly weapon at the time of
    the commission of the crime in Count II.
    Jurors polled: verdict unanimous.
    Verdict Form A; Special Verdict Form A; Verdict Form B and
    Special Verdict Form B are received and filed.
    Court's Instructions filed in open court.
    Jury is discharged.

9                        **TRIAL MINUTES**

STATE OF WASHINGTON VS. MATTHEW RUTH #03-1-02451-6

Sentencing set for December 28, 2004 @ 1:00 p.m. Department 5,
Judge Hulbert.
Order Setting Sentencing Date entered.

11:40 Court adjourned.

10                              TRIAL MINUTES

EXHIBIT

# 24

Jury Inquiry

Filed In Open Court

12-9-04/20

~~PAUL L. CARLES~~
COUNTY CLERK

By _Grace Hampton_
Deputy Clerk

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF SNOHOMISH

State of Washington )
Plaintiff, )
)
vs. )
)
Matthew Robert Ruth )
Defendant. )
)

CAUSE NO. 03-1-02451-6

**INQUIRY FROM THE JURY AND COURT'S RESPONSE**

**JURY INQUIRY:**

1) Transcripts of interview with Renee Warner   Dec 10 & 11, 2003

2) Transcript of interview(s) with Jeremy Custer   (Nov 24, 2003)

3) Transcript of interview with Drew Eden   (Nov 10, 2003)

DATE AND TIME _08 Dec 2004   16:12_

DATE AND TIME RECEIVED BY THE COURT: _12/8/04   4:12 pm_

**COURT'S RESPONSE:** The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank you

_____
JUDGE

DATE AND TIME RETURNED TO JURY: _12/8/04   4:15 pm_

AA
88

SAVE -- MUST BE FILED

Exhibit

3

MR. Ruth sent his only copy
of this exhibit with
The original Motion for
Discretionary Review
Exhibit 3. Please get
it from there. I could Not
get copies from the Prison.

It is also in my pro se
Reply to State's Amended response
To PRP.

Interview of Henry Slothang
By Michael Powers

**From:** Wlegalworks@aol.com
**Subject: Ruth, Matthew**
**Date:** January 11, 2011 7:45:17 AM PST
**To:** markmestel@comcast.net

Mark:

I met with an inmate at the Snohomish County Jail by the name of Melvin Roy Decoteau. Melvin is good friends with Renee Woerner. Melvin is currently in jail on a DOC violation. He can and will lead us to Renee when he gets out. Mr. Decoteau has not heard from his DOC officer since he was arrested four days ago. He was wondering of YOU could call Alona Kinch at 425-290-3200 and see if you can find out when he is scheduled to be released. Melvin's DOC number is 996 707. If we can find this out it might help to establish when Melvin is getting out so he could possibly help us locate and interview Ms. Woerner. If you can that's great if not then we will locate her regardless.

I was able to locate Renee Woerner's Dad. Her Dad's name is Henry Slothang. I located Mr. Slothang and sat and talked with him at his home yesterday. We met for almost an hour. In the end Mr. Slothang told me that he talks with Renee at least one time per week, every week. He agreed to talk with Renee and have her sit with me for an interview. Mr. Slothang told me that his daughter does want to help Matthew Ruth. He said that he too was present at the courthouse at the time of Matt's trial. He said that the prosecutor got very angry at Renee because Renee wanted to testify to the "complete truth and not just what was in her statement."

Mark, I feel as if Mr. Slothang will help put Renee and myself together. He tried to reach her while I was sitting in his home. Her voicemail was full. The number I showed him that we had he said was an old number. I am going to concentrate on Renee Woerner for now and then I will sit with Donnie Poole. I know roughly where Mr. Poole lives but he too seems to be trying to avoid myself as well as other members of Matt's family. He could be using also?

I will keep you updated.

Thanks,
Michael Powers