Exhibit

4

P.I. Powers

Interview

of

Henry Slothaug

And

Renee M. Woerner

TABLE OF AUTHORITI

The following is a summary of the notes that I took on January 20, 2010 when I interviewed Rene Woerner. Her father Henry was present during the entire interview.

Henry was at the courthouse on the day in question. He did witness Adcock "drag" his daughter into a side room where he then heard yelling going on between Adcock and his daughter. Henry said that he was not able to make out what was being said but when Rene came out of the room she told her Dad that she was not testifying and that Adcock would not listen to what she was TRYING to tell him. Henry did not recall what the subject was about but he does recall that Rene said that she tried to tell him the truth and he didn't want to listen so she no longer had to testify.

Rene told me that she DID tell Adcock, just prior to trial, that this was over drugs and that Eden and Custer "were high at the time of the shooting." Renee said that she does recall what happened on that day, not all but most of what happened.

Renee said that there were a lot of people at the trailer and outside the trailer at the time of the shooting. The only ones IN the trailer were her, Eden, Custer and Matt. She said that Custer and Eden came into the trailer without permission. Matt was telling them to get out. They were accusing Matt of stealing Custer's drugs. Matt kept telling them to get out. Eden sat on couch in the living room area and Custer made his way over to the bed where Renee was sitting. She said that Matt kept telling them to get out and that he had not stolen their drugs. Eden and Custer did not believe him. Custer kept saying that they had to search the entire trailer because "we are searching everyone's shit, no exceptions." At some point Custer actually sat on the end of the bed with Renee. Matt was telling him to get out of the trailer and off of

their bed, Custer would not leave. Custer was reaching down into Renee's purse going through it while saying "we are searching everybody's shit." Renee said that Matt kept pleading with them to get out. Eden was sitting on the couch saying "what's the problem, if you didn't steal it then don't worry, we are going to do this one way or another." Custer was telling Matt and Renee that he was going to search the trailer "one way or another."

---

Renee said that she didn't recall the specific threats that Custer and Eden were making but she does recall that Matt kept telling them to leave, get out of his trailer. Renee said that Custer was "going through my purse, sitting on the bed when Matt reached up and grabbed his gun." The next thing she knows Matt is firing and the two are running out of the trailer. She did NOT see a gun on either Eden or Custer. She did tell me that Custer carried guns but she didn't recall seeing one on him that day. Renee said that Custer or Eden could have had guns but she was not paying attention to whether they were carrying guns or not. I asked Renee if she thought her life or that of Matt's was in immediate danger at the time Matt started shooting? Renee response was "who knows, I didn't see any guns but then again I was not looking and they would not get out of the trailer."

She did confirm that Custer was "high as a kite at the time of the shooting." She feels that Matt grabbed the gun because he "felt trapped in the bedroom." She did recall that she was not able to see Custers other hand, the one that was not in her purse, so he might have had a gun in the hand that was not in her purse, she can't say for sure.

Renee told me that on the day of trial Adcock grabbed her arm so hard, to bring her into a side room. that he left bruises. She did tell Adcock that it was over drugs and that

Exhibit

5

MAtthew R. Strood I

I, Matthew R. Stroud I, swear or affirm:

That I was at Matthew Ruth's trial and they took a recess, Adcock, the prosecuting attorney, walked out of the court room just before I did, when I walked out of the court room into the hall I saw Adcock talking with Renee Woerner, Adcock looked at me as I walked towards his direction, Adcock then told Renee to come with him down the hall. I watched Adcock and Renee walk down the hall and turn right then they were gone from my sight and I could not hear them anymore, a few minutes later I heard Renee and Adcock yelling at each other and then seen both of them come back into the hall walking fast my direction as they got closer to me I heard Renee say "I will not lie for you" Adcock replied "you will say what I tell you to say or I will have you arrested" Renee said "then arrest me" Adcock was very upset and turned and walked into the court room I fallowed as I walked into the court room I saw Adcock walking over to Matthew Ruth's attorney, Adcock then told Matthew's attorney he was not going to put Renee Woerner on the stand because she told him she was going to lie and Adcock said I will not put anyone on the stand that tells me they are going to lie which is the opposite of what Renee said she was going to do. I walked over to Matthew Ruths attorney and told him what I had just saw and heard, he told me not to worry he was going to put Renee Woener on the stand.
In the hall was also Renee Woerner's Mother and Dad who also heard everything. After the trial was over the head juror asked to speak with Matt's attorney and me the juror asked Matt's attorney why he did not put the only other witness, Renee Woerner ,on the stand Matt's attorney replied that he wanted to but he could not find her, I spoke up that that was not true as he knew she was in the hall waiting to testify, the Juror said then we convicted an incent man, we all believed Matt but was told if there was any dough we had to find him guilty if Renee woerner had testified we would not of had any dough and would have found him innocent.

I SWEAR OR AFFIRM THAT THE ABOVE AND FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

9/16/2013 [signature]

Date Matthew R. Stroud I

STATE OF WASHINGTON

COUNTY OF SNOHOMISH

I, the undersigned Notary Public, do hereby affirm that Matthew R. Stroud I. personally appeared before me on the 16 day September, and signed the above Affidavit as his free and voluntary act and deed.

[signature]

Notary Public

AMANDA M. MURRAY
Notary Public
State of Washington
My Commission Expires
November 19, 2016

EXHIBIT

"6"

MARK Stephens
Defense Counsel



ORIGINAL

Filed In Open Court
12-28-04 20
PAM L. DANIELS
COUNTY CLERK
By Grace Hampton
Deputy Clerk

SNOHOMISH COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br>**Plaintiff,**<br>vs.<br>MATTHEW R. RUTH,<br>**Defendant.** | No.03-1-02451-6<br><br>**MOTION TO WITHDRAW** |

Counsel for the defendant in the above entitled cause, Mark Stephens, respectfully requests this Court allow counsel to withdraw from further representation of the defendant. Counsel makes this motion based upon the attached declaration.

Respectfully Submitted this 28th day of December, 2004.

03-1-02451-6 97

MARK STEPHENS, WSBA #26110
Attorney for Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

AA 97

EXHIBIT 21

## DECLARATION OF COUNSEL

Counsel for the defendant declares the following to be true and correct to the best of his belief and information:

1. On November 13, 2003 the State charged Matthew Ruth with First Degree Assault while armed with a firearm, and the State later added a second count of First Degree Assault while armed with a firearm.

2. The incident which led to the charges was witnessed by Renee Woerner, Ruth's girlfriend.

3. After the shooting, the State executed an arrest warrant for Ms. Woerner in California.

4. Some time after filing the case, the State listed Renee Woerner as a State's witness for trial.

5. Shortly after Ms. Woerner's arrival at the Snohomish County Jail, she gave police and the prosecutor a sworn, tape recorded interview which essentially corroborated the accounts of the shooting provided by the two alleged victims. At the time she was represented by attorney Bill Joice.

6. Before trial in December, 2004, Deputy Prosecutor John Adcock indicated to me he intended to call Ms. Woerner to testify as a State's witness at Ruth's trial.

7. On Saturday, December 4, 2004, while preparing for trial, I returned a phone call from Ms. Woerner, in which she suggested she would be testifying differently from what she had said in her taped interview. On the phone Ms. Woerner spoke very rapidly and somewhat incoherently.

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

8. On December 7, 2004, during a recess in the trial, Mr. Adcock went into the hallway outside the courtroom, apparently to confer with Ms. Woerner prior to her testimony. He returned and announced he would not be calling Ms. Woerner to testify because he believed she intended to perjure herself.

9. I then contacted Ms. Woerner and took her to a conference room to get an idea of whether I should call her as a defense witness.

10. Ms. Woerner appeared agitated, emotionally erratic, and extremely upset. She indicated to me Mr. Adcock had threatened to charge her with perjury if she testified. She expressed concern to me about potential legal consequences if she testified. I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.

11. After giving the matter some thought, and conferring with my client, I decided not to call Ms. Woerner as a witness at trial. I believed her testimony would be either corroborative of the victims' testimony, or easily impeached by her prior statement.

12. On December 9, 2004 the jury returned verdicts of guilty as charged in this case.

13. Some time the week of December 20, 2004 my temporary receptionist told me Ruth was trying to call me. I instructed her to accept his call if I was in the office when he called.

14. On December 27, 2004 I tried to visit Ruth in jail, but the jail was "locked down" and I was denied access. I was concerned because some information I wanted to review prior to sentencing had not yet been provided, and I wanted to discuss this with Ruth.

15. After I returned to my office, my receptionist told me by intercom that Ruth was

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

holding on the phone. My office has a single outside phone line accessible by the public. All calls go to the reception desk, and then are transferred to attorneys and staff.

16. I picked up the line and began to discuss the options for the next day's sentencing with Ruth. We spoke for a minute or two. At some point I made a disparaging remark to Ruth about his "girlfriend".

17. At that point a female voice which I recognized from prior conversations as belonging to Renee Woerner spoke up. I was surprised and shocked, realizing there had been a third person listening in on the conversation without my knowledge or permission. Ms. Woerner then told me "this is being taped" or words to that effect. Ms. Woerner and I exchanged a few more words, and I hung up the phone.

Signed this 28th day of December, 2004, under penalty of perjury, in Everett, Washington.

Mark Stephens, Attorney for the Defendant

Law Office of Mark R. Stephens
2907 Hewitt Avenue - P.O. Box 1887
Everett, Washington 98206-1887
(425) 259-2191 - Fax 259-2195

EXHIBIT

7

This Exhibit is Appendix "D" of my Motion for Discretionary Review. Sorry I could Not get copies.

12/11/03 Renee M. Woerner Police Interview.

*Snohomish County Sheriff's Office*

*Tape recorded INTERVIEW/STATEMENT* *Event #* S003-25124

This is the statement of Renee Woerner. The date is 12/18/03, and the time is now 1013. I am Willott, K. of the Snohomish County Sheriff's Office.

This statement is being recorded at Courthouse. There are 5 persons present in the room. For the purposes of voice identification, would each person present besides Renee, the person who is giving this statement, please state your name and occupation, one at a time.......

Q: Renee, do you understand that this statement is being recorded?

Q: Would you give your full name and spell it please?

Q: Would you give your address please?

Q: Would you give your home telephone number?

Q: Would you give me your date of birth?

1. **You have the right to remain silent.**
2. **Anything you say can be used against you in a court of law.**
3. **You have the right at this time to talk to a lawyer and have him present with you while you are being questioned.**
4. **If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.**
5. **You can decide at any time to exercise these rights and not answer any questions or make any statements.**

Juvenile (Optional): If you are under the age of 18, anything you say can be used against you in a juvenile court prosecution for a juvenile offense and can also be used against you in an adult court criminal prosecution if the juvenile court decides that you are to be tried as an adult.

1. **Do you understand each of these rights I have explained to you?**
2. **Having these rights in mind, do you wish to talk to us now?**

Renee Woerner
(Subject Signature)

[signature]
(Witness Signature)

**Questions at end of statement**

Q: Do you have anything else you would like to add to this statement?
Q: At any time during this statement, have you asked that the questioning or taping be stopped?
Q: At any time during this statement, have you requested an attorney?
Q: Is it true that the facts stated on this tape are true and correct to the best of your knowledge, and that your statement has been made freely, voluntarily, and without threats or promises of any kind?

Renee Woerner
(Subject Signature)

[signature]
(Witness Signature)

This recording ended at 1108.

**APPENDIX O**

# FOLLOW-UP

PAGE 12 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| DATE OF ORIGINAL REPORT Renee Woerner | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |
| PROPERTY CHANGES: ACTION / ADDITIONAL LOSS $ | ACTION / ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N / ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |

Det. Willoth: Jeremy didn't come home?

***R. Woerner:*** Jeremy came home the ne...that morning.

Det. Willoth: That morning. The next morning of the incident?

***R. Woerner:*** Yeah. The morning of the incident he was all kinda, I think he was kinda messed up. He hadn't had any sleep.

Det. Willoth: Okay. Who, who was there that, that morning?

***R. Woerner:*** Dan was there, Nigel rode a bicycle into Lynnwood um, because Jeremy hadn't come home in time for him to go handle his I don't know what it was, pick up his unemployment check or something. Matt was it was Ni...uh, Dan, Matt, me, Drew, is that his name?

Det. Willoth: Um huh.

***R. Woerner:*** Okay. Drew was there also. Um, and then Jeremy came. I don't know if Jeremy brought Drew, I can't remember if Jeremy brought Drew or not if or if he was already there.

Det. Willoth: Okay. When Jeremy showed up, where were all you guys at?

***R. Woerner:*** I was in the trailer in the bed.

Det. Willoth: Okay.

***R. Woerner:*** That's my spot. That's where I always stayed.

Det. Willoth: Okay.

***R. Woerner:*** And if not I'd be in there cleaning the dishes or having a shower. I didn't ya know, hang out and mingle with the guys too much cuz Matt didn't like that.

Det. Willoth: Okay. Where were all the other guys?

***R. Woerner:*** They were all across over in the house. In the blue house, in the little blue box.

Det. Willoth: Whose house is that?

REPORT NUMBER

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 12 | 12/11/03 | |
| IBR CLEARANCE: (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J | ( ) INSUFF / CLD ( ) OTHER / CLD ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) JUV ( ) PAT ( ) DSHS ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-245 9/94

ORDER = 8

291

# FOLLOW-UP

PAGE 14 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| TYPE OF ORIGINAL REPORT Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |

PROPERTY CHANGES: ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED

Det. Willoth: did, was he using drugs?

***R. Woerner:*** Well I mean he used, yeah there were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms.

Det. Willoth: Have you, what have you seen Matt do?

***R. Woerner:*** Meth, mushrooms, pot, that'd be it.

Det. Willoth: Okay. Have you ever seen

***R. Woerner:*** Oh, cocaine, yeah cocaine.

Det. Willoth: Cocaine too?

***R. Woerner:*** They were snortin' coke.

Det. Willoth: Okay. Um, when you say they who do you mean?

***R. Woerner:*** All of them.

Det. Willoth: 'kay. Are you talking about

***R. Woerner:*** Jeremy, Dan, when that day that of this incident Dan had big old sores all over his face from picking them because he had been scrapped out in the bathroom for ya know, a few days I don't' know. Doing whatever, doing meth I assume but...

Det. Willoth: Okay. So would you say they were, were they in the same business together? Uh, Matt and, and these guys?

***R. Woerner:*** Yeah, they were in the whatever their music thing does was what it was. Their karaoke, light show, D.J. studio business.

Det. Willoth: Okay.

***R. Woerner:*** And that's what they called it.

Det. Willoth: What was Matt's part in the business? What did he do?

***R. Woerner:*** I don't know what he did. I really don't. I, I mean I went with him. They used to go to the karaoke store a lot and they'd look at lights and they'd

REPORT NUMBER

OFFICER NAME/NUMBER: Detective Willoth #1335 14 | APPROVED BY: 12/11/03

IBR CLEARANCE (ONE): ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) JUV ( ) PAT ( ) DSHS ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY

299

SH-245 8/94 ORDER - 8

# FOLLOW-UP

PAGE 16 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| TYPE OF ORIGINAL REPORT Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |

PROPERTY CHANGES: ACTION / ADDITIONAL LOSS $ / ACTION / ADDITIONAL RECOVERED $ / TOTAL RECOVERED Y N / ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED

Det. Willoth: What about when Jeremy was gone and you and Matt were home?

*R. Woerner*: Sometimes he would leave it, sometimes he would lock it and Matt would get mad.. Ya know, he'd go pop the window open in the bathroom and go in or whatever so we could use the bathroom and stuff but...

Det. Willoth: Okay. Cuz I understand you didn't have a there's no bathroom in the trailer?

*R. Woerner*: Yeah, there's no, and there was no key for the, we didn't have a key to Jeremy's house so...

Det. Willoth: You didn't have a key?

*R. Woerner*: No.

Det. Willoth: Okay.

*R. Woerner*: Huh uh [that's a no].

Det. Willoth: Okay so um, let's go back to that day, Jeremy comes home, you said you were in the trailer

*R. Woerner*: Um huh [that's a yes].

Det. Willoth: and...

*R. Woerner*: They're all outside laughing and doing other things.

Det. Willoth: Okay.

*R. Woerner*: They were fine.

Det. Willoth: Okay. What happens after that?

*R. Woerner*: Then all of a sudden I hear em I see em talkin' I would sit on the bed cuz I mean that's ya know, that's where I spent my time and the computers in there or whatever. And I looked out the window and they're kinda being serious. Then they come up to the trailer. I think Matt

Det. Willoth: Who's they?

OFFICER NAME/NUMBER: Detective Willoth #1335 16 | APPROVED BY: 12/11/03 | REPORT NUMBER

IBR CLEARANCE: ( ) NONE ( ) ARR/A ( ) ARR/J ( ) EXC/A ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY

301

SH-246 9/94 ORDER = B

# FOLLOW-UP

PAGE 17 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| TYPE OF ORIGINAL REPORT: Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS: Det. Willoth |

PROPERTY CHANGES: ACTION / ADDITIONAL LOSS $ / ACTION / ADDITIONAL RECOVERED $ / TOTAL RECOVERED Y N / ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED

***R. Woerner*:** Matt, Jeremy and Drew. And Matt was like man check this out. There's a pound of weed missing and they think I stole the shit. And Jeremy's like man I'm not saying you stole it I just wanna check all your stuff and make sure that you didn't take it.

Det. Willoth: Who was he saying that to?

***R. Woerner*:** Matt was saying this to me.

Det. Willoth: To you?

***R. Woerner*:** Yeah.

Det. Willoth: So they had gone inside of the trailer?

***R. Woerner*:** Yeah. At this point they had come into the trailer. They were standing down in the living room.

Det. Willoth: And where was Dan? Was he

***R. Woerner*:** Dan was outside the whole time.

Det. Willoth: Okay.

***R. Woerner*:** And um, he was just, he was lost, he was gone whatever he had done his face all picked off he was like (unintelligible).

Det. Willoth: Okay.

***R. Woerner*:** Um, I was on the bed I was just kinda going well whatever. And Matt and Jeremy were arguing. Jeremy came up and sat on the bed.

Det. Willoth: 'kay. Where on the bed was Jeremy sitting?

***R. Woerner*:** Right in front of me on the edge of the bed.

Det. Willoth: Okay.

***R. Woerner*:** If you go in there I know you've seen it, there's a table right here to the right. There's the computer monitor, there was a computer there which Dan came and brought it to Matt whatever but um, just on the edge of the bed Jeremy was just sittin' on the edge of the bed.

REPORT NUMBER

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 17 | 12/11/03 |

IBR CLEARANCE (ONE): ( ) ARR/A ( ) ARR/J ( ) EXC/A ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF — COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: — DATA ENTRY

302

SH-245 8/94 ORDER - 8

# FOLLOW-UP

PAGE 18 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| TYPE OF ORIGINAL REPORT Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |
| PROPERTY CHANGES: ACTION / ADDITIONAL LOSS $ | ACTION / ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N / ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |

Det. Willoth: Okay. So he's sitting on the edge of the bed.

***R. Woerner:*** In front of me.

Det. Willoth: What is he facing?

***R. Woerner:*** Matt. Out towards the, out towards the ya know, the shower's on the right he's facing towards the living room.

Det. Willoth: Okay.

***R. Woerner:*** So...

Det. Willoth: And you're sitting on

***R. Woerner:*** behind him.

Det. Willoth: Behind him? Are you sitting on the side on the right side where the computer is or on the other side?

***R. Woerner:*** I'm kind of in the middle like right behind him.

Det. Willoth: Okay. In the middle you were in the middle of the bed?

***R. Woerner:*** Like ya know, yeah, I mean I was on the bed okay on the pillows.

Det. Willoth: Okay. Toward the headboard?

***R. Woerner:*** Yeah. It's got that weird little shelf thing. And I'm sitting in the back and he's right in front of me.

Det. Willoth: Okay.

***R. Woerner:*** So, I mean not right in front I'm not touching him but he's sittin' there and Matt's going no you gotta get outta the trailer. You can't ya know, that's not cool. You're disrespectful. You can't go through my shit.

Det. Willoth: They're talking about this?

***R. Woerner:*** Yes they're arguing about it.

Det. Willoth: 'kay. Where is Drew?

***R. Woerner:*** Out in the living room. And I didn't really see a whole lot of him. I was too busy like watching Matt and Jeremy.

REPORT NUMBER

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 18 | 12/11/03 |

| IBR CLEARANCE: (ONE) ( ) ARR/A ( ) ARR/J ( ) EXC/A ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |
|---|---|---|---|---|

SH-245 9/94 ORDER # 8

307

# FOLLOW-UP

PAGE 19 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| TYPE OF ORIGINAL REPORT Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |

| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |
|---|---|---|---|---|---|---|

Det. Willoth: 'kay. Where was Matt at that point?

***R. Woerner:*** Standing in front of Jeremy facing me.

Det. Willoth: How close to Jeremy was he?

***R. Woerner:*** 'bout that close.

Det. Willoth: So about a couple feet away?

***R. Woerner:*** Maybe if that, if that and that's just a guesstimate because I was just kinda trippin' like okay I was like Matt, just calm down ya know.

Det. Willoth: Okay. Who, at that point when they're discussing this you said Matt calm down, what was Matt's demeanor like?

***R. Woerner:*** Matt would get this weird look in his face any, any time that he got mad. And he'd just be like well I told you to get out and he had this, his eyes would turn black and he would just Matt, Matt was not really there anymore. You know what I mean, he was getting mad.

Det. Willoth: Okay. And what was Jeremy's demeanor like?

***R. Woerner:*** Jeremy's like dude, why you getting' so mad, man I haven't done anything. I just asked you if I could go through your stuff to make sure that there's nothing goin' on here ya know, cuz everybody's a suspect in this. Ya know, I'm not pickin' on you. Ya know, I'm just gonna go through your stuff real quick and then I'll go in the house and go through other stuff and ya know, so on and so forth. And he kinda dug around on the floor right on the side of the bed. And Matt's like see, you're going through my stuff.

Det. Willoth: And this is about the missing

***R. Woerner:*** Pound of weed.

Det. Willoth: pound of weed? Okay.

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 19 | 12/11/03 |

IBR CLEARANCE: (NONE) ( ) EXC/A ( ) ARR/A ( ) ARR/J ( ) EXC/J ( ) INSUFF / CLD ( ) OTHER / CLD ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY | REPORT NUMBER

304

SH-245 9/94 ORDER - 8

# FOLLOW-UP

PAGE 20 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| DATE OF ORIGINAL REPORT Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |

PROPERTY CHANGES: ACTION / ADDITIONAL LOSS $ / ACTION / ADDITIONAL RECOVERED $ / TOTAL RECOVERED Y N / ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED

***R. Woerner:*** So I, I'm just sittin' on the bed and I didn't, I didn't say anything more until the shooting started I was. Matt pulled the gun out of the cabinet. Matt was facing the bed, there's a cabinet right here on the left. There's a shower, there's a cabinet and there's a cabinet.

Det. Willoth: Okay.

***R. Woerner:*** The, the gun was in this cabinet. The top cabinet. He pulled it out and went like this. And I think stuck it in his pants and Jeremy's like wow I feel threatened. And Matt was like you gotta go man, you gotta get outta my house. You can't do this shit. And I was like Matt dude, you gotta, Matt calm down ya know. And but that's all I can say. I'm not gonna say too much cuz I mean he'd shoot me as soon as he'd shoot as well as he would shoot Jeremy. I mean he's already proven that.

Det. Willoth: The gun that he got out of the cabinet um, is that where he usually kept the gun?

***R. Woerner:*** No he moved it from place to place because, because. I don't know why. He'd usually keep it under the pillow.

Det. Willoth: Okay. Did you know, was it in any type of holster?

***R. Woerner:*** No, he had it wrapped in a handkerchief.

Det. Willoth: Okay.

***R. Woerner:*** A blue handkerchief.

Det. Willoth: A handkerchief?

***R. Woerner:*** Um huh [that's a yes].

Det. Willoth: 'kay. Um, was that at the time he took it out of the cabinet or was that just in

***R. Woerner:*** In general, I don't, I don't know. All I saw was that he pulled it out and I saw the ya know, the barrel.

REPORT NUMBER

| OFFICER NAME/NUMBER | | APPROVED BY | |
|---|---|---|---|
| Detective Willoth #1335 | 20 | 12/11/03 | |
| IBR CLEARANCE (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) JUV ( ) PAT ( ) DSHS ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

SH-245 8/94

30

# FOLLOW-UP

PAGE 21 OF 45

SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER

NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE | SO 03-25124

TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS

Renee Woerner DOB | Det. Willoth

PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED

Det. Willoth: Okay. Was it the, the same gun that you had seen that he obtained when you were living in the apartment in Lake City?

***R. Woerner:*** Yeah, the same gun he stuck down my throat, the same gun he hit me in the head with.

Det. Willoth: Okay. And I'll let you go on from there. Then he grabs the gun, he puts it in his uh, front waistband?

***R. Woerner:*** Yeah and then he kept arguing. And Jeremy's going dude, I feel threatened. I don't think that any of us thought that Matt would actually pull the trigger. Ya know what I mean? I, I don't know. Jeremy was like dude, why you threatening me like this. I'm coming in here nicely. I just wanna go through your stuff and find out where, where this stuff, who took my stuff is missing. And Matt I don't even remember what happened or like if Drew said anything or what I just heard a wierd pop sound. And I was like what the...and then I don't even remember I was like oh my God Matt stop and he just kept pop, pop, pop.

Det. Willoth: 'kay. When you first heard the pop sound

***R. Woerner:*** Um huh [that's a yes].

Det. Willoth: did you know what it was?

***R. Woerner:*** No, not at all. It didn't sound like a gun. It didn't hurt my ears or anything.

Det. Willoth: Were you looking at Matt at the time or where were you?

***R. Woerner:*** Like Jeremy was I was kinda focusing on Jeremy. I mean not, I wasn't really looking at Matt. I was, Jeremy was right in front of me and Matt was in front of him. I was just kinda I don't know I was just sitting there like they're arguing and I kinda looked at him and I was kinda looking at the computer and I'm like oh my God this argument's never gonna end.

REPORT NUMBER

OFFICER NAME/NUMBER: Detective Willoth #1335 | 21 | APPROVED BY: 12/11/03

IBR CLEARANCE: (ONE) ( ) ARR/A ( ) ARR/J ( ) EXC/A ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY

306

# FOLLOW-UP

PAGE 25 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S): Renee Woerner DOB | | REPORT DATE: Det. Willoth |
| TYPE OF ORIGINAL REPORT | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS |
| PROPERTY CHANGES: / ACTION / ADDITIONAL $ | | ( ) DRUG RELATED / ALCOHOL RELATED |

pasture and got up and ran towards the fence. Then Matt and Jeremy came tumbling out of the trailer together. And um, I don't remember what they said or anything.

Det. Willoth: Did you, when Matt came out of the trailer did he still have the gun?

*R. Woerner*: Yes. I, I couldn't see where, which hand he had it in but I know he had the gun. Because I heard another pop and the horses went runnin'. And then Jeremy and Matt went runnin' up towards the lady's house and Jere...this is all, I mean I'm not, not super clear on this. I'm guessin'.

Det. Willoth: That's okay.

*R. Woerner*: Ya know what I mean. I'm only super clear on what's going on, what's goin on inside when I was sitting on the bed. That was that will always be super clear to me in my head, always. But then Jeremy ran that way, he kinda did a tumble also. And him and Drew ran into the street and they're like oh my God we've been shot what do we do? Jeremy said no cops. They came back, I don't remember which way he came back. If he came up the driveway or if he came up over the fence, went in the house, grabbed a black garbage bag which I'm I've seen that he had pound of weed in it before so that's what, he grabbed the garbage bag and he said no cops like that. I didn't see any blood at all on him. None at all. Got in the Durango and drove off. Somebody in a white car I think picked up Drew. There was a big moving truck that was taking garbage that day. Wasn't a regular garbage truck, that had, was right on the side street right there. I know that and then Drew got in the car. And he's like I've been shot and I don't know if it was later the man was like what are you talking about. He lifted up his shirt and was like look, I've been shot in the back twice and then got in the car and drove off.

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 25 | 12/11/03 |

IBR CLEARANCE: (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF — COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: — DATA ENTRY

SH-245 9/94 — ORDER = 8

REPORT NUMBER

310

# FOLLOW-UP

PAGE 27 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| TYPE OF ORIGINAL REPORT: Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS: Det. Willoth |

PROPERTY CHANGES: ACTION | ADDITIONAL LOSS $ | ACTION | ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N | ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED

**R. Woerner**: No. He called Donny at work and he called his friend Bill, D.J. Wills whatever and told them both, I shot him. And his friend was like dude you're not suppose to when you fight with somebody shoot em you're suppose to ya know like punch him and go for balls if you have a problem with him. You're not suppose to shoot em. And he was like yeah man, I don't know I just freaked out and I got weirded out and I shot him. I shot him and that was that. So

Det. Willoth: Okay. So what happened after you left was it Bill's house?

**R. Woerner**: Donny's house. We, we got on a train and went down to California.

Det. Willoth: Okay.

J. Adcock: How'd you pay for that?

**R. Woerner**: He had money and a new gun.

Det. Willoth: 'kay. Where'd he get the money and the new gun?

**R. Woerner**: He just said he got it from whatever. I don't know he had a secret stash. He got it out of the yard. I don't know. This is what happened. We went our separate ways okay?

J. Adcock: When?

**R. Woerner**: At Donny's. I went with my friend Michelle. Okay, he went, he didn't go anywhere. He was there I left him there. I went to my friend Michelle's. He called me and said that they were gonna chase me down. That cuz I know that the guy that drops off the, the drugs with uh, Jeremy, and he's an Asian guy, and I don't know what's gonna, I just got scared and Matt is a master of manipulation or I'm just a real big idiot. And he was like okay, these people are coming to get you. They're gonna shoot you over this pound of weed and Jeremy getting shot. And that so we went

REPORT NUMBER

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 27 | 12/11/03 |

IBR CLEARANCE (ONE) ( ) ARR/A ( ) ARR/J ( ) EXC/A ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT ( ) CPS ( ) DSHS ( ) JUV ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY

SH-245 9/94 ORDER = 8

313

# FOLLOW-UP

PAGE 26 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION | REPORT NUMBER |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | ASSAULT 1 W/FIREARM | REPORT DATE SO 03-25124 |
| ... OF ORIGINAL REPORT Renee Woerner DOB | DATE / RECLASSIFY TO | CONNECTING REPORT NUMBERS Det. Willoth |
| PROPERTY CHANGES: ACTION / ADDITIONAL LOSS $ | ACTION / ADDITIONAL RECOVERED $ | TOTAL RECOVERED Y N / ( ) COMPUTER USED ( ) DRUG RELATED ( ) ALCOHOL RELATED |

Matt came back and grabbed me and was like come on let's go. I don't know, I didn't know if he had the gun on him or what and he so I went with him. Waited and Candy's mom or whatever her name is that farm lady came home and Matt got a ride from her. Dan went and got the computer and the shoes for me. He got my shoes and brought back the computer. Um, I didn't know if Matt still had the gun on him or not. I didn't see, he didn't start waving a gun around at this point.

Det. Willoth: Did Matt have any conversation with you at that point? Did he say

***R. Woerner:*** He's like just stand here. Don't move. And at that point that's what I did. Because I didn't know if he had the gun on him or not. I know whatever but um, then she gave us a ride to Monroe and dropped us off at Donny's house. The computer's still there.

Det. Willoth: Okay. What happened when you got to Donny's?

***R. Woerner:*** Donny wasn't home. Donny's dad let us in and we had like four cigarettes. Sat downstairs in the basement, watched TV.

Det. Willoth: Any conversation between you and Matt about what happened?

***R. Woerner:*** All it was, was I just cried because that was the most terrifying thing I've ever experienced in my life. I was like oh my God ya know, those are your friends. And I cried. He was like hee-hee-hee, hee does this weird thing when he gets excited. Like when he hit me in the head with the gun and shoved it down my throat and did all that weird stuff he does this thing. He gets all excited. It was really psychotic, it's creepy and he did that he's like maybe I'll be on TV I'll be famous. And I was just like oh my God. And yeah.

Det. Willoth: Did he ever talk to you about what his intent was that day or why he did what he did?

REPORT NUMBER

| OFFICER NAME/NUMBER | | APPROVED BY |
|---|---|---|
| Detective Willoth #1335 | 26 | 12/11/03 |

IBR CLEARANCE (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF — COPIES MADE FOR: ( ) PA ( ) CPS ( ) JUV ( ) PAT ( ) DSHS ( ) MH ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: — DATA ENTRY

SH-245 9/94 ORDER = 8

# INTERVIEW

PAGE 29 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

***R. Woerner:*** A thousand dollars or ss....yeah, a thousand dollars I believe.

Det. Willoth: A thousand dollars? Where does Michelle live?

***R. Woerner:*** Michelle lives in Silver Lake.

Det. Willoth: Okay. Okay so after um, the burglary happened how did you end up hooking back up with him?

***R. Woerner:*** He called, he said we've got to go. They're gonna come and they're gonna shoot you blah di blah. And because she had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shoot me over a pound of weed? But all this weird stuff had happened and it was stressful and I didn't know, I didn't know what to do. Ya know and so I did, I, I left. I didn't think about oh my God, the police are looking for me or anything like that cuz I didn't do anything wrong. I didn't, I didn't shoot anybody. Ya know and

Det. Willoth: Why did you go with him?

***R. Woerner:*** Because I didn't wanna get shot by drug dealers.

Det. Willoth: Okay.

***R. Woerner:*** That's all I mean I can't, there's no other reason. There's not. I can't think of a fancy lie or anything, that's all. I just didn't wanna get shot by by drug dealers. And cuz Jeremy said no cops when he left. Uh, it scared me.

Det. Willoth: Okay.

J. Adcock: How did he get a hold of you? At Michelle's?

***R. Woerner:*** On, on her cell phone.

J. Adcock: Did she call him or how did that (unintelligible)

***R. Woerner:*** He had her number. He

J. Adcock: Okay he knew...allright

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW | REPORT NUMBER |
|---|---|---|---|
| Detective Willoth #1335 | 29 | 12/11/03 | |

# INTERVIEW

PAGE 32 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: *ASSAULT 1 W/FIREARM* | REPORT NUMBER: *SO 03-25124* |
|---|---|---|
| E / DOB OF PERSON(S) INTERVIEWED: *Renee Woerner DOB* | | INTERVIEW REQUESTED BY: *Det. Willoth* |

Det. Willoth: Yeah.

*R. Woerner*: Okay. She said yeah, I'm hidin' from the police too. I'm lookin' at six years. You guys can stay here. So then she apparently, they were shooting up in the bathroom. I was sitting in the living room the whole time and um, they were shootin' up in the bathroom. Matt started pounding on me. That's when all her friends came in and said let go of her man. And that's when he tried to pop my eyes out. And uh, they're like dude let go of her. And he had me all wrapped up like this and I that was the last, that was the last day I spent with Matt. She took me and hid me down at a cousins. Matt they ran him off whatever he kept he didn't call me because I was at her cousins. He didn't know where I was at. That's when I called my mom and I was like I need to get outta here, I need to come home. That's when his sister came by and said you have a warrant for your arrest. I freaked out. I went oh my God I didn't do anything. She's like yeah, they're dead, they're murdered. You have a warrant for your arrest for murder. And I was like oh my God. My mom's gonna buy me a bus ticket and I was gonna come up here and handle it. Matt I don't know where he was. Running around in the shadows. I was afraid he was gonna catch me and at that point he was gonna take me to his, his plan was gonna take me to Mexico and or kill me and throw me out in the desert. I wanted to come home.

Det. Willoth: Did he tell you that?

*R. Woerner*: That is what he told me yeah. He was gonna kill me and then take me and bury me out in the desert, go find my kids, slit my daughter from her vagina to her throat, that's what he told me. So um, trying to think.

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| *Detective Willoth #1335* | 32 | *12/11/03* |

5/02

1060-253 318

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

Det. Willoth: Do you know if Matt ever stole stuff from Jeremy? Did he ever take things from him?

*R. Woerner:* He took he would take little, he would take weed and stuff from him. I don't know anything about anything else. But I know he'd take weed from him, yeah. I don't know if he took the pound of weed.

Det. Willoth: Okay.

*R. Woerner:* I don't know about that.

Det. Willoth: Did you ever see any of Jeremy's property inside of Matt's trailer?

*R. Woerner:* No. Dishes that we used.

Det. Willoth: Okay. Nothing else other than that?

*R. Woerner:* No huh uh. Nope.

Det. Willoth: 'kay.

*R. Woerner:* They would have it was a constant argument in the house. With Jeremy and everybody. Who stole my this? Who took my that? Ya know, it was mostly weed. Ya know like if he left his bag of weed out or whatnot and people would dig in it or whatever. But

Det. Willoth: Okay.

*R. Woerner:* that's all I know that was ever missing was like drugs.

Det. Willoth: Okay. Anybody else in the house or anybody else at the house at the trailer rather before this happened that I need to know about? Is there any other people that came by or any other people that were in the trailer?

*R. Woerner:* Huh uh [that's a no].

Det. Willoth: Nobody at all?

*R. Woerner:* No, not that, no. It was Drew was in the living room and Jeremy was on the bed and I was behind him and Matt was standing there.

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| Detective Willoth #1335 | 37 | 12/11/03 |

# INTERVIEW

PAGE 38 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

Det. Willoth: Okay. And Nigel?

*R. Woerner*: Nigel rode a bicycle into Lynnwood because Jeremy had not come home the night before and, and usually Jeremy would come home late, Nigel would take the car in the morning and go down into Lynnwood or whatever to his dad's and handle his unemployment check and do the thing.

Det. Willoth: So he wasn't there during this?

*R. Woerner*: Huh uh [that's a no].

Det. Willoth: Okay.

Det. Pince: One question. Um, you talk about there being lots of drugs used and around the place all the time.

*R. Woerner*: Uh huh and underage girls all kinds of strange things.

Det. Pince: Were these drugs for personal use or were they selling em?

*R. Woerner*: Ya know, I, I know they were selling them. I can't say that they were selling them. They weren't doing it like that. They would put it ya know, whatever uh, ya know, the, the zip sealed bags and everybody would get a backpack and they'd go about their thing. That's all I can say. Ya know, other than that all I saw was just them partaking of the drugs.

J. Adcock: Well they didn't work regular jobs did they?

*R. Woerner*: Well uh huh [that's a no] and they used the music thing and whatever and I know there's a stack of receipts that have my name on it that said paid for Matt's music lessons or D.J. lessons some such thing like that. That that's not real. It's just not real and he kept asking me when you gonna go back to work? I never told Jeremy that I quit my job. I just told him I was on leave because of my head injuries my head wounds and so he needed to know because he had continued to write these receipts for

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | DATE OF INTERVIEW |
|---|---|
| ~~Detective Willoth #1335~~ ~~38~~ | ~~12/11/03~~ |

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

these music lessons or whatever they were D.J. lesson's for Matt so that he could cover his tracks for the tax purposes and whatnot. And when he'd gone to tax class and all that and the library and all that so...

J. Adcock: Do you think it's possible they used the proceeds for drug sales to finance the lifestyle you had out there?

***R. Woerner:*** Uh, yeah. That's definitely ya know, I know that for a fact but I ya know, that's not ya know, I didn't see this I mean hand for hand like I said ya know.

Det. Pince: Was Matt selling drugs?

***R. Woerner:*** Matt, I know Matt acquired quite a bit of crystal meth at one point from one of their friends and they, everybody was all high. Everybody was all high and um, I just sat up in the trailer cuz it was crazy and that's yeah, that's when I got beat in the head and uh,

Det. Willoth: Okay. One thing I just realized

***R. Woerner:*** But he was selling little packages of this, of the meth. But mostly Jeremy and them were buying it from Matt so it was just like this inner, this little circle.

Det. Willoth: You're down in the jail down in California.

***R. Woerner:*** Um huh [that's a yes].

Det. Willoth: And uh, your mom had called me and spoke about some notes that you got.

***R. Woerner:*** Um huh [that's a yes].

Det. Willoth: Um, when did you get those and what, what was the deal with the notes?

***R. Woerner:*** God, they're just, I thought I don't know. Um, I don't 'member when I got the notes but the notes were disappointing first of all. So I thought okay,

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | DATE OF INTERVIEW |
|---|---|
| Detective Willoth #1335 | 12/11/03 |

6/02 1080-253 325

# INTERVIEW

PAGE 40 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

well maybe they might say he's sorry for bashing my head in and ya know, whatever. Ya know, just a last little string of hope. This is all been very traumatizing and that I know that I'm not, I should not have gone down to California with him. I should have ya know, I don't know, if I coulda done it different ya know, I, but the notes say something about Lou and Lou is the guy who they get the pounds of weed from. I know that. He's an Asian guy that comes in the black little sports car. Then brings the bag, garbage bag that Jeremy took out in the Durango. He's the one that takes it into Jeremy. That's all. I've seen that; that's all I know. But um, Matt wrote in there it's too bad that Lou came in and tried to rape you and hit you in the head with the gun and pistol whips you. It's a real ignorant, they're ignorant letters. And he's writing this and I'm goin oh my God, and when I, my cell mate is reading it and going oh my God, he's, he's telling you what to say. I got a Christmas card with the same crap up in it. I was like oh my God, ya know, at least write me a nice note or something.

Det. Willoth: Okay. So there was no, there was nothing that was direct in there like you have to say this?

*R. Woerner:* No, uh uh [that's a no].

Det. Willoth: It was telling you...

*R. Woerner:* I talked to a sheriff and he said that because they tried to rape you and tried to ya know, and I wrestled the gun out of his hand and somebody got shot

Det. Willoth: 'kay. And those were from Matt, the notes?

*R. Woerner:* Um huh [that's a yes]. And I wrote him back and I was like yeah, everything's all good. I love you, I miss you, whatever and he sent the

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| Detective Willoth #1335 | 40 | 12/11/03 |

5/02

1080-253

# INTERVIEW

PAGE 41 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

Chaplain over to try and marry me over at Riverside. I was like yeah, probably not. I was like you don't even know what we've, what I've been through because he was like well yeah, that's what I was tellin' Matt and he kinda jumps with the gun. I was like yeah, no pun intended. Ya know, it was very creepy and strange and that's when I had my mom call. I said you don't understand that it's getting weird down here.

Det. Willoth: Okay.

***R. Woerner:*** Ya know, cuz his mom's a corrections officer and because of the incident in 2002 and nobody did anything. I started to feel like okay, I'm never gonna get out of California. They're gonna set this up and it's gonna get strange. And so ya know

Det. Willoth: Okay.

***R. Woerner:*** yeah, the notes.

Det. Willoth: So there's two notes?

***R. Woerner:*** Yes. They should, they when I left Riverside when they came to transport me she gave me like 2.3 seconds to gather my stuff. Okay? They were in my Bible. That's the only thing I brought so, they should be in the Bible.

Det. Willoth: And you don't have a problem with us getting those

***R. Woerner:*** No, go ahead.

Det. Willoth: out of your property and taking a look at em?

***R. Woerner:*** Huh uh [that's a no].

Det. Willoth: Okay. Um,

J. Adcock: I need to ask you about your drug use cuz that's gonna come up.

***R. Woerner:*** Um huh [that's a yes].

J. Adcock: Why don't you tell me? Do you use?

| INTERVIEWER NAME/NUMBER | DATE OF INTERVIEW | REPORT NUMBER |
|---|---|---|
| Detective Willoth #1335 | 12/11/03 | |

# INTERVIEW

PAGE 42 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: *ASSAULT 1 W/FIREARM* | REPORT NUMBER: *SO 03-25124* |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: *Renee Woerner DOB* | | INTERVIEW REQUESTED BY: *Det. Willoth* |

***R. Woerner:*** No I, I'm not using drugs at this time. I have been, since before, before the pistol whipping I quit using drugs. I, I can't tell you I haven't used drugs ya know. I can't tell you I haven't done crystal meth. I haven't done cocaine. I live with Angie I mean come on and um, ya know, I smoke a little pot now and then. Um, but if you check my blood now I mean I'm clean. And

J. Adcock: Well you've been in custody

***R. Woerner:*** I've been in custody for over a month so ya know that's that but ya know, when I go home

J. Adcock: Were you using when the shooting occurred?

***R. Woerner:*** No.

J. Adcock: And you indicated you stopped after you got hit in the head?

***R. Woerner:*** Yeah it was in, around October so I've been about, it'd only been about a month. It wasn't very long.

J. Adcock: Okay.

***R. Woerner:*** But ya know, with a concussion that's all I did was want to sleep.

J. Adcock: Okay. Alright.

Det. Pince: Renee, you pointed to a mark on your eye and said that uh

***R. Woerner:*** Right here?

Det. Pince: he tried to poke your eye out or something?

***R. Woerner:*** He tried to pop it out.

Det. Pince: 'kay. Do you have any other injuries

***R. Woerner:*** Like that.

Det. Pince: related to your relationship with Matt?

***R. Woerner:*** I've got all kinds of scars yeah. Um huh [that's a yes].

Det. Pince: 'kay.

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| *Detective Willoth #1335* | *42* | *12/11/03* |

# INTERVIEW

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

***R. Woerner:*** And I have scars, these scars here where the skin is all gone and right there. And on my head the scars from the pistol whipping.

Det. Pince: How 'bout specifically from your trip to California? Anything that happened down there that...

***R. Woerner:*** The only thing I have from there is my bracelet that has the picture of my black eye. That's all.

Det. Pince: 'kay.

J. Adcock: When he pistol whipped you did he use the gun that he used to shoot?

***R. Woerner:*** Yes sir. And his friend Arrow is the one who cleaned it. His friend Arrow helped stop him but he said if Matt had a killed ya I'm sorry I woulda had to bury your body tonight?

Det. Pince: So when you were booked in California, you had a black eye?

***R. Woerner:*** Yes sir.

Det. Pince: 'kay.

***R. Woerner:*** Yep. It's on my bracelet. They took it after they took this ugly picture. Good Lord.

Det. Willoth: It's not very kind (laughs). But yeah.

Det. Pince: 'kay.

***R. Woerner:*** I feel better.

Det. Willoth: 'kay.

***R. Woerner:*** And Jeremy and Drew are okay?

Det. Willoth: Yes, they're fine. Luckily.

***R. Woerner:*** Like walking, talking, no bullets left inside of them or anything?

J. Adcock: One of em does have a bullet left in him.

Det. Willoth: Yes, Jeremy does.

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| Detective Willoth #1335 | 43 | 12/11/03 |

# INTERVIEW

PAGE 44 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: ASSAULT 1 W/FIREARM | REPORT NUMBER: SO 03-25124 |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: Renee Woerner DOB | | INTERVIEW REQUESTED BY: Det. Willoth |

J. Adcock: They couldn't operate. I mean they can't, it's too dangerous to take it out.

*R. Woerner*: Yeah, that's why I know that's a .22 but I'm ya know, concerned because like I said Jeremy was a nice guy. Ya know, and Drew I only met him a few times cuz he lived at that Love Israel Ranch or whatnot. Creepy. That's another weird thing I got scared about too. That ya know, but Jeremy was always a nice guy.

Det. Willoth: Okay. Renee, do you have anything else you'd like to add to this statement that you think's important or anything that you've left out?

*R. Woerner*: I've told the story. That's all, that's all I, that's it.

Det. Willoth: 'kay.

J. Adcock: I, would you be willing at some point to show us the uh, property and where people were and

*R. Woerner*: Um huh [that's a yes].

J. Adcock: point out? Okay.

*R. Woerner*: Yes. I have no problem at all.

Det. Willoth: Okay. Okay. At any time during this statement have you asked that the questioning or taping be stopped?

*R. Woerner*: No. No.

Det. Willoth: Okay. At any time during this statement have you requested an attorney? He's already here so no you haven't. Is it true that the facts stated on this tape are true and correct to the best of your knowledge, and that your statement has been made freely, voluntarily, and without threats or promises of any kind?

*R. Woerner*: Yes ma'am.

Det. Willoth: Okay. I'll have you sign the form.

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | | DATE OF INTERVIEW |
|---|---|---|
| Detective Willoth #1335 | 44 | 12/11/03 |

6/02

# INTERVIEW

PAGE 45 OF 45

| SNOHOMISH COUNTY SHERIFF'S OFFICE | TYPE OF INCIDENT: *ASSAULT 1 W/FIREARM* | REPORT NUMBER: *SO 03-25124* |
|---|---|---|
| NAME / DOB OF PERSON(S) INTERVIEWED: ***Renee Woerner DOB*** | | INTERVIEW REQUESTED BY: ***Det. Willoth*** |

***R. Woerner:*** Okay. Down here too?

Det. Willoth: Yeah.

***R. Woerner:*** Okay.

Det. Willoth: Okay. This concludes this statement. It is 1108 hours.

*Transcribed 12/11/03 by L.E. Secretary M. Noland #4116..*
*Reviewed and corrected by Det. K. Willoth #1335*

REPORT NUMBER

| INTERVIEWER NAME/NUMBER | DATE OF INTERVIEW |
|---|---|
| ***Detective Willoth #1335*** 45 | ***12/11/03*** |

EXHIBIT

"8"

Affidavit of
Matthew R. Ruth

I Matthew R. Ruth, Swear under the penalties of Perjury the following is true and correct to the best of my Knowledge.

1.) Each Part of the Reply where reference is made to My personal observations, actions, and etc. is part of this affidavit, I swear it is true.

2.) The Judge called the daily recess, and the Jury left the Court room. The Prosecutor John Adcock left to go talk to his Next Witness who was Material Eye-Witness Renee M. Woerner, one of the Four who were present in my home when the Shooting occured.

3.) 20 minutes later Mr. Adcock storms in the Courtroom, Matthew R. Stroud I trailing behind. Mr. Adcock announced very loudly to the entire Courtroom that he would not be calling Renae M. Woerner because she intended to Perjure herself. The Court reporter was not present to make this part of the record. My attorney Mr. Stephens approached Mr. Adcock by the Door out of my hearing. They began talking, and Mathew R. Stroud I, jumped into the conversation. Mr. Adcock left from them, and went to the Judge. Mr. Stephens and Mr. Stroud spoke for awhile, and then Mr. Stephens went out into the hallway.

4.) When Mr. Stephens returned he was red faced, wide eyed, zoomed by me, did not talk to me, and approached the Judges Bench. The Judge after hearing Mr. Stephens say something - which the Public, nor I could hear - Called Mr. Adcock over to the Bench, This was a Side Bar. Soon after Mr. Adcock, the Judge, and Mr. Stephens went In-Chambers, for around 15 Min.

5.) After the on the record summary, I asked Mr. Stephens what the alleged perjury is? He did not know. I told him to put Ms. Woerner on the stand. I told him from the very start to put her on the stand, and personally interview her, and that I wanted to be present during the interview. He promised he would call her to testify, if she was

not, too scared to testify from the prosecutors threats. He told me that his fear was that she also might get on the stand, and start lying under Mr. Adcock's aggressive and violent Cross-examination, and due to the threats she would break down and begin lying. I told Mr. Stephens that she is the only witness who corroborates my defense that was present, she is critical. I told him to call Gary Way, Donnie Poole, Bill Storie, Court Lamb, etc. He called nobody, presented no evidence, and the only witnesses who was exculpatory for me that was present at trial is Ms. Woerner. He promised he would call her to testify.

6.) The day the State rested its case, Ms. Woerners parents, and my Dad were present. Mr. Stephens told me Woerner was not appointed an attorney, and was too, scared to testify. I asked what happened to her original attorney Bill Joice? Apparently he had shot another attorney and was in jail. When I took the stand the Prosecutor and Judge teamed up on me, and attacked me, yelling at me, and threatening me, I asked them to stop, and made record that Mr. Adcock Threatened Ms. Woerner, Coached her, and that is why she would not testify. The Judge threatened to put me in restraints. I had no contact with anybody during trial because in a secret hearing without my attorney present, Mr. Adcock had me put into isolation. I was there for three months before trial, and returned with absolutely no contact with anyone every night at trial. I even wrote letters to the Judges office and ACLU asking why I was in Isolation with no hearing? The Sensory deprivation really messed me up.

7.) Ms. Woerner's original statement corroborated my defense, she said they were high on drugs during the shooting, accused me of stealing drugs, invaded our home, threatened us, there were lots of them, they would not leave, I kept screaming for them to leave, and they said they would do what ever it takes to search my home

for the stolen drugs. She corroborated them too, on where they were in the trailer. The bad stuff she said about me were domestic violence allegations, that she told the Western State Hospital people were not true, and she said because she was mad at me, and scared she would be charged as an accomplice. That is in my western state evaluation. The Domestic violence allegations were ruled not admissible during Motion In-Limine, the Prosecutor agreed. In my Rap 10.10 Issue one, I challenged the Prosecutor breaking this order by admitting the health certificate evidence that show Ms. Woerner had been assaulted. This proves he was trying to get her to bring in the Domestic violence stuff, and she wouldn't lie.

8.) Mr. Stephens never told me he wasn't going to call her after the In-Chambers incident. He never showed me what corroborated the Alleged victim, or was easily impeachable by her original statement, he could not because he never interviewed her about her statement, or intended testimony. In fact after trial I spoke to her on the phone, after released from Isolation, and she told me before trial, Adcock had tryed to get her to remove the parts of her statement that corroborated my defense, she would not, and he threatened her. She called my attorney, and he said it didn't matter because "Matt is F_cked anyways." We three way called him, I confronted him, he agreed that he said that to her, and then made really bad comments about her. She told him the call was recorded. That is what caused the Declaration and motion to leave.

9.) The Judge and Mr. Adcock were mean to me, and really biased, my presence was reduced to nothing, the trial proceeding as if I was not even there. The record at trial and sentencing proves that the Judge and Mr. Adcock were biased against me.

10.) I tried to file a motion for new trial, but the court would not let me file it, I included it and the affidavit in support in my brief as exhibit 6, it was notarized at Shelton because the County

Jail would not let me get it notarized. It is all true, and I want to adopt all of it in this Affidavit.

I swear all of this is true and correct to the best of my knowledge, under the penalties of perjury.

Signed in Aberdeen, Washington on This 10th Day of September, 2013.

X ______________________

Matthew R. Ruth

I, Barbara St Louis, am a Notary Public in and for the State of Washington, County of GraysHarbor, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes describes therein.

Signed and dated before me this 10th day of September, 2013.

/S/ ______________________

______________________ Barbara St Louis

NOTARY PUBLIC in and for the State of Washington, County of Grays Harbor.

My Commission Expires: 6-4-16

000028516

FILED
2005 MAR 18 PM 12: 12
PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT STATE OF WASHINGTON
IN AND FOR SNOHOMISH COUNTY

| | | |
|---|---|---|
| STATE OF WASHINGTON, Plaintiff, vs. MATTHEW R. RUTH, Defendant. | ) | No. 03-1-02451-6<br><br>Affidavit in Support of Motion for New Trial or Relief from Judgment and Sentence |

STATE OF WASHINGTON )
) Affidavit by Declaration:
COUNTY OF SNOHOMISH )

I, Matthew R. Ruth, am the Defendant in the above entitled cause and make this declaration in support of my motion to modify sentence. I hereby declare that I am over 21 years of age and competent to testify herein as the following facts are known by me to be true firsthand unless otherwise stated.

1.) I hereby claim that my attorney at trial was Mark Stephens and that he failed to provide me with effective assistance of counsel based on the following.

2.) There were notes from a key witness that could have been used to impeach, or lock in, testimony of a key state's witness that was not provided until October 20, 2004 and my attorney failed to object to the late discovery since the state had the evidence for 8 months prior to that date and his failure to act allowed the state's witness to lie and not be impeached. Had counsel objected to the late discovery, it is very likely that the court would have allowed some sanction to include

Mathew Ruth, pro se
1918 Wall Street
Everett, Washington 98201



the exclusion of the witnesses' testimony which would have likely been detrimental to the state's case and/or changed the outcome of the trial.

3.) My attorney refused to go over the evidence with me and refused to provide copies of the discovery to me claiming it was too expensive.

4.) My attorney did not interview any of the defense witnesses which were relevant to impeaching the state's witnesses and establishing his self defense or his credibility all of which was crucial at trial. The defendant provided a list of witness questions and the attorney failed to ask any of them. The defendant was prejudiced by the failure to conduct any defense due to the fact that;

a. Witnesses would testify that Jeremy Custer had fled the scene in his black Dodge Durango with two plastic bags from his house;

b. And that Dru Eden had hijacked Sarah Bryant in her car then told her he was just shot over drugs and that he was going to kill the defendant;

c. Witnesses would testify that Jeremy Custer proceeded to the house of Court Lamb, a witness in the Burkhiemer murder, and there at her house he refused to go to the hospital and wouldn't tell what happened.

d. Jeremy Custer testified that Court Lamb's Mother was a nurse and that testimony could have easily been proven to be false.

e. Court Lamb would testify that Jeremy Custer returned to the defendant's residence with other armed persons after they had stashed the drugs; she would also testify that the officers never searched these people.

f. Court Lamb would testify that Jeremy Custer freaked out and told the officers "I didn't break in, I won't talk to any body without a lawyer, I need a lawyer" and then he tried to run away but he was caught and handcuffed. Jeremy Custer and Dru Eden did not decide to give any statements until two weeks after the incident and then they changed their stories several times to include at trial.

5.) It is believed that the attorney should have made an offer of proof, off the record, at least, to show that the state had threatened the defense's key witness with adversities such as charges of perjury and threatening that she would not see her children for 10-15 years. The Prosecution was using these tactics continuously to try to get the witness to change her story to this story or that story by telling her, "[this is how it happened] remember, hint, hint!" The witness called the defense attorney and told him, he said, "it doesn't matter" that the state is tampering with the witnesses, "because he is fucked anyways."

6.) The state was allowed to admit evidence that was not relevant, [falsely claiming blood of a victim], and was prejudicial in that a blanket that had aged menstrual fluid was admitted as

Mathew Ruth, pro se
1918 Wall Street
Everett, Washington 98201

evidence that the alleged victim was further in the trailer, [where a shooting occurred], and which implied that the defendant was a liar. Although the blanket was available, counsel never had the blood tested for DNA to prove it did not belong to either of the alleged victims; therefore his client was not a liar and was innocent.

7.) Counsel yelled at his client in front of the jury, saying he wasn't going to listen to him anymore, when it was his attorney's failure to prepare that caused the confusion in that a witness was angry at his client and testified different than expected to exact a vendetta. Had counsel interviewed the witness, he would have known that she was changing her story and why. The witness has since recanted after discovering the reason for her vendetta was unfounded. The witness thought that the defendant had told on her for the drug activity at her farm which almost caused her to lose it. That fact could have been easily resolved except for the attorney's refusal to act on his client's behalf to interview and question his intended witnesses. It was one of the alleged victims that used to live on her property that caused her to almost lose her farm because he was paying her with drug profits and that information was discovered by the current landowner.

8.) A key states witness was a jailhouse snitch named Jeremy Sheridan. This witness had a record a mile long and a history of telling untruths. He was literally paid by receiving more favorable treatment on his charges by talking to the defendant and eliciting certain facts to use against him. The defense attorney failed to attempt to get this testimony suppressed as unlawfully obtained and later the attorney was unable to impeach the evidence given as being inconsistent with previous statements due to the failure to prepare for trial properly. The period of time in which that statement was alleged to have been elicited was during a period of time pending a competency evaluation by Western State Hospital, and after the defendant had been ruled incompetent by the court.

9.) Defense counsel attempted to set up a plea hearing to get the defendant to plea guilty in hopes of avoiding the inevitable trial. His intent was to refuse to conduct any defense and force his client to plea guilty. This is a common scheme used in Snohomish County. Mark Stephens was a long time member of the Snohomish County Public Defender's office where he honed these skills. It is very difficult to just ignore someone's pleas to assist in conducting a defense, but after some practice it is like raising children, you get used to the whining. Mark Stephens literally did not conduct any defense for the accused and was so bold as to just set up a hearing to plea guilty for his client without ever discussing it with his client.

10.) Current counsel, Charles Dold, that was appointed to represent me after trial, has openly said that I deserve to go to prison and that I shot two people. He claims my girlfriend is wiped out on drugs and cannot help me, however, he has not talked to this person and is only making up lies to avoid helping me. It is believed he has been influenced by my previous counsel, Mark Stephens, whom he used to word with in the same office and whom he maintains constant contact. It is part of the record that Mark Stephens made comments about my witness and I believe that he has spoiled my newly appointed counsel with the same disease.

Mathew Ruth, pro se
1918 Wall Street
Everett, Washington 98201

11.) I feel that I need to new counsel, besides Charles Dold, to assist me in presenting my ineffective assistance of counsel claims. I hereby pray that some relief is granted.

I hereby declare that I have read the aforesaid statements and verily believe the same to be true under the penalties of perjury under the laws of the State of Washington pursuant to RCW 9A.72 et seq.

Signed in Shelton, Washington on this 14 day of March ______, 2005.

/S/ Matthew R. Ruth
Matthew R. Ruth, pro se # 310079
Address: 1918 Wall Street
Everett, Washington 98201

I, Burton F. Averill, am a Notary Public in and for the State of Washington, County of Mason, and hereby declare that I know or have sufficient information to believe that the person appearing before me is the person purported to be and it appears that he has signed this document under his own free will for all intents and purposes described therein.

Signed and dated before me this 15th day of March, 2005

BURTON F. AVERILL NOTARY PUBLIC STATE OF WASHINGTON COMMISSION EXPIRES 2-18-07

/S/ Matthew R. Ruth
Burton F. Averill
NOTARY PUBLIC in and for the State of Washington, County of Mason.
My Commission Expires 02/18/07.

Mathew Ruth, pro se
1918 Wall Street
Everett, Washington 98201

FILED

000028515

2005 MAR 18 PM 12: 12

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

***The Superior Court of the State of Washington in and for Snohomish County***

| | | |
|---|---|---|
| STATE OF WASHINGTON, Plaintiff, | ) | No. 03-1-02451-6 |
| vs. | ) | MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT |
| MATTHEW R. RUTH, Defendant. | ) | |

1. IDENTITY OF MOVING PARTY

Matthew R. Ruth, is the Defendant in the above numbered cause. He seeks the relief designated in section 2.

2. STATEMENT OF RELIEF SOUGHT

Defendant, pro se, seeks an extension of time to file this action to the date of receipt based upon the fact he is incarcerated and not trained in the law and has prepared and filed this actions in as timely of manner as possible; he seeks appointment of new counsel to advance the legal and factual issues that remain unanswered or improperly presented and ultimately a new trial and/or arrest of judgment and dismissal of the charges. This motion is pursuant to CrR 7.5 and 7.4 and based partially upon CrR 8.3(b).

3. FACTS RELEVENT TO MOTION

Defendant hereby asserts that he is entitled to the relief requested based upon the following facts relevant to this motion.
Judge David F. Hulbert unnecessarily stated that he would put me in restraints while I was testifying before the jury.

My attorney failed to object or request a mistrial on those grounds. Further, my attorney failed to prepare any defense and appeared to join the prosecution and efforts to get me convicted. The failure to prepare and the resulting prejudice is too numerous to fit in this motion form so I have a sworn statement attached that I would like to have considered by this referrence to the document titled "Affidavit in Support of Motion for New Trial or Relief from Judgment and Sentense," annexed hereto.

My attorney allowed the prosecution to withhold discovery, extort witnesses, call me names and say I was delusional before the jury. He did not bring an issue properly about a juror seeing me in restraints. Failed to make an offer of proof for the record regarding defense witnesses proposed testimony. My attorney was given a list of witnesses and their expected testimony and he just refused to interview any of them. He refused to interview state's witnesses. He failed to try to get a bail reduction. My attorney complained that he was not getting

The defendant claims that based on the abovesaid facts, the court should find that the appointed counsel's representation fell so far below reasonable standards that the attorney effectively joined the prosecution and prejudice is presumed.

If the court does not agree with this notion, I set forth here the 2 parts required for the Strickland Test. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

1. Counsels Performance Was Deficient by failing to adequately prepare for trial and interview witnesses for both sides. My current counsel's performance is also deficient because he refuses to obtain the facts or try to schedule interview with my witnesses also. He refuses to advance these issues. It is clear that I have been denied effective assistance of counsel and continue to be denied effective assistance due to the fact my new attorney refuses to assert that his long time friend and colleague intentionally failed to conduct a defense. New counsel does not like me or want to help.

2. My trial would have turned out differently and I would not have been prejudiced had it not been for my attorney's deficiency as follows: Had my attorney actually tried to do his job or at least called my witness, Renee Woerner, and conducted interview's, I would have been completely acquitted of these charges

because the evidence all clearly shows that I am innocent and the state's story at trial is a rediculous fabrication that any reasonable trier of fact would clearly deny given any alternative. The truth is available and it must be presented in the interest of justice. With appointment of conflict free counsel who is allowed or willing to assist, there is every fact in my favor to get a new trial and acquittal.

D. THE DEFENDANT ALLEGES PROSECUTORIAL MISCONDUCT.

Two things must be shown before a court can require dismissal of charges under CrR 8.3(b). First, a defendant must show arbitrary action or governmental misconduct. > State v. Blackwell, 120 Wash.2d 822, 831, 845 P.2d 1017 (1993) (citing State v. Lewis, 115 Wash.2d 294, 298, 797 P.2d 1141 (1990)). Governmental misconduct, however, "need not be of an evil or dishonest nature; simple mismanagement is sufficient." Blackwell, 120 Wash.2d at 831, 845 P.2d 1017 (emphasis added). Absent a showing of arbitrary action or governmental misconduct, a trial court cannot dismiss charges under CrR 8.3(b):

We repeat and emphasize that CrR 8.3(b) "is designed to protect against arbitrary action or governmental misconduct and not to grant courts the authority to substitute their judgment for that of the prosecutor." State v. Cantrell, 111 Wash.2d 385, 390, 758 P.2d 1 (1988) (quoting State v. Starrish, 86 Wash.2d 200, 205, 544 P.2d 1 (1975)).

The second necessary element a defendant must show before a trial court can dismiss charges under CrR 8.3(b) is prejudice affecting the defendant's right to a fair trial. See State v. Cannon, 130 Wash.2d 313, 328, 922 P.2d 1293 (1996). Such prejudice includes the right to a speedy trial and the "right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense...." State v. Price, 94 Wash.2d 810, 814, 620 P.2d 994 (1980).

The defendant alleges prosecutor misconduct as follows: The prosecutor in this case literally went all out to threaten, harass and intimidate my witnesses and the state's witnesses. The prosecutor was responsible for misinforming the jury on the laws after being told by the court what the law was and that the accused did not have a duty to leave. That misled the jury and reversed the burden of proof. Further, the prosecution made comments that the accused is delusional and that is not supported by the record and all of the above was highly prejudicial and resulted in an unfair trial. The prosecution also withheld evidence and discovery from the defense. If not for the prosecutor's misconduct alone, the result would have been the opposite!

E. THE CUMULATIVE EFFECT OF THE ERRORS DENIED THE DEFENDANT A FAIR TRIAL.

The defendant claims that the overall effect of the errors denied him a fair trial.

> "[T]he cumulative error doctrine warrants reversal in this case. The application of that doctrine is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant

a fair trial. See, e.g., > State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984); > State v. Badda, 63 Wash.2d 176, 183, 385 P.2d 859 (1963) (three instructional errors and the prosecutor's remarks during voir dire required reversal); > State v. Alexander, 64 Wash.App. 147, 158, 822 P.2d 1250 (1992) (reversal required because (1) a witness impermissibly suggested the victim's story was consistent and truthful, (2) the prosecutor impermissibly elicited the defendant's identity from the victim's mother, and (3) the prosecutor repeatedly attempted to introduce inadmissible testimony during the trial and in closing); > State v. Whalon, 1 Wash.App. 785, 804, 464 P.2d 730 (1970) (reversing conviction because (1) court's severe rebuke of the defendant's attorney in the presence of the jury, (2) court's refusal of the testimony of the defendant's wife, and (3) jury listening to tape recording of lineup in the absence of court and counsel)." State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000).

Defendant makes these motions in good faith and believes he is entitled to the relief requested. He respectfully request that this court grant some relief as it deems proper.

I hereby declare that I have read the aforesaid and verily believe the same to be true under the pains and penalties of perjury under the Laws of The State of Washington.

Signed in Everett, Washington this 14 day of March, 2004.

**RESPECTFULLY SUBMITTED,**

/S/ Matthew R. Ruth

Matthew R. Ruth, pro se
CIN# 310079 Unit 2-S 66
1918 Wall Street
Everett, Washington 98201

Witnessed by: ______
Name: ______
Address: ______

Date: 3/14/05

DECLARATION OF PROOF OF SERVICE

STATE OF WASHINGTON )
) AFFIDAVIT BY DECLARATION:
COUNTY OF SNOHOMISH )

I, Matthew R. Ruth, hereby depose and declare that I properly mailed a true and accurate copy of the "Note for Motion Calendar" and "MOTION FOR NEW TRIAL OR ARREST OF JUDGMENT" to which this declaration is affixed directed to opposing counsel of record in the above numbered cause with First Class Postage arranged on this date under the pains and penalties of perjury under the laws of the State of Washington.

Signed in Everett, Washington this 14 day of March, 2004.

/S/ Matthew R. Ruth
Matthew R. Ruth
CIN# 310074 Unit
1918 Wall Street
Everett, Washington 98201

EXHIBIT

9

INterview of Jury member lesLey wINNey

By KRistINe A. Kain

Kristine Kain
1001 N Madison St
Tacoma, WA 98406

Court of Appeals, Division One
Case Number 683802
October 18, 2013

Affidavit

October 15, 2013 1:08 PM & October 17, 2013 Phone conversations with jury member LESLEY WINNEY

***I swear under the penalty of perjury that the following statement is true.*** I was in contact with jury member LESLEY WINNEY on the above said days. Of the jurors who were on Matthew Ruth's case, Lesley Winney is so far, the only one that I could find whose phone number was still valid. Any of the information regarding his position as a jury member for Matthew Ruth's case was given at the best of his recollection. He appeared to have a clear memory of what went on during the trial. There were some issues that stood out to me that Mr. Winney, more than once brought to my attention. Specifically that the jury thought Matthew Ruth was innocent up until deliberations where they were misinformed by the Bailiff who provided answers to their inquiries.

Mr. Winney said that the jury for this case was told that they were to only decide if the defendant shot the intruders in self-defense or if he deliberately shot them. Next, was that the present proceeding involving the shooting that they were jury members for was only a small part of a much larger, complex case. They were told that there were more trials or proceedings that involved the defendant and his criminal activity that were taking place or would be taking place. He reiterated that they were told that the only thing that they had to decide on was a minor part of the whole case. He referred to this case as being a case about the illegal use of a firearm. The jury as a whole had to guess what the case was about because when they asked what the charges were they were consistently told that the only thing they had to focus on was the illegal use of a firearm and this was just a small portion of a bigger, complex criminal trial. Mr. Winney had thought that maybe it was an Attempted Murder case? In a later conversation with Mr. Winney, he stated that he had thought this case could have also been about drugs. This was just what he was guessing. Mr. Winney said the jury was never told directly what this case was about. They were told that this was just a small part of a much larger case involving the defendant. Mr. Winney also said that when the jury was in deliberations, they tried to inquire about the case as a whole. He said that the Bailiff would tell them that they didn't need to know these things because their only duty was to determine if Matthew Ruth was guilty of the illegal use of a firearm. Did he shoot in self-defense or did he deliberately shoot them?

Mr. Winney said that he and the other jury members thought that Matthew Ruth was innocent and had reacted by shooting the victims in self-defense to protect his girlfriend from being hurt. It was during deliberations that the jury changed their minds about him being innocent to being guilty. One reason is because Matthew Ruth admitted to shooting them. Mr. Winney made a comment to me in regards to why they even were there if the defendant was going to admit to shooting these people? More importantly and emphasized by Winney throughout both phone conversations I had with him was that the jury was provided information that supports that the victims were shot in the back and at such a far distance from the shooter. Mr. Winney had mentioned that one of the victims was shot while climbing over a fence when he was trying to run away. It was then that the jury decided that the defendant was guilty and had shot the victims deliberately and that it could not have been self-defense. Therefore, this would constitute the illegal use of a firearm. When the jury had questions about this they were told they could not hear the rest of the information about the case. Trial transcripts provide testimony from both parties that the victims were shot in Matthew Ruth's home. The transcripts are confusing and make sense as to why the jury inquired about where the shooting took place. However, the Bailiff responded with information that is not factual. They were told once again that there was a whole lot more going on with this case and that there are other proceedings and trials taking place involving the criminal activity of the defendant. I asked Mr. Winney who answered these questions that the jury had asked and he said it was the Bailiff. He couldn't remember if anyone else provided the answers as well. As far as Ms. Woerner's testimony, they were told it wasn't necessary because she was in a back bedroom down the hallway and didn't see the shooting.

Aside from the information that Mr. Winney provided above he also said that he was led to believe that the defendant was a criminal who was involved in other criminal activity. When told that the defendant was a first time offender and that this conviction was the only thing on his record, he responded by saying that this was the first time he ever heard of this. He believed Matt's criminal record was far more extensive than just this case. When told the length of the sentence that Matt was handed down, he was obviously shocked. He said he didn't know this and that he thought that the crime of Attempted Murder doesn't get that long of a sentence. This reminded me of when I first started the phone conversation with Mr. Winney and had asked him if he was the Lesley Winney on a Snohomish County criminal case where the defendant was convicted on two Assault One charges. Mr. Winney said he was not a jury member on an assault case. He then asked what had happened and I told him that two men were shot in a trailer. He then said that he was on that jury. But, the jury was never told what the defendant was being accused of, just that they were to determine if this was the illegal use of a firearm.

Let me note that Lesley Winney said that he would write a signed affidavit confirming what I have just said. With less than a day's notice, it will be sent to the courts promptly.

***I swear to be true under the penalties of perjury*** that I was the designated point of contact between attorney, Mark D. Mestel and Matthew R. Ruth since January of 2011. Almost all correspondence between the two passed through me, for the most part by email. The following pages are email conversations to support the fact that Matthew R. Ruth, many times addressed with Mark Mestel the issue of Ineffective Assistance of Direct Appeal Counsel for failing to raise the public trial rights issue and the issue of Prosecutorial Misconduct for the use of the improper argument based on the Castle instruction. Mark Mestel put in writing in a letter to Coyote Ridge Correctional Center about two years back that Matthew Ruth was an important part of his own legal defense team and asked Ruth for his knowledge and thoughts and what issues he should use when preparing his Personal Restraint Petition and any briefs thereafter. Ruth tried to convey to Mr. Mestel that he wanted the above two issues to be raised and Mark Mestel chose not to.

***I swear to be true under the penalties of perjury*** that the Private Investigator who Mark D. Mestel hired for Matthew R. Ruth's case was Mike Powers. I have recently contacted Mike Powers to ask him a simple question and he has evaded the question with such comments as,

"Matt is going to need me at some point so if we can save any "favors" until they are really needed that would be great."

We have no idea what he is referring to and he refuses to answer when this comment is addressed.
Mike Powers was hired to investigate key eye witnesses such as Court Lamb, Daniel Gist and Nigel Colbert who were never asked to testify at Ruth's trial even though they were present on the day that Matthew Ruth shot Dru Eden and Jeremy Custer. He was also asked to interview the jury members as well as with Gary Way who was the first investigator on Ruth's case and Mark Stephenson, who was his attorney then. Ruth requested that Mike Powers interview the police who interacted with Eden and Custer on that date as well as with the emergency room doctors and the toxicologists because of conflicting hospital records and to find out why one of the victims received ibuprofen and the other victim something a bit stronger, but still not the medication a gunshot victim would receive. Mike Powers was supposed to find out what the two victims said in order for them to have such minor medications administered. Mr. Powers did not interview any of the above said people who Matthew Ruth requested while conducting his investigation making Matthew Ruth's case improperly investigated.

***I swear to be true under the penalties of perjury*** that I tried to contact Mark Stephen's, Matthew Ruth's trial attorney. My main objective in trying to reach Mr. Stephen's was to find out what the jury members said to him after trial and to ask him why he didn't put on record until his motion to withdraw that the prosecutor, Adcock, had threatened Renee Woerner if she testified? Also, why he didn't correct the prosecutor for misstating his own words while in chambers? Mr. Stephens has failed to return any of my phone calls or messages I had left him through his websites Contact page.

***I swear to be true under the penalties of perjury*** that during the second week of October 2013, I did contact and speak to Gary Way in regards to this case. At first Mr. Way did not remember the case. He then found a memo that was about his interview with Dru Eden. This is the interview that Matthew Ruth has requested to see several times over the past nine years. Mr. Way said he would send it out to Mr. Ruth. He was aware of the October 21, 2013 deadline in the Court of Appeals. I sent him by email and also left him phone messages reminding him of this. He has not returned my calls and has failed to send Mr. Ruth the content of that interview.

I did finally receive an email message from Mr. Way stating that he did find all of the interviews that were requested of him by the defense attorney, Mark Stephens at the time. However, they also have not been received by Mr. Ruth. I also tried to hire Gary Way and Mike Powers to re-investigate this case. Neither one of them would take on this task that they would be paid for and with no explanation as to why.

***I swear to be true under the penalties of perjury*** that on August 20, 2013 I received an email from Mark D. Mestel stating that if the unpaid part of Matthew Ruth's bill was not paid by the end of the month, he would be withdrawing as counsel for his case. This is the only conversation I have had with Mr. Mestel since that date. Mr. Mestel did file a motion to withdrawal as counsel on September 16, 2013 claiming that Ruth agreed for him to withdraw from his case. Matthew Ruth has not conversed with Mark Mestel about him withdrawing from his case. Ruth received notice of this motion on September 18, which was the same day as his Reply to Response to PRP was due. To date, Ruth has not received his Discovery from Mark Mestel, which he will need to properly litigate his case.

Signed in Washington State, County of Pierce on October 18, 2013 Kristin Kain.

State of Washington
Pierce County
Sherry A. Lamb
[signature]
Notary Public
Expires 06/01/2014

SHERRY A. LAMB
NOTARY PUBLIC
06-01-14
STATE OF WASHINGTON

ExHibit

10

Interview of Drew Eden
By Gary way

**WAY INVESTIGATIONS**
**P.O. BOX 1313**
**LANGLEY, WA 98260**

**(360) 321-7901**
**(425) 231-6397**

**CONFIDENTIAL MEMO**

**TO:** Mark Stephens

**FROM: Gary T. Way, (425) 231-6397**

**RE: Ruth, Matt**

**DATE:** 10/11/04

Summary of interview with Drew Eden

On 10/7 I met with Drew at his parent's residence to interview him regarding this case. His parents reside at 219 Elder in Everett. It is unclear where Drew currently resides although he indicated Arlington at one point and at another said he was "pretty much" staying with his parents. There was no on else present when I spoke with Drew. Drew says he has no criminal record and has only been cited for Racing in the past.

Drew has known Jeremy for "years." He says he has known Matt only a couple of months. He met him at Jeremy's house. He also described being gone for a time hanging out at the Garlic Farm with some gal. He wasn't around Jeremy much then. He says they are all "DJs" except Matt.

I asked Drew to describe for me what happened that day. He said he went over to Jeremy's to visit and Jeremy's wasn't home. He recalled that Dan was around and Matt came over but seemed unable to recall exactly what Matt did. Drew then decided Matt came over to use the bathroom. Drew said Matt made a comment about not wanting to go inside the house because he would get accused of stealing something. This was unclear because Drew said he thought Matt did go inside. Drew did not recall what Dan was doing then or at that time. Drew then said he thought Matt took a shower, but wasn't positive. I asked what they were all doing before Jeremy came home and he could not recall.

Drew then said that Matt appeared to be high on Meth but did not know if he was. He described Matt as "crazy" all the time. He then asked me if I had seen his girlfriend. When I told him I had not Drew said she was "pretty bad." He said she was with Matt all the time. I asked Drew what happened next. He said Jeremy came home and that he "seemed to know right away something was missing." He said Jeremy asked everyone (except him) about what was missing and then went out to Matt's trailer. I asked Drew what Jeremy was looking for. Drew said he didn't know and then said he heard he was looking for a "pound of weed." Drew then quickly said he only "heard" that and did not know for sure.

Drew then said Jeremy was looking for their studio equipment. He said there was a lot of equipment inside the house and said this house was basically "all studio." I asked what happened next. He said Jeremy went to Matt's trailer and said he could hear "shouting" and that it sounded "confrontational." Drew made the comment that he heard something like "get the hell out of my trailer" from Matt. Drew said he went over after this.

I asked Drew if the door was open or how he entered the trailer. He said the door was open and described how it would swing all the way open. Drew described where everyone was located when he went inside. He said Matt was standing on the "lower part" on the left as you entered the trailer and Jeremy was sitting on the bed with his elbows on his knees. He said they were not talking at this point and Matt had a "grimace" on his face. He said Renee was also on the bed to the left of Jeremy towards the back of the bed.

Drew said it "seemed calmer" after he went inside compared to what he heard before he went in. Drew said he went inside because he did not want them to fight. He said the atmosphere was tense. Drew said he was inside for about one minute and then Matt shoots Jeremy. He said he shot him while Jeremy was on the bed. I asked about how long the shooting lasted. He said it was about five minutes because Matt paused between each shot. Drew said he was shocked and was trying to hide near the shower. There is a lot of yelling and Jeremy is asking Matt why he is doing this. Drew said Matt responded calmly when Jeremy screamed that he was "killing him" with the statement, "Yes I am." Matt also yelled for Renee to "get out." Drew again said Matt would take a "big pause" between shots.

I asked Drew how he was shot. Drew said he was still inside the trailer and turned to run out when he was shot in the back. He said he ran out behind Renee. He thought he was still in the small hallway area when he was shot. Drew said he ran and jumped over the fence and stopped a car. He said this person took him to the hospital. He said he was not shot as he was running out the door. Drew said he jumped out in front of the car and told the driver to "let me in." He said the driver didn't believe that he was shot and Drew became upset with her because she was "going too slow." Drew said his mother met him at the hospital.

Drew then told me he thought Matt's plan was to kill Jeremy for the studio equipment. He said they had over $3,600 in equipment not including the records. I asked if Jeremy found what he was looking for when he went inside the trailer. Drew said he "didn't know." I asked Drew if anything was said when he first entered the trailer. He said Matt and Jeremy "said something." Drew thought Jeremy said something like "let me eliminate you as a suspect." He said Matt said something like "why am I being accused of stealing?" Drew said there were headphones missing and they were worth about $200. Drew then said he helped Jeremy pay for the equipment.

Drew is still carrying the bullet in his back. He said it was inches from his spine. He said because he has no medical insurance the doctors "left it up to him" about getting it removed. He said Jeremy knew Matt had the gun and also said Matt would tell them all "bull shit" stories about things he has done in the past. As I was preparing to leave Drew's residence he said, "Isn't this about my getting shot and not whether it was about some weed?" He seemed

frustrated with the attention given to how this happened and that it should not matter what the dispute was over between Jeremy and Matt.

Drew also said Jeremy was not at his listed address and was selling cars in Monroe seven days a week and hard to reach. He said he would tell Jeremy I wanted to talk with him and give him my number. I have not heard from him.

End of Memo

EXHIBIT
11

Gary Way

WAY INVESTIGATIONS
P.O. BOX 1313
LANGLEY, WA 98260

(360) 321-7901
(425) 231-6397

**CONFIDENTIAL MEMO**

TO: Mark Stephens

**FROM: Gary T. Way, (425) 231-6397**

**RE: Ruth**

**DATE: 12/10/04**

Summary of witness contacts

Per your instructions in the letter dated 11/11/04 I attempted to contact various witnesses in regards to the testimony of Jeremiah Sheridan in Matt's case. I made contact with the following witnesses in that regard:

1. On 11/17 Roy Schofield called me back from a phone message I left him regarding this case. I spoke with him at that time regarding Matt's case and the Sheridan. Roy said he did not know Matt but did know Sheridan from family connections. Roy said he was known as "Uncle Charger" to Sheridan. Roy said he was in custody and recalls being with a number of inmates waiting for transport to or from a court appearance and hearing the he, "Charger", was supposed to take care of some witnesses for Matt's case. It was not clear to Roy is he was supposed to contact them and ask them not to appear but he said he did not know anything about this and confronted Sheridan. Roy said he did not know anything about this witness stuff and told Sheridan that. Roy has not talked with Matt about this matter. He does not know what Sheridan was up to but believes the witness contacting was all his idea to get out of jail. He does not know this for a fact and only believes this to be true based on what he knows about Sheridan. He does not think Sheridan should be trusted or believed regarding this matter. Roy does not know anything about Sheridan's contacts with police or with Matt while he was in custody.

2. On 11/18/04 I made contact with Neil McCloud at the Snohomish County Jail. I asked Neil what he could tell me about this matter. Neil said "Sheridan pulled some shit to get out of jail." Neil said Sheridan "caught on to something and hustled Matt." He said Matt got comfortable with Sheridan and the next thing he knows Sheridan is "out of here." McCloud said Sheridan told him he was going to "hustle some information" and get a deal to get out. McNeil claims he told Sheridan not to do this. McNeil said Sheridan was "crazy and slow." He said Sheridan "courted" Matt and got some information from him. He said Sheridan was a junky. McCloud could not tell me specifically if Sheridan acted at the direction of anyone. He had no knowledge of Sheridan's contacts with Detectives in regards to Matt's case. I asked if he knew

about the written information Matt supposedly gave to Sheridan. McNeil paused and said, "Oh, I forgot about that." He does not know how this occurred or why it happened. McNeil seemed puzzled that Matt would give Sheridan this information. I concluded my conversation at that point.

3. I made numerous calls to the other witnesses and did not get any return calls except for a "Marilyn" in regards to Steve Kiona. I called Marilyn back and left her a message why I was trying to reach Steve. I did not get a return call from her.

End of Memo

EXHIBIT

12

Interview of Donnie G. Pode
By Michael Powers

**From:** Wlegalworks@aol.com
**Subject:** **Matt Ruth**
**Date:** January 18, 2011 9:54:10 AM PST
**To:** markmestel@comcast.net

Mark,

I was finally able to meet in person with Donnie Poole. I like the guy. He apologized for taking so long to get back in touch with me BUT his phone has not been working so he has not been getting my messages. That is fixed now and so he is ready to help IF he can.

Donnie works daily. He is a cement finisher. He said that if he can help he will. Donnie reminded me that it was over six years ago that he met with Mr. Adcock but he remembers "most of what was said." Donnie told me that he does not recall the entire conversation with Adcock but what he remembers most was that Adcock was "trying to intimidate me."

Donnie asked me if Adcock had recorded their meeting? He was hoping he had so he would have a "better record of what was said and when it was said." I told Donnie that as far as I know there was no recording of the interview between Mr. Adcock and himself. Donnie has been told over the years that Adcock used some of what Donnie ALLEGEDLY said to him during the meeting to convict Matt Ruth. Donnie has no idea as to what Mr. Adcock allegedly used in trial.

Mark, our client gave me a "heads up" to what he recalled Adcock saying during his trial with respect to Donnie Poole's interview.

One of the things that our client said was that Adcock alleged that Donnie Poole told Adcock that Matt Ruth had told him (Donnie) that he just "freaked out" and started shooting. Donnie agreed with Adcock on that statement BUT he said that Adcock forgot to mention that Donnie had told him (Adcock) that the reason that Matt "freaked out and started shooting" was because his life was in danger at the time." Donnie said that he does seem to recall telling Adcock that Matt told him that he (Matt) did say that he "freaked out" BUT it was after he had told him that Matt said that he freaked out after Custer threatened him with a gun. Donnie said this was about when Adcock started to get mad and started to yell at Donnie that he was just "covering for his friend and trying to get his friend off."

Donnie believes that the interview with Adcock started going bad when he TRIED to tell Adcock that he (Donnie) had bought drugs from Custer.

Donnie said that he recalled telling Adcock that Custer showed up at his house, several days after the shooting, he was not exactly sure when but thought it was shortly after the shooting and Custer threatened Donnie and told him that he had better not tell anyone (authorities) about Custer's business and what kind of a guy Custer was. Donnie said that he didn't really worry about what Custer had said to him about "not telling police" about his (Custer) business but he did take it as a threat.

I asked Donnie Poole specifically if he recalled telling Mr. Adcock that Matt Ruth had told him (Donnie) that Custer had a gun during the argument between Matt and Custer? Donnie said that Matt had told him, from the beginning, that Custer had a gun and he recalled mentioning to Mr. Adcock that was the reason that Matt 'freaked out and started shooting" was because Custer had a gun in the trailer. Donnie Poole recalled mentioning to Mr. Adcock that Matt had told him that Custer had a gun. He said that Mr. Adcock did not believe him and started to get red in the face and starting yelling at Donnie.

Mark, Donnie seemed to remember some more about the meeting with Adcock once we started talking some more. He is NOT sure of the order of the conversation but he is sure that he did tell Adcock several things during the interview. Donnie said that as soon as he started to tell Adcock the "truth" about Custer, Adcock started yelling at him saying things like "you're lying to protect your friend, none of this is true, this will never see the light of day."

Donnie remembers telling Adcock that this incident was over "drugs." Donnie said that at this point Adcock was in his face yelling at him and he (Donnie) was standing in his face yelling back at him. Donnie recalled that Mr. Adcock "really got mad when I told him that this was all over some drugs that Matt had supposedly stolen from Custer." Adcock would not believe him.

Donnie recalled that during the last minutes of the interview with Mr. Adcock that he told Adcock that he was being "unprofessional" and he did not scare him. The interview ended badly.

Donnie Poole told me that the interview with Adcock started off all right but as soon as he heard things that he didn't like to hear that's when Mr. Adcock, according to Donnie, started to get mad and was trying very hard to intimidate Donnie.

Donnie Poole will sit and talk with you if you would like? He does NOT recall the specific order of questioning by Mr. Adcock but he did remember the above facts without much effort.

I will continue to search out Renee Woerner. Let me know what you want done next?

Thanks,
Michael Powers

No. 899961

EXHIBIT
5A

State Supreme Court

Motion For Permission to File Supplemental Brief

SCCC Legal

No. 89906-1

THE SUPREME COURT
STATE OF WASHINGTON

In re Personal Restraint
Petition of:

MATTHEW R. RUTH,

Petitioner.

MOTION FOR PERMISSION TO FILE SUPPLEMENTAL BRIEF; RAP 1.2(a)

---

## 1. INTRODUCTION

On 9-25-14 this most Honorable Court published the next wave of public trial right cases. Four of the new cases are material to Mr. Ruth's pending RAP 13.5A, Motion for discretionary review. The following four cases are in favor of granting Mr. Ruth's RAP 13.5A for review: State v. Koss No. 85306-1 (2014); State v. Smith, No.85809-8 (2014); State v. Slert, No. 87844-7 (2014); State v. Frawley, No. 80727-2 (2014). An Equal, Fair, and Just decision cannot be made without considering how these cases apply to Mr. Ruth's claims. Mr. Ruth asks this Most Honorable Court to please grant permission to file his very important supplement brief.

## 2. ARGUMENT ON WHY MOTION SHOULD BE GRANTED

The Smith & Koss decisions are in favor of Mr. Ruth's two Public trial Right claims. The First closure occurred during the daily trial recess and Juan type "Substantial Government Interference" was discussed off-the-record at Sidebar & in Chamber. The Second closure occurred during jury deliberations and the record proves Defense Counsel, nor Mr. Ruth were notified of the unusual jury inquiry involving factual disputes.

A. SMITH DEFINES THE PROPER SCOPE OF CHAMBER DISCUSSIONS

THE FIRST CLOSURE: The proceeding being challenged in Mr. Ruth's case occurred during the daily trial recess and lasted 28 minutes. At 2:54 p.m. DPA Adcock went into the hallway to speak to his next witness, Renee M. Woerner. In the hallway a confrontation occurred where DPA Adcock called Ms. Woerner a "Stupid Bitch" Several times; physically assaulted her leaving bruises; and DPA Adcock threatened to charge Ms. Woerner with Perjury "If She Testified" to the complete truth. This altercation was witnessed by the public. This altercation caused Trial Judge Hulbert to call a sidebar - although the jury was not present - then from the sidebar counsels and Judge Hulbert went into Chambers, and exited into a sidebar. Excluded from the two sidebars & in chambers discussion was the public and Mr. Ruth. Judge Hulbert did not perform the required Bone-Club Analysis.

The Smith decision flies right in the face of the Court of Appeals reasoning for rejecting Mr. Ruth's first claim. "Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it 'expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor.'" No. 68380-2-I/3.

The Smith decision is the alleged missing relevant authority. The Smith court defined the proper scope of sidebar & chamber discussions, and proves that mundane scope was exceeded in Mr. Ruth's case. Although the lead in Smith did hold that traditional mundane sidebars do not implicate the public trial right a warning was given in footnote 10:

"We caution that merely characterizing something as a 'sidebar' does not make it so. To avoid implicating the public trial right, sidebars must be limited in content to their traditional subject area, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record. Whether the question is actually a sidebar is part of the experience prong inquiry and is not subject to the old legal-factual test." No. 85809-8/9. Justice J.M. Johnson instructed that the Smith analysis does not change for in chambers discussions. F.N. 3.

Similarly, the Slert majority applies the same test to chambers discussions, "The experience and logic test is also a useful analytical tool for determining whether a discussion may be held in chambers." No. 87844-7/11. Mr. Ruth asserts that the Smith analysis applies to the substance of the discussion in the two sidebars and in chamber conference.

Another critical factor to Mr. Ruth's case is the distinction made between Smith & Rovinsky v. McKaskle:

"The sidebars here are further distinguishable from the motions in Rovinsky because there is a video and audio recording. Any inquiring member of the public can discover exactly what happened at sidebar." No. 85809-8/11.

Unlike Smith, Mr. Ruth's case is on all fours with Rovinsky. In Mr. Ruth's trial no switch existed that Judge Hulbert flipped to record the hallway confrontation, sidebars, and chambers discussions. In fact Judge Hulbert did not even call for the court reporter to make a contemporaneous record of what transpired at the sidebars & in chamber discussions. Mr. Ruth & the Public had to rely on a "Real quick" summary, that defense counsel Stephens characterized as "More or less" what occurred. RP 180.

As in Mr. Ruth's case, in Rovinsky sidebars led into chambers. The chambers conference in Rovinsky is "similar in nature" to the in chambers proceeding that Mr. Ruth is challenging because the result is the same. The result in Rovinsky merely limited the right to cross-examination. The result in Mr. Ruth's case, is that the right to cross-examine Ms. Woerner was completely denied. Both Smith & Rovinsky support Mr. Ruth's position that any hearing regarding Mr. Ruth's Face-to-Face Constitutional Protection and where "Substantial Government Interference" is being discussed, must be done in open court, not in a secret sidebar and chamber conference.

The Smith decision proves that the substance of the in chamber discussion determines whether the public trial right is implicated, not the label given to the discussion. In rejecting Mr. Ruth's issue Division One adopted the trial Judge's label "witness scheduling," and completely ignored the substance of the discussion. Mr. Ruth proves in the Supplemental Brief, that the record clearly establishes that "Substantial Government Interference" was being discussed in chambers; and that Mr. Ruth's confrontation and Appear & Defend rights were in jeopardy by the secret hearing because the state introduced Woerner hearsay through the substance of the state witnesses testimony.

The new three prong Smith test is very important to Mr. Ruth's claim because of the emphasis that is placed on producing proper record to prove the closure. As Mr. Ruth points out in the supplemental brief the lower court ignored the direct record and off-the-record evidence of facts Mr. Ruth offered that proves his claim. The On & Off-the-record evidence that Mr. Ruth submitted, proves that a confrontation did occur in the hallway; that confrontation was discussed in sidebar & in chamber; and resulted in Ms. Woerner needing to be appointed an attorney because she was scared of the consequences of DPA Adcock's threats.

i. DIVISION ONE TRADES BASIC FAIRNESS FOR BARE ASSERTIONS

The Smith Court instructed the lower courts to apply the guiding principle to both prongs of the experience and logic test. No. 85809-8/6-7. However, the guiding principle was not applied to either prong in Mr. Ruth's case, but rejected as a "bare assertion." No. 68380-2-I/3. Contrary to the guiding principle Division One Stated that, "Ruth claims 'the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor.' Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions." No. 68380-2-I/3. The guiding principle is "Whether openness will 'enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" Smith, No. 85809-8/6-7. In Mr. Ruth's case Division One labeled the guiding principle a "bare assertion," and completely ignored the Basic Fairness inquiry.

ii. THE FRAWLEY MAJORITY REJECTED A DE MINIMIS STANDARD

Although, the Division One Acting Chief Judge (ACJ) did not specifically say a De Minimis standard was applied to Mr. Ruth's case, it is implied, for the following reasons:

1.) The ACJ made a big deal out of the word "briefly" used by the trial Judge, "Briefly, the attorneys and the trial judge met in chambers to discuss scheduling." No. 68380-2-I/3;

2.) "Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record." No. 68380-2-I/3. The ACJ obviously believes that the "real quick" summary placed on the record after the illegal closure, cured the public trial right violation. The ACJ placed an undue emphasis on that summary, and ignored everything defense counsel Stephens said in that summary. RP 180-81. The Summary is taken out of context by the isolation the ACJ applies. The Substance cannot be analyzed by this isolation tactic.

The ACJ obviously applied a De Minimis standard of review to Mr. Ruth's Public trial right challenges. In State v. Frawley, No. 80727-2 (2014), the Majority pointed out that a De Minimis Standard is unconstitutional, under the Washington State Constitution; and that this type of standard has been consistently rejected in Washington State. Next, the Frawley majority pointed out that a De Minimis standard is in conflict with the structural error standard that is applied to a Public Trial Right claim. The reason being that a De Minimis standard requires a showing of prejudice. Mr. Ruth asserts that the ACJ erroneously applied a De Minimis Standard to his Public Trial Right claims.

This Court should grant review of Mr. Ruth's case not only because he should have won in the Appeals Courts, but because Mr. Ruth's case presents the perfect facts to provide further guidance on how to properly determine if a Public Trial Right violation has occurred.

B. WHERE KOSS FAILS MR. RUTH SUCCEEDS

THE SECOND CLOSURE

Mr. Ruth demonstrated in his Supplemental Brief that unlike the record in Koss, the record in Mr. Ruth's case clearly proves that defense counsel & Mr. Ruth were not notified of the jury inquiry as is required by CrR 6.15(f)(1). The Jury submitted an inquiry during deliberations, one hour and six minutes, after Mr. Ruth was taken back into isolation segregation. The inquiry/response proceeding only lasted 3 minutes (4:12 - 4:15 p.m.). Mr. Ruth was in custody unlike Koss & Jasper. Also, unlike Koss, Mr. Ruth did properly present the following claims: (1) The Trial Court did not follow the CrR 6.15(f)(1) procedure; (2) Mr. Ruth was completely denied counsel; and (3) Mr. Ruth's Rights to "Appear & Defend" were violated.

The Koss decision makes clear that Division One adjudicated Mr. Ruth's claim contrary to the holding in Sublett. The ACJ erroneously interpreted the Sublett holding as:

"In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question. Sublett, 176 Wn.2d 75-78. Ruth fails to demonstrate a violation of his public trial right involving the jury question." No. 6830-I-2/3.

The Sublett Court did not make that holding, in fact, the Sublett court only held that an in chamber consideration of a jury inquiry, by defense counsel & the trial judge, regarding the jury instructions, does not implicate the public trial right. Division One resolved Mr. Ruth's claim contrary to clearly established State Supreme Court precedent. In Mr. Ruth's case the jury inquired about the police statements of Renee M. Woerner and the alleged victims.

Next, in F.N. 1 of Mr. Ruth's decision, the ACJ erroneously required Mr. Ruth to prove prejudice from the complete denial of Counsel claim, although, that error is structural. "Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief." No. 68380-2-I/2 F.N. 1. In Frawley Justice Wiggins stated that the complete denial of counsel will always be considered structural. No. 80727-2/9, 18. Justice Wiggins position is consistent with Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009).

The Koss decision is very important to help this most Honorable Court in their decision in whether to grant review of Mr. Ruth's Rap 13.5A.

Conclusion

Mr. Ruth asks that this most Honorable Court please grant permission to file his Supplemental Brief. The Supplemental Brief is necessary to promote the interest of justice. RAP 1.2(a). The appellate rules may be waived to promote justice. The new wave of Public Trial Right cases are critical to Mr. Ruth's case.

Respectfully Submitted,

9-23-14

X [signature]

MATTHEW R. RUTH PRO SE LITIGANT

Exhibit
Six

Motion to modify
RAP 17.7

(AAG Exh. 23)

Received
Washington State Supreme Court
FEB - 6 2015
Ronald R. Carpenter
Clerk

No. 89906-1

IN THE STATE SUPREME COURT OF WASHINGTON STATE

In the Matter of the
Personal Restraint Petition of:

MATTHEW ROBERT RUTH,

Petitioner.

MOTION TO MODIFY DEPUTY COMMISSIONER'S RULING; RAP 17.7

## 1. IDENTITY OF MOVING PARTY

Pro se litigant, Matthew R. Ruth, asks for the relief designated in Part 2.

## 2. STATEMENT OF RELIEF SOUGHT

Modify the ruling of the Deputy Commissioner filed on 12-5-14. (Appendix "A" Order denying review). In direct conflict with Koss, Smith, and Sublett, the Deputy Commissioner denied review of Mr. Ruth's Motion for Discretionary Review; RAP 13.5A. This most Honorable Court should grant review because Mr. Ruth met his burden under RAP 13.4(b).

## 3. FACTS RELEVANT TO MOTION

Mr. Ruth objects to the Deputy Commissioner's version of the facts because they are contrary to the record and evidence of off the record facts submitted as exhibits in the PRP & RAP 13.5A. The Facts & Exhibits are set out in Section D (Pg 7-11) of the original motion to the commissioner. (Appendix "B" STATEMENT OF THE CASE IN ORIGINAL RAP 13.5A).

EXHIBIT 23

Mr. Ruth's "Motion for Permission to File Supplemental Brief" was granted. (Appendix "C" Motion for Permission). In the "Supplemental Brief" Mr. Ruth incorporated the relevant facts into part 3, "Argument on why review Should be Granted." Mr. Ruth asks this court to please reference the facts & Exhibits on pages 4-5, 8-10, 12-15, 18-20. (Appendix "D" Supplemental Brief). The deputy commissioner completely ignored the "Supplemental Brief" in reaching the decision to deny review.

Mr. Ruth must incorporate the "Table of Contents" & "II. Relevant Facts" set out in the "Petitioner's Reply Memorandum to State's Supplemental Response to Personal Restraint Petition." (Appendix "E" Facts COA# 683802-I).

A. THE DEPUTY COMMISSIONER COMPLETELY MISSTATES THE FACTS & LIES

On Nov 5th, 2003, two armed domestic terrorists, Jeremy Custer & Drew Eden, invaded Mr. Ruth's home in direct violation of Wash. Const. 1 § 7. Mr. Ruth exercised his Wash. Const. Art. 1 § 24 right to use a firearm in defense of himself, Ms. Woerner, and property, when non-lethally shooting the two home invaders. Who were going to do "whatever it took" to search Mr. Ruth's Home. RP 142. Mr. Ruth had no criminal history before being attacked in the safety of his own home, for allegedly stealing Jeremy Custer's drugs and because Renee M. Woerner (Mr. Ruth's then-girlfriend) snitched on the alleged victims, for dealing drugs & money laundering. RP 113-17, 174, 207, 223-25, 241-47, 250-53, 263, 267, 281.

Ms. Woerner was one of only four people inside of Mr. Ruth's home during the shooting. At the beginning of trial DPA Adcock informed the jury that Ms. Woerner was a state's witness. RP 15-16. DPA Adcock stated that Ms. Woerner is "a crucial witness. Given the facts in this case, there was no doubt about that." RP 9-10.

Before the Public Trial Right violation occurred, that resulted in the State being relieved of their duty to present Ms. Woerner to the Jury & the Public for the defense to Cross-Examine. The State introduced only the adverse portions of Ms. Woerner's "police statement" through the substance of the states witnesses' testimony. RP 137, 164, 200, 207, 228. The state relied heavily on Ms. Woerner in their case in chief, especially, in closing arguments. RP 294-95, 297-301, 309. Mr. Ruth was not allowed to rebut any of the Woerner hearsay, nor challenge the portions of the alleged victims testimony that used Ms. Woerner substantively. RP 247, 266-67. This prejudiced the entire trial.

The first violation started in the hallway during the afternoon recess, when DPA Adcock was conferring with his next witness, Ms. Woerner. The <u>Coy v. Iowa</u> & Wash.Const.Art 1 § 22, Face-to-Face safeguard kicked in, and Ms. Woerner refused to further lie for DPA Adcock. 108 S.Ct. 2798, 2803. The trial Spectators witnesses DPA Adcock assault Ms. Woerner. (Exh. 1 P.I. Interview of Woerner & Slothuag). DPA Adcock dragged Ms. Woerner from public view and threatened to charge her with perjury if she testified, contrary to RCW 9A.72.060. (Exh. 2 Sworn Statement of Mark Stephens). Matthew R. Stroud I, a trial Spectator, followed DPA Adcock back into the courtroom. Mr. Stroud I, states that he heard DPA Adcock lie to the Court & defense counsel Stephens when claiming Ms. Woerner intended to perjure herself. Mr. Stroud I, told Mr. Stephens what transpired in the hallway, then Mr. Stephens left to speak to Ms. Woerner. (Exh. "3" Affidavit of Mr. Stroud I).

On pg. 2 of the "Order Denying Review" the Deputy Commissioner lies when stating:

"Defense counsel then spoke with Ms. Woerner, and she told him that the prosecutor had warned her of consequences of committing perjury."

That is a flat out lie! In fact please read Appendix "E" pg. 1 & 3, Mr. Ruth proved to the Court of Appeals that DPA Blackman misrepresented the same fact by omitting the words "If She Testified" from the end of "had threatened to charge her with perjury." Defense Counsel Stephens stated:

> Ms. Woerner appeared agitated, emotionally erratic, and extremely upset.
>
> She indicated to me Mr. Adcock had threatened to CHARGE her with PERJURY IF SHE TESTIFIED.
>
> She EXPRESSED concern to me about the potential LEGAL CONSEQUENCES IF SHE TESTIFIED.
>
> I indicated I could not advise her and suggested she seek appointed counsel to answer her questions.
>
> (Exh. 2 Sworn Statement of Mark Stephens)

Why is everyone ignoring what actually happened? This is more than enough for a reference hearing. Ms. Woerner did not say DPA Adcock merely WARNED her. In fact, read her interview with private investigator Michael Powers, she also says that DPA Adcock called her a Stupid Bitch and assaulted her. This is corroborated by her father. (Exhibit "1" P.I. Interview of Ms. Woerner). During the Stephens interview, Ms. Woerner was also concerned of the consequences of DPA Adcock's threats, if she testified. Mr. Stephens adivsed her to obtain counsel. (Exh. "2" Mark Stephens). Mr. Stephens went directly to Judge Hulbert with this information from Ms. Woerner. (Exh. "4" Affidavit of Matthew R. Ruth). The Judge called a sidebar and from sidebar both counsel & Judge Hulbert disappeared into chambers. Why call a sidebar when the jury is not present?

The Deputy Commissioner misstates the record again when claiming "Defense counsel confirmed to the court that the events as related by the prosecutor had occurred ...." Appendix "A" at 2.

Nothing could be further from the truth, as can be seen from Mr. Stephens' sworn statement. (Exh. "2" Mark Stephens). Mr. Ruth proves this on pages 8-9 of the original motion. (Appendix "B" RAP 13.5A). Mr. Ruth points out that "Not only does Mr. Stephens dispute that this was what was discussed In-Chambers, the context of the perjury threat, and that this was all that was said to Ms. Woerner in [the sworn statement of Mr. Stephens exh. 2], but also on the record:

I just might add that's more or less, what's happen .... She indicated concerns about comments Mr. Adcock made. She indicated the word perjury was used. I don't know what context that was in. RP 180."

Mr. Stephens disputed the context the word "Perjury" was used in, and added that Ms. Woerner was concerned about "Comments" DPA Adcock had made. This Court knows from Exh. 1 & 2, that those comments were threats to charge her with perjury, if she testifies, and DPA Adcock called her a "STUPID BITCH" several times. (Exh. 1 pg. 2-3)(Exh. 2 pg. 3 paragraph 10)(Exh. "5" pg. 2 paragraph 5 & pg. 11). This is of great public interest and presents significant constitutional questions. In Re Disciplinary of Bonet, 144 Wn.2d 502 (2001); U.S. v. Juan, 704 F.3d 1137 (9th.Cir. 2013).

Mr. Ruth did not find out about the Juan-type misconduct until he testified the next day. "When Mr. Ruth tried to make record of the threats, and account for the absence of Ms. Woerner, in front of the jury, Judge Hulbart threatened to place Mr. Ruth in restraints. RP 266-67. The point of that threat is unclear because Mr. Ruth even if restrained, is entitled to testify." See Motion for Discretionary Review at 17; (Exh. "4" Matthew r. Ruth);(Exh. "5" Affidavit & Pro Se Motion for New Trial that Mr. Ruth attempted to file at the original 2 A/05 sentencing).

B. WOERNER'S STATEMENT IS THE ONLY EVIDENCE CORROBORATING MR. RUTH'S DEFENSE

Through the substance of the State witnesses' testimony, the Jury & Public were only introduced to the adverse portions of Ms. Woerner's "Police Statement" that corroborated certain portions of the alleged victims version of events. RP 121-23, 125-26, 137, 161, 164, 200-03, 207, 228, 247, 294-95, 297-301, 309; (Appendix "D" pg. 5, 9-10, 12-15, 18); (Appendix "F" pg 2-6). The reason this is prejudicial is because Ms. Woerner's "Police Statement" is the only evidence that corroborated Mr. Ruth's defense and disputed key portions of the alleged victims testimony. (Appendix "B" Pg. 10-11); (Appendix "D" Pg. 14-15, 18); (Appendix "F"); (Exh. "1" Rene Woerner). The first public trial right violation covered up the <u>Juan</u>-type "Substantial Government Interference" and exculpatory portions of Ms. Woerner's statement. Mr. Ruth can only challenge the other State witnesses' testimony and elicit the substantively exculpatory portions of Ms. Woerner's "Police Statement" through cross-examination.

The Deputy Commissioner repeated the same prejudicial error by completely ignoring the exculpatory Woerner facts in the "Police Statement" and stating:

> "Ms. Woerner had previously given a sworn statement to police and the prosecutor corroborating the victims' account of events."
> Appendix "A" at 2.

Here is one example of Ms. Woerner's "police Statement" disputing the alleged victims. In anticipation of Ms. Woerner's testimony, DPA Adcock asked Jeremy Custer why he said "No Cops," Mr. Custer replied:

"Because honestly, I didn't — he had been a friend and I didn't know if he was just not thinking. Kind of the same reason I said, 'you're shooting me.' Like do you understand what you're doing? You know. I didn't have the anger, I guess, to — you know. I knew he was going to get in a lot of trouble." RP 137.

In Ms. Woerner's 12-11-03 Police Statement she stated:

"Woerner: Jeremy said 'No Cops' ... went in the house, grabbed a black garbage bag which I've seen that he had a pound of weed in it before so that's what, he grabbed the garbage bag and he said 'no cops' like that ...

Det. Willoth: Why did you go with him [Ruth]?

Woerner: Because I didn't want to get shot by drug dealers ... I can't think of a fancy lie or anything, that's all. I just didn't wanna to get shot by drug dealers. And cuz Jeremy said 'NO COPS' when he left. Uh, it scared me ... and because She had called Jeremy's phone I was, I was, I was concerned that these people these drug dealers were gonna come shot me over a pound of weed? But all this weird stuff had happened and it was stressful. (Exh "7" 25, 28-29)." (Appendix "D" Pg. 14-15).

Without cross-examination, Mr. Ruth was unable to defend against Mr. Custer's account of why he said "No Cops," which is clearly different than Ms. Woerner's account. Mr. Ruth has proven with Ms. Woerner's "Police Statement" that the Deputy Commissioner's above factual account is not accurate and is very misleading. See Appendix "B" pg. 10-11. The two Public trial right violations that occurred in Mr. Ruth's case prevented the Jury & the Public from assessing the portions of Ms. Woerner's "Police Statement" that corroborated Mr. Ruth's testimony.

Contrary to the Deputy Commissioner's implications, Ms. Woerner's anticipated testimony was not merely cumulative of other witnesses. Kandy Corder testified that Mr. Ruth & Ms. Woerner were drug addicts. RP 207. The State used Ms. Corder's testimony substantively in closing, and Mr. Ruth could not defend against it without Ms. Woerner. RP 299-301, 313-14. In Ms. Woerner's "Police Statement" she stated:

"Jeremy didn't come home ... that morning .... The morning of the incident he was all kinda, I think he was kinda messed up. He hadn't had any sleep, pg. 12. There were days he'd do all kinds of drugs. They'd do meth, meth, crystal whatever. They had mushrooms ... They were snortin coke ... All of them .... Jeremy, dan, when, when that day of this incident Dan had big old sores all over his face, pg. I looked out the window and they're kinda serious. Then they come up to the trailer, pg. 16. Matt [Ruth] was like man check this out. There's a pound of weed missing and they think I stole the shit, pg. 17. He called me and said that they were gonna chase me down. That cuz I know that the guy that drops off the, the drugs with uh, Jeremy, and he's an Asian guy, and I don't know what's gonna, I just got scared. Pg 2627. Det. Pince: You talk about there being lots of drugs used and around the place all the time. [Custer's apartment].

R. Woerner: Uh huh and underage girls all kinds of strange things .... I know they were selling them .... Zip sealed bags and everybody would get a backpack and they'd go about their thing .... Jeremy ... Continued to write these receipts ... so he could cover his tracks for tax purposes ... Matt [Ruth] had acquired quite a bit of crystal meth at one point from one of their friends, and they, everybody was all high .... he was selling little packages of this, of the meth. But mostly Jeremy and them were buying it from Matt so it was just this like this inner, little circle, pg. 38-39." (Appendix "B" Pg. 10-11).

During Mr. Ruth's direct-examination the defense attempted to rebut the States drug testimony and the Woerner hearsay, however, DPA Adcock testified in the form of an objection.

Mr. Adcock: Object to this line of testimony because it's not relevant. The testimony -- to this point about the shooting indicates there were no drugs present. How is this relevant? This is just an attempt to try to blame the victims or portray them in a negative light without any connection to the issues. RP 228, 295.

DPA Adcock objected every time Mr. Ruth attempted to rebut the Woerner drug accusations and lay a foundation for his self-defense claim. RP 221, 223-228. In dispute at trial was whether the alleged victims were drug dealers who carried guns, and whether they were high on crystal meth when they invaded Mr. Ruth's home. Both Custer & Eden claimed Mr. Ruth invited them into his home, and never asked them to leave. Mr. Ruth testified that they forced their way into his home, and he was screaming for them to leave the entire time. Ms. Woerner corroborated Mr. Ruth:

'Matt's going no you gotta get outta of the trailer. You can't go through my shit, Pg. 18. He'd just be like well I told you to get out, pg. 19. The gun was in the cabinet .. he pulled it out and went like this [cocked it]. And I think he stuck it in his pants ... and Matt was like you gotta go man, you gotta get outta my house. You can't do this shit. Pg. 20.

Mr. Custer & Mr. Ruth lived across from each other. Mr. Custer was seen placing garbage bags in his Durango. Mr. Custer then disappeared from the crime scene for many hours. Mr. Custer testified that the bags were full of equipment. Mr. Ruth testified the bags were full of drugs. Ms. Woerner Stated "Lou is the guy who they get pounds of weed from .... brings the bag, the garbage bag that Jeremy took to the Durango. pg. 40." (Appendix "B" 11).

C. THE FIRST PUBLIC TRIAL VIOLATION CAUSED THE SECOND VIOLATION WHEN JUDGE HULBERT PREVENTED MR. RUTH FROM REBUTTING THE WOERNER HEARSAY

The jury also heard testimony from State witnesses regarding Mr. Ruth & Ms. Woerner's relationship and Ms. Woerner's alleged actions during the shooting. RP 164, 200, 207. For example, after being asked by DPA Adcock what Ms. Woerner "Was doing during all this?" Drew Eden replied "I remember her being freaked out ... and she was saying, like 'Matt [Ruth], stop. Stop." RP 164. After the Juan-type "Substantial Government Interference" was covered up in the shadows of the Judge's chambers, and relieved the state of presenting Ms. Woerner for cross-examination, Mr. Stephens asked Mr. Ruth the same question. However, DPA Adcock objected. RP 247. In front of the jury Mr. Stephens explained to Judge Hulbert that DPA Adcock had used Ms. Woerner in their case-in-chief. Judge Hulbert commented on the evidence stating that was not his recollection and instructed the jury to make their own "Conclusion about their recollection," while sustaining the objection. RP 247.

Judge Hulbert's instruction to the Jury caused the second Public Trial Right violation, and the first denial of counsel violation. The reason being that during deliberations the jury tried to draw their own conclusion about the Woerner hearsay based on the one-sided version presented by the state. The Jury must have been confused because the they submitted an inquiry to the Judge asking for Ms. Woerner's "Police Statement." (Exh. "6" Jury Inquiry). Both the Jury inquiry and the trial minutes prove that Mr. Ruth and defense counsel were not notified of the inquiry. Judge Hulbert formulated the response to the jury inquiry in less than three minutes. (Exh. "7" Trial minutes).

## 4. GROUNDS FOR RELIEF AND ARGUMENT

### A. THE DEPUTY COMMISSIONER OPINION IS CONTRARY TO THIS COURTS SUBLETT AND KOSS DECISIONS

The Deputy Commissioner incorrectly stated that the "Consideration of and responses to jury inquires are not subject to the right to a public trial. Sublett, 176 Wn.2d at 77-78." (Appendix "A" Pg. 4). This Court in Sublett did not make that holding, in fact, "the Sublett Court only held that an in chamber consideration of a jury inquiry, by defense counsel & trial judge, regarding the jury instructions, does not implicate the public trial right." (Appendix "C" Motion for Permission to File Supplemental brief at 7).

Mr. Ruth demonstrated in his supplemental brief that unlike the record in Koss, the record in Mr. Ruth's case clearly proves that defense counsel and Mr. Ruth were not notified of the jury inquiry as is required by CrR 6.15(f)(1). Mr. Ruth also raised a denial of counsel claim, and argued that in Frawley Justice Wiggins stated that a complete denial of counsel will always be considered structural. No. 80727-2 ℘, 18. Justice Wiggins position is consistent with Musladin v. Lamarque, 555 F.3d 830, 841-44 (9th Cir. 2009). The Deputy Commissioner completely ignored this argument.

The trial minutes show every time Mr. Ruth (in custody) and defense counsel Stephens are present. On page 9, at 3:00 p.m. "the jury retires to deliberate upon their verdict." At 3:06 "Court in recess." (Exh. 7). Mr. Ruth was returned to segregation. One hour and six minutes later at 4:12 p.m. on 12-8-04, the jury submits a written inquiry requesting transcripts of the Renee Woerner, Jeremy Custer, and Drew Eden police interviews. Three Minutes later at 4:15 p.m. the trial Judge respond in writing that "The evidence requested by the jury was not admitted into evidence and is not available to the jury during deliberations. Thank you." (Exh. 6 & 7).

"It is physically impossible to notify the parties in three minutes. Notification is mandatory pursuant to crR 6.15(f)(1)." (Appendix "D" Supplemental Brief at 20). Mr. Ruth has an absolute right to participate in the formulation of the response. Musladin at 841-44. "In Jasper proper record was made that 'all counsel/parties [had the] opportunity to be heard.' 174 Wn.2d 96 (2012). The record proves Mr. Ruth & Counsel were deprived of 'an opportunity to comment upon the appropriate response.' CrR 6.15(f)(1)." (Appendix "D" at 20).

The Deputy Commissioner again erroneously stated:

"Mr. Ruth complains that the trial court did not follow the procedures for answering jury inquiries specified by CrR 6.15(f)(1). But again, this has nothing to do with the constitutional right to a public trial. Any interest under the public trial right are protected by the placement of the inquiry and the response in the public record, as the trial court did here."
(Appendix "A" at 4).

The Deputy Commissioner is way off base "Pursuant to CrR 6.15(f)(1) the trial Judge must make record that all the parties were notified and participated in the formulation of the response. This Court must send a message to the trial courts regarding the importance of that duty. Mr. Ruth asserts that CrR 6.15(f)(1) is the functional equivalent of the Bone-Club analysis during deliberation, that triggers upon inquiry. Simply filing the response in open court does not cure the violation of Mr. Ruth's Rights to public trial, Counsel, Appear & Defend, and Fair Trial. Since the Sublett Court reduced the public trial rights to CrR 6.15(f)(1), the Judges failure to make record of notification to the parties, is a closure that can never be justified." (Appendix "D" at 20).

The Deputy Commissioner stated:

"And to the extent Mr. Ruth claims error based only on the failure to strictly follow the rule, he demonstrates no actual and substantial prejudice stemming from constitutional error." (Appendix "A" at 4).

In Koss this Court points out that Chief Justice Madsen and Justice Stephens both share the opinion that a "deviation from CrR 6.15(f)(1) implicates constitutional protections." Koss, No. 85306-1/9 n.4. Mr. Ruth argued that the Ninth Circuit in Musladin held that it is the missed opportunity to participate in the formulation of the response that creates the critical Stage. Since, the jury inquiry was not about the jury instruction Musladin controls and the deviation from CrR 6.15 violates Mr. Ruth's right to be represented by counsel at a critical stage. Mr. Ruth also argued that he has a State Constitutional right to "Appear & Defend" and pursuant to State v. Irby, 170 Wn.2d 874, 885-86, fn 6 (2011), that right triggers under the chance that a substantial right may be in jeopardy. Mr. Ruth's right to counsel and public trial rights are substantial.

The Jury inquired about evidence not admitted in trial because of DPA Adcock's "Substantial Government Interference" and the In-Chambers closure that covered up the Juan violation. "The Substance of the jury's request-for evidence not admitted at trial ... [is] highly unusual." Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008). Since no Bone-Club analysis was conducted the Public & Ms. Woerner were unable to object & make record of the Juan violation. "The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The Ends of Justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depends on a full disclosure of all the fact." Taylor v. Illinois, 404 U.S. 400, 108 S.Ct. 646, 652-53 (U.S.Ill.1988).

The jury inquiry proves that Mr. Ruth's Confrontation, Compulsory, and Fair Trial Rights were violated by the first public trial violation. A conclusive presumption of prejudice is established when the jury followed Judge Hulbert's instructions (RP 247), and attempted to draw their "own conclusion" about the adverse Woerner evidence. That conclusion was drawn without Mr. Ruth being able to defend against the adverse Woerner evidence in direct-examination, and with cross-examination of Ms. Woerner. Rovinsky v. McKaskle, 722 F.2d 197, 198 (5th Cir. 1984); State v. Stentz, 30 Wash. 134, 70 p. 241, 243 (Wash.1902).

Mr. Ruth was stripped of the ability to defend against DPA Adcock's biased & untruthful one-sided adverse version. This created a Manifest error under RAP 2.5(a)(3) because the Juan violation that was covered up in chambers combined with the above prejudicial ruling from Judge Hulbert prevented Mr. Ruth from defending against the Woerner hearsay, and from presenting Mr. Ruth's theory of self-defense. RP 179-81, 207, 221, 223-38, 247, 266-67, 294-95, 297-301, 309.

If Mr. Ruth would have been allowed to participate in the formulation of the response, Mr. Ruth would have requested that the exculpatory portions of Ms. Woerner's "Police Statement" were allowed to be admitted to the jury. Mr. Ruth is entitled to have the exculpatory portions of Ms. Woerner's "Police statement" submitted to the jury for deliberations. Mr. Ruth has proven actual & Substantial Prejudice. Without Ms. Woerner's testimony or exculpatory portions of her "Police Statement" the State was allowed to be an architect of the trial, and convict Mr. Ruth based on only the adverse portions of Ms. Woerner's statement. If the jury would have heard Ms. Woerner's evidence Mr. Ruth would have been acquitted, the jury inquiry proves that Ms. Woerner's absence affected the verdict and tainted the entire fact-finding process.

Mr. Ruth has proven a conclusive presumption of innocence and should be given direct review. Mr. Ruth has met the standard in RAP 2.5(a)(3). Please read Kristine A. Kain's interview with jury Member Leslie Winney. (Exh. "8" Interview of Mr. Winney). Mr. Ruth asks that this court reverse and remand for a new trial, or dismiss all charges with prejudice.

B. THE DEPUTY COMMISSIONER DID NOT FAIRLY DETERMINE WHAT PROCESS IS SIMILAR IN NATURE TO THE PROCEEDING BEING CHALLENGED MR. RUTH ASKS THIS COURT GRANT REVIEW AND GIVE GUIDANCE ON HOW TO MAKE A FAIR SIMILAR IN NATURE COMPARISON WHEN CONDUCTING THE EXPERIENCE & LOGIC TEST

The Deputy Commissioner unfairly labeled the proceeding being challenged as "what witnesses the prosecutor or defense counsel intends to call, and the reasons for calling or not calling a witness." (Appendix "A" at 3). Mr. Ruth asks this court to announce a rule that gives guidance on how to properly make a fair similar in nature comparison. Mr. Ruth asserts that the reviewing court must (1) look at what rights are implicated in the proceeding; and (2) what impact the result of the closure had on the implicated rights, to determine the Similar nature for comparison. Mr. Ruth argues that the proceeding being challenged in his case is similar in nature to three different processes: (1) a Juan-type violation; (2) A Berrysmith perjury hearing; and (3) A Rovinsky hearing that prevented cross-examination of a a crucial State witness.

i. THE JUAN-TYPE VIOLATION

The Deputy Commissioner added an additional element to the Juan test that the Ninth Circuit does not require. The Deputy Commissioner erroneously believes that Defense Counsel Stephens feeling are determinative of a Juan Violation. 'Defense Counsel did not claim that the prosecutor had interfered with Ms. Woerner's testimony, and he did not request a hearing to explore the matter, which if held presumably would have been open." (Appendix "A" at 3).

In Juan the Ninth Circuit only requires that Mr. Ruth "demonstrate by a preponderance of the evidence that the totality of the circumstances proves that DPA Adcock's perjury warnings or threats were expressed to the witness, and the substance of that communication had the potential to affect whether the witness testifies, or alter the testimony. Juan at 1190. Defense Counsel stated that Ms. Woerner was emotionally erratic and concerned of the potential legal consequences of the prosecutor threats, if she testified. (Exh. 2). Mr. Ruth had met the Juan test.

The in-chambers hearing was caused from the Juan-type "Substantial Interference." The record clearly proves this was the topic of the In Chambers conversation. RP 179-81. The fact that "Substantial Government Interference" was resolved in the shadows of the judge's chambers, is proven by:

(1) Judge Hulbert agreeing that appointing Ms. Woerner counsel was "Fair enough," RP 180-81; and

(2) During sentencing, after new defense counsel Mr. Dold asked for a continuance to interview Ms. Woerner so that he could file "a motion for new trial based on either prosecutorial misconduct, ineffective assistance of counsel, or denial of justice, any of the three," DPA Adcock responded "We have been through this before ... given the fact it won't change anything. I'd ask you to deny the motion for continuance. (2/4/05 Sentencing hearing RP 3-5, 6-7);(Appendix "E" Pg. 6-7).

The above second offer of proof flies in the face of The Deputy Commissioner's erroneous statement that "Defense counsel did not claim that the prosecutor had interfered with Ms. Woerner's testimony, and he did not request a hearing to explore the matter, which if held presumably would have been open." (Appendix "A" at 3).

First, Mr. Stephens did express that DPA Adcock had interfered with Ms. Woerner's testimony and requested that she be appointed counsel before he decided whether he would call her as a witness. RP 179-81. The duty to present to the jury & Public, what DPA Adcock deemed "a crucial witness" (RP 15-16), is not Mr. Ruth's. That burden is on DPA Adcock. Any proceeding that switches the burden to call Ms. Woerner on the defense violates Mr. Ruth's Right to cross-examine Ms. Woerner.

Second, the in chambers hearing was not recorded, so nobody knows whether defense counsel requested a hearing to explore the matter and, according to DPA Adcock in chambers, the parties did go through motions for denial of justice and prosecutorial misconduct. (2/4/05 Sentencing Hearing RP 6-7).

Finally, If Judge Hulbert would have conducted the Bone-Club Analysis, the public and Ms. Woerner would have objected to the closure, and made record of the hallway assault & threats. In the Motion for Discretionary review, Mr. Ruth uses affidavits from the public, Private investigator Interviews of the public, & Ms. Woerner, to give an accurate account of the proceeding that violated Mr. Ruth's Public Trial Rights. (Appendix "B" Pg. 7-11).

Mr. Ruth was denied the right to cross-examine Ms. Woerner due to the Juan-type (704 F.3d 1137) "Substantial Government Interference," that occurred off record (and was witnessed by the public) between DPA Adcock & Ms. Woerner. The Trial Judge cloaked this misconduct in the shadows of an In Chamber hearing & two sidebars. RP 179-81.

ii. BERRYSMITH HEARING IS HARMONIC WITH JUAN

Ms. Woerner was used substantively against Mr. Ruth, "it was the plain duty of the prosecution," to present Ms. Woerner to the jury. Strange v. People, 24 Mich. 1, 10 (1871). At common law a rule evolved in England in

the early nineteenth century that the prosecutor in felony cases was under a duty to call all eyewitnesses to the offense. 7 Wigmore, Evidence § 2079 (3d ed. 1940). The term Res Gestae witness indicates a witness who mist be called because they posses knowledge of part of the criminal transaction. 6 Wigmore, Evidence §§ 1767-69 (3d. ed. 1940). DPA Adcock cannot empowered to switch the duty of presenting a state witness on the defense merely by making a false perjury accusation.

This proceeding is similar in nature to State v. Berrysmith, 87 Wash.App. 268, 273, 944 P.2d 397, 401 (1997).

In Berrysmith the in chambers discussion was about whether defense counsel was entitled to withdraw from representing Mr. Berrysmith because counsel believed his client intended to commit perjury. Id. at 401. The in chambers discussion in Mr. Ruth's case is similar in nature to whether Ms. Woerner was intending to commit perjury. The Berrysmith court reasoned that the "true issue is whether Mr. Mulligan had a sufficient factual basis for his strong belief that perjury was intended and could not be dissuaded, so that continuing with representation would result in a violation of the rules of professional misconduct." Id. 401.

Ms. Woerner was not represented by any attorney, and the State used Ms. Woerner in their case-in-chief, so Mr. Ruth's confrontation & compulsory rights were at issue automatically making the in chambers hearing a critical stage. Mr. Ruth's right to "Appear & defense" are violated by being excluded from this hearing. The attorney in Berysmith had the burden to prove that the belief in perjury was reasonable, and that it could not be dissuaded.

Mr. Ruth argues that DPA Adcock has a duty in open court to meet this same burden because Mr. Ruth Fair Trial Rights are implicated by Ms. Woerner not be presented for Cross-examination. "Whether a lawyers belief is reasonable depends upon whether it had a firm factual basis. James, 48 Wash.App. 353, 366-67 (1987)(Gut level suspicion is not enough). Id. at 401-402.

"The reasonableness of DPA Adcock's perjury allegation is not at issue becaise he did not represent Ms. Woerner and she is not a criminal defendant. At issue is whether a firm factual basis for the perjury allegations existed, and if so, whether the perjury can be dissuaded. Mr. Ruth's Fair Trial rights depend on the State presenting Ms. Woerner to the jury because without her Mr. Ruth loses not only the State's endorsement of Ms. Woerner, but the powerful tool of cross-examination. If the defense has the burden to call Ms. Woerner, the State is empowered to impeach any portion of Ms. Woerner's testimony that is exculpatory to Mr. Ruth, while maintaining the integrity of the "Adverse" Woerner hearsay through the credibility of the State's witnesses. 1966 WASH.U.L.Q. 068, 081 (19966)." (Appendix "D" at 11).

To repress the crime of perjury prevention is better than cure "and the law of England relied, for this purpose, on the means provided for detecting and exposing the crime at the moment of commission, such as PUBLICITY, CROSS-EXAMINATION, and the aid of the jury." State v. Olson, 92 Wash.2d 134, 594 P.2d at 1340-41 (1979). Mr. Ruth has proved that history places any perjury accusation in the view of the public & jury. Mr. Ruth asks that this Court make a "Ruth Hearing" that requires the trial court to determine and make record of the warning or threat made by the prosecution, the affect it had on the witness, establish the factual basis for the perjury accusation pursuant to Barrysmith, and allow the accused & Public to make record. Mr. Ruth also asked that all warnings are given on the record by a third party.

iii. MR. RUTH WAS DENIED THE ABILITY TO CROSS-EXAMINE MS. WOERNER

In Slert this court added as an element of the Experience prong, whether observing the process will aid the public in assessing the guilt or innocence of the accused? No. 87944-7/3. Mr. Ruth proved in the facts section that Ms. Woerner's testimony was critical for the Jury & Public to determine Mr. Ruth's guilt or innocence. It is an "ancient proposition of law .... 'that the public ... has a right to every man's evidence." U.S. v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 3108 (1974). "The very integrity of the judicial system and public confidence in the system depends on a full disclosure of the fact." Taylor at 108 S.Ct. 653. "[T]he confrontation clause imposes a burden on the prosecution to present it witnesses, not on the defendant to bring those adverse witnesses into court." Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527, 2541, 557 U.S. 305 (U.S.Mass.2009). The more protective State Face-to-Face protection imposes a duty & obligation on the state to present a "Res Gestae witness" for cross-examination to:

(1) Avoid the suppression of evidence favorable to the accused; and

(2) protects the accused against false accusation by giving him the opportunity through cross-examination to elicit exculpatory evidence. U.S. v. Lopez 373 U.S. 427, 445 (1963).

Any proceeding that limits Mr. Ruth's right to cross-examination must be done in open court. Rovinsky Supra; Stentz Supra. The mundane scope of Sidebar & inchamers discussion was exceeded by the closed process for two reasons.

First, the public's observation would aid in determining Mr. Ruth's guilt or innocence. Second, had the Bone-Club analysis been conducted the second proponent would have produced objection from the public to the closure, and record of what occurred in the hallway confrontation. Mr. Ruth has

satisfied the Experience and Logic test. Unlike Smith, Mr. Ruth has demonstrated that the public has a specific interest that is served by being privy to the sidebars & in chamber proceeding being challenged. No. 85809-8/12.

The "Ruth Hearing" will play a positive role in the functioning of any proceeding involving a Juan violation that prevents cross-examination. Mr. Ruth is entitled to cross-examine Ms. Woerner in front of the jury about the threats of Mr. Adcock. "The Evidence of threats is necessary to account for the specific behavior of a witness, that if unexplained, could damage a party's case." U.S. v. Thomas, 86 F.3d 647, 654 (1996). This Court made a similar connection in Orange, when recognizing the particular harm of precluding the defendant's family from contributing to the jury selcetion. 152 Wn.2d at 812. The prospective jurors in Orange did not see family participation, but their "conspicuous exclusion from it." 152 Wn.2d at 809. This court cured that prejudice by attaching the public trial right safeguard, the same must apply to Mr. Ruth's confrontation rights.

Mr. Ruth relied heavily on protecting Ms. Woerner in his self-defense claim. However, the jury did not see the participation of his girlfriend in trial, just her "Conspicuous Exclusion." As Mr. Ruth's girlfriend it seems suspicious for her not to testify. If Mr. Ruth was testifying truthfully about defending her, would she not defend him? The Juan rule applied the Webb protection to the Confrontation Clause, and Mr. Ruth asks that this court attach the public trial right to the Juan rule and crate the "Ruth Hearing" to cure the prejudice in this case. The jury inquiry proves that the verdict is the result of speculation, conjecture, and only the adverse portions of MS. Woerner's "Police Statement."

Respectfully Submitted,

1-4-15

X ____________________

MATTHEW R. RUTH, Pro se litigant

EXHIBIT

7

THE COURT OF APPEALS
DIVISION
ONE
No. 68380-2-I

ORDER OF DISMISSAL

(AAG Exh. 17)

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**
**DIVISION ONE**

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 68380-2-I |
| MATTHEW ROBERT RUTH, | ORDER OF DISMISSAL |
| Petitioner. | |

Matthew Ruth has filed this personal restraint petition challenging his conviction in Snohomish County Superior Court No. 03-1-02451-6. In Ruth's direct appeal, the Supreme Court remanded the matter for resentencing based on the use of the phrase "deadly weapon" rather than "firearm" in the special verdict forms on the enhancements in State v. Ruth, 167 Wn.2d 889, 225 P.3d 913 (2010), and issued the mandate in May 2010. The trial court resentenced Ruth on December 8, 2010. Ruth did not appeal. Ruth filed the present petition on December 2, 2011, raising issues relating only to his 2004 jury trial. In particular, Ruth now claims that the trial court violated his right to a public trial and his rights to the presumption of innocence and a unanimous verdict.

In order to obtain collateral relief by means of a personal restraint petition, Ruth must demonstrate either an error of constitutional magnitude that gives rise to actual prejudice or a nonconstitutional error that inherently results in a "complete miscarriage of justice." In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). Bare assertions and conclusory allegations do not warrant relief in a personal restraint proceeding. In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828

EXHIBIT 17

P.2d 1086 (1992). Because Ruth has not made any showing that he can satisfy this threshold burden, the petition is dismissed.

Ruth contends the trial court violated his right to a public trial by answering a jury question in chambers and by holding a conference in chambers about the State's decision not to call a witness. The sixth amendment to the United States Constitution and article I, section 22 of the Washington Constitution, provide the accused with the right to a public trial. In re Pers. Restraint of Orange, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Certain proceedings must be held in open court unless the five factors listed in State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995) justify closing the courtroom. Orange, 152 Wn.2d at 808-11. The threshold question is whether, under the experience and logic test, the proceeding at issue implicates the public trial right. State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Under that test, courts consider (1) "whether the place and process have historically been open to the press and general public;" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Sublett, 176 Wn.2d at 73 (quotations omitted). In Sublett, the Supreme Court determined that the public trial right does not attach to the consideration of and response to a jury question. Sublett, 176 Wn.2d at 75-78. Ruth fails to demonstrate a violation of his public trial rights involving the jury question.[1]

[1] Ruth asserts that the trial court also violated his right to be present and his right to counsel by failing to hold a hearing before responding to the jury question. Because Ruth fails to identify any resulting prejudice, he cannot establish grounds for relief.

As to the conference in chambers regarding the witness, Ruth claims that the particular circumstances here implicated the public trial right. Briefly, the attorneys and the trial judge met in chambers to discuss scheduling. Later, in open court without the jury, the trial judge asked the prosecutor to memorialize the in-chambers conference on the record, "in an overabundance of caution, real quickly, because Mr. Ruth was not present." The prosecutor explained that he believed Ruth's girlfriend Rene Woerner would commit perjury if called to testify by the State, that defense counsel had also spoken with Woerner, and that the Office of Public Defense would be providing an attorney to advise Woerner.

Without citation to relevant authority, Ruth claims that the trial judge should have ended the chambers conference as soon as it "expanded into a substantive discussion of a potential witness and the interaction that had occurred between the witness and the prosecutor." Ruth claims "the public's presence would arguably contribute to the fairness of the proceeding and serves as a potential check on the power of the prosecutor." Ruth fails to meet his burden to satisfy the experience and logic test with such bare assertions. In re Pers. Restraint of Yeats, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Relying on State v. Bennett, 161 Wn.2d 303, 315-16, 165 P.d 1241 (2007), Ruth also contends the use of the Castle[2] reasonable doubt instruction violated his constitutional rights. In Bennett, the Supreme Court concluded that the Castle instruction is "constitutionally adequate," but used its inherent supervisory power to

[2] State v. Castle, 86 Wn. App. 48, 935 P.2d 656 (1997).

No. 68380-2-I/4

direct trial courts to use only Washington Pattern Jury Instruction (WPIC) 4.01. Bennett, 161 Wn.2d at 315, 318. Without sufficient explanation, Ruth now claims that the use of the instruction in his 2004 trial undermined his constitutional right to the presumption of innocence and allowed the jury to convict based on a lower standard of proof. Because Ruth's trial took place years before the Supreme Court disapproved of the "constitutionally adequate" instruction in Bennett and he fails to identify or demonstrate a complete miscarriage of justice, this claim fails.

Finally, relying on State v. Bashaw, 169 Wn.2d 133, 234 P.3d 195 (2010), Ruth contends the jury instructions erroneously instructed the jury that it had to be unanimous in order to answer "no" on the special verdict forms. But our Supreme Court recently overruled the nonunanimity rule developed in Bashaw, concluding that it "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." State v. Nuñez, 174 Wn.2d 707, 709-710, 285 P.3d 21 (2012). Because the instructions were not erroneous, Ruth has no grounds for relief.

Now, therefore, it is hereby

ORDERED that the personal restraint petition is dismissed under RAP 16.11(b).

Done this 17th day of January, 2014.

Acting Chief Judge

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2014 JAN 17 PM 2:51

EXHIBIT
8

State's Response to PRP
Pages 21 - 24

If this is dispositive on direct appeal as harmless error, it should hold all the more on collateral attack, where the defendant must show actual and substantial prejudice. See In re St. Pierre, 118 Wn.2d at 328-29.

As for the question of the defendant's presence, the Sixth Amendment's confrontation clause confers upon the accused the right to be confronted with the witnesses against him – that is, to confront those who bear testimony. U.S. Const. amend VI (1791); State v. Jasper, 174 Wn.2d at 109. A jury inquiry does not fall within this category. A defendant does have a due-process right to be present during all critical stages of a criminal proceeding. U.S. Const. amend XIV, § 1 (1868); State v. Jasper, 158 Wn. App. at 538. A "critical stage" is one where the defendant's presence has a reasonably substantial relationship to the fullness of his or her opportunity to defend against the charge. Jasper, 158 Wn. App. at 539, citing In re Pers. Restraint of Benn, 134 Wn.2d 868, 920, 952 P.2d 116 (1998). Generally, in-chambers conferences between the court and counsel on legal matters are not critical stages except when the issues raised involve disputed facts. Jasper, 158 Wn. App. at 539, citing In re Pers. Restraint of Lord, 123 Wash.2d 296, 306, 868 P.2d 835 (1994). A jury inquiry that raises only a question

of law and no issues of disputed facts is similarly not a critical stage, and a defendant's presence in such instance is not constitutionally required. Jasper, 158 Wn. App. at 539; accord, State v. Sublett, 156 Wn. App. 160, 182, 231 P.3d 231 (2010).[2] Thus, his claim fails.

**E. NEITHER THE RESPONSE TO THE JURY INQUIRY NOR THE BRIEF DISCLOSURE IN CHAMBERS VIOLATED THE DEFENDANT'S RIGHT TO A PUBLICVTRIAL.**

The petitioner argues that both the jury inquiry and response, as well as the midtrial disclosure in chambers that the State would not be calling Renee Woerner as a witness, violated his right to a public trial. The former, as discussed above, involved no disputed facts – rather, the jury was told it could not see evidence that had not been admitted. Ex. 16 at 9; Ex. 17. The latter merely involved the State disclosing to the court and opposing counsel that it was not calling an endorsed witness, and why. 1 Trial RP 179-81; 2 Trial RP 182; Sent'g RP 5-6.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to a public trial. State v. Sublett, 156 Wn. App. at 181. "The public trial right applies to the evidentiary

[2] Review granted, 170 Wn.2d 1016 (2010). Oral argument was June 16, 2011.

phases of the trial, and to other 'adversary proceedings.'" State v. Rivera, 108 Wn. App. 645, 652-53, 32 P.3d 292 (2001). The right to public trial is linked to the defendant's constitutional right to be present during the critical phases of trial; thus, "a defendant has a right to an open court whenever evidence is taken, during a suppression hearing, . . . during voir dire," and during the jury selection process. Rivera, 108 Wn. App. at 653, 32 P.3d 292 (citing Press–Enter. Co. v. Superior Court of California, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629). "A defendant does not, however, have a right to a public hearing on purely ministerial or legal issues that do not require the resolution of disputed facts." State v. Sadler, 147 Wn. App. 97, 114, 193 P.3d 1108 (2008), citing, e.g., State v. Rivera, 108 Wn. App. 645, 652, 32 P.3d 292 (2001) (court addressed juror's complaint about another juror's hygiene in closed courtroom); and State v. Bremer, 98 Wn. App. 832, 835, 991 P.2d 118 (2000) (chambers conference re instructions).

The two instances complained of here fall into the "ministerial or legal" category. The matter disclosed to the court in chambers presented nothing for the judge to rule on; rather, the prosecutor simply informed why he was not going to call Ms. Woerner as a witness after all. This hardly required the resolution

of disputed facts. It did not even involve a question of law. And it was put on the record later that same afternoon. 1 Trial RP 179-81; 2 Trial RP 182; Sent'g RP 5-6. The jury inquiry during deliberations presented a straightforward and undisputed issue as well: they wanted to see evidence that had not been admitted, and the judge told them no. This did not require the resolution of disputed facts, either.

In Sublett, the jury was confused over the mens rea in accomplice instructions. Counsel agreed with the court in chambers that the only answer would be to re-read the instructions. Sublett, 156 Wn. App. at 178-79. Division II held that this presented "a purely legal issue . . . that did not require the resolution of disputed facts" and thus the defendants' right to a public trial did not apply in this context." Sublett, 156 Wn. App. at 182.

This is dispositive. The petitioner in fact concedes that Sublett is adverse to his position. Pet'n for Review 9. He notes that review was granted, however, and therefore he ought to prevail. Certainly review has been granted. See n.2 above. At the most the grant of review might justify a stay here; it hardly affords, by itself, a basis for relief. Moreover, a jury inquiry concerning the

Exhibit

9

THE SUPREME COURT
OF THE
STATE OF WASHINGTON

Ruling Denying Review
No. 89906-1

(AAG Exh. )

Filed
Washington State Supreme Court
DEC - 5 2014
Ronald R. Carpenter
Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In the Matter of the Personal Restraint of:

MATTHEW ROBERT RUTH,

Petitioner.

NO. 89906-1

RULING DENYING REVIEW

Matthew Ruth was convicted of two counts of first degree assault. The sentence included firearm enhancements, but because the jury returned verdicts finding only that Mr. Ruth was armed with a deadly weapon, this court remanded for entry of deadly weapon enhancements in place of firearm enhancements. *State v. Williams-Walker*, 167 Wn.2d 889, 225 P.3d 913 (2010). After resentencing, Mr. Ruth did not appeal, but he timely filed a personal restraint petition in Division One of the Court of Appeals raising errors relating to his trial. Finding no basis for relief, the acting chief judge dismissed the petition. Mr. Ruth now seeks this court's discretionary review. RAP 16.14(c).[1]

To obtain this court's review, Mr. Ruth must show that the acting chief judge's decision conflicts with a decision of this court or with another Court of Appeals decision, or that he is raising a significant constitutional question or an issue

[1] Mr. Ruth has also moved to file a supplemental motion for discretionary review. That motion is granted, and the supplemental motion is therefore accepted for filing.

701/149

of substantial public interest. RAP 13.4(b); RAP 13.5A(a)(1), (b). He does not make this showing. In his motion for discretionary review, Mr. Ruth reasserts only his claim below that his constitutional right to a public trial was violated in two respects: first, in relation to the decision of the prosecutor and defense counsel to not call Mr. Ruth's former girlfriend as a witness, and second in relation to the trial court's response to a jury inquiry during deliberations.

The first circumstance arose when the trial court noted on the record and outside the jury's presence that a "very brief conversation" had taken place in chambers about not calling a particular witness, and the court asked the attorneys to "flesh out" what had been discussed. Report of Proceedings (Dec. 7, 2004) at 179. The prosecutor then explained that in the chambers discussion he told defense counsel and the court that he had spoken with the former girlfriend, Renee Woerner, whom he had intended to call as a witness, and had decided not to call her because he believed she would commit perjury. (Ms. Woerner had previously given a sworn statement to police and the prosecutor corroborating the victims' account of events.) After his conversation with Ms. Woerner, the prosecutor explained his decision to defense counsel and suggested counsel might want to talk to Ms. Woerner. Defense counsel then spoke with Ms. Woerner, and she told him that the prosecutor had warned her of consequences of committing perjury. Defense counsel at that point determined that Ms. Woerner needed independent legal advice. Defense counsel confirmed to the court that the events as related by the prosecutor had occurred, and that he did not know then whether he would call Ms. Woerner as a defense witness. Counsel later explained in a declaration that after giving the matter thought and conferring with Mr. Ruth, he decided not to call Ms. Woerner as a witness, believing that she would either corroborate the victims' testimony or be easily impeached by her prior sworn statement.

Mr. Ruth does not show that the "very brief" in-chambers conference in which the prosecutor revealed he would not call Ms. Woerner as a witness violated his right to a public trial. Whether a particular part of a criminal trial must be open to the public is evaluated under the "experience and logic" test, under which the reviewing court first determines whether the place and process at issue have historically been open to the public, and then whether public access plays a significant positive role in the functioning of the particular process in question. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012); *State v. Smith*, 334 P.3d 1049, 1052-53 (2014). Mr. Ruth does not show with citation to authority or with persuasive analysis that discussions about what witnesses the prosecutor or defense counsel intends to call, and the reasons for calling or not calling a witness, have either historically been open to the public or would be positively affected by public view, especially where, as here, what transpired in chambers was memorialized in the public record. Mr. Ruth suggests that public view would have been beneficial here to guard against the possibility that the prosecutor had substantially interfered with Ms. Woerner's potential testimony by improperly threatening her with perjury. *See United States v. Juan*, 704 F.3d 1137, 1141-42 (9th Cir. 2013) (principle that prosecutor may not substantially interfere with witnesses' testimony extends to prosecution witnesses). He further argues he had a right to cross-examine Ms. Woerner about the matter. But this has nothing to do with the right to a public trial in the circumstances of this case. Defense counsel did not claim that the prosecutor had interfered with Ms. Woerner's testimony, and he did not request a hearing to explore the matter, which if held presumably would have been open. All that transpired in chambers as related on the record is that the prosecutor explained why he would not be calling Ms. Woerner as a witness, and defense counsel related that he had spoken with Ms. Woerner and that she would be appointed independent counsel in light of her concern about perjury. And defense counsel could

have called Ms. Woerner as a witness, but after speaking with her and consulting with Mr. Ruth, he decided not to do so. Mr. Ruth does not show that these proceedings implicated the constitutional right to a public trial.[2]

As for the jury inquiry, the jury asked during deliberations to see transcripts of interviews with the victims and Ms. Woerner. The trial court responded that the jury could not view these documents because they were not admitted into evidence. Consideration of and responses to jury inquiries are not subject to the right to a public trial. *Sublett*, 176 Wn.2d at 77-78. Mr. Ruth complains that the trial court did not follow the procedures for answering jury inquiries specified by CrR 6.15(f)(1). But again, this has nothing to do with the constitutional right to a public trial. Any interests under the public trial right are protected by placement of the inquiry and the response in the public record, as the trial court did here. *See Sublett*, 176 Wn.2d at 77. And to the extent Mr. Ruth claims error based only on the failure to strictly follow the rule, he demonstrates no actual and substantial prejudice stemming from constitutional error or a complete miscarriage of justice resulting from nonconstitutional error. *See In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (standard of relief in personal restraint petition).

The motion for discretionary review is denied.

[signature]
DEPUTY COMMISSIONER

December 5th, 2014

---

[2] Mr. Ruth also complains of his absence from the in-chambers discussion, seemingly suggesting his right to be present was violated. But even if he had a right to be present, he does not demonstrate he was prejudiced by his absence. *See State v. Irby*, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011) (violation of right to be present subject to harmless error analysis).

EXHIBIT
10

Jeremy Custer
Medical chart

- 2-liters of Alcohol
- 3+ shots Not 4
- Not sure why he was shot
- Red & yellow code Next to Drug ABuse
- Tried to remove Bullets w/Tweezers Befor returning to crime scene

18 **Multiple Trauma** (5)

MD / PA [signature] DATE: 11/5/03 TIME: 1700

HISTORIAN: ✓ patient __ spouse __ paramedics

__ EMS arrival / assessment reviewed.

__ HX / __ EXAM LIMITED BY:

**HPI** chief complaint: (Injury to) limbs

**occurred:** __ just PTA ✓ today __ yesterday __ days PTA

**where:** ✓ home __ neighbor's __ work __ school __ city park __ street

**context:** 1370 at Grande trail & shot c 22 gauge hand gun x3 Pt not sure why.

**quality:**

**location of pain / injuries:** head face mouth neck chest abdomen back upper mid- lower radiating to R / L thigh / leg

(right) shldr hip (arm) (thigh) elbow knee f-arm leg wrist ankle hand foot

(left) shldr (hip) arm thigh elbow knee f-arm leg wrist ankle hand foot

**severity of pain:** (mild) moderate severe

**associated symptoms:** __ lost consciousness / dazed duration: remembers: (impact) (coming to hospital) __ seizure

**ROS** ☑ all systems neg except as mrkd

__ loss feeling / power arms / legs
__ headache
__ double vision / hearing loss
__ weakness
__ palpitations
__ anxiety
__ depression
__ trouble breathing / chest pain
__ nausea / vomiting
__ loss of bladder function
__ skin laceration
__ recent fever / illness
__ DVT post nasal
__ diabetes gtt x 2d
__ hypothyroid cough →

**SOCIAL HX** ✓ recent ETOH ✓ smoker __ drug abuse yellow → 2 liters

**PAST HX** ✓ negative __ prior records reviewed

Meds- __ none / ✓ see nurses note
Allergies- __ NKDA / ✓ see nurses note

☑ Nursing Assessment Reviewed ☑ V.S. reviewed ✓ nl (except)
☐ Tetanus immun. UTD

V/S Temp ____ Pulse ____ RR ____ BP T 166/117

**PHYSICAL EXAM** ✓ Alert __ Lethargic __ Anxious

Distress- __ NAD __ mild __ moderate __ severe

Other- __ c-collar (PTA / in ED) __ back-board __ IV __ splint

**HEAD** ✓ no evidence of trauma __ see diagram __ Battle's sign / Raccoon Eyes

**NECK** ✓ non-tender ✓ painless ROM ✓ trachea midline __ see diagram __ vertebral point-tenderness __ muscle spasm / decreased ROM __ pain on movement of neck

**EYES** ✓ PERRL ✓ EOMI __ unequal pupils R- __ mm L- __ mm __ EOM entrapment / palsy __ subconjunctival hemorrhage

**ENT** ✓ nml external inspection ✓ no dental injury __ hemotympanum __ TM obscured by wax __ clotted nasal blood __ dental injury / malocclusion

**RESP / CVS** ✓ chest non-tender ✓ breath sounds nml ✓ heart sounds nml __ see diagram (on reverse) __ decreased breath sounds __ wheezing / rales __ splinting / paradoxical movements

JU (?) cough

**ABDOMEN** ✓ non-tender ✓ no organomegaly __ see diagram (on reverse) __ tenderness / guarding / rebound __ mass / organomegaly

**GENITAL / RECTAL** __ nml genital exam __ nml vaginal exam __ nml rectal exam __ heme negative stool __ perineal hematoma __ blood at urethral meatus __ decreased rectal tone

**NEURO / PSYCH** __ oriented x3 ✓ mood & affect ✓ CN's nml ✓ as tested sensation & motor nml __ confusion / disorientation __ EOM palsy / anisocoria __ facial asymmetry __ unsteady / ataxic gait __ sensory / motor deficit

© 1996 - 2002 T-System, Inc. Circle or check affirmatives, backslash (/) negatives.

Providence Everett Medical Center
**EMERGENCY PHYSICIAN RECORD**

CUSTER, JEREMY D 11/05/03 1652
03309-01194 03/05/80 23Y M

EXHIBIT
11

Jeremy custer

IBUPROFEN (mortrin)

why No Narcotics if he Eden?

Because custer was High on Drugs



PGMC, 1321 Colby, Everett, WA 98201 425-261-3000
PPC, 916 Pacific Ave, Everett, WA 98206 425-258-7555

## ED Discharge Instructions for:

**JEREMY D. CUSTER**

| | | | |
|---|---|---|---|
| Name: | JEREMY D. CUSTER | Medical Rec #: | 0001107782 |
| Address: | 12019 185TH AVE SE<br>SNOHOMISH, WA 98290 | Phone: | (425)422-9336<br>(425)422-9336 |
| Visit Date/Time: | November 5, 2003 16:52 | Pt. Account #: | 0330901194 |

## Evaluation

Evaluation in the Emergency Department included triage by a nurse, and a screening exam by the physician. You were treated by the following Emergency Department staff:
Emergency Md(s): RANDAL BENSEN.

## Tests

X-RAYS - These x-rays were preliminarily read by the emergency department physician and will be read by a radiologist. If there are any problems, we will notify you or your physician. The following tests were performed:
FEMUR
HUMERUS
HIPS

## Diagnosis-1

Based on the evaluation and tests, the following diagnoses have been made. Remember that these are preliminary diagnoses and follow up with your referral physician may be necessary.

* MULTIPLE GUN SHOT WOUNDS

## Diagnosis-2

* PUNCTURE WOUND RIGHT UPPER ARM AND RIGHT THIGH

## Diagnosis-3

* ABRASION L HIP

## Take Home Medications

Do NOT let anyone else use your medictions. Take your medications as prescribed.
ADVIL
* → IBUPROFEN (Motrin)
Motrin is a non-steriodal anti-inflammatory medication used to relieve pain, swelling, and inflammation.
If you did not receive a prescription from the doctor for this, you can purchase it over the counter at most stores. . Please ask for directions on dosage.
WARNINGS:
1. Do not take Motrin if you: have a history of ulcers, problems with bleeding or blood clotting, liver or kidney disease.

EXHIBIT

12

Psychological
evaluation

FILED

2005 FEB -4 PM 12:02

[illegible] L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY

STATE OF WASHINGTON
Plaintiff/Petitioner,

vs.

MATTHEW RUTH
Defendant/Respondent.

CAUSE NO.: 03-1-02451-6

COVER SHEET

ATTACHED HERETO IS: PSYCHOLOGICAL EVALUATION REPORT



Psychological Testing

The Mental Status Examination revealed that the subject is oriented X3, and did not display confusion and disorganization. He was not labile but somewhat depressed emotionally. There was no evidence of psychotic thinking or impairment of reality testing. His energy level seems fairly normal, but his affect was flat and somewhat labile. His intelligence appeared to be in the average, although formal psychometric testing was not administered. He denied symptoms of mania. He denied suicidal and homicidal thoughts, feelings or plans at this time.

The results of the MMPI-2 indicated rather extreme and possibly exaggerated results. He endorsed extreme persecutory thoughts and feelings, and very poor ego strength. He endorsed a high number of rare and unusual symptoms and complaints. He probably has a chronic personality disturbance, possibly with schizoid or paranoid features. Alienation, both social and emotional, is prominent features of that personality. He is extremely tense, anxious and unhappy.

Conclusions

The results of my examination revealed an individual who has chronic disturbance of judgment, personality and decision-making that has been greatly exacerbated by his drug abuse. Although he has denied intoxication or withdrawal around the time of the incident, and denied being the aggressor in the incident, it is evident that he was unrealistic, impulsive and reckless in his thinking at the time.

The question of a chronic psychotic disorder remains. He has refused to assert that he was mentally ill at the time, but he probably has disturbance in his thinking that causes him to interpret situations as threatening that might not be as dangerous in reality as they seem to him at the time. This is particularly true if he is intoxicated.

Mr. Ruth's disturbed childhood, with chaos, abuse and severe alienation, has rendered him compromised in his thinking and judgment. He has a wide-ranging and serious drug abuse history, including methamphetamine abuse by his own mother, and his own polysubstance abuse and dependence. His social development and social skills demonstrate the effects of that disturbed lifestyle. Under pressure he probably suffers unrealistic and idiosyncratic thinking as suggested by the schizotypal and paranoid traits of his personality disorder.

There was insufficient basis to conclude that Mr. Ruth was legally insane or lacked the specific capacity to form the mental intent at the time of the offense. However, his thinking, decision-making skills and his ability to anticipate

dangerous situations. While he probably was not psychotic at the time of this unfortunate and very dangerous incident, under the pressure of the situation he may have reacted with fear and suspiciousness that was not appropriate and caused him to respond in an unnecessarily violent manner. This event did occur in his "home", a small fifth wheel trailer, and he may have felt invaded and threatened by the trapping nature of this location.

Mr. Ruth's chronic mental condition, while not amounting to a true mental defense, could have been a significant contributing factor to his actions that day. While he did not misunderstand the nature of his actions, he may have interpreted those actions as being legal and appropriate, if as he asserted, he perceived him own life as being at risk.

Diagnosis (DSM-IV-TR)

Axis 1 Polysubstance dependence
Depressive disorder NOS
r/o Psychotic disorder NOS- probably secondary to drug abuse
Axis 2 Personality disorder NOS- with schizotypal and paranoid traits noted
Axis 3 No medical conditions
Axis 4 Severe stresses of current legal proceedings and incarceration
Axis 5 Current GAF Rating- 55-60, moderately impairing symptoms

Thank you for this referral.

Kenneth Muscatel, Ph.D.
Clinical, Forensic and
Neuropsychology

EXHIBIT
13

Record Proving
I was not competent
During the time Frame
Jeremiah Sheridian
Took notes From me
That were used To unlawfully
convict me

(During the 2:00 Criminal Hearings Calendar, the following proceedings were held:)

MR. HILTNER: The next matter is Matthew Ruth, Cause No. 03-1-02451-6.

There should be a competency order at the jail. The Court should have an order from Western State Hospital that indicates the defendant is competent. So we can set new dates.

MS. KYLE: Your Honor, I'm not comfortable signing an order I haven't seen. I don't represent Mr. Ruth; Mr. Scott does. I recommend you set this over one day.

THE COURT: Do you have any objection?

MR. HILTNER: I don't have an objection.

THE COURT: I've read it and I'm satisfied his competency has been restored, but I can understand your squeamishness. We'll set this over to -- is he going to be here tomorrow or is someone --

MS. KYLE: I'll make sure at least he knows and he can make a representation to the 2:00 person if he doesn't have any objection to the order.

THE COURT: Very well. March 24th.

(This was the conclusion of the hearing.)

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

RECEIVED
OCT 10 2005
Nielsen, Broman & Koch, P.L.L.C.

STATE OF WASHINGTON, Plaintiff,

v.

MATTHEW R. RUTH, Defendant.

NO. 03-1-02451-6

COA NO. 56318-1-I

VERBATIM REPORT OF PROCEEDINGS
PRETRIAL HEARING

THE HONORABLE RICHARD J. THORPE, Judge
Snohomish County Superior Court
Criminal Hearings Department
Everett, Washington

March 23, 2004

APPEARANCES:

For the Plaintiff: DAVID HILTNER, Deputy Prosecutor

For the Defendant: KATHLEEN KYLE, Public Defender

NORA C. STARR, Official Court Reporter, CSR No. 2701
3000 Rockefeller
Everett, Washington 98201
(425) 388-3303

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| STATE OF WASHINGTON, Plaintiff, vs. MATTHEW RUTH, Defendant. | ) Cause No. 03-1-02451-6 COA. 56318-1-I |

RECEIVED
DEC 0 6 2005
Nielsen, Broman & Koch, P.L.L.C.

VERBATIM REPORT OF PROCEEDINGS

BE IT REMEMBERED that on 24th day of March, 2004, the above-entitled and numbered cause came on for hearing before JUDGE RICHARD J. THORPE, Snohomish County Superior Court, Everett, Washington.

A P P E A R A N C E S

For the Plaintiff DAVID HILTNER

For the Defendant JON SCOTT

REPORTED BY:
DIANA NISHIMOTO, OFFICIAL COURT REPORTER
SNOHOMISH COUNTY COURTHOUSE
3000 EVERETT, WA 98201
PHONE (425)388-3281
CSR. 3222

MR. HILTNER: Next matter is State versus Matthew Ruth. This is for a competency hearing. The Court should have a report from Western --

THE COURT: Matthew Ruth.

Good afternoon, Mr. Scott.

MR. SCOTT: Good afternoon, your Honor. Jon Scott representing the defendant.

Your Honor, this matter comes in after a completion of an evaluation at Western State. They have deemed he is now competent. We have signed the copy of the order which attests to that fact and we need to get new omnibus and trial dates.

MR. HILTNER: The new 60th day is now April 22nd.

MR. SCOTT: April 22nd.

MR. HILTNER: The fact that we are requesting dates are from March --

THE COURT: Trial date will be April 9 omnibus. Mercy, would you rather do it April 1 or March 26th, this Friday or the following?

MR. HILTNER: I'm going to request April 1, since the Prosecutor won't be here April 26th.

THE COURT: Very well. April one or two, Mr. Scott?

MR. SCOTT: Let's do April 1st.

THE COURT: Very well. April 1, omnibus. Trial

is April 9th.

Next.

(Proceedings concluded.)

FILED
04 MAR 24 PM 4:03
PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

SUPERIOR COURT OF WASHINGTON
FOR SNOHOMISH COUNTY

THE STATE OF WASHINGTON,

Plaintiff,

v.

RUTH, MATTHEW ROBERT

Defendant.

No. 03-1-02451-6

ORDER ON MOTION

THIS MATTER having come on regularly before the undersigned Judge of the above court on the motion of:

[X] plaintiff
[ ] defendant

to ________________________________________.

AND THE COURT having considered the records and files herein and being fully advised;

Now Therefore, IT IS HEREBY ORDERED according to Western State Hospital reports dated March 19, 2004 that defendant MATTHEW ROBERT RUTH is now competent to stand trial on the above Cause for the crime of Count 1 First Degree Assault,.

DONE IN OPEN COURT this ~~23~~ 24 day of March, 2004.

____________________
JUDGE

Presented by:

____________________
JOHN S. ADCOCK, #15714
Attorney for Plaintiff

Approved as to form:

____________________
JON T. SCOTT, #30308
Attorney for Defendant

MAR-24-2004 WED 02:38 PM

FILED
04 MAR 24 PM 4:03
PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

# SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY

STATE OF WASHINGTON

VS.

MATTHEW R. RUTH
(DEFENDANT)

CAUSE NO.: 03-1-02451-6
JUDGE: RICHARD J. THORPE
REPORTER: DIANA NISHIMOTO
CLERK: JULIE KORST-GATLIN
DATE: 3-24-04 @ 2:00 P.M.

THIS MATTER CAME ON FOR: COMPETENCY HEARING / RESET TRIAL DATE

CONTINUED/CODE: DEPARTMENT/TIME:

HEARING STRICKEN/CODE:

STATE REPRESENTED BY: DAVID HILTNER

DEFENDANT APPEARED: YES IN CUSTODY: YES REPRESENTED BY: JON SCOTT

FAILED TO APPEAR: WARRANT AUTHORIZED: ISSUED: BAIL AMOUNT:

REQUESTED COUNSEL: REFERRED TO OFFICE OF PUBLIC DEFENSE:

DEFENDANT ANSWERS TO TRUE NAME AS CHARGED:

SERVED WITH TRUE COPY OF INFORMATION: READ IN OPEN COURT: READING WAIVED:

MOTION FOR RELEASE: RELEASED ON PERSONAL RECOGNIZANCE: P.R. ORDER ENTERED:

ADVISED OF BASIC CIVIL AND CONSTITUTIONAL RIGHTS:

DEFENDANT ADVISED OF LOSS OF RIGHT TO BEAR FIREARMS:

(a)

| HEARINGS SET/TRIAL CONTINUANCE: | SENTENCING DATE: |
|---|---|
| TRIAL DATE (1:00): 4-09-04 | SENTENCING DATE: |
| OMNIBUS HEARING (9:00): 4-01-04 | DEPT. NO./JUDGE: |
| 3.5 HEARING (10:00): | PRESENTENCE REPORT REQUESTED: |
| ARRAIGNMENT ON AMENDED INFORMATION: | RETURN DATE: |
| PLEA (3:00): | CHEMICAL DEPENDENCY SCREENING REPORT REQUESTED: |
| MOTION HEARING (10:00): | RETURN DATE: |
| SPEEDY TRIAL DATE: | |
| TRIAL CONTINUED TO (1:00): | 40 DAY RULE WAIVED: |

OTHER: DEFENDANT IS DEEMED COMPETENT TO STAND TRIAL.
FORENSIC PSYCHOLOGICAL REPORT FILED.
ORDER ON MOTION; AND ORDER RE-SETTING TRIAL DATE ENTERED.

03-1-02451-6 27

CRIMINAL MINUTE ENTRY

TD
27

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

| | | |
|---|---|---|
| STATE OF WASHINGTON,<br>Plaintiff,<br>vs.<br>MATTHEW RUTH,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | County No. 03-1-02451-6<br>COA No. 56318-1-I<br><br>REPORTER'S TRANSCRIPT |

COPY

RECEIVED

NOV 03 2005

Nielsen, Broman & Koch, P.L.L.C.

VERBATIM REPORT OF PROCEEDINGS

THE HONORABLE GEORGE N. BOWDEN
Criminal Hearings Courtroom
Snohomish County Courthouse
January 16, 2004

A P P E A R A N C E S

For the Plaintiff: MARA ROZZANO
Deputy Snohomish County
Prosecuting Attorney

For the Defendant: JON SCOTT
Attorney at Law

REPORTED BY: J. MICHAEL JAY, CSR NO. 2982

EVERETT, WASHINGTON, FRIDAY, JANUARY 16, 2004

AFTERNOON SESSION

--oo0oo--

THE COURT: No. 22, Matthew Ruth, cause 03-1-02451-6.

MR. SCOTT: For the record, Jon Scott. Your Honor, this comes on for defense motion requesting an evaluation for competency. It has been -- the order is going to be handed up shortly. It's been signed by Mr. Adcock and myself.

MS. ROZZANO: Mr. Scott, we can't hear you over here.

MR. SCOTT: I have spoken with Mr. Ruth on several occasions. I have also talked to some of the jail staff. There are --

THE COURT: Mr. Scott has indicated that there are some questions about competency, he'd like to have an evaluation before we proceed further. I'm willing to sign that order, which will help to get that done.

Mr. Ruth, do you have any questions at this time?

THE DEFENDANT: Yes. I went down to see my attorney and the first time I got to see him was yesterday at my omnibus and I was incompetent as of my crime that I was supposedly committed. But they have me

on medication and I feel more stable and I have not had the right to go to the law library. I feel like my -- okay. And I feel more stable now and I wasn't aware that my right for speedy trial would be violated if I signed this petition.

THE COURT: Well, your rights aren't being violated. It's just going to give them some more time. One of the reasons when you say you're feeling better now, your attorney would like to get a doctor's opinion about whether you were incompetent at the time. That may be very helpful to you, and if you don't allow him to do that you may be depriving your attorney of some defenses that he could raise at trial.

THE DEFENDANT: So my speedy trial will not be violated if I sign?

THE COURT: It's not going to be violated. So the time you're evaluated will start a new clock once you're back here. It's just different rules that apply.

THE DEFENDANT: Yes, sir.

THE COURT: So I will sign that order for the evaluation.

THE DEFENDANT: Yes, sir. I'll sign it then.

MR. SCOTT: Thank you, Your Honor.

--oo0Ooo--



FILED

04 MAR 24 PM 4:03

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

03-1-02451-6 28

SUPERIOR COURT OF WASHINGTON
FOR SNOHOMISH COUNTY

THE STATE OF WASHINGTON,

Plaintiff,

v.

RUTH, MATTHEW ROBERT

Defendant

No. 03-1-02451-6

ORDER ON MOTION

THIS MATTER having come on regularly before the undersigned Judge of the above court on the motion of:

[X] plaintiff
[ ] defendant

to ______________________________.

AND THE COURT having considered the records and files herein and being fully advised;

Now Therefore, IT IS HEREBY ORDERED according to Western State Hospital reports dated March 19, 2004 that defendant MATTHEW ROBERT RUTH is now competent to stand trial on the above Cause for the crime of Count 1 First Degree Assault.

DONE IN OPEN COURT this 23 24 day of March, 2004.

JUDGE

Presented by:

JOHN S. ADCOCK, #15714
Attorney for Plaintiff

Approved as to form:

JON T. SCOTT, #30308
Attorney for Defendant

Order on Competency Page 1 of 1
St. v. RUTH, MATTHEW ROBERT
PA#03F04554

Snohomish County Prosecuting Attorney
S:\felony\forms\insanity\competord.mrg
VIO/JSA/nav

MAR-24-2004 WED 02:36 PM FAX NO. P. 01

28

MAR-24-2004 WED 02:36 PM FAX NO. P. 01

FILED

04 MAR 24 PM 4:03

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

SUPERIOR COURT OF WASHINGTON
FOR SNOHOMISH COUNTY

| | |
|---|---|
| THE STATE OF WASHINGTON,<br>Plaintiff,<br>v.<br>RUTH, MATTHEW ROBERT<br>Defendant. | No. 03-1-02451-6<br>ORDER RE-SETTING TRIAL DATE (EXCLUDED PERIOD) (Clerk's Action Required) |

1. An omnibus hearing is set for 4.1.04 at 9:00 a.m

2. Trial is hereby re-scheduled for 4.9.04 at 1:00 p.m.

3. Other hearings are set as follows: ______________ at 10:00 a.m.

______________ at 10:00 a.m.

4. Trial and all hearings will be held in the Criminal Hearings Department, Room 201.

5. The re-setting of the trial date resulted from application of the following excluded period pursuant to CrR 3.3(e): 1/16/04 – 3/23/04. This period was excluded for the following reason:

[✓] COMPETENCY EXAMINATION: The period specified above is the period between the date a competency examination was ordered and the date the court entered a written order finding the defendant to be competent. CrR 3.3(e)(1).

[ ] PROCEEDINGS ON UNRELATED CHARGE: During the period specified above, the defendant was undergoing arraignment, pre-trial proceedings, trial, and/or sentencing on an unrelated charge. CrR 3.3(e)(2).

[ ] DISMISSAL: The period specified above is the time between the dismissal of a charge and the refilling of the same or a related charge. CrR 3.3(e)(4).

[ ] DISPOSITION OF RELATED CHARGE: The period specified above is the time between commencement of trial or entry of a plea of guilty on one charge and the defendant's arraignment in this court on a related charge. CrR 3.3(e)(5).

Order Re-Setting Trial Date (Excluded Period) Page 1 of 2
St. v. RUTH, MATTHEW ROBERT
PA#03F04554

Snohomish County Prosecuting Attorney
S:\felony\forms\time for trial\resettrl-excludedperiod.mrg
VIO/JSA/nav



[ ] DEFENDANT SUBJECT TO FOREIGN OR FEDERAL CUSTODY OR CONDITIONS: During the period specified above, the defendant was detained in jail or prison outside this State, was detained in a Federal jail or prison, or was subjected to conditions of release not imposed by a court of this State. CrR 3.3(e)(6).

[ ] JUVENILE PROCEEDINGS: During the period specified above, the defendant was involved in proceedings in juvenile court. CrR 3.3(e)(7).

[ ] UNAVOIDABLE OR UNFORESEEN CIRCUMSTANCES: During the period specified above, the trial was delayed by unavoidable or unforeseen circumstances beyond the control of the court or the parties. CrR 3.3(e)(8). These circumstances were: ______________________

[ ] DISQUALIFICATION OF JUDGE: The judge to whom the case was assigned for trial was disqualified. The period specified above is the time between the date of the disqualification and a date 5 days afterwards. CrR 3.3(e)(9)

6. The last allowable date for trial pursuant to CrR 3.3 is 4/22/04
[The expiration date is the later of (a) 30 days after the end of the excluded period or (b) 60 or 90 days after the commencement date, plus any excluded periods].

If the defendant objects to the trial date on the ground that it is not within the time limits proscribed by CrR 3.3, the defendant must, within 10 days from today, move that the court set a trial within those time limits. The defendant must also promptly note that motion for hearing in accordance with local procedures. If the defendant fails to do this, he or she will lose the right to object that a trial commenced on that date is not within the time limits prescribed by CrR 3.3.

THE DEFENDANT MUST APPEAR FOR TRIAL AND FOR ALL SCHEDULED HEARINGS. FAILURE TO APPEAR MAY RESULT IN ISSUANCE OF AN ARREST WARRANT, FORFEITURE OF BAIL, AND CRIMINAL PROSECUTION FOR BAIL JUMPING.

DONE IN OPEN COURT this 23 24 day of March, 2004.

JUDGE

Presented by:

JOHN S. ADCOCK, #15714
Deputy Prosecuting Attorney

Copy received this 23 24 day of March, 2004.

Matthew R. Ruth
MATTHEW ROBERT RUTH
Defendant

JON T. SCOTT, #30308
Attorney for Defendant

EXHIBIT

14

ATTENDING DOCTOR'S

NEVER testified

Never Read medical Reports

Jury did Not understand Nor did I

FILED

2004 MAY 24 AM 10: 45

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,
Plaintiff,

vs.

RUTH, MATTHEW ROBERT
Defendant.

No. 03-1-02451-6

Jury Trial SUBPOENA

State of Washington to :

DR. RANDAL BENSEN
PROVIDENCE MED CENTER - COLBY CAMPUS
1321 COLBY
EVERETT, WA 98201

In the name of the State of Washington, you are hereby commanded to appear at the CRIMINAL HEARINGS COURTROOM (ROOM 201) OF THE SUPERIOR COURT, 2ND FLOOR, COURTHOUSE IN EVERETT, WASHINGTON on the 26th day of July, 2004, at 1:00 PM, Snohomish County, Washington, then and there to give evidence in the above-entitled cause pending, and to remain in attendance at said court until discharged by the Court.

Dated this 21st day of May, 2004

JOHN S. ADCOCK #15714
Deputy Prosecuting Attorney

| PA Number | Originating Agency | Originating Case # | Offense Date |
|---|---|---|---|
| 03F04554 | SSO | 0325124 | 11/5/2003 |

Upon receipt of this subpoena please call Chris Yue, Legal Assistant to the above signed attorney at (425) 388-3663. cyue@co.snohomish.wa.us

AA
50

FILED
04 OCT 11 PM 2:37
PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

THE STATE OF WASHINGTON,
Plaintiff,

vs.

RUTH, MATTHEW ROBERT
Defendant.

No. 03-1-02451-6

Jury Trial SUBPOENA

State of Washington to :

DR DANIEL ZAK
PROV GEN MEDICAL CTR - COLBY CAMPUS
PO BOX 1147
EVERETT, WA 98201

In the name of the State of Washington, you are hereby commanded to appear at the SNOHOMISH COUNTY PROSECUTOR'S OFFICE, 1ST FLOOR, COURTHOUSE IN EVERETT, WASHINGTON on the 25th day of October, 2004, at 1:00 PM, Snohomish County, Washington, then and there to give evidence in the above-entitled cause pending, and to remain in attendance at assigned court until discharged by the Court.

Dated this 8th day of October, 2004

JOHN S. ADCOCK #15714
Deputy Prosecuting Attorney

| PA Number | Originating Agency | Originating Case # | Offense Date |
| --- | --- | --- | --- |
| 03F04554 | SSO | 0325124 | 11/5/2003 |

Mailed 10/11/04

EXHIBIT
15

Findings of Fact
And Conclusion of Law
3.5/3.6
Sheridian Testimony

FILED

2005 FEB -4 PM 2:09

PAM L. DANIELS
COUNTY CLERK
SNOHOMISH CO. WASH.

SUPERIOR COURT OF WASHINGTON
FOR SNOHOMISH COUNTY

THE STATE OF WASHINGTON,

Plaintiff,

v.

RUTH, MATTHEW ROBERT,

Defendant.

03-1-02451-6 TB

No. ~~04-1-02451-6~~

FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO CRIMINAL RULES 3.5/3.6

On December 7th, 2004, a hearing was held on the defendant's motion to suppress statements and written evidence. The court considered the testimony of the witnesses at the hearing and the arguments and memoranda of counsel. Being fully advised, the court now enters the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

During the latter part of December 2003, the defendant was an inmate housed at the Snohomish County jail awaiting trial of this matter. During this time period, the defendant was housed in a module with a second inmate, Jeremy Sheridan. Sheridan was serving time for a community supervision violation. Late in December 2003, the defendant introduced himself to Sheridan. The defendant told Sheridan that he shot two men. The defendant wanted Sheridan to contact the two victims in the case and persuade them to change their statements to police regarding the shooting. If this did not succeed, the defendant wanted Sheridan to make the two

victims disappear before trial. The defendant also wanted Sheridan to persuade a third witness, Renee Woerner, to change her statement to police regarding the shooting. The defendant offered to pay Sheridan $1,500 dollars to accomplish this.

The defendant subsequently wrote out five pages of instructions regarding his plan and gave them to Sheridan. Sheridan saw the defendant write out these instructions.

On January 15th, 2004, Sheridan attempted telephone contact with Snohomish County Sherrif's Office Detective Brad Pince. Detective Pince did not answer. Sheridan left Detective Pince a voicemail. The voicemail indicated that Sheridan had been contacted by the defendant and that the defendant had tried to enlist Sheridan in a plot to have witnesses change their stories or disappear before trial.

Upon receiving this message, Detective Pince contacted Snohomish County Detective Kelly Willoth and advised her of Sheridan's voicemail. Detective Willoth was the lead detective on the case. Detective Pince did not have any personal contact with Sheridan about this or any other matter.

On January 15th, 2004, Detective Willoth went to the Snohomish County jail and interviewed Sheridan. Sheridan advised Willoth that he had been approached by the defendant and that the defendant had asked Sheridan to get the two victims and a witness in the case, Renee Woerner, to change their statements to police regarding the shooting. The defendant also asked Sheridan to make the two victims disappear before trial. Given the defendant's demeanor, Sheridan believed the defendant wanted the two victims killed. The defendant offered to pay Sheridan $1500 for this purpose. Sheridan also turned over to Detective Willoth, five pages of written material setting out a plan and contact telephone numbers. Sheridan advised Detective Willoth that he received this material from the defendant and that he had

watched the defendant write the material out. Sheridan did not ask Detective Willoth for consideration of any kind for providing this information to Detective Willoth. Sheridan did not receive any consideration from the State for providing this information to Detective Willoth. Detective Willoth tape-recorded her interview with Sheridan. Detective Willoth did not instruct, command, request or suggest to Sheridan that he try and gather any additional information about the case from the defendant and Sheridan did not do so.

## II. CONCLUSIONS OF LAW

The defendant voluntarily initiated contact with Sheridan. At the time of the contact, Sheridan was simply another inmate housed in the same module at the Snohomish County jail. At the time Sheridan had contact with the defendant and received written material from him about the case, he was not acting as an agent of the state. In fact, Sheridan was never an agent of the state during these contacts as it relates to CRr 3.5 and 3.6. Detectives Pince and Willoth never instructed, commanded, requested or suggested to Sheridan that he try and obtain any information from the defendant about the case. Detectives Pince and Willoth merely received and recorded information that Sheridan on his own obtained from the defendant. As such, Sheridan cannot be considered to be an agent of the state as it relates to the information he received from the defendant. There was no violation by the state of the defendant's rights pursuant to CRr 3.5 and 3.6.

The statements made by the defendant to Sheridan as well as the written material the defendant gave to Sheridan are admissible in the State's case in chief at the trial of this matter.

DONE IN OPEN COURT this ~~28~~ 4th day of ~~Dec~~ Feb 2005, 2004.

JUDGE
HON. DAVID HULBERT

Presented by:

Deputy Prosecuting Attorney
J. ADCOCK #15214

Copy received this _________ day of _____________, 2004.

Approved as to form

Attorney for Defendant

Defendant

ExhiBit
16

Designation of clerk's pappers
SuPPlemental
COA No. 56318-1-I

THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY

| | |
|---|---|
| STATE OF WASHINGTON<br><br>*Respondent,*<br><br>*v.*<br><br>MATTHEW RUTH,<br><br>*Appellant.* | CAUSE NO. 03-1-02451-6<br><br>DESIGNATION OF CLERK'S PAPERS SUPPLEMENTAL<br>COURT OF APPEALS NO. 56318-1-I<br><br>Clerk's Action Required |

TO: Superior Court Clerk

Please prepare and transmit to the Court of Appeals, Division One, the following Clerk's Papers and Exhibits.

| Exhibit No. | Exhibit |
|---|---|
| 23 | 8.5" x 11" original: Portrait photo taken from bathroom into bedroom |
| 25 | 8.5" x 11" original: Landscape photo showing closet |
| 26 | 8.5" x 11" original: Landscape photo showing bed |
| 27 | 8.5" x 11" original: Landscape photo, taken from bathroom toward bedroom |
| 28 | 8.5" x 11" original: Landscape photo close-up of bedding |
| 29 | 8.5" x 11" original: Landscape photo, electrical outlet on left |

NIELSEN, BROMAN & KOCH, P.L.L.C.
1908 East Madison Street
Seattle, WA 98122
(206) 623-2373

46 Small evidence bag

DATED this 8th day of February, 2006.

Andrew Zinner, WSBA ID No. 18631
NIELSEN, BROMAN & KOCH P.L.L.C.
Attorneys for Appellant

Today I deposited in the mails of the United States of America a properly stamped and addressed envelope directed to attorneys of record of ~~respondent/appellant/plaintiff~~ containing a copy of the document to which this declaration is attached. Snohomish Co. clerk + pros.
I certify under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

Name Done in Seattle, WA Date 2-8-06

RECEIVED
COURT OF APPEALS
DIVISION ONE

FEB - 8 2006

NIELSEN, BROMAN & KOCH, P.L.L.C.
1908 East Madison Street
Seattle, WA 98122
(206) 623-2373